LATHAM & WATKINS LLP
  Daniel M. Wall (Bar No. 102580)
    *dan.wall@lw.com*
  Timothy L. O'Mara (Bar No. 212731)
    *tim.o'mara@lw.com*
  Andrew M. Gass (Bar No. 259694)
    *andrew.gass@lw.com*
  Kirsten M. Ferguson (Bar No. 252781)
    *kirsten.ferguson@lw.com*
  Alicia R. Jovais (Bar No. 296172)
    *alicia.jovais@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  +1.415.391.0600
Facsimile:  +1.415.395.8095

*Attorneys for Defendants Ticketmaster L.L.C.
and Live Nation Entertainment, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated, | Case No. 2:22-cv-00047-GW-GJS |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION** |
| v. | |
| Live Nation Entertainment, Inc., and Ticketmaster LLC, | The Honorable George H. Wu |
| Defendants. | Hearing Date: May 26, 2022 |
| | Hearing Time: 8:30 a.m. |
| | Courtroom: 9D, 9th Floor |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND ...................................................................... 3

    A.    Plaintiffs' Ticket Purchases & Agreement to the
        Amended Terms ................................................................................. 4

    B.    The Current Terms of Use ............................................................... 7

    C.    New Era ............................................................................................. 8

III.  LEGAL STANDARD ............................................................................... 10

IV.   ARGUMENT ........................................................................................... 11

    A.    The Terms Constitute a Valid, Enforceable Agreement .............. 11

    B.    The Parties Clearly and Unmistakably Delegated
        Arbitrability to the Arbitrator ....................................................... 13

    C.    Replacing JAMS with New Era—an Arbitration Provider
        That Has Procedures in Place to Litigate Mass
        Arbitrations—Does Not Render the Terms
        Unconscionable ............................................................................... 14

        1.    New Era's Procedures for Mass Arbitrations Are
               Fair, Equitable, and Mirror the MDL Procedures
               Used By Courts ..................................................................... 15

        2.    New Era's Subscription Option Is Not
               Unconscionable ..................................................................... 20

        3.    The $300 Filing Fee Is Not Unconscionable ......................... 22

        4.    The Attorneys' Fees Provisions Are Not
               Unconscionable ..................................................................... 23

    D.    Even If the New Era Arbitration Agreement Were
        Unenforceable, Plaintiffs Would Still Be Required to
        Arbitrate ......................................................................................... 24

    E.    This Action Should Be Dismissed ................................................. 25

V.    CONCLUSION ........................................................................................ 25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Abernathy v. DoorDash, Inc.*,
    438 F. Supp. 3d 1062 (N.D. Cal. 2020) ........................................................22

*Adams v. Postmates, Inc.*,
    2020 WL 1066980 (N.D. Cal. Mar. 5, 2020) ..................................................22

*Ajzenman v. Office of Comm'r of Baseball*,
    No. CV 20-3643, 2020 WL 6031899 (C.D. Cal. Sept. 14, 2020) ...............5, 12

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ...................................................................................11, 24

*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015)....................................................................11, 14

*Carmax Auto Superstores Cal. LLC v. Hernandez*,
    94 F. Supp. 3d 1078 (C.D. Cal. 2015)..............................................................17

*Dickey v. Ticketmaster LLC*,
    No. CV 18-9052, 2019 WL 9096443 (C.D. Cal. Mar. 12, 2019) ..........1, 12, 13

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) .......................................................................10, 15, 25

*Fleming v. Weather Shield Mfg., Inc.*,
    No. 18-00589, 2018 WL 6010365 (C.D. Cal. May 14, 2018) .........................22

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991) ..........................................................................................20

*Hansen v. Ticketmaster Entm't, Inc.*,
    No. 20-cv-02685, 2020 WL 7319358 (N.D. Cal. Dec. 11, 2020)...............5, 11

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    139 S. Ct. 524 (2019) .....................................................................................11

*Himber v. Live Nation Worldwide, Inc.*,
    No. 16-CV-5001, 2018 WL 2304770 (E.D.N.Y. May 21, 2018) ...............4, 14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

*Hodges v. Comcast Cable Commc'ns,*
  21 F.4th 535 (9th Cir. 2021) ............................................................ 15

*In re Grice,*
  974 F.3d 950 (9th Cir. 2020) ........................................................... 10

*In re Holl,*
  925 F.3d 1076 (9th Cir. 2019) .......................................................... 12

*In re Zimmer M/L Taper Hip Prosthesis,*
  MDL No. 2859, 2022 U.S. Dist. LEXIS 11866 (S.D.N.Y. Jan. 21,
  2022) .................................................................................................. 18

*In re Zyprexa Prod. Liab. Litig.,*
  467 F. Supp. 2d 256 (E.D.N.Y. 2006) .............................................. 18

*Johnmohammadi v. Bloomingdale's, Inc.,*
  755 F.3d 1072 (9th Cir. 2014) .......................................................... 25

*Johnson v. Oracle Am., Inc.,*
  No. 17-cv-05157, 2017 WL 8793341 (N.D. Cal. Nov. 17, 2017) ................... 13

*Lee v. Ticketmaster L.L.C.,*
  817 F. App'x 393 (9th Cir. 2020) ........................................... 5, 6, 12

*Lee v. Ticketmaster L.L.C.,*
  No. 18-CV-05987-VC, 2019 WL 9096442 (N.D. Cal. Apr. 1,
  2019), aff'd, 817 F. App'x 393 (9th Cir. 2020) ......................... 12, 14

*McGrath v. DoorDash, Inc.,*
  No. 19-cv-05279, 2020 WL 6526129 (N.D. Cal. Nov. 5, 2020) .................. 19

*McManus v. CIBC World Markets Corp.,*
  109 Cal. App. 4th 76 (2003) ............................................................ 17

*Nevarez v. Forty Niners Football Co., LLC,*
  No. 16-CV-07013, 2017 WL 3492110 (N.D. Cal. Aug. 15, 2017) .......... 12, 14

*Oberstein v. Live Nation Entertainment, Inc.,*
  No. CV 20-3888, 2021 WL 4772885 (C.D. Cal. Sept. 20, 2021) ............passim

*Ortiz v. Volt Mgmt. Corp.,*
  No. 16-cv-07096, 2017 WL 1957072 (N.D. Cal. May 11, 2017) .................. 23

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

*Payne v. Tennessee*,
    501 U.S. 808 (1991) ........................................................................................ 18

*Peterson v. Lyft*,
    No. 16-cv-07343, 2018 WL 6047085 (N.D. Cal. Nov. 19, 2018) .................. 25

*Pokrass v. The DirecTV Grp., Inc.*,
    No. EDCV 07-423, 2008 WL 2897084 (C.D. Cal. July 14, 2008) ................. 15

*Sanchez v. Valencia Holding Co., LLC*,
    61 Cal. 4th 899 (2015) .............................................................................. 14, 15

*Sandquist v. Lebo Auto., Inc.*,
    1 Cal. 5th 233 (2016) ............................................................................... 20, 21

*Shoals v. Owens & Minor Distrib., Inc.*,
    No. 2:18-CV-2355, 2018 WL 5761764 (E.D. Cal. Oct. 31, 2018) ................ 22

*Tompkins v. 23andMe, Inc.*,
    840 F.3d 1016 (9th Cir. 2016) ................................................................. 22, 23

**STATUTES**

28 U.S.C. § 1407(a) ............................................................................................ 16

9 U.S.C. § 2 ........................................................................................................ 10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

1  **I.      INTRODUCTION**

2          This case is <u>identical</u> to another case that this Court sent to arbitration less

3  than six months ago: *Oberstein v. Live Nation Entertainment, Inc.*, No. CV 20-3888,

4  2021 WL 4772885 (C.D. Cal. Sept. 20, 2021) (Wu, J.).  It is brought by the same

5  plaintiffs' counsel.  The allegations are the same.  The putative classes are the same.

6  The claims are the same.  Indeed, the complaint in this case is a nearly word-for-

7  word copy of the *Oberstein* complaint.  Why, then, are we here—yet again—and not

8  in arbitration?

