# Exhibit G

Pages 1 - 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

TERRELL ABERNATHY, et al.,      )
                                )
            Petitioner,         )
                                )
  VS.                           )   NO. C 19-07545 WHA
                                )
DOORDASH, INC.,                 )
                                )
            Respondent.         )
_____ )

                            San Francisco, California
                            Friday, December 20, 2019

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Petitioner:
                    KELLER LENKNER LLC
                    1300 I Street N.W.
                    Suite 400E
                    Washington, D.C. 20005
             **BY:  WARREN D. POSTMAN
                    ATTORNEY AT LAW**


For Third Party CPR:
                    MORGAN, LEWIS & BOCKIUS LLP
                    101 Park Avenue
                    New York, New York 10178-0060
             **BY:  KIMBERLEY E. LUNETTA
                    ATTORNEY AT LAW**


                    MORGAN, LEWIS & BOCKIUS LLP
                    1400 Page Mill Road
                    Palo Alto, California  94304
             **BY:  ANDREW P. FREDERICK
                    ATTORNEY AT LAW**


Reported By:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, CSR No. 7445

PROCEEDINGS

| | |
|---|---|
| 1 | **Friday - December 20, 2019**　　　　　　　　　　　　**10:55 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | 　　　**THE CLERK:**　Calling Civil Action 19-7545, Abernathy, |
| 5 | et al. versus DoorDash, Inc. |
| 6 | 　　Counsel, please step forward and state your appearances |
| 7 | for the record. |
| 8 | 　　　**MR. POSTMAN:**　Good morning, Your Honor.　Warren |
| 9 | Postman from Keller Lenkner for the petitioners. |
| 10 | 　　　**MS. LUNETTA:**　Good morning, Your Honor.　Kimberley |
| 11 | Lunetta from Morgan Lewis & Bockius on behalf of third party |
| 12 | CPR.　And I have with me my colleague. |
| 13 | 　　　**MR. FREDERICK:**　Hi.　Good morning, Your Honor.　Andrew |
| 14 | Frederick from Morgan Lewis as well. |
| 15 | 　　　**THE COURT:**　Welcome to all of you. |
| 16 | 　　So have you solved your problem? |
| 17 | 　　　**MS. LUNETTA:**　We're close.　If we could potentially -- |
| 18 | if I could just share with Your Honor what the issue seems to |
| 19 | be and we can maybe get some help resolving, that would be |
| 20 | great. |
| 21 | 　　First of all, we've come to a lot of additional |
| 22 | understanding today.　So your method works, of having everyone |
| 23 | sit in the room. |
| 24 | 　　Basically, what I understand the issue to be is that while |
| 25 | CPR believes that under Ninth Circuit law, all that matters for |

**PROCEEDINGS**

1    an assessment of substantive unconscionability, all that

2    matters is what's on the face of the protocol or the rules of

3    the arbitral forum, Mr. Postman is concerned that there's some

4    back -- and I'm not casting aspersions.  What he believes is

5    that there may be a motive on behalf of the defendant in this

6    case, DoorDash, to slow roll, if you will, the assignment of

7    arbitrators if this initial mediation process fails and that

8    that would allow Gibson Dunn and DoorDash to sort of delay

9    paying the fees over time for the arbitrations and it would

10   encourage them, incentivize them to not resolve the case and

11   just to have, basically, an annuitized legal spend over a

12   number of years when arbitrations are not going forward.

13       That is certainly not CPR's intention or understanding of

14   what they're doing.  But I understand Mr. Postman would plan to

15   argue that we need -- he needs that discovery about Gibson

16   Dunn's communications with CPR to see if that was the ask.

17       And so what I would like to do is -- I think we've come to

18   a -- we may have come to a resolution where, if we could just

19   place on the record our understanding that that is the

20   concern -- that Gibson Dunn and DoorDash had motivated, on the

21   back-end, these other processes for assigning arbitrators that

22   are not on the face of the protocol -- that if they've asked to

23   slow roll that and that's not on the face of the protocol but

24   it could be -- and it's not -- but it could be an understanding

25   between CPR and Gibson Dunn that would affect the process, I

 1    understand why he would be concerned if that is the case.

 2         I can represent to the Court that it's not.  I've looked

 3    at the documents.  But we'd be willing to produce those

 4    communications between Gibson Dunn, DoorDash, and CPR and any

 5    internal discussions about those communications.

