1                    UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  SKOT HECKMAN, et al.,          ) Case No. LA CV 22-00047-GW
                                  )                        GJS
5             Plaintiffs,         ) Los Angeles, California
                                  )
6  vs.                            ) Friday, November 18, 2022
                                  )
7  LIVE NATION ENTERTAINMENT,     ) (3:00 p.m. to 4:35 p.m.)
   INC., et al.,                  )
8                                 )
              Defendants.         )
9  _____)

10

11       TRANSCRIPT OF (IN CHAMBERS) ORDER GRANTING IN PART AND
      DENYING IN PART NON-PARTY NEW ERA ADR'S MOTION TO QUASH
12          PORTIONS OF PLAINTIFFS' SUBPOENAS [DKT. 71]
              BEFORE THE HONORABLE GAIL J. STANDISH
13               UNITED STATES MAGISTRATE JUDGE

14

   Appearances:                   See next page.
15
   Court Reporter:                Courtsmart
16
   Courtroom Deputy:              Ilene Bernal
17
   Transcribed by:                Jordan Keilty
18                                 Echo Reporting, Inc.
                                   9711 Cactus Street, Suite B
19                                 Lakeside, California 92040
                                   (858) 453-7590
20

21

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

2

```
 1  APPEARANCES:

 2  For the Plaintiffs:            WILLIAM R. SEARS, ESQ.
                                   KEVIN Y. TERUYA, ESQ.
 3                                 Quinn Emanuel Urquhart &
                                     Sullivan, LLP
 4                                 865 South Figueroa Street
                                   10th Floor
 5                                 Los Angeles, California 90017
                                   (213) 443-3000
 6
                                   ALBERT PAK, ESQ.
 7                                 Keller Postman, LLC
                                   1100 Vermont Avenue, NW
 8                                 12th Floor
                                   Washington, D.C. 20005
 9                                 (202) 918-1835

10  For Defendant Live Nation     ROBIN LORRAINE GUSHMAN, ESQ.
      Entertainment, Inc. and     SADIK HARRY HUSENY, ESQ.
11    Ticketmaster, LLC:           Latham & Watkins, LLP
                                   505 Montgomery Street
12                                 Suite 2000
                                   San Francisco, California
13                                   94111
                                   (415) 391-0600
14
    For Third Party Defendant     JOSHUA LOREN ROQUEMORE, ESQ.
15    New Era ADR, Inc.:           Riley Safer Holmes & Cancila,
                                     LLP
16                                 100 Spectrum Center Drive
                                   Suite 440
17                                 Irvine, California 92618
                                   (949) 359-5500
18
                                   SANDRA L. MUSUMECI, ESQ.
19                                 Riley Safer Holmes & Cancila,
                                     LLP
20                                 136 Madison Avenue, 6th Floor
                                   New York, New York 10016
21                                 (212) 660-1000

22

23

24

25
```

*Echo Reporting, Inc.*

3

1  Los Angeles, California; Friday, November 18, 2022 3:00 p.m.

2                          --o0o--

3                     (Call to Order)

4           THE CLERK:  Calling Case Number CV 22-00047-GW-

5  GJS, United States -- I mean Skot Heckman, et al. versus

6  Live Nation Entertainment, Inc., et al.

7           Counsel, please make your appearances, Plaintiffs

8  first.

9           MR. SEARS (via Zoom):  Good afternoon, your Honor.

10 This is Will Sears, Quinn Emanuel, for the Plaintiffs, and

11 I'll be arguing today, but I'm -- I'm joined by a couple of

12 my colleagues, who will introduce themselves as well.

13          THE COURT:  All right.  Thank you, Mr. Sears.

14          MR. TERUYA (via Zoom):  Good afternoon, your

15 Honor.  Kevin Teruya from Quinn Emanuel for the Plaintiffs

16 as well.

17          THE COURT:  Mr. Teruya.

18          MR. PAK (via Zoom):  Good afternoon, your Honor.

19 Albert Pak from Keller Postman for the Plaintiffs.

20          THE COURT:  All right.  Mr. Pak.

21          All right.  Let's hear from Defendants, Live

22 Nation first, and then -- and then we'll go to New Era.

23          MR. HUSENY (via Zoom):  Thank you, your Honor.

24 Good afternoon.  Sadik Huseny of Latham and Watkins for

25 Defendants Live Nation Entertainment and Ticketmaster.  I

*Echo Reporting, Inc.*

4

1  don't believe I will be arguing today because the issue is

2  between Plaintiffs and New Era.  But, to the extent

3  something comes up that needs addressing from and on behalf

4  of Defendants, it will be -- it will be myself.

5          THE COURT:  All right.  Thank you, sir.

6          MS. GUSHMAN (via Zoom):  Good afternoon, your

7  Honor.  Robin Gushman, also of Latham and Watkins, also on

8  behalf of Defendants Live Nation and Ticketmaster.

9          THE COURT:  All right, Ms. Gushman.

10         All right.  So, do we have appearances from New

11 Era?

12         MS. MUSUMECI (via Zoom):  Yes.  Good afternoon,

13 your Honor.  This is Sandra Musumeci of Riley Safer Holmes

14 and Cancila, on behalf of Non-Party New Era ADR,

15 Incorporated, and I'm joined by my colleague who I will

16 allow to make his own appearance.  I will be arguing on

17 behalf of New Era, however.

18         THE COURT:  All right.  Ms. Musumeci?

19         MS. MUSUMECI:  That's right.

20         MR. ROQUEMORE (via Zoom):  Good morning, your

21 Honor.  Joshua Roquemore, also on behalf of Non-Party New

22 Era ADR, Incorporated.

23         THE COURT:  All right.  Mr. Roquemore.

24         I think that's everybody.

25         All right.  We're here today on a motion to quash

5

1    related to certain topics for subpoenas both for documents

2    and for testimony that were served by Plaintiffs in this

3    case on Non-Party New Era.  The -- the background of the

4    case, obviously, everybody is aware of, but it comes to me

5    in the posture that the District Judge in the case had

6    already decided that there would be certain limited

7    discovery related specifically to the issue of

8    unconscionability or bias, that if there was, you know,

9    discovery or evidence related to that for the arbitration

10   clause, essentially, New Era as the -- the company, that at

11   least it has alleged is contracted in a certain way to

12   Defendants, to Live Nation and Ticketmaster to provide

13   arbitration services, and the allegation at least that Judge

14   Wu is going to be tasked or is going to be tasked -- is

15   tasked by the case with doing is looking at whether or not

16   the provision is unconscionable such that it would prevent

17   sending, you know, a multi-plaintiff case like this to

18   arbitration.

19          So, in the Court's view, it's a little bit meta,

20   as it always is, when you're looking at whether or not the

21   arbitration clause that's supposed to be enforced is

22   enforceable, but that's the issue that he opened up for

23   litigation.  So -- so that the parties know and it's on the

24   record, I have -- I have read all the papers, including the

25   underlying declarations, although I will tell you that the

6

1  specifics of the declarations I've read in preparation not

2  only for the fact that this hearing was supposed to be last

3  week but -- but prior to that, and for today, what I did is

4  I went back, and I've reread, you know, motion, opposition

5  and reply.  So, to the extent I make a factual misstatement

6  about what I remember being or not being in one of the

7  supporting or opposing declarations, do feel free to -- to

8  correct me.  Best way to do that on the Zoom so that we are

9  not talking over top of each other is if I get a visual

10  indication.  And, by the way, it's the audio of this that's

11  being recorded and is the real record.  I will try to

12  acknowledge the speaker, but I do ask that the parties, as

13  always, in court, try not to interrupt either the Court or

14  -- or the other parties when they're -- you know, make your

15  notes, and then we'll -- we'll go on from there.  Everybody

16  will get -- get their opportunity to speak.

17         The I think core issue that New Era has with the

18  specific topics is whether or not they are, you know,

19  specifically relevant to this Defendant or this case, and

20  then also whether or not they -- you know, they go directly

21  to the issue of bias or unconscionability.

22         Now, at base, the legal issue, legal question, as

23  Judge Wu presented it, is primarily almost an -- it's an

24  objective look at a contract, whether or not ultimately the

25  provision as written is fair or unfair, biased or not

7

1 biased, but he did indicate in his short opinion that there

2 was at least some relevance to whether or not, you know,

3 there's evidence that would support almost a, you know,

4 conspiracy to -- to right rules that were inherently biased

5 in favor of the Defendants.

6          So, I have all of that in mind.  I also do have in

7 mind that, although, New Era is -- the allegations about New

8 Era are central to the case, New Era is, at this point

9 anyway, not a Defendant in this action or -- or the others.

10 So, all of this plays into the balancing that the Court has

11 to do under the Federal Rules.  Obviously, I'm also

12 considering how much burden there is.

13          One of the things that I think often parties, even

14 very experienced parties like this don't think to do that --

15 that they ought to now that the Federal Rules really put

16 that balancing forefront -- it's -- it was always there, but

17 is, you know, you can say burden, and it's obvious in some

18 instances that there's lots of searching and things to go

19 on.  But in -- you know, the best practice is to say, you

20 know, we got 18 terabytes of data that they're asking us to

21 go through, things like that.  I don't recall there being

22 that kind of support here, which is not dispositive.  Again,

23 I'm just pontificating at this point.  I want you to know

24 the things I've thought about because I'm going to -- we're

25 going to go through each category.  I'm going to tell you my

8

1  -- my tentative and allow a very short amount of comment by

2  each side on that category, primarily to clarify how the

3  category is being treated, whether it's a yes, a no, or a

4  narrow, because I don't want there to be -- I mean, I know

5  that it's hard to draw black and white lines, but I am very

6  likely to be unavailable -- certainly not going to be

7  available during a deposition for somebody to -- you know, I

8  used to often be but I'm not now, to call and say, Hey, is

9  this question kosher or not?

