# EXHIBIT L

Case 2:22-cv-00047-GW-GJS Document 84-2 Filed 11/17/22 Page 3 of 19 Page ID #:1534
Case 2:22-cv-00047-GW-GJS Document 78-2 (Ex Parte) Filed 10/11/22 Page 2 of 18 Page ID #:1079
DocuSign Envelope ID: 38622348-C4A4-4777-BFC2-4725514C3B4B

# SUBSCRIPTION AGREEMENT

This Subscription Agreement ("**Agreement**"), effective as of June 22, 2021 (the "**Effective Date**"), is by and between New Era ADR, Inc., a Delaware Corporation with offices located at 917 W. Washington Blvd, Suite 104, Chicago, IL 60607 ("**Provider**"), on the one hand, and Live Nation Entertainment, Inc., a Delaware Corporation with offices located at 9348 Civic Center Drive, Beverly Hills, CA 90210, and all of Live Nation Entertainment, Inc.'s parents, subsidiaries, representatives, affiliates, officers, and directors (collectively, with Live Nation Entertainment, Inc., "**Customer**"), on the other. Provider and Customer may be referred to herein collectively as the "**Parties**" or individually as a "**Party**."

WHEREAS, Provider provides access to the Services to its customers; and

WHEREAS, Customer desires to access the Services, and Provider desires to provide Customer access to the Services, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. <u>Definitions</u>.

   (a) "**Aggregated Statistics**" means data and information related to Customer's use of the Services that are used by Provider in an aggregate and anonymized manner, including to compile statistical and performance information related to the provision and operation of the Services.

   (b) "**Authorized User**" means Customer's employees, consultants, contractors, and agents (i) who are authorized by Customer to access and use the Services under the rights granted to Customer pursuant to this Agreement, and (ii) for whom access to the Services has been purchased pursuant to Section 3 of **Exhibit A**.

   (c) "**Customer Data**" means information, data, and other content, in any form or medium—other than Aggregated Statistics—that are submitted, posted, or otherwise transmitted by or on behalf of Customer or an Authorized User through the Services.

   (d) "**Documentation**" means Provider's user manuals, handbooks, and guides relating to the Services provided by Provider to Customer either electronically or in hard copy form.

   (e) "**Provider IP**" means the Services, the Documentation, and any and all intellectual property provided to Customer or any Authorized User in connection with the foregoing. For the avoidance of doubt, Provider IP includes Aggregated Statistics and any information, data, or other content derived from Provider's monitoring of Customer's access to or use of the Services, but does not include Customer Data.

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

TM00000032

(f) "**Services**" means the following alternative dispute resolution services on the platform provided by New Era ADR, Inc. (https://neweraadr.com/) (the "**New Era Platform**"): (i) expedited virtual arbitrations, (ii) Mass Arbitrations (defined in Section 1 of **Exhibit A**), (iii) virtual mediations, and (iv) virtual mediations with a binding resolution (when available), and (v) all services on the New Era Platform that are provided ancillary to, and as a part of, clauses (i) - (iv) in this paragraph. For the avoidance of doubt, the Services shall not include Provider's standard virtual arbitration product. Further description is provided in **Exhibit A** and in the Rules and Procedures that govern Provider's dispute resolution processes, available at www.neweraadr.com.

(g) "**Third-Party Products**" means any third-party products provided with or incorporated into the Services.

2. Access and Use.

(a) Provision of Access. Subject to and conditioned on Customer's payment of Fees and compliance with all other terms and conditions of this Agreement, Provider hereby grants Customer a non-exclusive, non-transferable (except in compliance with Section 12(g)) right to access and use the Services during the Term, solely for use by Authorized Users in accordance with the terms and conditions herein. Such use is limited to Customer's internal use. Provider shall provide to Customer the necessary passwords and network links or connections to allow Customer to access the Services.

(b) Documentation License. Subject to the terms and conditions contained in this Agreement, Provider hereby grants to Customer a non-exclusive, non-sublicensable, non-transferable (except in compliance with Section 12(g)) license to use the Documentation during the Term solely for Customer's internal business purposes in connection with its use of the Services.

(c) Use Restrictions. Customer shall not use the Services for any purposes beyond the scope of the access granted in this Agreement or any applicable Statement of Work. Customer shall not at any time, directly or indirectly, and shall not permit any Authorized Users to: (i) copy, modify, or create derivative works of the Services or Documentation, in whole or in part; (ii) rent, lease, lend, sell, license, sublicense, assign, distribute, publish, transfer, or otherwise make available the Services or Documentation; (iii) reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to any software component of the Services, in whole or in part; (iv) remove any proprietary notices from the Services or Documentation; or (v) use the Services or Documentation in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law.

(d) Reservation of Rights. Provider reserves all rights not expressly granted to Customer in this Agreement. Except for the limited rights and licenses expressly granted under this Agreement, nothing in this Agreement grants, by implication, waiver, estoppel,

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

TM00000033

or otherwise, to Customer or any third party any intellectual property rights or other right, title, or interest in or to the Provider IP.

