QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
William R. Sears (Bar No. 330888)
willsears@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

KELLER POSTMAN LLC
Warren Postman (Bar No. 330869)
wdp@kellerpostman.com
Albert Pak (admitted pro hac vice)
albert.pak@kellerpostman.com
1100 Vermont Avenue, N.W., 12th Floor
Washington, D.C. 20005
Telephone: (202) 918-1123

*Attorneys for Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Live Nation Entertainment, Inc., and Ticketmaster LLC,<br><br>Defendants. | Case No: 2:22-cv-00047-GW-GJS<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**<br><br>The Honorable George H. Wu<br><br>Hearing Date: May 1, 2023<br><br>Hearing Time: 8:30 a.m.<br><br>**[REDACTED]** |

1

# **TABLE OF CONTENTS**

2

**Page**

3    INTRODUCTION ................................................................................. 1

4    FACTUAL BACKGROUND ................................................................. 1

5    A.    Defendants Switch to New Era ADR During Antitrust Litigation ................. 1

6    B.    New Era's Rules Are Transparently Tilted Toward Live Nation ..................... 3

7    C.    New Era's Mass Arbitration Rules Tilt Further Toward Live Nation ............. 4

8    ARGUMENT ....................................................................................... 5

9    A.    The New Era Arbitration Rules Are Unconscionable ................................ 5

10          1.    The Arbitration Clause (and its delegation clause in particular) is procedurally unconscionable ......................................................... 6

11
                a.    The Arbitration Clause is a contract of adhesion ......................... 6
12
                b.    Oppression and surprise .............................................. 7
13
          2.    The Arbitration Clause is substantively unconscionable ..................... 9
14
                a.    New Era is biased in favor of Defendants and Latham ............... 9
15
                b.    The mass arbitration protocol violates basic fairness, notice, and representation requirements .................................. 11
16
17              c.    The arbitrator selection procedure violates California law ........ 13

18              d.    The expedited procedures are unconscionable ..................... 16

19              e.    The discovery limitations are unconscionable ..................... 17

20              f.    The non-mutual right of appeal is unconscionable ................. 18

21              g.    The class action waiver provision is unconscionable under the Discover Bank rule ................................................ 19

22
     B.    The FAA Does not Preempt California Law .................................... 19
23
          1.    The FAA's saving clause preserves unconscionability ..................... 19
24
          2.    California law is not preempted by the FAA here because it does not interfere with traditional bilateral arbitration ....................... 20
25
26   C.    The Delegation Clause Itself Is Unconscionable ............................. 23

27   D.    Unconscionability Permeates the Arbitration Agreement ...................... 24

28   CONCLUSION ................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
   6 P.3d 669 (Cal. 2000) ....................................................................................6, 25

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ...................................................................................passim

*Azteca Constr., Inc. v. ADR Consulting, Inc.*,
   121 Cal. App. 4th 1156 (2004) ................................................................... 14

*Bliss Sequoia Ins. & Risk Advisors, Inc. v. Allied Prop. & Cas. Ins. Co.*,
   52 F.4th 417 (9th Cir. 2022) ........................................................................ 7

*Bradgate Assocs., Inc. v. Fellows, Read & Assocs.*,
   999 F.2d 745 (3d Cir. 1993) ...................................................................... 12

*Capili v. Finish Line, Inc.*,
   116 F. Supp. 3d 1000 (N.D. Cal. 2015) ...........................................24, 25

*Cheng-Canindin v. Renaissance Hotel Assocs.*,
   50 Cal. App. 4th 676 (1996) ...................................................................9, 10

*Comm. Coatings Corp. v. Cont'l Cas. Co.*,
   393 U.S. 145 (1968) .................................................................................. 10

*Discover Bank v. Superior Ct.*,
   113 P.3d 1100 (Cal. 2005) ....................................................................19, 20

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018) ............................................................................ 23

*Fitz v. NCR Corp.*,
   118 Cal. App. 4th 702 (2004) ................................................................. 17

*Flores v. Transamerica HomeFirst, Inc.*,
   93 Cal. App. 4th 846 (2001) ..................................................................... 8

*Graham v. Scissor-Tail, Inc.*,
   623 P.2d 165 (Cal. 1981) ...................................................................6, 9, 10

*Harper v. Ultimo*,
   113 Cal. App. 4th 1402 (2003) .............................................................. 18

*Home Depot USA, Inc. v. Lafarge North America, Inc.*,
   59 F.4th 55 (3d Cir. 2023) ....................................................................... 12

*Honeycutt v. JPMorgan Chase Bank, N.A.*,
   25 Cal. App. 5th 909 (2018) ................................................................... 15

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

*Lhotka v. Geographic Expeditions, Inc.*,
181 Cal. App. 4th 816 (2010) ................................................................. 7, 24

*Little v. Auto Stiegler, Inc.*,
63 P.3d 979 (Cal. 2003) ............................................................................ 18

*Martinez v. Master Prot. Corp.*,
118 Cal. App. 4th 107 (2004) ................................................................... 25

*McManus v. CIBC World Markets Corp.*,
109 Cal. App. 4th 76 (2003) ..................................................................... 16

*Oberstein v. Live Nation Entertainment, Inc.*,
No. 2:20-cv-03888, ECF No. 114 ............................................................... 8

*OTO, L.L.C. v. Kho*,
447 P.3d 680 (Cal. 2019) ............................................................................ 6

*Ovitz v. Schulman*,
133 Cal. App. 4th 830 (2005) ................................................................... 20

*Peleg v. Neiman Marcus Grp., Inc.*,
204 Cal. App. 4th 1425 (2012) ................................................................... 8

*Peng v. First Republic Bank*,
219 Cal. App. 4th 1462 (2013) ................................................................... 8

*Phillips Petrol. Co. v. Shutts*,
472 U.S. 797 (1985) .................................................................................. 11

*Pinela v. Neiman Marcus  Grp., Inc.*,
238 Cal. App. 4th 227 (2015) ................................................................. 8, 24

*Pokrass v. The DirecTV Grp., Inc.*,
No. EDCV 07-423, 2008 WL 2897084  (C.D. Cal. July 14, 2008) ...................... 6

*Richards v. Jefferson Cnty., Ala.*,
517 U.S. 793 (1996) .............................................................................. 11, 12

*Roussos v. Roussos*,
60 Cal. App. 5th 962 (2021) .................................................................. 14, 15

*Sonic-Calabasas A, Inc. v. Moreno*,
311 P.3d 184 (Cal. 2013) ........................................................................... 24

*Szetela v. Discover Bank*,
97 Cal. App. 4th 1094 (2002) ...................................................................... 7

*Taylor v. Sturgell*,
553 U.S. 880 (2008) .................................................................................. 16

*Viking River Cruises, Inc. v. Moriana*,
142 S. Ct. 1906 (2022) .......................................................................... 22, 23

## **<u>Statutes</u>**

9 U.S.C. § 2 ...............................................................................................................19

Cal. Civ. Code § 1670.5(a) ......................................................................................24

Cal. Civ. Proc. Code § 170.6 ..............................................................................4, 14

Cal. Civ. Proc. Code § 1281.9 ................................................................................14

Cal. Civ. Proc. Code § 1281.91 ................................................................................4

Cal. Civ. Proc. Code § 1281.91(b)(1) ................................................................14, 15

## **<u>Rules</u>**

Cal. R. Ct. RB ETHICS Standard 1 ....................................................................20, 22

Cal. R. Ct. RB ETHICS Standard 7 ........................................................................15

Cal. R. Ct. RB ETHICS Standard 12 ......................................................................15

**INTRODUCTION**

Defendants' Live Nation's and Ticketmaster's (or simply "Live Nation" for short) original arbitration agreement, which this Court enforced, called for traditional, bilateral arbitration between each consumer and Defendants before JAMS. But Defendants were the dog that caught the car. When they realized that many consumers would pursue traditional arbitration rather than giving up, Defendants attempted to change the rules mid-stream. Consumers, with barely any notice of the new rules, simply by continuing to use Defendants' websites, were subjected to a non-traditional, Kafkaesque arbitration procedure designed by Defendants to deter filing claims.

