# EXHIBIT A

 AMERICAN ARBITRATION ASSOCIATION®

# Consumer Due Process Protocol Statement of Principles

National Consumer Disputes Advisory Committee

## Statement Of Principles

### Principle 1. Fundamentally-Fair Process

All parties are entitled to a fundamentally-fair ADR process. As embodiments of fundamental fairness, these Principles should be observed in structuring ADR Programs.

### Principle 2. Access to Information Regarding ADR Program

Providers of goods or services should undertake reasonable measures to provide Consumers with full and accurate information regarding Consumer ADR Programs. At the time the Consumer contracts for goods or services, such measures should include (1) clear and adequate notice regarding the ADR provisions, including a statement indicating whether participation in the ADR Program is mandatory or optional, and (2) reasonable means by which Consumers may obtain additional information regarding the ADR Program. After a dispute arises, Consumers should have access to all information necessary for effective participation in ADR.

### Principle 3. Independent and Impartial Neutral; Independent Administration

1. *Independent and Impartial Neutral.* All parties are entitled to a Neutral who is independent and impartial.

2. *Independent Administration.* If participation in mediation or arbitration is mandatory, the procedure should be administered by an Independent ADR Institution. Administrative services should include the maintenance of a panel of prospective Neutrals, facilitation of Neutral selection, collection and distribution of Neutral's fees and expenses, oversight and implementation of ADR rules and procedures, and monitoring of Neutral qualifications, performance, and adherence to pertinent rules, procedures and ethical standards.

3. *Standards for Neutrals.* The Independent ADR Institution should make reasonable efforts to ensure that Neutrals understand and conform to pertinent ADR rules, procedures and ethical standards.

4. *Selection of Neutrals.* The Consumer and Provider should have an equal voice in the selection of Neutrals in connection with a specific dispute.

5. *Disclosure and Disqualification.* Beginning at the time of appointment, Neutrals should be required to disclose to the Independent ADR Institution any circumstance likely to affect impartiality, including any bias or financial or personal interest which might affect the result of the ADR proceeding, or any past or present relationship or experience with the parties or their representatives, including past ADR experiences. The Independent ADR Institution should communicate any such information to the parties and other Neutrals, if any. Upon objection of a party to continued service of the Neutral, the Independent ADR Institution should determine whether the Neutral should be disqualified and should inform the parties of its decision. The disclosure obligation of the Neutral and procedure for disqualification should continue throughout the period of appointment.

AMERICAN ARBITRATION ASSOCIATION®

### Principle 4. Quality and Competence of Neutrals

All parties are entitled to competent, qualified Neutrals. Independent ADR Institutions are responsible for establishing and maintaining standards for Neutrals in ADR Programs they administer.

### Principle 5. Small Claims

Consumer ADR Agreements should make it clear that all parties retain the right to seek relief in a small claims court for disputes or claims within the scope of its jurisdiction.

### Principle 6. Reasonable Cost

1. *Reasonable Cost.* Providers of goods and services should develop ADR programs which entail reasonable cost to Consumers based on the circumstances of the dispute, including, among other things, the size and nature of the claim, the nature of goods or services provided, and the ability of the Consumer to pay. In some cases, this may require the Provider to subsidize the process.
2. *Handling of Payment.* In the interest of ensuring fair and independent Neutrals, the making of fee arrangements and the payment of fees should be administered on a rational, equitable and consistent basis by the Independent ADR Institution.

### Principle 7. Reasonably Convenient Location

In the case of face-to-face proceedings, the proceedings should be conducted at a location which is reasonably convenient to both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination should be made by the Independent ADR Institution or by the Neutral.

### Principle 8. Reasonable Time Limits

ADR proceedings should occur within a reasonable time, without undue delay. The rules governing ADR should establish specific reasonable time periods for each step in the ADR process and, where necessary, set forth default procedures in the event a party fails to participate in the process after reasonable notice.

### Principle 9. Right to Representation

All parties participating in processes in ADR Programs have the right, at their own expense, to be represented by a spokesperson of their own choosing. The ADR rules and procedures should so specify.

### Principle 10. Mediation

The use of mediation is strongly encouraged as an informal means of assisting parties in resolving their own disputes.

AMERICAN ARBITRATION ASSOCIATION®

## Principle 11. Agreements to Arbitrate

Consumers should be given:

**a.** clear and adequate notice of the arbitration provision and its consequences, including a statement of its mandatory or optional character;

**b.** reasonable access to information regarding the arbitration process, including basic distinctions between arbitration and court proceedings, related costs, and advice as to where they may obtain more complete information regarding arbitration procedures and arbitrator rosters;

**c.** notice of the option to make use of applicable small claims court procedures as an alternative to binding arbitration in appropriate cases; and,

**d.** a clear statement of the means by which the Consumer may exercise the option (if any) to submit disputes to arbitration or to court process.

## Principle 12. Arbitration Hearings

**1.** *Fundamentally-Fair Hearing.* All parties are entitled to a fundamentally-fair arbitration hearing. This requires adequate notice of hearings and an opportunity to be heard and to present relevant evidence to impartial decision-makers. In some cases, such as some small claims, the requirement of fundamental fairness may be met by hearings conducted by electronic or telephonic means or by a submission of documents. However, the Neutral should have discretionary authority to require a face-to-face hearing upon the request of a party.

**2.** *Confidentiality in Arbitration.* Consistent with general expectations of privacy in arbitration hearings, the arbitrator should make reasonable efforts to maintain the privacy of the hearing to the extent permitted by applicable law. The arbitrator should also carefully consider claims of privilege and confidentiality when addressing evidentiary issues.

## Principle 13. Access to Information

No party should ever be denied the right to a fundamentally-fair process due to an inability to obtain information material to a dispute. Consumer ADR agreements which provide for binding arbitration should establish procedures for arbitrator-supervised exchange of information prior to arbitration, bearing in mind the expedited nature of arbitration.

## Principle 14. Arbitral Remedies

The arbitrator should be empowered to grant whatever relief would be available in court under law or in equity.

## Principle 15. Arbitration Awards

**1.** *Final and Binding Award; Limited Scope of Review.* If provided in the agreement to arbitrate, the arbitrator's award should be final and binding, but subject to review in accordance with applicable statutes governing arbitration awards.

**2.** *Standards to Guide Arbitrator Decision-Making.* In making the award, the arbitrator should apply any identified, pertinent contract terms, statutes and legal precedents.

**3.** *Explanation of Award.* At the timely request of either party, the arbitrator should provide a brief written explanation of the basis for the award. To facilitate such requests, the arbitrator should discuss the matter with the parties prior to the arbitration hearing.



## Introduction: Genesis of the Advisory Committee

Recent years have seen a pronounced trend toward incorporation of out-of-court conflict resolution processes in standardized agreements presented to consumers of goods and services. Some of these processes (such as mediation and non-binding evaluation) involve third party intervention in settlement negotiations; others involve adjudication (binding arbitration). Such processes have the potential to be of significant value in making dispute resolution quicker, less costly, and more satisfying.[1]

Yet because consumer contracts often do not involve arm's length negotiation of terms, and frequently consist of boilerplate language presented on a take-it-or-leave it basis by suppliers of goods or services, there are legitimate concerns regarding the fairness of consumer conflict resolution mechanisms required by suppliers. This is particularly true in the realm of binding arbitration, where the courts are displaced by private adjudication systems. In such cases, consumers are often unaware of their procedural rights and obligations until the realities of out-of-court arbitration are revealed to them after disputes have arisen.[2] While the results may be entirely satisfactory, they may also fall short of consumers' reasonable expectations of fairness[3] and have a significant impact on consumers' substantive rights and remedies.[4]

The use of mediation and other forms of alternative dispute resolution (ADR) by various state and federal courts has also raised concerns regarding quality, effectiveness and fairness. The response has been a number of national, state and local initiatives to establish standards for the guidance and information of courts. Until now, however, there has been no comparable national effort in the private consumer sphere.

In the spring of 1997, the American Arbitration Association® (AAA®) announced the establishment of a National Consumer Disputes Advisory Committee. The stated mission of the Advisory Committee is:

> *To bring together a broad, diverse, representative national advisory committee to advise the American Arbitration Association in the development of standards and procedures for the equitable resolution of consumer disputes.*

---

1   See, *e.g.*, CPR Institute for Dispute Resolution, *ADR Cost Savings & Benefit Studies* (Catherine Cronin-Harris, ed. 1994) (summarizing some of the research findings on the relative advantages ADR may offer). See also, *e.g.*, *Madden v. Kaiser Foundation Hosp.*, 17 Cal. 3d 699, 711, 552 P.2d 1178, 1186 (1976) ("The speed and economy of arbitration, in contrast to the expense and delay of a jury trial, could prove helpful to all parties….")

2   The arbitration agreement may be included in the "fine print" in a brochure of terms and conditions inside a box of goods. See, *e.g.*, *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997) (Customers agreed to computer company's contract terms, including arbitration agreement, by failing to return merchandise within 30 days). See *Age of Compelled Arbitration*, 1997, Wis. L. Rev33, 40-53 (Offering a "cautionary tale" regarding employment arbitration agreement.)

3   See Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection*, 10 Ohio St. J. On Disp. Res. 267 (1995) (discussing procedural limitations of arbitration in treating consumer disputes with banks and lenders); Schwartz, *supra* note 2 (discussing issues relating to adhesion contracts involving employees and consumers); Jean R. Sternlight, *Rethinking the Constitutionality of the Supreme Court's Preference for Binding Arbitration: A Fresh Assessment of Jury Trial, Separation of Powers, and Due Process Concerns*, 72 Tulane L. Rev. 1 (1997) (discussing due process concerns with binding arbitration under employment and consumer contracts). See, *e.g.*, *Engalla V. Permanente Med. Grp.*, 938 P.2d 903 (Cal. 1997) (medical group may not compel arbitration where it administers own arbitration program, fraudulently misrepresents speed of arbitrator selection process, and the forces delays); *Broemmer V. Abortion Serv. of Phoenix*, 840 P.2d 1013 (Az. 1992) (refusing to enforce agreement in "adhesion contract" where drafter inserted potentially self-serving term requiring sole arbitrator of medical malpractice claims to be licensed medical doctor).

4   See Schwartz, *supra* note 2, at 60-61 (discussing perceptions regarding relative damages awards in court and in arbitration), 64-66 (summarizing some statistics on arbitration awards). See also William W. Park, *When and Why Arbitration Matters*, in The Commercial Way to Justice 73, 75 (G.M. Beresfort Hartwell ed., 1997) (" Who interprets an…agreement will frequently be more significant than *what* the applicable law says about the agreement….").



AMERICAN ARBITRATION ASSOCIATION®

In light of its stated mission, the Advisory Committee's recommendations are likely to have a direct impact on the development of rules, procedures and policies for the resolution of consumer disputes under the auspices of the AAA.

