# EXHIBIT 2

**EXHIBIT D (ECF NO. 135-5) TO PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION TO
COMPEL ARBITRATION WITH
NON-PARTY NEW ERA ADR, INC.'S
PROPOSED REDACTIONS HIGHLIGHTED**

# ATTACHMENT 3

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          CASE NO. 2:22-cv-00047-GW-GJS

4

5   SKOT HECKMAN, LUIS PONCE, JEANENE

6   POPP, and JACOB ROBERTS, on behalf

7   of themselves and all those

8   similarly situated,

9               Plaintiffs,

10      v.

11    ,

12   and TICKETMASTER LLC,

13               Defendants.

14

15

16        REMOTE DEPOSITION OF KIMBERLY TOBIAS

17         PURSUANT TO FEDERAL RULE 30(B)(6)

18           LIVE NATION ENTERTAINMENT, INC.

19           THURSDAY, JANUARY 26, 2023

20            PALOS VERDES, CALIFORNIA

21

22

23   TSG Job No.:  221381

24   Reported by:  Marilynn Hoover, RPR

25               California CSR No. 8841

Page 2

```
 1        BE IT REMEMBERED THAT, pursuant to Rule 30(b)(6)
 2   the Federal Rules of Civil Procedure, the remote
 3   deposition of KIMBERLY TOBIAS was taken before
 4   Marilynn Hoover, California CSR No. 8841; on Thursday,
 5   January 26, 2023, commencing at the hour of 9:35 a.m.;
 6   the witness testifying from Palos Verdes, California.
 7
 8                    APPEARANCES
 9   QUINN EMANUEL URQUHART & SULLIVAN
10      BY WILLIAM SEARS, ESQ.
11      865 South Figueroa Street
12      Los Angeles, California 90017
13      On behalf of Plaintiffs
14
15
16
17   LATHAM & WATKINS
18      BY SADIK HUSENY, ESQ.
19         ROBIN GUSHMAN, ESQ.
20      505 Montgomery Street
21      San Francisco, California 94111
22      On behalf of Defendants
23
24
25
```

Page 3

```
 1                   EXAMINATION INDEX
 2                                                 PAGE
 3   Examination by Mr. Sears                        5
 4
 5
 6                    *   *   *
 7
 8
 9                   EXHIBIT INDEX
10   EXHIBIT NO.   DESCRIPTION                      PAGE
11   Exhibit 1    Plaintiffs' first rule 30(b)(6)
12                deposition notice to Live Nation
13                Entertainment Inc.                  6
14   Exhibit 2    Plaintiffs' amended first rule
15                30(b)(6) deposition notice to
16                Ticketmaster                        6
17   Exhibit 3    E-mail string (NEWERA_000160 to
18                NEWERA_000165, and NEWERA_001957
19                to NEWERA_001961)                  27
20   Exhibit 4    Defendants' supplemental privilege
21                log - January 6, 2023              59
22   Exhibit 5    Defendants' privilege log -
23                October 3, 2022                    59
24   Exhibit 6    E-mail string (NEWERA_000220 to
25                NEWERA_000223)                     69
```

Page 4

```
 1                EXHIBIT INDEX (CONT.)
 2   EXHIBIT NO.   DESCRIPTION                      PAGE
 3   Exhibit 7    E-mail string (NEWERA_000004 to
 4                NEWERA_000007)                     78
 5   Exhibit 8    E-mail string (NEWERA_000327 to
 6                NEWERA_000328)                     93
 7   Exhibit 9    Subscription agreement
 8                (NEWERA_000184 to 000183, and
 9                NEWERA_000198)                     95
10   Exhibit 10   E-mail string (NEWERA_000432 to
11                NEWERA_000447)                    111
12   Exhibit 11   E-mail string (NEWERA_000398 to
13                NEWERA_000419)                    129
14   Exhibit 12   E-mail string (NEWERA_000375 to
15                NEWERA_000392)                    133
16   Exhibit 13   Subscription agreement
17                (TM00000032 to TM00000048)        135
18   Exhibit 14   New Era ADR Rules and Procedures  138
19   Exhibit 15   Terms of Use - last updated
20                July 2, 2021                      145
21
22
23
24
25
```

Page 5

```
 1   THURSDAY, JANUARY 26, 2023; PALOS VERDES, CALIFORNIA
 2              KIMBERLY TOBIAS,
 3   called as a witness, being duly sworn on oath, was
 4   examined and did testify as follows:
 5              THE STENOGRAPHIC REPORTER:  Thank you.  You
 6   may begin, counsel.
 7                    EXAMINATION
 8   BY MR. SEARS:
 9      Q.   Good morning, Ms. Tobias.  I'm Will Sears.
10   I'm one of the attorneys representing the proposed
11   class in this case.
12           I understand you've been deposed before?
13      A.   I have.
14      Q.   And you're a lawyer by training?
15      A.   Yes.
16      Q.   You're currently in-house counsel at Live
17   Nation?
18      A.   Correct.
19      Q.   So you understand the deposition process?
20      A.   Very much so.
21      Q.   Okay.  I'll dispense with the ground rules,
22   then; but will you just -- if any of my questions are
23   unclear or confusing, will you let me know?
24      A.   Yes.
25      Q.   Do you understand that you're here as a rule
```

| Page 6 | Page 7 |

**Page 6**

```
 1   30(b)(6) witness for both Live Nation Entertainment
 2   Inc. and Ticketmaster LLC?
 3       A.   Yes.
 4       Q.   Do you have an understanding of what that
 5   means?
 6       A.   Yes.
 7       Q.   What is that understanding?
 8       A.   My understanding is that I'm here testifying
 9   as a corporate representative as to the corporation's
10   knowledge of the topics in the deposition notice.
11       Q.   And if I just refer to "Live Nation" or
12   "Ticketmaster," will you understand that I'm referring
13   to the specific corporate entities that I just
14   referenced?
15       A.   Yes.
16       Q.   Now, many of my questions will cover both
17   Live Nation and Ticketmaster.  So will you do me a
18   favor:  If at some point you need to differentiate
19   between the two entities, you'll let me know?
20       A.   Sure.
21            MR. SEARS:  So let's mark our first two
22   exhibits.  They'll be Exhibits 1 and 2.
23                 (Exhibit 1 and Exhibit 2 marked.)
24       Q.   BY MR. SEARS:  I've introduced them to the
25   chat, and they are deposition notices for Live Nation
```

**Page 7**

```
 1   and Ticketmaster.
 2            Let me know when you have them.
 3       A.   I have -- Yep, I have it open.
 4       Q.   Now, have you seen these notices before?
 5       A.   I have.
 6       Q.   And I'll just note:  These are the ones that
 7   I served on your counsel yesterday.  I don't know if
 8   you've seen those specifically; but do you understand
 9   that, in substance, these are essentially the same as
10   the ones that were served a few months ago?
11       A.   Let me take a quick look to make sure.  Yes.
12       Q.   Now, what did you do to prepare for this
13   deposition?
14       A.   I had two phone calls with counsel, my
15   counsel -- with our counsel, Latham & Watkins.  I
16   reviewed documents that were produced by us, Live
17   Nation and Ticketmaster, and by New Era, and reviewed
18   our subscription agreement with New Era.
19       Q.   Is that the subscription agreement that was
20   executed in June 2021?
21       A.   Correct.
22       Q.   You said you had two calls with your
23   counsel.
24            When did those take place?
25       A.   One was last week; I can't recall the
```

| Page 8 | Page 9 |

**Page 8**

```
 1   specific day.  And we had a call yesterday as well.
 2       Q.   And how long were each of the calls,
 3   approximately?
 4       A.   A couple of hours.
 5       Q.   And who all was on them?
 6       A.   Sadik Huseny, Robin Gushman, and Kirsten
 7   Ferguson, of Latham.
 8       Q.   Were you aware there was a deposition of a
 9   New Era witness this week?
10       A.   I am aware of that, yes.
11       Q.   Have you seen the transcript of that
12   deposition?
13       A.   No.
14       Q.   Have you discussed that deposition with
15   anyone?
16       A.   Very vaguely.  Just I know it took place.
17       Q.   I'm trying to be careful about privileged
18   conversations --
19       A.   Right.
20       Q.   -- with your lawyers, but do you have an
21   understanding of the testimony that was given in that
22   deposition?
23            MR. HUSENY:  I object.  I'm not sure that
24   she can answer that question, on privilege grounds.
25            Will, I know you're trying to be careful,
```

**Page 9**

```
 1   but I think she just testified that there was some
 2   discussion about that.
 3            MR. SEARS:  Well, why don't you let her
 4   answer yes or no, and we'll see where it goes.
 5            THE WITNESS:  I'll tell you that --
 6            MR. HUSENY:  I still object.  Okay.
 7            THE WITNESS:  Sorry.
 8            I'll tell you that the only discussion that
 9   I've had with anyone about the New Era deposition was
10   with my counsel; so I'm not going to disclose what
11   I've learned in that conversation.
12       Q.   BY MR. SEARS:  Okay.  Understood.  Let me --
13   Let me just ask this, and I think this is fair game:
14   To the extent you have an understanding of the
15   testimony that was given, the factual testimony that
16   was given, that was derived from a discussion with
17   your lawyers?  Yes or no.
18       A.   To the extent I have any knowledge of the
19   factual testimony, it would have come in a
20   conversation with my lawyers, yeah.
21       Q.   Okay.  Now, let's look at some of the topics
22   in the deposition notice.
23            And the topics are the same in both, so
24   let's just do -- let's just pick Ticketmaster, if that
25   works for you.
```

1    A.   Let's see which one I have open.

2    Q.   Even better.

3    A.   Yeah, I have Ticketmaster open.  Okay.

4    Q.   Even better.

5         So I understand that some of these topics,

6  there have been discussions about; but -- and whether

7  you'll have to testify; but, in general, are you

8  prepared to testify to the six topics that are listed

9  here?

10    A.   I'm prepared to testify to five of them, the

11  first five.

12    Q.   Okay.  And just as an example, you know, do

13  you see topic 1?

14    A.   Yes.

15    Q.   Did you do anything different to prepare for

16  that topic than the other topics or what you've

17  already described to me in terms of your preparation?

18    A.   Anything different, no.  All of my

19  preparation that I've already described applies the

20  same for all five topics that are at issue.

21    Q.   I see.  So what you described to me -- two

22  calls with your lawyers, a couple hours each,

23  reviewing documents -- that was how you prepared for

24  all five of the topics on which you're prepared to

25  testify?

1    A.   Yes.

2    Q.   Now, you mentioned reviewing documents;

3  right?

4    A.   Right.

5    Q.   Did you review all the documents that were

6  produced in the case, or just a subset?

7    A.   I actually don't know the answer to that

8  question.  I reviewed some documents.  I highly doubt

9  it's all documents that were produced in the case.

10    Q.   Approximately how many did you review?

11    A.   I couldn't tell you.

12    Q.   More or less than a hundred?

13    A.   Oh, way less than a hundred.  Yes.

14    Q.   Less than 50?

15    A.   Yes.

16    Q.   Okay.  Were those documents selected by

17  counsel for your review or did you select them

18  yourself?

19    A.   Selected by counsel.

20    Q.   Were there any -- Oh, strike that.

21         Were there any documents that refreshed your

22  recollection?

23    A.   Yes.

24    Q.   Which documents were those?

25    A.   Frankly, all of them refreshed my

1  recollection.

2    Q.   About what?

3    A.   The topics at issue in the notice, the

4  topics in the notice.

5    Q.   Could you be a little more specific?  I

6  mean, could you give me an example of a document that

7  you looked at that refreshed your recollection as to

8  something?

9    A.   I couldn't tell you a specific document, but

10  they were -- most of the documents were documents that

11  came from Live Nation that I had seen at some point,

12  so they refreshed my recollection as to the content of

13  the documents and the timing of when they were created

14  and sent and received.

15    Q.   I mean, can you be a little more specific?

16  Like what subjects were the documents about?  What

17  were the things that you remembered when you saw the

18  documents?

19    A.   I can't be more specific than that.  Sorry.

20    Q.   Now, how about the New Era documents?  Can

21  you describe the documents produced by New Era that

22  you reviewed?

23    A.   I'm sorry.  I'm having a hard time

24  remembering what I reviewed that was produced by

25  New Era versus produced by us, so I can't answer that.

1    Q.   Well, let me ask it this way:  The New Era

2  documents, I assume you hadn't seen before you

3  reviewed them for this depo; is that fair?

4    A.   Yes.

5    Q.   And, in general, what were they about?

6    A.   In general, if I recall correctly, they were

7  communications between myself and New Era.

8    Q.   So they were documents that you had seen

9  before.  They may have been produced by New Era, but

10  they were inbound or outbound e-mails on which you

11  were copied?

12    A.   Correct.

13    Q.   Let me ask you this:  Did you review any

14  documents by New Era that you had never seen before,

15  for example, because you weren't copied on them?

16    A.   I don't recall.

17    Q.   Did you review any marketing materials or

18  decks that New Era created?

19    A.   Not that I recall.  I don't remember.

20    Q.   And can you look at appendix A, the

21  definitions in the subpoena.

22         Just let me know when you're there.

23    A.   I'm here.

24    Q.   Okay.  So do you see that there's a term,

25  "Live Nation," that's defined?

Page 14

```
 1      A.    Yes.
 2      Q.    Do you see that "Live Nation" is defined to
 3 include not only Live Nation Entertainment Inc. but
 4 any of its parents, subsidiaries, affiliates,
 5 representatives, or agents?
 6      A.    I do see that it says that, yes.
 7      Q.    So Latham & Watkins is a representative for
 8 Live Nation in this case; right?
 9      A.    I wouldn't -- I don't have an understanding
10 of what that means in this context, if it's -- They're
11 not -- They're not a corporate affiliate of Live
12 Nation, no.  I'm not able to opine on that legal
13 definition.
14      Q.    Okay.  Sorry.  I didn't mean to talk over
15 you.  Were you done?
16      A.    I am, yeah.
17      Q.    Well, I mean, it is true that Latham &
18 Watkins is representing Live Nation Entertainment Inc.
19 in this lawsuit; right?
20      A.    Correct.
21      Q.    They -- They filed an appearance in this
22 case; right?
23      A.    Correct.
24      Q.    They prepared you for your deposition?
25      A.    Yes.
```

Page 15

```
 1      Q.    They're on this Zoom right now?
 2      A.    Yes.
 3      Q.    In that sense, Latham & Watkins is a
 4 representative of Live Nation?
 5      A.    In the sense that you just described, that
 6 they represent us in this litigation; yes; but I'm not
 7 going to guess or speculate as to what your firm meant
 8 when they defined the term -- when they added the term
 9 "representatives" to the definition of Live Nation.
10 That was a word you put in a document that I have not
11 -- I don't know what you were thinking when you
12 drafted that.
13      Q.    Sure.  That's not what I'm asking.
14            I mean, to cut through it, what I'm trying
15 to figure out, Ms. Tobias, is this -- and we'll go
16 into this a little bit more later -- but you're aware
17 that there were conversations between New Era and
18 Latham; right?
19      A.    Yes.
20      Q.    And you weren't involved in all those
21 conversations, were you, not personally?
22      A.    No, I was not.
23      Q.    For example, there were Zoom calls between
24 New Era and Latham that you were not on?
25      A.    I don't know if there were Zoom calls.  I
```

Page 16

```
 1 know there were conversations, that were not
 2 in-person, between Live Nation and New Era.  I have no
 3 idea what, you know, sort of platform they used.
 4            Did I say Live Nation?  I meant Latham &
 5 Watkins.
 6      Q.    All good.  So let me ask you this:  As part
 7 of your preparation for the deposition, did you
 8 prepare to testify about the discussions that were had
 9 between Latham and New Era?
10      A.    Yes.
11      Q.    Okay.  And how did you prepare to do that?
12      A.    Through conversations with my counsel.
13      Q.    And, Sadik, I think I'm entitled to ask yes
14 or no to this.
15            During those conversations, did they relay
16 to you the substance of their discussions with
17 New Era?
18      A.    They did not.  I am not aware of all of the
19 substance, what was said in every conversation; but I
20 know generally the topics, generally what was
21 discussed in those conversations.
22      Q.    I see.  So, I mean, let me ask it this way:
23 If I were to ask you to give me a stenographic record
24 of everything that was said between New Era and Latham
25 & Watkins, you couldn't do that, could you?
```

Page 17

```
 1      A.    No.
 2      Q.    But you are prepared to tell me generally
 3 what was discussed between them?
 4      A.    Yes.
 5      Q.    And we'll do this with documents in a bit,
 6 but I just need to get an understanding, so bear with
 7 me for a second.  Okay?
 8      A.    Okay.
 9      Q.    I mean, how granular does your understanding
10 go?  Like do you have an understanding of what was
11 discussed on specific calls?  Like a call in May 2021
12 was for this purpose and June 2021 was for that
13 purpose, or is it more general?
14      A.    I was in close contact with Latham during
15 this time that they were having discussions with
16 New Era, so I was certainly kept up to speed and
17 apprised of generally the topics of the conversation,
18 the conversations between the two entities.
19            As far as what was specifically discussed on
20 May 1st versus any other particular day in May, I
21 couldn't tell you; but I'm absolutely aware of the
22 general topics of discussion over the one and a half
23 month period that they had five or six conversations,
24 yes.
25      Q.    Let me ask you this:  Is this an
```

Page 18

1  understanding that you also developed in real-time
2  when Latham was talking to New Era, or is this an
3  understanding that you developed when preparing for
4  this deposition?
5      A.   In real-time.  Latham was acting at my
6  direction in their conversations with New Era.
7      Q.   Okay.  So when Latham & Watkins talked to
8  New Era, they were acting at Live Nation and
9  Ticketmaster's direction?
10     A.   As our counsel representing us, yes, they
11 act at our direction when performing work on behalf of
12 Live Nation and Ticketmaster.
13     Q.   And that's true for both Live Nation and
14 Ticketmaster, just to confirm?
15     A.   They represent, yes, Live Nation and
16 Ticketmaster and all of its subsidiaries.
17     Q.   All right.  And so Live Nation and
18 Ticketmaster would give Latham marching orders ahead
19 of these calls?
20     A.   Live Nation and Ticketmaster being me.
21 Marching orders?  No, I would not put it that way;
22 that's not how our relationship works.  But we have --
23 we were in close contact, as we are with all legal
24 work that Latham does for the company, about what
25 Latham is doing on our behalf.

Page 19

1      Q.   When you say you were in close contact with
2  Latham, who was it at Latham?  Just names.
3      A.   If memory serves, it was Kirsten Ferguson
4  and Alicia Jovais.
5      Q.   Okay.  So New Era was founded in 2020; is
6  that right?
7      A.   I actually don't know when they were
8  founded.
9      Q.   Is that something you knew at one point and
10 you're just not sure, or you just never -- never knew
11 it?
12     A.   I know that they are a startup from the last
13 couple of years.  I don't recall ever knowing what
14 year or date they technically were founded.
15     Q.   But they're a -- they're a new company, as
16 the name New Era would imply?
17     A.   I don't know that that's what the name
18 implies; but, yes, they are a new company.
19     Q.   Now, we'll talk about this a little more
20 later, but -- and I think you mentioned, but Live
21 Nation signed the subscription agreement with New Era
22 in about June 2021?
23     A.   Yes.
24     Q.   So fairly soon after New Era was founded?
25     A.   Correct.

Page 20

1      Q.   As a result of that subscription agreement,
2  Live Nation and Ticketmaster switched from using JAMS
3  to New Era in their online terms of use; is that
4  right?
5      A.   Correct.
6      Q.   And just so the record's clear:  When I say
7  "terms of use," do you understand that I'm referring
8  to the online terms of use for both Ticketmaster and
9  Live Nation?
10     A.   Yes.
11     Q.   You're familiar with those; right?
12     A.   Very.
13     Q.   You've had a hand in drafting them?
14     A.   Solely responsible for it, yes.
15     Q.   You've issued many declarations and lawsuits
16 about them?
17     A.   Yes.
18     Q.   Testified for --
19     A.   I'm sorry.  I'm going to correct -- Sorry.
20 Can you clarify.  What was the question?
21     Q.   You've issued many declarations in lawsuits
22 about them?
23     A.   Okay.  In lawsuits.  Yes.  Correct.
24     Q.   Do you have a real-time feed going, by the
25 way?

Page 21

1      A.   A what?
2      Q.   Oh, a real-time feed.
3      A.   I do not, no.
4      Q.   I was asking because they're -- It doesn't
5  matter.  Strike that.
6           And you actually testified about the terms
7  of use at least once, right, in a deposition?
8      A.   Yes.  Your law firm deposed me last year on
9  this topic.
10     Q.   Yeah, I remember.
11          How many times have you been deposed, by the
12 way?
13     A.   Only twice.  Both by -- Both by Quinn
14 Emanuel.
15     Q.   This is only number 2?
16     A.   Yeah.
17     Q.   Did you ever take a deposition in private
18 practice?
19     A.   I did.
20     Q.   About how many?
21     A.   Oh, not many.  I was a junior lawyer at a
22 big firm.  Maybe two or three.
23     Q.   Okay.  So going back to the questions about
24 the terms of use:  Remember, we were talking about
25 those?