9          We are here because Plaintiffs are attacking as unconscionable one change

10  that Ticketmaster and Live Nation made to their Terms of Use ("Terms") last year:

11  the current Terms select New Era ADR ("New Era") as the default arbitration

12  provider; by contrast, the prior version of the Terms (i.e., the one at issue in

13  *Oberstein*) selected JAMS.  Nothing else has changed in the intervening months that

14  could somehow compel a different result than the one the Court reached so recently

15  in *Oberstein*, after more than a year of litigation over the proper forum for Plaintiffs'

16  claims.  This case thus presents a single, narrow question: can Plaintiffs get out of

17  arbitration, despite their repeated agreement to it, simply because the Terms now

18  select New Era as the arbitration provider?

19          No.  As this Court has ruled numerous times now, the Terms are "clear and

20  unmistakable" in delegating enforceability issues to the arbitrator, not the Court.

21  *Oberstein*, 2021 WL 4772885, at *7; *Dickey v. Ticketmaster LLC*, No. CV 18-9052,

22  2019 WL 9096443, at *8 (C.D. Cal. Mar. 12, 2019).  And, in any event, there is

23  nothing about New Era that's remotely sub-standard for the industry, let alone

24  *unconscionable*, as the law would require for Plaintiffs' improbable gambit to

25  prevail.  Plaintiffs do not like New Era because, unlike JAMS and other arbitration

26  providers, New Era offers comprehensive rules and procedures to administer and

27  adjudicate mass individual consumer arbitrations on the merits.  Mass arbitrations

28  are a new but increasingly common strategy, pioneered by Plaintiffs' counsel in this

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

case, Keller Lenkner.  That strategy capitalizes on the fact that other arbitration providers (like JAMS) do <u>not</u> have pre-established rules and procedures in place to deal with the circumstance in which the same plaintiffs' counsel seeks to bring thousands of individual consumer claims.  As a result, at JAMS, the parties have to confront anew, with respect to each suite of cases, the question of how to administer numerous claims raising the same issues—on topics ranging from how to deal with filing fees, to how to stage and order the overlapping litigations, and beyond.

New Era's rules and procedures solve these problems.  They use a "bellwether" approach that mirrors not only the well-accepted MDL process used by federal courts, but also the process that Plaintiffs' own counsel have proposed for other mass arbitrations.  That process facilitates the arbitration of mass individual consumer claims efficiently and fairly, and thereby *promotes* arbitration—exactly as the Federal Arbitration Act intends.  Far from being *unconscionable*, New Era's rules and procedures are a material *improvement* over JAMS's.

Moreover, in assessing Plaintiffs' bid to override their repeated agreement to arbitration, it is important to take a step back and look at what the operative contract between Plaintiffs and Defendants actually says.  The Terms are clear that, if New Era cannot conduct the arbitration for <u>any</u> reason, the arbitration will be conducted by another arbitration provider: FairClaims.  And if FairClaims cannot conduct the arbitration for <u>any</u> reason, the parties will mutually select another arbitration provider to conduct the arbitration.  In other words, if the Court for some reason reached the question of enforceability *and* found that New Era's rules and procedures were unconscionable, the result would <u>not</u> be what Plaintiffs seek here: a class action in federal court.  The case would proceed in arbitration, just in front of a different arbitrator.

Plaintiffs are essentially asking the Court to issue an advisory opinion on the enforceability of New Era's rules and procedures, even though the Terms clearly and unmistakably delegate enforceability issues to the arbitrator.  Indulging the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

suggestion that the Court could and should tackle that issue, the result would be that New Era's rules and procedures are absolutely enforceable; it is not even a close question. But at the end of the day, there is *no* possible result here that would culminate in a federal class action. This case—just like *Oberstein*—must be sent to arbitration. To say that Plaintiffs' counsel are wasting the Court's time is an understatement.

## II.    FACTUAL BACKGROUND

On September 20, 2021, this Court granted Ticketmaster and Live Nation's motion to compel arbitration in the *Oberstein* case, finding that: (1) Ticketmaster and Live Nation's websites provided sufficient constructive notice of the Terms, thereby binding users to the Terms; (2) the authority to decide Plaintiffs' argument that their claims fell within an exception to the arbitration agreement had been clearly and unmistakably delegated to the arbitrator; and (3) the delegation clause itself was not unconscionable. *Oberstein*, 2021 WL 4772885, at *6-9. A month later, Plaintiffs appealed the Court's order to the Ninth Circuit. *See Oberstein v. Live Nation Entm't, Inc.*, No. 21-56200 (9th Cir. Oct. 29, 2021), ECF No. 1. That appeal is pending, and the parties are currently in the midst of briefing.

In the meantime, the same counsel initiated this case. The allegations, putative classes, and claims are the same. Indeed, with the exception of five paragraphs that Plaintiffs' counsel added at the beginning of the complaint (and the substitution of different named plaintiffs), the complaint here is a nearly identical, word-for-word copy of the *Oberstein* complaint. *Compare Heckman* Compl., ECF No. 1, *with Oberstein* Compl., No. CV 20-3888, ECF No. 1; *see also* Pls.' Notice of Related Cases at 2, ECF No. 5 (conceding that the cases are "substantively identical"). Those five paragraphs reveal the one thing that is "new" about this case: the named Plaintiffs here all agreed to the current Terms, in effect since July 2, 2021, which select New Era as the arbitration provider, rather than JAMS.

Ticketmaster and Live Nation's websites continue to provide "sufficient

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

1    constructive notice as required for mutual assent," *Oberstein*, 2021 WL 4772885, at

2    *7, and nothing has changed in the intervening months that would alter that

3    conclusion.  Nor do Plaintiffs allege otherwise.  Nevertheless, we will briefly walk

4    through Plaintiffs' recent purchases, the notices of the Terms that they saw, and the

5    substance of the Terms that they agreed to—repeatedly.

6         **A.    Plaintiffs' Ticket Purchases & Agreement to the Amended Terms**

7         During the putative class period, Plaintiffs have made over 200 purchases

8    from Defendants' websites: Skot Heckman purchased tickets more than 30 times,

9    Luis Ponce purchased tickets more than 50 times, Jeanene Popp purchased tickets

10   more than 30 times, and Jacob Roberts purchased tickets more than 90 times.  Decl.

11   of H. Green in Support of Defs.' Mot. to Compel Arb. ("Green Decl.") ¶¶ 5, 12, 20,

12   27.  More specifically, since Defendants amended the Terms on July 2, 2021—on

13   the Ticketmaster mobile and desktop sites alone—Heckman purchased tickets on

14   <u>four</u> separate occasions, Ponce purchased tickets on <u>five</u> separate occasions, Popp

15   purchased tickets on <u>eight</u> separate occasions, and Roberts purchased tickets on <u>five</u>

16   separate occasions.  *Id*. ¶¶ 6, 13, 21, 28.