 6         So DoorDash told us this on a call today.  We would be

 7    willing to produce that to address that concern, that perhaps

 8    DoorDash and Gibson Dunn asked for some delay in the procedures

 9    that do not appear on the face of the protocol.

10         It's my understanding that if we were to do that, we could

11    do that with a confidentiality order in place so that those

12    documents wouldn't be used outside this case and that that

13    would alleviate the concern that Mr. Postman had about wanting

14    to get all communications that CPR had with anyone and

15    everyone, internally and externally, about the protocol, their

16    finances, and all the other things that we found troublesome.

17              **THE COURT:**  Go ahead.

18              **MR. POSTMAN:**  Your Honor, and I'm sorry.  I think

19    before we had come in, we thought we were close to an

20    understanding.

21         My understanding was, actually, that what we were close to

22    was something different, which was CPR, it sounds like, was not

23    aware that DoorDash had pending arbitrations that they would

24    seek to apply the new protocol to; and they thought they were

25    being asked to create something for other arbitrations, not

1    ones that had already been filed with AAA; and they actually

2    thought, I believe, that DoorDash in this matter may not have

3    been attempting to still apply the CPR agreement to any of the

4    petitioners.

5            THE COURT:  Too many double negatives in there.  I

6    can't follow what you're saying.

7            MR. POSTMAN:  I'm sorry.  CPR's understanding was that

8    DoorDash agreed everyone here was subject to the AAA agreement,

9    not the --

10           THE COURT:  "Here."  What do you mean?

11           MR. POSTMAN:  In this case, all the petitioners.

12           THE COURT:  Yes.  So DoorDash agreed what now?

13           MR. POSTMAN:  I apologize.  I'm not --

14           THE COURT:  You're not being very clear.

15           MR. POSTMAN:  I will take a --

16           THE COURT:  Say it again.

17           MR. POSTMAN:  I will take a step back, if I may.

18       We plan to file a revised petition to compel arbitration

19    pursuant to the stipulated scheduling order; that we'll argue

20    that the vast majority of our clients have either never signed

21    the CPR agreement and therefore get to go to AAA or have signed

22    it and then opted out.

23       But there's this third bucket, which Your Honor raised in

24    the last hearing, of people who have signed the CPR agreement

25    but have either not submitted the opt-out in time or have not

**PROCEEDINGS**

 1    yet submitted an opt-out at all.

 2         DoorDash's position, as I understand it, is that those

 3    people, even though they've already filed at AAA and were

 4    closed out there due to DoorDash's refusal to proceed, now have

 5    to go to the new process at CPR.

 6         My understanding is that Ms. Lunetta didn't realize, CPR

 7    didn't realize that that was DoorDash's position.  They

 8    thought --

 9              **THE COURT:**  Wait.  Okay.  Wait.  So what did CPR think

10    was going to happen?

11              **MR. POSTMAN:**  It would only be for other people, not

12    petitioners.  None of the petitioners would go.  It would just

13    be some other DoorDash driver who brings a claim for the first

14    time in arbitration after the agreement was rolled out.

15              **THE COURT:**  All right.  So now I understand what

16    you're saying.

17              **MR. POSTMAN:**  I'm sorry.

18              **THE COURT:**  How does that affect today's proceeding?

19              **MR. POSTMAN:**  In light of that, we thought one way to

20    resolve it would be to just ask for CPR to ask DoorDash to

21    agree that that was what they would document.

22         And DoorDash -- Ms. Lunetta called them; they declined.

23    They said they still may -- they're willing to discuss it on a

24    case-by-case basis, but they may attempt to enforce the CPR

25    agreement against some of the petitioners in this case.

```
 1        So the issue, as we see it, is still in the case.

 2        MS. LUNETTA:  If I could just clarify, because I spoke

 3   to Gibson Dunn just a few minutes ago.

 4        Their position is people who had filed a petition in AAA

 5   but subsequently agreed to the CPR agreement and did not opt

 6   out of that would be able -- would still have the option, if

 7   they want -- they would be bound by the CPR agreement and, if

 8   they didn't opt out, would continue to be bound by the CPR

 9   agreement.

10        What I was told was, there are some people who may choose

11   to stay with the CPR agreement, and those people should be

12   allowed to do that.  Those who do not wish to can opt out and

13   go back to AAA.  And the people in the middle, who maybe didn't

14   get notice or didn't realize what they were signing, those

15   people could raise the issue to Gibson Dunn and DoorDash; and

16   they would probably allow those people, with good cause, to

17   not -- to go to back to AAA.

18        I think that's not -- CPR isn't part of that piece.

19   I think that's a question of contract probably, but that's not

20   CPR's piece of this.

21        THE COURT:  What do you mean, it's not your -- it's

22   not CPR's piece of it?

23        MS. LUNETTA:  So CPR is just there -- it's just their

24   rules that have been referenced and designated in the new

25   DoorDash agreement.  Anybody who signs this agreement will be
```

**PROCEEDINGS**

1  subject to arbitration under the rules of CPR, including the

2  mass arbitration protocol, if applicable.  Right?  So they're

3  just sitting there as the arbitral forum.