10      And I really want the lines drawn the best they

11 can today so that you don't have to, you know, go back to

12 Judge Wu and say we need more -- you know, more discovery.

13 We didn't get, you know, exactly what we need, although

14 that, of course, is always the right of the -- of the

15 winning party, the losing party, whatever, to have this

16 reviewed.

17      So, before I -- we start sort of through the --

18 through the categories, is there anything anybody wants to

19 put on the record as a kind of an initial statement, very

20 brief?

21      Mr. Sears, as representing Plaintiffs, let me ask

22 you first.

23      MR. SEARS:  Thank you, your Honor.  I'll be brief.

24 It sounds like you've given a lot of thought to this, and I

25 think the way you're talking about proceeding and your --

9

1   your description of the case all makes sense.

2         I guess the -- the two or three points I'd make at

3   the outset are, one, your Honor, has mentioned relevance and

4   burden.  We agree those are important.  We think there is an

5   overarching procedural issue with timeliness here, and I can

6   tell that that's not what your Honor's going to focus on.

7         THE COURT:  It's not -- it's not, in part because,

8   you know, sometimes that has a real impact.  But in this

9   case, given my schedule anyway, the fact that I think the

10  objections themselves were timely, I realize that the motion

11  wasn't raised and there's actually cases, as I'm sure you

12  know, Mr. Sears, both ways.  It's not a jurisdictional

13  issue, but it is an issue that if I thought there was, you

14  know, hanky panky or foot dragging or that kind of delay,

15  then it would be important to me.  But right now, what I'd

16  much rather do is get to the merits because I'm sure that's

17  what the District Judge would prefer that I do, rather than

18  just spend some time and go forth because then there's still

19  going to be argument about what's -- instead of what's

20  outside the pocket, what's way outside what -- what he

21  ordered as the bounds of discovery.

22        MR. SEARS:  I understand, your Honor.  So, we'd

23  like to preserve the issue, but I -- I won't belabor the

24  point.

25        THE COURT:  Yeah.  No, you're -- the issue's

10

1  preserved.  You did put it in your papers.  I'm not going to

2  get to that, but to the extent I'm not -- you know, I'm

3  granting or denying the motion, it's not going to be based

4  on -- or portions of it, it's not going to be based on that.

5  So, that issue is preserved if you want to raise it later in

6  the proceedings.

7          MR. SEARS:  Thank you.  So, then, briefly, the

8  other two points I'd make today is I think your Honor is

9  exactly right that what was done here in terms of

10 quantifying the burden is less than you often see and is

11 less than the cases in this District and others require.  We

12 have no hit counts.  We have no real insight into the

13 burden.  We have no declaration from someone in house.  I

14 mean, there is a declaration in the record, but it doesn't

15 speak to burden.  So, we think that weighs very strongly, as

16 I think your Honor touched on, against granting the motion

17 to quash, especially since relevance is a low bar, as Judge

18 Wu noted at ECF 50.

19          So, the proportionality analysis we think goes our

20 way.  We're much higher than a low bar.  We don't want to

21 emphasize the -- the ease of the standard too much, but we

22 think we've cleared that by proffering a request to go

23 squarely to what he authorized.

24          Just the other point that I would make is that

25 since we briefed this motion, since we filed our opposition,

11

1  we've gotten some documents from new error, and they note

2  that in their reply.  Those documents aren't before the

3  Court.  We think that obviously a lengthy recitation of them

4  is beyond the scope of this hearing.  We think they really

5  bolster our case for some of these RFP's in particular.

6  What they show, for example, is that there were a number of

7  calls between Latham and Watkins and New Era or Defendants

8  and New Era.  Now, as I think New Era acknowledges, they've

9  produced documents going back and forth on those.  We don't

10 have the internal documents, which when you have a situation

11 where an arbitration provider is talking to a law firm like

12 Latham and Watkins, it's not all that surprising that

13 perhaps not everything said is written down in a back and

14 forth.  So, we really think the internal documents are here

15 to fleshing out that story.  And the documents have also

16 confirmed a lot of the allegations that we med -- that we

17 plead, excuse me, that Judge Wu noted, you know, we had pled

18 but maybe not proved.  They've shown that there's a

19 subscription agreement with New Era, for example.  They've

20 shown that Latham and Watkins is what Ne Era calls an

21 evangelist for their firm, and they've showed that

22 Defendants Live Nation and Ticketmaster were a critical

23 Fortune 500 anchor client for New Era.  So, we think that's

24 probative of bias, and it justifies additional discovery to

25 see just how deep that goes.  It's -- it's not sufficient

12

1  for the reasons we set forth in our motion and because we

2  don't have the internal documents, but it certainly confirms

3  to us that there's at least red flags here that weren't

4  peaking under the hood a little bit more as we think Judge

5  Wu contemplated.

6        THE COURT:  All right.  We'll talk about some of

7  those issues as we go through categories.

8        But, Ms. Musumeci, would you like to -- and if I

9  butcher your name, please correct me.

10       MS. MUSUMECI:  No, that is fine, your Honor.

11       THE COURT:  You know, I should be able to handle

12 similar names.  I'm actually a quarter Sicilian, believe it

13 or not.  But -- but I still -- you know, it's a combination

14 of memory and the fact that your name is about -- it is tiny

15 on my screen right now.  But I'm assuming you'd like to make

16 a few comments on behalf of New Era as well?

17       MS. MUSUMECI:  Yes, your Honor.  And, first of

18 all, it is a Sicilian name.  Second, I neglected at my

19 appearance to thank the Court and -- and all of the parties

20 for your indulgence with my illness last week and

21 rescheduling this.  I realize it was an inconvenience for

22 everybody, but I promise you that it is a much more pleasant

23 conference for everybody with my voice being -- being able

24 to speak.  So, I thank everybody for that.

25       THE COURT:  You didn't want to sound like you were

13

1  actually from the "Godfather", is that --

2          MS. MUSUMECI:  That's right.  That's right.

3          But, yes, your Honor, I would like to just briefly

4  make an opening statement.  And that is that the motion to

5  quash here, obviously, yes, there is a very broad standard

6  for relevance under the Federal Rules, but I think it's

7  important to remember the context of where we are here.

8  This is not discovery at large.  This is a very narrow bit

9  of preliminary discovery that has been ordered for a very

10 narrow topic.  Judge Wu was very clear in that -- on that in

11 his order under Docket Number 50.

12         In fact, in granting the Plaintiffs' request for

13 discovery, he specifically noted that he wouldn't sure he

14 could grant their entire request because he didn't

15 understand what the scope of their request was.  And, in

16 fact, he also contemplated in his -- in his order a process

17 similar to what we're doing here where the Plaintiffs would

18 issue their requests.  The parties would look at them or in

19 this case the non-party.  There would be conferencing back

20 and forth, negotiation back and forth.  And then, if we

21 couldn't reach an agreement about the scope of the request,

22 that we would come to the Court.  And that's exactly how it

23 is playing out, yes, your Honor.

24         And, so, I -- I cite that specifically with the

25 timeliness issue as well, that we have -- obviously that

14

1  your Honor is not going to squarely rule on right now.

2          With respect, though, to the broader contexts of

3  these requests, I think it is important to note that -- that

4  the allegations made when Plaintiffs were first seeking to

5  conduct discovery on the issue of unconscionability and the

6  arbitrability, if they were focused on effectively collusion

7  between New Era and the Defendants and the Defendants'

8  counsel, they made allegations that there was something

9  untoward going on.  In fact, at this point, based on the

10  documents that we've produced -- and we've produced more

11  than 2,000 pages of documents.  We've produced all of the

12  written communications that existed between New Era and

13  Latham and Watkins and New Era and Live Nation, all of those

14  documents, as well as all of the attachments to those

15  documents.

16          That -- those -- that discovery does not bear out

17  that there was anything going on other than an arm's-length

18  transaction.  The -- the allegation that -- that the rules

19  and procedures were somehow catered specifically to the

20  needs of Live Nation or Latham and Watkins is not borne out

21  at all by the discovery that's been produced.  And, in fact,

22  you didn't hear Mr. Sears say that it was.  What he said is

23  that there was a subscription agreement that has never been

24  contested, that there were -- that there were negotiations

25  and discussions.  Of course, there were.  That's the way any

15

1  -- any company enters a contract with a -- a customer, and

2  -- and any startup company, as New Era admittedly was and is

3  still a young company, has customers who are going to be

4  their early customers.  There is nothing inherently wrong,

5  underhanded, or evil about that.  And, in fact, when we have

6  disclosed this to the Plaintiffs, Live Nation was not the

7  largest source of revenue for New Era.  They were not wholly

8  reliant on New Era.  In fact, New Era had extensive funding,

9  and this is all publically available, millions of dollars of

10 funding, which dwarfs the $350,000 subscription agreement

11 that is at issue here.

12         I think the bigger point, though, your Honor, is

13 that the Plaintiffs now have all of that information.  They

14 have all of the information, and they can -- they can

15 characterize it as they wish in responding to the motion to

16 compel arbitration.  And it's important to not lose sight

17 that that is where we are.  That is the reason this

18 discovery has been ordered is to allow them to make reasoned

19 arguments based on facts and not mere speculation.

20         The additional discovery that they're seeking to

21 obtain relates to internal workings and internal business

22 plans and investments of -- investments into New Era which

23 have no basis whatsoever and no bearing on whether Live

24 Nation or Latham and Watkins were somehow conspiring or

25 working behind the scenes with New Era to create an unfair

16

1  process.