(e) Suspension. Notwithstanding anything to the contrary in this Agreement, Provider may temporarily suspend Customer's and any Authorized User's access to any portion or all of the Services (a **"Service Suspension"**) if: (i) Provider reasonably determines that (A) there is a threat or attack on any of the Provider IP; (B) Customer's or any Authorized User's use of the Provider IP disrupts or poses a security risk to the Provider IP or to any other customer or vendor of Provider; (C) Customer, or any Authorized User, is using the Provider IP for fraudulent or illegal activities; (D) subject to applicable law, Customer has ceased to continue its business in the ordinary course, made an assignment for the benefit of creditors or similar disposition of its assets, or become the subject of any bankruptcy, reorganization, liquidation, dissolution, or similar proceeding; or (E) Provider's provision of the Services to Customer or any Authorized User is prohibited by applicable law; (ii) any vendor of Provider has suspended or terminated Provider's access to or use of any third-party services or products required to enable Customer to access the Services; or (iii) in accordance with Section 4(a)(iii). Provider shall use commercially reasonable efforts to provide written notice of any Service Suspension to Customer and to provide updates regarding resumption of access to the Services following any Service Suspension. Provider shall use commercially reasonable efforts to resume providing access to the Services as soon as reasonably possible after the event giving rise to the Service Suspension is cured. Provider will have no liability for any damage, liabilities, losses (including any loss of data or profits), or any other consequences that Customer or any Authorized User may incur as a result of a Service Suspension.

(f) Aggregated Statistics. Notwithstanding anything to the contrary in this Agreement, Provider may monitor Customer's use of the Services and collect and compile Aggregated Statistics. As between Provider and Customer, all right, title, and interest in Aggregated Statistics, and all intellectual property rights therein, belong to and are retained solely by Provider. Customer acknowledges that Provider may compile Aggregated Statistics based on Customer Data input into the Services. Customer agrees that Provider may (i) make Aggregated Statistics publicly available in compliance with applicable law, and (ii) use Aggregated Statistics to the extent and in the manner permitted under applicable law; provided that such Aggregated Statistics do not identify Customer or Customer's Confidential Information as defined in Section 5 of this Agreement.

3. Customer Responsibilities.

(a) General. Customer is responsible and liable for all uses of the Services and Documentation resulting from access provided by Customer, directly or indirectly, whether such access or use is permitted by or in violation of this Agreement. Without limiting the generality of the foregoing, Customer is responsible for all acts and omissions of Authorized Users, and any act or omission by an Authorized User that would constitute a breach of this Agreement if taken by Customer will be deemed a breach of this Agreement by Customer. Customer shall use reasonable efforts to make all Authorized

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

TM00000034

Case 2:22-cv-00047-GW-GJS Document 84-21 Filed 11/17/22 Page 6 of 19 Page ID #:1537
Case 2:22-cv-00047-GW-GJS Document 78-2 (Ex Parte) Filed 10/11/22 Page 5 of 18 Page ID #:1082
DocuSign Envelope ID: 38622348-C4A4-4777-BFC2-4725514C3B4B

Users aware of this Agreement's provisions as applicable to such Authorized User's use of the Services, and shall cause Authorized Users to comply with such provisions.

(b) Third-Party Products. Provider may from time to time make Third-Party Products available to Customer. For purposes of this Agreement, such Third-Party Products are subject to their own terms and conditions and the applicable flow-through provisions. If Customer does not agree to abide by the applicable terms for any such Third-Party Products, then Customer should not install or use such Third-Party Products.

4. Fees and Payment.

(a) Fees. Customer shall pay Provider the subscription fees ("**Fees**") as set forth in **Exhibit A** without offset or deduction pursuant to an invoice (which shall specify a payment due date that is 30 days from the date of the invoice) to be submitted by Provider upon execution of this Agreement. Provider shall submit a new invoice (each specifying a payment due date that is 30 days of the date of the invoice) for each Renewal Term prior to the termination of the then-current Term. Customer shall make all payments hereunder in US dollars on or before the due date set forth in each such invoice. If Customer fails to make any payment within ten (10) business days of such due date, without limiting Provider's other rights and remedies: (i) Provider may charge interest on the past due amount at the rate of 1.5% per month calculated daily and compounded monthly or, if lower, the highest rate permitted under applicable law; (ii) Customer shall reimburse Provider for all reasonable costs incurred by Provider in collecting any late payments or interest, including attorneys' fees, court costs, and collection agency fees; and (iii) if such failure continues for sixty (60) days or more, Provider may suspend Customer's and its Authorized Users' access to any portion or all of the Services until such amounts are paid in full.

(b) Taxes. All Fees and other amounts payable by Customer under this Agreement are exclusive of taxes and similar assessments. Customer is responsible for all sales, use, and excise taxes, and any other similar taxes, duties, and charges of any kind imposed by any federal, state, or local governmental or regulatory authority on any amounts payable by Customer hereunder, other than any taxes imposed on Provider's income.

(c) Auditing Rights and Required Records. Customer agrees to maintain complete and accurate records in accordance with generally accepted accounting principles during the Term and for a period of two years after the termination or expiration of this Agreement with respect to matters necessary for accurately determining amounts due hereunder.