The abrupt way Defendants imposed the new arbitration procedure is procedurally unconscionable, and the new arbitration procedure is also substantively unconscionable. Plaintiffs pay 100% of the marginal cost and must prove their case in the face of absurd limitations on documents (10 total), briefing page lengths (5), witnesses (2-3), and discovery (none). All cases are consolidated before one arbitrator who can reject *all* cases based on dispositive issues at once (with no discovery, 10 documents, and one 5-page brief). But if Plaintiffs survive on dispositive issues, then Defendants can litigate individual issues seriatim, virtually indefinitely, producing a controlled drip of final decisions to reduce the pressure on Defendants. If a plaintiff wins injunctive relief, Defendants have a one-sided right of appeal *de novo* to a different arbitral forum (while denials of injunctive relief are unreviewable). In short, Defendants can win efficiently, but can only lose after Plaintiffs incur unprecedentedly tendentious inefficiencies.

The Federal Arbitration Act ("FAA") does not preempt California unconscionability law. Indeed, Defendants' rules present a process so different from the bilateral arbitration protected by the FAA that it does not apply to this process at all. Defendants' motion to compel arbitration should be denied.

**FACTUAL BACKGROUND**

**A.      Defendants Switch to New Era ADR During Antitrust Litigation**

After violating a DOJ consent decree, engaging in exclusive dealing, and settling

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

suits from competitors, Live Nation and Ticketmaster faced substantial litigation from consumers. But as they compelled traditional arbitration in the *Oberstein* case, they noticed a growing trend of consumers actually arbitrating claims rather than just giving up. *See* Mot. at 8 n.6 (referencing arbitrations from 2019-2020).

Enter New Era ADR. ███████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

        ███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████



[1]
███████████████████████████████████████████

1 ███████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████

## B. New Era's Rules Are Transparently Tilted Toward Live Nation

Under New Era's "Expedited" arbitration rules, which Defendants mandated, "[c]omplaints are limited to 10 total pages" and must set forth the "nature of the dispute, including applicable dates and times, parties involved, as well as the facts." O'Mara Decl. (Dkt. No. 30-3), Ex. A ("New Era Rule") § 5(a)(ii)(1)(a)-(b). But New Era accompanies those draconian page limits with the further rule that "New Era is *not* a notice pleading platform," and so "[g]eneralized or generic facts are not sufficient." *Id.* § 6(a)(ii)(1)(a)-(b) (emphasis added). Any claimant that violates "these requirements" is subject to "Sanction[s]." *Id.* § 6(a)(ii)(1)(d).

After pleadings, there is no right to discovery. To obtain discovery, a Plaintiff would need to "make a request to be upgraded to New Era ADR's Standard Arbitration process" and pay additional fees of $15,000. *Id.* § 2(o)(ii). But even that privilege is

illusory, because a Plaintiff can only "upgrade[]" with Live Nation's agreement. *Id.* at § 6(a)(i) ("***New Era ADR will respect [] contractual agreements***" to the expedited rules).

Next, both parties "upload the relevant documents," which are the entire record. *Id.* § 6(a)(vii). All "[u]ploads are limited to the lesser of 10 total files, 25 total pages for each file, or 25MB of aggregate uncompressed uploads." *Id.* Here—but not for complaints or discovery—the rules note that a "neutral has discretion to allow" more documents. *Id.* Once all the documents are uploaded, the arbitrator may hold a hearing, and the parties file briefs "limited to 15K characters," which is approximately *five* pages. *Id.* § 6(a)(x); Ex. C at 124-25. ███████████████████

████████████████████████████████████████████

███████████████████████████████

If a plaintiff somehow manages—with no discovery and a five-page brief—to prove liability, damages, and an entitlement to injunctive relief, Live Nation has the *unilateral* right to a *de novo* appeal. A plaintiff cannot appeal the *denial* of injunctive relief. Tobias Decl. (Dkt. No. 31-29) Ex. 29 ("Terms of Use") § 17, Limited Right to Appeal (allowing appeal only if "the arbitrator awards injunctive relief".)

## C.   New Era's Mass Arbitration Rules Tilt Further Toward Live Nation

One might think that "mass arbitration" rules would provide more discovery, record building, or briefing, but they do not. The "Mass Arbitration Rules … are a subset of the Virtual Expedited Arbitration Rules," and if there is "any conflict," "the Virtual Expedited Arbitration Rules and Procedures will apply." New Era Rule § 6(b)(i)(1)-(2).

Mass arbitration rules apply if multiple cases present "'Common Issues of Law and Fact." *Id.* § 2(x)(i). A single arbitrator has "sole discretion in determining" whether there are *any* similarities in "evidence," "witnesses," "facts," or "issues of law." *Id.* § 2(x)(i)-(ii). Until the arbitrator decides otherwise, New Era itself "may group similar cases" for mass arbitration. *Id.* Next, three bellwethers proceed under the expedited rules. *Id.* § 6(b)(iii)(3). Although California law allows plaintiffs (in both court and arbitration) the right to strike a decisionmaker, Cal. Civ. Proc. Code §§1281.91; 170.6,

the bellwether process strips individual claimants of that right. After the arbitrator renders a decision in the bellwethers, the parties must conduct settlement discussions. If the cases do not settle, the arbitrator applies the "factual findings and legal determinations" to all similar cases, "even if later filed." New Era Rule §§ 2(y); 6(b)(iii)(5). *All* claimants who survive must wait to be heard by the same, single arbitrator, who "will create a process for handling and resolving individualized issues of law and fact." *Id.* § 6(b)(iii)(6).

In reality, only plaintiffs bear the risk of loss on common issues. ██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████ But Defendants *would* know, and if they lost on any important issue, they could immediately change their terms of service to ensure newly filed claims go to a different arbitral forum. This stratagem is hardly far-fetched, as Live Nation *already* has changed arbitral forums mid-litigation to obtain tactical advantages.