The Advisory Committee's recommendations may also have a significant impact in the broader realm of consumer ADR. A Statement of Principles which is perceived as a broadly-based consensus regarding minimum requirements for mediation and arbitration programs for consumers of goods and services may influence the evolution of consumer rules generally and the development of state and federal laws governing consumer arbitration agreements. The standards may affect the drafting of statutes and influence judicial opinions addressing the enforceability of arbitration agreements pursuant to existing state or federal law.[5]

## Scope of the Consumer Due Process Protocol

The *Consumer Due Process Protocol (Protocol)* was developed to address the wide range of consumer transactions those involving the purchase or lease of goods or services for personal, family or household use. These include, among other things, transactions involving: banking, credit cards, home loans and other financial services; health care services; brokerage services; home construction and improvements; insurance; communications; and the purchase and lease of motor vehicles and other personal property.

Across this broad spectrum of consumer transactions, the Protocol applies to all possible conflicts from small claims to complex disputes. In light of these realities, the Advisory Committee sought to develop principles which would establish clear benchmarks for conflict resolution processes involving consumers, while recognizing that a process appropriate in one context may be inappropriate in another. Therefore, the Protocol embodies flexible standards which permit consideration of specific circumstances.

In some cases, the AAA is developing or has developed special dispute resolution policies and procedures governing particular transactional systems. A recent example is its current initiative with respect to ADR in contracts for health care services. Where the general principles set forth in this Protocol conflict with more specific standards developed under the auspices of the AAA or some other independent organization with relatively broad participation by affected parties, the latter should govern.

There are other transactions that share many of the features of consumer transactions, such as those involving small businesses and individual employment contracts. While the Protocol was not developed for specific application to such other transactions, there may be circumstances in which the Protocol might be applied by analogy to ADR in those venues. The Principles articulated here are likely to have an impact on minimum standards of due process for other ADR systems involving persons of disparate bargaining power.

Each section of this document is devoted to treatment of a discrete topic concerning consumer ADR. It begins with a basic Principle that embodies the fundamental reasonable expectation of consumers as defined by the Advisory

---

[5]    See, *e.g., Cole v. Burns International Security Services*, 105 F.3d 1465 (D.C.Cir. 1997) (Citing Due Process Protocol for Employment Disputes). The consensus-based approach of the broadly constituted group reflects the "public interest" model espoused by Professor Speidel. See Richard E. Speidel, *Contract Theory and Securities Arbitration: Whither Consent?,* 62 Brook. L. Rev. 1335 (1996).

 AMERICAN ARBITRATION ASSOCIATION®

Committee. Each Principle is accompanied by Reporter's Comments that explain the rationale of the Advisory Committee in the context of other emerging standards. In addition, some Principles are supplemented by Practical Suggestions for putting the Principles into practice.

The specific mention of mediation and binding arbitration reflects the current emphasis on these processes in consumer conflict resolution. The Advisory Committee recognizes that a number of other approaches are being employed to resolve commercial and consumer disputes, and encourages their use in accordance with the spirit of the Protocol.

The signatories to this Protocol were designated by their respective organizations, but the Protocol reflects their personal views and should not be construed as representing the policy of the designating organizations. Although the following Principles reflect a remarkable degree of consensus, achieved during the course of several meetings of the entire Advisory Committee, subcommittee deliberations, exchanges of numerous memoranda and of five drafts of the Protocol, Advisory Committee members at times accepted compromise in the interest of arriving at a common ground. As was the case with the task force which developed the *Employment Due Process Protocol*, opinions regarding the appropriateness of binding pre-dispute arbitration agreements in consumer contracts were never fully reconciled. Like that group, however, the Advisory Committee was able to address standards for ADR processes within the given context.

## Glossary of Terms

### Consumer

Consumer refers to an individual who purchases or leases goods or services, or contracts to purchase or lease goods or services, intended primarily for personal, family or household use.

### Provider

Provider refers to a seller or lessor of goods or services to Consumers for personal, family or household use.

### ADR Process

An ADR (Alternative Dispute Resolution) Process is a method for out-of-court resolution of conflict through the intervention of third parties. Mediation and arbitration are two widely used ADR processes.

### Mediation

Mediation refers to a range of processes in which an impartial person helps parties to a dispute to communicate and to make voluntary, informed choices in an effort to resolve their dispute. A mediator, unlike an arbitrator, does not issue a decision regarding the merits of the dispute, but instead facilitates a dialogue between the parties with the view of helping them arrive at a mutually agreeable settlement.



AMERICAN ARBITRATION ASSOCIATION®

## Arbitration

Arbitration is a process in which parties submit disputes to a neutral third person or persons for a decision on the merits. Each party has an opportunity to present evidence to the arbitrator(s) in writing or through witnesses. Arbitration proceedings tend to be more informal than court proceedings and adherence to judicial rules of evidence is not usually required. Arbitrators decide cases by issuing written decisions or "awards." An award may or may not be binding on the parties, depending on the agreement to arbitrate. A "binding" arbitration award may be enforced as a court judgment under the terms of federal or state statutes, but judicial review of arbitration awards is limited.

## Neutral

A Neutral is a mediator, arbitrator, or other independent, impartial third party selected to intervene in a Consumer-Provider dispute.

## ADR Agreement

An ADR Agreement is an agreement between a Provider and a Consumer to submit disputes to mediation, arbitration, or other ADR Processes. As used in this Statement, the term includes provisions (sometimes incorporated by reference) in standard contracts furnished by Providers which signify the assent of the Consumer and Provider to such processes (although the assent may only be the "generalized assent" typically given by Consumers to standard terms).

## ADR Program

An ADR Program is any program or service established by or utilized by a Provider of goods and services for out-of-court resolution of Consumer disputes. The term includes ADR rules and procedures and implementation of administrative structures.

## Independent ADR Institution

An Independent ADR Institution is an organization that provides independent and impartial administration of ADR Programs for Consumers and Providers, including, but not limited to, development and administration of ADR policies and procedures and the training and appointment of Neutrals.

## Major Standards and Sources

The Reporter's Comments accompanying these Principles cite a number of existing standards and sources relied upon by the Advisory Committee. The more frequently cited standards and sources are set forth below by their full title as well as the abbreviated title that appears in the Comments.

American Arbitration Association, *Commercial Arbitration Rules,* July 1, 1996 (AAA Commercial Rules)

American Arbitration Association, *Construction Industry Dispute Resolution Procedures,* Oct. 15, 1997 (AAA Construction Procedures)

 AMERICAN ARBITRATION ASSOCIATION®

American Arbitration Association, *Wireless Industry Arbitration Rules,* July 15, 1997 (AAA Wireless Rules)

American Arbitration Association & American Bar Association, *Code of Ethics for Arbitrators in Commercial Disputes* (1977) (Code of Ethics for Arbitrators)

Center for Dispute Settlement, Institute of Judicial Admin., *Standards for Court-Connected Mediation Programs* (Standards for Court-Connected Programs)

Council of Better Business Bureaus, Inc., *Arbitration (Binding)* (BBB Arbitration Rules)

CPR-Georgetown Commission on Ethics and Standards in ADR Working Group on Provider Organizations, *Principles for ADR Provider Organizations* (Draft of April 4, 1998) (Principles for ADR Provider Organizations)

*Federal Arbitration Act,* 9 U.S.C. ''1-16 (as amended and in effect July 1, 1992) (Federal Arbitration Act)

Blue-Ribbon Advisory Panel on Kaiser Permanente Arbitration, *The Kaiser Permanente Arbitration System: A Review and Recommendations for Improvement* 1 (1998) (Kaiser Permanente Review and Recommendations)

Joint Committee (American Arbitration Association, American Bar Association and Society of Professionals in Dispute Resolution) on Standards of Conduct, *Standards of Conduct for Mediators* (1994) (Joint Standards for Mediators)

Society of Professionals in Dispute Resolution (SPIDR) Commission on Qualifications, *Ensuring Competence and Quality in Dispute Resolution Practice* (Draft Report 1994) (SPIDR Report on Qualifications)

Society of Professionals in Dispute Resolution (SPIDR) Law and Public Policy Committee, *Mandated Participation and Settlement Coercion: Dispute Resolution as It Relates to the Courts* (1991) (SPIDR Report on Court-Mandated ADR)

Society of Professionals in Dispute Resolution (SPIDR) Commission on Qualifications, *Principles Concerning Qualifications* (1989) (SPIDR Principles)

Task Force on Alternative Dispute Resolution in Employment, *A Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship* (1995) (Employment Due Process Protocol)

*Uniform Arbitration Act,* 7 U.A.A. 1 (1997) (Uniform Arbitration Act)


AMERICAN ARBITRATION ASSOCIATION®

## Principle 1. Fundamentally-Fair Process

All parties are entitled to a fundamentally-fair ADR process. As embodiments of fundamental fairness, these Principles should be observed in structuring ADR Programs.

### Reporter's Comments

Users of ADR are entitled to a process that is fundamentally fair. Emerging standards governing consensual and court-connected ADR programs reflect pervasive concerns with fair process. *See, e.g.,* III Ian R. Macneil, Richard E. Speidel, & Thomas J. Stipanowich, *Federal Arbitration Law: Agreements, Awards & Remedies Under the Federal Arbitration Act* '32.2.1 (1994) [hereinafter Federal Arbitration Law ] (noting "universal agreement" that arbitrators must provide parties with fundamentally-fair hearing). *See also Kaiser Permanente Review and Recommendations* 1 ("As the sponsor of a mandatory system of arbitration, Kaiser Permanente must assure a fair system to their members, physicians and staff.")

Where conflict resolution processes are defined by a written contract, that writing is often viewed by courts as the primary indicator of the "procedural fairness" for which the parties bargained. As the Advisory Committee recognized, however, ADR agreements in most Consumer contracts are "take-it-or-leave-it" contracts which are not products of negotiation by Consumers. *See* David S. Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration,* 1997 Wis. L. Rev. 33, 55-60 (discussing adhesion dimension of pre-dispute arbitration agreements in standardized contracts); *Kaiser Permanente Review and Recommendations 28 (noting that many members of a major HMO have no realistic alternative for medical care).* It is possible, therefore, that contracts to which they have generally assented contain ADR Agreements which fall so far short of Consumers' reasonable expectations that they would not have entered into the agreement had they been aware of the provisions. Thus, although these Principles attempt to enhance the likelihood that Consumers will have specific knowledge of ADR provisions at the time of contracting, the Advisory Committee also believed it necessary to describe a baseline of reasonable expectations for ADR in Consumer transactions. These Principles identify specific minimum due process standards which embody the concept of fundamental fairness, including: informed consent; impartial and unbiased Neutrals; independent administration of ADR; qualified Neutrals; access to small claims court; reasonable costs (including, where appropriate, subsidized Provider-mandated procedures); convenient hearing locations; reasonable time limits; adequate representation; fair hearing procedures; access to sufficient information; confidentiality; availability of court remedies; application of legal principle and precedent by arbitrators; and the option to receive a statement of reasons for arbitration awards.