Page 22

```
1     A.   I remember.
2     Q.   So after Live Nation signed the subscription
3  agreement with New Era, Ticketmaster and Live Nation
4  replaced JAMS with New Era in their terms of use;
5  right?
6     A.   Among other changes, yes.
7     Q.   Right.  And by "replaced JAMS with New Era,"
8  I mean they switched from JAMS to New Era as the
9  default ADR provider in the terms of use; correct?
10    A.   Correct.
11    Q.   Live Nation and Ticketmaster were some of
12 the first big companies to do that, to put New Era in
13 their terms of use, as far as you know; right?
14    A.   I don't know who -- whether -- how many
15 other companies had signed on with New Era.  I don't
16 track that.
17    Q.   As far as you know, at the time Live Nation
18 and Ticketmaster began using New Era in their terms of
19 use, there were few, if any, other big companies that
20 did so; right?
21    A.   Again, I -- I don't know.
22    Q.   Did you do diligence on New Era before
23 deciding to switch from JAMS to New Era in the terms
24 of use?
25    A.   Yes.  My counsel did the diligence.
```

Page 23

```
1     Q.   As part of that diligence, did you learn how
2  many other companies used New Era in online terms of
3  use?
4          MR. HUSENY:  Objection.  Asked and answered.
5          THE WITNESS:  Yeah, again, I don't know the
6  answer to the question.
7     Q.   BY MR. SEARS:  Was that a question that you
8  raised in due diligence?
9          MR. HUSENY:  Objection.  Calls for
10 privileged information to the extent it's talking
11 about conversations between Ms. Tobias and counsel.
12         MR. SEARS:  Are you instructing her not to
13 answer, or not?
14         MR. HUSENY:  I'm instructing her not to
15 answer because it's privileged, Will.
16         I mean, do you want me to say that every
17 time?  I can.
18         MR. SEARS:  Yeah, you know, you need to be
19 clear; so rather, instead of these what are starting
20 to be speaking objections, you should say "privilege"
21 and "instruct not to answer," and we'll limit the
22 cross-talk.  Okay?
23         MR. HUSENY:  I'll repeat my objection.
24         Calls for privileged information to the
25 extent of conversations between Ms. Tobias and
```

Page 24

```
1  counsel.  I instruct the witness not to answer.
2          That is not a speaking objection.  That is
3  an objection with now an instruction.
4          MR. SEARS:  All right.  This is gratuitous:
5  Please, you know, tone it down going forward; but I'm
6  going to continue.
7     Q.   BY MR. SEARS:  As far as you know,
8  Ms. Tobias, Live Nation was New -- one of New Era's
9  earliest clients or customers; right?
10    A.   I believe that's the case.  I don't know.
11    Q.   Was that a topic you explored in due
12 diligence?
13    A.   I really -- If I answered that question --
14         MR. HUSENY:  Objection to the extent it
15 calls for privileged information.
16         THE WITNESS:  -- I'd be divulging privileged
17 information.  I'm not going to answer.
18    Q.   BY MR. SEARS:  Let me ask you this:  Without
19 getting into communications with your lawyers, what
20 was the purpose of conducting due diligence into
21 New Era, from Live Nation's perspective?
22    A.   To understand the rules, procedures, the
23 credentials of the neutrals, how the platform worked,
24 among other things.
25    Q.   And why, if at all, was that important to
```

Page 25

```
1  Live Nation?
2          MR. HUSENY:  Objection.  Calls for
3  privileged information.
4     Q.   BY MR. SEARS:  Why, if at all, was that
5  important to Ticketmaster?
6          MR. HUSENY:  Objection.  Calls for
7  privileged information.
8          You're asking about the mental impressions
9  of the attorney.
10    Q.   BY MR. SEARS:  You testified, Ms. Tobias,
11 that Live Nation conducted diligence into New Era to
12 understand the rules, the procedures, the credentials
13 of the neutrals, how the platform worked, among other
14 things; is that right?
15    A.   Correct.
16    Q.   Was there any business purpose for doing
17 that, or was it purely a legal purpose?
18    A.   I think you're asking me why, which is --
19 why we did diligence; and I think Sadik just said that
20 was encroaching on privileged information.  I'm not
21 going to answer.
22    Q.   All right.  So just to be clear:  You're not
23 going to tell me why Live Nation did --
24         (Reporter request.)
25    Q.   BY MR. SEARS:  Just to be clear:  You're not
```

| Page 26 | Page 27 |
|---|---|
| 1  going to tell me why Live Nation and Ticketmaster did | 1      A.   It certainly is, but it's not something I |
| 2  due diligence into New Era? | 2  looked into in preparation for this deposition. |
| 3          MR. HUSENY:  Objection.  Calls for | 3          MR. SEARS:  Okay.  Let's mark our next |
| 4  privileged information. | 4  exhibit. |
| 5      Q.   BY MR. SEARS:  Okay.  So before switching to | 5          (Exhibit 3 marked.) |
| 6  New Era, Live Nation and Ticketmaster both used JAMS; | 6      Q.   BY MR. SEARS:  Let me know when you have it, |
| 7  right? | 7  Ms. Tobias. |
| 8      A.   Correct. | 8          THE STENOGRAPHIC REPORTER:  Exhibit 3, |
| 9      Q.   JAMS is an ADR provider; correct? | 9  counsel? |
| 10      A.   Correct. | 10          MR. SEARS:  Yes, thank you.  And thank you |
| 11      Q.   It's an established ADR provider; right? | 11  for keeping track, because I'm going to forget to do |
| 12      A.   Yes. | 12  that. |
| 13      Q.   It's been around for many years? | 13          THE WITNESS:  I have it.  I'm just trying to |
| 14      A.   I know it's been around for at least ten | 14  download that. |
| 15  years.  I don't know longer than that. | 15      Q.   BY MR. SEARS:  While you do that:  Just for |
| 16      Q.   It's administered many arbitrations; right? | 16  the record, Exhibit 3 is a document produced by New |
| 17      A.   I mean, I would assume so.  I don't know. | 17  Era bearing Bates number NEWERA_000160. |
| 18      Q.   Well, let me ask you this:  How many | 18      A.   Hmm.  It's saying it's downloaded, but I'm |
| 19  arbitrations has JAMS administered for Live Nation and | 19  not seeing it appear for some reason. |
| 20  Ticketmaster? | 20          Do I have to -- Sorry.  Do I have to remove |
| 21      A.   I don't know. | 21  the other exhibits before viewing it?  Because it's |
| 22      Q.   Is it more than ten? | 22  not coming up. |
| 23      A.   I don't know. | 23          MR. SEARS:  Can we go off the record? |
| 24      Q.   Is that something that Live Nation and | 24          THE WITNESS:  Oh, I have it now.  Sorry. |
| 25  Ticketmaster track? | 25      Q.   BY MR. SEARS:  Okay.  Perfect. |

| Page 28 | Page 29 |
|---|---|
| 1          Now, let me ask you this:  Ms. Tobias, have | 1  e-mails like this, they sent us a mapping document and |
| 2  you seen -- Well, strike that. | 2  represented that these are the attachments to the |
| 3          Do you see this is an e-mail with some | 3  e-mail. |
| 4  attachments? | 4          To the best of our knowledge, these are the |
| 5      A.   That's what it appears.  It appears to have | 5  correct attachments based on information provided by |
| 6  attachments.  I see it's an e-mail, yes. | 6  New Era.  And I will note that we have spent countless |
| 7      Q.   Okay.  I mean, if you -- if you scroll | 7  hours going back and forth and involved with the court |
| 8  through the PDF, you'll see some attachments. | 8  on this dispute, so I certainly hope it's correct. |
| 9          Do you see those? | 9          MR. HUSENY:  Well, I won't comment on that. |
| 10      A.   Yes.  I see some documents at the end that | 10          The fact that even within the attachments |
| 11  are not part of the e-mail, so I assume those are | 11  there's a jump from 1957 to 1960, I just want to make |
| 12  attachments.  Yeah. | 12  sure that the record is clear on that. |
| 13      Q.   Have you seen this e-mail or the attachments | 13          You're saying that the mapping document |
| 14  before? | 14  provided by New Era is such that these three |
| 15      A.   I don't recall this specific -- Let me read | 15  attachments or these three pages in the attachments |
| 16  it through. | 16  were the correct attachments to this e-mail. |
| 17          MR. HUSENY:  Will, while the witness does | 17          Is that -- Is that fair? |
| 18  this, could I just ask about the Bates numbering that | 18          MR. SEARS:  Yes.  That's our best |
| 19  jumps from 165 at the end of e-mail to 1957, the | 19  understanding. |
| 20  attachment?  Is there a reason for the jump?  I just | 20          MR. HUSENY:  Okay. |
| 21  want to make sure the attachment is what was actually | 21          MR. SEARS:  And, in the future, for these |
| 22  attached to the e-mail. | 22  administrative issues, can we go off the record?  I |
| 23          MR. SEARS:  The reason -- The reason for the | 23  really want to limit the cross-talk between us. |
| 24  jump is that, after much back-and-forth with New Era, | 24          You're entitled to object and ask questions, |
| 25  which initially failed to produce the attachments to | 25  but I don't want to muddy the record with this.  I |

Page 30

1  really don't.  I'm trying to be patient, but we've
2  only been going for half an hour and this has now
3  happened a couple times.
4          MR. HUSENY:  Will, I'm going to have a real
5  disagreement with you on that.  If there is an issue
6  about an exhibit, that is on the record, and we can
7  have as much on the record as we want.  So let's move
8  on.
9          You have jumps in Bates numbers on these
10  documents, and I'm entitled to ask that on the record.
11  Ask your question.
12          MR. SEARS:  All right.  Well, let me just
13  note that I've sent you the mapping documents, so I
14  hoped you'd looked at them before.  If you didn't,
15  there's not much I can do.  But let's -- let's
16  proceed.
17      Q.   BY MR. SEARS:  So, Ms. Tobias, is this a
18  document that you reviewed in preparing for your
19  deposition?
20      A.   I don't recall this specific document.
21  Maybe.  I don't remember.
22      Q.   It's not one of the ones that you told me
23  earlier refreshed your recollection?
24      A.   As I believe I testified earlier, I don't
25  recall which specific documents refreshed my

Page 31

1  recollection in what way or another.  I -- I don't
2  recall exactly whether I saw this document or not.
3  I'm not on it.
4      Q.   Okay.  I understand.
5          Now, have you had a chance to scroll through
6  the e-mail?
7      A.   No.  I'll do that now.
8      Q.   Okay.  If it helps, my question is going to
9  be pretty narrow and it's going to be on page 4 of the
10  PDF, which is Bates number ending in 163.
11      A.   Okay.  I'm there.
12      Q.   Do you see that?  Starting at the top of the
13  third page, going to the bottom, there's an e-mail
14  from someone named Shane Mulrooney at New Era to
15  counsel at Latham & Watkins.
16      A.   Yes.
17      Q.   And have you ever met Mr. Mulrooney before,
18  either in person, on Zoom, or on a phone call?
19      A.   I don't recall specifically.  I had a phone
20  call with -- I think Shane was on the call, after we
21  signed our subscription agreement, to discuss
22  logistics; but I can't recall if Shane was on it,
23  sitting here today.
24      Q.   Okay.  Now, one of the things that
25  Mr. Mulrooney says in the e-mail is:  "Hi, Alicia."

Page 32

1          And that's to Alicia Jovais; right?
2      A.   Yes.
3      Q.   A lawyer at Latham?
4      A.   Yes.
5      Q.   Represents Live Nation in this case?
6      A.   Again, yes.
7      Q.   One of the people that I believe you told me
8  was involved in the due diligence of New Era; is that
9  right?
10      A.   I believe so, yes.
11      Q.   Okay.  And then Mr. Mulrooney says:  "██████
██████████████████████████████████████████████████████
█████████████"
14          Right?
15      A.   Um-hum.  Yes.
16      Q.   Do you have an understanding of what that
17  refers to?
18      A.   I believe that would refer to ████████████
███████████████████████████████████████████████████████
███████████████████████ Excuse me.
22      Q.   And is that data that Live Nation and
23  Ticketmaster have, ████████████████████████████████████
██████████████████████████████████████████████████?
25      A.   It's data that I can pull together.

Page 33

1      Q.   Is it data that you pulled together while
2  Latham was conducting diligence on New Era?
3      A.   I believe I did, yes.
4      Q.   And I will just represent to you, my
5  understanding from the New Era deposition is that
6  Latham showed New Era this information over a Zoom
7  call.
8          Does that sound right to you?
9      A.   I have no idea.
10      Q.   But you do believe you pulled this together
11  as part of the due diligence process?
12      A.   That's my recollection, yes.
13      Q.   Did you send it to anyone?
14      A.   I don't believe it was sent.  I believe it
15  was in a phone call that I shared it with our lawyers.
16      Q.   So you shared it with your lawyers, and they
17  may have then relayed that information to New Era?
18      A.   That's my --
19          MR. HUSENY:  Objection.  Calls for
20  speculation.  Go ahead.
21          THE WITNESS:  Oh, yeah.
22          That's my understanding, but I wasn't in
23  that conversation with New Era and Latham.
24      Q.   BY MR. SEARS:  And, to the best of your
25  knowledge, █████████████████████████████████████████

**Page 34**

```
 1  [REDACTED]
 2       A.  I can't recall.
 3       Q.  And you can't recall even a ballpark,
 4  [REDACTED]?
 5       A.  [REDACTED]
    [REDACTED]
 7       Q.  So -- Well, do you remember -- Strike that.
 8            Let me ask you this:  [REDACTED]
    [REDACTED]
    [REDACTED]
11       A.  I don't remember.
12       Q.  How long does Live Nation or Ticketmaster
13  keep that data?
14            Is there a point at which it doesn't go back
15  any farther, or how is it stored?
16       A.  I track that data.  I've been at the company
17  for 17 years, so I have data going back quite some
18  time; but it's just stored by me in my records of [REDACTED]
    [REDACTED]
20       Q.  And when you say "stored by you," how is it
21  stored?  Is there an Excel spreadsheet that contains
22  it all?  Is it something else?
23       A.  Various different locations and types of
24  documents.
25       Q.  And what are the locations and types of
```

**Page 35**

```
 1  documents?
 2       A.  Excel spreadsheets, reports, located on my
 3  computer.
 4       Q.  Sorry.  I didn't mean to cut in.
 5            When you say "reports located on your
 6  computer," just help me visualize:  Is that a PDF?  Is
 7  it a PowerPoint?  Is it something else?
 8       A.  Primarily Excel spreadsheets.
 9       Q.  And you mentioned Excel before.  What's the
10  part of this that is not Excel?
11       A.  There is not one document that tracks all of
12  [REDACTED]  As the only person at the company who handles
14  litigation, I have my own system where I have various
15  documents that I -- reporting documents for -- that I
16  use.  Some are Excel documents, some are Word
17  documents.
18       Q.  As best you can, please describe to me the
19  system that you just mentioned.
20       A.  I just did.  I just -- What's your question?
21       Q.  Well, how does it work in practice?  Is this
22  something that you update every time [REDACTED]
    [REDACTED]  Do you periodically update them?
24            Just walk me through how Kim Tobias,
25  in-house lawyer at Live Nation, keeps these reports
```

**Page 36**

```
 1  and spreadsheets.
 2       A.  I periodically update them.
 3       Q.  About how often?
 4       A.  Periodically.  Frequently.
 5       Q.  You said it's not just one document.
 6            I mean, approximately how many are we
 7  talking?  Is it thousands or five?  Give me a
 8  ballpark.
 9       A.  Not thousands.  I don't know.  I haven't
10  researched -- I haven't pulled together all my files
11  to look at how many there are.  It's -- I don't have
12  the answer for you there.
13       Q.  Is it under a hundred?
14       A.  Let me just clarify your question here.
15            You're asking me -- Actually, why don't you
16  ask me -- You need to ask it a different way, because
17  I don't -- I don't think it's clear what exactly --
18  what information you're asking for in terms of asking
19  me how many documents would contain what information.
20  It's just very vague.
21       Q.  Thank you for clarifying.
22            So you remember you were telling me that you
23  track [REDACTED]
    [REDACTED] is that right?
25       A.  To clarify:  I don't track the number.  I
```

**Page 37**

```
 1  keep track of and handle [REDACTED]
    [REDACTED]
 3            So I can refer back to various documents to
 4  figure -- to come to an answer as to [REDACTED]
    [REDACTED]
 6  [REDACTED]  It would take some time because I would need to
 7  cross-reference the various documents I already referred to --
 8  I already explained -- various Excel spreadsheets,
 9  various Word documents, various files of actual
10  litigations and arbitrations that were filed.  But,
11  no, there is no document that tracks [REDACTED]
    [REDACTED] clearly, sitting anywhere at Live
13  Nation.
14       Q.  Let me ask you this:  What was the process
15  when you pulled together this data as part of doing
16  due diligence on New Era?  What did you do?
17       A.  I asked my assistant to pull it together.
18       Q.  And how long did that take them?
19       A.  I don't recall.
20       Q.  How long did it take you personally to get
21  it together, not including the time of your assistant?
22       A.  I -- I don't recall.
23       Q.  But it is information that, when you decided
24  to pull it together for purposes of doing due
25  diligence on New Era, you were able to pull it
```

**Page 38**

```
 1   together; right?
 2        A.   To be clear:  I did not testify that we
 3   pulled it together as part of doing diligence into
 4   New Era.  I never said that.
 5        Q.   Okay.  You pulled this information together
 6   for a purpose at some point; correct?
 7        A.   For a purpose.  It's not related to
 8   diligence and to New Era; but, yes, for a purpose.
 9        Q.   All right.  What was the purpose?
10        A.   The pricing model that New Era created was
11   based on ███████████████████████████████████
     ██████████████████████████.
13        Q.   Got it.  So when you --
14             (Reporter request.)
15             THE WITNESS:  Which -- At least that's my
16   understanding.
17             THE STENOGRAPHIC REPORTER:  Thank you.
18        Q.   BY MR. SEARS:  I understand.  So when you
19   pulled together this ████████████████████████████
     ██████████████████████████████, it was
21   something you were able to pull together; is that
22   right?
23        A.   Correct.
24        Q.   Okay.  I mean, ██████████████████████████
     ██████████████
```

**Page 39**

```
 1   ████████████ in 2019?
 2             Do you have a ballpark for that?
 3        A.   I don't.
 4        Q.   Okay.  I promise, I'm not trying to be
 5   difficult.  I don't have all the information you do,
 6   so I have to ask these questions different ways to
 7   make sure I understand.  I hope you get it.
 8             How about in the last year?  How many
 9   ████████████████████████████████████████
     ███████████████████████████
11        A.   In the last 12-month period?
12        Q.   Yes.
13        A.   I don't know the exact number.
14        Q.   How many consumer arbitrations has New Era
15   administered involving Live Nation or Ticketmaster?
16        A.   They have not administered any.  One was
17   filed, one consumer arbitration was filed, with
18   New Era.  I can't recall the exact timeline.  It was
19   -- I believe it was in the last 12 months.  It was not
20   administered by New Era, because it was settled.
21        Q.   So let me ask you this:  I mean, you told me
22   earlier that, around June 2021, Live Nation and
23   Ticketmaster switched to New Era from JAMS in their
24   terms of use; right?
25        A.   Right.
```

**Page 40**

```
 1        Q.   Am I correct, then, that there has only been
 2   one consumer arbitration filed against Live Nation or
 3   Ticketmaster since Ticketmaster and Live Nation
 4   switched to New Era?
 5        A.   Only one has been filed with New Era.  But
 6   at the time we made the switch to New Era, we
 7   implemented an alternate dispute resolution process in
 8   our terms of use, that has led to a lot of consumer
 9   complaints and issues that would likely have ended up
10   in arbitration being resolved pre-arbitration.
11        Q.   Can you explain what you mean by that?
12        A.   I'll tell you factually that, in the terms
13   of use on Ticketmaster.com and LiveNation.com, there's
14   a process by which a consumer who has a dispute with
15   Live Nation or Ticketmaster is asked -- or is required
16   in the terms of use to send an e-mail to a designated
17   e-mail address, explaining their dispute, prior to
18   filing arbitration.
19             That -- Then there is just a process laid
20   out by which a representative of the company, Live
21   Nation or Ticketmaster, confers with the individual in
22   an attempt to resolve the dispute.  And if the dispute
23   is not resolved, then the consumer could proceed with
24   arbitration.
25        Q.   And when was that process implemented in the
```

**Page 41**

```
 1   terms of use?
 2        A.   July 2nd, 2022.
 3        Q.   Okay.  So that was about a year after Live
 4   Nation and Ticketmaster switched to New Era?
 5        A.   I'm sorry.  I have the date wrong.  July
 6   2nd, 2021; not 2022.
 7        Q.   Oh, I see.  So it was the same time that the
 8   update in the terms of use was made to switch from --
 9   from JAMS to New Era?
10        A.   Yes.
11        Q.   I see.  And how many cases or claims do you
12   believe have been resolved through that process?
13        A.   Quite a few.  I couldn't tell you.  I have
14   not -- I have nowhere -- Nowhere am I tracking those
15   coming in, but they come in with frequency.
16        Q.   But you don't know the number?
17        A.   I don't, but it's -- yeah, but they do come
18   in with some frequency.
19        Q.   Now, just focusing on arbitrations:  I
20   believe you told me that there's only been one
21   arbitration initiated against Live Nation or
22   Ticketmaster since switching to New Era.
23             Am I right about that?
24        A.   Sorry.  Ask that -- Can you ask that again.
25        Q.   Yeah, I'm just table setting.
```

1        I think you told me before that there's only
2   been one consumer arbitration initiated against Live
3   Nation or Ticketmaster since switching to New Era.
4        Am I right about that?
5        A.   No, that is not right.  There's been one
6   arbitration filed with New Era since we switched.
7        Q.   Okay.  That -- Maybe that's where I'm
8   getting confused.
9        Were there -- How many arbitrations were
10   filed with another ADR provider?
11        A.   Over what time period?
12        Q.   Since switching to New Era.
13        A.   I don't know the answer to that.
14        Q.   I mean, were there any?
15        A.   Yes.
16        Q.   And what were the circumstances by which
17   arbitrations were filed with someone other than
18   New Era?
19        A.   They're employment claims.  Our -- Yeah,
20   employment claims.
21        Q.   I see.  So just to be clear:  I'm focusing
22   on consumer arbitrations, by which I mean a consumer
23   who complains about something Live Nation or
24   Ticketmaster did vis-a-vis ticket sales, for example.
25        Do you understand what I'm saying?