17        In order to make those purchases, Plaintiffs had to assent to the current Terms

18   multiple times—including each time they signed into their accounts, and each time

19   they placed an order.[1]  For example, when Plaintiffs made their post-July 2, 2021

20   purchases on the Ticketmaster desktop and mobile sites, they were required to sign

21   in to their accounts in order to make every purchase.  And each time they did that,

22   they were notified: "By continuing past this page, you agree to the **Terms of Use**

23

24   [1]   Users also have to agree to the Terms when they create their accounts; and, at
     the bottom of virtually every Live Nation and Ticketmaster website page that users
25   navigate in the ticket selection and purchase process, there is a notice that, by using
     the site, users are agreeing to the Terms.  *See* Decl. of K. Tobias in Support of Defs.'
26   Mot. to Compel Arb. ("Tobias Decl.") ¶¶ 5, 14, 16, 25.  Each of these additional
     points of assent are valid and binding.  *See, e.g.*, *Oberstein*, 2021 WL 4772885, at
27   *6-7; *Himber v. Live Nation Worldwide, Inc.*, No. 16-CV-5001, 2018 WL 2304770,
     at *5 (E.D.N.Y. May 21, 2018).  But to streamline this motion, the factual discussion
28   will focus on the named Plaintiffs' post-July 2, 2021 acceptances of the current
     Terms at the point of sign-in and the point of purchase.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

1    and understand that information will be used as described in our **Privacy Policy**."
2    The words "Terms of Use" appeared in bold, color-contrasting text, immediately
3    above the "Sign In" button, and hyperlinked to the full text of the current Terms:



4
5
6
7
8
9
10
11
12
13

14    *See* Tobias Decl. ¶ 7.  This is the <u>exact same</u> notice that the named plaintiffs saw in
15    *Oberstein*, and that this Court (and others) found constitute constructive notice,
16    binding users to the Terms.  *Oberstein*, 2021 WL 4772885, at *6-7; *Hansen v.*
17    *Ticketmaster Entm't, Inc.*, No. 20-cv-02685, 2020 WL 7319358, at *1, *5 (N.D. Cal.
18    Dec. 11, 2020); *Ajzenman v. Office of Comm'r of Baseball*, No. CV 20-3643, 2020
19    WL 6031899, at *1-2, *4 (C.D. Cal. Sept. 14, 2020); *see also Lee v. Ticketmaster*
20    *L.L.C.*, 817 F. App'x 393, 394-95 (9th Cir. 2020) (substantially identical notice).
21    Since July 2, 2021, Heckman would have seen this notice on Ticketmaster's sites at
22    least <u>four</u> times; Ponce would have seen it at least <u>five</u> times; Popp would have seen
23    it at least <u>eight</u> times; and Roberts would have seen it at least <u>five</u> times.[2]

24          In order to complete each of their post-July 2, 2021 purchases on the
25    Ticketmaster desktop and mobile sites, Plaintiffs also would have been required to
26    check a box affirmatively acknowledging their acceptance of the current Terms.

27    _____
28    [2]    Roberts also saw this notice on Live Nation's sites at least four more times
      since July 2, 2021.  *See* Green Decl. ¶ 28; Tobias Decl. ¶ 18 & Exs. 17-18.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

Specifically, depending on whether the particular event had special protocols related to COVID-19 in place at the time of purchase, Plaintiffs would have seen either: (a) "**I have read and agree to the current Terms of Use**," as shown in the excerpt below, or (b) "**I have read and agree to the current Terms of Use**," plus the event's COVID disclosure, as shown in the other excerpt below, for example. Tobias Decl. ¶¶ 10-11.[3]   Either way, the notice required the user to check a box affirming their agreement to the Terms to make the purchase.   The notice appeared in bold font, with the words "**Terms of Use**" in color-contrasting text (hyperlinked to the full text of the current Terms), immediately above the "Place Order" button:



*See* Tobias Decl. ¶ 10.   This notice is similar to the one that this Court found constituted constructive notice (thereby binding users to the Terms) in *Oberstein*— it appears in bold, color-contrasting, hyperlinked text immediately above the "Place Order" button.   *Oberstein*, 2021 WL 4772885, at *6-7; *see also Lee*, 817 F. App'x at 394-95 (reaching the same conclusion, on *de novo* review, with respect to substantially identical notice on Ticketmaster's purchase page); Tobias Decl. ¶ 13 & Exs. 11-12 (screenshots of notices at issue in *Oberstein*).   But in contrast to the notice at issue in *Oberstein*, the purchase page notice in this case also required Plaintiffs to check a box affirming their agreement to the current Terms.[4]   And since July 2, 2021,

---

[3]   Each of the Plaintiffs saw (and checked the box in) version (a)—i.e., "**I have read and agree to the current Terms of Use**," without a COVID disclosure—on at least one occasion since July 2, 2021.   *See* Green Decl. ¶¶ 8, 16, 23, 31; Tobias Decl. ¶¶ 10-11, 21-22.

[4]   Notably, in *Oberstein*, Plaintiffs' counsel complained that the notice on the purchase page did not include such a checkbox, arguing that, without it, the notice was "inconspicuous."   Pls.' Opp'n to Am. Mot. to Compel Arb. at 2, *Oberstein*, No. CV 20-3888 (C.D. Cal. Mar. 19, 2021), ECF No. 92-1.   The Court rejected that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

1    Heckman has checked that box on Ticketmaster's sites <u>four</u> times, Ponce has

2    checked it <u>five</u> times, Popp has checked it <u>eight</u> times, and Roberts has checked it

3    <u>five</u> times.[5]  Each and every time they did so, Plaintiffs affirmed their agreement to

4    the "**current Terms of Use**."

5        **B.    The Current Terms of Use**

6        Over the years, Defendants have revised the Terms from time to time.  Tobias

7    Decl. ¶ 28.  The current Terms have been in effect since July 2, 2021.  *Id.*  The core

8    provisions of those Terms are substantially the same as prior versions enforced by

9    this Court and others: like those prior versions, the current Terms provide for

10   binding, individual arbitration, state that the arbitration agreement is governed by

11   the Federal Arbitration Act ("FAA"), and delegate the power to decide arbitrability

12   to the arbitrator.  *Compare id*. Exs. 29 & 30, *with id*. Exs. 31-35 & 36-40.  The

13   primary difference is the arbitration provider.  The prior version of the Terms (at

14   issue in *Oberstein*) selected JAMS.  By contrast, the current version provides:

15            Any arbitration will be administered by New Era ADR in
16            accordance with their Virtual Expedited Arbitration Rules
              and Procedures, as well as any applicable General Rules
17            and Procedures, except as modified by the Terms ….

18            In the event that New Era ADR is unable to conduct the
              arbitration for any reason, the arbitration will be conducted
19            by FairClaims pursuant to its FastTrack Rules &
              Procedures, and/or any applicable rules for consumer
20            arbitrations, available at www.fairclaims.com.   In the
              event that FairClaims is unable to conduct the arbitration
21            for any reason, you and we will mutually select an
              alternative arbitration provider, and the arbitration will be
22            conducted pursuant to that provider's applicable rules ….

23   *Id*. Ex. 29 at 8 & 30 at 12.

24

25

26   argument, finding "that the Defendants' websites already provide adequate
     constructive notice as is." *Oberstein*, 2021 WL 4772885, at *6.  Nevertheless, for
27   almost two years now, the purchase page has included the checkbox that Plaintiffs'
     counsel claimed was needed to bind users to the Terms.  Tobias Decl. ¶ 11.

28   [5]      Roberts also checked this box *four more times* on Live Nation's sites.  Green
     Decl. ¶ 28; Tobias Decl. ¶ 21 & Exs. 21-24.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

## C.     New Era

JAMS's rules and procedures are designed for traditional, one-off arbitrations—for example, where one consumer brings claims against a company in a standalone case.  But there is a new and increasingly common trend in arbitration: mass individual arbitrations, in which hundreds or thousands (and sometimes tens of thousands) of individual, but otherwise identical, claims are brought in arbitration. Keller Lenkner, Plaintiffs' counsel in this case, pioneered this strategy—starting first with mass numbers of employment claims, and expanding more recently to mass numbers of consumer claims.[6]   JAMS, however, does not have _any_ rules or procedures in place for mass individual arbitrations, employment or consumer.[7] How will thousands of individual arbitrations be administered and actually arbitrated—and on what timeline?  How will arbitrators for so many cases be appointed?  How will discovery be conducted?  Will there be a process to avoid inconsistent rulings on common issues?  What fees should be assessed when there are thousands of nearly identical claims?[8]  There are no rules or procedures in place

---

[6]     _See, e.g._, Opp'n to Mot. to Compel Arb. at 3, _Abadilla et al. v. Uber Techs., Inc._, No. 3:18-cv-07343 (N.D. Cal. Jan. 14, 2019), ECF No. 53 (Keller Lenkner filed 12,501 employment arbitrations against Uber in 2018); Opp'n to Am. Mot. to Compel Arb. at 6, _Abernathy et al. v. DoorDash, Inc._, No. 3:19-cv-07545 (N.D. Cal. Jan. 16, 2020), ECF No. 157 (Keller Lenkner filed 6,250 employment arbitrations against DoorDash in 2019-2020); R. Cole Decl. ¶¶ 18-19, _In re Intuit Free File Litig._, No. 3:19-cv-02546 (N.D. Cal. Dec. 7, 2020), ECF No. 192 (Keller Lenkner filed over 100,000 consumer arbitrations against Intuit in 2019 and 2020).