4       And whether DoorDash has a contract with somebody to go to

5  AAA or a contract to go to CPR isn't for CPR to decide.

6  They're going to be there for people who are subject to

7  arbitration before CPR.

8       **THE COURT:**  How does this -- look, this is --

9  all right.  I'm pleased to hear all this argument about the

10  broader issues in the case, but you're here for a discovery

11  dispute.  So --

12       **MR. POSTMAN:**  If I may explain why I don't think that

13  we actually resolved it and what I would ask for, given

14  DoorDash's position that we still need to litigate over whether

15  some of the petitioners have to go to CPR.

16       I thought CPR was going to consider, because they didn't

17  realize that was going to be the case, saying CPR would not --

18  would refuse to take any of petitioners' cases because turns

19  out they were already at AAA and CPR is not going to use this

20  for people who already started at AAA.

21       It sounds like, based on Ms. Lunetta's proposal just now,

22  that CPR is not willing to do that.

23       Is that correct?

24       **MS. LUNETTA:**  So my hope was that that was always the

25  understanding on the DoorDash side, but I'm not sure whether

1   that was their understanding or not.

2        The problem that CPR has is they contracted to handle

3   arbitrations that DoorDash brings them with people who have

4   agreements saying that they'll arbitrate through CPR.  So CPR

5   has to take all comers, so to speak.  People who opted to keep

6   and not opt out of the CPR agreement have a valid agreement

7   that CPR has to abide by.  So that piece of it, I believe, will

8   have to be decided by you, Your Honor.

9        However, the reason that it matters to our discovery

10  dispute is that the Ninth Circuit case law and California state

11  case law says that in determining whether a protocol like CPR's

12  protocol is unconscionable goes to the process itself.  Is the

13  process fair?  And we -- I think we agree that on the face of

14  the protocol, it appears to be fair.

15       What Mr. Postman is concerned about is that if there --

16  there are all of these sort of soft administrative decisions

17  that are made by CPR or AAA or any arbitral provider about how

18  quickly cases will be assigned to an arbitrator, how long it

19  may take to schedule discovery and schedule hearings.

20       And Mr. Postman's concern is that there may have been

21  conversations by Gibson Dunn to CPR in developing the protocol

22  where they said, "Hey, we don't want these to go quickly.  We

23  want to slow roll this process."

24       And so there weren't.  I can represent that to the Court.

25  However, Mr. Postman, understandably, doesn't want to take my

```
 1   word for it.
 2       So what --
 3           THE COURT:  Were you the one who did this?  Were you
 4   an actor in the thing?  How can you be so sure?
 5           MS. LUNETTA:  I reviewed all the documents,
 6   Your Honor.  I reviewed all the communications.
 7           THE COURT:  Well, maybe there were slow roll
 8   conversations that were verbal.
 9           MS. LUNETTA:  There may have been.  But I've spoken to
10   the people who were involved, and they've represented to me
11   that there weren't.  And they would testify -- if we had a
12   deposition, they would testify that there were not.  So that's
13   that piece.
14       However, I would be willing to provide all of the
15   documentations -- all of the documentation between Gibson Dunn,
16   DoorDash, and CPR to the plaintiffs as long as -- I think we've
17   discussed doing it under a protective order before, but I would
18   be willing to produce that stuff.
19       The concern that I have is that we not -- that CPR's
20   reputation as a neutral is not sullied in this process.  And
21   CPR is willing to discuss how they could potentially -- and
22   maybe it's with DoorDash and with petitioners' counsel -- how
23   they can, on the back-end process, handle some of these
24   concerns that they have about timing and about the assignment
25   of arbitrators and the timing in which arbitrations would
```

1   happen and some escape valves if that process is not fast

2   enough.  They're perfectly willing to undertake that effort,

3   and they have no intention of slow rolling anything.