2          So, Plaintiffs have the information that they

3  need, and they should be able to mount a zealous --

4          THE COURT:  A vigorous and zealous opposition.

5          MS. MUSUMECI:  -- based on what they have.  The

6  other point, the last point I'll make, your Honor, because

7  I --

8          THE COURT:  All right.

9          MS. MUSUMECI:  -- is that there's still a

10 deposition to take place, as your Honor alluded to.  And,

11 so, to the extent that the Plaintiffs have further questions

12 about the documents that they've received, they will have an

13 opportunity to ask a -- a high-level representative of New

14 Era about those communications.

15          I'll leave it at that at this point, but I'm happy

16 to address your questions, your Honor.

17          THE COURT:  And one of the things I -- yeah,

18 because I do want to go through the categories.  One of the

19 things I have to note, though, is that this is not a,

20 though, but for everybody is I really need to stress that,

21 you know, the law firms here, I know them well.  I know

22 they're good and aggressive.  You know, I was just in an

23 airport and saw Quinn Emanuel's -- you know, essentially

24 it's hand grenade poster recently as well.  I'm well

25 acquainted with all of the firms here, and the deposition

17

1  has to go smoothly, and it has to be within the bounds of

2  what we discussed because I am not going to be available,

3  and what's going to happen if you have niggling arguments

4  about what we -- what happens today, is you're going to get

5  tossed off either to another Magistrate Judge or to Judge

6  Wu, who will not be pleased about this.

7           I have a chronic health problem.  I have cancer,

8  and it is acting up right now.  So, I'm going to have to do

9  some icky stuff for a little while, and then I'll be back

10  again.  But the -- the chances of you getting to have

11  another hearing like this with me before January are not

12  real good.  And, so, I don't want -- rather than, you know,

13  delay you if you have further arguments about something

14  we've already discussed, I will probably just transfer the

15  case.

16           Now, if it's something that, you know, can -- can

17  wait and Judge Wu wants to do that, we can do that.  But

18  what I'd rather do is try to get -- figure out the bounds of

19  things today.  I am mindful that there are definitely some

20  -- some things I'm going to say I want produced and

21  discussed.  There are going to be also some limitations that

22  we're going to discuss because, ultimately, the issue of

23  unconscionability is whether or not there's bias, you know,

24  in favor of Ticketmaster or Live -- or Live Nation to the

25  detriment of a customer and, you know, whether -- whether or

18

1  not -- you know, in my view anyway, whether or not New Era

2  says good things, bad things about mass plaintiff litigation

3  in general.  I mean, the whole point of trying to be an

4  alternative dispute resolution is to -- hopefully to save

5  both sides money, but -- but the fact is New Era is in

6  competition, so to speak, with the firms that don't want

7  things to go to arbitration.

8          That is not importantly relevant to me, but

9  whether or not in order to get that business they indicate

10 externally or to a limited extent internally, I am going to

11 make up a silly example.  I'm sure it doesn't exist, but if

12 there was an internal email that said, "Hey, don't say

13 anything out loud because we don't want a record of it to

14 Ticketmaster, but, you know, we need to know -- we need to

15 write our rules so that Ticketmaster's going to win more

16 than they ought to so that they'll hire us," that's kind of

17 -- that's clearly relevant very specifically to -- to what

18 Judge Wu was worried about, although, from 30,000 feet, you

19 know, your intent is not as important as when -- once you've

20 got the rules written, whether or not those rules are fair,

21 whether or not the -- the driving force was to -- to make

22 them simpler or to "take business away from litigation and

23 put it in arbitration" is -- is less important, and that's

24 sort of the framework that I'm -- I'm looking at here.

25          Mr. Sears is correct that relevance is -- is

19

1    pretty broad.  Its burden is not high, and -- and nobody's

2    mentioned it, but implicit in that is, you know, we no

3    longer use the standard of, you know, must lead to

4    admissible evidence, and we're also talking about the motion

5    to compel arbitration, which doesn't require the same level

6    of admissibility as we would if we were talking about the

7    evidence that's going to be presented before a jury anyway.

8    Now, it can't be complete hearsay, but -- but I'm more

9    concerned about whether or not what's going to come out is

10   something that Judge Wu believes he ought to be considering

11   or not.

12        So, all of that as -- as background, let's go

13   ahead and go through the -- the categories.  And, you know,

14   it's really -- you're all arguing about the big kitchen sink

15   catchall category even though we haven't gotten there yet.

16   That's in the middle.  But let me start, and I may or may

17   not miss one.  I'm looking over here at my notes, but the

18   first category that I think was at issue was whether or not

19   -- you know, advertising, what advertising means and whether

20   or not documents and testimony related to how New Era

21   advertised its services would be relevant.  It does have

22   some -- some relevance, and I don't see how this, you know,

23   public information, although potentially available or it

24   might have been available through other sources, would be

25   that burdensome.  So, I -- with respect to the motion to

20

1  quash that category, I'm going to deny it with respect to

2  that category.

3        With respect to the definition of advertising, I

4  don't think we need to go, you know, write one down as if

5  this was a patent Markman hearing.  It is what I would

6  consider the usual definition, but I will make sure that I

7  give examples  Obviously, if there is advertising on a

8  website, if there's -- there were push through ads, you

9  know, I open a -- a web page on, you know, what bicycle I

10 want to buy and if I've ever in my life googled arbitration,

11 am I going to get a popup from New Era or from JAMS or

12 something, but I would consider that advertising.  If there

13 was mass marketing.  So, mass or targeted marketing where

14 there was an attachment or something like that that just

15 said, "Hey, consider our services.  Here's what we can

16 provide."  There's no basis for any of that to be

17 confidential.  I don't think that it would be burdensome to

18 look for, and if the company is relatively young, you know,

19 advertising shouldn't be terabytes of data.

20        We'll talk separately about what might be the

21 overlap between advertising and raising money, but right now

22 I'm only talking about the, you know, advertising for -- for

23 clients such as Defendants.

24        And, so, this category, I'm not going to limit it

25 just to anything that they know was put in front of the

21

Defendants, but I -- because I think that, you know, mass

ads shouldn't be that difficult.

So, let me ask is there -- that one I really don't

think I need argument on.  I think it's pretty

straightforward, but let me ask -- if Mr. Sears or Ms.

Musumeci if there's any issue of vagueness in the Court's

ruling, does that need to be clarified?

MR. SEARS:  Thank you, your Honor.  For

Plaintiffs, no vagueness.  There are a couple of points New

Era's counsel made I'd like to respond to at the end, but I

don't want to interrupt the flow of the proceedings.  So,

nothing else --

THE COURT:  Yeah.  Let's go through the categories

first.  Then we'll see where we wind up.  This isn't -- I

mean, as you know, since this is a discovery hearing, it is

not one of those things where if you don't respond to

everything that was raised on the record that you're going

to have waived an argument.  Your arguments in general are

in your papers, and -- and, frankly, other than factual

findings I make, which the District Judge -- Judges may give

some -- you know, some credence to, any legal ruling I make

is -- is de novo review by the District Judge anyway if

these are brought up to Judge Wu.  So --

MR. SEARS:  Understood.  I'm going to adjust my

blinds in the background.  I don't want you to think I'm not

22

1  paying attention, but I'm having some light issues, as you

2  can probably see.

3        THE COURT:  And you're striped.  So, you kind of

4  look a little bit like a zebra there.

5        Ms. Musumeci, anything you want to raise with

6  respect to clarity?

7        MS. MUSUMECI:  Very briefly, your Honor.  Number

8  one, I know you said it's not relevant.  I would note we

9  have produced everything that was shared with Latham and

10 Watkins and with Live Nation.  But, aside from that, I have

11 a question regarding the time frame, the relevant time

12 frame.  You know, the contract -- the subscription agreement

13 here at issue was -- was from 2021.

14        New Era, for example, has a very active social

15 media presence, posts things on Linkedin perhaps multiple

16 times a day currently.  And, so, it seems to me, for

17 example, that what they've been posting for the past three

18 months or since these subpoenas were produced (a) is

19 publically available but (b) also should not relevant or

20 responsive.  Would -- would you limit it to the time -- up

21 until the time or shortly after the subscription agreement

22 was signed or some -- put some time limitation on it?

23        Secondarily, if not at this point, I would ask if

24 we would have an opportunity to be heard about reasonable

25 limitations because, in fact, with the social --

23

1          THE COURT:  I would think --

2          MS. MUSUMECI:  -- in the new world --

3          THE COURT:  -- two things.  I would think a timing

4  limitation as to what you actually have to, you know,

5  produce does make sense.  I -- I don't see that anything

6  that you've been, you know, posting since -- certainly since

7  the filing of the litigation, this present litigation, is --

8  or the subscription agreement -- I'll ask Mr. Sears if he

9  really has a care there.  But, because it is all also

10 publically available, I would say provide the -- the links.

11 I'm sure they already have them.  They've probably been

12 monitoring these things.  But and if for some reason after

13 reviewing that -- that information, you know, they can say,

14 Hey, I found this public thing on your website to your

15 30(b)(6) witness.  So, they -- obviously, they're, you know,

16 going to be asked to comment if there is something on there.

17 I expect that, you know, that your -- your company -- your

18 client has been probably fairly careful about trying not to

19 -- to talk about the litigation.  But if they have and Mr.

20 Sears finds it, it's fair game for him to ask about it.  I'm

21 not going to say that that's outside the scope.

22          Mr. Sears, you know, once the -- the terms were

23 written and the -- you know, since the allegations are

24 essentially of unfair collusion in the actual terms of the

25 arbitration agreement itself, is that a good date for us to

24

1    pick that they need to -- you know, everything up to and

2    including that as a date for all of these categories?