5. Confidential Information. During the Term, it is highly likely that either Party may disclose or make available to the other Party information about its business affairs, products, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information, whether orally or in written, electronic, or other form or media, whether or not marked, designated, or otherwise identified as "confidential" (collectively, "**Confidential Information**"). Confidential

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

TM00000035

Case 2:22-cv-00047-GW-GJS Document 84-2 Filed 10/17/22 Page 7 of 19 Page ID #:1538
Case 2:22-cv-00047-GW-GJS Document 78-2 (Ex Parte) Filed 10/11/22 Page 6 of 18 Page ID #:1083
DocuSign Envelope ID: 38622348-C4A4-4777-BFC2-4725514C3B4B

Information does not include information that, at the time of disclosure is: (a) in the public domain; (b) known to the receiving Party at the time of disclosure; (c) rightfully obtained by the receiving Party on a non-confidential basis from a third party; or (d) independently developed by the receiving Party. The receiving Party shall not disclose the disclosing Party's Confidential Information to any person or entity, except to the receiving Party's employees who have a need to know the Confidential Information for the receiving Party to exercise its rights or perform its obligations hereunder. Notwithstanding the foregoing, each Party may disclose Confidential Information to the limited extent required (a) in order to comply with the order of a court or other governmental body, or as otherwise necessary to comply with applicable law, provided that the Party making the disclosure pursuant to the order shall first have given written notice to the other Party and made a reasonable effort to obtain a protective order; or (b) to establish a Party's rights under this Agreement, including to make required court filings. On the expiration or termination of the Agreement, the receiving Party shall promptly return to the disclosing Party all copies, whether in written, electronic, or other form or media, of the disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the disclosing Party that such Confidential Information has been destroyed. Each Party's obligations of non-disclosure with regard to Confidential Information are effective as of the Effective Date and will expire five years from the date first disclosed to the receiving Party; provided, however, with respect to any Confidential Information that constitutes a trade secret (as determined under applicable law), such obligations of non-disclosure will survive the termination or expiration of this Agreement for as long as such Confidential Information remains subject to trade secret protection under applicable law.

6. Intellectual Property Ownership; Feedback.

(a) Provider IP. Customer acknowledges that, as between Customer and Provider, Provider owns all right, title, and interest, including all intellectual property rights, in and to the Provider IP and, with respect to Third-Party Products, the applicable third-party providers own all right, title, and interest, including all intellectual property rights, in and to the Third-Party Products.

(b) Customer Data. Provider acknowledges that, as between Provider and Customer, Customer owns all right, title, and interest, including all intellectual property rights, in and to the Customer Data. Subject to the confidentiality provisions in Section 5 of this Agreement, Customer hereby grants to Provider a non-exclusive, royalty-free, worldwide license to reproduce, distribute, and otherwise use and display the Customer Data and perform all acts with respect to the Customer Data as may be necessary for Provider to provide the Services to Customer, and a non-exclusive, perpetual, irrevocable, royalty-free, worldwide license to reproduce, distribute, modify, and otherwise use and display Customer Data incorporated within the Aggregated Statistics, consistent with Section 2(f).

(c) Feedback. If Customer or any of its employees or contractors sends or transmits any communications or materials to Provider by mail, email, telephone, or otherwise, suggesting or recommending changes to the Provider IP, including without limitation, new features or functionality relating thereto, or any comments, questions, suggestions, or the

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

TM00000036

like ("**Feedback**"), Provider is free to use such Feedback irrespective of any other obligation or limitation between the Parties governing such Feedback. Customer hereby assigns to Provider on Customer's behalf, and on behalf of its employees, contractors and/or agents, all right, title, and interest in, and Provider is free to use, without any attribution or compensation to any party, any ideas, know-how, concepts, techniques, or other intellectual property rights contained in the Feedback, for any purpose whatsoever, although Provider is not required to use any Feedback.

(d) Trademark. Neither Party shall use the other Party's trademark(s) without express written consent except as specifically set forth herein. Without limiting the generality of the preceding sentence, Provider shall have a revocable right to use Customer's trademark solely in marketing materials demonstrating that Customer is a user of the Provider's Platform.

7. Limited Warranty and Warranty Disclaimer.

(a) Provider warrants that the Services will conform in all material respects to the Documentation and in a commercially reasonable manner when accessed and used in accordance with the Documentation. Provider does not make any representations or guarantees regarding uptime or availability of the Services. THE FOREGOING WARRANTY DOES NOT APPLY, AND PROVIDER STRICTLY DISCLAIMS ALL WARRANTIES, WITH RESPECT TO ANY THIRD-PARTY PRODUCTS.

(b) EXCEPT FOR THE LIMITED WARRANTY SET FORTH IN SECTION 8(a), THE PROVIDER IP IS PROVIDED "AS IS" AND PROVIDER HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. PROVIDER SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE PRACTICE. EXCEPT FOR THE LIMITED WARRANTY SET FORTH IN SECTION 8(a), PROVIDER MAKES NO WARRANTY OF ANY KIND THAT THE PROVIDER IP, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET CUSTOMER'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM, OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR FREE.

8. Indemnification.

(a) Provider Indemnification.