Defendants get the best of both worlds: the opportunity to defeat all claims on common issues, *and* (if that fails) the choice of leaving New Era or forcing every individualized issue through the bottleneck of a single arbitrator. There is no time limit on this process, but plaintiffs could wait years (or decades) while a defendant, with every incentive to delay, litigates individual issues against thousands of claimants seriatim.[3]

## ARGUMENT

Live Nation's biased and unconscionable arbitration procedure is unenforceable under California law for multiple independent reasons, none of which is preempted.

### A.    The New Era Arbitration Rules Are Unconscionable

---

[2]   Notably, application of prior (confidential) rulings is not restricted to cases with the same counsel. *See* New Era Rule § 2(y).

[3]   Defendants suggest that their rules are similar to those proposed by one of Plaintiffs' counsel in an unrelated case, but the comparison is facially inaccurate. Mot. at 25. The proposed process had none of New Era's fee asymmetry or absurd process limitations. O'Mara Decl. Ex. B at 3 (proposing application of the "Federal Rules of Civil Procedure"). It also had a determinate endpoint rather than serial litigation of individualized issues. *Id.*

"A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party." *OTO, L.L.C. v. Kho*, 447 P.3d 680, 689 (Cal. 2019). Unconscionability has procedural and substantive components: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 689-90 (Cal. 2000).

**1.   The Arbitration Clause (and its delegation clause in particular) is procedurally unconscionable**

Live Nation's monopoly power allowed it to extract consent to adhesion contracts with surprising and oppressive terms that it changed to favor itself in arbitration *because* it was being sued for antitrust violations and anticipated mass arbitration claims.

**a.   *The Arbitration Clause is a contract of adhesion***

Procedural unconscionability "begins with an inquiry into whether the contract is one of adhesion." *OTO, L.L.C.*, 447 P.3d at 690. That "term signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Graham v. Scissor-Tail, Inc.*, 623 P.2d 165, 171 (Cal. 1981). Here, Defendants drafted the contract, had bargaining power, and did not negotiate terms, so the Arbitration Clause (and its delegation clause[4]) is a textbook adhesion contract.

Defendants misstate the law in claiming that "[c]ontracts of adhesion covering non-essential recreational activities … are not procedurally unconscionable." Mot. at 15. Defendants rely on an unpublished district court case for that proposition. *Id.* (citing *Pokrass v. The DirecTV Grp., Inc.*, No. EDCV 07-423, 2008 WL 2897084, at *6 (C.D. Cal. July 14, 2008)). But more recent appellate cases have rejected the argument "that contracts for recreational activities can *never* be unconscionabl[e]," and have declined

---

[4]   *OTO L.L.C.* itself ruled a *delegation* clause unconscionable, since the arbitration agreement delegated "exclusive authority" to the arbitrator to determine "enforceability." 14 Cal. App. 5th 691, 717 (2017) (reproducing the agreement).

to "hold that contracts for recreational activities are immune from analysis for procedural unconscionability." *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 822-23 (2010).[5] Rather, the "option" not to purchase, "like any availability of market alternatives, is relevant to the existence, and degree, of oppression." *Id.* at 823-24. The recreational activities line of cases "concern[s] challenges to release of liability clauses under the rule that invalidates exculpatory provisions that affect the public interest," *id.* at 823, not arbitration of antitrust claims in which the underlying market is recreational.

### b.   *Oppression and surprise*

The Arbitration Clause here is oppressive because of how Live Nation changed its terms. The circumstances match those in *Lhotka* and *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094 (2002), both of which involved non-essential services with market alternatives (and arbitration clauses with delegation provisions). In *Szetela*, the consumer received "the amendment to the Cardholder Agreement in a bill stuffer," with the "option, if he did not wish to accept the amendment," of "closing his account." *Id.* at 1100; *see also Lhotka*, 181 Cal. App. 4th at 825. Here, Live Nation's amendment was "effective immediately," applied "irrespective of when [the] dispute … arose," and each consumer "agree[d]" merely "[b]y continuing to use this Site after that date." Terms of Use § 17. As in *Szetela*, the "oppressive nature in which the amendment was imposed"— a no-notice, take-it-or-leave-it unilateral change in the middle of an ongoing contractual relationship—"establishes the necessary element of procedural unconscionability." 97 Cal. App. 4th at 1100. Here the oppression is even clearer, since Live Nation changed the terms while subject to an antitrust suit, for the purpose of gaining an advantage over plaintiffs and customers.

The terms are also surprising. "Surprise" exists where "the supposedly agreed-upon terms are hidden in a prolix printed form." *Flores v. Transamerica HomeFirst,*

---

[5]   Even if *Pokrass* did not predate *Lhotka*, an unpublished federal district court decision is far less probative than decisions of a "state's intermediate appellate courts" which federal courts must follow absent "convincing evidence that the state supreme court would decide differently." *Bliss Sequoia Ins. & Risk Advisors, Inc. v. Allied Prop. & Cas. Ins. Co.*, 52 F.4th 417, 419 (9th Cir. 2022).

1   *Inc.*, 93 Cal. App. 4th 846, 853 (2001). In *Pinela v. Neiman Marcus Grp., Inc.*, 238 Cal.

2   App. 4th 227, 246 (2015), the delegation clause was unconscionable because the

3   arbitration provision surprisingly selected Texas law even for claims "brought by a

4   California employee," which the arbitrator may have lacked power to disregard. *Id.*

5   Similarly here, how the delegation clause would be applied is surprising. Defendants'

6   terms prominently guarantee "individual arbitration," not "any purported class or

7   representative proceeding." Terms of Use § 17. Nonetheless, the New Era terms make

8   the bellwether cases *representative* proceedings, including on threshold matters

9   addressed by the delegation clause. *See* New Era Rule § 2(y). None of the extreme

10  limitations on briefing, discovery, or documents in expedited proceedings (which apply

11  to threshold questions addressed by the delegation clause) is apparent from the terms of

12  service, yet, surprisingly, they apply to threshold issues: "issues … [of] arbitrability,

13  governing law, jurisdiction, or otherwise, shall be argued and decided at the regularly-

14  scheduled hearings on the merits of the case." New Era Rule § 2(z).

15      This Court previously found "a low level of procedural unconscionability," when

16  assessing Defendants' *prior* arbitration clause, Ruling on Defendants' Amended Motion

17  to Compel Arbitration at 15, *Oberstein v. Live Nation Entertainment, Inc.*, No. 2:20-cv-

18  03888, ECF No. 114, but that ruling was *before* Defendants modified their terms to gain

19  a litigation advantage. Under California law an "implied covenant" "prevents [a party]

20  from modifying an arbitration agreement once a claim has accrued or become known to

21  it." *Peng v. First Republic Bank*, 219 Cal. App. 4th 1462, 1474 (2013). That is because

22  "an arbitration contract containing a modification provision is illusory"—and so

23  unenforceable—"if … a contract change[ ]applies to claims that have accrued or are

24  known." *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1433 (2012). This

25  rule prevents the drafter from "amend[ing] the contract in anticipation of a specific

26  claim, altering the arbitration process to the [plaintiff's] detriment and making it more

27  likely the [defendant] would prevail." *Id.* Defendants did exactly that, imposing New

28  Era's arbitration procedure midstream, during a pending class action, to impair absent

class members' ability to bring viable claims. That change by itself is reason to deny the motion, and certainly is enough in combination with the severe substantive unconscionability discussed below.