Where provisions in a standardized pre-dispute arbitration agreement fail to meet Consumers' reasonable expectations, there is authority for the principle that courts may properly refuse to enforce the arbitration agreement in whole or in part. *See Restatement (Second) of Contracts* ' 211 (1981); *Broemmer v. Abortion Services of Phoenix, Ltd.,* 173 Ariz. 148, 840 P.2d 1013 (1992) (standardized arbitration agreement was unenforceable where its terms fell beyond patient's reasonable expectations); *Graham v. Scissor-Tail, Inc.,* 623 P.2d 165 (Cal. 1981) (arbitration clauses in adhesion contracts are unenforceable if they are contrary to the reasonable expectations of parties or unconscionable). *Cf. Cole v. Burns International Security Services,* 105 F.3d 1465 (D.C. Cir. 1997) (setting forth minimum due process standards for judicial enforcement of arbitration agreement in the context of a statutory employment discrimination claim where the employee was required to enter into the agreement as a condition of employment). Procedural fairness in Consumer arbitration



AMERICAN ARBITRATION ASSOCIATION®

agreements may also be policed under other principles. *See, e.g., Stirlen v. Supercuts,* 51 Cal. App. 4th Supp. 1519, 60 Cal. Rptr.2d 138 (1997) (finding remedial limits in "adhesive" employment agreement unconscionable); *Engalla v. Permanente Med. Grp.,* 938 P.2d 903 (Cal. 1997) (arbitration agreement was unenforceable if there was substantial delay in arbitrator selection contrary to consumer's reasonable, fraudulently induced, contractual expectations).

Because the Principles in this Protocol represent a fundamental standard of fairness, waiver of any of these Principles in a pre-dispute agreement will naturally be subject to scrutiny as to conformity with the reasonable expectations of the parties and other judicial standards governing the enforceability of such contracts. Assuming they have sufficient specific knowledge and understanding of the rights they are waiving, however, Consumers may waive compliance with these Principles after a dispute has arisen.

## Principle 2. Access to Information Regarding ADR Program

Providers of goods or services should undertake reasonable measures to provide Consumers with full and accurate information regarding Consumer ADR Programs. At the time the Consumer contracts for goods or services, such measures should include (1) clear and adequate notice regarding the ADR provisions, including a statement indicating whether participation in the ADR Program is mandatory or optional, and (2) reasonable means by which Consumers may obtain additional information regarding the ADR Program. After a dispute arises, Consumers should have access to all information necessary for effective participation in ADR.

### Reporter's Comments

*See SPIDR Report on Qualifications* at 9 ("Consumers are entitled to know what tasks the neutral…may perform and what tasks they are expected to perform in the course of a particular dispute resolution service.") *Cf. SPIDR Principles* at 6-7 ("It is the responsibility of…private programs offering dispute resolution services to define clearly the services they provide…[and provide information about the program and Neutrals to the parties.]"); *Kaiser Permanente Review and Recommendations 28* (provider of medical services has duty to provide users with "enough information and facts to allow them to understand the actual operation of the arbitration system"); *Principles for ADR Provider Organizations 2*. At a minimum, Consumers should be provided with (or have prompt access to) written information to explain the process. This should include general information describing each ADR process used and its distinctive features, including:

* the nature and purpose of the process, including the scope of ADR provisions;
* an indication of whether or not the Consumer has a choice regarding use of the process;
* the role of parties and attorneys, if any;
* procedures for selection of Neutrals;
* rules of conduct for Neutrals, and complaint procedures;
* fees and expenses;
* information regarding ADR Program operation, including locations, times of operation, and case processing procedures;
* the availability of special services for non-English speakers, and persons with disabilities; and,
* the availability of alternatives to ADR, including small claims court.



AMERICAN ARBITRATION ASSOCIATION®

*See, e.g., BBB Arbitration Rules* (defining arbitration and the roles of various participants; providing "checklist" for Consumers preparing for arbitration; setting forth procedural rules). *Cf. Standards for Court-Connected Programs* ' 3.2.b. (listing information which courts sponsoring mediation should provide to program users). *See also SPIDR Principles* at 6-7 (listing information which private programs should offer to parties regarding the program and participating Neutrals). Consumers should also be able to obtain a copy of pertinent rules and procedures. In the case of binding arbitration provisions, there should also be a straightforward explanation of the differences between arbitration and court process. *See* Principle 11 "Agreements to Arbitrate." Although the Provider of goods or services is charged with the responsibility for making certain that Consumers have access to appropriate information regarding ADR, the Independent ADR Institution has an important role in this area. The Independent ADR Institution must be prepared to communicate to the parties all information necessary for effective use of the ADR process(es), particularly after a dispute arises.

All materials should be prepared in plain straightforward language. As a rule, such information should be in the same language as the principal contract for goods or services. *See, e.g., N.Y. Pers. Prop. Law* ' 427 (McKinney 1997). *See also Standards for Court-Connected Programs* ' 3.2.b., Commentary, at 3-4 (If a significant percentage of the population served is monolingual in a particular language, the material should be available in that language.)

**Practical Suggestions**

An example of a creative approach to providing information about Consumer ADR is provided by a major university medical center's Health Care Dispute Resolution Program. The medical center provides prospective patients with a written explanation of mediation and arbitration procedures for resolution of health care-related disputes one month before they visit the center to complete the remaining paperwork. As the written materials explain, the program is voluntary; patients are not required to opt for the procedures as a condition to receiving treatment. Patients may contact the center for additional information regarding the processes.

For purposes of allowing Consumers access to information about dispute resolution programs, the AAA makes available an 800 customer service telephone number. In addition, the AAA, like some other Independent ADR Institutions, also has a World Wide Web site; it posts its rules and an explanation of its mediation and arbitration procedures on the Web site. A panel proposing reforms to a major HMO-sponsored arbitration system recommended the creation of an "ombudsperson program to assist members in navigating the system of dispute resolution." Kaiser Permanente Review and Recommendations 2.43.

## Principle 3. Independent and Impartial Neutral; Independent Administration

1. *Independent and Impartial Neutral.* All parties are entitled to a Neutral who is independent and impartial.

2. *Independent Administration.* If participation in mediation or arbitration is mandatory, the procedure should be administered by an Independent ADR Institution. Administrative services should include the maintenance of a panel of prospective Neutrals, facilitation of Neutral selection, collection and distribution of Neutral's fees and expenses, oversight and implementation of ADR rules and procedures, and monitoring of Neutral qualifications, performance, and adherence to pertinent rules, procedures and ethical standards.

3. *Standards for Neutrals.* The Independent ADR Institution should make reasonable efforts to ensure that Neutrals understand and conform to pertinent ADR rules, procedures and ethical standards.



**AMERICAN ARBITRATION ASSOCIATION**®

4. *Selection of Neutrals.* The Consumer and Provider should have an equal voice in the selection of Neutrals in connection with a specific dispute.

5. *Disclosure and Disqualification.* Beginning at the time of appointment, Neutrals should be required to disclose to the Independent ADR Institution any circumstance likely to affect impartiality, including any bias or financial or personal interest which might affect the result of the ADR proceeding, or any past or present relationship or experience with the parties or their representatives, including past ADR experiences. The Independent ADR Institution should communicate any such information to the parties and other Neutrals, if any. Upon objection of a party to continued service of the Neutral, the Independent ADR Institution should determine whether the Neutral should be disqualified and should inform the parties of its decision. The disclosure obligation of the Neutral and procedure for disqualification should continue throughout the period of appointment.

## Reporter's Comments

The concept of a fair, independent and impartial Neutral (or Neutral Panel) is enshrined in leading standards governing arbitration and mediation. *See Federal Arbitration Act* ' 10(a) (2); *Uniform Arbitration Act* ' 12(a) (2); *AAA Commercial Rules* 12, 13, 14, 19; *BBB Arbitration Rules* 6, 8. *The Joint Standards for Mediators* describe mediator impartiality as "central" to the mediation process and require mediators to conduct mediation in an impartial manner. *Joint Standards for Mediators*, Art. II; *Standards for Court-Connected Programs* ' 8.1.a. Similar policies animate standards requiring mediators to disclose conflicts of interest and to conduct the mediation in a fair manner. Joint Standards for Mediators, Arts. III, VI; *SPIDR Principles*, Principles 4.b., c., f.; 6.d., e., i.; *Standards for Court-Connected Programs* ' 8.1.b.

When Neutrals are appointed by a court or other organization, the appointing entity has an important obligation to ensure their impartiality. This obligation entails a reasonable level of oversight of Neutral performance. Comments to the *Joint Standards for Mediators* indicate that "[w]hen mediators are appointed by a court or institution, the appointing agency shall make reasonable efforts to ensure that mediators serve impartially." *Joint Standards for Mediators*, Art. II. *The Standards for Court-Connected Programs* therefore require courts to "adopt a code of ethical standards for mediators [covering, among other things, impartiality and conflict of interest], together with procedures to handle violations of the code." *Standards for Court-Connected Programs* ' 8.1. For these and other reasons, the integrity and impartiality of the administrative organization is also important; the growing use of arbitration and mediation in the Consumer context has also raised issues regarding the administration of such processes. *See, e.g., Engalla v. Permanente Med. Grp.*, 928 P.2d 903 (Cal. 1997). *See generally* Edward Dauer, *Engalla's Legacy to Arbitration*, ADR Currents, Summer 1997, at 1; *Principles for ADR Provider Organizations* (setting forth general principles of responsible practice for ADR Provider Organizations, "entities which hold themselves out as offering, brokering or administering dispute resolution services").

In addition to appointing Neutrals, administering institutions often perform many functions which have a direct impact on the conduct of the dispute resolution process, including functions sometimes performed by Neutrals. The consensus of the Advisory Committee was that the reality and perception of impartiality and fairness was as essential in the case of Independent ADR Institutions as it was in the case of individual Neutrals. Thus, the Advisory Committee concluded that when an ADR Agreement mandates that parties resort to mediation or arbitration, the administering Independent ADR Institution should be independent of either party and impartial. *See, e.g., Kaiser Permanente Review and Recommendations 31* (recommending, first and foremost, the "creation of an independent, accountable administrator" for the Kaiser Permanente arbitration system to counter "perception of bias" raised by "self-administration"). *See also Principles for ADR Provider Organizations* (draft standards for organizations providing ADR services). For this and other



AMERICAN ARBITRATION ASSOCIATION®

reasons, this Principle may be the single most significant contribution of the Protocol. In the long term, moreover, the independence of administering institutions may be the greatest challenge of Consumer ADR.

Broad disclosure of actual or potential conflicts of interest on the part of prospective Neutrals is critical to the real and perceived fairness of ADR. Although consenting parties have considerable freedom to choose Neutrals, including those with experience in a particular industry or profession, the key to informed consent is broad disclosure by prospective Neutrals. Therefore, a long line of authority under federal and state arbitration statutes establishes the principle that an arbitrator's failure to disclose certain relationships or other facts which raise issues of partiality may result in reversal of an arbitration award. *See generally* III *Federal Arbitration Law* Ch. 28 (discussing legal and ethical rules governing arbitrator impartiality). The principle of disclosure is embodied in leading arbitration rules and ethical standards. *See AAA Commercial Rule* 19, *NASD Code* ' 10312; *BBB Arbitration Rules* 6, 8.

*The Joint Standards for Mediators* mandate disclosure of "all actual and potential conflicts of interest reasonably known to the mediator" including any "dealing or relationship that might create an impression of possible bias." *Joint Standards for Mediators,* Art. III. Thereafter, the mediator must await the parties' agreement to proceed with mediation. The same concerns require mediators to identify and avoid conflicts during (and even after) mediation. *Id. Cf. Employment Due Process Protocol* ' C.4. (mediators and arbitrators have a duty to disclose any relationship which might reasonably constitute or be perceived as a conflict of interest); *SPIDR Principles*, Principles 4.b., c., f.; 6.d.,e., i.; *Standards for Court-Connected Programs* ' 8.1.b.