1        A.   I do now, but your question didn't say
2   "consumer arbitrations."
3        Q.   It did, but that's -- that's okay.  So let
4   me just ask it again.
5        Since Live Nation and Ticketmaster switched
6   from JAMS to New Era, there's only been one consumer
7   arbitration initiated against Live Nation or
8   Ticketmaster.
9        Am I right about that?
10        A.   Through New Era, yes.
11        Q.   Through --
12        A.   Yes.  Yes.
13        Q.   Not just through New Era.
14        There's only been one consumer arbitration
15   initiated against Live Nation and Ticketmaster; is
16   that right?
17        A.   There's -- Yes, that is right.
18        Q.   Just to be perfectly clear about this:  It's
19   not like there were some consumer arbitrations -- not
20   employment, but consumer arbitrations -- initiated
21   with some other ADR provider?
22        A.   There were not.  There were lawsuits filed,
23   notwithstanding the arbitration provision; but no
24   arbitrations filed with New Era.  We do get plenty of
25   lawsuits, as you know.

1        Q.   Now, I know you couldn't tell me exactly how
2   many consumer arbitrations were filed against Live
3   Nation and New Era before switching to New Era.
4        I'm right about that too; right?
5        MR. HUSENY:  Objection.  I think you mis --
6   I think you mis-asked your question, Will.
7        MR. SEARS:  No, I said --
8        MR. HUSENY:  Filed against Live Nation and
9   New Era?
10        MR. SEARS:  Oh, Live Nation and
11   Ticketmaster, yes.
12        MR. HUSENY:  Would you reask the question.
13        THE WITNESS:  Yeah, now I've lost the
14   question.
15        Q.   BY MR. SEARS:  Sure.  So I'm just trying to
16   table set here.
17        Before, you couldn't tell me exactly how
18   many consumer arbitrations were filed against Live
19   Nation and Ticketmaster before switching to New Era.
20        Am I right about that?
21        A.   You're right.  I still don't know that
22   answer.
23        Q.   Ballpark, was it more than one per year?
24        A.   As I said, it varies significantly from year
25   to year.  There are years where there were definitely

1   more than one.
2        Q.   I mean, were there any other years where it
3   was just one?
4        A.   I don't remember.
5        Q.   I mean, so you can't actually tell me if
6   there was a specific year, before switching to
7   New Era, where only one consumer arbitration was filed
8   against Live Nation or Ticketmaster?
9        A.   No, I can't tell you that.  I didn't prepare
10   that in advance of this deposition; it's not one of
11   the topics in our deposition.  So, no, my testimony
12   stands:  I cannot tell you how many arbitrations were
13   filed against the company in a particular year,
14   period.
15        Q.   Okay.  Is JAMS a well-regarded ADR provider?
16        A.   I have no idea.
17        Q.   Well, Live Nation and Ticketmaster used them
18   for many years; right?
19        A.   We did.
20        Q.   And what was it that made you designate JAMS
21   as an ADR provider in the first place?
22        A.   I will not --
23        MR. HUSENY:  Objection.  Calls for
24   privileged information.
25        Q.   BY MR. SEARS:  Was there a reason that Live

1  Nation and Ticketmaster designated JAMS as an ADR
2  provider in the first place?  Yes or no.
3        MR. HUSENY:  Objection.  Calls for
4  privileged information.
5        Q.  BY MR. SEARS:  I'm asking if there was a
6  reason; I'm not asking what it was.  That's fair game.
7  Yes or no?
8        MR. HUSENY:  Same objection.
9        MR. SEARS:  All right.  You're not going to
10  let her answer the question whether Live Nation and
11  Ticketmaster selected JAMS for a reason?
12        MR. HUSENY:  You're asking about the
13  decision-making process.  Whether or not you're asking
14  about details, Will, you're asking about the decision
15  making process in selecting JAMS, and that is
16  privileged.
17        MR. SEARS:  Okay.  I respectfully disagree,
18  but I'm going to go on and make my record.  You can
19  keep making your objections.
20        Q.  BY MR. SEARS:  You're aware that other
21  companies besides Live Nation and Ticketmaster
22  designate JAMS in online terms of use?
23        A.  I'm not aware.  I don't review other
24  companies' terms of use.
25        Q.  That's not something you looked at when

1  selecting JAMS in the first place?
2        A.  I'm not going to answer that question,
3  because, if I would, I'd be divulging my work that
4  I've done as in-house counsel for Live Nation and
5  Ticketmaster.  How or what I look into when advising
6  my client is privileged.
7        Q.  Let me ask you this:  You mentioned the work
8  that you've done.  Were you involved in the decision
9  to select JAMS in the first place?
10        A.  Yes.
11        Q.  You said you'd been there for 17 years; is
12  that right?
13        A.  Yes.
14        Q.  And the terms of use have contained
15  mandatory -- allegedly mandatory arbitration clauses
16  since 2010 or so?
17        A.  Sorry.  Did you say allegedly the terms of
18  use contained an arbitration provision, or are you
19  asking did they contain an arbitration provision?
20        Q.  I'll just ask it again.
21        The terms of use have contained allegedly
22  mandatory arbitration clauses since 2010 or so?
23        MR. HUSENY:  Objection.  Vague and
24  ambiguous.
25        THE WITNESS:  I -- Yeah.

1            (Reporter request.)
2        MR. HUSENY:  Calls for a legal conclusion.
3        THE STENOGRAPHIC REPORTER:  Thank you.
4        MR. SEARS:  So do you -- I'm going to make a
5  request.  My request is that you limit your objections
6  to form or privilege and instruct not to answer.
7  Thank you.
8        Q.  BY MR. SEARS:  My -- I'll ask a different
9  question, which is --
10        MR. HUSENY:  I'm -- Excuse me.
11        Will, I'm going to name my objection.  I
12  think that is absolutely appropriate.
13        When I say "objection, calls for a legal
14  conclusion," that is absolutely appropriate and I will
15  continue to do that.
16        So please stop telling me how to object.
17  I'm not instructing anything, but naming the
18  objection.  Please go on.
19        MR. SEARS:  If you interrupt me again, we're
20  going to have to pause the deposition and call the
21  judge.  You're being unprofessional.  Now, let me
22  please ask my question.
23        Q.  BY MR. SEARS:  My question is:  Since 2010
24  or so, there have been arbitration clauses in the
25  online terms of use.

1        Am I right just about the time frame?
2        A.  I believe it was 2011.  It could be 2010.
3  More -- Around that time period, yes.
4        Q.  All right.  And has JAMS always been the ADR
5  provider before switching to New Era?
6        A.  In the terms of use, yes.
7        Q.  So the terms of use designated JAMS for
8  about a decade as the ADR provider; is that correct?
9        A.  Correct.
10        Q.  Did Live Nation or Ticketmaster have a
11  problem with JAMS over that time?
12        MR. HUSENY:  Objection.  Vague and
13  ambiguous.
14        THE WITNESS:  Yeah, I'm not sure I
15  understand.  A problem with them?
16        Q.  BY MR. SEARS:  Well, was there a concern
17  about JAMS specifically that led Live Nation and
18  Ticketmaster to stop using them and instead designate
19  New Era?
20        MR. HUSENY:  Objection.  Calls for
21  privilege.
22        THE WITNESS:  Yeah, there's no way for me to
23  answer that question without divulging privileged
24  information, my own thoughts about JAMS.
25        Q.  BY MR. SEARS:  So just to be clear:  You're

1  not going to tell me what the reason was for switching
2  from JAMS to New Era.
3      A.   No.  Nor am I required to or was I asked to
4  in the notice.
5      Q.   Yeah, and that's fine.  I'm really just -- I
6  need to make my record.  I understand that there are
7  privilege objections, but I have to ask the questions;
8  so I hope you understand.
9           Fair enough?
10     A.   Fair enough.
11     Q.   So just so we're clear:  You're -- You're
12  not going to testify about the reason for switching
13  from JAMS to New Era?
14     A.   Absolutely not.
15     Q.   You were involved in both the decision to
16  select JAMS and the decision to select New Era?
17     A.   Yes.
18     Q.   There were legal considerations that went
19  into the decision.  Fair?
20     A.   Yes.  And I'm in-house counsel for Live
21  Nation and Ticketmaster.
22     Q.   I understand.  And that's why you're not
23  going to tell me what the considerations were or what
24  concerns, if any, led to that switch?
25     A.   All concerns, to use your word, that -- I'm

1  sorry.  Ask the -- Can you ask the question again.
2      Q.   Yeah.  The reason you're not going to tell
3  me what concerns or considerations, if any, went into
4  the decision to switch from JAMS to New Era is because
5  you believe it was a legal decision.  Fair?
6      A.   It was a legal decision and I'm not going to
7  disclose my legal advice, privileged advice and
8  communications with my client.
9      Q.   And you're also not going to disclose the
10  consideration or process that went into vetting
11  New Era, if any?
12          MR. HUSENY:  Objection.
13          THE WITNESS:  That seems to be a very open
14  -- I mean, there may be questions that I can answer if
15  you would give me a specific question.  I wouldn't say
16  I'm not going to -- I guess I don't understand your
17  question.
18     Q.   BY MR. SEARS:  Okay.  What considerations,
19  if any, did you have in the process of vetting New Era
20  in consideration for designating them as an ADR
21  provider in the terms of use?
22          MR. HUSENY:  Objection.  Calls for
23  privileged information.
24     Q.   BY MR. SEARS:  I mean, what was the process,
25  if any, that went into vetting New Era when Live

1  Nation and Ticketmaster considered switching from JAMS
2  to New Era in the terms of use?
3      A.   I'm sorry.  One more time.
4      Q.   Yeah.  What was the process, if any, that
5  went into vetting New Era when Live Nation and
6  Ticketmaster considered switching from JAMS to New Era
7  in the terms of use?
8      A.   The process was our -- our counsel at Latham
9  & Watkins had conversations with New Era about their
10  platform, their offering, their neutrals, their rules,
11  their procedures.
12     Q.   And what concerns, if any, did Live Nation
13  have about their offerings?
14          MR. HUSENY:  Objection.  Calls for
15  privileged information again.
16     Q.   BY MR. SEARS:  Okay.  What concerns, if any,
17  did Live Nation and Ticketmaster have about their
18  rules and procedures?
19          MR. HUSENY:  Objection.  Calls for
20  privileged information.
21     Q.   BY MR. SEARS:  Okay.  What concerns, if any,
22  did Live Nation and Ticketmaster have about their
23  neutrals?
24          MR. HUSENY:  Objection.  Calls for
25  privileged information.

1      Q.   BY MR. SEARS:  Is there any -- I'm really
2  just trying to cut through this here.
3           Is there anything else you can tell me about
4  either the decision to switch from JAMS to New Era in
5  the terms of use or the process for making that
6  decision, or have you told me everything that you
7  believe is not privileged?
8           MR. HUSENY:  Objection.  Calls for
9  privileged information.
10          THE WITNESS:  I mean, again, you can
11  continue to ask questions.  There may be some I can
12  answer.  But it's hard -- it's hard for me, sitting
13  here, to tell you that I've told you everything you
14  may want to know, that you may want to ask.
15     Q.   BY MR. SEARS:  I mean, what other facts can
16  you tell me about Live Nation and Ticketmaster's
17  decision to switch from JAMS to New Era, if any?
18          MR. HUSENY:  Objection.  Vague and
19  ambiguous.
20          THE WITNESS:  Yeah, you'd have to ask me a
21  question.  What other facts can I tell you?  I...
22     Q.   BY MR. SEARS:  I mean, what factors did --
23  other than the ones you've mentioned, did Live Nation
24  and Ticketmaster consider when making the decision to
25  switch from JAMS to New Era?

1    MR. HUSENY:  Same objection, and privileged.
2    Q.   BY MR. SEARS:  Let me ask you this:  Were
3 there any business people at Ticketmaster or Live
4 Nation involved in the decision to switch from JAMS to
5 New Era in terms of use?
6    A.   No.
7    Q.   It was purely a legal decision made by
8 in-house counsel and outside counsel; is that fair?
9    A.   Fair.  Correct.
10    Q.   Were there any other in-house counsel
11 besides yourself involved in that decision?
12    A.   No.
13    Q.   Let me ask you this:  Was there a specific
14 point in time when the decision to switch from JAMS to
15 New Era was made?
16    A.   Sorry.  Any specific point in time when the
17 final decision was made to make the switch?
18    Q.   Yep.
19    A.   June 2021, when we were -- we executed the
20 subscription agreement, is when we switched.
21    Q.   I see.  And just as a factual matter, how
22 long did the process take?  I mean, how long did Live
23 Nation and Ticketmaster consider whether to switch
24 from JAMS to New Era?
25    A.   The process from -- when it began, my

1 recollection is May, early May 2021, when Latham first
2 had their discussions with New Era about their
3 platform; and the agreement was executed June 22nd,
4 2021; and our terms of use were updated to reflect the
5 change to New Era on July 2nd, 2021.  So two months.
6    Q.   I see.  So it's fair to say Live Nation and
7 Ticketmaster spent about two months considering
8 whether to switch from JAMS to New Era?
9    A.   My testimony was a two-month
10 period from the time we -- that Latham on our behalf
11 first had discussions with New Era and the terms of
12 use were updated and the subscription agreement was
13 signed.
14    Q.   So, I mean, yes or no:  Did Live Nation and
15 Ticketmaster spend approximately two months
16 considering whether to switch from JAMS to New Era?
17    MR. HUSENY:  Objection.
18    THE WITNESS:  Your question, the word
19 "considering," you're suggesting something that I'm
20 not -- I've testified to you that it was a two-month
21 period from the moment that -- the time when we first
22 learned of New Era and their offering and the time it
23 went live.
24    I don't know -- I'm not going to
25 characterize it as us considering making a switch for

1 a two-month period.  The fact -- The timeline speaks
2 for itself.
3    Q.   BY MR. SEARS:  Okay.  Well, let me ask you
4 this:  Would you characterize the decision to switch
5 from JAMS to New Era and Live Nation and
6 Ticketmaster's terms of use as a careful one?
7    A.   Yes.  Everything that we do, that I do, all
8 my work for the company is carefully considered.
9    Q.   It certainly wasn't an arbitrary decision
10 that you made on a whim to switch from JAMS to
11 New Era?
12    A.   Absolutely not.
13    Q.   I understand you don't want to tell me the
14 reasons, but there were reasons?
15    MR. HUSENY:  Objection.  That's not a
16 question.  Same objection as before.
17    MR. SEARS:  Sadik, come on.
18    Q.   BY MR. SEARS:  I'm going to ask it again.  I
19 understand you don't want to tell me the reasons, but
20 there were reasons that Live Nation and Ticketmaster
21 switched from JAMS to New Era?
22    MR. HUSENY:  Same objections.
23    THE WITNESS:  I mean, why you want the
24 answer to that -- There are reasons for everything
25 that I do, that you do, that we all do, all decisions

1 we make as professionals and in our personal lives.
2 There's a reason for everything, yes.  It was not an
3 arbitrary decision.  It was a reason --
4    Q.   BY MR. SEARS:  So the answer to my question
5 was yes?
6    A.   Sorry?
7    Q.   The answer to my question was yes, there was
8 a reason that Live Nation --
9    A.   Is that your testimony?
10    Q.   I apologize.
11    A.   There were -- Sorry.
12    Q.   Go ahead.
13    A.   My testimony is yes.  There are -- There are
14 reasons for everything that we do, yes.
15    Q.   Okay.  And I apologize.
16    A.   What the reasons are, I will not disclose;
17 but, of course.  Yes, I'll answer that.
18    Q.   Thanks.  Are you done?
19    A.   I am.
20    Q.   Yeah, sorry.  I didn't mean to cut in.  I'm
21 just going to ask it again so it's clean.
22    So just to be clear:  Live Nation and
23 Ticketmaster had reasons for switching from JAMS to
24 New Era?
25    A.   Clean answer:  Live Nation and Ticketmaster

Page 58

1  have reasons for everything we do.  All the legal work
2  we do, there is a reason behind it.  So, yes, it was a
3  reasoned decision.
4       Q.  But you will not tell me what the reasons
5  were, because you believe they are privileged?
6       A.  Because they are privileged, yes.
7            MR. SEARS:  Okay.  I'm going to mark our
8  next two exhibits, which I believe will be four and
9  five, and I'm going to do them together and I'm going
10  to drop them into the chat.
11           THE WITNESS:  Okay.  Oh, sorry.  I didn't
12  mean to cut you off.
13           MR. SEARS:  No, please.
14           THE WITNESS:  After we go through this line
15  of questioning on these exhibits, I'd like to take a
16  few-minute break.
17           MR. SEARS:  If you need a break now, that's
18  fine.  I know you're an experienced witness, so I
19  didn't give you the normal warning; but I -- in most
20  depositions, I say, "If you ever need a break, you
21  should just let me know."  So if you need to take one
22  now, that's more than okay.
23           THE WITNESS:  I'm okay.  Unless the court
24  reporter needs to rest her fingers, I'm okay for
25  another few minutes.

Page 59

1            THE STENOGRAPHIC REPORTER:  I've never
2  turned one down.  I would love a break.
3            THE WITNESS:  Okay.
4            MR. SEARS:  Sure.  Why don't we come back at
5  10:45 even, Pacific.
6            THE WITNESS:  Sounds great.
7            THE STENOGRAPHIC REPORTER:  Thank you.
8  Agreeable to go off the record?
9            We're off the record.
10           (Recess.)
11           (Exhibit 4 and Exhibit 5 marked.)
12           THE STENOGRAPHIC REPORTER:  We're back on
13  the record.
14      Q.  BY MR. SEARS:  Good morning again,
15  Ms. Tobias.
16           Are you ready to resume your deposition?
17      A.  I am.
18      Q.  Did you talk to anyone on the break?
19      A.  I called Sadik.
20      Q.  And you may have answered, I think, but
21  you're at your home right now?
22      A.  Yes.
23      Q.  Okay.  So before we took a break, I marked
24  the next two exhibits, 4 and 5.
25           Do you have those?

Page 60

1       A.  So I believe I do.  2023.1.6, 2022 -- Yeah,
2  I do have those two.
3       Q.  Can you open up the 2022.10.03.
4       A.  Sure.
5       Q.  Do you see that this is a privilege log
6  prepared by Live Nation Entertainment Inc. and
7  Ticketmaster?
8       A.  It's still opening.  Just give it a second.
9            MR. SEARS:  Oh, sorry.
10           MR. HUSENY:  Just for the record, for me,
11  Will:  This is number 5; right?
12           MR. SEARS:  If Marilynn says so, sure.
13           MR. HUSENY:  Fair enough.
14           (Reporter request.)
15           MR. SEARS:  Okay.  I thought -- I mean,
16  these are four and five; right?
17           THE STENOGRAPHIC REPORTER:  Are they labeled
18  that way?
19           MR. SEARS:  Can we go off the record.
20           THE STENOGRAPHIC REPORTER:  Thank you.
21  Agreeable to go off the record?
22           MR. HUSENY:  Yes.
23           THE STENOGRAPHIC REPORTER:  We're off the
24  record.
25           (Off the record.)