[7]     As of the date of filing, none of the old establishment arbitration providers (JAMS, AAA, CPR) have adopted pre-established rules and procedures for administering mass individual arbitrations of consumer claims (like the ones asserted by Plaintiffs here).  CPR does offer special rules and procedures for mass arbitrations of employment claims, but those rules and procedures do not apply to consumer claims.  _See_ Decl. of T. O'Mara in Support of Defs.' Mot. to Compel Arb. ("O'Mara Decl.") Ex. C (CPR Employment-Related Mass Claims Protocol).

[8]     JAMS's rules, for example, require an up-front filing fee of $1,750 for each case, regardless of whether it's a standalone or one of 10,000 individual (but otherwise identical) cases filed at the same time.  _See_ JAMS Arbitration Schedule of Fees and Costs, www.jamsadr.com/arbitration-fees (last visited Mar. 8, 2022).  In either case, the company pays $1,500 of the fee, and the claimant pays $250 (unless the claimant can demonstrate an inability to pay, in which case the company pays the entire $1,750).  _Id._; JAMS Consumer Arbitration Minimum Standards, www.jamsadr.com/consumer-minimum-standards/ (last visited Mar. 8, 2022).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

to answer these questions.  As a result, the parties involved in mass individual arbitrations end up embroiled in contentious negotiations over how to conduct discovery and arbitrate the claims (e.g., bellwether arbitrations, consolidation, etc.), over the number and type of arbitrators, and over whether the typical fees should be modified.  Those negotiations can last for months, even years. Adjudication of claims on the merits is, at best, delayed and sometimes never occurs at all.[9]

New Era, founded in 2020, stepped in to fill the void.  Unlike other arbitration providers, it offers comprehensive rules and procedures to administer and adjudicate both traditional, standalone arbitrations <u>and</u> mass individual consumer arbitrations efficiently—and to conclusion, on the merits.  The rules and procedures for mass arbitrations apply where the presiding neutral[10] determines that more than five arbitrations have been filed that present common issues.  O'Mara Decl. Ex. A, Rules 2(x), 6(b) ("New Era Rules").  In such cases, the arbitrations will be subject to a bellwether process which (as explained in more detail in Section IV.C.1, below) mirrors the process routinely used by federal courts in multi-district litigations ("MDLs").  *See* New Era Rules 6(b)(ii)(1) & 6(b)(iii)(3).

---

Multiply those numbers by 5,000 arbitrations, and the upfront fees (to say nothing of the administration fees, all paid by the company) quickly become astronomical, making the prospect of arbitrating the cases on the merits a dim one.

[9]      *See, e.g.*, Mot. to Compel Arb. at 9-10, *Abadilla et al. v. Uber Techs., Inc.*, No. 3:18-cv-07343 (N.D. Cal. Dec. 5, 2018), ECF No. 3 (parties spent <u>nine months</u> trying to work out mass arbitration procedures: arbitrations filed August-November 2018; parties unsuccessfully attempted to negotiate process for arbitrating the merits; plaintiffs then moved to compel arbitration; case was voluntarily dismissed in May 2019); Opp'n to Am. Mot. to Compel Arb. at 4-11, *Abernathy et al. v. DoorDash, Inc.*, No. 3:19-cv-07545 (N.D. Cal. Jan. 16, 2020), ECF No. 157 (parties spent over <u>1.5 years</u> trying to work out mass arbitration procedures: arbitrations threatened in March 2019, and filed in July-September 2019; parties and AAA unsuccessfully attempted to negotiate workable fee schedule and process for handling demands; plaintiffs then moved to compel arbitration, which the court granted, in part, in February 2020; case was voluntarily dismissed in December 2020).

[10]      The neutral is selected by the parties using a rank-and-strike process. *See* New Era Rules 2(j) & 6(b)(iii).  New Era neutrals are members of the National Academy of Distinguished Neutrals, which accepts only professional neutrals who are referred by at least two current members and have arbitrated at least 20 civil cases to final award or mediated at least 200 private civil disputes. Our Neutrals, New Era ADR, www.neweraadr.com/neutrals/ (last visited Mar. 6, 2022); Membership Requirements, www.nadn.org/membership (last visited Mar. 6, 2022).

New Era offers two pricing options for its services: (1) a "pay as you go" option, where, for each arbitration filed, the company pays $9,500 and the consumer pays $500, New Era Rules 1(a)(ii), 6(a)(iii)(1)(c); or (2) a subscription option, which consists of an annual subscription fee (paid by the company), plus a reduced per-case filing fee (i.e., $300 instead of $500), New Era Rule 1(e)(i).[11]  The New Era Rules provide an example of how these two options compare: if 100 mass individual arbitrations were filed with New Era, a non-subscribing company would be charged $950,000 (100 x $9,500), and each claimant would pay a $500 fee; by contrast, a subscribing company with a $250,000 annual subscription would pay its $250,000 subscription fee, and each claimant would pay a reduced fee of $300.  New Era Rules 1(e)(i)(5), 1(a)(ii), 6(a)(iii)(1)(d).  Defendants have a subscription with New Era.

## III.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs Plaintiffs' claims.  *See* Tobias Decl. Exs. 29-40 (current and prior versions of the Terms, stating that the FAA governs).  Under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Congress enacted the FAA in order "to replace [a] widespread judicial hostility" toward arbitration "with a liberal policy favoring arbitration."  *In re Grice*, 974 F.3d 950, 955 (9th Cir. 2020).  This liberal policy applies specifically to the parties' chosen arbitration rules and procedures: "[n]ot only did Congress require courts to respect and enforce agreements to arbitrate; it also specifically directed them to respect and enforce the parties' chosen arbitration procedures."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018).  Courts must "rigorously … enforce arbitration agreements according to their terms, including terms that specify … *the rules* under which that arbitration will be conducted."  *Id.*

---

[11]   Under the subscription option, the reduced per-case filing fee may be allocated to consumers and/or the company, pursuant to the parties' arbitration agreement; the subscription fee, however, is paid entirely by the company.  New Era Rules 1(a)(iii)(1), 1(e)(i)(3)-(4).

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

10

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

1   (emphasis in original).  By "affording parties discretion in designing arbitration

2   processes," the FAA promotes "efficient, streamlined procedures tailored to the type

3   of dispute."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).

4           Pursuant to the FAA's strong policy favoring arbitration, the district court's

5   role in ruling on a motion to compel arbitration is typically "limited to determining:

6   (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the

7   agreement encompasses the dispute at issue."  *Oberstein*, 2021 WL 4772885, at *2.

8   But where (as here) the parties delegate to the arbitrator the power to decide gateway

9   arbitrability issues—such as the scope and enforceability of the arbitration

10  agreement—the district court's inquiry is even more limited.  "[I]f a valid agreement

11  exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court

12  may not decide the arbitrability issue."  *Henry Schein, Inc. v. Archer & White Sales,*

13  *Inc.*, 139 S. Ct. 524, 530 (2019).  To determine whether there is a valid delegation,

14  the court undertakes a limited inquiry into whether the parties "clearly and

15  unmistakably" delegated the power to decide arbitrability to the arbitrator.  *Brennan*

16  *v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

17  **IV.   ARGUMENT**

18          **A.   The Terms Constitute a Valid, Enforceable Agreement**

19          There is no question that each Plaintiff in this case repeatedly (dozens if not

20  hundreds of times) agreed to various versions of the Terms over the years, and that

21  each Plaintiff repeatedly agreed to the <u>current</u> Terms over the past eight months.