4       And they certainly don't want to appear to anyone to be

5   not neutral or to be not working as efficiently as possible to

6   adjudicate arbitrations.

7       **MR. POSTMAN:**  So, Your Honor, if I may, I do have to

8   say, I mentioned those other two options because that's what we

9   were discussing and what I thought we were close to agreeing

10  to.  We did not agree to any of that.

11      We agreed to potentially pulling back a bunch of discovery

12  if our clients were not going to be subjected to the CPR

13  protocol.

14      It sounds like Ms. Lunetta's client was not willing to

15  agree to that, and we've walked in, and now I need to address

16  the basic issue, which is -- these facts are undisputed; and

17  Ms. Lunetta can please jump in if anything I'm saying is

18  inaccurate -- Gibson Dunn knew, before it reached out to CPR

19  about the protocol, that Keller Lenkner was representing a

20  large number of clients against two of its clients, DoorDash

21  and Postmates.  It reached out in May.

22      My understanding is that there really wasn't much

23  discussion in earnest of the new protocol until mid-September,

24  which was right after Keller Lenkner filed the large number of

25  demands and AAA made the administrative rulings DoorDash did

1  not like.

2      The rulings DoorDash did not like were that all of the

3  arbitrations had to proceed without delay.  DoorDash, through

4  its counsel, Gibson Dunn, who is one of the largest donors,

5  among the largest level -- the highest category of donors to

6  CPR, was on six substantive phone calls -- we don't know how

7  many scheduling calls or other calls -- but six substantive

8  calls, three of which had in-house counsel at DoorDash, to

9  review the rules and comment on them.  So it was actively

10  involved in the review process.

11      Gibson Dunn, quote, made some suggestions.  And as they

12  face their payment deadline for our clients at AAA, they urged

13  CPR to publish the rules as soon as possible.  Then, when our

14  clients' claims were closed out, they rolled out the new rules,

15  incorporating the CPR agreement the next day.

16      I do think there are things that are unconscionable on the

17  face of the protocol.  I think the protocol allows our clients'

18  claims to be staged in a way that could take years for them to

19  even have a hearing or even be assigned to an arbitrator.

20      I believe that there is a lot of circumstantial

21  evidence -- I don't have the actual communications right now --

22  but circumstantial evidence, based on the development of the

23  case, that Gibson Dunn and DoorDash went to CPR, with their

24  intention being to come up with a set of rules that would stage

25  these arbitrations to undo the decision of AAA.

1     Now, I understand that Ms. Lunetta feels like CPR didn't

2 know that; they didn't join Gibson Dunn in the endeavor of

3 writing the rules that way.  But based on the way this rule

4 developed and what has been --

5              **THE COURT:**  What is the name of the rule?

6              **MR. POSTMAN:**  The CPR Mass Employment Claims Protocol.

7              **MS. LUNETTA:**  I brought a copy for Your Honor.

8                     (Document handed up to the Court.)

9              **MS. LUNETTA:**  These are the main rules, and then the

10 protocol comes right after.

11             **THE COURT:**  What do you object to about this protocol?

12 What's so bad about this?

13             **MR. POSTMAN:**  Under the protocol, if more than 30

14 plaintiffs bring related similar claims against a single

15 defendant, the defendant only has to face ten at first.  The

16 rest are stayed.  The ten are bellwethered.  And then there is

17 a mediation process where the rest remain stayed.

18     And, of course, parties mediate knowing what's coming

19 next.  And what's coming next in this case is, unlike a class

20 where you do your initial decision and it gets applied to

21 everyone else, none of the other plaintiffs get any benefit

22 from the initial rulings.  They'd have to litigate it again.

23     And when it comes time to litigate it again, everybody is

24 assigned a number and put in order and they proceed

25 sequentially, to the extent practicable.

 1    To our understanding, CPR right now has 63 employment

 2  arbitrators; whereas AAA has thousands.  As I discussed in the

 3  last hearing, I think that could mean it could take years

 4  before any individual has even been assigned to an arbitrator.

 5    This is at the very core of the dispute between the

 6  parties at AAA, the very issue DoorDash was trying to undo, and

 7  I think it's unfair.

 8    As I said, to take an extreme example, if a set of rules

 9  said that only five arbitrations could proceed against any

10  defendant each year, and everyone else has to wait, and this is

11  a defendant that is, in our view, misclassifying hundreds of

12  thousands of people in an obvious way, paying them below

13  minimum wage, saying to the minimum wage workers or sub-minimum

14  wage workers, "You'll get your arbitrator assignment in six

15  years," that is unfair on the face.