3         MR. SEARS:  Perhaps, your Honor.  I -- I don't

4    want to push my luck, but I do think in our -- in the course

5    of our discussions, they had generally agreed to produce

6    documents through the present, even through, you know,

7    filing of the complaints.  And I can see the relevance for

8    some of those materials, for example, discussions about the

9    lawsuit.  So, just to make sure we're consistent with what

10   we've already been doing and not, you know, going backwards

11   in some respects, I understood New Era's counsel's comment

12   to really be about social media, and that -- that I think is

13   really a (Zoom glitch) problem.  That I -- I think we can

14   agree to limit, you know, perhaps at the filing of the

15   lawsuit.  But, for other things, perhaps it's more of a

16   situation where we -- we meet and confer on this and we get

17   a better sense of what there is.

18        For example, if there were advertisements shortly

19   after the lawsuit that said that you should still come to us

20   because we have these great clients, Live Nation and

21   Ticketmaster, even though there's a lawsuit pending, we --

22   we might want to see those.  So, I just -- I don't want to

23   cut off things that may exist without knowing a little bit

24   more, but I understand the Court's comments, and I -- I

25   truly think this is something that we can work out and

25

1  shouldn't be a holdup for this request generally.

2        THE COURT:  Well, like I said, if you can't work

3  it out and you're still fighting about it, the chances are

4  you're not going to have anybody look at it any time soon.

5  So, I would rather pick a date.  Maybe it is up to the

6  filing of the complaint, and then, you know, just make sure,

7  Ms. Musumeci, that you, you know, can -- can say we have

8  these social media accounts.  And if for some reason, you

9  know, membership -- Linkedin or something, if membership is

10 required, here's a way to go look and see what we've -- you

11 know, what our public advertisements have been or, you know,

12 our -- our commentary.

13        As I said, I know you would like to find a smoking

14 gun, Mr. Sears, but I doubt sincerely that there's been a

15 recent posting on Linkedin saying, you know, gee, that

16 daggone lawsuit, we had to change things because it was so

17 biased and unfair that we decided to rewrite our terms and

18 conditions.

19        MR. SEARS:  I understand.  If we're just talking

20 about social media, we're fine with a -- a complaint cutoff.

21 If that's all that applies to, that's -- we're good.

22        THE COURT:  Well, let me actually just -- Ms. --

23 sorry.  Ms. Musumeci, you know, anything in particular?  I

24 mean, the company's not even that old, but as long as we

25 have a cutoff.

26

1          MS. MUSUMECI:  I think that your Honor's

2    suggestion about providing the social media account names

3    and allowing the Plaintiffs to -- to find it themselves

4    would certainly eliminate some burden.  And a lot of it is

5    publically available.  I think that's -- you know,

6    presumably, they may have already done that, but that's a

7    good suggestion.

8          Again, I don't -- I don't see -- I don't see the

9    relevance.  Yes, you can speculate there's a smoking gun

10   that was made last week, but, you know, the Court has

11   discretion to prevent fishing expeditions based on hearsay.

12         THE COURT:  Yeah, no, and -- and I -- I actually

13   -- you don't need to continue because as I think about it, I

14   really do think that, you know, I -- I agree with that for

15   sort of post-subscription, you know, when the subscription

16   agreement and the -- and the terms were drafted because,

17   again, there's -- this is mostly objective decision as to

18   whether or not it's in -- in reality a -- an unconscionable

19   term with some of these internal documents at least

20   supporting, you know, whether or not that, you know, an

21   inherent bias has been written in, but I'm not sure that

22   the, you know, continued commentary afterwards, especially

23   at this point when -- when New Era is a third party.  You

24   know, I have no idea what Plaintiffs are planning in the

25   future, but I do want to keep that in mind, that New Era is

27

1   central to the allegations but -- but is still a third

2   party.  So, that's how we're going to go.  You know, provide

3   the social media accounts for the -- the later stuff.  Make

4   sure that they have access so if there's some back and forth

5   required so that they can go do that on their own.  But with

6   respect to everything else, let's -- let's use when, you

7   know, the allegedly bad arbitration term was finalized and

8   the -- and the subscription agreement as a cutoff.

9           All right.  We've made it all the way to the

10  second category, which is the efforts to raise capital.

11  This -- the motion to quash with respect to this I largely

12  believe is -- should be granted.  There's going to be some

13  exceptions, but, as I said, at this point, New Era is not a

14  defendant in the case.  What's really critical in this case

15  is whether or not the terms as they appear with this

16  Defendant are unconscionable or not.  How they advertised

17  themselves when they were raising capital really I think is

18  of no moment, with a couple of exceptions.

19          I think it's already been provided that there are

20  -- there are one or two arbitrators that in some way, you

21  know, supposedly that are not linked to how they decide

22  things, have some small percentage ownership in the -- in

23  the company.  I think those agreements may already have been

24  provided or information about that, but to the extent that

25  there are any communications with -- specifically with the

28

1   arbitrators, that, again, you know, some smoking gun could

2   exist.  I doubt it, but that -- but that says, you know,

3   and, by the way, the company's going to do a lot better if

4   you make sure that you come out, you know, 70/40 on behalf

5   of the big subscription clients rather than the customers,

6   that should be produced.

7           As I said, I'm not sure that there's any -- any

8   such communications exist, but those arbitrators decided to

9   invest in some way, and they are functioning as arbitrators

10  for the company.  So, I think that that is fair game because

11  it could bear on potential conflict of interest or bias.

12          And, in addition, again, to the extent that it

13  even falls in this category, the communications -- I

14  understand the Defendants have produced these, but from the

15  New Era side, if there are communications in the context of

16  this with Defendants and -- and/or Latham as kind of their

17  representative or their evangelist or whatever we were

18  talking about, anything that hasn't already been, you know,

19  turned over isn't duplicative should be produced and New

20  Era's witness to be able to talk about those things.

21          So, again, we're under the efforts to raise

22  capital.  I don't know -- you know, this is is, you know,

23  really just overlapping with the subscription agreement

24  itself, but if there are -- you know, if that's considered

25  an effort to raise capital to get them as a large subscriber

29

1  and their -- because they are specifically the Defendant in

2  the case and there was any communication, again, I like to

3  make things up.  If I was the Plaintiff, I'd be hoping there

4  was something saying, you know, Hey, subscribe with us.  You

5  know, not only will it be cheaper, but we'll make sure that,

6  you know, you win, you know, a higher percentage of the time

7  than you should.  That would show bias.  So, that's what

8  we're going to do on that.

9          Now we're going to get to one that I know the

10  parties kind of negotiated and were talking about an offer

11  of proof, but the subscription agreements with other

12  customers, I don't think that's relevant.  So, I'm going to

13  grant the motion with respect to that again with the -- the

14  following exception or limitation.

15          So, New -- New Era made an offer of proof but not

16  -- but not something I think that would be kind of sworn or

17  admissible about, you know, how important or the percentage

18  of the business that was Ticketmaster or Live Nation versus,

19  you know, other subscribers.

20          I -- you know, I think that the parties should

21  talk about this.  My -- my inclination is to say you can

22  either have a witness -- you know, you don't need to produce

23  the underlying documents.  Normally if a witness testifies X

24  percent of our business is this and our overall business is,

25  you know, 14 -- $14 million and $3 million of it comes from

30

1  Ticketmaster and not, you know, with respect to any of these

2  other -- any of our other subscribers, you would normally,

3  if you had that testimony, you'd get the underlying

4  documents.

5          I just want the Plaintiffs to be able to have, you

6  know, sworn declaration of testimony that they can rely on

7  in their opposition.  I do want the witness to be able to

8  and -- and, you know, will have to answer questions under

9  the protective order as to, you know, who the other major

10 clients are, not their -- how much they're spending, nothing

11 specific, but I know that some of them are ones that either

12 have touted that they use New Era or New Era has been given

13 permission to tout that they use them.  I don't think that,

14 you know, given the confidentiality agreement we have -- I

15 mean, the protective order, that simply saying, Look, you

16 know, 95 percent of our business comes from these four

17 companies and Ticketmaster's, you know, payments, you know,

18 their remuneration or subscription fees or whatever it is

19 amounts to 30 percent of a total amount of business in year,

20 you know, 2020, 2021, that -- that information isn't going

21 to give anybody else a leg up over -- over them.  It will be

22 confidential and used only for purposes of this litigation,

23 not for any of the other litigations that may -- that may

24 come up.  The protective order is specific to the case, and

25 unlike the usual situation, I am not going to require all of

31

1 the documents that would -- because this is a burden that

2 would have to be redacted and everything, to be produced.

3          It may be -- and I want counsel to -- to try to

4 agree to this.  If they can't, you can just do it by

5 deposition.  But a -- I think it would be more thoughtful

6 and useful and prepared if -- Mr. Sears, if you and Ms.

7 Musumeci talked about a declaration that could be provided.

8          The declaration, if -- if this is the route you

9 go, it cannot be a declaration of counsel.  It has to be

10 from a -- from a New Era officer or, you know, someone who

11 actually can say, "I have a basis for this knowledge," you

12 know, I reviewed these kinds of documents.  I -- I'm the

13 CFO, whatever, and I can provide that information.  Because,

14 Mr. Sears, I think you can make the arguments that you need

15 to make off of that without having them have to go through

16 all their financial documents and try to redact out

17 information that I don't think is necessary.  I do think

18 it's completely irrelevant, frankly, to whether or not the

19 terms and conditions and the like for this Defendant in this

20 case are -- are biased.

21          MR. SEARS:  I understand, your Honor.  That --

22 that seems like a very sensible compromise, and that's --

23 that's the direction we were going in our brief, some kind

24 of compromise proffer, and I think a declaration under oath

25 with sufficient information to allow us to test it is a good

32

1  idea.  But no -- no dispute on the declaration and

2  information versus documents.  We understand and think

3  that's a good one.