(i) Provider shall indemnify, defend, and hold harmless Customer from and against any and all losses, damages, liabilities, and costs (including reasonable attorneys' fees) ("**Losses**") incurred by Customer resulting from any third-party claim, suit, action, or proceeding ("**Third-Party Claim**") that the Services, or any use of the Services in accordance with this Agreement, infringes or misappropriates such third party's US

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

TM00000037

intellectual property rights, US patents, copyrights, or trade secrets, provided that Customer promptly notifies Provider in writing of the claim, cooperates with Provider, and allows Provider sole authority to control the defense and settlement of such claim.

(ii) If such a claim is made or appears possible, Customer agrees to permit Provider, at Provider's sole discretion, to (A) modify or replace the Services, or component or part thereof, to make it non-infringing, or (B) obtain the right for Customer to continue use. If Provider determines that neither alternative is reasonably available, Provider may terminate this Agreement, in its entirety or with respect to the affected component or part, effective immediately on written notice to Customer.

(iii) This Section 8(a) will not apply to the extent that the alleged infringement arises from: (A) use of the Services in combination with data, software, hardware, equipment, or technology not provided by Provider or authorized by Provider in writing; (B) modifications to the Services not made by Provider; (C) Customer Data; or (D) Third-Party Products.

(b) Customer Indemnification. Customer shall indemnify, hold harmless, and, at Provider's option, defend Provider from and against any Losses resulting from any Third-Party Claim that the Customer Data, or that any use of the Customer Data in accordance with this Agreement, infringes or misappropriates such third party's US intellectual property rights, and from any Third-Party Claims based on Customer's or any Authorized User's (i) negligence or willful misconduct in connection with the Services or Customer Data; (ii) use of the Services in a manner not authorized by this Agreement; (iii) use of the Services in combination with data, software, hardware, equipment, or technology not provided by Provider or authorized by Provider in writing; or (iv) modifications to the Services not made by Provider, provided that Provider promptly notifies Customer in writing of the claim, cooperates with Customer, and allows Customer sole authority to control the defense and settlement of such claim.

(c) Sole Remedy. THIS SECTION 8 SETS FORTH THE PARTIES' SOLE REMEDIES, LIABILITIES, AND OBLIGATIONS FOR ANY ACTUAL, THREATENED, OR ALLEGED CLAIMS THAT THE SERVICES INFRINGE, MISAPPROPRIATE, OR OTHERWISE VIOLATE ANY INTELLECTUAL PROPERTY RIGHTS OF ANY THIRD PARTY.

9. Limitations of Liability.

(a) IN NO EVENT WILL PROVIDER BE LIABLE UNDER OR IN CONNECTION WITH THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE, FOR ANY: (a) CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, ENHANCED, OR PUNITIVE DAMAGES; (b) INCREASED COSTS, DIMINUTION IN VALUE OR LOST BUSINESS, PRODUCTION, REVENUES, OR PROFITS; (c) LOSS OF GOODWILL OR REPUTATION; (d) USE, INABILITY TO USE, LOSS, INTERRUPTION, DELAY, OR RECOVERY OF ANY DATA, OR BREACH OF DATA OR SYSTEM SECURITY; OR (e) COST OF REPLACEMENT GOODS OR

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

TM00000038

Case 2:22-cv-00047-GW-GJS   Document 143-14 Filed 11/17/24   Page 10 of 18   Page ID #:1641
Case 2:22-cv-00047-GW-GJS   Document 78-2 (Ex Parte)   Filed 10/11/22   Page 9 of 18   Page ID #:1086
DocuSign Envelope ID: 38622348-C4A4-4777-BFC2-4725514C3B4B

SERVICES, IN EACH CASE REGARDLESS OF WHETHER PROVIDER WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE. IN NO EVENT WILL PROVIDER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE EXCEED TWO TIMES THE TOTAL AMOUNTS PAID AND AMOUNTS ACCRUED BUT NOT YET PAID TO PROVIDER UNDER THIS AGREEMENT IN THE YEAR PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM.

(b) IN NO EVENT WILL CUSTOMER BE LIABLE TO PROVIDER OR ANYONE ELSE UNDER OR IN CONNECTION WITH THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE, FOR ANY: (a) CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, ENHANCED, OR PUNITIVE DAMAGES; (b) INCREASED COSTS, DIMINUTION IN VALUE OR LOST BUSINESS, PRODUCTION, REVENUES, OR PROFITS; (c) LOSS OF GOODWILL OR REPUTATION; (d) BREACH OF DATA OR SYSTEM SECURITY; OR (e) ERRORS, MISTAKES, INACCURACIES OR OMISSIONS IN CUSTOMER DATA OR ANY CONTENT CUSTOMER CAUSES TO BE PUT ON THE NEW ERA PLATFORM, IN EACH CASE REGARDLESS OF WHETHER CUSTOMER WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE. IN NO EVENT WILL CUSTOMER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE EXCEED TWO TIMES THE TOTAL AMOUNTS PAID AND AMOUNTS ACCRUED BUT NOT YET PAID TO PROVIDER UNDER THIS AGREEMENT IN THE YEAR PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM.