### 2. The Arbitration Clause is substantively unconscionable

Multiple independent forms of unconscionability permeate the arbitration clause.

#### a. *New Era is biased in favor of Defendants and Latham*

"[A] dispute resolution procedure is not an arbitration unless there is a third party decision maker, a final and binding decision, and a mechanism to assure a minimum level of impartiality with respect to the rendering of that decision." *Cheng-Canindin v. Renaissance Hotel Assocs.*, 50 Cal. App. 4th 676, 687-88 (1996). Arbitration may not be conducted in a forum with "interests [] so allied with those of the party that, for all practical purposes, [it] is subject to the same disabilities which prevent the party [itself] from serving." *Graham*, 28 Cal. 3d at 827.

Here, New Era's bias is palpable. ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

New Era's rules themselves are proof of bias as well. No arbitral forum that was actually neutral would impose heightened pleading standards on plaintiffs while limiting

their pleadings to 10 pages, impose a 5-page limit on briefs, or eliminate discovery entirely. Because plaintiffs carry the burden of proof, all of these rules facially favor defendants. Indeed, arbitral forums that are actually neutral refuse to enforce arbitration agreements like these, recognizing that they violate basic principles of fairness. *See* Ex. A (AAA Due Process Protocol); Ex. B (JAMS Arbitration Minimum Standards); *cf. Comm. Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 149 (1968) (consulting AAA rules and describing them as "highly significant" though they did not apply).

██████████████████████████████████████████████████████
███████████████████████████████████████████ Any attempt to justify a biased *selector* of arbitrators proves too much. After all, an arbitration agreement would plainly be unenforceable if it provided that Defendants' outside counsel at Latham selected the arbitrator. And the result would be no different if Defendants' outside counsel picked a *pool* of arbitrators and then followed a rank-and-strike process from among their chosen pool. The analysis is no different if Defendants outsource arbitrator selection to New Era instead of Latham.

Moreover, New Era and Defendants retain an iron grip on the process. In *any* arbitration, at *any* time, New Era retains the power to "replace a neutral at its sole discretion." New Era Rule § 2(k)(iv). New Era also could simply change its rules on a whim, since it "reserves the right to make changes and amendments to these Rules *at its discretion and without notice*." *Id.* § 2(dd) (emphasis added). Or Defendants could "make changes to the Terms" of its arbitration clause "at any time" which would be "effective immediately when we post a revised version of the Terms on the Site." Terms of Use at 1. Such changes would control, since arbitration proceeds "in accordance" with New Era's rules "as modified by the Terms" of Defendants' arbitration clause. Terms of Use § 17.

Defendants' terms, which rest on a biased subscription-fee model with a defense-slanted arbitral forum, are "not a contract to arbitrate, but an engagement to capitulate." *Graham*, 28 Cal.3d at 824-25 (citation omitted); *see also Cheng-Canindin*, 50 Cal. App.

4th at 692-93 (denying motion to compel where "procedure totally lacks impartiality"). The Court need look no further to strike down Defendants' terms.

### b. *The mass arbitration protocol violates basic fairness, notice, and representation requirements*

The mass arbitration rules unfairly impose the consequences of class or representative proceedings without the attendant procedural protections. The Supreme Court has held that, before a plaintiff may be bound by a class proceeding, he "must receive notice plus an opportunity to be heard," "an opportunity to remove himself," and "adequate[] represent[ion]" by the class representative. *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985). Building on *Phillips*, the Supreme Court also reversed application of *res judicata*, explaining that where plaintiffs "received neither notice of, nor sufficient representation," "that adjudication, as a matter of federal due process, may not bind them." *Richards v. Jefferson Cnty., Ala.*, 517 U.S. 793, 805 (1996).

The Supreme Court has emphasized that representative *arbitration* must comply with the same due process requirements. Just as in court, such arbitration "*requires* procedural formality." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 349 (2011). In representative litigation, "absent members must be afforded notice, an opportunity to be heard, and a right to opt out of the class" and this same process "would presumably be required for absent parties to be bound by the results of arbitration." *Id.* (citing *Phillips*). The Supreme Court underscored this requirement even though absent parties would already have consented to a representative process in the arbitration contract. Arbitration can modify a vast range of procedural rules but cannot change the constitutional minimum to be bound by an adjudication.

New Era's process violates this basic due process rule. Consider a plaintiff who learns of her claim after bellwethers are ruled upon. She had no notice of any earlier suit—in fact, the "proceedings" themselves, all "evidence," and all "communications" are "confidential." New Era Rule § 2(c). She had no opportunity to be heard, since her case had not even been filed and she was purposefully not notified of the earlier

1   proceedings. No one "represented [her] in a constitutionally adequate manner,"
2   *Richards*, 517 U.S. at 802, since the bellwethers were selected by strangers to her, under
3   no obligation to her, and without any special procedures or criteria to guarantee
4   adequacy. But, once she files her "[l]ater filed case[]," the common rulings will be
5   applied to her by the same arbitrator with no appeal or other recourse. *See* New Era Rule
6   § 2(y). She cannot make different legal arguments; she cannot put forward a better expert
7   witness; she cannot undo waivers; she cannot suggest a different market definition. In
8   every sense that matters she is treated not as a *subsequent* litigant up against persuasive
9   precedent, but as one who has *already* litigated by proxy. That is fatal.

10      Defendants claim that this procedure is just like an MDL, but in fact this procedure
11   goes far beyond what MDLs permit. Consider the recent case *Home Depot USA, Inc. v.*
12   *Lafarge North America, Inc.*, 59 F.4th 55 (3d Cir. 2023). There, the MDL judge applied
13   issue preclusion and law of the case, concluding that "Home Depot [was] bound by
14   rulings issued in this MDL before Home Depot joined it." *Id.* at 61. The Third Circuit
15   reversed, holding that law-of-the-case cannot apply because each case in an MDL retains
16   its separate identity. And "neither MDL centralization nor any other procedural device
17   can 'impose the heavy toll of a diminution of any party's rights.'" *Id.* at 62 (quoting
18   *Bradgate Assocs., Inc. v. Fellows, Read & Assocs.*, 999 F.2d 745, 750 (3d Cir. 1993)).
19   Issue preclusion could not apply because Home Depot lacked a "full and fair opportunity
20   to litigate" and was neither a "party" in a prior adjudication, nor "in privity" with one.
21   *Id.* at 63. New Era's secret resolution of common issues cannot bind for the same reason.

22      Even if MDLs worked as Defendants suggest, MDLs have fundamental
23   safeguards that New Era's rules lack. Regarding notice, they are public, while New Era
24   arbitrations are confidential. Regarding the opportunity to be heard, they allow
25   participation by any interested party, while New Era does not. Regarding adequate
26   representation, MDLs generally have court-appointed leadership with duties to every
27   plaintiff—New Era has no process to appoint leadership, and attorneys in arbitration
28   have no duty to non-clients.