Although they did not establish it as a requirement under these Principles, most members of the Advisory Committee endorsed the concept of a "list selection" process similar to that employed by the AAA. *See AAA Commercial Rule* 14. Under this process, the Independent ADR Institution provides each of the parties with lists of prospective Neutrals and invites the parties to identify and rank acceptable individuals. Mutually acceptable Neutrals are thereby identified. The AAA approach served as the model for other ADR standards. *See, e.g., Employment Due Process Protocol* ' C.3.; Securities Industry Conference on Arbitration, *List Selection Rule* (Final Draft, Sept. 18, 1997) (proposed by SICA as modification to Section 8 of the *Uniform Code of Arbitration*); Proposed Rule Change by National Association of Securities Dealers, File No. SR-NASD097 (proposed by NASD as modification to Rules 10310 and 10311 of the NASD Code of Arbitration Procedure). The concern was expressed that the list selection approach may create a financial tie between Neutrals in the pool and Providers, who will be "repeat players" in the ADR Program. Such considerations may mandate, among other things, a larger panel of Neutrals, rotating assignments, or disclosure of past awards rendered by arbitrators.

In the interest of informed selection, the Advisory Committee recommends that parties be provided with or have access to some information regarding recent ADR proceedings conducted by prospective Neutrals. *Cf. Employment Due Process Protocol* ' B.3 (recommending that parties be provided with names, addresses, and phone numbers of party representatives in a prospective arbitrator's six most recent cases to aid in selection).

The dictates of fairness also extend to the conduct of ADR sessions. Thus, for example, arbitrators generally are forbidden from communicating with parties outside of hearings. *See* III *Federal Arbitration Law* ' 32.4. Similarly, standards for mediator conduct demand impartiality. *See, e.g., Standards for Court-Connected Programs* ' 8.1.


AMERICAN ARBITRATION ASSOCIATION®

Although the rules and procedures of an ADR Program and oversight by the Independent ADR Institution are important in assuring the impartiality of Neutrals, it is also essential that Neutrals be bound to perform in accordance with recognized ethical standards. In the case of arbitrators, the leading ethical standard is the *Code of Ethics for Arbitrators in Commercial Disputes* (current version). Similarly, ethical standards governing mediator eligibility also require impartiality. *See, e.g., Standards for Court-Connected Programs* ' 8.1. It is the responsibility of the Independent ADR Institution to develop or adopt ethical standards for Neutrals and to ensure that Neutrals understand and conform to applicable standards.

Some arbitration procedures provide for a "tripartite" panel in which each party appoints its own "party-arbitrator," and the two party-arbitrators select a third arbitrator to complete the panel. *See generally* III *Federal Arbitration Law* ' 28.4; see also Alan Scott Rau, *Integrity in Private Judging,* 38 S. Tex. L. Rev. 485, 505-08 (1997) (noting problems with party-arbitrator concept). For a number of reasons, the Advisory Committee believed such practices should be avoided in the Consumer sphere, and that all arbitrators should be neutral. *Cf. Kaiser Permanente Review and Recommendations* 42 (expressing serious concerns regarding tripartite panel approach).

## Practical Suggestions

Independent ADR Institutions should develop procedures which are appropriate to each of the ADR Programs they administer. A helpful model for program administrators is the User Advisory Committee now being utilized by the AAA to establish procedures and policies for ADR in the areas of employment, construction, health care, and other transactional settings. *Cf. Kaiser Permanente Review and Recommendations* 32 (recommending "on-going, volunteer Advisory Committee" comprised of representatives of various interest groups, including "an appropriate consumer advocacy organization" to consult in development of arbitration program). Such entities should provide a forum in which representatives of Consumers and Providers cooperate in the development and implementation of policies and procedures governing an ADR program, including selection of Neutrals.

For selection of Neutrals, the Independent ADR Institution might utilize a list procedure similar to that used by the AAA. The list of prospective Neutrals should include pertinent biographical information, including the names of parties and representatives involved in recent arbitration proceedings handled by the prospective Neutral. *Cf. Employment Due Process Protocol* ' B.3 (recommending that parties be provided with names, addresses, and phone numbers of party representatives in a prospective arbitrator's six most recent cases to aid in selection). Each party should be afforded discretion to reject any candidate with or without cause. Failing agreement on a Neutral or panel of Neutrals in this fashion, the Neutral should be appointed by the Independent ADR Institution, subject to objection for good cause.

## Principle 4. Quality and Competence of Neutrals

All parties are entitled to competent, qualified Neutrals. Independent ADR Institutions are responsible for establishing and maintaining standards for Neutrals in ADR Programs they administer.

## Reporter's Comments

Organizations providing ADR services for Consumer transactions should have a continuing obligation to monitor the quality of the services they provide. This obligation requires that they establish and maintain standards for Neutrals within



the program which are appropriate to the issues or disputes being addressed. The SPIDR Commission on Qualifications calls upon private as well as public programs offering ADR services to set and monitor program performance. *See SPIDR Principles,* Principle 6, at 3-4. Likewise, the *Standards for Court-Connected Programs* call upon courts to "ensure that the mediation programs to which they refer cases are monitored adequately…and evaluated [periodically]." *Standards for Court-Connected Programs '* 6.0.

The most critical element in ADR quality control is the establishment and maintenance of standards of competence for Neutrals within the program. "Competence" refers to "the acquisition of skills, knowledge and…other attributes" deemed necessary to assist others in resolving disputes in a particular setting. *See SPIDR Report on Qualifications* at 6. In 1989, the SPIDR Commission on Qualifications published a list of general skills and areas of knowledge that should be considered by groups establishing competency standards. *See SPIDR Principles*, Principle 11, at 4-7.

While ensuring the competence of Neutrals is always important, it is particularly "critical in contexts where party choice over the process, program or neutral is limited" a reality of many Consumer ADR programs. *See SPIDR Report on Qualifications* at 5; *SPIDR Principles,* Principle 3 at 2 (extent to which Neutral qualifications are mandated should vary by degree of choice parties have over dispute resolution process, ADR Program, and Neutral). The SPIDR Commission on Qualifications requires private programs to, among other things, establish clear criteria for the selection and evaluation of Neutrals and conduct periodic performance evaluations. *SPIDR Principles* at 3. See also SPIDR Report on Qualifications at 6 (Neutrals, professional associations, programs and Consumers should all have responsibility for addressing and assessing Neutral performance); American Bar Ass'n Young Lawyers Div. & Special Comm. On Alternative Means of Dispute Resolution, *Resolving Disputes: An Alternative Approach, A Handbook for Establishment of Dispute Settlement Centers* 32 (1983) (noting importance of post-mediation evaluation by administering agency).

The Advisory Committee concluded that it would be inappropriate (and, probably, impossible) to set forth a set of universally applicable qualifications for Neutrals in Consumer disputes. The Advisory Committee's conclusions parallel those of other groups establishing broad standards for the conduct of ADR. *See, e.g., SPIDR Report on Qualifications; SPIDR Principles* at 1, 2. As the SPIDR Commission on Qualifications determined, Neutral qualifications are best established by joint efforts of concerned "stakeholders" in specific contexts. *See, e.g., Kaiser Permanente Review and Recommendations* 35-36 (recommending involvement of advisory committee in development of arbitrator qualifications).

It is important for Consumers to have a voice in establishing and maintaining standards of competence and quality in ADR programs. The SPIDR Commission on Qualifications recently observed that "consumers…share a responsibility with programs, [Neutrals]…and associations to join in evaluating and reporting on the performance of [Neutrals]…and programs and contributing to the development of policies and standards on qualifications." *SPIDR Report on Qualifications*, ' G.2. at 9. *See also SPIDR Principles*, Principle 2 at 2 (private entities making judgments about neutral qualifications should be guided by groups that include representatives of consumers of services). Although Neutral expertise is traditionally a hallmark of arbitration, technical or professional experience often carries with it the perception if not the reality of bias. From the Consumer's perspective, therefore, an arbitrator who shares the professional or commercial background of a Provider may not be the ideal judge. *See, e.g., Broemmer v. Abortion Serv. of Phoenix,* 840 P.2d 1013 (Ariz. 1992) (adhesion arbitration agreement provided by abortion clinic which, among other things, required arbitrator to be a licensed obstetrician/gynecologist, was unenforceable as beyond reasonable expectations of patient).



An Independent ADR Institution's responsibility for the qualifications of Neutrals in a particular Consumer ADR program dictates the development of an appropriate training program. Ideally, the training should include a mentoring program with experienced Neutrals as well as coverage of applicable principles of Consumer law. *See* Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection*, 10 Ohio St. J. on Disp. Res. 267, 315 (arbitrators need special legal expertise to address statutory issues respecting consumer claims against financial institutions). Successful completion of such training should be reflected in the information on prospective Neutrals furnished to the parties prior to selection. *Cf. Employment Due Process Protocol* ' C.2.

The Advisory Committee generally supports the concept of broad choice in selection of Neutrals, and recognizes the right of Consumers and Providers to jointly select any Neutral in whom the parties have requisite trust, even one who does not possess all of the qualifications recommended by an ADR Program. *Cf. Employment Due Process Protocol* ' C.1.; *Standards for Court-Connected Programs* ' 13.4 ("Parties should have the widest possible latitude in selecting mediators, consistent with public policy."). This assumes, of course, that both parties have a true choice in the matter, that they are duly informed about the background and qualifications of the Neutrals proposed, and that all such Neutrals have made full disclosure of possible conflicts of interest in accordance with Principle 3.

### Practical Suggestions

Elements of effective quality control include the establishment of standards for Neutrals, the development of a training program, and a program of ongoing performance evaluation and feedback. Because the requirements of parties will vary with the circumstances, it will be necessary to establish standards for Neutrals in an ADR Program with due regard for the specific needs of users of the program. As noted in connection with Principle 3, a helpful model for program administrators is the User Advisory Committee now being utilized by the AAA to establish procedures and policies for ADR in the areas of employment, construction, health care, and other transactional settings. Such entities could bring Consumer and Provider representatives together to assist in the development and implementation of programs to train, qualify and monitor the performance of Neutrals.

## Principle 5. Small Claims

Consumer ADR Agreements should make it clear that all parties retain the right to seek relief in a small claims court for disputes or claims within the scope of its jurisdiction.

### Reporter's Comments

Disputes arising out of Consumer transactions often involve relatively small amounts of money. Such disputes may be well-suited to resolution by informal ADR processes and judicial small claims procedures.

Within the judicial system, the least expensive and most efficient alternative for resolution of claims for minor amounts of money often lies in small claims courts. These courts typically provide a convenient, less formal and relatively expeditious judicial forum for handling such disputes, and afford the benefit, where necessary, of the coercive powers of the judicial


AMERICAN ARBITRATION ASSOCIATION®

system. The Advisory Committee concluded that access to small claims tribunals is an important right of Consumers which should not be waived by a pre-dispute ADR Agreement.