Page 61

1            THE STENOGRAPHIC REPORTER:  We're back on
2  the record.
3       Q.  BY MR. SEARS:  All right.  So, for the
4  avoidance of doubt, Exhibit 5 is a document entitled
5  "defendant's privilege log, October 3rd, 2022."
6            Do you see that, Ms. Tobias?
7       A.  Yes.
8       Q.  And Exhibit 4 is the other document that we
9  introduced.
10           Do you have that one too?
11      A.  Which is that one?
12      Q.  It's a document entitled "defendant's
13  supplemental privilege log, January 6, 2023."
14           Do you have that one?
15      A.  I don't have it open, but I see it in the
16  chat.
17      Q.  Great.  So going to Exhibit 5, the October
18  3rd, 2022, log.
19           Do you have that one in front of you?
20      A.  Yes.
21      Q.  Have you seen this before?
22      A.  Yes, I have.
23      Q.  And this shows documents that were withheld
24  for privilege in this case; right?
25      A.  Right.

```
 1        Q.   And the first entry here is from May 11th,
 2   2021; right?
 3        A.   Yes.
 4        Q.   So there were no documents, prior to that
 5   date, that were withheld for privilege in this
 6   lawsuit; right?
 7             MR. HUSENY:  Objection.  Calls for
 8   speculation on this witness's part.
 9             MR. SEARS:  Sadik, I'm going to repeat my
10   request that you limit it to form and privilege.
11        Q.   BY MR. SEARS:  You can answer, Ms. Tobias.
12        A.   I didn't prepare the privilege log; my
13   lawyers did that.  They reviewed the documents that I
14   provided to them, that were responsive to your
15   requests.  So I can't tell you with certainty, sitting
16   here, what was -- you know, what their thought process
17   was or what the entire universe of documents was.
18        Q.   So the reason I'm asking you is this:  I
19   want to know if there were communications -- you don't
20   have to disclose the substance, but just yes or no --
21   were there communications at Live Nation about
22   switching from JAMS to New Era before this date, May
23   11th, 2021?
24        A.   I'm sorry.  Did you ask were there
25   communications between like myself and Michael Rowles,
```

```
 1   or communications at all?
 2        Q.   My question was:  Were there communications
 3   at Live Nation about switching from JAMS to New Era
 4   before this date, May 11th, 2021?
 5        A.   Oh, I don't know the answer to that
 6   question.
 7        Q.   Is it possible there were?
 8        A.   I mean, I guess so.  I couldn't tell you yes
 9   or no.  I don't know.
10        Q.   Were there communications at Ticketmaster
11   about switching from JAMS to New Era before this date,
12   May 11th, 2021?
13        A.   Again, I don't know the answer.
14        Q.   And I'm just asking because before I asked
15   for Live Nation, and I wanted to make sure your answer
16   covered Ticketmaster.  Fair enough?
17        A.   Fair enough.
18        Q.   Now, before this date, May 11th, 2021, did
19   you have discussions with Latham & Watkins about
20   switching from JAMS to New Era?
21        A.   Yes.
22        Q.   Okay.  And those are just not reflected on
23   this privilege log?
24        A.   Phone calls.
25             MR. HUSENY:  Object to form.
```

```
 1        Q.   BY MR. SEARS:  Okay.  Were there written
 2   communications between you and Latham & Watkins about
 3   switching from JAMS to New Era before this date, May
 4   11th, 2021?
 5        A.   Oh, I don't recall.
 6        Q.   Is it possible there were?
 7             MR. HUSENY:  Object.  Asked and answered.
 8             THE WITNESS:  I don't recall.
 9        Q.   BY MR. SEARS:  You just don't know one way
10   or another?
11        A.   That's my testimony.
12             MR. HUSENY:  Same objection.
13        Q.   BY MR. SEARS:  And that's why I introduced
14   the other privilege log as well.  You can look at that
15   if you like, but my understanding is that doesn't show
16   any prior communications either.
17             Is that --
18             MR. HUSENY:  Objection.  Not a question.
19             MR. SEARS:  Sadik, for the second time,
20   you've interrupted me as I was in the middle of a
21   question.  Please give me a chance to finish.  I would
22   appreciate it.
23        Q.   BY MR. SEARS:  Is that your reading of the
24   privilege log as well, Ms. Tobias?
25        A.   No.  Well, first of all, let me open the
```

```
 1   other one.
 2             Okay.  I see the other one.  Okay.  I have
 3   them both up.
 4             And your question was what, again?
 5        Q.   And you don't see any communications here
 6   that are logged before May 11th, 2021, do you?
 7        A.   I don't see that there were privileged
 8   documents that were withheld from the production, that
 9   were dated prior to 05/11/2021.
10        Q.   Okay.  And, now, 05/11/2021, do you recall
11   that's actually the day after there was a hearing on a
12   motion to compel arbitration in a lawsuit against
13   Ticketmaster and Live Nation?
14        A.   I don't recall.
15        Q.   Do you remember the Oberstein lawsuit?
16        A.   It's ongoing.  Of course I remember it.
17        Q.   Okay.  I -- And just for the record, what is
18   the Oberstein lawsuit?
19        A.   It is a putative class action lawsuit filed
20   by your firm against Live Nation and Ticketmaster.
21        Q.   And is it a coincidence that the first
22   privileged communication that's logged here is one day
23   after the hearing on the motion to compel arbitration
24   in Oberstein?
25        A.   I absolutely have no idea.
```

Case 2:22-cv-00047-GW-GJS    Document 142-1    Filed 03/22/23    Page 20 of 58    Page
ID #:2981

| Page 66 | Page 67 |
|---|---|

**Page 66**

1    MR. HUSENY:  Objection.  Assumes facts.
2    MR. SEARS:  Okay.  Sadik, I think you talked
3 over the witness.
4    Q.   BY MR. SEARS:  Ms. Tobias, can you repeat
5 your answer.
6    A.   I'll let him make his objection first, and
7 then I'll answer.
8    MR. HUSENY:  I think the reporter got it
9 all.  Thank you very much, Ms. Hoover.
10    But my objection was assumes facts.
11    Q.   BY MR. SEARS:  And, Ms. Tobias, your answer
12 was?  Just so I can hear it.
13    A.   Now you have to ask the question again.  I
14 apologize.
15    Q.   Is it a coincidence that the first
16 privileged communication that's logged here is one day
17 after the hearing on the motion to compel arbitration
18 in Oberstein, which is O-B-E-R-S-T-E-I-N?
19    MR. HUSENY:  Same objection.
20    THE WITNESS:  I have no idea.  I can't
21 answer that question.  I don't recall specifically
22 this communication.  What other communications were
23 going on at that place, at that time, or even the date
24 of the -- you said it was the hearing on a motion to
25 compel arbitration?  I don't recall any of that.

**Page 67**

1    Q.   BY MR. SEARS:  Do you recall -- Sorry.  Were
2 you finished?
3    A.   I said I don't recall any of the timing
4 there.
5    Q.   Did anything that was happening in the
6 Oberstein lawsuit have any effect on Live Nation and
7 Ticketmaster's decision to switch from JAMS to
8 New Era?
9    A.   I'm not going to answer that question.  I'd
10 be divulging privileged communications, in my legal
11 opinion, as in-house counsel.
12    Q.   So just to be clear:  You can't tell me
13 whether anything in the Oberstein lawsuit contributed
14 in any way to Live Nation and Ticketmaster's decision
15 to switch from JAMS to New Era?
16    A.   It doesn't get much more privileged than
17 that; so, no.
18    (Reporter request.)
19    MR. HUSENY:  Objection.  Privilege.
20    MR. SEARS:  Sadik, I think you're going to
21 be out of a job.  The witness is doing a good job
22 about taking care of herself in these.
23    Q.   BY MR. SEARS:  Now, do you remember the
24 first time that Latham had a discussion with New Era?
25    A.   I recall it was early May 2021.

| Page 68 | Page 69 |
|---|---|

**Page 68**

1    Q.   Do you recall what day it was specifically?
2    A.   I don't.
3    Q.   Let me ask you this:  Was it Latham &
4 Watkins that came to Live Nation and raised the idea
5 of reaching out to New Era, or was it Live Nation or
6 Ticketmaster that raised the idea?
7    MR. HUSENY:  Objection.  Calls for
8 privileged documents -- information.
9    Q.   BY MR. SEARS:  So you can't tell me whether
10 it was Latham's idea or Live Nation or Ticketmaster's
11 idea to begin discussions with New Era?
12    A.   No, because what you're asking me to
13 disclose is what the communications were between Live
14 Nation and its counsel.
15    Q.   Let me ask you this:  Just as a factual
16 matter, date or range of dates, when did you learn
17 about New Era?
18    A.   May of 2021.
19    Q.   How did you learn about New Era?
20    MR. HUSENY:  Objection.  Privilege.
21    Q.   BY MR. SEARS:  Let me ask you this:  Did you
22 learn about New Era from any source other than your
23 counsel at Latham & Watkins?
24    MR. HUSENY:  Same objection.
25    Q.   BY MR. SEARS:  I think I'm entitled to ask

**Page 69**

1 this, but I'll ask it a little differently.
2    I mean, did you -- did you learn about
3 New Era yourself, for example, from marketing
4 materials or Google?
5    A.   The way you've asked that question is a
6 clear attempt at end-running around figuring out if
7 Latham and I discussed New Era and that's how I
8 learned about it, so I'm not going to answer that
9 question.
10    MR. SEARS:  That was the only question I
11 asked that Sadik didn't object to.  Really?
12    THE WITNESS:  Hey, sorry.  Sorry, Sadik, I'm
13 not going there.
14    Q.   BY MR. SEARS:  So just to be clear:  You
15 can't or won't tell me how you learned about New Era?
16    A.   Nope.
17    Q.   You'll tell me it was May 2021, but you
18 won't tell me how?
19    A.   Correct.
20    MR. SEARS:  Okay.  Let me introduce our next
21 exhibit, which will be Exhibit 6.  And this is a
22 document produced by New Era, bearing Bates number
23 NEWERA_000220.
24    (Exhibit 6 marked.)
25    Q.   BY MR. SEARS:  Let me know when you have it,

1   Ms. Tobias.
2       A.   I do.
3       Q.   Have you seen this document before?
4       A.   I don't recall this document.  I don't think
5   I've seen it before.
6       Q.   It's not one of the ones that refreshed your
7   recollection?
8       A.   Not that I recall.
9       Q.   It's not a document, as best you can recall,
10  that you saw when preparing for this deposition?
11      A.   I mean, it could have been, but I don't
12  recall it specifically.
13      Q.   Let me ask you this, just yes or no:  Do you
14  have an understanding that there were exhibits
15  introduced in the New Era deposition a couple days
16  ago?
17      A.   I don't.  But I know how depositions work,
18  so I would assume so.
19      Q.   What I'm trying to get at:  Do you -- Do you
20  know whether you reviewed the exhibits from that
21  deposition or not?
22      A.   Not that I'm aware of.  I was never told
23  anything I was looking at was an exhibit to a
24  deposition, no.
25      Q.   Nothing had like an exhibit stamp on it?

1       A.   No, not that I recall.
2       Q.   Okay.  So you're not on this e-mail, but do
3   you see it's an e-mail from Mr. Mulrooney at New Era
4   and some folks at Latham & Watkins?
5       A.   Yes.
6       Q.   Including Ms. Jovais and Ms. Ferguson, who I
7   believe you told me were involved in the process of
8   vetting New Era?
9       A.   Yep.
10      Q.   And it's from May 4th, 2021; right?
11      A.   Yes.
12      Q.   I believe you told me earlier -- I'm not
13  trying to put words in your mouth; I just want to make
14  sure I understand -- that you authorized all of
15  Latham's communications with New Era.
16           Do I have that right?
17      A.   Yes.
18      Q.   You authorized this one?
19      A.   Yes.  All communications.
20      Q.   I mean --
21      A.   I was aware of all -- Sorry.  I was aware of
22  all the communications as they were ongoing.
23      Q.   As best you know, is this the first time
24  that -- Well, let me just ask you this:  If I'm going
25  to -- If I refer to Ms. Jovais, Ms. Ferguson,

1   Ms. Gushman, and Mr. Huseny, as "the Live Nation
2   litigation team," can we just call them that, going
3   forward, so I have a shorthand to talk about the
4   lawyers that are representing Live Nation and talked
5   to New Era?
6       A.   Let's call them the Latham litigation team.
7       Q.   It'd be better.  I just want to make sure we
8   have a shorthand.
9            So when we say "Latham litigation team,"
10  we'll understand that we're talking about Latham
11  lawyers that represent Live Nation.  Fair?
12      A.   Fair.  I mean, I may ask you to clarify
13  which lawyer you're speaking about, but I understand
14  generally that -- who you're referring to in general
15  when you -- if you use that phrase.
16      Q.   As best you know, is this the first time the
17  Latham litigation team spoke to New Era?
18      A.   Honestly, I'm assuming, based on the content
19  of the e-mail as I read it; but that's -- my
20  recollection of this is it's very early May, the first
21  conversation.  So I would say that's my understanding.
22      Q.   You certainly don't remember earlier
23  conversations between Latham and New Era?
24      A.   You mean earlier than May 4th?
25      Q.   Correct.

1       A.   I don't think so.
2       Q.   So remember, when we looked at the privilege
3   logs, there are no entries before May 11th, 2021.
4            Do you remember that?
5       A.   I do, yes.
6       Q.   So am I correct, then, that you had no
7   communications in writing with Latham & Watkins about
8   New Era between May 4th, 2021, and May 11th, 2021?
9       A.   That would appear to be the case.
10      Q.   Did you have phone calls -- not getting into
11  substance, just facts:  Did you have phone calls with
12  the Latham litigation team between May 4th and May
13  11th, 2021?
14      A.   Did I have phone calls with them during that
15  time?  Absolutely.  Of course.
16      Q.   Do you remember --
17      A.   There have been phone calls with our
18  litigation team.
19      Q.   You may have answered my question, but about
20  how many?
21      A.   Oh, I -- I couldn't tell you.
22      Q.   Let me ask you this:  About how many phone
23  calls or Zooms or non-written communications did you
24  have with the Latham litigation team about New Era?
25      A.   I have no idea.

Page 74

1    Q.   More than five?
2    A.   Again, "no idea" means I have no idea.
3    Q.   You can't give me a ballpark?
4    A.   No.   No.   It was a year ago or, what, almost
5    two years ago.   I have no recollection of how many
6    times we spoke.
7    Q.   All right.   And so we have the privilege log
8    which shows some of the written communications, but
9    you don't know how many oral communications there
10   were?
11   A.   Correct.
12   Q.   Now, I think you told me this, but the
13   negotiations by the Latham litigation team over the
14   subscription agreement, those were handled by Latham;
15   you weren't involved in those discussions with
16   New Era?
17   A.   I was not.
18   Q.   And your understanding of them comes from
19   speaking to the Latham litigation team?
20   A.   I was speaking with them in real-time as
21   those discussions were ongoing, yes.
22   Q.   And you may have told me this before, but
23   when you prepared for your deposition, did you speak
24   to the lawyers at Latham that were involved in those
25   discussions with New Era, like Ms. Ferguson and

Page 75

1    Mr. Jovais?
2    A.   Ms. Jovais.   Yes, Ms. Ferguson.   I believe
3    Ms. Jovais is on maternity leave.   I did not speak
4    with her.
5    Q.   I see.   She was on both of the preparatory
6    calls that you did?
7    A.   Ms. Ferguson was, yes.
8    Q.   Now, based on your understanding of the
9    negotiations between the Latham litigation team and
10   New Era, which side first proposed the idea of the
11   subscription agreement?
12   A.   So when you say "proposed the idea," it
13   suggests that that was something that was negotiated.
14   It wasn't.   That New Era -- New Era's platform, their
15   -- their offering is a subscription agreement.   It
16   wasn't a proposal by either side.   It is what it is.
17   Q.   So just to make sure I understand.
18         So there wasn't really another alternative.
19   When the Latham litigation team spoke to New Era, the
20   only option was a subscription agreement?
21   A.   That is how New Era works, yes.
22   Q.   Well, what do you mean, "that's how New Era
23   works"?
24   A.   New Era provides arbitration services.
25   Their pricing model is that the entity who enters into

Page 76

1    a subscription -- I mean, I'm sorry -- yeah, a
2    subscription agreement with them pays a subscription
3    fee for -- you know, for the services, for a
4    multi-year period.
5    Q.   As best you understand it from preparing for
6    the deposition, New Era operates on a subscription-fee
7    model for arbitration; is that right?
8    A.   Correct.   And my understanding is that it's
9    partially subscription.   There are times or
10   circumstances where some arbitrations might fall
11   outside of the subscription payment and would require
12   a separate fee, but by and large it's subscription.
13   Q.   The fact that New Era operates via a
14   subscription-fee model is different than JAMS; right?
15   A.   Correct.
16   Q.   JAMS doesn't have a subscription-fee model?
17   A.   Not that I'm aware of.
18   Q.   Has any ADR provider that Live Nation or
19   Ticketmaster has ever worked with operated with a
20   subscription-fee model like New Era's?
21   A.   We've only, as we testified -- as I
22   testified previously, we've only worked with, in our
23   terms of use, JAMS and New Era; so the answer is no.
24   JAMS doesn't have one.
25   Q.   So the subscription agreement was a new

Page 77

1    approach to arbitration by Live Nation and
2    Ticketmaster.   It wasn't something they'd done before?
3    A.   Correct.
4    Q.   And you weren't directly involved in any of
5    the discussions with New Era prior to the signing the
6    subscription agreement; right?
7    A.   No.   But I was very much kept in the loop as
8    to what the discussions -- how the discussions were
9    unfolding; but I had never had substantive
10   conversation with them, or any conversation with them
11   at all, until after the subscription agreement was
12   signed.
13   Q.   That was going to be my next question.
14         You didn't actually meet anyone from New Era
15   until after the agreement was signed?
16   A.   Correct.
17   Q.   And your understanding is that the
18   discussions between the Latham litigation team and
19   New Era often occurred via phone or Zoom?
20   A.   I actually don't know the answer to that.
21   Q.   When you -- Well, you said you authorized
22   them and got debriefs on them afterwards; right?
23   A.   Correct.
24   Q.   I mean, tell me how that process would work.
25         I'm not asking about substance, but would

Page 78

1  you generally get a debrief or a download if the
2  Latham litigation team had a call with New Era?
3      A.   Yes.  Or any communication with New Era,
4  they would update me after.
5      Q.   Would it be in writing or over the phone or
6  a combination of both?
7      A.   Most likely on the phone.  We spent a lot of
8  time on the phone.
9           MR. SEARS:  I'm going to introduce our next
10  exhibit, which I believe is Exhibit 7.
11          THE STENOGRAPHIC REPORTER:  Correct.
12          MR. SEARS:  Marilynn's going to keep me
13  honest, and I'm going to read the Bates number into
14  the record.  It's a document bearing Bates stamp
15  NEWERA_000004.
16               (Exhibit 7 marked.)
17      Q.   BY MR. SEARS:  Let me know when you have it,
18  Ms. Tobias.
19      A.   I have it.
20      Q.   Let me make sure I have it up.
21           So you see this is an e-mail dated July
22  15th, 2021, that involves you and some folks at
23  New Era?
24      A.   Yes.  If you could give me a second to read
25  through it.

Page 79

1               (Pause.)
2           THE WITNESS:  Okay.
3      Q.   BY MR. SEARS:  As best you can recall, is
4  this the first time that you were introduced to
5  New Era?
6      A.   Yes.
7      Q.   And in this e-mail -- And it's sent from
8  someone named Rich Lee.
9           You've met him?
10      A.   Yes.
11      Q.   And what's your understanding of his role at
12  New Era, if any?
13      A.   His signature block says he's CEO and
14  co-founder.
15      Q.   And here he says:  "Hi, Kim.  Thanks again
16  for taking time out of your day to meet with us."
17           Right?
18      A.   That's what it says, yes.
19      Q.   So this is after you had a call or a Zoom
20  with New Era?
21      A.   Yes.
22      Q.   And what did you discuss on that call or
23  Zoom?
24      A.   It was just logistics, setting up.  I
25  believe they asked for who on my team would need a

Page 80

1  login to access the platform.  Discussed how we would
2  be notified when we were served the new arbitration
3  demand.  It was a short call.
4      Q.   Is this one of the documents you reviewed in
5  preparing for your deposition?
6      A.   I do recall this document, yeah.
7      Q.   Is it one of the ones that refreshed your
8  recollection?
9      A.   Yeah, I actually didn't need my recollection
10  refreshed.  I recall -- I recall that conversation
11  with New Era.
12      Q.   And one of the things Mr. Lee says is:  "All
13  of us thoroughly enjoyed meeting you, and we're
14  thrilled and thankful that you believe in our vision
15  of bringing efficiency and pragmatism to dispute
16  resolution."
17           Do you see that?
18      A.   I do.
19      Q.   Did you have any discussions on this call
20  about the substance of New Era's rules and procedures?
21      A.   Not that I recall, no.
22      Q.   Did you have a discussion about their vision
23  of bringing efficiency and pragmatism to dispute
24  resolution?
25      A.   Not that I recall, no.

Page 81

1      Q.   In the process of considering whether to
2  switch from JAMS to New Era, did you personally review
3  New Era's rules and procedures?
4      A.   I did, yes.
5      Q.   And you told me, I believe, you wrote the
6  terms of use for Live Nation and Ticketmaster; right?
7      A.   Well, yes -- not single-handedly; with the
8  help of outside counsel -- but, yes, I'm responsible
9  for the terms.
10      Q.   Obviously, the terms of use and the rules
11  and procedures, they're different things, but you have
12  some understanding of the rules governing internet
13  conduct from working on the terms of use; right?  This
14  isn't something totally new for you?
15      A.   Correct.
16      Q.   So you reviewed New Era's rules and
17  procedures and developed an understanding of them?
18      A.   Yes.
19      Q.   That was something you felt that you needed
20  to do as part of deciding whether to switch from JAMS
21  to New Era?
22      A.   It's something I did.  What -- How I felt
23  about it, I won't -- I won't get into; but it is a
24  fact that I reviewed their rules and procedures.
25      Q.   That was something that was important for

1  Live Nation and Ticketmaster to do before switching to
2  a new ADR provider?
3       A.  Again, it's a fact that I reviewed their
4  rules and procedures.
5       Q.  Presumably, you didn't do it because it's
6  fun.  You did it for a reason.  Right?
7       A.  You can presume.  I just told you I reviewed
8  them.
9       Q.  Well, I mean, I'm asking you:  You didn't do
10 it for fun or on a whim or because you needed to kill
11 some time.  You did it for a reason.  Correct?
12      MR. HUSENY:  Objection.  Asked and answered.
13      THE WITNESS:  I mean, I'll stand by my
14 previous -- You can keep asking me about whether I had
15 a reason to do anything.  I'll just tell you my
16 running response is:  There's a reason for everything
17 I do.
18      So if you need me to testify to whether
19 there's a reason for why I reviewed rules -- look, of
20 course there's a reason why I reviewed rules.  I'm
21 in-house counsel for the company and I review
22 everything that I'm responsible for --
23      Q.  BY MR. SEARS:  Did Live Nation --
24      A.  -- that I'm involved in and responsible for,
25 period.