22          In particular, since July 2, 2021, Plaintiffs assented to the current Terms each

23  time they signed in to their accounts (which they were required to do in order to

24  purchase tickets).  *See* Tobias Decl. ¶¶ 7-9, 18-20.  Specifically, at the point of sign-

25  in, Plaintiffs were presented with a notice that this Court has already found is

26  conspicuous and binds users to the Terms.  *See Oberstein*, 2021 WL 4772885, at *6-

27  7 (exact same notice at sign-in "provided sufficient constructive notice as required

28  for mutual assent"); *see also Hansen*, 2020 WL 7319358, at *1, *5 (exact same

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

11

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

1   notice at sign-in bound users to the Terms); *Ajzenman*, 2020 WL 6031899, at *2, *4

2   (same); *Lee*, 817 F. App'x at 394-95 (same conclusion, on *de novo* review, with

3   respect to substantially identical notice at sign-in).

4        The notice at sign-in alone binds Plaintiffs to the current Terms.[12]  But there's

5   more: since July 2, 2021, each Plaintiff also checked a box, *many times*, affirming

6   that they read and agreed to the current Terms.  *See* Tobias Decl. ¶¶ 10-12, 21-23.

7   This Court and others have repeatedly found that similar notices (without the

8   additional step of a checkbox) on Defendants' purchase pages are conspicuous and

9   bind users to the Terms.  *See Oberstein*, 2021 WL 4772885, at *6-7; *Lee*, 817 F.

10   App'x at 394-95; *Ajzenman*, 2020 WL 6031899, at *2, 4; *Nevarez v. Forty Niners*

11   *Football Co., LLC*, No. 16-CV-07013, 2017 WL 3492110, at *7-10 (N.D. Cal. Aug.

12   15, 2017).   The notice on the purchase page is now, if anything, even more

13   conspicuous: it includes a box that users must check, attesting that they "have read

14   and agree to the current Terms," before they can purchase tickets.  Courts routinely

15   find that checkbox notices bind users to the terms at issue.  *See In re Holl*, 925 F.3d

16   1076, 1084 (9th Cir. 2019) ("no question" that plaintiff "affirmatively assented to

17   the … Terms" where "[h]e checked a box acknowledging as much").   Indeed, in

18   *Oberstein*, Plaintiffs' counsel expressly conceded that a checkbox "approach

19   supports a finding that website users had actual notice of the Terms."  Appellant's

20   Opening Br. at 28, *Oberstein*, No. 21-56200 (9th Cir. Feb. 7, 2022), ECF No. 18.

21        Less than six months ago, after careful consideration of the notices on

22   Defendants' websites, this Court concluded: "Ultimately, the Court joins many

23   others in again finding that the Defendants' websites provided sufficient constructive

24   notice as required for mutual assent."   *Oberstein*, 2021 WL 4772885, at *7.

25   Absolutely nothing has changed since then that could compel a different finding.

26   

---

27   [12]   The Court need only find that Plaintiffs assented to the Terms at *one* point in
the user flow to conclude that the Terms are enforceable.  *See Lee v. Ticketmaster*
28   *L.L.C.*, No. 18-CV-05987-VC, 2019 WL 9096442, at *1 n.1 (N.D. Cal. Apr. 1,
2019), *aff'd*, 817 F. App'x 393 (9th Cir. 2020); *Dickey*, 2019 WL 9096443, at *7.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

1  Plaintiffs assented to the current Terms, which select New Era as the arbitration

2  provider for any disputes—and they did so many, many times.

3      **B.**    **The Parties Clearly and Unmistakably Delegated Arbitrability to**

4          **the Arbitrator**

5        Because Plaintiffs agreed to be bound by the Terms, this case must be sent to

6  arbitration.   Nevertheless, the Complaint makes clear that Plaintiffs intend to

7  challenge the enforceability of the Terms on the basis that they are "permeated with

8  unconscionability," due to the decision to switch from JAMS to New Era.  Compl.

9  ¶ 5.  But as this Court has already determined—multiple times—the Terms are "clear

10  and unmistakable" in delegating such enforceability issues to the arbitrator, not the

11  Court.  *Oberstein*, 2021 WL 4772885, at *7; *Dickey*, 2019 WL 9096443, at *8.

12        The Terms specify that "[t]he arbitrator, and not any federal, state or local

13  court or agency, shall have exclusive authority to the extent permitted by law to

14  resolve <u>all</u> disputes arising out of or relating to the interpretation, applicability,

15  <u>enforceability</u>, or formation of this Agreement, including, but not limited to any

16  claim that all or any part of this Agreement is void or voidable."[13]  *See* Tobias Decl.

17  Ex. 29 at 8 & Ex. 30 at 13 (current Terms) (emphases added); *see also id*. Exs. 31-

18  40 (prior versions).[14]  "Multiple other courts," in addition to this one, "have looked

19  _____

20  [13]    In addition, the Terms also specify that the arbitration "will be administered
   by New Era ADR in accordance with their Virtual Expedited Arbitration Rules and
21  Procedures, as well as any applicable General Rules and Procedures, except as
   modified by the Terms."  Tobias Decl. Ex. 29 at 9 & Ex. 30 at 13.  The New Era
22  Rules specify that "[a]ny question or matter of arbitrability of a dispute shall be
   determined solely by the neutral(s) provided by New Era ADR Inc. and not in a court
23  of law or other judicial forum. *The parties agree and acknowledge that they are
   waiving their right to seek a determination of arbitrability in a court of law or other
24  judicial forum.*"  New Era Rule 2(z)(i) (emphasis in original).  This is further "clear
   and unmistakable" evidence that the parties intended the arbitrator to determine the
25  threshold question of arbitrability.  *See, e.g., Johnson v. Oracle Am., Inc.*, No. 17-
   cv-05157, 2017 WL 8793341, at *6-9 (N.D. Cal. Nov. 17, 2017) (enforcing
26  arbitration agreement incorporating arbitration provider's rules, which gave
   "arbitrator authority to decide arbitrability disputes").

27  [14]    The delegation clause in the current Terms is identical to prior versions
   (including the versions at issue in *Oberstein* and *Dickey*), save for one difference; it
28  includes a narrow exception: "in the event of a dispute about which particular version
   of this Agreement you agreed to, a court will decide that specific question."  *Id.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

at the exact same language and also confirmed that it satisfies the 'clear and unmistakable' standard." *Oberstein*, 2021 WL 4772885, at \*7 (citing *Lee*, 2019 WL 9096442, at \*1, *aff'd*, 817 F. App'x 393 (9th Cir. 2020)); *Nevarez*, 2017 WL 3492110, at \*11; *Himber*, 2018 WL 2304770, at \*5.

As this Court explained just a few months ago, because "the delegation clause clearly and unmistakably delegates arbitrability to the arbitrator, the Court's unconscionability inquiry is limited to the delegation clause instead of the arbitration clause as a whole." *Oberstein*, 2021 WL 4772885, at \*8.  In other words, the only unconscionability challenge the Court may entertain is a challenge to whether the delegation clause itself is unconscionable.  The Court already carefully considered this specific question in *Oberstein*, and found that the delegation clause was <u>not</u> unconscionable. *Id*. at \*8-9.  As a result, Plaintiffs' challenge to the enforceability of the current Terms on the basis that they are "permeated with unconscionability" must be sent to arbitration, because it is the arbitrator who must rule on these arguments. *Id*. at \*8 (ruling that plaintiffs' claim that the arbitration clause as a whole was unconscionable must go to the arbitrator).  The Court's inquiry can and should end there.  Nothing about the selection of New Era changes this.

## C. Replacing JAMS with New Era—an Arbitration Provider That Has Procedures in Place to Litigate Mass Arbitrations—Does Not Render the Terms Unconscionable

In any event, if the Court were to reach Plaintiffs' challenge to the enforceability of the Terms, Plaintiffs' various arguments—all of which attack the use of New Era as somehow unconscionable—are meritless.  To prove unconscionability under California law, a plaintiff must show both procedural and substantive unconscionability—i.e., "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to

---

Tobias Decl. Ex. 29 at 8 & Ex. 30 at 13.  This exception does not apply here; Plaintiffs concede that they each purchased tickets after the current Terms took effect, and that those Terms are the relevant version. *See* Compl. ¶¶ 1-5, 25-28.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

1   the other party." *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 910 (2015).