16    There is a dispute about whether that's how it would play

17  out.  I understand that.  CPR heavily disputes it.  I would

18  submit that one good way to help Your Honor decide if that's

19  how this might play out is if that's how the parties involved

20  in the drafting intended it to play out.  And the

21  communications between the parties would certainly shed light

22  on that.

23    We have two very different world views of how these should

24  proceed.  But if what was being discussed at CPR was "These

25  should be staged; don't make them go all at once," and CPR was

 1    hearing that from a bunch of defendants, I think that's highly

 2    relevant to the unconscionability question we'll be briefing in

 3    this case.

 4          **MS. LUNETTA:**  Your Honor, if I may respond to that.

 5          **THE COURT:**  Wait a sec.  You can, but wait.

 6       I'm trying to sort out.  I know that there are people who

 7    have the AAA and have opted out of CPR.  And DoorDash said last

 8    time those people go back to AAA.  That was an important thing

 9    that happened at the last hearing.

10       But with respect to those people who do not opt out of

11    CPR, we have several categories.  One would be the category of

12    employee who actually wants -- I should call it driver --

13    driver who wants CPR.  Second category is the people who did

14    not want CPR, wanted AAA, but screwed up and didn't opt out.

15    And you seem to be mentioning a third category.

16          **MR. POSTMAN:**  I think it would be the people who did

17    not want CPR, opted out, but did it too late.  There's a 30-day

18    window.

19          **THE COURT:**  All right.  Those people.  All right.

20       So how about brand-new drivers who never had AAA?  Are you

21    trying to represent them too?

22          **MR. POSTMAN:**  We have -- my firm has a number of

23    clients that are in that situation.  None of them are

24    petitioners here in this case.  So I haven't raised the

25    situation they'd be in with Your Honor.

**PROCEEDINGS**

1        In discussing this discovery issue, my view is that I need

2   to be focused on the petitioners in this case and how it's

3   relevant to --

4        **THE COURT:**  All right.  I'll tell you what I want to

5   do here.  You ready for my ruling on the discovery point?

6   Thank you.  Here's the ruling.

7        **MS. LUNETTA:**  Your Honor, if I may, my client paid for

8   me to fly all the way out here.  If I could just speak to it

9   briefly before you rule.

10       **THE COURT:**  No.  I've heard what I need to hear.

11       **MS. LUNETTA:**  Okay.

12       **THE COURT:**  You agreed to produce some documents;

13  correct?

14       **MS. LUNETTA:**  Yes, Your Honor.

15       **THE COURT:**  Did you explain to your opponent what

16  those documents were?

17       **MS. LUNETTA:**  Yes.  In short, those are the

18  communications between CPR, Gibson Dunn, and DoorDash; and

19  communications internally that reflect conversations with

20  DoorDash or Gibson Dunn.

21       **THE COURT:**  All right.  I'm going to order you to

22  produce those, but no further ones for the time being.

23       **MR. POSTMAN:**  Your Honor, minor category, if I may.

24       **THE COURT:**  I don't want to hear anything more.  I'm

25  quashing most of what you submitted.

 1      I have a standing order that you grossly violated.  I say

 2   you can never have a 30(b)(6) with more than ten topics, and

 3   you have 30-something topics.  Did you know you were violating

 4   that?

 5           **MR. POSTMAN:**  Your Honor, I apologize that you view

 6   our notice as doing it that way.  We believe there are seven

 7   headings, and we provided --

 8           **THE COURT:**  There are 30-something.

 9           **MR. POSTMAN:**  I apologize.

10           **THE COURT:**  It was way beyond the pale.

11      I used to practice longer than any of you three here,

12   24 years before I got this job.  And I've now been on this job

13   almost 20 1/2.  And one of the most abused things is

14   Rule 30(b)(6).

15      And you are a prime example of how it can be abused.  I'm

16   going to be frank.  You just listed 30-something topics and

17   expect them to stand on their head and stack greased BBs and

18   comply.  Sorry.  It's just too abusive.  So quashed in its

19   entirety.

20      And I'm also quashing the rest of the document requests

21   for the same reason, overbroad, except for the ones you've

22   agreed to produce.

23           **MS. LUNETTA:**  Thank you, Your Honor.