4         THE COURT:  Okay.  And we'll talk about when you

5  guys need to -- to get all this done.  I know you have

6  another hearing in front of Judge Wu I think in -- you know,

7  a little bit after Thanksgiving, but I -- I, frankly, didn't

8  go back and read that order to see whether it's a status

9  thing or whether you're supposed to have discovery completed

10  or not.  So, we'll talk about that at the end when we talk

11  about -- because I also, if I -- you know, if the parties

12  need a certain amount of time or anything, I'll pop them an

13  email or give them a call, and he's one of the District

14  Judges who is very nice, I think, to the parties about

15  trying to make sure nobody's holidays are messed up and that

16  -- and, yet, he'll, you know, have enough information to be

17  able to make a -- a good decision for -- for everyone.

18         Okay.  Now we get to topic 10, which I call the

19  kitchen sink or catch-all category.  There definitely is

20  relevant stuff in this category.  There's also, I tink --

21  the problem is it -- it's written to be extremely broad,

22  which is the way, by the way, all of us -- except I'm

23  looking.  There's a couple of lawyers on the -- on the call

24  who seem to be young enough that they may not have been

25  brought up with the write as many RFP's as you can and ask

33

1   for all documents all the time because that's, frankly, what

2   the practice was.  So, I want to talk about how to narrow

3   this one.

4          So, you know, on the one hand, I don't have a

5   whole lot of stuff about specific burden.  On the other

6   hand, I also don't have from the Plaintiffs any -- any real

7   proposals on -- on not only how to narrow but what

8   specifically they have in mind for each of these

9   subcategories that would be relevant.  And, you know, one of

10  the things, again, the Federal Rules are supposed to do is

11  you don't have to know a specific document exists but a very

12  specific type of document is what you're supposed to be

13  asking for, not big categories nowadays.  Otherwise, we are

14  in the position that we're talking about supporting fishing

15  expeditions.

16         So, I think the way -- let me see if the parties

17  think that this works and is clear enough -- that all of

18  these subtopics that are in there, the topics or subtopics

19  are -- are relevant only to the extent that they relate to

20  the particular Defendant and Defendant's counsel -- I

21  realize some of this, and some of it might -- there might be

22  arguments as to what's privileged and what's not.  But, you

23  know, the Defendants and -- and Latham, any of the -- so,

24  externally, if New Era hasn't already provided any of the

25  back and forth with Ticketmaster or Latham and then -- and

34

1    really only because Judge Wu said "I am interested to see
2    whether or not these were intentionally crafted to be
3    biased," this is the -- the level of internal documents that
4    I'm interested in seeing produced.
5            If there are internal communications or memos that
6    talk specifically about the drafting of terms for this
7    Defendant or with or for Latham, I think those are relevant
8    and should be produced.  I do not -- just to show -- to tell
9    you what is not included here is, you know, generally
10   dissing Keller, dissing mass litigation, any of that stuff,
11   because I can tell you that, having been on both defense and
12   plaintiff side, I can come up with reasons to diss mass
13   litigation.  I can come up with reasons to diss arbitration.
14   I can diss mediation.  And -- and, you know, if your
15   business model is to try -- not to be unfair, you know, in
16   the best view of ADR, it is intended to be cheaper for
17   everyone and still be fair.  And, so, the fact that, you
18   know, a company is trying to take business away from the
19   courts, yay, and -- and give it to, you know, paid private
20   arbitrators and mediators but still be fair, then, you know,
21   I think that's what the SAA is all about.  It's -- it's all
22   for that kind of idea.
23           So, I don't think, unless it relates specifically,
24   it's -- it can be internal because, as Mr. Sears noted, if
25   you're really smart, you do -- if anything -- well, really,

35

1  you talk on the phone, but nobody uses the phone anymore.

2  So, you know, you would have internal documents.  And,

3  again, the smoking gun would be, you know, we're going to be

4  working with Latham.  We need to draft these in a way that

5  Latham will figure out that they're beneficial to

6  Ticketmaster and anti their customer, as opposed to anti

7  Keller or anti the idea of the mass Plaintiffs' case.

8          So, since that's kind of -- I've been

9  pontificating on that one a little bit.  Let me ask first

10  Mr. Sears whether or not there's anything specific that I

11  have missed that you think should be included, not general

12  categories but what kind of document other than what I was

13  talking about can you actually explain to me would be

14  supportive of your case against going to arbitration?

15          MR. SEARS:  Thank you.  And I -- your Honor, I

16  hate to ask -- or answer a question with a question, but I

17  want to make sure I understand the scope of what the Court

18  is authorizing because I -- I appreciate the thought you've

19  given to this, and I want to make sure we're on the same

20  page.

21          So, they will have to search for and produce

22  internal documents talking about Defendants, about Latham

23  and Watkins, you know, their subscription agreements with

24  Defendants and the drafting of their rules and procedures

25  and terms.  Those are fair game, and what -- as you -- as

36

1  you put it very well, what's out is dissing Keller, which I
2  hope no one's doing, but I -- I understand the Court's
3  ruling on that.  Is that about --
4           THE COURT:  Or dissing litigation versus
5  arbitration or any -- that's too broad.  I want -- if it's
6  specifically related.  So, it should be easy, and we're
7  going to talk about search terms and the like later -- it
8  should be easy to figure out, you know, what documents
9  relate specifically, even if they weren't communicated, to
10 the drafting of these rules, to the extent they're even
11 different than the rules they use.  I'm -- I'm not even --
12 you know, I don't know enough about it.  They may not be
13 different than the rules they have put in every other
14 subscription agreement that they have, but they need to be
15 specific to this case.  And, again, as Ms. Musumeci said,
16 they're time limited.  I don't want -- you know, from the --
17 from the time, once the subscription agreement has been done
18 and signed, if there were no alterations after that, then,
19 you know, the fact that once there's a litigation filed,
20 people get mad or angry and gossip in a -- in a --
21 internally, and they -- you know, they're not -- frankly,
22 most of that stuff that goes back and forth isn't
23 necessarily binding on the company anyway.  I really want
24 this to be related to the issue Judge Wu raised were these
25 -- was there some kind of collusion where these -- the

37

1  terms, conditions or the rules or lack of rules or whatever

2  was specifically drafted to be in favor, not of just I want

3  -- we want our clients to come to us but in favor of the

4  outcome being biased for -- in favor of Ticketmaster and

5  against their customers or clientele.

6          MR. SEARS:  I -- so, your Honor, I have two quick

7  points on that.  So, that -- I think that masks sense.  The

8  one thing it wasn't clear to me that's encompassed but I

9  think we -- we very much need is request 10 calls for

10  documents about "your e-arbitration process."  I think

11  that's squarely relevant.  Judge Wu even made comments at

12  the hearing we had back in May about how the -- the

13  arbitration process could be --

14          THE COURT:  How does it work?  How does it work?

15          MR. SEARS:  (Zoom glitch.)  And then the other

16  point I want to make is --

17          THE COURT:  But I -- let me stop a second.  I want

18  to limit that before Ms. Musumeci -- she's being really good

19  about not letting her head explode.  That's one of those

20  kinds of categories where it's documents sufficient to

21  demonstrate how it works.  That's not every scrap of paper.

22  And, again, that's something that all of the case law, since

23  we've made this modification to the -- to the Federal Rules,

24  you know, that's something that Judge Wu wants explained,

25  but it's how does the process work now?  How is it going to

1  work in this agreement?  It does not need to be every scrap

2  of paper about -- about how that was done.  But that is

3  something I don't -- I don't know.  I've never done a -- you

4  know, I do mediations on Zoom all the time, but I don't know

5  how you do a -- a digital arbitration and what the rules

6  are.  So --

7          MR. SEARS:  That makes two of us, your Honor.  And

8  then the other -- the other quick point I would make is I'm

9  concerned about the date limitation here.  My co-counsel

10  reminded me that if you just go to New Era's website, you'll

11  see that they updated their rules and procedures March 2nd,

12  2022.

13          THE COURT:  Closing the barn door after the horse

14  is out is one of the things that we specifically don't allow

15  admissible in -- you know, in our Rules, remember.  Oh, gee,

16  somebody has pointed out that this doesn't look good.  Too

17  bad, so sad, not admissible.

18          MR. SEARS:  Oh, that I understand, your Honor.

19  But the issue -- so, I get the Rule 407 issue.  That's a

20  good point.  But we look at it a little differently.  You

21  know, the up shot of this is that if we don't prevail on

22  this motion to compel arbitration, these are the rules our

23  Plaintiffs would be arbitrating under.  If they update the

24  rules, they -- they have in prior litigations and I think

25  would take the position here, that we're stuck to them.  So,

39

since Judge Wu has authorized discovery into whether those
rules and procedures are fair, if there were updates made to
them, if our Plaintiffs are going to be subjected to it,
it's not a 407 issue.

THE COURT:  Yeah.  But, so get a copy of the
Rules.  But what I don't think that you need is --
especially if they've updated them because they're --
frankly, they're worried that they're going to look biased
because you filed a lawsuit, you need to know what those
rules are and be able to bring them to his attention and if
you want to challenge them, you can.  But -- but we're not
going to have a whole secondary litigation that's not
something that's in the complaint because the rules are
different than what they were when you filed the complaint
that says -- and, you know, every time they change it, we
are assuming that they're colluding again for biased
purposes.

So, yes, copy of the rules of what applies.  In
fact, you know, if I was New Era, not their lawyer but one
of the -- you know, one of the principals of the company, I
would probably be talking to counsel about saying let's --
you know, let's negotiate with the other side, you know.
Here's what the rules are.  Challenge them, don't challenge
them, but those are the rules we're going to apply so that,
you know, we're not going to change them yet again because

40

1  we'll get sued yet again or we'll -- you know, we'll see a

2  motion to Judge Wu to amend the complaint, and that could go

3  on and on forever.