THE PARTIES' LIABILITY WILL BE LIMITED UNDER THIS SECTION TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW; HOWEVER, THE PROVISIONS OF THIS PARAGRAPH WILL <u>NOT</u> APPLY TO THE EXTENT APPLICABLE LAW (a) PERMITS THE RECOVERY OF AND (b) PROHIBITS THE LIMITATION OF, SUCH DAMAGES, ATTORNEYS' FEES OR COSTS THAT ARE OTHERWISE PROHIBITED UNDER THIS PARAGRAPH.

10. Term and Termination.

(a) Term. The initial term of this Agreement begins on the Services Commencement Date (defined in **Exhibit A**) and, unless terminated earlier pursuant to this Agreement's express provisions, will continue in effect until one year from such date (the "**Initial Term**"). After the Initial Term, this Agreement shall be automatically renewed each year for an additional one-year period at the rates set forth in Section 5(iii) (each a "Renewal Term" and together with the Initial Term, the "Term") for five years following the end of the Initial Term, unless the Provider or the Customer elects not to renew this Agreement

by providing written notice to the other Party at least sixty (60) days prior to the end of the then-current term.

(b) Termination. In addition to any other express termination right set forth in this Agreement:

(i) Provider may terminate this Agreement, effective on written notice to Customer, if Customer: (A) fails to pay any amount when due hereunder, and such failure continues more than sixty days after Provider's delivery of written notice thereof; or (B) breaches any of its obligations under Section 2(c) or Section 5;

(ii) either Party may terminate this Agreement, effective on written notice to the other Party, if the other Party materially breaches this Agreement, and such breach: (A) is incapable of cure; or (B) being capable of cure, remains uncured thirty days after the non-breaching Party provides the breaching Party with written notice of such breach;

(iii) either Party may terminate this Agreement, effective on written notice to the other Party, if the other Party: (A) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (B) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (C) makes or seeks to make a general assignment for the benefit of its creditors; or (D) applies for or has appointed a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business; and

(iv) Customer may terminate this Agreement, effective on written notice to Provider, if: (A) Provider is unable to commence any Service(s) on the New Era Platform—including assigning a neutral to preside over the Service(s)—within sixty (60) days of the date on which the claim(s) that are the subject of the Service(s) were filed or submitted to Provider; (B) with respect to the Services described in Section 1(f)(ii), Provider is unable to complete administration of the bellwether cases (as set forth in the Provider Rules and Procedures) on the New Era Platform within one year of the date on which the first claim in the Mass Arbitration (as defined in Section 1 of **Exhibit A**) was filed or submitted to Provider; (C) Provider is unable to complete any of the Services described in Section 1(f)(i), (iii), or (iv) on the New Era Platform within one year of the date on which the claim(s) that are the subject of the Service(s) were filed or submitted to Provider; or (D) a court of competent jurisdiction determines that Provider cannot provide the Services.

(c) Effect of Expiration or Termination. Upon expiration or earlier termination of this Agreement, Customer shall immediately discontinue use of the Provider IP and, without limiting Customer's obligations under Section 6, Customer shall delete, destroy, or return all copies of the Provider IP, and certify in writing to the Provider that the Provider IP has been deleted or destroyed. No expiration or termination will affect Customer's obligation to pay all Fees that may have become due before such expiration or termination or entitle Customer to any refund, except as expressly set forth in **Exhibit A**. Provider shall delete,

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

TM00000040

destroy or return all copies of Customer Data at the direction of Customer or, if no direction is given, within one-hundred-eighty (180) days of the termination of this Agreement.

(d) Survival. This Section 10(d) and Sections 1, 4, 5, 6, 7(b), 8, 9, and 11 survive any termination or expiration of this Agreement. No other provisions of this Agreement survive the expiration or earlier termination of this Agreement.

11. Miscellaneous.

(a) Entire Agreement. This Agreement, together with any other documents incorporated herein by reference (including, without limitation, Provider's Terms and Conditions and Privacy Policy (collectively the "Provider Terms of Use"), and the applicable rules and procedures that govern Provider's dispute resolution processes (collectively the "Provider Rules and Procedures"), each as set forth on the website www.neweraadr.com at the time of the filing of a claim or, in the case of a Mass Arbitration (defined in Section 1 of **Exhibit A**), at the time of the filing of the first claim in the Mass Arbitration) and all related Exhibits, constitutes the sole and entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior and contemporaneous understandings, agreements, and representations and warranties, both written and oral, with respect to such subject matter. With respect to this Agreement, in the event of any inconsistency between the statements made in the body of this Agreement, the related Exhibits, and any other documents incorporated herein by reference, the following order of precedence governs: (i) first, the Statement of Work (set forth in **Exhibit A** to this Agreement); (ii) second, this Agreement, excluding its Exhibits; (iii) third, any other Exhibits to this Agreement as of the Effective Date; and (iv) fourth, any other documents incorporated herein by reference (including the Provider Terms of Use). However, when conducting any Services pursuant to this Agreement, in the event of any inconsistency between the Provider Rules and Procedures and items (i) through (iv), the Provider Rules and Procedures shall take precedence over (i) through (iv), in that order.