Beyond all of these problems, the process itself disfavors plaintiffs by eliminating any prospect of timely individual resolutions. While Plaintiffs can *lose en masse*, they face a bottleneck to prevailing on individual issues. If MDLs were consolidated indefinitely, defendants would benefit tremendously, since, after resolving all pre-trial matters, the MDL court could do at most a dozen trials per year. Defendants would happily litigate in *one* court indefinitely, offering plaintiffs a lowball settlement or the slim chance of a trial decades from now. That is why after resolving pre-trial matters, MDL courts *remand* for trial to hundreds of courts around the country, eliminating the bottleneck. Unsurprisingly, New Era took everything defendants like about MDLs (the potential for cross-cutting dispositive rulings), but *added* a perpetual bottleneck that will allow Defendants to leverage near-indefinite delay to extract a deep settlement discount. After all, the same arbitrator must address every case if it has any similar issue of law or fact, and Defendants are sure to raise claimant-specific issues, particularly when doing so can grind the pace of awards to a near halt. As Defendants noted, "Keller Lenkner filed over 100,000 consumer arbitrations against Intuit." Mot. at 8, n.6. How long would it take one arbitrator to resolve 100,000 claims? The last 20,000 claims, even if meritorious, would be worth near-$0 in expectation, since they would never be resolved.[6] All of this is substantively unconscionable in the extreme.

### c.    *The arbitrator selection procedure violates California law*

The New Era mass arbitration protocol is irreconcilable with California law, which provides each claimant a right to disqualify any arbitrator. California law mandates that every "proposed neutral arbitrator" must submit a disclosure statement, and an arbitrator "shall be disqualified on the basis of the disclosure statement after any party entitled to receive the disclosure serves a notice of disqualification within 15

---

[6]   By contrast, when mass arbitrations proceed in neutral arbitral fora, arbitrations are assigned to as many arbitrators as are needed to resolve cases individually, greatly speeding up merits resolutions. To be sure, paying retainers for these arbitrators increases costs, but Defendants' complaints about those fees conveniently ignore the fact that individual adjudication of thousands of claims—exactly what Defendants demand rather than a class action—necessarily requires hundreds of arbitrators.

calendar days." Cal. Civ. Proc. Code §§1281.9, 1281.91(b)(1); *see also id.* §170.6 (comparable right to strike judges). California courts construe this provision to grant "an absolute right to disqualify [an arbitrator] without cause." *Roussos v. Roussos*, 60 Cal. App. 5th 962, 974 (2021). "[P]arties cannot contract away California's statutory protections for parties to an arbitration, including mandatory disqualification of a proposed arbitrator upon a timely demand." *Id.* at 967. Defendants purport to "contract away" this "absolute right" in three ways.

First, the rules give New Era the power to override a plaintiffs' decision to disqualify an arbitrator. For mass arbitrations, New Era selects a "panel with at least 3 and up to 8 neutrals," each side strikes either 1 or 2, and the arbitrator is chosen from those remaining based on rankings prepared by each side. New Era Rule § 6(b)(iii)(1). If a party objects to an arbitrator,[7] he can nonetheless serve if New Era decides "*that the neutral can still maintain impartiality notwithstanding the disclosed matter*." *Id.* § 2(k)(i) (emphasis added). The next section emphasizes that "New Era ADR shall make the final determination whether, in its sole discretion, the objection to a neutral's impartiality requires replacement of the neutral." *Id.* § 2(k)(iii).

Placing the decision of whether an arbitrator will be disqualified in New Era's hands violates California law. *Azteca* is precisely on point. *See Azteca Constr., Inc. v. ADR Consulting, Inc.*, 121 Cal. App. 4th 1156 (2004). There, the arbitral forum overrode a party's disqualification based on its discretion "to rule on any objection to the continued service of an arbitrator." *Id.* at 1164. The court vacated the award for failing to follow the statute, which creates an "unqualified" right to strike an arbitrator. Contrary arbitral rules "must yield to the disqualification scheme," which protects a "public purpose," not merely a private interest. *Id.* at 1167. Courts regularly vacate arbitration awards where a parties' disqualification is ignored, rejecting preemption and other defenses. *See, e.g.*, *Roussos*, 60 Cal. App. 5th at 973. New Era's terms mirror the terms

---

[7]   That is, if a party can object. Whenever a party seeks preliminary injunctive relief, "New Era ADR will appoint the neutral" with no party input at all. New Era Rule §2(aa).

1    in *Azteca* and are unenforceable for the same reason.

2        Second, the mass arbitration rules structurally prevent claimants from exercising

3 their right to disqualify an arbitrator. By law, "any party" can disqualify an arbitrator by

4 serving a "notice of disqualification," Cal. Civ. Proc. Code § 1281.91(b)(1), but under

5 New Era's mass arbitration rules only a "side," not a "party," can strike an arbitrator: "If

6 there is more than one attorney or law firm for the claimant(s), respectively, or

7 respondent(s), respectively, the attorneys for each side are responsible for meeting and

8 conferring internally and achieving consensus for that side." New Era Rule § 6(b)(iii)(1).

9 Conflict-of-interest facts vary among thousands of claimants. A proposed arbitrator

10 could be one claimant's cousin or have litigated against another claimant's counsel.

11 Under California law, *each and every* claimant has the unconditional right to disqualify

12 an arbitrator, but New Era prevents them from exercising that right unless all agree.

13        Third, California law gives each party the right to disqualify any arbitrator that

14 takes another case at the same time, a right New Era's rules flout. Ethics Standard 12(b)

15 requires disclosure "if, while that arbitration is pending, he or she will entertain offers

16 of employment … including offers to serve as a dispute resolution neutral in another

17 case." Cal. R. Ct. RB ETHICS Standard 12; *see also* Cal. R. Ct. RB ETHICS Standard

18 7 (requiring disclosure if the arbitrator has served as an arbitrator for any of the same

19 parties or attorneys). The standard expressly states that a "party *may disqualify the*

20 *arbitrator* based on this disclosure." Cal. R. Ct. RB ETHICS Standard 12 (emphasis

21 added). In other words, California law provides that a party may object to the arbitrator

22 in his case serving "as a dispute resolution neutral in another case" (particularly one with

23 the same parties or attorneys). *See Honeycutt v. JPMorgan Chase Bank, N.A.*, 25 Cal.

24 App. 5th 909, 923, 928 (2018) (vacating an award under Standards 7 and 12). Rather

25 than respect this right, New Era's mass arbitration rules require every plaintiff to have

26 the same arbitrator.

27        Defendants essentially argue that courts have upheld rank-and-strike systems, but

28 none of the cases they cite addressed these problems. For example, Defendants claim

1  that the strike system used in *McManus v. CIBC World Markets Corp.*, 109 Cal. App.

2  4th 76, 94-97 (2003) is similar, but there, the court specifically noted that arbitrators

3  were required to file California disclosures, and that any "award must be set aside" if an

4  arbitrator "fails to recuse … upon receipt [of] a recusal demand." *Id.* at 97. In other

5  words, the court upheld the contract only because the forum there would follow

6  California law on disqualification. Clearly that is not true here.

### d.     The expedited procedures are unconscionable

8      The due process problems created by New Era's representative process become

9  even more acute when one examines the procedures the supposed bellwethers will

10  follow. Complaints, including in complex antitrust cases on behalf of thousands of

11  claimants, cannot exceed "10 total pages," but also must meet a heightened pleading

12  standard at risk of "sanctions" because "New Era is not a notice pleading platform."