Practical Suggestions

Because, for cases involving small amounts of money, parties retain the option of an oral hearing in small claims court, it may be reasonable for the ADR Agreement to provide for arbitration of small claims without a face-to-face hearing. Such alternatives may include "desk arbitration," which involves the making of an arbitration award based on written submissions; proceedings conducted by telephone or electronic data transmission; and other options. *See* Principle 12.

Mediation conducted by telephone conference call has also proven effective in resolving Consumer disputes. At least one major auto manufacturer has successfully used this technique to resolve warranty claims.

## Principle 6. Reasonable Cost

1.  *Reasonable Cost.* Providers of goods and services should develop ADR programs which entail reasonable cost to Consumers based on the circumstances of the dispute, including, among other things, the size and nature of the claim, the nature of goods or services provided, and the ability of the Consumer to pay. In some cases, this may require the Provider to subsidize the process.

2.  *Handling of Payment.* In the interest of ensuring fair and independent Neutrals, the making of fee arrangements and the payment of fees should be administered on a rational, equitable and consistent basis by the Independent ADR Institution.

Reporter's Comments

A fundamental principle of our civil justice system is that a person should never be denied access to a court due to an inability to pay court costs. The reality is that the public justice system is heavily subsidized, and that users pay only a small fraction of the actual cost of trial and related procedures. Moreover, indigent litigants may be afforded relief from even these small fees. This principle has been extended in many cases to court-connected ADR programs, in which courts defray all or part of the expenses of mediation or court-connected arbitration. *See Standards for Court-Connected Programs,* '' 5.1.a, 13.0 ("[c]ourts should impose mandatory attendance only when the cost of mediation is publicly funded"; "[c]ourts should make mediation available to parties regardless of the parties' ability to pay"). According to data from the National Center for State Courts' ADR database, approximately 60% of programs did not depend upon the parties to pay mediator fees for contract and tort cases; no programs charged user fees for mediation of small claims. *See Standards for Court-Connected Programs* ' 13.2., Commentary, at 13-4.

Similar policies have prompted various private ADR tribunals to institute mechanisms for waiving filing fees and other administrative expenses in appropriate cases. *See, e.g., NASD Code* ' 10332 (permitting Director of Arbitration to waive fees or deposits for parties in securities arbitration); *Nazon v. Shearson Lehman Bros., Inc.,* 832 F. Supp. 1540, 1543 (S.D. Fla. 1993) (employee, although required to bear expenses of pursuing civil rights claim in arbitration, might seek waiver of fees under NASD rules). One federal court of appeals recently concluded that to be enforceable with respect to actions under statutes governing employment discrimination, an arbitration agreement must not "require employees to pay



either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum."
*Cole v. Burns Int'l Security Serv.,* 105 F.3d 1465, 1482-84 (D.C. Cir. 1997).

Due to the wide range of transactions and the equally broad spectrum of conflict in the Consumer arena, it is inappropriate to mandate bright-line rules regarding ADR costs. In determining what is reasonable, consideration should be given to the nature of the conflict (including the size of monetary claims, if any), and the nature of goods or services provided. In some cases, it may be possible to fulfill the principle of reasonable cost by the use of the Internet, the telephone, other electronic media, or through written submissions. *See, e.g.,* Michael F. Altschul & Elizabeth S. Stong, *AAA Develops New Arbitration Rules to Resolve Wireless Disputes,* ADR Currents, Fall 1997, at 6. Abbreviated procedures may be particularly appropriate in the context of small monetary claims, where there is always the alternative of a face-to-face hearing in small claims court. *See* Principle 5.

In some cases, the need to ensure reasonable costs for the Consumer will require the Provider of goods or services to subsidize the costs of ADR which is mandated by the agreement. Indeed, many companies today deem it appropriate to pay most or all of the costs of ADR procedures for claims and disputes involving individual employees. *See* Mei L. Bickner, et al, *Developments in Employment Arbitration,* 52 Disp. Res. J. 8 (1997). The consensus of the Committee was that if participation in mediation is mandated by the ADR agreement, the Provider should pay the costs of the procedure, including mediator's fees and expenses. The Committee considered, and ultimately rejected, the alternative of establishing specific requirements for Provider subsidization of the cost of arbitration procedures, other than to conclude that the Provider of goods and services should ensure the consumer a basic minimum arbitration procedure appropriate to the circumstances.

In some cases, an arbitrator may find it appropriate to defray the cost of Consumer participation in arbitration by an award of costs. Some lemon laws provide for such relief. *See, e.g., Chrysler Corp. v. Maiocco,* 209 Conn. 579, 552 A.2d 1207 (1989) (applying Connecticut Lemon Law); *Walker v. General Motors Corp.,* 160 Misc.2d 903, 611 N.Y.S.2d 741 (1994) (applying provision of New York Lemon Law permitting "prevailing consumer" to receive award of attorney's fees); *General Motors Corp. v. Fischer,* 140 Misc.2d 243, 530 N.Y.S.2d 484 (1988) (same). In some cases, it may be appropriate for an arbitrator in a Consumer case to render an award of attorney's fees pursuant to statute or in other cases where a court might do so. Without such an award, however, the Committee does not support the proposition that Providers are required to subsidize Consumers' attorney's fees for ADR.

At the same time, there are legitimate concerns that having the Provider pay all or a substantial portion of neutral's fees and expenses may undermine the latter's impartiality. For this reason, as observed in the *Employment Due Process Protocol,* "[i]mpartiality is best assured by the parties sharing the fees and expenses of the mediator and arbitrator." *Employment Due Process Protocol '* 6. *See also* Stephen J. Ware, *Arbitration and Unconscionability After* Doctor's Associates, Inc. v. Casarotto, 31 Wake Forest L. Rev. 1001, 1023 (1996). *But see* Alan Scott Rau, *Integrity in Private Judging,* 38 S. Tex. L. Rev. 485, 528 (1997). Therefore, the Advisory Committee concludes that Consumers should have the option to share up to half of the Neutral's fees and expenses. In addition, unless the parties agree otherwise after a dispute arises, the handling of fee arrangements and the payment of fees should be conducted by the Independent ADR Institution. The latter, "by negotiating the parties' share of costs and collecting such fees, might be able to reduce the bias potential

 AMERICAN ARBITRATION ASSOCIATION®

of disparate contributions by forwarding payment to the mediator and/or arbitrator without disclosing the parties' share therein." *Employment Due Process Protocol* ' 6.

Some ADR Programs serving Consumers are staffed wholly or partly by unpaid volunteers. *See, e.g., BBB Arbitration Rules* at 2. The use of such programs, including community dispute resolution centers, may be a satisfactory means of addressing cost concerns associated with Consumer ADR, particularly in cases involving low stakes. However, concerns have been expressed by some authorities regarding overdependence on volunteer Neutrals. *See Standards for Court-Connected Programs* ' 13.1, Commentary, at 13-2 (warning of dangers of exclusive reliance on volunteers in ADR programs). Care must be taken by those responsible for overseeing such programs to make certain that lower cost does not come at the expense of adequately qualified Neutrals.

### Practical Suggestions

In the event that an ADR procedure is mandated by the Provider of goods and services and the Consumer demonstrates an inability to pay all or part of the costs of the procedure, the Provider should front such costs subject to allocation in the arbitration award or mediation settlement.

In some cases, it may be possible to fulfill the principle of reasonable cost by the use of the Internet, the telephone, other electronic media, or through written submissions. *See, e.g.,* Michael F. Altschul & Elizabeth S. Stong, *AAA Develops New Arbitration Rules to Resolve Wireless Disputes,* ADR Currents, Fall 1997, at 6.

## Principle 7. Reasonably Convenient Location

In the case of face-to-face proceedings, the proceedings should be conducted at a location which is reasonably convenient to both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination should be made by the Independent ADR Institution or by the Neutral.

### Reporter's Comments

The Advisory Committee concludes that ADR proceedings should take place at a location that is reasonably convenient to all parties.

Flexibility in choosing a hearing location is a theoretical advantage of consensual conflict resolution, permitting minimal cost and inconvenience to all parties. On the other hand, location terms may put one party at a great disadvantage, significantly increasing the cost and logistical complexity of dispute resolution. This is particularly true with regard to binding arbitration, which may involve the participation of multiple witnesses as well as the parties and their representatives. *See III Federal Arbitration Law* ' 32.8.3.

Typically, contractual agreements which provide that arbitration hearings will be conducted in a particular place are honored by the courts. *See, e.g., Management Recruiters Int'l,* Inc. v. Bloor, 129 F.3d 851 (6th Cir. 1997) (under *Federal Arbitration Act,* forum expectations of parties in arbitration agreement are enforceable, and may not be upset by state



law); *Bear Stearns & Co. v. Bennett*, 938 F.2d 31, 32 (2nd Cir. 1991) (noting "prima facie validity" of forum-selection clauses, including those in arbitration agreements); *Snyder v. Smith*, 736 F.2d 409, 419 (7th Cir.), cert. denied, 469 U.S. 1037, 105 S. Ct. 513, 83 L. Ed.2d 403 (1984) (courts must give effect to freely-negotiated arbitration clause in commercial agreement). *See* II *Federal Arbitration Law* ' 24.2.3.4 (discussing *Federal Arbitration Act*). *Cf. Carnival Cruise Lines, Inc. v. Shute*, 449 U.S.585,111 S.Ct. 1522, 113 L. Ed. 2d 622 (1991) (judicial forum selection clause in terms on cruise ship passenger ticket enforceable); *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S. Ct. 1907. 32 L.Ed.2d (1972) (judicial forum selection clause is prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances).

The same is true of cases where the parties agree to a process for selecting location, such as that provided by the *AAA Rules. See, e.g., AAA Commercial Rule* 11. There is authority for pre-award challenges to location selection mechanisms. *Aerojet-General Corp. v. AAA*, 478 F.2d 248 (9th Cir. 1973) (pre-award judicial review appropriate where choice of arbitration locale not made in good faith and one or more parties are faced with severe irreparable injury). Again, however, such action is likely to be deemed appropriate only in extreme cases. *See Seguro de Servicio de Salud v. McAuto Systems,* 878 F.2d 5, 9 n.6 (1st Cir. 1989); *S.J. Groves & Sons Co. v. AAA,* 452 F. Supp. 121, 124 (D. Minn. 1978).