1       Q.  Thanks.  I'm sorry.  I didn't mean to
2  interrupt.  I thought you were done.
3       Did Live Nation or Ticketmaster do any kind
4  of comparative analysis of the JAMS rules and
5  procedures versus the New Era rules and procedures?
6       A.  A comparative analysis?  I wouldn't put it
7  that way.  I'm not sure what you mean by that.
8       Actually, can you explain what you mean by
9  "comparative analysis"?
10      Q.  Well, let me just ask you this, if the
11 "comparative" word is confusing:  Did Live Nation and
12 Ticketmaster do any analysis of New Era's rules and
13 procedures?
14      A.  For the record, I'm not confused by the word
15 "comparative."  I know what it means.
16      I will tell you that I am familiar with JAMS
17 rules and I'm familiar with New Era's rules.
18      Q.  All right.  Did Live Nation and Ticketmaster
19 do any analysis of New Era's rules?
20      A.  By that, do you mean did I?
21      Q.  We can start with that.  Sure.
22      A.  An analysis?  Based on my understanding of
23 that word, no, there was no analysis.
24      I reviewed their rules.  Beyond that, I
25 think I'd be disclosing my work product, wouldn't I?

1  I'm not going to answer anything beyond that.
2       Q.  Well, let me just ask you, yes or no, as a
3  factual matter:  Was there work product that Live
4  Nation or Ticketmaster prepared about New Era's rules
5  and procedures?
6       A.  Written work product that I prepared?
7       Q.  Yes.
8       A.  No.
9       Q.  Did Latham & Watkins prepare written work
10 product about New Era's rules and procedures?  Just
11 yes or no.
12      A.  I don't know.
13      Q.  None that you ever saw?
14      A.  I just said I don't know.
15      Q.  All right.  So you never saw any kind of
16 analysis from Latham & Watkins about New Era's rules
17 and procedures?
18      A.  I don't recall.  I don't know.
19      MR. HUSENY:  Objection.  Asked and answered.
20      THE WITNESS:  Yeah.  Sorry, Sadik.
21      MR. HUSENY:  That's fine.
22      Q.  BY MR. SEARS:  So it's possible they did one
23 and you forgot?
24      I'm just trying to tell if it's -- if you
25 can't remember or if it's just you don't know.

1       A.  As I testified, I actually don't know the
2  answer to your question, period.
3       Q.  Okay.  So there's nothing you saw on the
4  subject of an analysis of New Era's rules and
5  procedures?
6       A.  I don't recall.
7       Q.  Was it the topic of discussion, even if not
8  a topic of written work product?
9       MR. HUSENY:  Objection.  Vague.
10      THE WITNESS:  Also, I'm not going to
11 disclose what the -- the topics of my conversation
12 with Latham & Watkins.
13      Q.  BY MR. SEARS:  So you won't tell me if you
14 had a conversation with Latham & Watkins about the
15 New Era's rules and procedures?
16      A.  No.
17      Q.  Did you have a conversation with Latham &
18 Watkins about whether New Era's rules and procedures
19 were unconscionable?
20      A.  I'm not going to answer that question.
21 That's absolutely privileged.
22      Q.  Was there a written work product prepared
23 about whether New Era's rules and procedures were
24 unconscionable?
25      A.  Not that I recall.  I don't know.

1   Q.   So you don't recall written work product
2  about whether New Era's rules and procedures were
3  unconscionable, and you won't tell me if there were
4  conversations about that topic?
5       I just want to be sure I understand.
6       A.   To be clear:  I'm not going to disclose any
7  communications, the substance of them, with my
8  lawyers, whether -- you know, even if they -- if
9  there's work product that exists.  I'm not going to go
10 there.  It couldn't be more privileged, again.
11      Q.   Still looking at this e-mail:  Do you think
12 the -- Do you see the last line here, where Mr. Lee
13 says:  "Thank you for trusting us with your dispute
14 resolution needs"?
15      A.   I see that, yes.
16      Q.   Do Live Nation and Ticketmaster trust
17 New Era with their dispute resolution needs?
18      MR. HUSENY:  Objection.
19      THE WITNESS:  I mean, I don't even know how
20 to answer that question.  I can't speak on behalf -- I
21 mean, do I trust them?  Or who's Live Nation and
22 Ticketmaster?  Who are you referring to there, since
23 they're corporate entities?
24      Q.   BY MR. SEARS:  You're the 30(b)(6) on their
25 behalf; right?

1       A.   So you're asking me?
2       Q.   Yeah.
3       A.   So what's your question for me?  Do I trust
4  them with our dispute resolution needs?
5       My answer is:  We -- They are our designated
6  arbitration provider in our terms of use.  We have a
7  subscription agreement with them.  That's all I can
8  testify to.  I don't -- How I feel or whether I trust
9  them is certainly well outside the bounds of what
10 you're entitled to ask me as in-house counsel.
11      Q.   Okay.  So you won't tell me whether you
12 think New Era's rules and procedures are fair?
13      A.   No.  I -- I'm in-house counsel.  No.
14      Q.   You believe that's privileged?
15      A.   How I feel?
16      MR. HUSENY:  Objection.  One sec.
17      Objection.  You're asking the witness about
18 mental impressions and state of mind, and that is
19 privileged.
20      MR. SEARS:  I'm just trying to clarify.
21      I asked if the witness could tell me whether
22 New Era's rules and procedures are fair.  The witness
23 said no.
24      I'm trying to understand why she's not
25 answering the question.  That's all I'm getting at.

1       Q.   BY MR. SEARS:  If it's because you believe
2  it's privileged, I'd just like to know.
3       A.   I don't just believe it's privileged.  It's
4  about as privileged, again, as it gets.
5       You're asking me, as in-house counsel, how I
6  feel and what my thoughts and mental impressions are.
7  It's privileged.  I'm not answering it.
8       Q.   Okay.  I hope you understand.  I have to ask
9  these questions --
10      A.   I get it.
11      Q.   -- to understand what the privilege is.  I
12 hope I'm not frustrating you.  That's why -- That's
13 why I'm asking the questions this way.
14      Do you know whether Latham & Watkins
15 commented on New Era's rules and procedures?
16      A.   They did not.
17      Q.   Do you know whether New Era's rules and
18 procedures were finalized, as of early May 2021, when
19 Latham & Watkins began discussions with New Era?
20      A.   My recollection is that they were largely
21 final but they had not been posted on their website
22 and publicly available, but largely final.
23      Q.   What do you mean by "largely final"?
24      A.   I -- They were essentially in final form, is
25 my understanding.

1       Q.   And what part of them was not final?
2       A.   I don't know.  You'd have to -- That's a
3  New Era question.  I'm -- I don't know.  I don't know
4  the answer to that question.
5       Q.   I'm just trying to understand:  How did you
6  derive an understanding that the rules were being
7  mostly final but not quite?
8       Was that something that was communicated by
9  Latham or your own review of the rules?
10      A.   No, I'm sorry.  What I was -- What -- My
11 testimony here is that I would not consider anything
12 final until it's made publicly available.  I know it
13 was made publicly available, gosh, on their website, I
14 want to say, you know, late June.
15      I don't know when they were final.  I had
16 nothing to do with, nor did Latham, with their rules
17 and procedures and their process for drafting them or
18 when they were final.  I don't know.  I don't know.
19 You need to ask New Era that question, when they were
20 final.
21      Q.   Well, let me ask you this:  Based on your
22 understanding, the New Era rules and procedures were
23 not published at the time that Latham & Watkins was
24 negotiating the subscription agreement with them?
25      A.   I believe that's true.

1    Q.    Now, you told me earlier that Latham &
2  Watkins didn't comment on the rules and procedures.
3         Do you remember that?
4    A.    And -- Yes.  You mean comments to New Era
5  and providing feedback?
6    Q.    Yes.
7    A.    They did not.
8    Q.    I guess they may have commented to you on
9  the rules and procedures, but I understand you would
10  assert privilege over that; correct?
11    A.    Correct.
12    Q.    Okay.  Now focusing on Latham & Watkins and
13  New Era.  Are you with me?
14    A.    Yes.
15    Q.    How did you develop your understanding that
16  Latham & Watkins didn't comment on the rules and
17  procedures?
18    A.    That's privileged.
19    Q.    Did your lawyers tell you that?
20         MR. HUSENY:  Objection.  That's privileged.
21  You just asked her what her lawyers told her.
22         MR. SEARS:  You can just say "objection,
23  privilege," Sadik.  You've been doing so well for the
24  past half hour.  I was so proud of you.  I'll ask it
25  again.

1         MR. HUSENY:  Because you moved to facts
2  rather than privilege, and now you're back to
3  privilege, Will.
4         I was proud of you too.  Let's -- Let's move
5  on and try to keep it to the facts.
6    Q.    BY MR. SEARS:  So my next question is:  I
7  mean, is there some other source of information, other
8  than the Latham litigation team, that developed your
9  understanding that Latham didn't comment on the rules
10  and procedures?
11    A.    So here we're back, you're doing that -- and
12  I get it; I know you have a tough job here -- but
13  you're doing the exact same thing you did with the
14  prior line of questioning, where you're trying to do
15  an end run in figuring out what my conversations were
16  with Latham by asking if anyone else told me this fact
17  that you're assuming to be true.
18         I'm not going to explain how or why I know
19  anything here on this topic.
20    Q.    Okay.  Well, I appreciate the constructive
21  feedback on my deposition.
22    A.    Hey, I'm trying to move it along, Will.  I
23  know none of us want to be here.
24    Q.    I will just ask one more question.
25         You won't tell me how you know that Latham

1  didn't comment on New Era's rules and procedures?
2    A.    No.
3    Q.    Now, you understand, within New Era's rules
4  and procedures, that they're sort of general rules at
5  the beginning; right?
6    A.    Can you clarify that question.
7    Q.    Well, what I was going to ask is:  You
8  understand there's a subset of the rules about mass
9  arbitrations?
10    A.    There are mass -- There are rules that apply
11  to mass arbitrations, yes.
12    Q.    Right.  There are -- There sort of a
13  general set of rules for New Era, then there is a
14  subset about mass arbitrations.
15         Is that your understanding?
16    A.    That's my recollection, yeah.
17    Q.    Now, when we were talking about the rules
18  being finalized, you said that the rules in general
19  were essentially finalized by the time Latham was
20  talking to New Era?
21    A.    They were published after -- before we
22  signed the subscription agreement.
23    Q.    Wait.  The rules were published before you
24  signed the subscription agreement?
25    A.    Yes.

1    Q.    Just give me a moment here.
2    A.    I'm sorry.  Before we went -- Let me correct
3  that.
4         Before we pub -- Before we officially made
5  the change to New Era on our -- on our terms of use,
6  that they had been published; so we -- I confirmed the
7  rules were as I thought they would be.
8         I just need to change my testimony there.
9  By the time we posted them publicly on our website,
10  they had been published on New Era's website.
11         MR. SEARS:  Yeah, I'll just introduce our
12  next exhibit -- which, Marilynn, would you remind me
13  which number this is?
14         THE STENOGRAPHIC REPORTER:  Exhibit 8.
15         MR. SEARS:  This will be Exhibit 8.  It's a
16  document bearing Bates number NEWERA_000327.
17              (Exhibit 8 marked.)
18         THE WITNESS:  Yes, I see it.
19    Q.    BY MR. SEARS:  And is this a document you've
20  seen before, Ms. Tobias?
21    A.    I can't recall if I've seen this one in
22  particular.
23    Q.    You don't remember if it's one you saw
24  during deposition prep?
25    A.    I don't recall.

| Page 94 | Page 95 |
|---|---|
| 1    Q.  Do you see it's another e-mail between | 1    A.  I don't recall. |

1    Q.   Do you see it's another e-mail between
2  New Era and Latham?
3    A.   Yes.
4    Q.   And it's dated June 21st, 2021?
5    A.   Yes.
6    Q.   That's the date the subscription agreement
7  was signed.
8         Am I right about that?
9    A.   I believe it was signed June 22nd, 2021.
10   Q.   So this is one day before?
11   A.   Yes.
12   Q.   I see.  And this is -- Based on this e-mail,
13 that's the date that the rules and procedures were
14 published on the website?
15   A.   Yes.
16   Q.   So the rules and procedures by New Era were
17 published one day before Live Nation and New Era
18 signed the subscription agreement?
19   A.   Again, yes.
20   Q.   Now, earlier, remember we were talking about
21 the mass arbitration provisions and the New Era rules?
22   A.   I remember you asked me about them, yes.
23   Q.   Were those rules finalized, or essentially
24 finalized, at the time when Latham began talking to
25 New Era in May 2021?

1    A.   I don't recall.
2    Q.   You just don't know one way or another?
3    A.   No.
4    Q.   Did you have an understanding and you can't
5  remember, or do you just never know?
6    A.   I just don't know the answer.
7         MR. SEARS:  All right.  We'll mark our next
8  exhibit.
9         THE STENOGRAPHIC REPORTER:  Exhibit 9.
10        (Exhibit 9 marked.)
11   Q.   BY MR. SEARS:  This is Exhibit 9.
12   A.   This one is taking a minute.  Hold on.
13        Hmm.  There we go.  Okay.  It's downloading
14 now.
15   Q.   So Exhibit 9 is a document bearing Bates
16 number NEWERA_000184.
17   A.   Yeah, give me one second.  It's still
18 opening.  Wow.  Some of them take a while.  It's not
19 -- Hold on.
20        Oh, here we go.  Okay.  I have it open.
21   Q.   Okay.  And I'll just -- I'll tell you, for
22 you and Mr. Huseny's benefit:  So this is a family of
23 documents produced by New Era.
24        Do you see at the beginning it's a draft of
25 the subscription agreement?

1    A.   Yes.
2    Q.   And if you scroll down to about page 15 of
3  the PDF, you'll see an e-mail that attaches the
4  subscription agreement.
5         Do you see that?
6    A.   I'm not there.  Hold on.  Okay.
7    Q.   And then if you scroll down, you'll see
8  another attachment at the end.
9    A.   Oh, yes.
10   Q.   I'll just represent to you that my
11 understanding is that this e-mail on page 15 is what
12 attaches the subscription agreement and the other
13 document.
14        As I explained earlier, there were some
15 issues with how New Era produced the documents, but my
16 understanding is that this is all part of a family:
17 This is the e-mail, and the other two documents are
18 the attachments.
19        Does that make sense?
20   A.   I'll take your word for it.
21   Q.   And do you see that, in substance, this is
22 an e-mail from Mr. Mulrooney at New Era to the Latham
23 litigation team, attaching a draft of the subscription
24 agreement and something called "mass arbitration
25 rules"?

1    A.   Yes.
2    Q.   As best you know, is this the first draft of
3  the subscription agreement that was sent by New Era to
4  Latham?
5    A.   I actually don't know.
6    Q.   Do you recall a prior draft?
7    A.   I would -- Honestly, I would have to review
8  all of the drafts and compare and contrast.  I don't
9  know the answer to that question.
10   Q.   Let me ask you this:  Did you -- Do you
11 recall, at this time, May/June 2021, reviewing a few
12 drafts of the subscription agreement?
13   A.   I'm trying to recall if I was reviewing
14 drafts or just having discussions with counsel.  My
15 recollection is that I did not review the drafts until
16 they were -- until it was close to final.
17   Q.   That -- You actually anticipated my next
18 question.
19        Do you remember the first time you reviewed
20 a draft?
21   A.   I believe it was when it was close to final.
22   Q.   Could you give me, I mean, even a ballpark
23 date range?  Was that like June or late May?
24   A.   That would probably be June, but I'd be --
25 I'd be guessing.

Page 98

1    Q.   So, as best as you recall, you didn't review
2  this draft of the subscription agreement from May
3  12th, 2021?
4    A.   I -- you know, I don't -- I don't think I
5  did.
6    Q.   Did you review this document in preparing
7  for your deposition?
8    A.   I don't think so.
9    Q.   So, as far as you know, you actually haven't
10  seen this draft of the subscription agreement before?
11    A.   I couldn't tell you with certainty whether
12  I've seen this particular draft.
13    Q.   But it's not something you remember being
14  prepared to testify on for your deposition?
15    A.   Each individual draft, no.
16    Q.   How -- Well, let me ask you this:  Did you
17  review drafts of the subscription agreement when
18  preparing for your deposition?
19    A.   Actually, I don't recall reviewing drafts;
20  just the subscription agreement, the executed
21  subscription agreement.
22    Q.   So you reviewed the final draft to prepare
23  for your deposition, but not the interim drafts?
24    A.   That's my recollection.
25    Q.   Are you prepared to testify about the

Page 99

1  drafting process generally?
2    A.   Yes.
3    Q.   And is your understanding of the drafting
4  process generally something you developed in real-time
5  when it was happening or something that you prepared
6  to do for this deposition?
7    A.   In real-time as it was happening.
8    Q.   Okay.  And you also -- did you also prepare
9  for it as part of your deposition?
10    A.   I'm sorry.  What was your question?  Did I
11  prepare?
12    Q.   Is this also a topic that you prepared to
13  testify on as part of your deposition prep?
14    A.   Generally, yes.
15    Q.   Okay.  So, I mean, do you know, based on
16  this e-mail or otherwise, who prepared the first draft
17  of the subscription agreement at Latham or New Era?
18    A.   New Era did.
19    Q.   Okay.  And you got downloads from Latham at
20  the time; so, even if you didn't see a draft, you may
21  have discussed it with them?
22    A.   Yes.
23    Q.   And I believe you told me this before, but
24  it was -- it was New Era's idea to do subscription
25  pricing because that's how New Era's business model

Page 100

1  works?
2    A.   Yes.
3    Q.   That wasn't something that Live Nation or
4  Ticketmaster proposed?
5    A.   Correct.
6    Q.   Now, you mentioned the pricing model
7  earlier.
8       Do you remember that?
9    A.   Yes.
10    Q.   Okay.  What is your understanding of the
11  pricing model?
12    A.   In terms of -- Are you asking generally how
13  it works or the amounts paid?
14    Q.   Generally how it works.
15    A.   Generally, we pay in our subscription
16  agreement a certain amount of money that is
17  predetermined, that was determined at the time we
18  signed the agreement, over the term of the agreement,
19  which is five or six years.  The first year is
20  ████████, and that covers all mass arbitrations that
21  are filed against the company and up to 50 standalone
22  arbitrations.  And then the price each year, for the
23  first few years, goes up by a ████████ and then it
24  levels off the final two years of the agreement, of
25  the period.

Page 101

1    Q.   And you mentioned that the agreement can
2  extend over a period of years.
3       Is your understanding that it's broken up
4  into one-year terms?
5    A.   I believe there are -- it is a -- it is for
6  a term of years, but both parties have termination
7  rights.
8    Q.   So, for example, Live Nation could
9  unilaterally terminate the agreement after one of the
10  years?
11    A.   Yes.
12    Q.   If it was unhappy with New Era, it could
13  tear up the agreement?
14    A.   I believe so, yes.
15    Q.   And -- Now, we were talking about the model
16  earlier.
17       I mean, what is your understanding of how
18  the model relates to subscription pricing?
19       Does the model calibrate subscription
20  pricing based on factors or is it something else?
21    A.   I'm sorry.  I don't understand your
22  question.  My understanding of what?
23    Q.   You mentioned a pricing model earlier;
24  right?
25    A.   Yes.

**Page 102**

1  Q.  That's a New Era pricing model?
2  A.  Yes.
3  Q.  All right.  What is your understanding of
4  what the model does and how it works?
5  A.  I thought I just answered that.
6  Q.  Let me ask it again.  I just want to make
7  sure.
8  What is your understanding of how -- Well,
9  let me ask this:  You told me about the subscription
10  payments and how they work over a period of time;
11  right?
12  A.  Correct.
13  Q.  My question is like about the model, like
14  what does the model do?
15  Is the model what comes up with that number,
16  or is it something else?  I'm asking because you
17  mentioned it earlier.
18  A.  I'm sorry.  The model comes up with that
19  number?
20  Q.  How does the number -- How does the model,
21  the pricing model that you mentioned, relate to the
22  subscription pricing in the agreement, if at all?
23  A.  I'm sorry.  I really don't understand what
24  you're asking.  I can try to explain it again.
25  Q.  Let me ask you this:  When you -- When you

**Page 103**

1  say "the model," are you talking about like an Excel
2  spreadsheet that spits out numbers, or are you talking
3  about generally how the subscription agreement works
4  and what the price is each year?
5  A.  Yeah, no.  When I say "pricing model," I
6  mean the pricing terms in the contract.
7  Q.  Now I understand.  That's where --
8  A.  Oh, okay.
9  A.  We were like two ships passing in the night.
10  A.  Oh, okay.  I wasn't sure --
11  Q.  Are you aware of any internal pricing model
12  at New Era?
13  A.  Oh, no.  No.
14  Q.  Okay.  That was my -- That was my confusion.
15  Thank you.
16  A.  Okay.
17  Q.  So does Ticketmaster or Live Nation have
18  internal discussions -- just yes or no -- about the
19  subscription pricing model with New Era?
20  A.  Yeah, I had discussions with our chief
21  financial officer, informing her of the deal.
22  Q.  So you had discussions with business people
23  at Ticketmaster and Live Nation about the subscription
24  pricing model?
25  A.  Not a discussion.  More informing our CFO

**Page 104**

1  that what -- that we had signed a subscription
2  agreement and a payment would need to be paid.
3  Q.  And when did you inform the CFO of that?
4  A.  Probably right before we signed the
5  agreement, making sure she was on board to pay the
6  subscription cost.
7  Q.  Did you inform the CFO because you needed
8  authorization from the CFO for something, or was it
9  more of a heads-up?
10  A.  Authorization under our financial
11  requirements for the company.
12  Q.  And what was it that triggered the
13  authorization?  Just help me understand that.
14  A.  I need approval from our CFO before entering
15  into an agreement that is above a certain threshold in
16  cost.
17  Q.  What's the threshold?
18  A.  It depends on the agreement.  Settlement
19  agreements are different than contracts.  I believe
20  contracts like this are, I believe, $250,000.
21  Q.  So because it's ████ for the first year
22  of the subscription agreement, you needed
23  authorization from Live Nation's CFO to enter it?
24  A.  Correct.
25  Q.  And authorization was given?