2   The party asserting unconscionability bears the burden of proof. *Id.* at 911.

3        Plaintiffs cannot show procedural unconscionability.  Contracts of adhesion

4   covering non-essential recreational activities (like attending concerts or sporting

5   events) are not procedurally unconscionable, because "the consumer always has the

6   option of simply foregoing the activity." *Pokrass v. The DirecTV Grp., Inc.*, No.

7   EDCV 07-423, 2008 WL 2897084, at *6 (C.D. Cal. July 14, 2008).  Here, Plaintiffs

8   "could choose not to attend these specific recreational events." *Oberstein*, 2021 WL

9   4772885, at *9.  But Plaintiffs did choose to purchase from Defendants, many times.

10  The Terms are not procedurally unconscionable.

11       Moreover, nothing about New Era renders the Terms substantively

12  unconscionable.  To be substantively unconscionable, "[i]t is not enough that terms

13  are slightly one-sided or confer more benefits on a particular party; a substantively

14  unconscionable term must be so unreasonable and one-sided as to 'shock the

15  conscience.'"  *Id*.  There is nothing like that here.  To the contrary—unlike JAMS

16  and other arbitration providers—New Era's rules, procedures, and fee structure all

17  facilitate the arbitration of mass numbers of individual consumer claims on the

18  merits, efficiently and fairly.  Selecting New Era <u>promotes</u> arbitration, as the FAA

19  intends.  *See Epic Sys. Corp.*, 138 S. Ct. at 1621 (FAA requires courts to

20  "rigorously … enforce" the parties' agreement regarding *the rules* under which …

21  arbitration will be conducted"); *Hodges v. Comcast Cable Commc'ns*, 21 F.4th 535,

22  547 (9th Cir. 2021) (FAA protects "efficient, streamlined procedures" for consumer

23  arbitrations).  That's not remotely unconscionable.

24              **1.    New Era's Procedures for Mass Arbitrations Are Fair,**

25                  **Equitable, and Mirror the MDL Procedures Used By Courts**

26       Plaintiffs claim that New Era's rules force consumers "to submit to batched

27  arbitration proceedings," which Plaintiffs characterize as "a novel and one-sided

28  process that is tailored to disadvantage consumers." Compl. ¶ 4.  That's false.  New

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

1    Era's rules do not provide for "batching"; nor are New Era's procedures "novel" or

2    "one-sided."  To the contrary, New Era uses a bellwether approach that mirrors not

3    only the well-accepted MDL process used by federal courts, but also the process that

4    Plaintiffs' own counsel have proposed for other mass arbitrations.

5         New Era's rules provide that—where the neutral determines that there are

6    more than five cases that present the same or similar evidence, witnesses, or issues

7    of law and fact—those cases are governed by New Era's mass arbitration rules.  New

8    Era Rules 2(x), 6(b)(ii)(1), 6(b)(iii)(3)(a).  Contrary to Plaintiffs' claim, New Era

9    does <u>not</u> "group [consumers'] cases together for any reason it deems appropriate."

10   Compl. ¶ 4.  New Era may initially, "[s]olely for administrative purposes," treat

11   cases as part of a mass arbitration, so that those cases can be sent to a neutral for

12   determination as to whether they involve common issues.  New Era Rules 2(x)(ii) &

13   6(b)(ii)(2).  But it is the presiding neutral—not New Era—who has the "[u]ltimate

14   authority" to make that determination.  *Id.*  And the neutral does so by applying a

15   standard which tracks the MDL statute.  *Compare* New Era Rules 2(x) & 6(b)(ii)(1)

16   (providing that "cases or proceedings [that] present the same, or similar evidence;

17   present the same, or similar, witnesses; and/or rely on determination of the same, or

18   similar, facts and issues of law" are governed by the mass arbitration rules and

19   procedures), *with* 28 U.S.C. § 1407(a) (providing that "civil actions involving one

20   or more common questions of fact … may be transferred to any district for

21   coordinated or consolidated pretrial proceedings").

22        The neutral who presides over the mass arbitration—and who makes the

23   threshold determination as to whether the cases involve common issues—is chosen

24   by the parties using New Era's rank-and-strike process.  New Era Rule 6(b)(iii)(1).[15]

25   _____

26   [15]   Specifically: New Era provides a list of neutrals; each party may strike 1-2
     neutrals; each party ranks the remaining neutrals; if one neutral has the best score,
27   that neutral is appointed; in the event of a tie, neutrals with the worst scores are
     dropped, the parties re-rank the remaining neutrals, and the neutral with the best
28   score is appointed; and, if the re-ranked scores remain tied, New Era randomly
     appoints one of the remaining neutrals.  New Era Rules 6(b)(iii)(1) & 2(j)(iii).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

That process does not "abridge consumers' rights to select neutral decisionmakers," as Plaintiffs claim. Compl. ¶ 4. To the contrary, numerous arbitration providers use similar rank-and-strike processes, and those processes are routinely blessed by courts. *See, e.g.*, JAMS Streamlined Arbitration Rules & Procedures, Rule 12, www.jamsadr.com/rules-streamlined-arbitration/ (last visited March 8, 2022) ("JAMS Rules") (describing rank-and-strike process); *Carmax Auto Superstores Cal. LLC v. Hernandez*, 94 F. Supp. 3d 1078, 1107 (C.D. Cal. 2015) (approving neutral selection process where arbitration provider sent list of seven neutrals; each party struck unacceptable neutrals; and arbitration provider selected neutral from remaining names); *McManus v. CIBC World Markets Corp.*, 109 Cal. App. 4th 76, 94-97 (2003) (arbitrator selection process where each party had one peremptory challenge and unlimited challenges for cause not unconscionable). Nor is it unfair or even unusual that "later-filing consumers will not be able to participate" in the arbitrator selection process. *See* Compl. ¶ 4. Plaintiffs who file related claims in federal court after the conclusion of JPML proceedings selecting the transferee court do not have the opportunity to weigh in on the proper transferee court. Similarly, at JAMS, parties to a consolidated proceeding are deemed to have waived their right to select an arbitrator. *See* JAMS Rule 6(e)(iii) (providing that, "[u]nless applicable law provides otherwise, where JAMS decides to consolidate a proceeding into a pending Arbitration, the Parties to the consolidated case or cases will be deemed to have waived their right to designate an Arbitrator").

Once the presiding neutral determines that the cases involve common issues and should proceed under the mass arbitration rules, the New Era Rules provide that three bellwether cases will be arbitrated to conclusion: one chosen by the claimants, one chosen by the respondents, and one chosen through a process set by the neutral. New Era Rule 6(b)(iii)(3).[16] After the neutral issues a decision in each bellwether,

---

[16] The New Era Rules also provide that the "neutral shall have the discretion to increase the number of Bellwether Cases … but only if it is necessary to allow for a

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

the parties participate in a mandatory, non-binding settlement conference.  New Era Rule 6(b)(4).  If the conference does <u>not</u> result in settlement, the neutral will apply, as precedent, the decisions from the bellwether cases to all common issues in each remaining individual case, and then create a process for resolving remaining cases that involve individual issues.  New Era Rules 6(b)(iii)(4)-(6).  If the conference does result in settlement, any party can opt out of that settlement and continue to proceed individually: the neutral will apply, as precedent, the decisions from the bellwether cases to all common issues in the opt-out cases, and create a process for resolving individual issues in those cases.  *Id.*

There is nothing "novel" or "one-sided" about this process.  Bellwether cases are used routinely in MDLs, where (as in a mass arbitration) there are multiple similar cases that are not proceeding as a class action; bellwethers are "important case management tools" that allow the decisionmaker "to give the major arguments of both parties due consideration without facing the daunting prospect of resolving every issue in every action."  *In re Zimmer M/L Taper Hip Prosthesis*, MDL No. 2859, 2022 U.S. Dist. LEXIS 11866, at *31-33 (S.D.N.Y. Jan. 21, 2022).  Moreover, under New Era's rules, the outcome of the bellwether cases is not unfairly "forced" on consumers, as Plaintiffs claim.  Compl. ¶ 4.  Application of precedent to common issues is routine and expected; it promotes stability and efficiency, and protects reasonable expectations.  *See, e.g.*, *Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (adherence to precedent "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process").  Indeed, in an MDL, "[o]rders issued by a federal transferee court remain binding if the case is sent back to the transferor court."  *In re Zyprexa Prod. Liab. Litig.*, 467 F. Supp. 2d 256, 273 (E.D.N.Y. 2006).  There is nothing unfair about applying decisions on

fundamentally fair process.  Each party is entitled to an equal number of Bellwether Cases."  New Era Rule 6(b)(iii)(3)(d).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

common issues in the bellwether cases to individual cases not resolved after the settlement conference.  And, of course, a claimant always has the opportunity to arbitrate any issues unique to her individual claim.  New Era Rules 6(b)(4)-(6).