24           **THE COURT:**  Now, but you need to identify -- I'm

25   talking now to CPR -- one witness who knows what happened.

```
 1         Who was the person who was in charge of all this?

 2              MS. LUNETTA:  It was Allen Waxman.  He's the president

 3    and CEO.

 4              THE COURT:  Was he in these conversations?

 5              MS. LUNETTA:  He was.

 6              THE COURT:  All right.

 7         Now, I may wind up letting you take more than one

 8    deposition, but we're going to start with the right way to do

 9    this.  And I hope you all learn something from this about how

10    discovery ought to be conducted.

11         No 30(b)(6).  Mr. Waxman will appear for his deposition,

12    and plaintiffs' counsel can depose him on all of this using the

13    documents that you have, and he may inquire into the existence

14    of other documents.  He may inquire into the existence of other

15    witnesses that might be useful, but he can also inquire into

16    everything he wants to with respect to what happened here on

17    these mass rules.  And we'll have one day.

18         And if I was doing the deposition, I would get -- if I was

19    a lawyer -- not to toot my own horn -- I would do a good job,

20    and I would get some real -- instead of grandstanding, I would

21    get some real useful information that could be used to the next

22    step and say, "Judge, now we got this, here's the next step we

23    need of more discovery."

24         So we will do it in a measured way, proportional to the

25    needs of the case, instead of this grossly beyond the pale.
```

```
 1         You know, some judges would just quash this and say you're
 2    not going to get anything.
 3         But you're going to produce Mr. Waxman.  Do you want me to
 4    give you the date now, or can you agree that it will be done --
 5    what date did I give?  What did I say before?
 6         MS. LUNETTA:  Your Honor, we had agreed to produce
 7    Mr. Waxman as noticed, but we were just trying to work out the
 8    scope.  So there's not going to be --
 9         THE COURT:  What date was he noticed?
10         MS. LUNETTA:  I believe it was by December 15th.
11         THE COURT:  Well, he hasn't -- that's come and gone.
12         MS. LUNETTA:  Exactly.  So whenever you tell us to
13    produce him, we will do so.
14         THE COURT:  All right.  How about the week between --
15    how about December 27th?  Would that be too much of an
16    imposition?
17         MS. LUNETTA:  It would not be for me.  However, I just
18    have to check with Mr. Waxman and make sure that he doesn't
19    have travel plans.
20         THE COURT:  I'll give you the following dates:  27,
21    30, or January 3 or 6.  And he can choose.  Mr. Waxman can
22    choose.  Then plaintiff is going to have to wreck his holiday
23    to be there.
24         MS. LUNETTA:  Thank you.
25         MR. POSTMAN:  Thank you.
```

**PROCEEDINGS**

1    **THE COURT:**  All right.  Now, you've got to produce the

2  documents at least 24 hours before the deposition.  You can't

3  spring them on him at the deposition.

4    **MS. LUNETTA:**  Understood.

5    **THE COURT:**  All right.  Now, what I expect will happen

6  from this if plaintiffs' counsel does a decent job is he will

7  come out of that with the identity of one more witness that

8  needs to be deposed and a group of documents that are narrowly

9  defined and reasonably narrow, proportional to the needs of the

10  case.

11    So that's what I think should occur here.

12    **MR. POSTMAN:**  Thank you, Your Honor.  And if I may, I

13  apologize on the 30(b)(6).

14    **THE COURT:**  You should.  And this was beyond the pale.

15  I think this is a topic worthy of examination, but not to the

16  overreaching extent that you tried.  And I think CPR's counsel

17  has been eminently reasonable.

18    **MR. POSTMAN:**  I agree.

19    **MS. LUNETTA:**  Thank you, Your Honor.

20    **MR. POSTMAN:**  I agree.

21    **THE COURT:**  So you go back and tell your client that

22  you were -- the judge thinks you were eminently reasonable.

23    **MS. LUNETTA:**  Thank you, Your Honor.

24    **THE COURT:**  Are we done for today?

25    **MS. LUNETTA:**  We are.  Have a happy holiday.

PROCEEDINGS

1     **THE COURT:**  Happy Holidays.

2     **MS. LUNETTA:**  Thank you, Your Honor.

3          (Proceedings adjourned at 11:22 a.m.)

4                    ---o0o---

5

6          **CERTIFICATE OF REPORTER**

7     I certify that the foregoing is a correct transcript

8  from the record of proceedings in the above-entitled matter.

9

10 DATE:  Monday, December 23, 2019

11

12

13

14  _____

15  Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
        Official Reporter, U.S. District Court
16

17

18

19

20

21

22

23

24

25