4          So, I'm starting I think to talk so much that I'm

5  getting unclear.  So, let me actually pass that to Ms.

6  Musumeci and see whether or not my Paisano thinks that I

7  have been at all clear or if she has some questions as well.

8  I'm a quarter Sicilian, three-quarters mutt Jew.  So, isn't

9  that a great combination, and I've got blonde hair anyway.

10          MS. MUSUMECI:  I can see the Sicilian coming out,

11  though, your Honor.  So, my -- my question relates --

12  relates to the e-arbitration term.  And, as Mr. Sears knows

13  -- I'm not sure if your Honor does or not -- that is sort of

14  a -- a term of art that prior to actually launching the

15  business, New Era was playing around with and submitted an

16  application to the --

17          THE COURT:  Okay.  I --

18          MS. MUSUMECI:  -- and then abandoned it.

19          THE COURT:  -- I do remember this.

20          MS. MUSUMECI:  And, so, it is -- you know, the

21  idea of understanding how to conduct a remote arbitration is

22  one thing.  The phrase that they're using, e-arbitration, is

23  a -- I will call it a term of art that -- that doesn't exist

24  and, honestly, is not pertinent to this.

25          THE COURT:  I'm only interested in -- and I think

41

1  that's what I was talking to Mr. Sears about.  I'm not

2  interested in that trademark application or that it was old

3  and that it was abandoned.  I want to know what it -- you

4  know, whether it's -- when you use the term, if you use it

5  now at all, trademarked or not, to describe the process, I

6  want to know what the process is.  What is the process that

7  you sell to the -- you know, how is it described to

8  Ticketmaster, because, again, I want -- I'm interested in

9  this case right now until it becomes a mass litigation about

10  a mass litigation, which, you know, hopefully I'll be

11  retired by then.  But I think that that's the concern Judge

12  Wu had is understanding, to the extent that term is used,

13  and understanding what the process is, because none of us

14  have done one, and, you know, for all I know, it may truly

15  be in some form a wave of the future.  Certainly, if I was,

16  you know, bringing an individual, you know, claim against

17  my, you know, cable provider and I could do it quickly and

18  not have to do a mass thing, I might be interested unless I

19  found out that the reason that they were doing that was

20  because they had a contract with somebody saying, you know,

21  it's flip a coin or less and you're going to, you know, lose

22  except for 25 percent of the time.  To me that's the basic

23  issue here, and I -- I think that's kind of the way Judge Wu

24  was looking at it too.

25           MS. MUSUMECI:  I -- I understand.  I don't think I

42

1  have any further questions at this point, your Honor.  You

2  know, we obviously will get a transcript of this proceeding,

3  and I am curious if --

4          THE COURT:  And I hope it's not -- I hope it -- I

5  hope it makes more sense when you read it than I think that

6  it's making to us now while we're -- while we're talking it

7  through.

8          MS. MUSUMECI:  This is helpful, but I was curious

9  if there will -- if your Honor intends to do a written

10 decision as well or if it will be the transcript of this.

11         THE COURT:  I was -- I'm going to do a -- a brief

12 summary that at least says sort of granted in part, and I'm

13 going to try to the extent that it's consistent with the

14 notes I had taken.  I haven't changed my mind on anything.

15 I think we've gotten a little more clear.  Well, let me ask

16 you this.  And I know we're not done yet, but if you and Mr.

17 Sears want to get a transcript and try to -- to work out a

18 proposed order and a proposed schedule for, you know, when

19 we finish for getting all of this stuff done, I would be

20 inclined to then say, you know, if you guys can -- I don't

21 know how fast you can get a transcript now, frankly.  But if

22 you, you know, want to get a proposed order to me within

23 whatever you say, a week or something like that, a week, two

24 weeks, and -- and set a schedule, I should be able to at

25 least review that and -- and get that out.  And then what

43

1  you would get from today is the Court, you know, made

2  rulings on the record, you know, please see the transcript,

3  but ask the parties to provide a more specific proposed

4  order.  That way, if you have some really specific

5  questions, I might be able to get to them.  I, frankly,

6  don't -- I don't know.  I have an appointment on Monday with

7  my oncologist, at which time I will find out what's going to

8  happen in the next few weeks, if anything, in the next just

9  couple of weeks.  So, I -- you know, part of me is loathe to

10 let you guys find more disagreements, although you're both

11 being incredibly reasonable today.

12         So, let me ask both of you, like I said, if I do a

13 summary, it's going to be a few sentences about each topic.

14 I might try to put a few examples in.  I would probably get

15 that done such that my courtroom deputy would file it on --

16 on -- she has until Monday -- Monday or Tuesday at the

17 latest, but it's probably -- it's not going to have the

18 level of detail that the transcript is.  And, so, what I do

19 is a summary and then don't bother me.  See the transcript

20 if you have questions.

21         What would you prefer?  Would you like to work out

22 a -- a proposed order based on the transcript or would you

23 rather I just do a summary?

24         MS. MUSUMECI:  My view, your Honor, is I thought

25 that Mr. Sears and I were working well together when we were

*Echo Reporting, Inc.*

44

1  having meet and confers.  Recently, perhaps, maybe that

2  hasn't been quite as productive.  But I'm -- I'm certainly

3  game to give it a try.  And with -- with the recognition

4  that we're not -- you know, we want to minimize the burden

5  on you while you're going through what I'm very sorry to

6  hear you're going through.

7          THE COURT:  Unfortunately, it happens much too

8  frequently to people today.  But, yes.  And, again, I have

9  -- you know, my colleagues would be -- you know, if you

10 provide them with a transcript, but I would really rather

11 not burden somebody else with it if you have -- if you have

12 questions.  I'd rather be able to take care of it myself.

13         Mr. Sears, which would -- you know, which makes

14 most sense to you?

15         MR. SEARS:  That works for us as well, your Honor,

16 and I should say I -- I'm very sorry to hear that as well,

17 but I'm -- I'm optimistic we could work something out with

18 Ms. Musumeci.

19         THE COURT:  Okay.  In which case, again, we're

20 going to go through the rest of these, but what you're going

21 to get -- and I'll still probably -- you know, probably will

22 be Monday so that my -- you know, I have a -- Ms. Bernal

23 has, you know, very nicely agreed to handle this today, but

24 she's not my courtroom deputy.  So, I'm not going to be

25 asking her to draft or file anything for me when we're done

45

1   today.  But I'll get it done and get it to Ms. Quintero, my

2   -- my courtroom deputy, so that it would come out Monday,

3   but it would really just say hearing was held.  The Court

4   made certain rulings which are evidenced by the transcript.

5   The parties have agreed to try to, you know, make that more

6   -- more clear, put it in writing and submit a proposed order

7   to the Court by whatever date we pick.  So, that's what

8   we'll -- we'll wind up doing.

9           So, anyway, we got -- that's -- that's topic 10.

10  Am I missing one more?

11          MS. MUSUMECI:  The last was topic 13, your Honor.

12          THE COURT:  Oh, that's right.  Topic 13 is the --

13          MR. SEARS:  Business plans.

14          THE COURT:  -- the business plans.  I -- I'm

15  inclined to very largely grant the motion to quash on

16  business plans generally, same extent as things before.  To

17  the extent there's something out there that may look like a

18  business plan or a presentation or something that is

19  relevant to this Defendant or, you know, with Latham and

20  Watkins, that I think is encompassed by the topic 10 we were

21  talking about anyway.  But, just generally business plans,

22  because the business plan, again, may be -- it -- to me it's

23  very similar to the raising capital generally that's not

24  relevant at least at this time to this portion of the case.

25          The other thing, by the way, is because discovery

46

1   is so, you know, fact -- fact -- or procedurally specific

2   and everything, all of these rulings and topics we talk

3   about are without prejudice to at a different procedural

4   point in the case.  If the case doesn't go to arbitration

5   and discovery gets opened wider or if, you know, other

6   parties are added to the case, this is not a the Court has

7   made a complete and final ruling for all time on any of

8   these issues.  So, essentially, it's without prejudice for

9   if there is a -- a change in the procedural posture or, you

10  know, if there's good cause based on a document or something

11  for reconsideration.  Just the reconsideration rules,

12  basically.  If you're going to bring it back to the same

13  judge and not appeal it to the higher authority, there has

14  to be a reason to do so.  But that -- again, I don't find

15  that that topic is particularly relevant to the issue of

16  whether the subscription agreement here has terms,

17  conditions, or rules that are -- are or will demonstrate

18  bias in favor of Ticketmaster or Live Nation.

19            MR. SEARS:  Your Honor, could I just make a couple

20  of brief points?  I'm very very cognizant of how much time

21  you've devoted to this, and I really appreciate --

22            THE COURT:  Well, okay.  And it's only 4:10.  For

23  a minute I thought it was 5:10 and that I was keeping Ms.

24  Bernal after when I should.

25            MR. SEARS:  Right.  Well, just a couple of points.

47

1   One, you said something to the effect that it's not

2   particularly relevant.  I just want to emphasize this is not

3   an all documents request.  This is documents sufficient to

4   show.  So, for this one, there's -- there's basically no

5   burden.  They could find a couple of business plans and

6   produce them.  So, that --

7            THE COURT:  They could, but if they don't find all

8   the business plans, the business plan, just like their

9   trademark application, what they thought their business plan

10  was when the company was a two-person startup versus what it

11  is now versus if it's not relevant to, you know, the -- you

12  know, if they wrote a, you know, business model to get

13  Ticketmaster on the hook, business model to be presented to

14  Latham and Watkins for their clients, then that seems --

15  it's a presentation or something that seems relevant to me

16  because it goes to the issue of what's going on with the

17  provision in this case, but -- but a business plan that says

18  we want to grow our business because we want to take the

19  business away from all of the -- the Plaintiffs' litigation

20  firms and make money that way, it doesn't seem to be

21  relevant as to whether or not the provision that they draft

22  in order to enforce, you know, other contractual provisions

23  is -- is fair to a customer or biased.  Again, it may be

24  biased against -- biased against cross-actions, which, you

25  know, one in a certain number of them are the most important

48

1  things that ever happened in this country, and, you know, a

2  number in a bunch of them are frivolous.  And that is not

3  dependent on law firm or anything else, but they are a

4  business model for litigation firms, just as arbitration is

5  a business model for arbitrators.  And, so, generally, one

6  business trying to compete with another business I don't

7  find relevant to whether a particular set of rules is biased

8  or not.