(b) Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") must be in writing and addressed to the Parties at the addresses set forth on the first page of this Agreement (or to such other address that may be designated by the Party giving Notice from time to time in accordance with this Section). All Notices must be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage pre-paid). Except as otherwise provided in this Agreement, a Notice is effective only: (i) upon receipt by the receiving Party; and (ii) if the Party giving the Notice has complied with the requirements of this Section.

(c) Force Majeure. In no event shall either Party be liable to the other Party, or be deemed to have breached this Agreement, for any failure or delay in performing its obligations under this Agreement, if and to the extent such failure or delay is caused by any circumstances beyond such Party's reasonable control, including but not limited to

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

TM00000041

Case 2:22-cv-00047-GW-GJS   Document 143-2   Filed 12/14/22   Page 13 of 29   Page ID #:1634
DocuSign Envelope ID: 38622348-CAA4-4777-BFC2-4725514C3B4B
Case 2:22-cv-00047-GW-GJS   Document 78-2 (Ex Parte)   Filed 10/11/22   Page 12 of 18   Page ID #:1089

acts of God, flood, fire, earthquake, OTHER POTENTIAL DISASTER(S) OR CATASTROPHE(S), SUCH AS EPIDEMICS, explosion, war, terrorism, invasion, riot or other civil unrest, strikes, labor stoppages or slowdowns or other industrial disturbances, or passage of law or any action taken by a governmental or public authority, including imposing an embargo.

(d) <u>Amendment and Modification; Waiver</u>. No amendment to or modification of this Agreement is effective unless it is in writing and signed by an authorized representative of each Party. No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement: (i) no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof, and (ii) no single or partial exercise of any right, remedy, power, or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(e) <u>Severability</u>. If any provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect their original intent as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(f) <u>Governing Law; Submission to Jurisdiction</u>. This Agreement is governed by and construed in accordance with the internal laws of the State of Illinois without giving effect to any choice or conflict of law provision or rule that would require or permit the application of the laws of any jurisdiction other than those of the State of Illinois. Any unresolved dispute or controversy arising from or relating to this Agreement shall be finally resolved by binding alternative dispute resolution through an alternative dispute resolution provider mutually acceptable to the parties. Any neutral assigned to the dispute or controversy shall be a professional neutral with substantial experience in resolving commercial disputes (a "**Neutral**"). Each party will bear its own costs with respect to any disputes arising under this Agreement. Each party shall pay one-half (1/2) of any fees charged in connection with the proceeding.

(g) <u>Assignment</u>. Customer may not assign any of its rights or delegate any of its obligations hereunder, in each case whether voluntarily, involuntarily, by operation of law or otherwise, without the prior written consent of Provider. Any purported assignment or delegation in violation of this Section will be null and void. No assignment or delegation will relieve the assigning or delegating Party of any of its obligations hereunder. This Agreement is binding upon and inures to the benefit of the Parties and their respective permitted successors and assigns. Provider may assign this Agreement upon a sale of all, or substantially all, of its assets.

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

TM00000042

Case 2:22-cv-00047-GW-GJS Document 143 Filed 10/17/22 Page 14 of 19 Page ID #:1645
Case 2:22-cv-00047-GW-GJS Document 78-2 (Ex Parte) Filed 10/11/22 Page 13 of 18 Page ID #:1090
DocuSign Envelope ID: 38622348-C4A4-4777-BFC2-4725514C3B4B

(h) <u>Equitable Relief</u>. Each Party acknowledges and agrees that a breach or threatened breach by a Party of any of its obligations under Section 5 or, in the case of Customer, Section 2(c), would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy, and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity, or otherwise.

(i) <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

| NEW ERA ADR, INC. | LIVE NATION ENTERTAINMENT, INC. |
|---|---|
| By: *Richard Lee* | By: *kimberly Tobias* |
| Name: Richard Lee | Name: Kimberly Tobias |
| Title: CEO & Co-Founder | Title: Vice President, Legal Affairs |

# EXHIBIT A

## Statement of Work

This **Statement of Work** ("**SOW**"), adopts and incorporates by reference the terms and conditions of the Subscription Agreement ("**Agreement**"), which was entered into on June 22, 2021, between New Era ADR, Inc., a Delaware Corporation ("**Provider**"), on the one hand, and Live Nation Entertainment, Inc., a Delaware Corporation with offices located at 9348 Civic Center Drive, Beverly Hills, CA 90210, and all of Live Nation Entertainment, Inc.'s parents, subsidiaries, representatives, affiliates, officers, and directors (collectively, with Live Nation Entertainment, Inc., "**Customer**"), on the other. Provider and Customer may be referred to herein collectively as the "**Parties**" or individually as a "**Party**."

This SOW is effective beginning on the date the Subscription Fee under Section 5 has cleared Provider's bank account ("**Services Commencement Date**"), and will remain in effect for one year, unless earlier terminated in accordance with the Agreement, or unless renewed by Customer in accordance with the Agreement and Section 5(iii) below. Transactions performed under this SOW will be conducted in accordance with and be subject to the terms and conditions of this SOW and the Agreement. Capitalized terms used but not defined in this SOW shall have the meanings set out in the Agreement.