13  New Era Rule § 6(a)(ii)(1)(a)-(d). Presentations of the evidence are limited to "10 total

14  files," *Id*. § 6(a)(vii), and any argument is "limited to 15K characters," *Id*. § 6(a)(x). For

15  reference, if Defendants' Motion to Compel were limited to "15k characters" it would

16  end halfway through the facts section. An antitrust plaintiff bears the burden of proof,

17  must define the market, demonstrate anticompetitive conduct, prove damages, and

18  more—no one could think this is doable with 15,000 characters and 10 files, to say

19  nothing of the limitations on witnesses. These procedures are inadequate to litigate even

20  a single plaintiff's complex antitrust case, let alone sufficient "to protect the nonparties'

21  interests," in a representative proceeding.  *Taylor v. Sturgell*, 553 U.S. 880, 897 (2008).

22      Defendants may argue that the arbitrator has full discretion to ignore any rules,

23  but the rules do not support that reading. *Certain* provisions state that the arbitrator has

24  discretion to deviate from the rules—for example, to allow more documents. But many

25  do not, including the complaint rules and argument length. And the rules expressly state

26  that *both parties* must agree (and pay $15,000) to convert an expedited arbitration to a

27  standard arbitration (with fewer limitations). Moreover, even if the arbitrator has

28  *discretion* to deviate from the rules, there is no guarantee that any arbitrator actually will

exercise that discretion. A party certainly cannot expect it.[8] The problem is more serious as, without a right to appeal, even blatant errors would be impossible to correct.

### e. *The discovery limitations are unconscionable*

California law requires that arbitration provisions allow sufficient discovery to vindicate the right at issue. The Fourth District held that it was unconscionable to restrict discovery to "the sworn deposition statements of two individuals and, in addition, any expert witnesses" as well as "documents to be used as exhibits and a list of all potential witnesses" and anything "the arbitrator finds a compelling need to allow" (which meant "if a fair hearing is impossible without additional discovery"). *Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 709 (2004). The problem was that "curtailment of discovery to only two depositions does not have mutual effect and does not provide Fitz with sufficient discovery to vindicate her rights." *Id.* at 716. Mutuality was absent because the defendant "already has in its possession many of the documents relevant" while the plaintiff did not. *Id.* Though the arbitrator *could* order discovery, that was "an inadequate safety valve." *Id.* at 717. Without more discovery by right, the plaintiff may not be able to demonstrate the need for more. The provision was unconscionable unless it allowed the "type of discovery that is necessary for a fair opportunity to vindicate her claim." *Id.* at 719. Neither AAA nor JAMS would administer an arbitration with no discovery, since both recognize this falls below minimum standards. Exs. A, B.

New Era's rules violate this standard. As New Era's founder and 30(b)(6) witness stated, ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████ Under the standard rules, discovery is limited to 3 depositions unless more is "necessary to ensure a fundamentally fair process." New Era Rule § 5(a)(ix)(2). That amount is obviously inadequate for an antitrust case spanning ten

---

[8]  This argument would mean that Defendants could justify essentially any rules, no matter how absurd, by arguing that the arbitrator is free to depart from them. Further, such an argument would amplify the *procedural* unconscionability of the terms, as claimants would have no way of knowing what rules and procedures would govern before they decide to invest the time and money necessary to bring a claim.

1    years, and the exception for discovery "necessary to ensure a fundamentally fair

2    process" is essentially identical to the standard held unconscionable in *Fitz*. As bad as

3    the *standard* rules are, the *expedited* rules are worse—there is no formal discovery *at*

4    *all*, and arbitrators cannot switch from expedited to standard arbitrations. *Id.* § 2(o)(ii).

5        The unconscionability is magnified because the lack of discovery could prove

6    dispositive on a *common* issue. If a bellwether plaintiff lacks discovery, the arbitrator

7    may rule against claimants in *all* cases with that same issue, forever—not for any merits

8    reason, but because the unfair process allows Defendants to turn a procedural limitation

9    on discovery in one case into a case-killer for *everyone* with similar facts.

10                    **f.     *The non-mutual right of appeal is unconscionable***

11       California courts have long held that a one-sided right to appeal is substantively

12   unconscionable, and the Arbitration Clause here suffers from that exact defect. In *Little*

13   *v. Auto Stiegler, Inc.*, the arbitration clause provided that "awards exceeding $50,000"

14   were appealable. 63 P.3d 979, 983 (Cal. 2003). The California Supreme Court noted that

15   the right to appeal would be valuable for the *defendant* when the award is high (say,

16   above $50,000), but valuable for the *plaintiff* when "the arbitrator rules that the plaintiff

17   takes nothing." *Id.* at 985. So, "the $50,000 threshold inordinately benefits defendants,"

18   and was substantively unconscionable despite *formal* mutuality. *Id.*

19       The same rule applies here. Under Defendants' terms, a party may appeal New

20   Era's decision to JAMS when "the arbitrator awards injunctive relief." Terms of Use

21   § 17. Defendants knew from the similar antitrust case *they were already litigating* that

22   Plaintiffs would seek injunctive relief. *See, e.g.*, Compl. ¶ 208(g). The injunction appeal

23   provision is far more valuable to Defendants. A plaintiff would appeal the *denial* of

24   injunctive relief—but could not. Defendants would appeal the award of injunctive

25   relief—and can. "The odds were far more likely" that this rule would benefit Defendants,

26   making it unconscionable. *Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1408 (2003).

27       Notably, the one-sided appeal provision renders the terms' delegation clause

28   unconscionable. If an arbitrator enjoined the application of any portion of the arbitration

agreement as unconscionable, that relief would be subject to appeal (but, of course, if the arbitrator *declined* to invalidate anything, there would be no appeal).

### g. *The class action waiver provision is unconscionable under the Discover Bank rule*

Last, the class action waiver is substantively unconscionable under California law. As a matter of California law, "when the waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money" "such waivers are unconscionable under California law." *Discover Bank v. Superior Ct.*, 113 P.3d 1100, 1110 (Cal. 2005). True, the Supreme Court held this rule preempted by the FAA where the waiver facilitated *traditional*, bilateral arbitration. *Concepcion*, 563 U.S. 333 (2011). But the arbitration contemplated here is emphatically not bilateral and traditional. Therefore, as explained below, the FAA has no preemptive effect in this case.

## B. The FAA Does not Preempt California Law

Since their arbitration procedure is unconscionable many times over, Defendants will likely argue that federal law requires applying the contract even though it violates California law. But this argument finds no support in the FAA, which expressly preserves generally applicable defenses.

### 1. The FAA's saving clause preserves unconscionability

The defenses here fit within the FAA's text. Under the FAA, agreements to arbitrate are "enforceable, save upon grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Contracts are unconscionable in California, regardless of whether arbitration is involved, if they impose a biased decisionmaker, deny parties notice and an opportunity to be heard, deny statutory rights to disclosure and disqualification, or unfairly restrict the right to a full and fair hearing through absurd page and discovery limitations or one-sided procedural rules.