Some courts, however, have identified limits on locational designations in judicial forum selection provisions. *See* Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection,* 10 Ohio St. J. on Disp. Res. 267, 292; David S. Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration,* 1997 Wis. L. Rev. 36, 121 n.366. Forum selection clauses may be overcome if it can be demonstrated that their incorporation in the contract was the result of fraud, undue influence, or an extreme disparity in bargaining power, or if the selected forum is so inconvenient that it would effectively deprive a party of a day in court. *See, e.g., Kubis & Persyk Assoc., Inc. v. Sun Microsystems, Inc.,* 146 N.J. 176, 188-97, 680 A.2d 618, 624-29 (1996) (reviewing cases and recognizing limits on enforceability of forum selection clauses); *Moses v. Business Card Expr., Inc.,* 929 F.2d 1131, 1136-39 (6th Cir.), cert. denied, 502 U.S. 821, 112 S. Ct. 81, 116 L.Ed.2d 54 (1991) (in considering change of venue motion, forum selection clause must be considered along with convenience of parties and witnesses and overall fairness); *Hoffman v. Minuteman Press Int'l, Inc.,* 747 F. Supp. 552 (W.D. Mo. 1990) (denying venue change in accordance with forum selection agreement on basis of extreme hardship and alleged fraud in the inducement); *Cutter v. Scott & Fetzer Co.,* 510 F. Supp. 905, 908 (E.D. Wis. 1981) (refusing to enforce forum selection clause on basis of state Fair Dealership Law, and observing that clause was not the subject of negotiation). *See also Restatement (Second) of Conflict of Laws* ' 80 (1969) (agreement regarding place of action will be given effect unless it is unfair or unreasonable); Benjamin Levin & Richard Morrison, *Kubis and the Changing Landscape of Forum Selection Clauses*, 16 Franchise. L.J. 97 (1997) (discussing trend to limit enforceability of forum selection clauses in franchise agreements by statute and case law); Donald B. Brenner, *There is a Developing Trend Among Courts of Making Choice of Forum Clauses in Franchise Agreements Presumptively Invalid,* 102 Com. L.J. 94 (1997) (same).

In the course of finding a judicial forum selection provision in a form franchise agreement presumptively invalid, the New Jersey Supreme Court recognized that the following factors may be relevant to enforceability: (1) whether the provision is the product of arm's length negotiations or is effectively imposed by a party with disproportionate bargaining power; and (2) whether the provision provides an "indirect benefit to…[the stronger party by making] litigation more costly and cumbersome for economically weaker…[parties] that often lack the sophistication and resources to litigate effectively



AMERICAN ARBITRATION ASSOCIATION®

a long distance from home." *Kubis,* 146 N.J. at 193-94, 680 A.2d at 626-27. *See also Model Choice of Forum Act '* 3(4) Comment (1968) ("A significant factor to be considered in determining whether there was an abuse of economic power or other unconscionable means' [sufficient to deny enforcement to a forum selection clause] is whether the choice of forum agreement was contained in an adhesion, or take-it-or-leave-it' contract.").

Such considerations may also affect the enforceability of an agreement to arbitrate. *See Patterson v. ITT Consumer Financial Corp.,* 14 Cal. App. 4th, 1659, 18 Cal. Rptr.2d 563 (1993) (arbitration provisions in loan agreements requiring California consumers to arbitrate in Minnesota were unconscionable).

Similar concerns have led some states to enact laws placing geographical limitations on the situs of arbitration. *See, e.g., Hambell v. Alphagraphics Franchising Inc.,* 779 F. Supp. 910 (E.D. Mich. 1991) (provision in franchise agreement for arbitration to take place outside state is void and unenforceable under Mich. Stat. Ann. ' 19.854(27) (f) (1984)); *Donmoor, Inc. v. Sturtevant,* 449 So.2d 869 (Fla. Ct. App. 1984) (clause in contract providing for arbitration in another state is unenforceable). Of course, such laws may be preempted by federal substantive law within the scope of the *Federal Arbitration Act. See* Levin & Morrison, *supra,* at 115-16.

In light of concerns such as the foregoing which are also relevant in the consumer arena, the Advisory Committee concluded that contractual ADR provisions should include a commitment to conduct ADR at a "reasonably convenient location." Some members of the Advisory Committee favored setting an arbitrary mileage limit (i.e. "no more than 50 miles from the place where the transaction occurred") while others advocated the nearest large city. Others pointed out that parties sometimes relocate. There was general agreement, however, that an agreed-upon process for independent determination of the locale if the parties fail to agree would be fair and equitable to both parties. *See, e.g., AAA Rule* 11; *Uniform Code of Arbitration '* 9; *NASD Code of Arbitration Procedure '* 10315. A similar function may be performed by the arbitrator or other duly appointed Neutral. (The AAA Rules already accord arbitrators the authority to set specific sites for arbitration hearings. See AAA Rule 21.)

In many cases, it may be possible to minimize the need for long distance travel and attendant expenses through the use of telephonic communications and submission of documents. An example of the application of such devices is the Expedited Procedures of the *AAA Rules,* which are generally applied to claims of $50,000 or less. *See AAA Rules* 9, 53-57. *See also Uniform Code of Arbitration '* 2. Telephonic mediation has long been a feature of some lemon law programs, and is currently being used in Consumer ADR by the National Futures Association (NFA). The National Association of Securities Dealers (NASD) is currently conducting a pilot program utilizing telephonic mediation.

Recent projects sponsored by the Better Business Bureau, the American Arbitration Association, and other organizations suggest the possibilities of online conflict resolution for online transactions as well as other kinds of disputes. *See generally* George H. Friedman, *Alternative Dispute Resolution and Emerging Online Technologies: Challenges and Opportunities,* 19 Hastings Comm. & Ent. L.J. 695 (1997).

If, as proposed, Consumers have the alternative of pursuing relief in a small claims court of competent jurisdiction, many concerns associated with long distance travel will be obviated with regard to small claims.



AMERICAN ARBITRATION ASSOCIATION®

## Practical Suggestions

Unless a convenient location can be specifically identified in the ADR agreement, the location should be left to the agreement of the parties after a dispute has arisen. The rules governing ADR under the agreement should establish a process for determination of the location by an independent party (such as a Neutral or the Independent ADR Institution) if the parties cannot agree on a location.

In some cases, it may be reasonable to conduct proceedings by telephone or electronic data transmission, with or without submission of documents. *See, e.g.,* Principle 12. Such options may be particularly desirable in the case of arbitration of small claims, since the parties have the choice of going to small claims court. See Principle 5.

## Principle 8. Reasonable Time Limits

ADR proceedings should occur within a reasonable time, without undue delay. The rules governing ADR should establish specific reasonable time periods for each step in the ADR process and, where necessary, set forth default procedures in the event a party fails to participate in the process after reasonable notice.

## Reporter's Comments

A primary impetus for conflict resolution outside the court system is the potential for relatively speedy and efficient resolution of disputes. From the Consumer's perspective, moreover, the expectation of a reasonably prompt conclusion is likely to be, along with cost savings, the leading perceived advantage of consensual mediation or arbitration. *See Madden v. Kaiser Foundation Hospitals,* 17 Cal.3d 699, 711, 131 Cal. Rptr. 882, 552 P.2d 1178 (1976) (speed and economy of arbitration, in contrast to the expense and delay of jury trial, could prove helpful to all parties).

The principle of relatively prompt, efficient conflict resolution underlies standards governing the conduct of Neutrals. Mediators are admonished that "[a] quality process requires a commitment by the mediator to diligence…" *Joint Standards for Mediators*, Art. VI. *The Joint Standards for Mediators* also comment that "[m]ediators should only accept cases when they can satisfy the reasonable expectations of the parties concerning the timing of the process." Id.

A basic requirement is that the rules governing ADR establish and further the basic principle of conflict resolution within a reasonable time. This means not only that the rules should set forth specific time periods for various steps in the ADR process, but that default rules come into play if a party fails to participate in the manner required by the rules after due notice. This principle is embodied in leading ADR standards, including the *AAA Commercial Rules. See, e.g.,* Rules 6, 8, 11, 13, 14, 15, 21, 35, 36, 41. *See also BBB Arbitration Rule* 27 ("BBB shall make every effort to obtain a final resolution of your complaint within 60 days, unless state or federal law provides otherwise. This time period may be extended at the request of the customer.").

Of course, it is not enough that the agreement places strict time limitations on procedural steps if these limitations are not effectively enforced a likely occurrence when an ADR Program is not independent of the Provider. Extreme disparity between stipulated time limits and actual practice under arbitration rules may render an arbitration agreement


AMERICAN ARBITRATION ASSOCIATION®

unenforceable, as discussed at length in a recent California Supreme Court decision. *See generally Engalla v. Permanente Med. Grp., Inc.,* 938 P.2d 903 (Cal. 1997). The court pointedly observed,

[M]any large institutional users of arbitration, including most health maintenance organizations (HMO's), avoid the potential problems of delay in the selection of arbitrators by contracting with neutral third party organizations, such as the American Arbitration Association (AAA). These organizations will then assume responsibility for administering the claim from the time the arbitration demand is filed, and will ensure the arbitrator or arbitrators are chosen in a timely manner.

*Id.* at 975-76. In response to this decision, Kaiser appointed an advisory panel to propose reforms to its arbitration program. *See Kaiser Permanente Review and Recommendations* 33-34 (recommending establishment of and adherence to stated arbitration process deadlines).

Similarly, courts interpreting state lemon laws have acknowledged the right of Consumers to forgo arbitration and sue in court when the statutory period for the lemon law remedy elapsed without a remedy through no fault of their own. *See, e.g., Harrison v. Nissan Motor Corp.,* 111 F.3d 343 (3rd Cir. 1997) (court suit permissible where BBB failed to conduct arbitration within stipulated period); *Ford Motor Co. v. Ward,* 577 So.2d 641 (1991) (Consumer not required to exhaust arbitration procedures before bringing suit where dealer made it impossible for Consumer to arbitrate).

### Practical Suggestions

When a Consumer dispute involves a small amount of money and relatively straightforward issues, it is reasonable to assume that an out-of-court resolution of such issues should be relatively quick. In such cases, it may be appropriate to develop expedited procedures and to set outside time limits on ADR Processes. Thus, for example, "Fast Track" arbitration procedures for construction disputes provide that "[t]he arbitration shall be completed by settlement or award within sixty (60) days of confirmation of the arbitrator's appointment, unless all parties agree otherwise or the arbitrator extends this time in extraordinary cases…" *AAA Construction Procedures,* ' F-12. The rules also require the award to be rendered within seven days from the closing of the hearing. *See id.,* ' F-11.

Similarly, the *AAA Wireless Rules* set forth Fast Track procedures for matters involving less than $2,000 in claims or counterclaims. The Fast Track contemplates a "desk" arbitration procedure involving a hearing on documents; a limit of one seven-day extension on the time to respond to a claim or counterclaim; notice by telephone, electronic mail and other forms of electronic communication and by overnight mail, shortened time limits to select an arbitrator; no discovery except in extraordinary cases; a shortened time limit for rendition of award; and a time standard which sets a goal of 45 days from appointment of the arbitrator to award.

### Principle 9. Right to Representation

All parties participating in processes in ADR Programs have the right, at their own expense, to be represented by a spokesperson of their own choosing. The ADR rules and procedures should so specify.


AMERICAN ARBITRATION ASSOCIATION®

### Reporter's Comments

The right to be counseled by an attorney or other representative is an important one that is frequently reflected in standard rules governing ADR proceedings. *See, e.g., AAA Commercial Rule* 22; *NASD Code* ' 10316; *BBB Arbitration Rule* 9.

The Advisory Committee adapted pertinent provisions of the *Employment Due Process Protocol. See Employment Due Process Protocol* ' B.1.

In the interest of full disclosure of potential conflicts of interest on the part of Neutrals, the Advisory Committee recommends that the names and affiliations of lawyers and other representatives of each party be communicated to prospective Neutrals and to all parties prior to selection of Neutrals.