**Page 105**

1  A.  Yes.
2  Q.  Were there e-mail communications about
3  those?
4  A.  I believe I sent an e-mail to our CFO, Kathy
5  Willard, yeah, seeking authorization.
6  Q.  Now, previously, remember when you were
7  telling me that Live Nation and Ticketmaster used to
8  use JAMS?
9  A.  I do remember that.
10  Q.  Did you ever need authorization from the CFO
11  to enter into an agreement with JAMS?
12  A.  Ticketmaster did not have an agreement with
13  JAMS.
14  Q.  Was there any point at which Ticketmaster or
15  Live Nation needed authorization from the CFO with
16  respect to anything with JAMS?
17  A.  Yes.  Before paying their hefty fees for
18  arbitrations, yes.
19  Q.  I mean, were there specific examples of
20  where that happened, or is that just more of a -- more
21  of a general thing?
22  A.  No, just in general.
23  Q.  I mean -- Okay.  Was there a recent time
24  where you recall having to go to the CFO to get
25  authorization for something with respect to JAMS?

1    A.   With respect to a payment being made to
2  JAMS?
3    Q.   Yeah.
4    A.   Yeah.  A recent settlement.
5    Q.   Oh, okay.  Was that after -- I assume that
6  was before switching to New Era?
7    A.   No.
8    Q.   Was this a non-consumer case, then, such
9  that it was not subject to the terms of use?
10   A.   Yes.
11   Q.   Does Live Nation or Ticketmaster still use
12 JAMS for non-consumer arbitrations?
13   A.   In limited circumstances, yes.
14   Q.   Like what?
15   A.   Employment cases that have been pending for
16 some time.
17   Q.   Let me ask you this:  Live Nation and
18 Ticketmaster, are they generally transferring their
19 ADR needs to New Era as opposed to JAMS or other
20 providers, or does New Era more handle the consumer
21 disputes?
22   A.   Generally making -- We're generally making
23 the switch.
24   Q.   Are there cases, that are not legacy cases,
25 that predate the switch to New Era, that Live Nation

1  and Ticketmaster use JAMS for?
2    A.   You mean do we have any existing pending
3  JAMS arbitrations right now?
4    Q.   I'm actually -- I'm kind of asking the
5  opposite.
6         I'm asking if Live Nation or Ticketmaster
7  have begun or been involved in any JAMS arbitrations
8  that started after July 2021.
9    A.   I can't recall.  I believe -- I can't recall
10 specifically the dates.
11   Q.   I mean, in general, does Live Nation or
12 Ticketmaster still use JAMS sometimes, even after
13 switching to New Era in the terms of use?
14   A.   Yes.
15   Q.   And you mentioned this a little bit before,
16 but like what would those circumstances be?
17        Would it be an agreement with an arm's
18 length counterparty that calls for JAMS, or something
19 else?
20   A.   With JAMS specifically, in the last year or
21 two, I can recall a couple of employment cases, as I
22 had mentioned.
23   Q.   And why does Live Nation or Ticketmaster use
24 JAMS for employment cases?
25        MR. HUSENY:  Objection.

1         THE WITNESS:  Because that is the legacy
2  provider that's designated in our employment
3  contracts.
4    Q.   BY MR. SEARS:  And you say "legacy."
5         Is it still designated in the employment
6  contracts, or have those switched to New Era?
7    A.   I don't believe -- I believe we made the
8  switch, but I -- my colleague handles the employment
9  contracts, and I can't recall if she made the switch.
10   Q.   Okay.  What I'm trying to get at here is:
11 Is Live Nation or Ticketmaster generally sending all
12 new cases to New Era, or are there new arbitrations
13 that still get filed that Live Nation or Ticketmaster
14 are using JAMS for?
15   A.   I see where you're getting at, and I feel
16 like I've answered it.
17        So we have had arbitrations filed through
18 JAMS because we have employees who have been with the
19 company and signed their contract longer than two
20 years ago, or, you know, a while ago.  Those are run
21 through JAMS.  I don't know how else to answer that.
22   Q.   Okay.  I mean, does JAMS do a capable job of
23 handling those cases?
24   A.   Incredibly expensive.
25   Q.   And is that, what, arbitrator fees or

1  something else?
2    A.   Yes.  The fees to use JAMS can run up to
3  $200,000 for one arbitration.
4    Q.   Okay.  And the -- So the subscription
5  pricing under the subscription agreement is ████████
6  for the first year?
7    A.   Correct.
8    Q.   How is that number arrived at by Live Nation
9  and New Era?
10   A.   That was the price that New Era gave us,
11 that said, "█████████████████████████████████
12 ████████████████████████████████
13   Q.   I mean, what do you mean by "███████
14 ████████████████████████████████████████
15 ████████████████████████████████?
16   A.   Yes.
17   Q.   And how, if at all, did that affect the
18 price as you understand it?
19   A.   That I don't know.  That's New Era.  That
20 was an internal New Era decision.  I -- We weren't --
21 I wasn't a part of those discussions internally at
22 New Era.
23   Q.   But were there back-and-forth discussions
24 between the Latham litigation team and New Era about
25 subscription pricing?

| Page 110 |
|---|

```
 1      A.   There -- There were, yes.
 2      Q.   And did they haggle back and forth on the
 3 price term?
 4      A.   I don't believe so.  I believe New Era said,
 5 "This is the price," and we accepted it.
 6      Q.   So you still have this draft of the
 7 subscription agreement in front of you?
 8      A.   Yes.
 9      Q.   If you just -- If you turn to the last page
10 of the subscription agreement, so not the other
11 attachment in the e-mail but the subscription
12 agreement, which is Bates number ending 197.
13           Let me know when you're there.
14      A.   Okay.  I'm there.
15      Q.   All right.  Do you see there's a section on
16 pricing here?
17      A.   Yes.
18      Q.   And it's blank in this draft?
19      A.   Yes.
20      Q.   This is before there had been discussions
21 about price?
22      A.   Well, I don't know if this was before
23 there'd been discussions.  I just know there's no
24 price here.
25           MR. SEARS:  Okay.  I'm going to mark our
```

| Page 111 |
|---|

```
 1 next exhibit.
 2           THE STENOGRAPHIC REPORTER:  Exhibit 10.
 3           (Exhibit 10 marked.)
 4      Q.   BY MR. SEARS:  Exhibit 10 is a document
 5 bearing Bates number NEWERA_000432.
 6      A.   Okay.  I have it open.
 7      Q.   Okay.  Ms. Tobias, do you see that this is
 8 an e-mail from June 2nd, 2011, from Mr. Mulrooney to
 9 the Latham litigation team, with a couple of other
10 New Era folks copied?
11      A.   June 2nd, 2021.  Yes, I see it.
12      Q.   And it's attaching an updated subscription
13 agreement draft; right?
14      A.   Correct.
15      Q.   Now, is this a draft that you reviewed
16 before?
17      A.   Oh, I couldn't tell you.  Same as before, I
18 could not tell you which -- what -- which of these
19 drafts.  I can't tell the difference between this
20 draft and the prior draft, without comparing every
21 word.
22      Q.   But as you told me before, you didn't look
23 at the drafts when preparing for your deposition?
24      A.   Not in -- Not in detail like this, no, not
25 to know the differences among the drafts.
```

| Page 112 |
|---|

```
 1      Q.   I mean, did you -- I'm not trying to be
 2 pedantic, but did you look at them at all?
 3           I understood you hadn't reviewed the
 4 drafts --
 5      A.   No.
 6      Q.   -- to prepare for your deposition.
 7           Was it a cursory review when you had the
 8 document, or you just didn't look at it?
 9      A.   I didn't look at them.
10      Q.   Why don't you turn to page bearing Bates
11 number 446.  It's near the end of the document.
12      A.   Sorry.  Do you have a question?
13      Q.   Yeah.  Are you there?
14      A.   Yeah, I'm here.
15      Q.   Oh, okay.  Great.  I'm going to ask you
16 about pricing.
17           Do you see the section about "pricing and
18 refunds"?
19      A.   Yes.
20      Q.   Now, here there's a mention of a
21 subscription fee.
22           Do you see that?
23      A.   Yes.
24      Q.   That's what we were talking about earlier?
25      A.   Yes.
```

| Page 113 |
|---|

```
 1      Q.   And it's an annual fee and it's bracketed as
 2 a range of ███████ to ███████; right?
 3      A.   Yes.
 4      Q.   I mean, what's your understanding of what
 5 those numbers mean in this draft?
 6      A.   I don't have one.  My -- My guess is that
 7 they're saying that the range would be somewhere
 8 between ███████ and ███████.
 9      Q.   Okay.  So it wasn't like they just said,
10 "The price is ███████."  They actually came to the
11 Latham litigation team with a range?
12      A.   I don't know.
13      Q.   Which is not something you're prepared to
14 testify about?
15      A.   Specifically whether they came to Latham
16 with a range?  I'm prepared to testify that that's --
17 Yes, that's my understanding.  I don't -- I can't tell
18 you -- Yeah, no.
19           Okay.  I do know that they -- they must have
20 -- that they did come to Latham with a range, that'd
21 it be somewhere within this area, and that New Era
22 wanted to see ██████████████████████████ to
23 determine where we would fall in that range.
24      Q.   Okay.  I'm just asking -- Before, I thought
25 you had told me that they had started with the
```

Page 114

```
 1   ████████ number, and it looks from this like it was
 2   really more of a range.
 3            Is your understanding that it was more of a
 4   range?
 5        A.  It is now, looking at this document.  I just
 6   know that the price they gave us was ████████.
 7        Q.  Did you have discussions with Latham -- just
 8   yes or no -- about the pricing for the subscription
 9   agreement?
10        A.  Yes.
11        Q.  Do you know how it came to be that the
12   subscription agreement went from a range of ████████
13   to ████████ to a final number of ████████████████
14        A.  Yes.  ██████████████████████████████████████
     ██████████████████████████████████████████████████
     ██████████████████████████████████████
17        Q.  ████████████████████████████████████████████
     ██████████████████████████████████████████████████
     ██████████████████████████████████
20        A.  Yes.
21        Q.  And that was something New Era did?
22        A.  Yes.
23        Q.  You don't know how they did it, but you know
24   they did it?
25        A.  Yes.
```

Page 115

```
 1        Q.  I mean, at any point, did Latham ask them
 2   how they were coming up with those numbers, as best
 3   you know?
 4        A.  I don't -- I don't know.
 5        Q.  You're just not sure?  It's not something
 6   you covered in deposition prep?
 7        A.  I -- Yeah, I don't know.  We didn't cover
 8   it.  I don't know how -- whether Latham asked them how
 9   they came up with that figure.
10        Q.  So you don't really know the history of
11   getting from the ████████████████████ range to the
12   final figure of ████████████?
13        A.  No -- No, I do know the history.  You were
14   asking me additional --
15            The history is this:  New Era said that they
16   determine the pricing for any particular subscription
17   agreement based on ████████████████████████████████
     █████████████████████████████████████████████████████
20            They said the range was somewhere, as you
21   see here, between████████████████.  They asked
22   us for those numbers, we provided them, and they came
23   back with a number of ████████████.
24            Beyond that, how New Era on their end
25   figured ████████ was the right number based on ████
```

Page 116

```
 1   ████████████████, that's a question for New Era.
 2   We have no insight into that.
 3        Q.  Okay.  But, to the best of your
 4   understanding, it was based largely or at least
 5   somewhat on ████████████████████████████████████████
     ██████████████████████████████████████████████
 7        A.  It was based entirely on that.
 8        Q.  And that's data that Live Nation and
 9   Ticketmaster through Latham provided to New Era;
10   right?
11        A.  Yes.
12        Q.  It affected the pricing for the subscription
13   agreement?
14        A.  It didn't just affect it; it determined the
15   price.
16        Q.  But -- And that's data that you pulled
17   together for this purpose; right?
18        A.  Yes.  We've discussed that ad nauseam.  Yes.
19        Q.  But you can't tell me what the data shows,
20   sitting here today?
21        A.  No.  I'll tell you it varies.  It varied
22   over, you know, each year; the number changed very
23   significantly.  But I can't recall with specificity
24   what the numbers look like on any given -- in any
25   given year.
```

Page 117

```
 1        Q.  Can you flip back a couple pages to Bates
 2   number 442, and just let me know when you're there.
 3        A.  I'm there.
 4        Q.  Do you see that there's a "governing law,
 5   submission to jurisdiction" section?
 6        A.  Yes.
 7        Q.  Do you see that the gist of this is that
 8   this is proposing that disputes involving the
 9   agreement will be resolved through New Era?
10        A.  Yes.
11        Q.  Now, that's a term that changed in the
12   final draft; right?
13        A.  Yes.
14        Q.  Why?
15        A.  Why was it changed?  We didn't agree with
16   that provision.
17        Q.  Why not?
18        A.  We didn't like it.
19        Q.  Why didn't you like it?
20        A.  I'm not going to tell you what my -- I mean,
21   Sadik, I'm not willing to talk about how -- go into
22   that.
23            MR. HUSENY:  That's correct.
24            Objection.  Privileged.
25        Q.  BY MR. SEARS:  Okay.  So just to be clear:
```

Page 118

```
1   You won't tell me why Live Nation and Ticketmaster
2   didn't want to use New Era as the platform to resolve
3   any disputes about the subscription agreement?
4           MR. HUSENY:  Same objection.
5           THE WITNESS:  Yeah, that would be disclosing
6   my -- my own thought process as counsel.
7       Q.   BY MR. SEARS:  It was a legal concern or a
8   legal issue?
9       A.   This is a legal agreement, yeah.  It's a
10  contract.
11      Q.   Give me a moment.
12           If you'll look at page Bates number 440.
13  Just let me know when you're there.
14      A.   Okay.  I'm there.
15      Q.   Do you see the term and termination period?
16      A.   Yes.
17      Q.   Is that -- That's blank here; right?
18      A.   Yes.
19      Q.   It hadn't been decided yet?
20      A.   Looks like it had not been finalized, yes.
21      Q.   And did Live Nation and Ticketmaster have
22  discussions about what the term of the subscription
23  agreement would be?  Just yes or no.
24      A.   Yes.
25      Q.   Would you consider those discussions
```

Page 119

```
1   privileged?
2       A.   Yes.  They were discussions I had, yes.
3       Q.   Now, I'm trying to move us along here, so
4   let me just -- let me just tell you:  My understanding
5   is that it's blank here, there's another agreement
6   where it's ten years, and it ultimately ends up being
7   five years.
8           As a factual matter, does that sound right?
9       A.   That's my recollection.
10      Q.   But I take it you won't tell me, on the
11  basis of privilege, how it came to be that it went
12  from blank to ten years to five years?
13      A.   No.
14      Q.   You won't tell me how Live Nation and
15  Ticketmaster ultimately settled on a term of five
16  years for the subscription agreement?
17           MR. HUSENY:  Objection.  To the extent
18  you're asking her about internal discussions, I think
19  that's correct; but your questions are now -- are now
20  vague.
21      Q.   BY MR. SEARS:  Well, let me just ask you
22  this:  I mean, did Live Nation and Ticketmaster have
23  internal discussions about the term of the
24  subscription agreement?
25      A.   So what do you mean by "internal
```

Page 120

```
1   discussions"?
2           Do you mean did I have a discussion with
3   someone at Live Nation and Ticketmaster, as opposed to
4   Latham?
5       Q.   Yes.  I was really trying to address
6   Mr. Huseny's objection.  That was the word he used, so
7   hopefully we're all clear on it.
8       A.   So, no, I did not have a discussion with
9   someone internal at Ticketmaster or Live Nation about
10  this contract negotiation.
11      Q.   No discussions, period, with anyone at
12  Ticketmaster or Live Nation about the subscription
13  agreement?
14      A.   That's not what I said.  I said about the
15  negotiation of the agreement.  So, no, I did not have
16  internal discussions with anyone at my company about,
17  you know, negotiating the term, for example.
18      Q.   Let me ask you this:  You remember earlier
19  you told me that you did communicate with the CFO
20  about executing the agreement?
21      A.   Correct.
22      Q.   Was there anyone else that you talked to
23  about the subscription agreement?
24           I wasn't trying to characterize your
25  testimony.  My understanding was that the CFO was the
```

Page 121

```
1   only other person you talked to about it.
2           Was there -- Was there someone besides that?
3       A.   I would have informed my boss, our general
4   counsel, Michael -- Mike Rowles.
5       Q.   Anyone else that you talked about the
6   subscription agreement with at Live Nation or
7   Ticketmaster?
8       A.   That I talked about -- talked about it with,
9   that suggests like in-depth conversations about the
10  substance?  No.  But our prior company controller,
11  Brandy Lecoq, I let her know.  She was in
12  communications with Kathy Willard and I about getting
13  a payment set up and getting approval for payment
14  after the agreement had been executed or just prior
15  thereto.
16      Q.   Okay.  Wait.  Let me just get this straight.
17           So you didn't talk to anyone at Live Nation
18  or Ticketmaster about the negotiation of the
19  agreement; is that right?
20      A.   No.
21      Q.   No, you didn't talk to anyone at Live
22  Nation?
23      A.   I'm sorry.  That's -- I'm sorry.  You're
24  correct, I did not, about the negotiation of the
25  agreement, yeah.
```

Page 122

1    Q.   But at various points you talked to
2  Mr. Rowles, the CFO, and the company controller just
3  about the agreement generally?
4    A.   Correct.
5    Q.   I take it the discussion with Mr. Rowles was
6  legal in nature?
7    A.   Oh, yes.  He's a lawyer.
8    Q.   And so you're not going to tell me about
9  that one?
10   A.   No.
11   Q.   But the ones with the controller and the CFO
12 were business in nature?
13        MR. HUSENY:  Objection.
14        THE WITNESS:  Yeah, no, they were not.  They
15 were me providing legal advice and -- to my client,
16 our CFO.  They were not -- They were absolutely legal
17 in nature as well.
18   Q.   BY MR. SEARS:  All I mean is that the one to
19 the CFO was about getting approval for the
20 subscription agreement, the one to the controller was
21 about wiring the payment; is that right?
22   A.   The communication with our CFO and the
23 controller was definitely -- it was a privileged
24 communication explaining what we were doing and asking
25 for financial approval to execute and pay.

Page 123

1    Q.   I see.  And just to close the loop on this,
2  though:  But your view is that any of the discussions
3  about the substance of the subscription agreement are
4  privileged; is that fair?
5    A.   No.
6    Q.   Okay.  Well, I mean, let me just take a few
7  provisions.
8         You believe that the back-and-forth or the
9  -- Let me ask it this way:  You believe that the
10 reasons for making changes, if any, to the term of the
11 agreement are privileged?
12   A.   Yes.
13   Q.   You believe that the reasons for arriving at
14 a pricing number, other than what you've told me about
15 New Era's model for doing so, are privileged?
16   A.   No, I did not testify to that.  I said I
17 don't know how they arrived, what algorithm or
18 whatever their -- their own pricing, how they
19 determined internally that ████████ year was the
20 price for Live Nation and Ticketmaster.  That's not
21 privileged; I just don't have that information, nor
22 would I.
23   Q.   Let me ask you this:  So the way it worked
24 is you paid New Era ██████ for the first year of the
25 subscription agreement; right?