Other arbitration providers have developed similar procedures for mass arbitrations of employment claims.[17]  For example, CPR's protocol for employment-related mass claims provides for ten randomly-selected test cases followed by mediation; if a global resolution is not reached, any party may proceed individually in court or arbitration, and if a global resolution is reached, an unsatisfied claimant may opt-out and proceed in individual arbitration.  *See* O'Mara Decl. Ex. C (CPR Employment-Related Mass Claims Protocol).  A court in the Northern District of California reviewed this protocol and found that it was "fair and impartial—i.e., one that is not predisposed more favorably to … defendants generally compared to other generally accepted conventional arbitration rules." *See McGrath v. DoorDash, Inc.*, No. 19-cv-05279, 2020 WL 6526129, at *9-11 (N.D. Cal. Nov. 5, 2020).[18]

Indeed, in a mass arbitration that they initiated against Uber at JAMS, Plaintiffs' own counsel proposed procedures for administering those arbitrations that are strikingly similar to New Era's.[19]  *See* O'Mara Decl. Ex. B (*Abadilla v. Uber Techs., Inc.*, No. 3:18-cv-07343, Ex. I to Mot. to Compel Arb., ECF No. 3-4 (N.D. Cal. Dec. 5, 2018)).  Specifically, Warren Postman, counsel for Plaintiffs here,

---

[17]     *See supra* n.7.

[18]     Likewise, FedArb designed an MDL-like process pursuant to which a panel of three arbitrators decides all common issues, and those decisions are binding on all current and future claimants.  *See* FedArb Framework for Mass Arbitration Proceedings,  www.fedarb.com/rules/framework-for-mass-arbitration-proceedings-adr-mdl/ (last visited March 8, 2022).

[19]     Because JAMS does not have rules and procedures for mass arbitrations, the parties and JAMS had to engage in negotiations over how the arbitrations would proceed (e.g., what procedures would apply, and what fees would be paid); those negotiations were so fraught and contentious, the dispute over arbitration ultimately ended up in court.  *See, e.g.*, Mot. to Compel Arb. at 9-10, *Abadilla*, No. 3:18-cv-07343 (N.D. Cal.), ECF No. 3.  This illustrates what can happen in the absence of pre-established rules and procedures to administer mass arbitrations efficiently and on the merits.  Indeed, *Abadilla* was never litigated on the merits. *See id.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

proposed that: (1) the parties jointly select three bellwether cases from each of three relevant jurisdictions; (2) the parties select an arbitrator using an alternating strike process; (3) after conclusion of the bellwethers, the parties participate in non-binding mediation to decide on a formula for extrapolating the results of the bellwethers to the remaining claims; and (4) if the mediation did not result in agreement, the parties brief the appropriate formula before a single arbitrator, who would then decide how to extrapolate the results of the bellwethers.  *Id.  These were the procedures that Plaintiffs' own counsel proposed*.  They are—undeniably—incredibly similar to New Era's procedures.  Now, in this case, the same counsel suddenly claim that those procedures are so "novel" and "one-sided" as to shock the conscience and render the Terms unenforceable.  That's absurd.

### 2.    *New Era's Subscription Option Is Not Unconscionable*

Plaintiffs also take issue with New Era's subscription option, pursuant to which businesses pay an annual subscription fee in advance, covering a set number of arbitrations; this compares to the "pay as you go" model, which is used by other arbitrations providers, such as JAMS.  *See* Compl. ¶ 3 (claiming that the subscription model puts New Era "on retainer" for companies).  Plaintiffs never identify how the subscription option supposedly makes the Terms unconscionable, but the argument seems to be that this option gives New Era and its arbitrators a business incentive to rule in favor of subscribing defendants.  *See id.*  This argument is meritless.

California law is clear that "the belief that arbitrators might over time be biased toward the repeat players that bring them business" is <u>not</u> a basis for finding an arbitration agreement unconscionable.  *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 259 (2016).  Courts may not presume "that arbitrators are ill-equipped to disregard such institutional incentives and rule fairly and equitably," because "the FAA requires that [they] treat arbitration as a coequal forum for dispute resolution."  *Id.*; *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991) (declining "to indulge the presumption that the parties and arbitral body conducting

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

1    a proceeding will be unable or unwilling to retain competent, conscientious and

2    impartial arbitrators").

3          Nothing about New Era's subscription option changes this analysis.  First, to

4    be clear, New Era's role is administrative; New Era does not make any substantive

5    determinations in the arbitrations it administers.  *See, e.g.*, New Era Rule 2(x)(ii)(2)

6    ("New Era ADR makes no determination with respect to issues of law and fact.").

7    The neutral, <u>not</u> New Era, decides all substantive issues, including whether

8    individual arbitrations present common issues such that the mass arbitration rules

9    should apply.  *See* New Era Rules 2(x)(ii)(2) & 6(b)(ii)(2).  There is absolutely no

10   basis to presume that New Era's experienced, qualified neutrals (who are members

11   of the National Academy of Distinguished Neutrals) cannot rule fairly and equitably.

12   *See Sandquist*, 1 Cal. 5th at 259 (2016).

13         Second, any purported incentives associated with New Era's subscription

14   option are the same as the incentives at play every time a company specifies an

15   arbitration provider in its terms of use.  When a company agrees with consumers in

16   its terms of use to arbitrate disputes at a particular arbitration provider, it is agreeing

17   to pay that provider its applicable fees for any arbitrations brought under those terms,

18   essentially keeping the provider "on retainer."  Compl. ¶ 3.  That is exactly the case

19   here; the only difference is that New Era offers companies the predictability of an

20   annual up-front fee, compared to the variability of the "pay as you go" model.

21         Moreover, the New Era Rules provide an example of how the subscription

22   model (compared to "pay as you go" pricing) results not only in predictability, but

23   also in <u>less</u> total money being paid to New Era in the event of a mass arbitration:

24         Example of default vs subscription pricing:

25         Default Pricing = 100 Mass Arbitration cases at $10,000
           per case fee = $1M

26

27         Sample of Subscription Fees = 100 Mass Arbitration cases
           on $250,000 annual subscription fee + $300 per case filing
           fee = $280,000

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

New Era Rule 1(e)(i)(5).  This subscription pricing is a far cry from what JAMS and other arbitration providers claim they are owed in the event of a mass arbitration.[20] If JAMS collecting millions from companies does not create improper bias (and the law is clear that it does not), then it's hard to fathom how New Era's subscription option possibly could.  Any "assertion that business incentives bias [New Era's] arbitrators to repeat player defendants" who pay a subscription is flatly "inconsistent with … the FAA" and should be rejected.  *Shoals v. Owens & Minor Distrib., Inc.*, No. 2:18-CV-2355, 2018 WL 5761764, at *6 (E.D. Cal. Oct. 31, 2018).