9          MR. SEARS:  Can I -- I apologize.

10         THE COURT:  No.  Go ahead, sir.

11         MR. SEARS:  That I understand, and I really -- I

12  won't belabor this point too much.  The one thing I just

13  want to note is that Judge Wu did note our allegations that

14  New Era would "eliminate" Plaintiffs' litigation rights in

15  ECF 50 at two.  And, so, I understand the Court's point

16  about arbitration providers competing with each other.  I

17  just think we're in a little bit of a different situation

18  here.  This case is truly sui generis.  We don't have to

19  rely on the trademark application to say it.  They actually

20  say it in the first page of their reply brief, that New Era

21  is trying to usher in "a new paradigm".  There is --

22         THE COURT:  Why is it called New Era?  But, see, I

23  don't think you need any of their internal documents to be

24  able to say that their -- their whole point is to try, and,

25  you know, some people will think that's good.  Some people

49

1  think that's terrible.  But Plaintiff -- when I read it,

2  what Judge Wu said -- now, maybe it's not what was in your

3  complaint, but I read it as Ticketmaster's customers'

4  litigation rights.  We want to get rid of -- now, if -- if

5  -- you know, and their business may be we would like all

6  plaintiffs to not have rights to litigate because we want

7  them to have to come to us, but it doesn't mean we're trying

8  to be unfair to them.  Every time if you knowingly sign an

9  arbitration agreement -- I got a lot of medical issues,

10 right?  I have to -- whether or not it's going to be

11 enforceable would be a question if I had to bring it to a

12 court, but there's no doctor in the world that will treat me

13 if I don't -- or hospital or any of those systems that don't

14 have an arbitration agreement in their -- in their terms of

15 use.  Well, if I have to use the hospital, I'm signing away

16 my litigation rights.  But, guess what?  I'm not really,

17 because some of that is probably not enforceable.  That's

18 the situation we have here.  So, the fact that all doctors

19 on the planet want me to sign away my ability to be able to

20 sue them for malpractice isn't really relevant to whether or

21 not the arbitration thing they've put in there is actually

22 signing away everybody, you know, all plaintiffs' rights to

23 sue or even necessarily in some cases, you know, by an

24 individual.

25            So, again, you know, ultimately, if -- that is

50

1  something that when you write your opposition, it would be a

2  -- you know, it's not until you craft your specific

3  arguments before the District Judge perhaps that you'll

4  know, boy, Standish got it wrong.  I expect that if I could

5  make this argument or I'm making this argument but I expect

6  there's a document out there that would support it, then in

7  that instance, Judge Wu may say she got that wrong.  I want

8  you to go back and, you know, almost like you were doing a

9  -- you know, a Rule 54 opposition.

10         The reason I can't win this case now is that this

11  one specific thing that I'm pretty certain exists and I -- I

12  wasn't allowed to get would allow me to win, then we'll --

13  you know, he would -- I'm sure, to be fair, he would stop

14  and say go get that document.

15         But, just as he was talking about, I'm not even

16  sure of the scope of what you're asking for.  I am at this

17  point not sure of the relevance of everything you -- that --

18  you know, I don't -- I don't really see how that's any more

19  relevant than the fact that their website says -- says what

20  it says about, you know, let's make all this low cost go --

21  you know, get away from litigation.

22         So --

23         MS. MUSUMECI:  Your Honor, if I may -- and I'm

24  mindful of time, and I -- and I understand this is a

25  discovery hearing, but in light of, you know, Plaintiffs --

51

1  Plaintiffs have made their allegations about a potential

2  bias.  I just need to say one time that New Era is -- is

3  designed to make it more efficient, less expensive, quicker

4  and easier for consumers' claims to actually be heard and to

5  be considered on the merits and not just based on a -- an

6  economic mode.

7              THE COURT:  I --

8              MS. MUSUMECI:  (Zoom glitch) the point, but there

9  was a record that --

10             THE COURT:  I know, and you want to put it on the

11 record.  But, you know, Judge Wu is not going to give a --

12 you know, a rat's tail, you know, about anything I say

13 that's related to substance, and I think I've been careful.

14 Discovery's based on the allegations until either they get

15 dismissed or anything.  So, we're talking only about

16 allegations, and I am trying to be careful to say I -- you

17 know, I'm -- I'm in favor of, you know, the statutes of the

18 land which the arbitration is a favored forum.  It doesn't

19 mean it's always a fair one.  It doesn't mean -- litigation

20 isn't always fair either.

21             So, I am not taking a position, but the Plaintiffs

22 have made certain allegations, and I'm trying to -- to kind

23 of narrowly, you know, provide -- provide them discovery.

24 But I am certainly not making any findings one way or the

25 other with respect to the -- the third party.  And, again, I

52

1   -- I do have that in mind.  New Era is not a Defendant in

2   this case, and I -- I realize the allegations are of some

3   kind of solution, but they -- I assume that if the

4   Plaintiffs had enough to actually prove that, then New Era

5   would have been a Defendant and not a third party at this

6   point.  So, enough -- enough pontificating.  But you have a

7   point, Ms. Musumeci.

8          The one thing that I am going to say when we get

9   -- so, this is about the -- the 30(b)(6) deposition.  There

10  was some back and forth in the papers about, you know, how

11  documents were searched for and who the custodians are.

12         Ms. Musumeci, I want New Era's witness to be able

13  to talk to all of that.  There is nothing confidential, and

14  there is no -- no waiver of privilege in -- in the

15  Plaintiffs being able to ask questions about how is

16  information kept, where is it kept, who are the custodians,

17  not why did you choose them but who are the custodians that

18  you -- what -- what positions do they have, what six did you

19  choose, and, you know -- you know, who are the -- what

20  other, you know, email custodians exist, just so that if

21  they want to -- to, you know, make a claim at some point

22  that, you know, heck, the most important person based on

23  titles, emails were never searched.

24         MS. MUSUMECI:  I understand, your Honor.

25         THE COURT:  Okay.  And then this is one of the

53

1  reasons I would like you guys to agree on a schedule.  To

2  the extent that there are, you know, privileged documents

3  that fall within these categories, I actually think the most

4  burdensome thing most of the time is having to actually

5  create that log.

6          So, I -- I do want the -- the third party to

7  prepare a privilege log.  They don't have to, obviously,

8  produce privileged documents, and hopefully most of what

9  we've been talking about is all related to, you know, it's

10  mostly communications with other parties just, you know,

11  business only decisions, but I suspect some things may come

12  up where, you know, questions were asked of counsel related

13  to this even before the filing of the lawsuit.

14          So, I will want a privilege log.  It doesn't

15  necessarily -- if it can happen before the -- the 30(b)(6),

16  that's best only because then the foundation for -- for the

17  privilege can at least be, you know, who is this person?

18  This person's a lawyer?  But I want the privilege log to

19  contain, you know, just sufficient information to

20  demonstrate the privilege exists so that if there, you know,

21  has to be a challenge later, it will be much easier for the

22  Court to review.

23          So, that said, do -- Mr. Sears or Ms. Musumeci,

24  the hearing on the 1st, again, I forgot to go back and see

25  what it was Judge Wu's order was about.  Is that a status of

54

1  discovery post this hearing or is that supposed to be a

2  deadline for some of the discovery itself?

3          MR. SEARS:  That's a status hearing, your Honor.

4  As much as we'd all like to do the 30(b)(6)'s between now

5  and December 1st, I don't -- I don't think that's going to

6  happen.

7          THE COURT:  Yeah.  We've got a little bit of

8  Thanksgiving holiday and stuff in the middle there too.  All

9  right.  If that's the case, then I am not going to order

10 that any of this be done by a specific date.  I want -- what

11 I am going to, you know, put in the five or six-sentence

12 order is going to be that the parties are to provide a -- a

13 proposed schedule for the discovery that I've ordered to the

14 District Court and to -- you know, copied to me, but it's

15 Judge Wu who will sign off on it or not in terms of setting

16 the schedule so that then he can also set the -- the further

17 schedule for the motion practice.

18          So, you know, please talk about a date for

19 documents, date for the 30(b)(6), date for the privilege

20 log.  And, to the extent that you don't agree on those

21 dates, please present them to Judge Wu as our proposal,

22 their proposal, just like you would if you were doing a Rule

23 16 conference so that he can either pick one date, the

24 other, or make up his own for that.  But you guys do seem to

25 be working well together, and -- and, you know, keep in mind

55

1  obviously that you have other holidays coming up as well,

2  and neither myself nor Judge Wu are going to want anybody to

3  either miss a -- a holiday or child's recital or something

4  important.  Something -- believe me, I understand better now

5  than I ever did before there are lots of things more

6  important than this Zoom hearing that we're having right

7  now.

8          All right.  Now that we've talked until we're all

9  hoarse, is there anything -- I'll ask you first, Mr. Sears,

10  is there anything that you believe I have missed that we

11  need to talk about?