1. <u>Defined Terms</u>. For purposes of this SOW, the following terms shall have the following meanings:

"**Common Issues of Law and Fact**" means when cases or proceedings present the same, or similar, evidence; present the same, or similar, witnesses; and/or rely on determination of the same, or similar, facts or issues of law.

"**Mass Arbitrations**" are defined as arbitration claims filed on the New Era Platform (a) that number more than five (5) and (b) that arise out of Common Issues of Law and Fact. For the avoidance of doubt, "Mass Arbitrations" include all of the following: (i) access to Virtual Expedited Arbitrations for the bellwether cases, (ii) mandatory non-binding Virtual Mediation, (iii) application of Precedent to Common Issues of Law and Fact, and (iv) administration of the Remaining Cases, each as set forth in the Provider Rules and Procedures (all capitalized terms not otherwise defined in this sentence have the meanings ascribed to them in the Provider Rules and Procedures).

"**New Era Neutrals**" means any arbitrator or mediator provided by Provider for any New Era Proceeding under Section 2 of this SOW, and in accordance with the Provider Rules and Procedures. For clarity, New Era Neutrals are independent contractors, and not employees, of Provider.

"**New Era Proceedings**" means proceedings filed on the New Era Platform that utilize the Services (as defined in the Agreement) and as further set forth under Section 2 of this SOW.

"**Non-Mass Arbitration New Era Proceedings**" means any proceeding on the New Era Platform in which Customer is a party thereto, and which is not a Mass Arbitration. For

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

TM00000044

the avoidance of doubt, Non-Mass Arbitration New Era Proceedings include all Services other than Mass Arbitrations.

"**Non-Mass Arbitration Subscription Cases**" means any Non-Mass Arbitration New Era Proceeding that is at or below the limit of Non-Mass Arbitration New Era Proceedings covered by the Subscription Fee, as identified in Section 2 of this SOW.

2. Scope of Work. Provider will provide Customer access to the Services. This will include access to New Era Neutrals as well as any third-party software integrated into the New Era ADR Platform.

For the Subscription Fee described in Section 5 of this SOW, Customer will have access to the following number of New Era Proceedings:

- Full Coverage of Mass Arbitrations (Unlimited); and

- **50** Non-Mass Arbitration New Era Proceedings

    - If Customer exceeds 50 Non-Mass Arbitration New Era Proceedings, Customer shall pay Provider's Standard Pricing Per Case Fees as set forth in Section 5 of this SOW for each successive Non-Mass Arbitration New Era Proceeding.

With respect to Mass Arbitrations, any Removal Case (as defined in the Provider Rules and Procedures) will be treated as a Non-Mass Arbitration New Era Proceeding for purposes of this SOW.

As described further in Section 5 herein, all fees are pre-paid annually based on a 365-day calendar year (or 366-day, in the case of a leap year). Unless Customer elects to renew a prior subscription under Section 5(iii) of this SOW, the subscription must be in place in order for a case to fall under this SOW; for example, if a subscription is paid for on January 1, 2021, cases filed between January 1, 2021 and December 31, 2021 will be covered under this SOW. If a case is filed on January 1, 2022 and the subscription has not been renewed pursuant to Section 5(iii), it will not fall under the pricing of this SOW and will, instead, be subject to Provider's Standard Pricing Per Case Fees as set forth in Section 5 of this SOW. All cases remain subject to the applicable statute of limitations.

Customer may specify Provider in any arbitration clause(s) at Customer's discretion, and any Mass Arbitrations or Non-Mass Arbitration New Era Proceedings arising under those arbitration clause(s) shall fall within and be covered by this SOW.

Customer shall provide an applicable email address(es) for service in any arbitration clause which names Provider as the dispute resolution forum.

3. Permitted Subcontractors / Delegates.

Customer is allowed up to ten (10) delegates on their account for the duration of the subscription period. The delegates can be changed or removed at any time by sending an email to support@neweraadr.com.

4. <u>Work Schedule / Deliverables</u>. Access to the New Era Platform will commence on the Services Commencement Date.

5. <u>Pricing, Refunds, and Renewal</u>. All costs listed below are based on the scope and assumptions included in this SOW. All pricing is inclusive of Provider's fees and New Era Neutral fees, unless otherwise expressly stated herein.

(i) <u>Pricing</u>.

- Subscription Fee (Annual) – ▮▮▮▮▮▮▮ This Subscription Fee covers the Scope of Work specified in Section 2 of this SOW, and will be paid by Customer.

- "Subscription-Level Per Case Filing Fee" – ▮▮▮▮ The Subscription-Level Per Case Filing Fee shall be paid for each New Era Proceeding that is a part of a Mass Arbitration as well as for each Non-Mass Arbitration Subscription Case, each allocated as specified in the applicable arbitration clause (e.g., by the claimant in each case, or Customer, or both); if the applicable arbitration clause does not specify who pays the Subscription-Level Per Case Filing Fee, Customer and the other party in each proceeding shall split the Subscription-Level Per Case Filing Fee in accordance with the default rules in the Provider Rules and Procedures.