None of the cases addressing these principles has held them preempted. Decisionmaker bias, *supra* § A(2)(a), under cases like *Graham* and *Cheng-Canindin* are grounded in unconscionability, a general contract defense. The notice concerns discussed in section A(2)(b) derive from the Supreme Court's discussion in *Concepcion* itself. They apply to courts and arbitration equally. The notice and disclosure requirements, *supra* § A(2)(c), have survived FAA preemption challenges. *See Ovitz v. Schulman*, 133 Cal. App. 4th 830, 849 (2005). California's longstanding disclosure and disqualification requirements "promote public confidence in the arbitration process." Cal. R. Ct. RB ETHICS Standard 1. Similarly, the requirements of allowing sufficient documentation, discovery, and evenhanded appeals and even the *Discover Bank* rule are "normally thought to be generally applicable." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011). The FAA's saving clause easily preserves these defenses.

### 2. California law is not preempted by the FAA here because it does not interfere with traditional bilateral arbitration

In *Concepcion*, the Supreme Court held that the *Discover Bank* rule, which bars parties from enforcing class action waivers, was preempted by the FAA when applied to invalidate a traditional arbitration agreement. But *Concepcion* expressly distinguished the situation here, and even the *Discover Bank* rule is *not* preempted in this case, because its application does not interfere with traditional, bilateral arbitration.

In *Concepcion*, the Supreme Court acknowledged that the *Discover Bank* rule was a doctrine "normally thought to be generally applicable." 563 U.S. at 341. Namely, the rule provides that it is unconscionable for a contract to waive—either in court or in arbitration—the right to a class action. *Discover Bank*, 113 P.3d at 1110. But "[a]lthough §2's saving clause preserves generally applicable contract defenses," a neutral doctrine could still "stand as an obstacle to the accomplishment of the FAA's objectives" if it "interferes with fundamental attributes of arbitration." 563 U.S. at 343-44. Requiring class arbitration "interferes with arbitration" because "[c]lasswide arbitration includes absent parties, necessitating additional and different procedures and involving higher

1    stakes." *Id.* at 347-48. The "switch from bilateral to class arbitration sacrifices the

2    principal advantage of arbitration—its informality" because "class arbitration *requires*

3    procedural formality." *Id.* at 348-49. Only bilateral arbitration was "envisioned by

4    Congress when it passed the FAA in 1925," *id.* at 349, and nontraditional, aggregate

5    arbitration procedures "is not arbitration as envisioned by the FAA," *id.* at 351.

6         Here, application of the *Discover Bank* rule will not interfere with traditional

7    bilateral arbitration. It will instead invalidate a representative, consolidated, and non-

8    bilateral proceeding that has all the evils that *Concepcion* tells us the FAA was trying to

9    avoid. The very reasons the protocol is unconscionable are the reasons class arbitrations

10   were anathema in *Concepcion*. Class arbitration "involv[es] higher stakes," *id.* at 348,

11   as does mass arbitration. Arbitrators "are generally not knowledgeable in …

12   certification," *id.*, nor MDL procedures or issue preclusion. Class arbitrations are

13   "slower, more costly, and more likely to generate procedural morass than final

14   judgment," *id.*, as are mass arbitrations. It is unlikely *any* mass arbitration will ever go

15   all the way to final judgment unless the defendant wins on a case-destroying common

16   issue. By contrast, bilateral, traditional arbitrations go quickly, with no plaintiff required

17   to wait indefinitely behind bellwethers and mandatory mediation.[9] The Supreme Court

18   could have been writing about New Era's flawed paradigm in deeming it "unlikely that

19   in passing the FAA Congress meant to leave the disposition" of how bellwethers could

20   "adequately represent" other litigants, how "absent members must be afforded notice,

21   an opportunity to be heard, and a right to opt out" of mass arbitration. *Id.* at 349. Yet

22   under New Era's rules these questions would be at one arbitrator's sole discretion.

23        Defendants may complain that arbitrating thousands of cases individually

24   produces unfair pressure to settle, and that the FAA protects their ability to impose novel,

25

26   _____
     [9]   Defendants may argue that the relevant comparison is resolving a thousand cases through mass

27   arbitration protocols or a thousand cases bilaterally, but the Supreme Court specifically rejected that
     view. *Concepcion*, 563 U.S. at 349 & n.7. It compared *each person's individual, bilateral* arbitration

28   (the traditional form), to the class arbitration (the new form), not the equivalent number of individual
     bilateral arbitrations to a class (a comparison along which class arbitration would shine). *Id.*

bespoke procedures that give Defendants all of the efficiencies of class proceedings with none of the protections for plaintiffs or risk to defendants. But *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022), rejects that argument. Applying *Concepcion*, the Court held that the claim joinder rule of the Private Attorneys General Act was preempted, but made crystal-clear that traditional, bilateral arbitration was the touchstone: "[O]ur precedents do not hold that the FAA allows parties to contract out of *anything* that might amplify defense risks." *Id.* at 1921. Rather, "our cases hold that States cannot coerce individuals into forgoing arbitration by taking the individualized and informal *procedures* characteristic of traditional arbitration off the table." *Id.* The inquiry is whether the challenged law "contains any procedural mechanism at odds with arbitration's basic form," *id.*, because parties cannot be "compelled to arbitrate using procedures at odds with arbitration's traditional form," *id.* at 1918. Here, Defendants seek to arbitrate using unconscionable *non-traditional* forms. California law *can* bar that.

Looking beyond the *Discover Bank* rule, none of the unconscionable aspects of New Era's arbitrations is fundamental to arbitration. No one would suggest that a biased arbitral forum is fundamental, *supra* § A(2)(a). The many due process, fairness, and notice problems inherent in New Era's mass arbitration protocol are entirely novel, *supra* § A(2)(b), and the antithesis of traditional arbitration. California's longstanding arbitrator disclosure and disqualification rules, *supra* § A(2)(c) are fully compatible with traditional arbitration, and actually "promote public confidence in the arbitration process." Cal. R. Ct. RB ETHICS Standard 1. While *some* limitations on the presentation of evidence, discovery, and appeals are common in arbitration, traditional arbitration has never limited presentation to 10 documents and 15 thousand characters with no discovery and a one-way appeal. *Supra* § A(2)(d)-(f). Far from "fundamental," such restrictions are so extreme that reputable arbitral fora would not apply them. *See* Exs. A, B. Even if traditional arbitration might have *some* of these attributes, none would apply rulings based on them to *every* subsequent case.