As previously noted, the Advisory Committee recognizes that the cost of legal services should be borne by the parties who are receiving the services, and Providers should not be expected to subsidize the cost of legal representation for Consumers. There may, however, be situations where an arbitrator awards attorney's fees in circumstances where they would be available in court. See Commentary to Principle 6.

The Advisory Committee recognizes that the involvement of non-attorney representatives in some forms of binding arbitration has raised issues respecting the unauthorized practice of law. The Committee takes no position regarding these issues.

### Practical Suggestions

Although the cost of legal services should be borne by the parties who are receiving the services, Independent ADR Institutions should provide Consumers with information regarding referral services and other institutions which might offer assistance in locating and securing competent spokespersons, such as bar associations, legal service associations, and Consumer organizations.

## Principle 10. Mediation

The use of mediation is strongly encouraged as an informal means of assisting parties in resolving their own disputes.

### Reporter's Comments

The increasing popularity of mediation has been a primary impetus for the revolution in conflict resolution approaches. Mediation describes a range of processes in which an impartial person helps disputing parties to communicate and to make voluntary, informed choices in an effort to resolve their dispute. The rapid growth of mediation may be attributed to its informality, flexibility, and emphasis on the particular needs of disputing parties. For this reason, mediation is uniquely adaptable to a wide spectrum of controversies.



AMERICAN ARBITRATION ASSOCIATION®

The widespread use of mediation in court-connected programs inspired the development of a set of national standards for such endeavors. *See generally Standards for Court-Connected Programs.*

Parallel developments are occurring in the private sphere. Recently, the leading standard construction industry contract was modified to require mediation as an element in project conflict resolution, necessitating modification of related AAA rules. *See AAA Construction Procedures.*

Advisory Committee members agreed that mediation should be encouraged as a valuable intervention strategy, but differed as to the propriety and reasonableness of Provider-drafted ADR Agreements in Consumer contracts which require Consumers to participate in mediation. Those unopposed to such provisions, a majority of Advisory Committee members, noted that mediation offers significant potential advantages and relatively few risks to participants. Particularly where the Provider subsidizes mediation, they reasoned, the prospective benefits to Consumers far outweigh the costs. Those expressing concerns regarding "mandatory" mediation adhere to the view that the choice to participate in settlement discussions should be made voluntarily, and only after conflict arises. Other concerns relate to the cost of mediation, the quality of mediators, the likelihood that not all disputes will be appropriate for mediation, and the lack of understanding of mediation processes (including an understanding of the role of the neutral intervener) on the part of many Consumers. *Cf. Standards for Court-Connected Programs* ' 5.0 (courts should impose mandatory attendance in court-connected mediation only when the cost of mediation is publicly funded, the mediation program is of high quality, and other requirements are met); *SPIDR Report on Court-Mandated ADR* at 2-3.

Encouragement of the use of mediation involves, among other things, educating Consumers and their attorneys about the process. *See* Principle 2 "Access to Information Regarding ADR Program." *See also SPIDR Principles* at 6 ("It is the responsibility of…private programs offering dispute resolution services to define clearly the services they provide…[and provide information about the program and neutrals to the parties.]"). At a minimum, Consumers should be provided with (or have immediate access to) written information to explain mediation. As a rule, such information should be in the same language as the principal contract for goods or services. *Cf. Standards for Court-Connected Programs* ' 3.2.b., Commentary, at 3-4 (If a significant percentage of the population served is non-English-speaking, the material should be available in other languages as well.) *See* Principle 2.

Education of users should also include some treatment of the distinctive styles and strategies employed by mediators. Today, mediators handling commercial disputes sometimes employ a facilitative, non-directive approach to problem-solving; in other situations, a more directive approach may be employed. *See generally* Leonard L. Riskin, *Understanding Mediators' Orientations, Strategies, and Techniques: A Grid for the Perplexed,* 1 Harv. Negotiation L. Rev. 7 (1996) (providing a graphic tool for analyzing mediator approaches). Participants need to decide in advance of selection the approach they want a mediator to adopt. The Independent ADR Institution should advise the parties regarding the possibility of interviewing prospective mediators regarding qualifications and style, and help to arrange such interviews.

Practical Suggestions

As referenced in Principle 5, mediation conducted by telephone conference call has proven to be an effective, economical method of resolving Consumer disputes where in-person mediation may not be feasible.



**A**MERICAN **A**RBITRATION **A**SSOCIATION®

## Special Provisions Relating to Binding Arbitration

### Principle 11. Agreements to Arbitrate

Consumers should be given:

**a.** clear and adequate notice of the arbitration provision and its consequences, including a statement of its mandatory or optional character;

**b.** reasonable access to information regarding the arbitration process, including basic distinctions between arbitration and court proceedings, related costs, and advice as to where they may obtain more complete information regarding arbitration procedures and arbitrator rosters;

**c.** notice of the option to make use of applicable small claims court procedures as an alternative to binding arbitration in appropriate cases; and,

**d.** a clear statement of the means by which the Consumer may exercise the option (if any) to submit disputes to arbitration or to court process.

### Reporter's Comments

In convening the Advisory Committee which developed this Protocol, the AAA requested that the Committee focus its attention upon due process standards for the conduct of Consumer ADR processes and not directly address the process of forming an agreement to mediate or to arbitrate. Committee deliberations revealed a range of opinions regarding the use of pre-dispute binding arbitration agreements in Consumer contracts. Without taking a position on the appropriateness of such agreements, the Committee developed Principle 11 with the intended purpose of providing guidance to the AAA and similar Independent ADR Institutions in the development of specific arbitration programs within the context of existing law enforcing pre-dispute arbitration agreements. Within this context, Principle 11 emphasizes the importance of knowing, informed assent to arbitration agreements.

### Practical Suggestions

Consumers should have clear and adequate notice of the arbitration provision and basic information regarding the process at the time of assent. The appropriate method of giving notice and providing essential information will vary with the circumstances. For example, electronic transactions involving software licensure agreements require different notice procedures than face-to-face negotiations or paper transactions. In all cases, however, there should be some form of conspicuous notice of the agreement to arbitrate and its basic consequences (including comparison to court process, cost information, etc.). In addition, the Consumer should be given the opportunity to acquire additional information regarding the arbitration process. The latter might be obtainable through a mail or Web site address, an 800 number or other means for Consumers to obtain additional information regarding arbitration rules and procedures (such as a brochure available on request).

AMERICAN ARBITRATION ASSOCIATION®

The following is an example of a possible notice. Ideally, the "notice box" would be sufficiently prominent in the contract document or electronic record so that a Consumer would readily notice it.

| NOTICE OF ARBITRATION AGREEMENT: |
|---|
| This agreement provides that all disputes between you and [PROVIDER] will be resolved by BINDING ARBITRATION. |
| You thus GIVE UP YOUR RIGHT TO GO TO COURT to assert or defend your rights under this contract (EXCEPT for matters that may be taken to SMALL CLAIMS COURT). |
| * Your rights will be determined by a NEUTRAL ARBITRATOR and NOT a judge or jury. |
| * You are entitled to a FAIR HEARING, BUT the arbitration procedures are SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT. |
| * Arbitrator decisions are as enforceable as any court order and are subject to VERY LIMITED REVIEW BY A COURT. |
| **For More Details**, |
| *Review Section 6.2 above, OR |
| * Check our Arbitration Web Site @ ACMEADR.COM, OR |
| * Call 1-800-000-0000 |

Among other things, Consumers should have access to information regarding the initiation of the arbitration process. This may be accomplished, for example, by providing customers with a brochure outlining relevant arbitration procedures. If the Consumer has the option of choosing between arbitration or court process, either at the time of contracting or after disputes have arisen, the timing and means of electing the option should also be clearly stated in the notice.

## Principle 12. Arbitration Hearings

1.  *Fundamentally-Fair Hearing.* All parties are entitled to a fundamentally-fair arbitration hearing. This requires adequate notice of hearings and an opportunity to be heard and to present relevant evidence to impartial decision- makers. In some cases, such as some small claims, the requirement of fundamental fairness may be met by hearings conducted by electronic or telephonic means or by a submission of documents. However, the Neutral should have discretionary authority to require a face-to-face hearing upon the request of a party.

2.  *Confidentiality in Arbitration.* Consistent with general expectations of privacy in arbitration hearings, the arbitrator should make reasonable efforts to maintain the privacy of the hearing to the extent permitted by applicable law. The arbitrator should also carefully consider claims of privilege and confidentiality when addressing evidentiary issues.



**AMERICAN ARBITRATION ASSOCIATION®**

### Reporter's Comments

There is universal agreement that parties to arbitration are entitled to a "fundamentally-fair hearing." *See* III *Federal Arbitration Law* ' 32.3.1.1. The language of subsection 1 closely follows the definition of a "fundamentally-fair hearing" set forth in *Bowles Financial Grp., Inc. v. Stifel, Nicolaus & Co.,* 22 F.3d 1010, 1013 (10th Cir. 1994) (applying the *Federal Arbitration Act*). Beyond these basic requirements, of course, "[a]rbitration need not follow all the niceties of…courts." *Grovner v. Georgia-Pacific Corp.,* 625 F.2d 1289, 1290 (5th Cir. 1980). Moreover, the arbitrators have great leeway in conducting hearings, within the bounds of the parties' agreement. See Federal Arbitration Law, supra, '' 32.1., 32.3.1.1.

Although authority is split on whether or not parties are guaranteed a face-to-face hearing before the arbitrators, *see id.,* the Advisory Committee concluded that while in some circumstances fundamental fairness may require a face-to-face hearing, in other cases the requirement may be satisfied by telephonic or electronic communications or submissions of documents. *See, e.g., Construction Arbitration Procedures* ' F-9. *See, e.g.,* Michael F. Altschul & Elizabeth S. Stong, *AAA Develops New Arbitration Rules to Resolve Wireless Disputes,* ADR Currents, Fall 1997, at 6. In small claims cases, the requirement of these Principles that parties retain the option of going to small claims court may make it reasonable for the ADR agreement to provide alternatives to a face-to-face hearing.

Although confidentiality of hearings may be considered an advantage of arbitration, there is no absolute guarantee of confidentiality. *See id.,* ' 32.6.1. Unlike court proceedings, however, the general public has no right to attend arbitration proceedings; if the parties agree, moreover, attendance at hearings may be severely restricted. *See, e.g., AAA Commercial Rule* 25 (directing arbitrators to "maintain the privacy of the hearings unless the law provides to the contrary"). Likewise, arbitrators should be mindful of evidentiary privileges and confidentiality rights available to its parties under applicable law and have discretion to issue protective orders respecting such rights.

The Advisory Committee recognized the dilemma posed by the tension between the desire for confidentiality in arbitration and the need to provide Consumers access to information regarding arbitrators and sponsoring Independent ADR Institutions, including case statistics, data on recent arbitrations and other pertinent information. *See, e.g.,* Alan Scott Rau, *Integrity in Private Judging,* 38 S. Tex. L. Rev. 485, 524-26 (1997) (discussing concerns with "asymmetry of information" regarding arbitrators when one party is an institutional "repeat player," and suggesting need for increased disclosure of information regarding past decisions by an arbitrator); Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection,* 10 Ohio St. J. on Disp. Res. 267, 293 (discussing disparity between "repeat players" and consumers with regard to knowledge of prospective arbitrators). Although the Advisory Committee did not address this issue, it recommends that the matter be the focus of serious study by the Committee or a similar advisory group, supported by appropriate independent research efforts.