Page 124

1    A.   Yes.
2    Q.   Am I correct that no consumer arbitrations
3  were filed during that year?  I know there was one
4  later, but during that year there were none?
5    A.   Through New Era, correct.  That's my
6  recollection.
7    Q.   Do Live Nation and Ticketmaster consider it
8  a good deal to pay ██████ to an ADR provider that
9  doesn't administer any arbitrations in a year?
10        MR. HUSENY:  Objection.  Vague and
11 privileged.
12        (Reporter request.)
13   Q.   BY MR. SEARS:  Do Live Nation and
14 Ticketmaster consider it a good deal to pay ██████
15 to an ADR provider for a year in which that provider
16 administers no arbitrations for them?
17        MR. HUSENY:  Objection.  Vague and ambiguous
18 and calls for privileged information.
19        MR. SEARS:  Are you instructing the witness
20 not to answer?
21        THE WITNESS:  I think I can answer as to the
22 fact -- Sadik, let me know if that's okay -- as to
23 what the term covers.
24        MR. HUSENY:  Sure.
25        THE WITNESS:  Okay.  I won't testify to what

Page 125

1  I consider.  My considerations are my thought process.
2  But it is an agreement that covers a term of a number
3  of years.  Some years, there are many arbitrations
4  filed against Ticketmaster and Live Nation; some
5  years, there aren't.  It's not just a one-year
6  contract.  Those are the facts that I'll testify to.
7    Q.   BY MR. SEARS:  But as you told me earlier,
8  it is a contract that Live Nation can elect not to
9  renew after each year?
10   A.   Yes.
11   Q.   And Live Nation elected to renew it in 2022;
12 is that right?
13   A.   Yes.
14   Q.   And it paid more that year than the previous
15 year; right?
16   A.   Yeah, the price goes up every -- the first
17 few years, by a percentage.
18   Q.   What's the reasoning for the price going up
19 every year, if any?
20   A.   That's New Era's -- That was the way they --
21 they built it.  I don't know what their reasoning is.
22   Q.   I mean, did Live Nation and Ticketmaster
23 consider that a good term or a fair term for them?
24        MR. HUSENY:  Objection.  Privileged.
25   Q.   BY MR. SEARS:  And do you recall the

Page 126

1   approximate size of the payment in 2022 when Live
2   Nation renewed the contract?
3        A.   Yes.  It was ████████.
4        Q.   Great.  You've just saved us an exhibit.
5        So it was up by about ████ and change?
6        A.   I believe it goes up by ████ per -- up by ████
7   percent of the prior year; so, yes.
8        Q.   So why did Live Nation and Ticketmaster
9   elect to renew the subscription agreement at a higher
10  price, when New Era had not administered any
11  arbitrations in the prior year?
12            MR. HUSENY:  Objection to form.
13            THE WITNESS:  Yeah, you're asking for a why
14  there, that's privileged.
15       Q.   BY MR. SEARS:  So just so I've got that
16  right:  You won't tell me why Live Nation and
17  Ticketmaster renewed the agreement?
18            MR. HUSENY:  Objection.  Mischaracterizes
19  facts.  Objection to form.
20            THE WITNESS:  The agreement, as you'll see
21  from the terms, it automatically renews.  There was no
22  -- We didn't make an affirmative election; we just
23  decided not to terminate it.
24       Q.   BY MR. SEARS:  But you won't tell me why
25  Live Nation chose to proceed and not to terminate it?

Page 127

1        A.   No.
2        Q.   Because you're asserting privilege over
3   that?
4        A.   Correct.
5        Q.   And you also, presumably, will not tell me
6   the reason that Live Nation entered into the agreement
7   in the first place?
8        A.   No.
9        Q.   Because you consider that privileged?
10       A.   Yes.  And it also isn't a topic of the
11  deposition.
12       Q.   Okay.  We -- Well, I mean, but you would
13  also object to it on privilege?
14       A.   Yes.
15            MR. HUSENY:  Well, I've objected repeatedly
16  to that same line of questioning on privilege, Will,
17  so -- for the record.
18            MR. SEARS:  Oh, believe me Sadik, I heard
19  you.
20            MR. HUSENY:  You keep coming back to it, so
21  I wanted to make it clear as well.
22            MR. SEARS:  You've made yourself extremely
23  clear.  Let's -- Next exhibit.
24            MR. HUSENY:  I'm so sorry.  It's -- We've
25  been going about an hour and 15 minutes, and I am sure

Page 128

1   Ms. Hoover would like a little bit of a break.  I
2   actually could use one, if that's okay, and perhaps
3   the witness can as well.
4            MR. SEARS:  That's fine.
5            And, Ms. Hoover and Ms. Tobias, would you
6   like a break?
7            THE WITNESS:  I'd love one.
8            THE STENOGRAPHIC REPORTER:  Yes, please.
9            MR. SEARS:  How do you -- How do you guys,
10  or you all, want to do this?  I mean, it's a lunch
11  time.  If the witness would like lunch, we can take
12  it.
13            I have to tell you, I really -- Well, let's
14  go off the record.
15            MR. HUSENY:  Okay.
16            THE STENOGRAPHIC REPORTER:  We're off the
17  record.
18            (Lunch recess.)
19            THE STENOGRAPHIC REPORTER:  We're back on
20  the record.
21       Q.   BY MR. SEARS:  Good afternoon.  Welcome
22  back, Ms. Tobias.
23            Ready to resume your deposition?
24       A.   I am.
25       Q.   Did you talk to anyone on the break?

Page 129

1        A.   I talked briefly to Sadik and Robin.
2        Q.   Anyone else?
3        A.   No.
4        Q.   Okay.  So I believe I introduced the next
5   exhibit before we went on the break, but it looks like
6   it's disappeared in the chat, so I'm going to drop it
7   in again to make sure everyone gets it.
8            Let me know when you have it, Ms. Tobias.
9        A.   Okay.  It's just downloading.
10            MR. SEARS:  And while that's happening:
11  This is a document bearing Bates number NEWERA_000398.
12            THE STENOGRAPHIC REPORTER:  Confirm the
13  exhibit number, counsel.
14            MR. SEARS:  I want to say 11.
15            THE STENOGRAPHIC REPORTER:  Thank you.
16            (Exhibit 11 marked.)
17            THE WITNESS:  I have it open.
18       Q.   BY MR. SEARS:  Okay.  And do you see this is
19  a June 9th, 2021, e-mail about the New Era contract?
20       A.   Yes.
21       Q.   And it's from Latham to New Era?
22       A.   Yes.
23       Q.   And attached is an updated draft of the
24  subscription agreement?
25       A.   I see it attaches a draft, yes.

Page 130

1    Q.   Is this a draft that you remember reviewing?
2    A.   I don't recall which specific drafts I've
3 reviewed.
4    Q.   Okay.  So you wouldn't know what the -- what
5 changes were made in this draft or the reasoning for
6 them?
7    A.   No.
8    Q.   And if you look at section 11 on page 412 --
9 Let me know when you're there.
10   A.   Sorry, I just skipped right past it.
11 Section 11.  Oh, okay.  So, yeah, on page 411?
12   Q.   Yeah, I'm looking at 11(f), actually, which
13 is in 412.
14   A.   Okay.
15   Q.   This is the governing law section.  Remember
16 we talked about that?
17   A.   Yes.
18   Q.   And, in this draft, it's been edited so that
19 New Era is no longer the designated forum for
20 resolving disputes about the agreement.
21        Do you see that?
22   A.   Let me just read through it.  Yes, I see
23 that.
24   Q.   And a decision, in your view, to make that
25 change or not use New Era as the forum for dispute

Page 131

1 resolution was a privileged one?
2    A.   Yes.
3    Q.   If you'd turn to the statement of work,
4 which is Exhibit A, at page ending 417.
5    A.   Yes.
6    Q.   Do you see that the pricing term has now
7 been filled in for ███████
8    A.   Yes.
9    Q.   And, as we've discussed, it ended up being
10 more than that, ████████
11   A.   Correct.
12   Q.   Was it New Era that pushed for the price to
13 be ██████
14   A.   Yes.  We negotiated, tried to get them to
15 ████████████████ but their price was ██████████
16   Q.   And what, if anything, can you tell me about
17 those negotiations and their substance?
18   A.   It was just your typical pricing
19 negotiation.  We preferred to pay █████████ and they
20 came back with the price as ██████████
21   Q.   And what reasoning, if any, did they give
22 for keeping it at █████████
23   A.   I don't recall their reasoning.  It was just
24 that was the price.
25   Q.   And there's also a standard mass arbitration

Page 132

1 per-case filing fee of $300.
2        Do you see that?
3    A.   Yes.
4    Q.   Now, is that a price that New Era came up
5 with or that Live Nation or Ticketmaster came up with?
6    A.   New Era came up with it.
7    Q.   And do you -- What was their reasoning, if
8 any, for that price as opposed to another one?
9    A.   Oh, that's a question for New Era.  I don't
10 know.
11   Q.   You just don't know?
12   A.   No, that's a -- New Era made that decision.
13   Q.   Now, under the Live Nation and Ticketmaster
14 terms of use, there is a default $300 filing fee for
15 New Era arbitration.
16        Am I right about that?
17   A.   Yes.  Unless the consumer can't afford to
18 pay the $300 filing fee, in which case we cover it.
19   Q.   Now, that $300 filing fee, who came up with
20 that number, New Era or Live Nation and Ticketmaster?
21   A.   It's the New Era's price is $300.  As I
22 testified, that is their price, the filing fee for
23 New Era that they came up with.
24   Q.   Oh, so is the standard mass arbitration
25 per-case filing fee of $300 here, that's the same

Page 133

1 thing as the $300 in the terms of use?
2    A.   Oh, I'm sorry.  I misunderstood your
3 question.
4        Yeah, the -- a filing fee that New Era
5 requires, my understanding is, for all arbitrations,
6 whether it's a mass arbitration or an individual
7 arbitration, is a $300 filing fee.
8    Q.   Okay.  So New Era came with that number?
9    A.   Yes.
10        MR. SEARS:  Okay.  I'm going to introduce
11 our next exhibit, which I believe is Exhibit 12.  It's
12 a document bearing Bates number NEWERA_000375.
13        (Exhibit 12 marked.)
14   Q.   BY MR. SEARS:  Just let me know when you
15 have it, Ms. Tobias.
16   A.   I have it.
17   Q.   Okay.  You see this is now an e-mail back
18 from New Era to the Latham litigation team?
19   A.   I see that.
20   Q.   It's dated June 11th, 2021?
21   A.   Yep.
22   Q.   It's attaching another updated draft of the
23 subscription agreement?
24   A.   Yep.
25   Q.   Do you recall reviewing this one at any

Page 134

```
 1  point?
 2       A.   No.
 3       Q.   So you don't know, sitting here today, what
 4  the -- what the changes made in this version were?
 5       A.   No.
 6       Q.   Now, do you see this e-mail from
 7  Mr. Mulrooney?
 8       A.   Yes.
 9       Q.   And one of the things he said is:  "We also
10  thought we'd include a quick issues list of the
11  remaining open items."  Right?
12       A.   Right.  Yeah, it says that.
13       Q.   And one of them is renewal; right?
14       A.   Yep.
15       Q.   He says:  "We'd like to discuss our
16  rationale behind our changes and potential alternative
17  options."  Right?
18       A.   Right.
19       Q.   Do you know what those changes were?
20       A.   No.
21       Q.   Do you know what the potential alternative
22  options were?
23       A.   No.
24       Q.   Then he says:  "Price.  Again, to discuss
25  rationale, break-even, and Latham discount points."
```

Page 135

```
 1       Right?
 2       A.   Right.
 3       Q.   Do you know what "Latham discount points"
 4  refers to here?
 5       A.   I have no idea.
 6       Q.   That's not something you've ever discussed
 7  with Latham?
 8       A.   No, I've never seen that.
 9       Q.   You've never seen this document before?
10       A.   No, or discussed Latham discount points.  I
11  don't know what that is.
12       Q.   This is not an e-mail or a document that you
13  reviewed in preparing for your deposition?
14       A.   Not that I recall.
15       Q.   And it's not one you recall being forwarded
16  to you?
17       A.   Not that I recall.
18            MR. SEARS:  Okay.  Introduce our next
19  exhibit.  This is Exhibit 13.  This is a document
20  produced by Ticketmaster and Live Nation, bearing
21  Bates number TM00000032.
22            (Exhibit 13 marked.)
23       Q.   BY MR. SEARS:  Let me know when you have it.
24       A.   I have it.
25       Q.   Is this the final subscription agreement?
```

Page 136

```
 1       A.   Yes.
 2       Q.   If you scroll to the last page, is that your
 3  signature?
 4       A.   That's my DocuSign, yes.
 5       Q.   You signed it on behalf of Live Nation?
 6       A.   Yes.
 7       Q.   And this one you did review?
 8       A.   Yes.
 9       Q.   But you won't disclose your mental
10  impressions or views about the agreement, because you
11  believe those are privileged?
12       A.   Yes.
13       Q.   Okay.  Now, we've talked earlier about
14  whether Live Nation and Ticketmaster did an analysis
15  of New Era's rules and procedures.
16            Do you remember that discussion?
17       A.   Yes.
18       Q.   And to the extent an analysis was done, I
19  understand you believe it was privileged?
20       A.   Correct.
21       Q.   And you won't tell me about it?
22       A.   I never even said an analysis was done; but,
23  no, I won't tell you about our thought process or the
24  work product that we embarked on, that I embarked on.
25       Q.   Just to be clear:  Was there an analysis
```

Page 137

```
 1  done?
 2       A.   I don't recall.
 3       Q.   You mentioned work product that you embarked
 4  on.
 5            Was there work product on this subject, even
 6  if you won't disclose its substance?
 7       A.   On the subject of the -- We've already gone
 8  over this and I -- So what was your question?  Whether
 9  -- I don't know why we're rehashing this.
10       Q.   Well, you just mentioned that there was work
11  product you embarked on.  I'm just --
12       A.   I said I won't discuss any of my thought
13  process, any analyses I may or may not have done.
14            I don't recall if there was an analysis on
15  their rules and procedures.  As I've testified
16  clearly, I read their rules and procedures.
17       Q.   Well, what I'm going to do is I'm going to
18  ask you some questions about their rules and
19  procedures.
20            I mean, in general, if I ask you about a
21  term and ask you whether you think it's fair or
22  reasonable, would you consider that privileged?
23       A.   Yes.  I won't answer those questions.
24       Q.   Okay.  I'm going to do a couple, just so we
25  have examples; but I understand where you're going
```

1  with this.  So just bear with me, because this is --
2  this is what I have to do.
3         Understand?
4      A.  I understand, yeah.
5         MR. SEARS:  So I'm going to mark as our next
6  exhibit, Exhibit 14.  And this is a document entitled
7  "New Era ADR rules and procedures."
8         (Exhibit 14 marked.)
9      Q.  BY MR. SEARS:  Let me know when you have it.
10     A.  Not yet.  Sorry.  It doesn't want me to open
11 it.  I keep clicking.
12     Q.  It's okay.  Just take your time.
13     A.  There we go.  Okay.
14     Q.  Now, you have reviewed New Era's rules and
15 procedures; right?
16     A.  I have.
17     Q.  I'll represent to you that, as best as I can
18 understand it, this is the most recent current rules.
19        Fair enough?
20     A.  Fair.
21     Q.  No reason to disagree with that, based on
22 skimming through them now?
23     A.  I have not skimmed through them.  I am not
24 going to agree or disagree with you.  I'll take your
25 word for it.  I have no idea if this is identical to

1  the rules that are currently posted on their site.
2      Q.  Well, let me ask you this:  My understanding
3  is that their rules have -- and procedures have
4  changed from time to time.
5         Is that your understanding?
6      A.  I don't know.
7      Q.  When was the last time you recall reviewing
8  their rules and procedures?
9      A.  Prior to executing the subscription
10 agreement.
11     Q.  Do you remember we looked at an e-mail from
12 June 21st, 2021, about publishing the rules and
13 procedures?
14     A.  Yes.
15     Q.  So it would have been whatever version they
16 published then that you looked at?
17     A.  Yes.
18     Q.  Now, do you also remember that the
19 subscription agreement was signed the next day, June
20 22nd, 2021?
21     A.  Yes.
22     Q.  Did your entire review of New Era's rules
23 and procedures take place between June 21st and June
24 22nd, 2021?
25     A.  Yes.  I was aware generally about their

1  procedures and what they -- you know, generally how
2  their -- their offering worked or how their platform
3  works; but my -- like a closer view of their rules and
4  procedures, yeah, it was June 21st, 22nd.
5      Q.  So the close review that you mentioned, you
6  did it between when the rules were published and when
7  you signed the contract?
8      A.  Yep.
9      Q.  And you said that you were generally -- you
10 were aware generally about their procedures before
11 that; right?
12     A.  Generally.
13     Q.  All right.  What was the general awareness
14 that you had about their rules and procedures?
15        MR. HUSENY:  Objection.  Vague.
16        THE WITNESS:  Yeah, can you clarify?  What
17 do you mean, what was my general --
18     Q.  BY MR. SEARS:  Well, you said you were
19 generally aware.
20        I mean, were there specific provisions that
21 you looked at?  Was there a certain part that you were
22 focused on?
23        What did you know about the rules and
24 procedures before you saw them?
25     A.  I was aware that they had rules and

1  procedures governing mass arbitrations, that JAMS and
2  AAA and other arbitration providers don't have.
3      Q.  And what, if anything, did you know about
4  those rules and procedures?
5      A.  I knew that they have a system in place
6  where there's -- I believe there's a process by which
7  you can rank and strike neutrals, and there's a
8  bellwether process in place --
9      Q.  Let me ask you this --
10     A.  -- generally speaking.
11     Q.  It's not a memory test.  I'm just trying to
12 know what you as the witness and the 30(b)(6) know.
13        So I'm just going to ask you:  Sitting here
14 today, what's your understanding of the mass
15 arbitration rules that New Era has?
16     A.  I'm pretty sure I just -- Didn't I just tell
17 you?
18        MR. HUSENY:  Objection.
19        THE WITNESS:  Yeah.  I just answered the
20 question.
21     Q.  BY MR. SEARS:  Is there anything else?
22        You gave me a couple examples about rank and
23 strike process and the bellwether process.
24        I mean, is there anything else that you know
25 about them?

Page 142

1    A.   I mean, I'd have to refresh my recollection
2  and read them.  If you want to give me a minute, I'll
3  read them.
4    Q.   Well, we're going to do that in a second.
5       I just -- I want to know, you know, in
6  preparing for the deposition and from reviewing them
7  before, you mentioned a bellwether process, you
8  mentioned a rank and strike process.
9       What else, if anything, do you know about
10 the mass arbitration rules and procedures?
11      MR. HUSENY:  Objection.  Vague and
12 ambiguous.
13      THE WITNESS:  Moreover, this isn't a topic
14 of my deposition, so I didn't spend time memorizing
15 all the rules and procedures.  The last time I really
16 looked at this in depth was in June 2021.
17      If you want to ask me about them, let's go
18 over the rules.
19   Q.   BY MR. SEARS:  So we're going to do that in
20 a second, but just before that:  The only thing you
21 know, as of now, or the only thing you remember, is
22 that there's a rank and strike process and a
23 bellwether proceeding; is that fair?
24   A.   That's not fair.
25   Q.   Okay.  Why not?

Page 143

1    A.   Because I didn't say that's all I know.
2  You're completely mischaracterizing my testimony.
3    Q.   I'm simply asking questions.
4       What are the other things that you know
5  about the mass arbitration rules and procedures that
6  you haven't told me yet?
7       MR. HUSENY:  Objection.  Vague and
8  ambiguous.
9       If you have a specific provision you want to
10 ask her about, can you do that?
11      THE WITNESS:  Yeah.  Just ask me a question.
12   Q.   BY MR. SEARS:  I mean, is the answer to my
13 question there's no other -- there's nothing else you
14 can tell me about the mass arbitration rules and
15 procedures by New Era, other than the rank and strike
16 process and the bellwether process?
17   A.   I know generally about those processes.
18 Anything further, I -- let me look at it.  Give me
19 some time, I'll look at it.
20   Q.   It's right in front of you.  Let's -- Sure,
21 let's walk through a couple of them.
22   A.   Okay.
23   Q.   So let's turn to page 11.
24   A.   I'm there.
25   Q.   Okay.  Do you see at the top of the page, it

Page 144

1  says:  "All proceedings at New Era ADR are
2  time-limited with the following as expected timelines
3  as set forth above"?
4    A.   I read that, yeah.
5    Q.   Now, is that something you were aware of
6  before this deposition?
7    A.   I don't recall.
8    Q.   Then it lists a few of the things New Era
9  offers, like mediation and expedited arbitration.
10      Do you see that?
11   A.   I see those orders, yes.
12   Q.   Do you see that it says that expedited
13 arbitrations -- that it goes on to explain that they
14 will be time-limited in 45 to 60 days from
15 appointment/selection of a neutral?
16   A.   Yes.
17   Q.   Okay.  Is that something you knew before
18 this deposition just now?
19   A.   I don't recall whether I was aware of that
20 specific rule.  I read them all, so probably.
21   Q.   Okay.  Now, and let me ask you this:  Now,
22 Live Nation and Ticketmaster's terms of use specify
23 that arbitrations through New Era will go through the
24 expedited arbitration process; is that right?
25   A.   We have -- I'd have to -- You'd have to pull

Page 145

1  those up and show me.
2       Do you have those handy?
3       MR. SEARS:  Yeah, I do.  Give me one second.
4       We'll mark our next exhibit.  Please keep
5  the other one open, Ms. Tobias, but we'll just look at
6  this one for a moment.
7       I'm marking as our next exhibit, which I
8  believe is 14, a document entitled "terms of use."
9       THE STENOGRAPHIC REPORTER:  Fifteen,
10 counsel.
11      MR. SEARS:  Oh, it's 15?  Thanks for keeping
12 me honest.
13      (Exhibit 15 marked.)
14   Q.   BY MR. SEARS:  So Exhibit 15 is
15 Ticketmaster's terms of use.
16      And, Ms. Tobias, you can look if you need
17 to, but I'll represent that we pulled these off the
18 website and I believe that they're the most recent
19 ones.
20      Does that look right to you?
21   A.   I'll take your word for it, if you took them
22 off our site, but...  That's all I can do here.
23   Q.   Well, they haven't been updated since July
24 2nd, 2021, have they?
25   A.   They have not.  But, again, you pulled these

1  and you're putting a document before me and telling me
2  this is how you obtained them.  I'll take your word
3  for it.  I'm not going to tell you under oath that
4  these are the exact terms of use on our website.  I
5  didn't pull them from our site; you did.
6      Q.  Well, there's no tricks here.  If you want
7  to take a look at it, you can.  If you have any reason
8  to believe that they're not accurate, I'd like to
9  know.
10      A.  I would -- The only way I could -- I could
11  -- I'm not trying to be difficult, but I'm under oath
12  here.
13          If you want me to do a side-by-side
14  comparison based on me pulling up our terms of use
15  that are live on the website now and reading verbatim
16  whether or not what you're representing to be our
17  current terms of use is accurate, I'm happy to do
18  that.  If you want to ask a question about whether
19  that's my understanding of a specific provision,
20  whether that is our -- what our terms of use say now,
21  I'll answer them.  But I'm not going to just accept
22  your word that this is identical.  I don't -- We've
23  litigated against each other for too long.
24      Q.  Okay.  I'm asking what I thought was a
25  straightforward question.