### 3.   *The $300 Filing Fee Is Not Unconscionable*

Plaintiffs also suggest that the Terms are unconscionable because consumers are asked to pay a discounted[21] $300 filing fee.  *See* Compl. ¶ 3.  But such fees are nothing new.  JAMS, AAA, and others all require claimants to pay per case filing fees of similar amounts, as do the federal courts.[22]  Moreover, courts routinely approve arbitration agreements that require claimants to pay filing fees of this amount.  *See Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1026 (9th Cir. 2016) (cost-shifting provision in consumer arbitration agreement is unenforceable "[o]nly if the agreement 'impos[es] arbitral forum fees that are prohibitively high,' such that the agreement 'effectively blocks every forum for the redress of disputes, including arbitration itself'"); *Fleming v. Weather Shield Mfg., Inc.*, No. 18-00589, 2018 WL

---

[20]   *See, e.g.*, *Adams v. Postmates, Inc.*, 2020 WL 1066980, at *1 (N.D. Cal. Mar. 5, 2020) (AAA demanded $10 million in fees); *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1064 (N.D. Cal. 2020) (AAA demanded $9.5 million in fees); Opp'n to Mot. to Compel Arb. at 1, *Abadilla et al. v. Uber Techs.*, No. 3:18-cv-07343 (N.D. Cal. Jan. 14, 2019), ECF No. 53 (Uber supposedly owed JAMS $18 million).

[21]   As noted above, where the company has a subscription with New Era, the per case filing fees "are discounted from the default per case pricing as a result of the subscription fee."  New Era Rule 1(e)(i)(3)(b).

[22]   *See, e.g.*, JAMS Consumer Minimum Standards, www.jamsadr.com/consumer-minimum-standards/ (last visited March 8, 2022) (providing for $250 fee); CPR Due Process Protections, www.cpradr.org/resource-center/rules/pdfs/Due-Process-Protections.pdf (last visited March 8, 2022) (providing that consumers may be required to pay an amount equivalent to filing a lawsuit in court); C.D. Cal. Schedule of Fees, www.cacd.uscourts.gov/sites/default/files/forms/G-072/G-72.pdf ($402 fee to file a civil lawsuit in C.D. Cal.).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

6010365, at *7 (C.D. Cal. May 14, 2018) (Wu, J.) (cost-shifting provision in arbitration agreement not unconscionable where "[t]he sole cost Plaintiff would bear is a $300 filing fee").  Further, the Terms are clear that Defendants—in addition to paying for the arbitration itself—will pay the consumer's $300 filing fee if the consumer cannot pay.  *See* Tobias Decl. Ex. 29 at 8 & Ex. 30 at 12 ("[I]f New Era ADR determines that you are unable to pay any part of the filing fee, we will pay that part too."); New Era Rule 6(b)(iii)(2)(c) (financial hardship affidavits).  That certainly does not "shock the conscience" or come close to meeting the threshold the Ninth Circuit has set for unconscionability of fees: i.e., "arbitral forum fees that are prohibitively high,' such that the agreement 'effectively blocks every forum for the redress of disputes, including arbitration itself.'"  *Tompkins*, 840 F.3d at 1026.

### 4.    *The Attorneys' Fees Provisions Are Not Unconscionable*

Finally, Plaintiffs argue that New Era's rules are unconscionable because they strip away their statutory right to attorneys' fees and costs.  Compl. ¶ 5.  That's false.  The Terms expressly state that, "in cases where a statute gives you the right to recover attorneys' fees if you prevail, the arbitrator may award attorneys' fees pursuant to that statute."   Tobias Decl. Ex. 29 at 8 & Ex. 30 at 12-13 ("Any arbitration will be administered by New Era ADR in accordance with their [rules] … except as modified by the Terms.").  In addition, New Era's rules provide that "[t]he neutral may grant any remedy or relief that is just and equitable and within the scope of the parties' agreement or applicable law." New Era Rule 2(e); *see also, e.g.*, *Ortiz v. Volt Mgmt. Corp.*, No. 16-cv-07096, 2017 WL 1957072, at *4 (N.D. Cal. May 11, 2017) (provision that "arbitrator may be entitled to award reasonable attorneys' fees and costs to the prevailing party, in accordance with the law" not unconscionable; "[t]he arbitrator's discretion with regard to attorneys' fees is bounded by what otherwise would be allowed under the applicable laws").

\*        \*        \*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

There's nothing about New Era's rules and procedures that's unconscionable or unenforceable. The subtext of Plaintiffs' complaints is this: they prefer the current situation at JAMS and other arbitration providers, where there are no established rules and procedures in place to administer and actually arbitrate mass arbitrations, because the resulting chaos gives them outsized settlement leverage, right out of the gate. But that preference has absolutely nothing to do with arbitrating claims on the merits; it only concerns a perceived tactical advantage for Plaintiffs' counsel. If the concern was about facilitating the arbitration of mass claims—and reaching an efficient resolution on the merits—there would be no complaint about New Era whatsoever. New Era makes the actual arbitration of mass claims *more* feasible. That is (and should be) a welcome result for all involved. Moreover, that result is specifically what the FAA so strongly encourages. *See Concepcion*, 563 U.S. at 344 ("The point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures tailored to the type of dispute.").

### D.   Even If the New Era Arbitration Agreement Were Unenforceable, Plaintiffs Would Still Be Required to Arbitrate

If the Court for some reason reached the question of enforceability *and* found that New Era's rules and procedures were unenforceable, the result would not be what Plaintiffs seek here: a class action in federal court. The case would still proceed in arbitration, just not at New Era. The Terms clearly provide that, if New Era is unable conduct the arbitration for <u>any</u> reason, its will instead be conducted by FairClaims, another arbitration provider. Tobias Decl. Ex. 29 at 8 & Ex. 30 at 12. And if FairClaims is unable to conduct the arbitration for <u>any</u> reason, the parties will mutually select another arbitration provider to conduct the arbitration. *Id*. In other words, if there were some problem with New Era (which there manifestly is not), the answer is not a class action in federal court; it's an arbitration conducted by another arbitration provider. This is what Plaintiffs agreed to, repeatedly, when they checked the box affirming their agreement to the Terms: <u>arbitration</u>. Plaintiffs did

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS

not have to check that box; they did not have to purchase tickets from Defendants and agree to arbitrate their disputes. But they did—many, many times. The Court should enforce that clear agreement.

### E.    This Action Should Be Dismissed

The Court "may either stay the action or dismiss it outright when, as here, the court determines that all of the claims raised in the action are subject to arbitration." *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014). Here, as courts have found in many other cases, dismissal is the most efficient path forward. *See, e.g.*, *Peterson v. Lyft*, No. 16-cv-07343, 2018 WL 6047085, at *6 (N.D. Cal. Nov. 19, 2018) (granting motion to compel arbitration, dismissing case).

## V.   CONCLUSION

The FAA directs courts to "respect and enforce the parties' chosen arbitration procedures" and "rigorously … enforce arbitration agreements according to their terms, including terms that specify … *the rules* under which that arbitration will be conducted." *Epic Sys. Corp.*, 138 S. Ct. at 1621. The parties here unquestionably agreed to New Era's procedures and, barring that, to arbitration before FairClaims or a mutually agreed upon arbitration provider. What they did not agree to is litigation in federal court. Defendants therefore respectfully request that the Court compel individual arbitration and dismiss or, in the alternative, stay this action.

Dated: March 8, 2022                    Respectfully Submitted,

                                        LATHAM & WATKINS LLP

                                  By:   *Timothy L. O'Ma*
                                        Timothy L. O'Mara
                                        505 Montgomery Street, Suite 2000
                                        San Francisco, California 94111-6538
                                        Telephone: +1.415.391.0600
                                        Facsimile: +1.415.395.8095
                                        tim.o'mara@lw.com

                                        *Attorneys for Defendants*
                                        *Ticketmaster L.L.C. and Live Nation*
                                        *Entertainment, Inc.*

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

MEM. OF POINTS & AUTHS. ISO
MOT. TO COMPEL ARBITRATION
CASE NO. 2:22-CV-00047-GW-GJS