12          MR. SEARS:  There was one thing you mentioned that

13  we would come back to that we haven't talked about yet,

14  which is search terms and at, you know, 4:30 on a Friday, I

15  don't think any of us would like to have a long conversation

16  about it.  What I want to be clear on, though, is consistent

17  with your comments about the 30(b)(6), that New Era is part

18  of this process and in the spirit of transparency and

19  cooperation, is going to have to provide some detail about

20  the discovery that they're doing.

21          As we explained in the motion, one of our concerns

22  is -- is not just what they are agreeing to produce in the

23  abstract but how that actually works, because we don't --

24          THE COURT:  Exactly.  So, that's what I meant is

25  why -- so, I'm not -- I'm not requiring them to have -- or

56

1  to allow you to sign off on their search terms, but they

2  know what I want them to produce, and when you depose their

3  witness about how those documents -- you know, how they came

4  up with those documents or what that witness did to prepare

5  to understand to be able to answer your questions.  You

6  know, if they used search terms, great.  If what happened is

7  that even though we have a digital platform, we still keep

8  everything in a box under our desk, they'll tell you that,

9  you know, who the custodians are, who they -- who they

10  chose.

11          I don't want there to be privilege debates about,

12  you know, well, why did you choose them?  Chose them in

13  consultation with counsel.  Don't need a why.  Who are your

14  principals?  You know, who -- where is this kind of data

15  kept so that we can get non-duplicative stuff, and who was

16  it that you chose.  So, you know, I -- so, big waste of time

17  on the record when you ask, you know, why did you do this

18  and not the other.  Oh, you didn't do the CEO?  Would the

19  CEO be expected to have non-duplicative blah, blah, blah?

20  And if the answer is he would be expected to have it and you

21  didn't search it, then you know that, Mr. Sears, and when

22  you get to go to Judge Wu, you say they were -- you know, my

23  theory is that they were hiding things because they only

24  searched the janitor's email.

25          And -- and, Ms. Musumeci, I am -- I know I'm --

57

1  like I -- that's why I always say I'm making stuff up.  I
2  realize that is not what's -- what's going to happen here.
3  And I actually trust that -- that the parties are going to
4  do their best.  I realize it's going to be, you know, iron
5  fists and velvet gloves, but -- but I think you both know
6  that Judge Wu, if he thinks he's missing something that --
7  so that he can't make a decision, believe it or not, he's --
8  you know, he, kind of my issue.  You're not going to be mad
9  at me.  He's going to be mad at the -- at counsel.  He
10 didn't get mad at anybody.  He's great actually.

11        You've got a great -- a very very good and a very
12 thoughtful judge on this.  So, all right.  Let me ask.  I
13 think it was Mr. Huseny, were you the one who was going to
14 speak if necessary on behalf of -- of the Defendants?

15        MR. HUSENY:  I was, your Honor, and I don't think
16 it's necessary.  But, of course, happy to answer any
17 questions you may have.

18        THE COURT:  No.  I just wanted it to be clear on
19 the record since, again, there's -- the official record is
20 the audio transcript, not the -- not the Zoom, which is --
21 was this unfortunate mess because of security reasons as to
22 how we -- what we record and how we do it, and I wanted to
23 make it just clear that if there's something you wanted to
24 say, I gave you the opportunity.

25        MR. HUSENY:  Thank you.

58

1          THE COURT:  All right.  Anything -- Mr. Sears, go

2  ahead.

3          MR. SEARS:  I'm -- I'm sorry, your Honor.  There

4  is -- perhaps it's apt that Mr. Huseny was called in.  So,

5  we -- we have a potential dispute with the Defendants over

6  some documents we requested from Latham and Watkins.  I'm

7  not going to get into the merits now because it's not

8  briefed.  We've also had some followup requests with Ms.

9  Musumeci, not about what we're talking about today but about

10  some of the documents they've produced, some metadata we

11  think is missing, some issues with some of the attachments.

12          Given what your Honor has told us and the holidays

13  coming up, you know, our -- our strong preference would be

14  able to resolve these type of disputes very quickly.

15          What is -- what is the best procedure if we're not

16  able to agree on things.  Is it to try to schedule another

17  hearing?  Is there some kind of expedited briefing we could

18  do?  I think we're at the point where we're working well

19  enough that we don't need 15-page opening and reply briefs

20  stretched out over weeks, but we may realistically need

21  intervention from the Court before discovery is over.

22          THE COURT:  Well, if that's the case, the problem

23  is that I don't know my schedule until after this next week,

24  and I'm not even certain, you know, until I get -- actually

25  get to talk to my doctor what his proposed schedule is going

59

1  to be and what the proposed treatment's going to be and, you

2  know, and whether or not there's going to be people

3  available to do whatever it is they decide that they're

4  going to do.

5          So, my guess is that, especially if you want

6  something sooner rather than later, you know, I -- I'm going

7  to -- I'm going to send an email to Judge Wu.  As I said, if

8  there's going to be a lot more going on in the near term,

9  I'm probably going to transfer the case, in which case,

10  unfortunately for at least the first motion after that,

11  you're going to need to provide the same kind of briefing

12  that -- you know, so that there's background and everything

13  else.  All my colleagues will do the same thing I did.  I

14  went and -- you know, even before I read the papers, I went

15  and looked at the docket to see what the heck was going on.

16  I couldn't -- we have enough cases that I couldn't remember

17  if I'd ever touched on the case before, if I'd ever issued

18  an order, if you'd ever had a discovery dispute.  So, I went

19  back and looked and read Judge Wu's orders so that that's

20  how I came into this.  And, unfortunately, that's really how

21  somebody else is going to wind up parachuting in.

22          If I transfer the case, generally, what will

23  happen is it will go -- it will stay with Judge Wu.  It will

24  go back on the wheel most of the time unless Judge Wu has a

25  preference, which I'll talk to him about, for, you know,

1 transferring the case to a particular Magistrate Judge that

2 -- that is available to handle it.  But most of the time the

3 District Judges are just like, you know, we're fungible.

4          So, it will -- it will be a new random assignment

5 from me to somebody else.  If you want to propose to him

6 that the schedule be far enough out that, you know, I can

7 handle this again most likely in January, then at least

8 there's the possibility that you'll get me then because,

9 hopefully, I'll know more next week as to whether or not I'm

10 going to -- I'm going to keep the case.

11          Because you'd already briefed -- you already

12 briefed this before I found out what I found out.  So,

13 otherwise, I would have transferred the case in advance.

14 Probably would have been smarter, so that you could have the

15 same Magistrate Judge with some background.  I was hoping

16 that this would be the extent of the disputes, but if

17 there's going to be more, it's -- it is more likely you're

18 going to wind up with someone else or Judge Wu may decide to

19 do it himself, but the District Judges are -- you know, we

20 think we're busy.  The District Judges are insanely busy by

21 comparison.  So --

22          MR. SEARS:  I understand.  Well, best of luck,

23 your Honor.  I really hope it goes as well as it can Monday,

24 and thank you again for making time for us.

25          THE COURT:  Yeah.  No, and, like I said, I will

61

1  let Judge Wu know what's going on.  And if it turns out that

2  things are going to go faster or be easier than I thought,

3  great.  But, otherwise, thank you for the heads up because

4  what I would probably then do is have the case thrown back

5  on the wheel sooner rather than later so you would know who

6  the judge was, and I would know as well, because I will

7  transfer my case files and -- to the extent that there are

8  files, and -- and try to help that Magistrate Judge get up

9  to speed about what's going on.

10          MR. HUSENY:  Your Honor, we will work with

11  Plaintiffs on that.  I'm a little surprised they raised it

12  because no issue is pending currently.  Certainly, nothing's

13  been drafted.  This is a --

14          THE COURT:  No, and I'm not -- look, again, I'm

15  glad Mr. Sears did, in light of my comments about how the

16  heck do we get court intervention if we need it, given what

17  I said.  Just the fact that he raised it does not mean that

18  I think anyone's got a good issue or a bad issue or any

19  issue at all, and I hope that whatever it is, you guys will

20  be able to work it out, you know, because it's -- it only

21  slows you down if you have to get -- and I -- you guys have

22  been wonderful, but I used to sometimes get frustrated

23  enough with parties that I would -- you know, my version of

24  an outburst was, you know, just because you guys can't play

25  nicely in the sound box and you need mommy to intervene,

62

1  that's not this case.  But, hopefully, you can work it out

2  and you won't need mommy or daddy to intervene.

3          So, go forth.  I'm sorry we talked for an hour and

4  a half because you guys have to go through the transcript

5  and see what you can make of it.  I will do, like I said,

6  paragraphs that will kind of say this one's granted.  I'm

7  going to do a little tiny summary, but it's going to note

8  that to the extent my little summary is inconsistent with

9  what's in the transcript, the transcript that you will --

10 you guys will go through will control.  So, don't worry if

11 I, you know, based on my old notes -- and it's not going to

12 be -- it's going to be a little paragraph about each thing,

13 because the -- the courtroom deputies, or what we call our

14 DQA's, when they're entering the hearing, are going to want

15 to -- they're going to want to see it's going to say, you

16 know, granted in part and denied in part and -- because they

17 like to be able to put it in a box, but, otherwise, it will

18 be mostly just a little summary.  Expect that -- to get that

19 Monday or at latest Tuesday on the record.

20         All right.  Thank you guys for your patience, and

21 I hope that we've got most of this clear.  There's always

22 something that comes up afterwards that the parties have to

23 talk about, but -- and if y'all are lucky, you actually

24 won't -- won't need any further help before you talk to

25 Judged Wu.

63

1          All right.  Thank you very much.

2          ALL:  Thank you, your Honor.

3     (Proceedings concluded.)

64

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/Jordan Keilty                      11/22/2022
     Transcriber                           Date
6
     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
     /s/L.L. Francisco
9    L.L. Francisco, President
     Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25