- "Standard Pricing Per Case Fees" shall be paid for each Non-Mass Arbitration New Era Proceeding that is not a Non-Mass Arbitration Subscription Case (allocations of standard case fees amongst the parties are discussed in the Provider Rules and Procedures, available on www.neweraadr.com).

    o Virtual Mediations: ▮▮▮▮▮

    o Virtual Mediations with a Binding Resolution: ▮▮▮▮▮▮

    o Expedited Virtual Arbitrations: ▮▮▮▮▮

(ii) <u>Refunds</u>. No refunds will be provided to Customer, and Customer is not entitled to any refund of any fees paid to Provider, unless a Refund Event occurs. A "**Refund Event**" has occurred if: (a) Provider is unable to commence any New Era Proceeding(s) on the New Era Platform—including assigning a New Era Neutral to preside over the New Era Proceeding(s)—within 60 days of the date on which the New Era Proceeding(s) was filed or submitted to Provider; (b) with respect to Mass Arbitrations, Provider is unable to complete administration of the bellwether cases (as set forth in the Provider Rules and Procedures) on the New Era Platform within one year of the date on which the first claim in the Mass Arbitration was filed or submitted to Provider; (c) Provider is unable to complete any of the Services described in Sections 1(f)(i), (iii), or (iv) of the Agreement on the New Era Platform within one year of the date on which the claim(s) that are the subject of the Service(s) were filed or submitted to Provider; (d) Provider terminates the Agreement pursuant to Section 8(a)(ii) of the Agreement; (e) Provider materially breaches the Agreement as set forth in Section 10(b)(ii) or Section 10(b)(iii) of the Agreement; or (f) a court of competent jurisdiction determines that Provider cannot provide the Services.

DocuSign Envelope ID: 36622348-C4A4-4777-BFC2-4725514C3B4B

If a Refund Event has occurred, and Provider is unable to provide the Services for the duration of the Term, or has terminated the Agreement pursuant to Section 8(a)(ii) of the Agreement, Customer shall be entitled to a pro rata refund of the Subscription Fee. For example, if such a Refund Event occurs exactly six months into the Term, Customer shall be entitled to a 50% refund of the Subscription Fee.

If a Refund Event has occurred with respect to a specific New Era Proceeding, but the Agreement has not been terminated and Provider remains able to provide Services, going forward, as set forth in the Agreement and SOW, Customer shall be entitled to refunds as follows:

- If the Refund Event relates to a Mass Arbitration, the following shall apply: If the bellwether cases (as that term is used in the Provider Rules and Procedures) are not yet litigated to completion on the New Era Platform at the time it is determined that a Refund Event has taken place, then Customer shall be entitled to a refund equal to 25% of the Subscription Fee. If it is determined that a Refund Event has taken place after such bellwether cases have already been litigated to completion on the New Era Platform, Customer shall be entitled to a refund equal to 15% of the Subscription Fee.

- In the event of a Refund Event related to a New Era Proceeding other than a Mass Arbitration, Customer shall be entitled to a refund equal to (1) for any New Era Proceeding subject to Standard Pricing Per Case Fees, the amount actually paid by Customer for that particular New Era Proceeding and (2) for any New Era Proceeding subject to Subscription-Level Per Case Filing Fees, 2% of the Subscription Fee.

For the avoidance of doubt, a settlement amongst Customer and other parties to a Service, whether reached on the New Era Platform during a Virtual Mediation or otherwise, shall not constitute a Refund Event. In the event a Service is unable to be completed due to a New Era Neutral's acts or omissions, Customer's exclusive remedy shall be removal and reassignment of such New Era Neutral according to the procedure laid out in the Provider Terms.

(iii) <u>Renewal.</u>

If Customer elects to renew the Agreement as set forth in Section 10(a) of the Agreement, the Subscription Fee for each Renewal Term shall be:

- For the 1st Renewal Term, ▆% of the previous annual Subscription Fee;
- For the 2nd Renewal Term, ▆% of the previous annual Subscription Fee;
- For the 3rd Renewal Term, ▆% of the previous annual Subscription Fee;
- For the 4th Renewal Term, ▆% of the previous annual Subscription Fee; and
- For the 5th Renewal Term, ▆% of the previous annual Subscription Fee.

Further, in the event that (a) the Agreement expires or is terminated and Customer no longer specifies New Era ADR in its arbitration clause(s), but (b) an individual or entity bound only by a previous version of Customer's arbitration clause properly files a claim with New Era ADR, then the parties agree that Customer will have the option to either pay for the arbitration

under New Era ADR's Standard Pricing Per Case Fees, or renew its subscription, retroactive by 30 days, at the rate according to whichever Renewal Term was last applicable pursuant to the bullet points set forth above, and otherwise subject to the terms set forth in the Agreement and this SOW.

IN WITNESS WHEREOF, the Parties hereto have executed this SOW as of the date first above written.

NEW ERA ADR, INC.

By: *Richard Lee*
Name: Richard Lee
Title: CEO & Co-Founder

LIVE NATION ENTERTAINMENT INC.

By: *Kimberly Tobias*
Name: Kimberly Tobias
Title: Vice President, Legal Affairs

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

TM00000048