1    Defendants may argue that the policy of the FAA is to enforce parties' contracts,
2    and therefore ask the Court to leave untouched *any* contract to which they affix the label
3    "arbitration." But that argument is both incomplete and proves too much. It is incomplete
4    because *Concepcion* rejected the view that arbitration is whatever parties agree to do.
5    Parties can "agree to aggregation," to class arbitration, or to "arbitrate pursuant to the
6    Federal Rules of Civil Procedure," but "what the parties in the aforementioned examples
7    would have agreed to *is not arbitration as envisioned by the FAA*." 563 U.S. at 351
8    (emphasis added). The FAA privileges agreements to "traditionally individualized"
9    arbitration, not agreements to all kinds of arbitration. *Epic Sys. Corp. v. Lewis*, 138 S.
10   Ct. 1612, 1623 (2018). If parties agreed to class arbitration, for example, obstacles and
11   purposes preemption would not apply to regulation of it. A state cannot require
12   procedural formality for bilateral, traditional arbitration consistent with the FAA, but it
13   *could* for class arbitration. There, the argument would not be "that a contract is
14   unenforceable *just* because it requires bilateral arbitration," but rather because it requires
15   class arbitration without adequate safeguards. *Id.* at 1623 (emphasis added). In fact,
16   courts would be obligated to impose procedures, since "class arbitration *requires*
17   procedural formality." *Concepcion*, 563 U.S. at 349. Defendants cite no case applying
18   obstacles preemption to *non*-traditional arbitration. None exist.

19   The argument that *any* arbitration contract must be enforced also proves too much.
20   The FAA mandates "enforcement of 'provision[s]' to settle a controversy 'by
21   arbitration,'" as envisioned by the FAA, "not [enforcement of] *any provision* that
22   happens to appear in a contract that features an arbitration clause." *Viking River Cruises*,
23   142 S. Ct. at 1919 n.5 (emphasis added). Were it otherwise, the "purpose" of applying
24   *every* term in *every* arbitration contract would swallow section 2's saving clause. That
25   cannot be. "[S]tate-law rules that do not 'interfere[] with fundamental attributes of
26   arbitration' do not implicate *Concepcion's* limits on state unconscionability." *Sonic-*
27   *Calabasas A, Inc. v. Moreno*, 311 P.3d 184, 201 (Cal. 2013).

28   **C.    The Delegation Clause Itself Is Unconscionable**

1  Each unconscionable aspect of New Era's arbitration rules directly renders the
2  delegation clause unenforceable independent of "the inherent features and consequences
3  of delegation clauses." *Pinela*, 238 Cal. App. 4th at 246. The delegation clause is a
4  contract of adhesion, was imposed mid-stream on *known* claims, has surprising features,
5  and is oppressive. *Supra* § A(1). The same biased arbitral forum, with the same arbitrator
6  a plaintiff cannot disqualify, will decide threshold issues. *Supra* § A(2)(a), (c). Threshold
7  issues will be common issues decided under the mass arbitration protocol, *supra* §
8  A(2)(b), with no additional briefing or evidence, *supra* § A(2)(d), no discovery, *supra* §
9  A(2)(e), with a one-way appeal if plaintiffs receive injunctive relief on a threshold issue
10  (such as enjoining application of the unconscionable arbitration clause), *supra* § A(2)(f).

11 **D.    Unconscionability Permeates the Arbitration Agreement**

12  Citing no legal authority, Defendants breezily suggest, that even if New Era's
13  arbitration is fatally unconscionable, Plaintiffs must arbitrate with "FairClaims," or,
14  perhaps, "another arbitration provider." Mot. at 24. Defendants may not employ salami
15  tactics to calibrate the precise level of unconscionability they can get away with. "Were
16  that the law, employers would have every incentive to pack their arbitration agreements
17  with unenforceable provisions designed to chill employees' pursuit of employment-
18  related claims," then arbitrate in their second-favorite venue if that fails. *Capili v. Finish*
19  *Line, Inc.*, 116 F. Supp. 3d 1000, 1009 (N.D. Cal. 2015).

20  To foil this stratagem, California law provides that, if a court rules "any clause of
21  the contract to have been unconscionable," it "may refuse to enforce the contract." Cal.
22  Civ. Code § 1670.5(a). California courts "refuse to enforce an entire agreement if the
23  agreement is 'permeated' by unconscionability," meaning "it 'contains more than one
24  unlawful provision,'" since "'multiple defects indicate a systematic effort to impose
25  arbitration ... not simply as an alternative to litigation, but as an inferior forum that works
26  to the [stronger party's] advantage." *Lhotka*, 181 Cal. App. 4th at 826 (quoting
27  *Armendariz*, 6 P.3d at 697) (alterations in original). The sheer number of unconscionable
28  provisions in New Era's rules—including core provisions—show that this doctrine

1  applies. "If [Defendants] wish[] to compel arbitration … [they] must draft an agreement

2  that is not permeated with unenforceable provisions." *Capili*, 116 F. Supp. 3d at 1009.

3        Defendants' unconscionable Arbitration Clause "produce[d] an unacceptable

4  chilling effect." *Martinez v. Master Prot. Corp.*, 118 Cal. App. 4th 107, 114, 116-17

5  (2004). There were 47 mass arbitration demands against Defendants in 2019, 20 in 2020,

6  and **zero** in 2021 and 2022, when Defendants switched to New Era (and just one bilateral

7  arbitration). Defendants' shift to New Era "chills the exercise" of consumers' rights,

8  rendering them pervasively unconscionable. *Armendariz*, 24 Cal. 4th at 110.

9  **CONCLUSION**

10        To appreciate the absurdity of what Defendants request, consider a not-so-distant

11  hypothetical. In the middle of a pending antitrust class action, Defendants require absent

12  class members to sign new terms with modifications: JAMS or AAA must pick

13  arbitrators from a small pool designated by a new startup funded primarily by

14  Defendants. Plaintiffs who file suit later will, without notice, be bound by earlier losses.

15  Plaintiffs are limited to a 10-page complaint, but will be sanctioned if they fail to meet

16  a heightened pleading standard. Plaintiffs are not entitled to discovery. Plaintiffs lose

17  their right to strike arbitrators based on conflicts or otherwise. Plaintiffs can lose *en*

18  *masse* but must win individually. Defendants have a right to appeal their position on

19  injunctive relief, but Plaintiffs do not. JAMS and AAA would refuse to apply these

20  terms, as they violate their basic due process protocols. And no Court would enforce

21  them either. The fact that Defendants and their counsel helped fund a new organization

22  that *is* willing to impose these same requirements does not change the legal analysis.

23        The Motion to Compel an unconscionable arbitration should be denied.  To the

24  extent the Court believes calling witnesses from New Era and Defendants will allow the

25  Court to better evaluate any contested facts regarding bias, Plaintiffs request an

26  evidentiary hearing.

27

28

Dated: March 17, 2023

Respectfully submitted,

/s/ *Kevin Y. Teruya*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Kevin Y. Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
  Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
  William R. Sears (Bar No. 330888)
  willsears@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

KELLER POSTMAN LLC
  Warren Postman (Bar No. 330869)
  wdp@kellerpostman.com
  Albert Pak (admitted *pro hac vice*)
  albert.pak@kellerpostman.com
1100 Vermont Avenue, N.W., 12th Floor
Washington, D.C. 20005
Telephone: (202) 918-1123
Facsimile: (312) 971-3502

*Attorneys for Plaintiffs Skot Heckman,*
*Luis Ponce, Jeanene Popp, and Jacob*
*Roberts, on behalf of themselves and all*
*those similarly situated*