### Practical Suggestions

Because these Principles provide that parties should retain the option of an oral hearing in small claims court (Principle 5), it may be reasonable for the ADR agreement to provide other means for small claims arbitration. Such alternatives may include a "desk arbitration" involving a decision on written submissions, participation in proceedings by telephone or electronic data transmission, and other options.



AMERICAN ARBITRATION ASSOCIATION®

As is generally the case in commercial arbitration, arbitrators may undertake reasonable means to protect the privacy of the hearing.

## Principle 13. Access to Information

No party should ever be denied the right to a fundamentally-fair process due to an inability to obtain information material to a dispute. Consumer ADR agreements which provide for binding arbitration should establish procedures for arbitrator-supervised exchange of information prior to arbitration, bearing in mind the expedited nature of arbitration.

### Reporter's Comments

It is understood that ADR sometimes represents a tradeoff between the concept of full discovery associated with court procedures and the efficiencies associated with minimal pretrial process. A hallmark of binding arbitration is the avoidance of the cost and delay associated with extensive pre-hearing discovery. *See* III *Federal Arbitration Law* ' 34.1. In recent years, however, the notion that arbitration means little or no discovery has moderated due to the widening range of cases submitted to arbitration and the increasing recognition that at least some pre-hearing exchange of information may be necessary and appropriate to meet the due process rights of participants and may in some cases reduce the overall length of the process. *See id.,* Ch. 34. *See also* Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection*, 10 Ohio St. J. on Disp. Res. 267, 283-84, 311, 314 (arguing that limits on discovery in arbitration hamper consumer claimants).

Addressing statutory disputes arising out of employment relationships, the *Employment Due Process Protocol* states that "[a]dequate but limited pre-trial discovery is to be encouraged and employees [and their representatives] should have access to all information reasonably relevant to mediation and/or arbitration of their claims." *Employment Due Process Protocol* ' B.3. The Committee supports the concept of limiting the exchange of information as much as possible while ensuring that Consumers and Providers each have access to information that is legally obtainable and relevant to their case. In most cases, this means that pre-hearing information exchange will consist of an exchange of documents as directed by the arbitrator, identification of witnesses and a summary of their expected testimony. Arbitrators should have the authority to require additional discovery when necessary, such as requiring the deposition of witnesses unable to appear at the hearing in order to preserve their testimony.

Although information exchange issues which cannot be handled by the agreement of the parties should generally be left to the discretion of the arbitrator, it may be appropriate for advisory groups (including adequate consumer representation) to develop guidelines for information exchange in specific kinds of cases. *See, e.g.,* National Association of Securities Dealers, National Arbitration and Mediation Committee, *Report of the Drafting Subcommittee on The Discovery Guide,* Dec. 3, 1997 Draft.

Some Advisory Committee members also expressed concern about the forced production of privileged documents, and argued that arbitrators should be required to observe established privileges such as the attorney-client privilege and work-product privilege. *See* James H. Carter, *The Attorney-Client Privilege and Arbitration,* ADR Currents, Winter 1996-97, 1. As stated in Principle 12, arbitrators should "carefully consider claims of privilege and confidentiality when addressing


American Arbitration Association®

evidentiary issues." Such protections may be addressed in the arbitration agreement (including incorporated arbitration procedures), and should be thoroughly treated, along with information exchange issues, in arbitrator training programs.

*Practical Suggestions*

In many cases, issues relating to information exchange may be addressed by the arbitrator(s) at a preliminary conference. *See, e.g., AAA Wireless Rules* '' R-9, R-10. Some rules require that all exhibits be exchanged a certain number of days prior to hearings. *See id.,* R-10.

## Principle 14. Arbitral Remedies

The arbitrator should be empowered to grant whatever relief would be available in court under law or in equity.

*Reporter's Comments*

As a general rule, arbitrators have broad authority to fashion relief appropriate to the circumstances. *See* III *Federal Arbitration Law* ' 36.1.1. Their discretion is limited only by the agreement of the parties and the scope of the submission to arbitration. *See id.,* ' 36.1.2.

There are, however, a number of issues respecting the ability of arbitrators to award certain remedies which would be available in court. For example, although the trend under federal and state law is to acknowledge the authority of arbitrators to award punitive damages, a few state courts still take the opposing view. *See generally Federal Arbitration Law, supra,* ' 36.3; Thomas J. Stipanowich, *Punitive Damages and the Consumerization of Arbitration,* 92 Nw. U. L. Rev. 1 (1998). And although courts may award attorney's fees where permitted by statute or by agreement of the parties, or where a party acts vexatiously or in bad faith, there is conflicting authority regarding the ability of arbitrators to take similar action. *See generally Federal Arbitration Law, supra,* ' 36.8.

This provision incorporates language similar to that contained in the *Employment Due Process Protocol,* ' C.5. The intent is to make clear that arbitrators deriving their authority from Consumer contracts should enjoy the same authority courts have to fashion relief, including awarding attorney's fees and punitive damages in appropriate cases.

Contractual limitations of damages may limit the authority of arbitrators in the same fashion that they limit judicial remedies. It is possible that an award of damages in excess of a contractual limit would be vacated under pertinent statutory standards or common law principles. *See, e.g., FAA* ' 10(a) (4). *But see* Stipanowich, *Punitive Damages, supra,* at 33-36 (discussing public policy limitations on pre-dispute caps on punitive damages).

## Principle 15. Arbitration Awards

1. *Final and Binding Award; Limited Scope of Review.* If provided in the agreement to arbitrate, the arbitrator's award should be final and binding, but subject to review in accordance with applicable statutes governing arbitration awards.

2. *Standards to Guide Arbitrator Decision-Making.* In making the award, the arbitrator should apply any identified, pertinent contract terms, statutes and legal precedents.


AMERICAN ARBITRATION ASSOCIATION®

**3.** *Explanation of Award.* At the timely request of either party, the arbitrator should provide a brief written explanation of the basis for the award. To facilitate such requests, the arbitrator should discuss the matter with the parties prior to the arbitration hearing.

### Reporter's Comments

Review of arbitration awards is very limited under modern arbitration statutes. Courts are very reluctant to vacate awards, or to second-guess the decisions of arbitrators on matters of procedure or substance. *See generally* IV *Federal Arbitration Law*, ch. 40. "Arbitrators can misconstrue contracts, make erroneous decisions of fact, and misapply law, all without having their awards vacated." *See id.,* ' 40.6.1. While some members of the Advisory Committee expressed concerns regarding the current state of the law, it was generally agreed that finality was a primary objective of arbitration and that it would be inappropriate to recommend more rigorous judicial review for Consumer arbitration awards than for other arbitration awards. At the same time, however, the Advisory Committee concluded that the rules should specifically direct arbitrators to follow pertinent contract terms and legal principles. This requirement may have implications for qualifications and training of Neutrals pursuant to Principle 4.

Leading modern arbitration statutes do not require arbitrators to provide a written explanation or give reasons for their awards. *See generally* III *Federal Arbitration Law* ' 37.4.1. Similarly, some leading commercial arbitration rules do not require findings of fact or conclusions of law. *See, e.g., AAA Commercial Rules.* Those supporting "bare" awards argue that a written rationale will make it more likely that courts will inquire into the merits of the award, contrary to policies of finality underlying modern statutes. They also observe that not being required to write an opinion simplifies the arbitral task and permits multi-member arbitration panels, like juries, to agree on a decision without concurring on a rationale. *See id.*

On the other hand, some other commercial arbitration rules call for a statement of the underlying rationale. *See, e.g., CPR Rules for Non-administered Arbitration of Business Disputes, Rule* 13.2. Those supporting awards with written rationales argue that a written rationale encourages more disciplined decision-making and enhances party satisfaction with the result. *See* Alan Scott Rau, *Integrity in Private Judging*, 38 S. Tex. L. Rev. 485, 529-39 (1997) (offering arguments in favor of "reasoned" awards). After considering the pros and cons of "reasoned " awards, the Advisory Committee concluded that arbitrators of Consumer disputes should provide at least a brief written explanation if requested to do so by any party.

As noted in the Comments accompanying Principle 12, the Advisory Committee recognized the dilemma posed by the tension between the desire for confidentiality in arbitration (including information regarding arbitration awards) and the need to provide Consumers access to information regarding arbitrators and sponsoring Independent ADR Institutions, including case statistics, data on recent arbitrations and other pertinent information. Although the Advisory Committee did not address this issue, it recommends that the matter be the focus of serious study by the Advisory Committee or a similar advisory group, supported by appropriate independent research efforts.

### Practical Suggestions

To facilitate requests for reasoned awards, the arbitrator should raise the issue with the parties prior to the arbitration hearing. The matter should be addressed at the preliminary conference if one is conducted.

**AMERICAN ARBITRATION ASSOCIATION**®

# A Due Process Protocol for Mediation and Arbitration of Consumer Disputes

Dated: April 17, 1998

Some of the signatories to this Protocol were designated by their respective organizations, but the Protocol reflects their personal views and should not be construed as representing the policy of the designating organizations.

**The Honorable Winslow Christian**
*Co-chair*
Justice (Retired)
California Court of Appeal

**William N. Miller**
*Co-chair*
Director of the ADR Unit
Office of Consumer Affairs
Virginia Division of Consumer Protection
Designated by National Association of Consumer
Agency Administrators

**David B. Adcock**
Office of the University Counsel
Duke University

**Steven G. Gallagher**
Senior Vice President
American Arbitration Association

**Michael F. Hoellering**
General Counsel
American Arbitration Association

**J. Clark Kelso**
Director
Institute for Legislative Practice
University of the Pacific
McGeorge School of Law

**Elaine Kolish**
Associate Director
Division of Enforcement
Bureau of Consumer Protection
Federal Trade Commission

**Robert Marotta**
Wolcott, Rivers, Wheary, Basnight & Kelly, P.C.
Formerly Office of the General Counsel
General Motors Corporation

**Robert E. Meade**
Senior Vice President
American Arbitration Association

**Ken McEldowney**
Executive Director
Consumer Action

**Michelle Meier**
Former Counsel for Government Affairs
Consumers Union

**Anita B. Metzen**
Executive Director
American Council on Consumer Interests

**James A. Newell**
Associate General Counsel
Freddie Mac



**AMERICAN ARBITRATION ASSOCIATION**®

**Shirley F. Sarna**
Assistant Attorney General-In-Charge
Consumer Frauds and Protection Bureau
Office of the Attorney General State of New York
Designated by National Association of
Attorneys General

**Daniel C. Smith**
Vice President and Deputy General Counsel
Fannie Mae

**Terry L. Trantina**
Member
Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C.
Formerly General Attorney
AT&T Corp.

**Deborah M. Zuckerman**
Staff Attorney
Litigation Unit
American Association of Retired Persons

**Thomas Stipanowich**
Academic Reporter
W.L. Matthews Professor of Law
University of Kentucky College of Law