1      Let's just look at the top.  Do you see that
2  it says "last updated July 2nd, 2021"?
3      A.  Yep.
4      Q.  Okay.  That's the date they were last
5  updated; right?
6      A.  Correct.
7      Q.  Okay.  And, I mean, you can scroll through
8  if you want.
9          You don't see anything that looks wrong
10  here, do you?
11      A.  Do you have a question, Will?  I'm sorry.
12  I'm not --
13      MR. HUSENY:  Yeah, objection.
14          Objection.  She just said she took your word
15  for it that you pulled it from the website.  I think
16  that's all we need, Will.  If we can just go to the
17  questions.
18      Q.  BY MR. SEARS:  I was trying to ask what I
19  thought was a simple question, but I'll move on.
20          Why don't you go down to section 17, which I
21  believe is the part that deals with arbitration.
22          Am I right about that?
23      A.  Correct.
24      Q.  Okay.  Do you see that there's a reference
25  to New Era here?

1      A.  Yes.
2      Q.  Do you see that it says at the bottom of the
3  page:  "Any arbitration will be administered by
4  New Era ADR in accordance with their virtual expedited
5  arbitration rules and procedures as well as any
6  applicable general rules and procedures except as
7  modified by the terms"?
8      A.  Yes.
9      Q.  Okay.  Am I correct, then, that the virtual
10  expedited arbitration rules and procedures are what
11  would govern an arbitration administered by New Era
12  involving Live Nation and a consumer?
13      A.  You're correct that that's what it says,
14  yes, and this is a mandatory arbitration provision.
15      Q.  Okay.  That's all I was trying to figure
16  out.
17          Let's go back to the New Era rules.  Can you
18  let me know when you have those out.
19      A.  Yes.
20      Q.  So do you remember we were looking at the
21  language about how "all proceedings at New Era are
22  time-limited, with the following as expected
23  timelines"?
24      A.  Yes.
25      Q.  The expected timeline for an expedited

1  arbitration is 45 to 60 days; right?
2      A.  Yes.
3      Q.  From appointment and selection of a neutral?
4      A.  Yes.
5      Q.  So 45 to 60 days from the appointment or
6  selection of a neutral is the expected timeline for an
7  arbitration administered by New Era involving Live
8  Nation.
9          Am I right about that?
10      A.  This is what it says.  This is what their
11  rules say what an expedited arbitration is.
12      Q.  Okay.  Do you think that that's a reasonable
13  amount of time to do an arbitration for an antitrust
14  case against Live Nation?
15      A.  I'm not going to provide you with my
16  thoughts.
17      Q.  But you believe that's privileged?
18      A.  I know it's privileged.
19      Q.  Let me just -- Ms. Tobias, I promise, I'm
20  trying to get you out of here as fast as I can.
21          So let me just ask:  If I have any questions
22  about whether the timeline for a New Era expedited
23  arbitration is fair or reasonable or unconscionable,
24  would you view that all as privileged?
25      A.  Yes.

Page 150

1       MR. HUSENY:  I would object as privileged
2   and calling for legal conclusions in the first
3   instance, and then Ms. Tobias can answer your
4   question.
5       THE WITNESS:  Yes, all privileged.
6       Q.   BY MR. SEARS:  So you won't, on grounds of
7   privilege, answer questions about whether the timeline
8   for New Era or arbitration is reasonable or fair?
9       A.   I will not answer those questions, based on
10  privilege.
11      Q.   Do you see about halfway down the page, it
12  says:  "Neutrals are also expected to maintain these
13  time frames"?
14      A.   Can you point me on the -- to the section
15  you're referring to?
16      Q.   It's about -- It's subsection 5 on page 11,
17  right above "witnesses".
18      A.   Oh, I see that.
19      Q.   Okay.  And do you have a -- Let me ask you
20  this:  I mean, will you answer questions about whether
21  it's reasonable for New Era to expect neutrals to
22  maintain these time frames, or do you believe that's
23  privileged?
24      A.   I believe that's privileged.
25          MR. HUSENY:  I would object as privileged,

Page 151

1   yeah.
2       Q.   BY MR. SEARS:  Now, you mentioned a rank and
3   strike process earlier.
4       Do you remember that?
5       A.   Yes.
6       Q.   Do you -- If I were to ask you whether the
7   rank and strike process is fair or reasonable, you'd
8   view that as privileged?
9       A.   How -- What I think of it?  Yes, it's
10  privileged.  And it's also what JAMS does.
11          MR. HUSENY:  Yeah, and to your question
12  earlier, Will, I would object to all of these
13  questions about whether this lawyer for Live Nation
14  thinks these terms are fair and reasonable as
15  privileged and objectionable and calling for a legal
16  conclusion.
17      Q.   BY MR. SEARS:  And let me ask you this:  I
18  mean, you're the person at Live Nation that's most
19  familiar with its relationship with New Era and the
20  New Era rules and procedures; right?
21      A.   Yep.
22      Q.   There's not some business person that I
23  could go and ask whether the New Era rules were fair
24  and reasonable, that could give testimony on that?
25      A.   No.

Page 152

1       Q.   It's just you; right?
2       A.   It's just me, yes.
3       Q.   And you won't -- you won't tell me whether
4   any aspect of the New Era rules are fair or reasonable
5   or unconscionable, because you believe that's
6   privileged?
7       A.   Correct.
8       Q.   Okay.  I'm going to go through a couple more
9   examples just to make clear, but I think we're on the
10  same page.
11          You're not going to testify about whether
12  New Era rules are fair or reasonable or
13  unconscionable; right?
14      A.   For the fourth time:  No, I'm not.
15          MR. HUSENY:  Same objection as before.
16      Q.   BY MR. SEARS:  And you're also not going to
17  testify, on grounds of privilege, about whether it
18  would be reasonable to litigate an antitrust case like
19  this one under New Era's rules and procedures?
20          MR. HUSENY:  I'm going to -- Same objection
21  as before.  I'm also going to say, Will, I've let you
22  ask all these questions about rules and procedures,
23  that were never even listed as a topic in this
24  deposition notice.  You keep asking the same questions
25  on a topic you never even listed, and it's a topic

Page 153

1   asking for privileged information.
2       So, for all those reasons, I'm just going to
3   put that objection on the record.
4       MR. SEARS:  Okay.  Thank you.
5       Just two notes:  One, you were doing well on
6   speaking objections.  The speeches on the record
7   aren't getting us out of here any faster.
8       Two, I respectfully disagree on the notice;
9   but I'll ask my questions and make my record, and we
10  can take it up afterwards.
11      Q.   BY MR. SEARS:  So why don't you look to the
12  bottom of page 11, where it talks about discovery.
13      A.   Okay.
14      Q.   Do you see where it says:  "New Era ADR
15  operates on the premise that limitations on discovery
16  are one of the primary ways efficiencies are achieved
17  in arbitration, and discovery must be narrowly
18  tailored only to the information necessary to
19  advancing neutrals understanding the case"?
20      Do you see that?
21      A.   Yes.
22      Q.   And I take it you won't testify about
23  whether discovery limitations in New Era's rules and
24  procedures are fair or reasonable?
25      A.   I won't, for two reasons:  It's not a topic

Page 154

```
1   of this deposition, and it calls for privileged
2   information.
3       Q.   Even if we were -- Putting aside our
4   differences in views on topics, even if we were to
5   serve a new 30(b)(6) notice and bring you back, you
6   still would not testify on that?
7       A.   Absolutely not.
8       Q.   Okay.  And I believe we're actually looking
9   at the general rules here too.
10           Do you have an understanding that there are
11  also provisions about discovery and time frame within
12  the expedited arbitration rules for New Era?
13      A.   I don't recall.  You'd have to point them
14  out to me.
15      Q.   I can.  But if I were to ask you questions
16  about the expedited rules specifically, you would have
17  the same answer, that your view of whether they're
18  fair or reasonable is privileged?
19      A.   Yes.  My views on any of this are
20  privileged.  I'm in-house counsel for the company.
21      Q.   That would be true for the mass arbitration
22  rules as well?
23      A.   For any -- Anytime you're asking me about my
24  views, my opinions, my -- my legal thought and process
25  is absolutely privileged.
```

Page 155

```
1       Q.   And same -- you know, you talked about a
2   bellwether process earlier.
3            Your views on that, if any, you consider
4   privileged?
5       A.   Yes.
6       Q.   And you consider your discussions with
7   Latham about that privileged?
8       A.   Yes.
9       Q.   And your discussions with other people at
10  Live Nation or Ticketmaster are privileged?
11      A.   Yes.
12      Q.   Now, you mentioned a bellwether process.
13           Do you understand that, under New Era's mass
14  arbitration rules, there's a process whereby
15  bellwether cases are selected?
16      A.   Yes.
17      Q.   What's your understanding, if any, of what
18  happens after that under New Era's arbitration rules?
19           Not asking for privileged views; just
20  factually, what do you understand about how it works?
21      A.   I'd have to reread the rules.  Do you want
22  me to go there?
23      Q.   I'll jump ahead.  I would have some
24  questions about whether you think certain provisions
25  are fair or reasonable, but I take it you're just not
```

Page 156

```
1   going to answer those on grounds of privilege?
2       A.   Correct.
3       Q.   Are you aware there are also limitations on,
4   for example, the number of witnesses that can appear
5   at a hearing, under New Era's rules?
6       A.   You'd have to show me.  I don't recall.
7       Q.   But, I mean, if I were to ask you about, you
8   know, the number of witnesses at a hearing in New Era,
9   I take it your response would be the same, that your
10  views on that are privileged?
11           MR. HUSENY:  Objection.
12           THE WITNESS:  Yes.
13           MR. HUSENY:  If you ask her about the number
14  of witnesses in a hearing, that -- I'm sorry.  Will, I
15  think you meant to ask a different question.  I would
16  object to that question.
17           MR. SEARS:  I didn't -- I didn't make it
18  sufficiently clear.  If you just want to say
19  "objection to form," I'll try to move it on; but, you
20  know, these long diatribes are not helping.
21      Q.   BY MR. SEARS:  So, Ms. Tobias, if I were to
22  ask you questions about the number of witnesses that
23  are allowed at a hearing under New Era's rules, you
24  know, you would consider your views on that
25  privileged?
```

Page 157

```
1       A.   My views on it, yes.  But if you want to go
2   over what the rules say, sure, I'll testify to that,
3   if you want to pull it up.
4       Q.   Well, I mean, let's do this, then:  Let's
5   look at section 2(o), which is what -- it starts at
6   the top of page 11 and goes on to page 12.
7       A.   2(o).
8       Q.   Yeah.  Bottom of 11, going on to 12.
9       A.   Yeah.
10      Q.   Okay.  There's some language about discovery
11  we were looking at earlier.
12           Do you see that?
13      A.   Yes.
14      Q.   And another thing it says is:  "A formal
15  discovery process exists solely in New Era ADR's
16  standard arbitration process and is described in
17  section 5 below."
18           Do you see that?
19      A.   Sorry.  Which section are you reading?
20      Q.   It says:  "Formal discovery process exists
21  solely in New Era ADR's standard arbitration process
22  and is described in section 5 below."
23           Do you see that?
24      A.   Sorry.  I -- It helps if you say -- The way
25  it's drafted, there's (o), "discovery," and there's
```

Case 2:22-cv-00047-GW-GJS    Document 134-21    Filed 03/21/23    Page 43 of 58    Page
ID #:2192

Page 158

```
1   subsections.
2           So if you could just tell me:  Are you on
3   subsection 4?  You're -- None of the sentences that
4   I'm looking begin -- so I have to -- Are you at
5   (o)(ii), (o)(iii), (o)(iv)?
6       Q.   I'm at (o)(i), second sentence, top of
7   page 12.
8       A.   Oh, I see.  Yeah.
9       Q.   Okay.  Does that convey that there is no
10  formal discovery process for expedited arbitrations
11  under New Era?  I'm not asking for your views; just as
12  a factual matter.
13      A.   Oh, I don't know.  I mean, it says what it
14  says.  I don't --
15      Q.   Is that --
16      A.   I can interpret it for you.
17      Q.   Look, I'm trying to save time here.
18           You mentioned that you might be able to
19  answer questions about the rules.  If your response to
20  provisions will be that they say what they say, that's
21  fine and I understand it.
22           Would that typically be your response if I
23  was to go through a number of provisions and ask you
24  about them?
25      A.   Yes.  I mean, my response is going to be
```

Page 159

```
1   that the rules are what -- that they -- they're there
2   in this document.  You can read them, I can read them
3   with you; but I'm not going to testify beyond what --
4   that I confirm that this document, you know, that
5   you're reading verbatim what it says.  I'm not going
6   to go beyond that.
7       Q.   Let me ask you this:  Do you have any
8   non-privileged views that you can share about any
9   provisions of New Era's rules and procedures?
10      A.   No.  All of my views are privileged about
11  New Era.
12      Q.   Right.
13      A.   I'm in-house counsel for this company, and
14  this is a dispute resolution proceeding -- or rules
15  and procedures for proceeding with dispute resolution.
16  This is squarely privileged.  My views on it and my
17  thoughts are completely privileged.
18      Q.   Okay.  So, you know, other than reading the
19  words on the page together, there's not really
20  anything about the substance of the rules we can
21  discuss without intruding on privilege, in your views?
22      A.   No, I would --
23           MR. HUSENY:  Objection.
24           THE WITNESS:  Whoops.  Sorry, Sadik.
25           MR. HUSENY:  No, go ahead.
```

Page 160

```
1           THE WITNESS:  Just, I mean -- Yeah, I don't
2   know.  No, there's nothing, beyond the words on the
3   page, that I could testify to without treading into
4   privileged territory.
5       Q.   BY MR. SEARS:  And I assume that would be
6   true of the Ticketmaster and Live Nation terms of use
7   as they reference New Era?
8           MR. HUSENY:  Objection.  Vague and
9   ambiguous.
10      Q.   BY MR. SEARS:  You can try to answer; and if
11  you can't, I'll ask another question.
12      A.   I can't answer as posed.
13      Q.   Okay.  Well, I mean, do you believe that the
14  references to New Era and Live Nation and Ticketmaster
15  terms of use are fair, reasonable, and not
16  unconscionable?
17      A.   I'm not going to -- I know you say you want
18  to save time, but you're asking me the same question
19  over and over and I keep giving you the same answer.
20           I'm not going to testify to my views, my
21  thoughts, my thought process, my legal opinion, my --
22  my opinion as in-house counsel.  No matter what
23  question you ask, the answer remains the same.
24           MR. SEARS:  Okay.  I'm going to suggest
25  this:  I want to take a 15 -- Well, let's go off the
```

Page 161

```
1   record.
2           THE STENOGRAPHIC REPORTER:  Agreeable,
3   counsel?
4           MR. HUSENY:  Agreeable.
5           THE STENOGRAPHIC REPORTER:  We're off the
6   record.
7           (Recess.)
8           THE STENOGRAPHIC REPORTER:  We're back on
9   the record.
10      Q.   BY MR. SEARS:  Welcome back, Ms. Tobias.
11           Are you ready to resume your deposition?
12      A.   Yes.
13      Q.   Did you talk to your lawyers on the break?
14      A.   Just Sadik, briefly.
15      Q.   So you remember earlier we talked about the
16  subscription payments that Live Nation has made to
17  New Era?
18      A.   Yes.
19      Q.   There were two; right?  There was one for
20  [redacted] in 2021; right?
21      A.   Right.  Yes.
22      Q.   And then another one for [redacted] in 2022?
23      A.   Correct.
24      Q.   Have there been any other payments from Live
25  Nation or Ticketmaster to New Era?
```

1    A.   No.
2    Q.   Has Live Nation determined whether to renew
3  its contract with New Era in 2023?
4    A.   Not at this point.
5    Q.   And I'll just -- I'll ask it a little
6  differently based on an exchange we had earlier.
7         Has Live Nation decided whether to terminate
8  its contract with New Era when it's up in 2023?
9    A.   No.
10   Q.   It just hasn't made a decision yet?
11   A.   No.
12   Q.   Sitting here today, do you expect that Live
13 Nation will continue to contract with New Era?
14   A.   I couldn't say.
15   Q.   You couldn't say because you don't know or
16 because you believe it's privileged?
17   A.   I don't know.
18   Q.   And we talked a little bit about mass
19 arbitration earlier.
20        Do you remember that?
21   A.   Frankly, no.  I remember what -- what --
22 "Talked about it," I don't know what you're referring
23 to.
24   Q.   Well, we saw some e-mails that reference
25 mass arbitration in the header, for example.

1         Do you remember that?
2    A.   I actually don't.
3    Q.   Are you aware of a litigation strategy or
4  type of litigation known as mass arbitration?
5    A.   I am aware of that strategy.
6    Q.   Since Live Nation and Ticketmaster began
7  using New Era in their terms of use, has anyone
8  initiated a mass arbitration against either of them?
9    A.   No.
10   Q.   Do you have any views about the concept of
11 mass arbitration that you can share with me, or do you
12 believe that that falls within privilege?
13   A.   I believe that falls within privilege.
14        MR. HUSENY:  Objection.  Privilege.
15   Q.   BY MR. SEARS:  So if I were to ask you, for
16 example, if Live Nation views mass arbitration as a
17 risk to its business model, your answer would be
18 privileged.
19   A.   Yes, because you're asking for my views.
20 I'm in-house counsel, so all of my views on litigation
21 risk are certainly privileged.
22        MR. SEARS:  Okay.  Thank you for your time,
23 Ms. Tobias.  I have no further questions at this time.
24 But, you know, I have time left.  I'm going to reserve
25 the balance of it in case additional materials are

1  produced in discovery.
2         Sadik, I expect you'll object to that.
3  That's fine.  I'm preserving my options on the record.
4         I'm also going to put on the record a
5  request, Sadik, that you won't produce ████████████
6  ██████ that we discussed and saw in an e-mail.
7         My understanding from the New Era deposition
8  and from this deposition is that that information
9  exists, that Ms. Tobias has compiled it before, and
10 that it was shown to New Era.  So I'm going to request
11 that you produce it.  I believe it's responsive to our
12 subpoena and relevant.  And I'm going to ask that you
13 all do it as soon as possible, given upcoming
14 deadlines.
15        Thank you.
16        MR. HUSENY:  So I will -- Thank you, Will.
17        I'll put in terms of the record that, of
18 course, as you expected, I will object to keeping the
19 deposition open in any respect.  And I will consider
20 your request for the additional information; I think
21 we will talk about that offline.
22        MR. SEARS:  Thank you very much.
23        Ms. Tobias, I appreciate your time.
24        And, most of all, Ms. Hoover, thank you so
25 much for your service today.  I really appreciate it.

1         Everyone have a great day.
2         THE STENOGRAPHIC REPORTER:  Stay on the
3  line, counsel, please.
4         We're off the record.
5         (DEPOSITION ADJOURNED AT 1:23 P.M..)

Page 166

1  STATE OF CALIFORNIA      )
                            ) SS.
2  COUNTY OF LOS ANGELES    )
3       I, MARILYNN HOOVER, CSR No. 8841 for the State of
4  California, do hereby certify:
5       That prior to being examined, the witness named
6  in the foregoing deposition was duly sworn to testify
7  the truth, the whole truth, and nothing but the truth;
8       That said deposition was taken down by me in
9  shorthand at the time and place therein named, and
10 thereafter reduced by me to typewritten form; and that
11 the same is a true, correct, and complete transcript
12 of the said proceedings.
13      Before completion of the deposition, review of
14 the transcript [X] was [ ] was not requested.  If
15 requested, any changes made by the deponent (and
16 provided to the reporter) during the period allowed
17 shall be appended hereto.
18      I further certify that I am not interested in the
19 outcome of the action.
20      Witness my hand this 27th day of January 2023.
21
22
23
24         Marilynn Hoover, RPR
25         California CSR No. 8841

Page 167

Page  Line     Change        Reason

(blank correction lines)

Page 168

1           CERTIFICATE OF WITNESS
4       I, KIMBERLY TOBIAS, do hereby certify that I have
5  read the foregoing portion of the transcript of my
6  deposition taken on Thursday, the 26th day of January
7  2023, and that the said transcript is true and correct
8  except for such corrections as I may have noted.
14              KIMBERLY TOBIAS
19 Subscribed and sworn to before me
20 this ____ day of _____ 2023.
23 _____
24 Notary Public, State of _____
25 My Commission Expires: _____

$

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Index: capable..credentials

Case 2:22-cv-00047-GW-GJS Document 143-2 Filed 03/17/23 Page 49 of 58 Page ID #:2198

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Document 143-2 Filed 03/17/23 Page 50 of 58 Page ID #:3200

6[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Case 2:22-cv-00047-GW-GJS Document 143-2 Filed 03/17/23 Page 56 of 58 Page ID #:3206

[redacted]

S [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Case 2:22-cv-00047-GW-GJS Document 143-2 Filed 03/17/23 Page 59 of 58 Page ID #:2208

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]