**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SKOT HECKMAN; LUIS PONCE; JEANENE POPP; JACOB ROBERTS, on behalf of themselves and all those similarly situated, | No. 23-55770 |
| | D.C. No. 2:22-cv-00047-GW-GJS |
| *Plaintiffs-Appellees*, | |
| | OPINION |
| v. | |
| LIVE NATION ENTERTAINMENT, INC.; TICKETMASTER, LLC, | |
| *Defendants-Appellants*. | |

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted June 14, 2024
Pasadena, California

Filed October 28, 2024

Before: William A. Fletcher, Morgan Christen, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Fletcher;
Concurrence by Judge VanDyke

# SUMMARY[*]

## Arbitration

The panel affirmed the district court's order denying defendants' motion to compel arbitration in a putative antitrust class action under the Sherman Act, alleging anticompetitive practices in online ticket sales.

Plaintiffs bought tickets to live entertainment promoted by Live Nation Entertainment, Inc., and sold through Ticketmaster LLC's website. Their online ticket purchase agreement on the Ticketmaster website included an agreement to comply with Ticketmaster's Terms of Use, which provided that any claim arising out of the ticket purchase, as well as any prior ticket purchase, would be decided by an arbitrator employed by a newly created entity, New Era ADR, using novel and unusual expedited/mass arbitration procedures. The district court denied defendants' motion to compel arbitration pursuant to the arbitration agreement, holding that a clause delegating to the arbitrator the authority to determine the validity of the arbitration agreement was unconscionable, both procedurally and substantively, under California law.

The panel held that the delegation clause of the arbitration agreement, and the arbitration agreement as a whole, were unconscionable and unenforceable under California law. The panel held that the delegation clause was part of a contract of adhesion, and the Terms on Ticketmaster's website, and the manner in which

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Ticketmaster bound users to those Terms, evinced an extreme amount of procedural unconscionability far above and beyond a run-of-the-mill contract-of-adhesion case. In addition, four features of New Era's arbitration Rules supported a finding of substantial substantive unconscionability of the delegation clause: (1) the mass arbitration protocol, including the application of precedent from bellwether decisions to other claimants; (2) procedural limitations, such as the lack of a right to discovery; (3) a limited right of appeal; and (4) the arbitrator selection provisions. The panel held that the provisions of the arbitration agreement and New Era's Rules that made the delegation clause unconscionable also served to make the entire agreement unconscionable, both procedurally and substantively. In addition, the district court did not abuse its discretion in declining to sever the offending provision of Ticketmaster's Terms and New Era's Rules.

The panel held further that the application of California's unconscionability law to the challenged Terms and Rules was not preempted by the Federal Arbitration Act because this application relied on generally applicable principles that neither disfavored arbitration nor interfered with the objectives of the Act.

Finally, the panel held, as an alternate and independent ground, that the Federal Arbitration Act does not preempt California's prohibition, under *Discover Bank v. Superior Court*, 113 P.3d 1110 (Cal. 2005), of class action waivers contained in contracts of adhesion in large-scale small-stakes consumer cases. The panel held that Ticketmaster's Terms and New Era's Rules were independently unconscionable under *Discover Bank*.

Concurring in the judgment, Judge VanDyke agreed with the majority that the panel should affirm the district court's decision, but wrote that he would resolve the case by simply concluding that the Federal Arbitration Act does not apply to the type of mass arbitration contemplated by Live Nation's agreements. Judge VanDyke wrote that the Supreme Court's rationale in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), holding that the *Discover Bank* rule is preempted in the context of traditional, bilateral arbitration agreements, did not support preemption for the very different sort of arbitration at issue here.

---

**COUNSEL**

Warren D. Postman (argued), Albert Y. Pak, Noah Heinz, and Ethan H. Ames, Keller Postman LLC, Washington, D.C.; Kevin Teruya, Adam Wolfson, and William R. Sears, IV, Quinn Emanuel Erquhart & Sullivan LLP, Los Angeles, California; for Plaintiffs-Appellees.

Roman Martinez (argued) and Uriel Hinberg, Latham & Watkins LLP, Washington, D.C.; Sadik H. Huseny, Latham & Watkins LLP, Austin, Texas; Timothy L. O'Mara, Andrew M. Gass, Alicia R. Jovais, Robin L. Gushman, and Nicholas Rosellini, Latham & Watkins LLP, San Francisco, California; for Defendants-Appellants.

Jennifer B. Dickey and Jonathan D. Urick, U.S. Chamber Litigation Center, Washington, D.C.; Andrew J. Pincus, Archis A. Parasharami, Daniel E. Jones, and Wajdi C. Mallatt, Mayer Brown LLP, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

Benjamin M. Flowers, Ashbrook Byrne Kresge LLC, Cincinnati, Ohio; Adam Mortara, Lawfair LLC, Nashville, Tennessee, for Amicus Curiae Professor Brian Fitzpatrick.

Matthew W.H. Wessler, Gupta Wessler LLP, Washington, D.C.; Jessie Garland, Gupta Wessler LLP, San Francisco, California; for Amici Curiae American Association for Justice and Public Justice.

---

# OPINION

W. FLETCHER, Circuit Judge:

Plaintiffs-Appellees Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts (collectively, "Plaintiffs") brought a putative class action against Live Nation Entertainment, Inc., and Ticketmaster LLC (collectively, "Defendants") in January 2022, alleging anticompetitive practices in violation of the Sherman Act. Live Nation is the largest concert promoter for major entertainment venues in the United States. Ticketmaster is the largest primary ticket seller for live events at major concert venues in the United States. Live Nation and Ticketmaster merged in 2010.

Plaintiffs bought tickets to live entertainment promoted by Live Nation and sold through Ticketmaster's website. Their online ticket purchase agreement on the Ticketmaster website included an agreement to comply with Ticketmaster's Terms of Use ("Terms"). Ticketmaster's Terms provide that any claim arising out of the ticket purchase, as well as any prior ticket purchase, will be decided by an arbitrator employed by a newly created entity,

New Era ADR ("New Era"), using novel and unusual procedures.

The district court denied Defendants' motion to compel arbitration pursuant to the arbitration agreement. It held that the clause delegating to the arbitrator the authority to determine the validity of the arbitration agreement—the "delegation clause"—was unconscionable under California law, both procedurally and substantively. *Heckman v. Live Nation Ent., Inc.*, 686 F. Supp. 3d 939, 967 (C.D. Cal. 2023). Defendants appealed. We have jurisdiction under 9 U.S.C. § 16(a). *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 739 (2023)*.*

We affirm. We hold that the delegation clause of the arbitration agreement, and the arbitration agreement as a whole, are unconscionable and unenforceable under California law. We hold further that the application of California's unconscionabililty law to the facts of this case is not preempted by the Federal Arbitration Act ("FAA"). Finally, we hold, as an alternate and independent ground, that the FAA does not preempt California's prohibition of class action waivers contained in contracts of adhesion in large-scale small-stakes consumer cases.

## I. Background

In 2011, the Supreme Court decided *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), holding that states cannot require companies to use class arbitration in dealing with individual large-scale small-stakes consumer claims. *Id.* at 346–47. For several years in the wake of *Concepcion*, plaintiff-side attorneys saw no practical way to bring large numbers of individual small-stakes consumer claims. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 550 (2018) (Ginsburg, J., dissenting) ("Expenses entailed in mounting individual claims will often far outweigh potential

recoveries."). In recent years, however, plaintiff-side attorneys have had some success in bringing large numbers of parallel individual small-stakes consumer claims in arbitration. This case arises out of an attempt to counter this success.

In *Oberstein v. Live Nation Entertainment, Inc*., 60 F.4th 505 (9th Cir. 2023), a separate case from the one now before us, we upheld the district court's grant of Defendants' motion to compel individual arbitration of claims by ticket purchasers. *Id.* at 509. However, while proceedings were still underway in the district court in *Oberstein*, Defendants foresaw that if their motion to compel in that case were granted, they would be faced with a large number of parallel individual claims by ticket purchasers. In anticipation of such claims, Defendants sought to gain in arbitration some of the advantages of class-wide litigation while suffering few of its disadvantages. They turned to New Era, a newly formed arbitration company.

New Era was founded in 2020. Its stated mission is to provide a "critical prophylactic measure for client's mass arbitration risk." *Heckman*, 686 F. Supp. 3d at 962. While the parties dispute the extent of their collaboration, it is undisputed that New Era and Defendants' attorneys, Latham & Watkins LLP, have shown a "remarkable degree of coordination" in devising a set of procedures to be followed when large numbers of similar consumer claims are brought in arbitration. *Id.* at 958 n.13. New Era offered a subscription option under which a client company pays an annual subscription fee. On June 21, 2021, Defendants executed a subscription agreement as New Era's first subscriber. Later that same day, New Era published procedures applicable to large-scale arbitrations in consumer cases.

New Era offered two kinds of arbitration—Standard Arbitration and Expedited/Mass Arbitration. Standard Arbitration is "[g]enerally sought after for complex and/or more evidence intensive disputes. This product is the most similar to a traditional arbitration[.]" New Era Arbitration Rules, ¶ 1.c.ii.1 ("Rules"). Expedited/Mass Arbitration is "[g]enerally sought after for disputes that would benefit from an even more streamlined process [than Standard Arbitration]." Rules, ¶ 1.c.iii.1. A "Mass Arbitration" is "[a] specific type of expedited arbitration where there are Common Issues of Law and Fact among five or more cases." Rules, ¶ 1.c.iii.3.a. With limited exceptions, proceedings in Mass Arbitrations are virtual. *Id.*

On July 2, 2021, while a motion to compel arbitration was pending in the district court in *Oberstein*, Ticketmaster amended the Terms on its ticket sales website to require that any person using its website agree to arbitrate any dispute arising out of a ticket purchase, whenever that purchase took place, and to arbitrate under New Era's Rules applicable to Expedited/Mass Arbitrations.

## II. Defendants' New Terms and New Era's Expedited/Mass Arbitration Rules

The most salient provisions of Defendants' new Terms and New Era's Rules for Expedited/Mass Arbitration are as follows. In this section of our opinion, we do our best to describe the process established by the Rules. However, we note at the outset that New Era's Rules are internally inconsistent, poorly drafted, and riddled with typos, and that Live Nation's counsel struggled to explain the Rules at oral argument.

Under the new Terms of Ticketmaster's website, a person using the website agrees to Expedited/Mass

Arbitration not only for any claim arising out of a current ticket purchase but also for all claims arising out of prior ticket purchases. Terms, § 17. Any updates to the Terms become "effective immediately when [Ticketmaster posts] a revised version of the Terms on the Site." *Heckman*, 686 F. Supp. 3d at 954. By merely "continuing to use [the Ticketmaster] Site after that date, [a consumer] agrees to the changes." *Id.* This provision is particularly disadvantageous to consumers because they often revisit the site in order to use previously purchased digital tickets. It is thus nearly impossible to avoid retroactive application of any changes Ticketmaster imposes.

New Era's Rules for Expedited/Mass Arbitration proceedings differ significantly from the rules of traditional arbitration fora such as Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association. New Era's Rules provide for Mass Arbitration whenever "more than five" cases involve common issues of law or fact. Rules, ¶ 6.b.ii.1; *compare* Rules, ¶ 1.c.iii.3.a. ("five or more"). The Rules purport to provide that the "[d]etermination of whether case(s) [sic] involve Common Issues of Law and Fact rests solely in the hands of the neutral handling the proceeding or a New Era ADR neutral." Rules, ¶ 2.x.ii. But a close reading of the Rules reveals that New Era, and only New Era, will unilaterally make a determination to group, or "batch," similar cases. Under the Rules' order of operations, the arbitrator assigned to the batched cases cannot be determined without input from the lawyers representing the plaintiffs, and the lawyers representing the plaintiffs cannot be identified until after the batching decision is made. Thus, New Era will always unilaterally decide which cases will proceed in a batch.

Rules, ¶ 2.x.ii.2.   Live Nation conceded this point at argument.

After cases are batched, a single arbitrator is chosen to decide all cases in the batch.  Rules, ¶ 2.j–k.  The Rules purport to give plaintiffs an equal say in the selection of the arbitrator through a rank and strike process.  Rules, ¶ 2.j.  In batched cases specifically, "the attorneys for that party (ies) [sic] are responsible for meeting and conferring internally and achieving consensus for purposes of making selections for the rank/strike process."  Rules, ¶ 2.j.v.  While plaintiffs may be able to participate in the selection, New Era "may also otherwise replace a neutral at its sole discretion, upon what New Era ADR deems a legitimate request orconcern [sic] or upon unforeseeable circumstances."  Rules, ¶ 2.k.iv.  The suggestion in the Rules that plaintiffs will have input into the selection of an arbitrator is thus undermined by the fact that the neutral may be replaced at New Era's sole discretion.

Three "bellwether cases" are chosen from the batched cases—one chosen by the plaintiffs, one by the defendant, and one "through a process to be determined by the [arbitrator]."  Rules, ¶ 6.b.iii.3.b.  The arbitrator's decisions in these cases become "precedent" on all common issues in the batched cases, as well as in any later-filed cases added to the batch.  Rules, ¶¶ 6.b.iii.5.a–b.  "Only if a party can demonstrate that there are no Common Issues of Law and Fact will a case be removed from the Mass Arbitration."  Rules, ¶ 6.b.iii.6.c.

Though decisions in bellwether cases are precedential, the arbitration hearing and award in those cases proceed individually and are confidential, known only to the particular plaintiffs, to the defendant company, and to the

arbitrator. Terms § 17. Decisions by the arbitrator in a bellwether case that favors a defendant will thus be binding on non-bellwether plaintiffs, who had no chance to participate in the arbitration and who are ignorant of the decision until it is invoked against them.

A complaint before the arbitrator must set forth the "nature of the dispute, including applicable dates and times, parties involved, as well as the facts," but complaints are limited to ten pages. Rules, ¶ 6.a.ii.1.a–b. There is no right to discovery in Expedited/Mass Arbitration proceedings. Rules, ¶ 2.o.ii. A party in an Expedited/Mass Arbitration proceeding may get discovery only by requesting an "upgrade" to a Standard Arbitration proceeding. The arbitrator "has discretion" to grant or deny such a request. Rules, ¶¶ 2.o.ii–iii.

Both parties must "upload their documents," which comprise all evidence and briefing, within 14 days of filing the complaint. Rules, ¶ 6.a.vii.2. All "[u]ploads are limited to the lesser of 10 total files, 25 total pages for each file or 25MB of aggregate uncompressed uploads." Rules, ¶ 6.a.vii.3. The arbitrator "has discretion to allow evidence in excess of the stated limits [on documents] as necessary to ensure a fundamentally fair process." Rules, ¶ 6.a.vii.4.

After the parties exchange documents and submit briefs, the arbitrator may (but need not) hold a hearing. Rules, ¶¶ 6.a.viii–ix. There is no separate hearing or briefing allowed for threshold issues such as "arbitrability, governing law, [or] jurisdiction." Rules, ¶ 6.z.ii. Those issues "shall be argued and decided at . . . hearings on the merits of the case, and not through any preliminary hearings or motion practice." Rules, ¶ 6.z.ii. After a hearing, or a ruling that "no hearing is necessary," the parties' briefs on

their "final arguments based on the documents and initial arguments submitted earlier in the proceeding" are limited to "15K characters" (about five pages). Rules, ¶ 6.a.x.2.

Once decisions are issued in the three bellwether cases, all plaintiffs batched with those bellwether plaintiffs must participate in a single settlement conference. It is not specified in the Rules, but Live Nation contended during oral argument that Batched Plaintiffs receive bellwether decisions sometime before the settlement conference. Rules, ¶ 6.b.iii.4.b. It is not until after the settlement conference that plaintiffs can finally argue for removal from the mass arbitration. Rules, ¶ 6.b.iii.6.a. Even then, plaintiffs are removed from the batch only if a they can show their case shares "no Common Issues of Law and Fact" with the bellwether cases. Rules, ¶ 6.b.iii.6.c. It is unclear how a batched plaintiff who did not participate in the bellwether case could demonstrate this, because the Rules do not provide access to the bellwether record for non-bellwether plaintiffs in the batch. Without such access, plaintiffs will struggle to differentiate their cases from the bellwethers. Notably, this lack of access is asymmetrical: the defendant will always have access to the record as a party to bellwether cases.

These hurdles are even greater for later-filed cases that are added to the batch. At oral argument, Live Nation contended that later-filing plaintiffs will receive bellwether decisions after they file. However, the Rules do not state when plaintiffs with later-filed cases will receive the bellwether decisions. Rules, ¶ 6.b.iii.4.b. No provision is made in the Rules for later-filing plaintiffs to receive the associated briefing or discovery from the bellwether cases. This is particularly problematic because the records for

earlier-decided cases are permanently deleted 60 days after
the end of the proceedings in those cases.  Rules, ¶ 2.bb.

An award of injunctive relief by the arbitrator may be
appealed to a panel of arbitrators employed by JAMS, but a
denial of injunctive relief may not be appealed. Terms, § 17.
As a practical matter, given that injunctive relief will
virtually always be sought by the plaintiff rather than by the
defendant, this provision operates asymmetrically.    It
provides a right of appeal if the plaintiff's request for an
injunction is granted, but denies a right of appeal if the
plaintiff's request is denied.

### III.  Decision of the District Court

The district court concluded that the delegation clause is
unconscionable, both procedurally and substantively, and is
therefore unenforceable under California state law.    It
concluded, further, that the FAA does not preempt the
application of California law in this case.  The court denied
Defendants' motion to compel arbitration. *Heckman*, 686 F.
Supp. 3d at 969.

The district court first determined that the delegation
clause is procedurally unconscionable "to an extreme
degree." *Id.* at 952.  The court then identified four elements
of New Era's model that rendered the delegation clause
substantively unconscionable:  (1) the application of
precedent from the bellwether decisions to the claimants
who had no opportunity to participate in, or even learn the
content of, those decisions; (2) the lack of discovery and
other procedural limitations; (3) the provisions governing
the selection of arbitrators;  and (4) the limited right of
appeal. *Id.* at 967.  The district court declined to sever the
unconscionable provisions because "unconscionability
permeates" the Terms and Rules. *Id.* at 967–68.

### IV. Standard of Review

We review legal questions de novo, but "review for clear error any factual findings underlying the district court's order." *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023). "We review a district court's decision not to sever unconscionable portions of an arbitration agreement for abuse of discretion." *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021).

### V. Unconscionability Analysis

"In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Under the FAA, a court may declare an arbitration agreement unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, and may invalidate an arbitration agreement by "generally applicable contract defenses, such as fraud, duress, or unconscionability," *Concepcion*, 563 U.S. at 339 (quoting *Dr.'s Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

#### A. Unconscionability of the Delegation Clause

The first question before us is whether the clause delegating to the arbitrator the authority to decide the validity of the arbitration agreement—the delegation clause—is unconscionable and therefore unenforceable. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010). In deciding whether a delegation clause is unenforceable, our analysis is not limited to the bare text of the clause. "A party is . . . permitted under *Rent-A-Center* to challenge the enforceability of a delegation clause by explaining how

'unrelated' provisions make the delegation unconscionable."
*Holley-Gallegly*, 74 F.4th at 1002. "In evaluating an
unconscionability challenge to a delegation provision under
California law, a court must be able to interpret the provision
in the context of the agreement as a whole, which may
require examining the underlying arbitration agreement as
well." *Bielski v. Coinbase, Inc*., 87 F.4th 1003, 1012 (9th
Cir. 2023). A court must "consider the parts of the
agreement that impact[] the delegation provision to decide
its enforceability." *Id.* at 1011. "[I]f a court cannot look
through the delegation provision to the rest of the contract, a
court would fail to see how delegating questions of
arbitrability to an arbitrator was unconscionable." *Id.* at
1012.

To demonstrate unconscionability of Defendants'
delegation clause under California law, Plaintiffs must show
that the clause is both procedurally and substantively
unconscionable. *Armendariz v. Found. Health Psychcare
Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000). "[T]he more
substantively oppressive the contract term, the less evidence
of procedural unconscionability is required to come to the
conclusion that the term is unenforceable, and vice versa."
*Id.* If there is "substantial procedural unconscionability . . . ,
even a relatively low degree of substantive
unconscionability may suffice to render the agreement
unenforceable." *OTO, LLC v. Kho*, 447 P.3d 680, 693 (Cal.
2019).

The delegation clause of Ticketmaster's arbitration
agreement provided in relevant part:

> **Delegation; Interpretation.** The arbitrator,
> and not any federal, state or local court or
> agency, shall have exclusive authority to the

> extent permitted by law to resolve all disputes
> arising out of or relating to the interpretation,
> applicability, enforceability, or formation of
> this Agreement, including but not limited to,
> any claim that all or any part of this
> Agreement is void or voidable . . . .

Terms, ¶ 17.

We conclude, as did the district court, that the delegation clause is both procedurally and substantively unconscionable.

### 1. Procedural Unconscionability

The district court concluded that the delegation clause is "procedurally unconscionable to an extreme degree." *Heckman*, 686 F. Supp. 3d at 952. We agree.

"Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion," *Armendariz*, 6 P.3d at 689, defined as "a standardized contract, imposed upon the subscribing party without an opportunity to negotiate the terms," *Flores v. Transamerica HomeFirst, Inc.*, 113 Cal. Rptr. 2d 376, 381–82 (Cal. Ct. App. 2001). The parties agree that the delegation clause is part of a contract of adhesion. *See Heckman*, 686 F. Supp. 3d at 952 ("The agreement is certainly contained within a contract of adhesion . . . ."). Some California courts have held that in itself "[a] finding of a contract of adhesion is essentially a finding of procedural unconscionability." *Flores*, 113 Cal. Rptr. 2d at 382; *Aral v. EarthLink, Inc.*, 36 Cal. Rptr. 3d 229, 238 (Cal. Ct. App. 2005); *Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 11 (Cal. 2016); *Ramirez v. Charter Commc'ns, Inc.*, 551 P.3d 520, 530 (Cal. 2024). The contract between Plaintiffs and

Ticketmaster is much more than a mere garden variety contract of adhesion.

In deciding procedural unconscionability, California courts "focus[] on the factors of oppression and surprise." *Patterson v. ITT Consumer Fin. Corp.*, 18 Cal. Rptr. 2d 563, 565 (Cal. Ct. App. 1993). "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice." *Flores*, 113 Cal. Rptr. at 381. Surprise is a "function of the disappointed reasonable expectations of the weaker party," *Harper v. Ultimo*, 7 Cal. Rptr. 3d 418, 422 (Cal. Ct. App. 2003), and can arise when "the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms," *Patterson*, 18 Cal. Rptr. 2d at 565 (quoting *A & M Produce Co. v. FMC Corp.*, 186 Cal. Rptr. 114, 122 (Cal. Ct. App. 1982)). The elements of oppression and surprise are "satisfied by a finding that the arbitration provision was presented on a take-it-or-leave-it basis and that it was oppressive due to 'an inequality of bargaining power that result[ed] in no real negotiation and an absence of meaningful choice.'" *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006) (en banc) (quoting *Flores*, 113 Cal. Rptr. 2d at 381) (alteration in original). Both oppression and surprise are present here.

The district court wrote, with respect to oppression, "[I]t is hard to imagine a relationship with a greater power imbalance than that between Defendants and its consumers, given Defendants' market dominance in the ticket services industries." *Heckman*, 686 F. Supp. 3d at 952. Because Ticketmaster is the exclusive ticket seller for almost all live concerts in large venues, prospective ticket buyers in most instances are faced with a choice. They can either use

Ticketmaster's website and accept its Terms, or refuse to use the website and be entirely foreclosed from purchasing tickets on the primary market. *See Szetela v. Discover Bank*, 118 Cal. Rptr. 2d 862, 867 (Cal. Ct. App. 2002) ("The availability of similar goods or services elsewhere may be relevant to whether the contract is one of adhesion . . . ."), *abrogated in part on other grounds by Concepcion*, 563 U.S. 333.

We note, with respect to surprise, that Ticketmaster's Terms state they may be changed without notice and changes apply retroactively. Ticketmaster changed the Terms on its website on July 2, 2021, requiring all website users to agree to arbitration under New Era's Rules. Its website provides that a person merely browsing the website without purchasing a ticket agrees to Ticketmaster's changed Terms. Binding consumers who merely browse a website to the terms specified in the website has been "consistently held . . . to be unenforceable, as individuals do not have inquiry notice." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024); *see also Nguyen*, 763 F.3d at 1177–79; *Douglas v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 495 F.3d 1062, 1066–67 (9th Cir. 2007).

Ticketmaster's Terms also permit unilateral modification of the Terms without prior notice. The Terms provide that Ticketmaster retains the power to "make changes to the Terms at any time" which would "be effective immediately when we post a revised version of the Terms on the Site." Under California law, "oppression is even more onerous" when a "clause pegs both the scope and procedure of the arbitration to rules which might change." *Harper*, 7 Cal. Rptr. 3d at 422; *see also Serpa v. Cal. Sur. Investigations, Inc*., 155 Cal. Rptr. 3d 506, 515 (Cal. Ct. App. 2013).

The changed Terms apply not only prospectively but also retroactively. That is, they apply to "any dispute, claim or controversy . . . irrespective of when that dispute, claim, or controversy arose." *Heckman*, 686 F. Supp. 3d at 954 (alteration in original) (capitalization adjusted). "[A] customer who purchased a ticket prior to the changes to the [Terms] . . . could then be required to bring any dispute regarding that *same* purchase before New Era merely because the customer opened Defendants' website at some later date (regardless of whether they had any intention of transacting business on that occasion)." *Id.* (footnote omitted). Indeed, customers may be *required* to visit the website again to access and use previously purchased tickets. Even standing alone, this provision is procedurally unconscionable under California law. *Peleg v. Neiman Marcus Grp., Inc.*, 140 Cal. Rptr. 3d 38, 42 (Cal. Ct. App. 2012) ("[A]n arbitration contract containing a modification provision is illusory if . . . a contract change[] applies to claims that have accrued or are known."); *see also Szetela*, 118 Cal. Rptr. 2d at 867 (holding that a take-it-or-leave-it amendment to terms "establishe[d] the necessary element of procedural unconscionability").

Finally, the Terms on Ticketmaster's website are affirmatively misleading. For example, they specifically state that all claims will be resolved by "individual arbitration," and not "in any purported class or representative proceeding." This statement is flatly inconsistent with New Era's Rules, to which the Terms bind any person even browsing the site. As described above, the Rules contemplate that cases with common issues or facts will be batched, and that "batched" claims are not resolved by individual arbitration, but are rather treated in a "class or representative" fashion. The ability to request removal from

the batch does not arise until after the arbitration proceedings
and settlement conference, and removal is conditioned on a
showing of "no Common Issues of Law and Fact" with the
bellwether cases.

Read together with the Terms, New Era's Rules form the
final element of surprise.  They are printed in a legible font
and clearly linked to the Terms on Ticketmaster's website,
but the Rules are so dense, convoluted and internally
contradictory to be borderline unintelligible.  *OTO, LLC*,
447 P.3d at 692.  Given that Live Nation's own experienced
appellate counsel strained to explain the Rules during oral
argument, we are left with no confidence that a reasonable
consumer would have any hope of understanding them.

In sum, the Terms on Ticketmaster's website, and the
manner in which Ticketmaster bound users to those Terms,
"evince[] an extreme amount of procedural
unconscionability far above and beyond a run-of-the-mill
contract-of-adhesion case."  *Heckman*, 686 F. Supp. 3d at
953.

### 2.  Substantive Unconscionability

"Substantive unconscionability pertains to the fairness of
an agreement's actual terms and to assessments of whether
they are overly harsh or one-sided."  *OTO, LLC*, 447 P.3d at
690 (quoting *Pinnacle Museum Tower Assn. v. Pinnacle
Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1232 (Cal. 2012));
*Ramirez*, 551 P.3d at 531. When there is "substantial
procedural unconscionability . . . even a relatively low
degree of substantive unconscionability may suffice to
render the agreement unenforceable."  *OTO, LLC*, 447 P.3d
at 693.

The district court held that four features of New Era's Rules support a finding of substantive unconscionability of the delegation clause:  (1) the mass arbitration protocol, including the application of precedent from the bellwether decisions to other claimants; (2) procedural limitations, such as the lack of a right to discovery; (3) the limited right of appeal;  and  (4) the  arbitrator  selection  provisions.[1] *Heckman*, 686 F. Supp. 3d at 957.  We agree.

### a.  Mass Arbitration Protocol

"[A]bsent members [in a class] must be afforded notice, an opportunity to be heard, and a right to opt out of the class." *Concepcion*, 563 U.S. at 349.  This holds true in the arbitral context:  "[A]t least this amount of process would presumably be required for absent parties to be bound by the results of arbitration" as well. *Id.*;  *Epic Systems*, 584 U.S. at 509–10.

If the arbitrator in the bellwether cases holds that the delegation clause is valid, that holding is binding on the plaintiffs in all of the batched non-bellwether cases.  That is, the validity of the delegation clause in all cases is decided in bellwether cases, even though plaintiffs in the non-bellwether cases have no right to participate in the bellwether cases.  Indeed, plaintiffs in the non-bellwether cases will not even know the decision in the bellwether case as to the validity of the delegation clause until that decision is invoked against them.

---

[1] Because we affirm the district court's finding that these four features of the delegation clause render it substantively unconscionable, we do not reach the issue whether plaintiffs plausibly alleged that New Era is biased in favor of Defendants. *Heckman*, 686 F. Supp. 3d at 957–58.

It is black-letter law that binding litigants to the rulings of cases in which they have no right to participate—let alone case of which they have no knowledge—violates basic principles of due process. *Hansberry v. Lee*, 311 U.S. 32, 40–43 (1940). Further, although the procedures set forth in New Era's Rules for Expedited/Mass Arbitrations are superficially similar to the familiar procedures in conventional class actions, they differ in critical respects. A batched plaintiff whose case is not a bellwether case has no notice of the bellwether cases and no opportunity to be heard in those cases. Further, that plaintiff has no guarantee of adequate representation in those cases and has no right to opt out of the batched cases that will be bound by the results in the bellwether cases. *Compare Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985); *Richards v. Jefferson Cnty.*, 517 U.S. 793, 805 (1996); *Taylor v. Sturgell*, 553 U.S. 880, 889–90 (2008).

Recognizing the dissimilarity between New Era's Rules and the rules governing conventional class actions, Defendants contend that the procedures provided in the Rules are similar to those used in federal multidistrict litigation ("MDL"). *See* 28 U.S.C. § 1407. The comparison is inapt, as a quick review of MDL procedures makes clear. The MDL statute authorizes temporary consolidation of civil actions that are filed in different district courts but involve common questions of fact. MDL cases are transferred to a single district court for pretrial proceedings pursuant to an order of a special MDL court, but they remain separate cases. A panel of seven Article III judges decides the fairness of transfers after a hearing; proceedings and judicial rulings are public; the court appoints adequate lead counsel to represent all plaintiffs; and any plaintiff has the opportunity to be heard. 28 U.S.C. § 1407; *see* Andrew Bradt, "A Radical

Proposal: The Multidistrict Litigation Act of 1968," 165 U. PA. L. REV. 831, 842 (2017).  After pretrial proceedings in the transferee court are completed, cases that have not settled are typically transferred back to their original district for trial.

In their brief to us, Defendants contend that the arbitrator's application of "precedent" from the bellwether cases is completely discretionary.  It is true that the Rules provide that an arbitrator "may" apply the "precedent" created by the decisions in the bellwether cases. Rules § 2.x, y.  However, it is obvious that anything more than an occasional failure to apply precedent established in the bellwether cases would defeat the very purpose of the mass arbitration protocol.  Indeed, it is implausible to the point of near impossibility that an arbitrator, absent some compelling reason, would fail to apply the precedent established in the bellwether cases.  Defendants have not suggested a compelling reason—or indeed any reason—that would lead an arbitrator to fail to apply those precedents in a significant number of the batched non-bellwether cases.  Further, even if some discretion exists as to when bellwether precedent is applied to non-bellwether cases, the "Rules provide no guidance as to *how* the neutral is to exercise that discretion." *Heckman*, 686 F. Supp. 3d at 961.

The district court concluded, with some understatement, "that the mass arbitration protocol creates a process that poses a serious risk of being fundamentally unfair to claimants, and therefore evinces elements of substantive unconscionability." *Id.* at 963.  We agree.  New Era's Rules provide to defendants many of the protections and advantages of a class action, but provide to non-bellwether plaintiffs virtually none of its protections and advantages.

b.  Lack of Discovery and Procedural Limitations

Under California law, an arbitral forum must provide "such procedures as are necessary to vindicate th[e] claim." *Armendariz*, 6 P.3d at 761.

New Era's Rules are inadequate vehicles for the vindication of plaintiffs' claims.  To recapitulate briefly: There is no right to discovery.  Complaints are limited to 10 total pages and must set forth the "nature of the dispute, including applicable dates and times, parties involved, as well as the facts."  The evidentiary record and initial briefing is limited to 10 documents, subject to limited exceptions.  Closing briefs are limited to 15,000 characters, or about five pages.  Rules, ¶¶ 2.o, 6.a.vii, 6.a.x, 6.a.ii.1.a–d.

"The denial of adequate discovery in arbitration proceedings leads to the de facto frustration of" statutory rights.  *Armendariz*, 6 P.3d at 683; *see also Fitz v. NCR Corp.*, 13 Cal. Rptr.3d 88, 96 (Cal. Ct. App. 2004).  Discovery is often necessary to decide threshold issues such as the validity of the delegation clause.  For example, a plaintiff may wish to object to the arbitrator charged with ruling on the validity of the delegation clause in one of the bellwether cases on the ground that the arbitrator is unqualified or improperly appointed.  Such an objection would ordinarily require discovery as to the background and possible conflicts of the arbitrator.  Indeed, the district court in this case deemed discovery necessary to fairly resolve such questions.  And the district court evidentiary record in this case is several hundred pages long.  Discovery included not only documents requested from Defendants and New Era, but also extensive depositions.

New Era's restrictions on briefing border on the absurd.  A bellwether plaintiff would have to work a miracle to

successfully brief the merits of his or her claim, make any arbitrability arguments, and provide all evidence in only 10 documents totaling 250 pages, and with 15,000 characters of "final arguments." Rules, ¶ 2.z.ii; 6.a.vii, 6.a.x. We note for comparison that Defendants' memorandum in the district court in support of their motion to compel arbitration—which exclusively addressed threshold issues of arbitrability—was approximately 66,000 characters. Plaintiffs' opposition brief in the district court was approximately 63,000 characters. On appeal to us, Defendants' brief arguing the same threshold issues was approximately 110,000 characters, spanning 82 pages. And in support of its argument, Defendants' submitted over 300 pages of record. The briefing and record on arbitrability alone far exceeds the limits that would apply in a New Era arbitration, which apply to both arbitrability and the merits of a dispute.

It is clear that the procedures specified in the Rules are insufficient to "vindicate" the rights of a single claimant, *Armendariz*, 6 P.3d at 761, let alone sufficient "to protect the nonparties' interests" in a representative proceeding. *Sturgell*, 553 U.S. at 897.

### c. Right of Appeal

When evaluating substantive unconscionability, California courts consider "mutuality" and whether procedures make "[t]he odds . . . far more likely" for one side. *Harper*, 7 Cal. Rptr. 3d at 423.

The Terms on Ticketmaster's website provide: "[I]n the event that the arbitrator awards injunctive relief against either you or us, the party *against whom injunctive relief was awarded* may . . . appeal that decision to JAMS." Terms § 17 (emphasis added). Because only plaintiffs are likely to

pursue injunctive relief, the right to appeal an award of
injunctive relief to JAMS is functionally reserved for
Defendants. "As a practical matter, the benefit which the
[appeals] clause confers on [claimants] is nothing more than
a chimera." *Saika v. Gold*, 56 Cal. Rptr. 2d. 922, 925 (Cal.
Ct. App. 1996). There is no right to appeal the denial of
injunctive relief.

Defendants contend that the California Supreme Court
decision in *Sanchez v. Valencia Holding Co., LLC*, 353 P.3d
741, 751 (Cal. 2015), allows the asymmetrical appeal
provision. The Court in *Sanchez* upheld a law
asymmetrically providing that only arbitral grants of
injunctive relief are subject to second arbitration. The Court
noted that the review of an order granting injunctive relief
furnishes a corporate defendant a "'margin of safety' that
provides the party with superior bargaining strength a type
of extra protection for which it has a legitimate commercial
need." *Id.* at 753 (quoting *Armendariz*, 6 P.3d at 691).

We agree with the district court that *Sanchez* does not
protect the asymmetrical appeal provision in Ticketmaster's
Terms. As the district court pointed out, *Sanchez* involved
traditional arbitration between two individual parties, and
the "fate of the rest of the putative class of claimants was not
in jeopardy." *Heckman*, 686 F. Supp. 3d at 965. Here,
Ticketmaster created "much more than a 'margin of safety';
they [] effectively stacked the deck so they [could] arbitrate
thousands of claims in a single go, and if they lose, simply
go back to JAMS to take an appeal." *Id.* at 966. The denial
of injunctive relief, however, is final for the entire batched
class of plaintiffs.

Defendants argue that even if the asymmetric appeal of
injunctive relief is unconscionable, that "has nothing to do

with the parties' delegation clause." We disagree. Plaintiffs challenging the validity of the delegation clause may be seeking an injunction against the unconscionable arbitration provisions in the rest of the agreement. *See*, *e.g.*, *Morgan Stanley & Co., LLC v. Couch*, 134 F. Supp. 3d 1215, 1219 (E.D. Cal. 2015) (granting preliminary injunction of arbitration); *Brooks v. AmeriHome Mortg. Co.*, *LLC*, 260 Cal. Rptr. 3d 428, 429 (Cal. Ct. App. 2020) (same); *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 784 (9th Cir. 2001) (same). Or they may be seeking an injunction barring the use of a New Era arbitrator. *See Heckman*, 686 F. Supp. 3d at 967 n.21. If the arbitrator denies such requests for injunctive relief, the Terms prohibit appeal of any of the arbitrator's decisions leading to the denial, including the arbitrator's threshold decision under the delegation clause that the parties' dispute is arbitrable.

### d. Procedure for Selecting the Arbitrator

Plaintiffs challenge the procedures provided in New Era's Rules for selecting the arbitrator. If the selection Rules are unconscionable, any decision by an arbitrator selected under those Rules, including a decision under the delegation clause, is infected by that unconscionability.

The district court noted three ways in which it is undisputed that the arbitrator selection Rules are inconsistent with California law:

> Plaintiffs point to three features of New Era's Rules that they claim violate California law: (1) New Era has the power to override a claimant's decision to disqualify an arbitrator; (2) each side, rather than each individual party, has a right to disqualify an

> arbitrator; and (3) a single arbitrator presides
> over several cases at one time.  Defendants
> do not dispute that New Era's Rules violate
> these state law requirements[.]

*Heckman*, 686 F.3d at 964.

Defendants did not argue in the district court, and do not argue here, that these Rules are consistent with the California Arbitration Act ("CAA").  Instead, they contend that the CAA is preempted by the FAA.  We disagree.

The FAA does not "reflect a congressional intent to occupy the entire field of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 477 (1989).  The relevant provisions of the CAA do not empower courts to invalidate arbitration agreements; nor do they interfere with or otherwise burden or obstruct arbitration.  Rather, they are procedural requirements whose stated purpose is to protect the interests of parties to arbitration and thereby "promote public confidence in the arbitration process." Cal. R. Ct. RB Ethics Standards, Standard 1.  They are not "an obstacle to the accomplishment and execution of the full purposes and objectives of the FAA." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183 (2019).

### 3. Unconscionability of the Delegation Clause

Based on the foregoing, we conclude that the delegation clause is procedurally unconscionable to an extreme degree and substantively unconscionable to a substantial degree. Taken in combination, this procedural and substantive unconscionability is fatal to the delegation clause contained in Ticketmaster's Terms.

### B. Unconscionability of the Arbitration Agreement

Because the delegation clause is unconscionable and unenforceable, it falls to the district court, and to our court on appeal, to determine whether the arbitration agreement as a whole is unconscionable and unenforceable. We conclude that it is.

#### 1. Unconscionability

The provisions of the arbitration agreement and New Era's Rules that make the delegation clause unconscionable also serve to make the entire agreement unconscionable, both procedurally and substantively. Even limiting our analysis to the provisions described above, it is plain that it would be impossible for plaintiffs to present their claims on equal footing to Live Nation. Forced to accept Terms that can be changed without notice, a plaintiff then must arbitrate under New Era's opaque and unfair Rules. As explained, the Rules contain multiple interrelated substantive provisions that overtly favor defendants. Read together, the Rules and the Terms are so "overly harsh or one-sided," *OTO, LLC*, 447 P.3d at 690, as to unequivocally represent a "systematic effort to impose arbitration . . . as an inferior forum" designed to work to Live Nation's advantage. *Armendariz*, 6 P.3d at 697.

#### 2. Severability

Ticketmaster's Terms contain a provision stating that in the event New Era cannot conduct the arbitration for any reason, "the arbitration will be conducted by FairClaims pursuant to its FastTrack Rules & Procedures," and, failing that, by an alternative, mutually selected arbitration provider. Terms, § 17. The Terms also include a global severability clause providing that "if any part of the Terms

is determined to be illegal, invalid, or unenforceable," then
(a) "that part shall nevertheless be enforced to the extent
permissible in order to effect the intent of the Terms" and
(b) "the remaining parts shall be deemed valid and
enforceable."  Terms, § 19.

California law grants broad leeway to trial courts to
remedy unconscionable contracts:  "[T]he court may refuse
to enforce the contract, or it may enforce the remainder of
the contract without the unconscionable clause, or it may so
limit the application of any unconscionable clause as to
avoid any unconscionable result." Cal. Civ. Code
§ 1670.5(a).  "At the outset, a court should ask whether 'the
central purpose of the contract is tainted with illegality'" and
whether "the interests of justice would be furthered" by
severance. *Ramirez*, 551 P.3d at 546 (quoting *Armendariz*,
6 P.3d at 696).    The presence of multiple unconscionable
clauses weighs in favor of severance. *Id*.; *Pinela v. Neiman
Marcus Grp., Inc.*, 190 Cal. Rptr. 3d 159, 183 (Cal. Ct. App.
2015);  *Armendariz*, 6 P.3d at 696–97.  We review the
district court's choice for abuse of discretion. *Lim*, 8 F.4th
at 999.

The district court found that Defendants engaged in a
"systematic effort to impose arbitration . . . as an inferior
forum." *Armendariz*, 6 P.3d at 697.  The district court found,
further, that the effects of these unconscionable provisions
were "entirely foreseeable and intended," and that under an
overly generous severability policy, "companies could be
incentivized to retain unenforceable provisions designed to
chill customers' vindication of their rights." *MacClelland v.
Cellco P'ship*, 609 F. Supp. 3d 1024, 1046 (N.D. Cal. 2022);
*Ramirez*, 551 P.3d at 547 ("In conducting this [severability]
analysis, the court may also consider the deterrent effect of
each option."); *Mills v. Facility Sols. Grp., Inc*., 300 Cal.

Rptr. 3d. 833, 859 (Cal. Ct. App. 2022). The district court found that unconscionability permeates all aspects of the arbitration agreement because "the central purpose of the contract" was unlawful and contrary to public interest, *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1273 (9th Cir. 2017), and the agreement contained multiple unconscionable provisions. The district court did not abuse its discretion in so finding and in declining to sever the offending provision of Ticketmaster's Terms and New Era's Rules.

## C.  Preemption

The application of California's unconscionability law to the Terms and Rules challenged here is not preempted by the FAA. Under the FAA, a court may invalidate an arbitration agreement pursuant to "generally applicable contract defenses, such as fraud, duress, or unconscionability," *Concepcion*, 563 U.S. at 339 (quoting *Dr.'s Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). The FAA preempts the application of state unconscionability law that "disfavors" arbitration and interferes with the FAA's objectives. *Id.* at 342. Here, the application of California unconscionability law relies on generally applicable principles that neither disfavor arbitration nor interfere with the objectives of the FAA.

## D.  Unconscionability Conclusion

For the reasons articulated above, we hold that the delegation clause and the arbitration agreement as a whole are both unconscionable under California law, and that the application of California's unconscionability law is not preempted by the FAA.

VI. Alternate and Independent Ground

We also hold, based on an alternate and independent ground, that the application of California unconscionability law to the arbitration agreement at issue here is not preempted by the FAA. We agree with our concurring colleague that the FAA simply does not apply to and protect the mass arbitration model set forth in Ticketmaster's Terms and New Era's Rules. Because the FAA does not apply, the rule of *Discover Bank v. Superior Court*, 113 P.3d 1110 (Cal. 2005), governs the case before us.

In *Discover Bank*, the California Supreme Court held that class action waivers in consumer contracts of adhesion are unconscionable under California law. *Id.* at 1110. The United States Supreme Court later held in *Concepcion* that the FAA preempts any application of the *Discover Bank* rule that poses an "obstacle" to objectives of the FAA. *Concepcion*, 563 U.S. at 352. As applied to the Expedited/Mass Arbitration procedures set forth in Ticketmaster's Terms and New Era's Rules, the *Discover Bank* rule poses no such obstacle, because those procedures do not apply to the forms of arbitration covered by the FAA. We therefore hold under *Discover Bank* that the Terms' class action waiver is unconscionable and unenforceable.

It is clear that Congress did not have class-wide arbitration in mind when it passed the FAA. The Supreme Court has told us that "class arbitration was not . . . envisioned by Congress when it passed the FAA in 1925." *Concepcion*, 563 U.S. at 349; *Viking River Cruises v. Moriana*, 596 U.S. 639, 656–57 (2022); *Varela*, 587 U.S. at 184 ("[I]t is important to recognize the 'fundamental' difference between class arbitration and the individualized form of arbitration envisioned by the FAA."). Class-wide

arbitration did not exist in 1925, *Concepcion*, 563 U.S. at 349 (citing *Discover Bank*, 113 P.3d at 1110), and we should not read the FAA as protecting such arbitration. Rather, "FAA precedents treat *bilateral arbitration* as the prototype of the *individualized* and informal form of arbitration protected from undue state interference by the FAA." *Viking River Cruises*, 596 U.S. at 656–57 (emphasis added); *Epic Systems*, 584 U.S. at 508 (FAA privileges "traditionally individualized" arbitration).

The Supreme Court has consistently disparaged the use of aggregation in arbitration. *Varela*, 587 U.S. at 184; *Concepcion*, 563 U.S. at 350 ("Arbitration is poorly suited to the higher stakes of class litigation."); *id.* at 349 ("[C]lass arbitration requires procedural formality."). A switch from bilateral to aggregative arbitration "sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Concepcion*, 563 U.S. at 348–49; *Epic Systems*, 584 U.S. at 509. Even though some "parties may and sometimes do agree to aggregation" of arbitration claims, the Supreme Court has emphasized that such parties would not be agreeing to "arbitration as envisioned by the FAA." *Concepcion*, 563 U.S. at 351.

Arbitration, as understood by Congress when it enacted the FAA, was designed to be a fair and efficient alternative to bilateral judicial proceedings. It may not be too much to say that this method of dispute resolution contemplated by New Era's Rules is "unworthy even of the name of arbitration." *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999). It is certainly beyond dispute that it is not arbitration as envisioned by the FAA in 1925. *Concepcion*, 563 U.S. at 350. Accordingly, we hold that the application of California law to Ticketmaster's Terms and

New Era's Rules is not preempted by the FAA. *Discover Bank* therefore applies.

*Discover Bank* held that class waivers are unenforceable when contained in a "consumer contract of adhesion," when small damage disputes could predictably arise between the parties, and when the "party with the superior bargaining power" is alleged to have "carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money." *Discover Bank,* 113 P.3d at 1110. As these criteria are easily met here, Ticketmaster's Terms and New Era's Rules are therefore independently unconscionable under *Discover Bank*.

### Conclusion

We affirm the district court. We hold that the delegation clause of Defendants' arbitration agreement with Plaintiffs is unconscionable, that the arbitration agreement as a whole is unconscionable, and that the application of California's unconscionability law is not preempted by the FAA. We also hold, as an alternate and independent ground, that the FAA does not preempt California's *Discover Bank* rule as it applies to mass arbitration.

**AFFIRMED.**

---

VANDYKE, Circuit Judge, concurring in the judgment:

I agree with the majority that we should affirm the decision in this case. But I would resolve this case by simply concluding that the Federal Arbitration Act ("FAA") just does not apply to the type of mass "arbitration" contemplated by Live Nation's agreements.

In *Discover Bank v. Superior Court*, 113 P.3d 1100 (Cal. 2005), the California Supreme Court held that class action waivers in contracts of adhesion are unconscionable. While the Supreme Court held that this state rule is preempted by the FAA in the context of traditional, bilateral arbitration agreements, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), the Court's rationale in *Concepcion* does not support preemption for the very different sort of arbitration now before us. Nor did the district court abuse its discretion in declining to sever the contracts' mass arbitration requirement and replace it with one of Live Nation's backup schemes. Because I think this approach provides the most simple and direct way to resolve this case, I concur in the judgment.

## I. The FAA Does Not Preempt California Law in This Case.

The FAA was enacted in 1925 "in response to widespread judicial hostility to arbitration agreements." *Concepcion*, 563 U.S. at 339. Notably, Section 2 of the FAA contains a savings clause that "permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* (cleaned up); *see also Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 657 (2022) ("[Section] 2's saving clause does not preserve defenses that would allow a party to declare that a contract is unenforceable *just because it requires bilateral arbitration*." (cleaned up) (emphasis in original)).

The Supreme Court in *Concepcion* held that the FAA preempts "state-law rules that stand as an obstacle to the

accomplishment of the FAA's objectives."  563 U.S. at 343.
The FAA's objective is to "ensure the enforcement of
arbitration agreements," which Congress in 1925 understood
to be bilateral in nature, not collective.  *Id.* at 344; *see also
Viking River Cruises*, 596 U.S. at 656–57 (explaining that
there are "fundamental" differences between "the norm of
bilateral arbitration" and class-based arbitration).  It was
enforcement of a *particular type* of arbitration—bilateral
arbitration with its specific advantages and attributes—that
Congress set out to protect when it passed the FAA roughly
one hundred years ago.  *Concepcion*, 563 U.S. at 348; *see
also Viking River Cruises*, 596 U.S. at 649.

So a threshold issue in analyzing FAA obstacle
preemption has to be whether the arbitration agreement
under consideration is one that shares the attributes of
bilateral arbitration as understood in 1925—the only form of
arbitration conceived of by Congress at the time.  *See Viking
River Cruises*, 596 U.S. at 656 ("Our FAA precedents treat
bilateral arbitration as the prototype of the individualized
and informal form of arbitration protected from undue state
interference by the FAA.").  Simply labeling something as
"arbitration" does not automatically bring it within the ambit
of the FAA's protection.  Imagine, for example, an arbitration
clause that required the parties to resolve their disputes
through a vigorous, winner-take-all game of ping-pong.
Would the label "arbitration" be enough to bring that
agreement under the FAA and protect such an "arbitration"
agreement from state laws deeming it unconscionable?  Of
course not.  The Supreme Court said as much in *Viking River
Cruises* when it observed that the "right to enforce
arbitration agreements" secured by the FAA is a protection
only against state laws that attempt to "transform traditional

individualized arbitration into … litigation … at odds with arbitration's informal nature." *Id.* at 651 (cleaned up).

Basic logic and the Supreme Court's reasoning in *Concepcion* and *Viking River Cruises* equally support that there must be an outer boundary to the type of "arbitration" subject to FAA obstacle preemption. Inside that boundary are state laws that "interfere[] with fundamental attributes of arbitration," which are preempted because they "create[] a scheme inconsistent with the FAA." *Concepcion*, 563 U.S. at 344. But outside that boundary are agreements that, even if labeled "arbitration" agreements, operate under procedures whose attributes fundamentally differ from the core attributes of bilateral arbitration envisioned by the FAA. *Viking River Cruises*, 596 U.S. at 658 (noting that class and collective arbitration go beyond the "degree of deviation from bilateral norms" of "traditional arbitral practice"). State laws that interfere with such agreements—those that lack the fundamental attributes of bilateral arbitration—are not obstacles to accomplishing Congress's goals in the FAA and are therefore not preempted.

Understanding the limits of this boundary is key because the Supreme Court's ruling in *Concepcion*—which held that the FAA preempts California's rule in *Discover Bank* that class arbitration waivers can be unconscionable as a matter of law—relies entirely on obstacle preemption. 563 U.S. at 352; *see also Discover Bank*, 113 P.3d at 1109–10. But the scope of obstacle preemption under the FAA is limited to state laws that frustrate Congress's goal of protecting "arbitration's traditionally individualized form." *Viking River Cruises*, 596 U.S. at 655. So applying the reasoning of *Concepcion* to this context leads to a different result than it did in *Concepcion*, where the Court expressly

contemplated interference with "individual" arbitration. *See, e.g.*, 563 U.S. at 350.

What New Era calls "mass arbitration" in this case is certainly outside the bounds of "the norm of bilateral arbitration as our precedents conceive of it." *Viking River Cruises*, 596 U.S. at 657–58 (explaining that "[o]ur precedents use the phrase 'bilateral arbitration' in opposition to 'class or collective' arbitration"). The scheme that New Era has created, which among other arbitration novelties includes "bellwether cases" and "batch proceedings," is an entirely new form of dispute resolution *intentionally designed* to avoid individual, bilateral adjudication of claims—exactly the attributes of arbitration the Supreme Court in *Concepcion* recognized that the FAA protects. Supreme Court precedent thus leaves no doubt that New Era's system of collective arbitration is not what Congress set out to protect in the FAA. *Concepcion*, 563 U.S. at 349 ("[C]lass arbitration was not even envisioned by Congress when it passed the FAA in 1925."); *Viking River Cruises*, 596 U.S. at 655–58. Because *Concepcion* stands for the principle that state law may not create an obstacle to the FAA's purpose of protecting specifically *bilateral* arbitration, its holding is simply inapplicable here. 563 U.S. at 352.

And because New Era's mass arbitration fundamentally differs from bilateral arbitration, the FAA has no preemptive effect in this case. As a result, California's *Discover Bank* rule springs back to life in this context. The rule articulated by the California Supreme Court in that case provides that class action waivers found in consumer contracts are unconscionable as a matter of law, and therefore unenforceable, "when [1] the waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of

damages, and when [2] it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money." *Discover Bank*, 113 P.3d at 1110.

Here, there is no dispute that the contracts at issue are contracts of adhesion. And Plaintiffs allege that Defendants, the party with superior bargaining power, have carried out this scheme in order to cheat large numbers of consumers out of individually small sums of money. So the class action waivers in this case—which run to the delegation clause by preventing class-wide adjudication of threshold issues—are unconscionable and unenforceable under California law.

This is enough to defeat Defendants' motion to compel arbitration. And because appellate courts "may affirm on any basis finding support in the record," I would affirm on this ground without addressing the majority's alternative ground. *Hell's Angels Motorcycle Corp. v. McKinley*, 360 F.3d 930, 933 (9th Cir. 2004).

## II. The District Court Did Not Abuse Its Discretion in Declining to Sever.

I also agree with my panel colleagues that the district court did not abuse its discretion in declining to sever the mass arbitration clause. *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (explaining that a district court's decision "not to sever unconscionable portions of an arbitration agreement" is reviewed for abuse of discretion).

Under California law, district courts enjoy broad leeway when remedying unconscionable contracts and "may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so

limit the application of any unconscionable clause as to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a). "The overarching inquiry is whether the interests of justice would be furthered by severance." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 696 (Cal. 2000) (cleaned up); *see also Ramirez v. Charter Commc'ns, Inc.*, No. S273802, 2024 WL 3405593, at \*19 (Cal. July 15, 2024) (holding that "[e]ven if a contract *can* be cured, the court should also ask whether the unconscionability *should* be cured through severance or restriction because the interests of justice would be furthered by such actions" (emphasis in original)). And severance does not serve the interests of justice when an agreement is "permeated by unconscionability." *Lhotka v. Geographic Expeditions, Inc.*, 104 Cal. Rptr. 3d 844, 853 (Cal. Ct. App. 2010); *Ramirez*, 2024 WL 3405593, at \*19 (explaining that a contract whose "central purpose … is tainted with illegality … cannot be cured" by severance and so, instead, "the court should refuse to enforce it").

Finding that "unconscionability permeates the arbitration clause" in this case, the district court "decline[d] to sever the offending provisions." California law gives district courts "discretion … to refuse to enforce an entire agreement if the agreement is 'permeated' by unconscionability," Cal. Civ. Code § 1670.5(a), and I agree with the majority that Defendants have not met their burden of showing that this was an abuse of the district court's discretion.

\* \* \*

There is one more massive elephant in the room that cries out for acknowledgement. Live Nation argues that none of these issues should be decided by the courts, because the

arbitration agreements in this case contain delegation clauses that require issues such as unconscionability and enforceability to be decided by the arbitrator, not a court. I agree with my colleagues that Live Nation cannot avoid the unconscionability issue in this case, however, because it is well-established that even where the parties' agreement delegates threshold issues to the arbitrator, it is still up to the courts to decide whether the delegation clause itself is unconscionable. *Lim*, 8 F.4th at 1000; *see also O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1092 (9th Cir. 2018). And here, whether you take the majority's route or mine, all the Plaintiffs' arguments about unconscionability apply to the delegation clause in addition to the rest of the arbitration agreement. For example, the argument that *Concepcion*'s preemption rationale simply doesn't apply in the mass arbitration context applies equally to the delegation clause, because under New Era's batching and bellwether way of deciding cases, that issue once decided by the arbitrator in one of the initial arbitrations could be applied as "precedent" to other arbitrations in the same batch of related arbitrations.

But what if they didn't? What if Live Nation was right and only the arbitrator could address the threshold unconscionability and enforceability issues in this case? Pretend with me for a moment you are a freshly hired New Era arbitrator tasked with deciding the very first New Era "bellwether" case, which—because of the contracts' delegation clause—includes the novel questions of whether this whole mass arbitration approach is unconscionable, whether the FAA applies, whether *Discover Bank* applies, etc. Let's say that after much study he reached the same conclusions that I have: that *Concepcion*'s obstacle preemption analysis doesn't apply in the context of mass arbitration agreements, that *Discover Bank* therefore does

apply, that the arbitration agreements aren't severable, and thus Live Nation's mass arbitration clauses are unenforceable.

That single arbitrator would face quite a practical dilemma. If the arbitrator issued that ruling, he wouldn't just be dismissing the case before him. He would literally be ruling against his employer's—New Era's—entire business model. He would be destroying New Era, and of course his own job along with it. And after the dust settled from the nuke he just dropped on his own employer, he would know with absolute certainty that no other arbitration provider or business would ever touch him with a ten-foot pole.

I hope that if I was that person, I would still do the right thing and issue the correct decision. But I know I would think it was enormously unfair that I was put in a situation involving such a massive and obvious conflict of interest.

In addition to that certain conflict of interest, others too seem highly probable in this case. The district court observed below that Live Nation "provided nearly all of New Era's revenue during its first year" and that "there appears to be a remarkable degree of coordination between [Defendants' counsel] and New Era in terms of their interpretation and the evolution of New Era's Rules." Finding these facts to be "concerning," the district court noted that this "could certainly create an inference of bias." It seems to me that the circumstances in this case create more than merely an inference of bias—they create a strong and inescapable perception of bias.

"[A] dispute resolution procedure is not an arbitration unless there is a third party decision maker." *Cheng-Canindin v. Renaissance Hotel Assocs.*, 57 Cal. Rptr. 2d 867, 874 (Cal. Ct. App. 1996). And a third-party decision maker

"whose interests are so allied with those of the party" is, "for all practical purposes … subject to the same disabilities which prevent the party himself from serving." *Graham v. Scissor-Tail, Inc.*, 623 P.2d 165, 177 (Cal. 1981). That seems to be the case here. Not only is the line between Defendants and New Era blurry, but more than that, this agreement would require a New Era arbitrator to decide the question of whether their employer's invention—developed with the help of the party in front of them—is a failure. If the answer to that question is yes, goodbye New Era and the arbitrator's job as an arbitrator—with any arbitration provider, forever.

At oral argument, Live Nation's able counsel pointed to three California cases which stand for the proposition that "generally uncognizable is the belief that arbitrators might over time be biased toward the repeat players that bring them business." *Sandquist v. Lebo Auto., Inc.*, 376 P.3d 506, 522 (Cal. 2016); *see also Tiri v. Lucky Chances, Inc.*, 171 Cal. Rptr. 3rd 621, 635 (Cal. Ct. App. 2014) (holding that conflict issues "are virtually *always* present with delegation clauses" (emphasis in original)); *Aanderud v. Superior Ct.*, 221 Cal. Rptr. 3d 225, 239 (Cal. Ct. App. 2017) (explaining that the fact that threshold "determinations are left to the arbitrator does not make the delegation clause substantively unconscionable").

Respectfully, I don't think those cases are on all-fours with the exceptional pressure-cooker New Era's arbitrator would find himself in if he was forced to decide what we are deciding today. It certainly is true that courts "may not presume categorically that arbitrators are ill-equipped to disregard such institutional incentives and rule fairly and equitably." *Sandquist*, 376 P.3d at 522. But no presumption is required to see a conflict of interest here—the conflict is manifest. Defendants were intimately involved in the

creation of New Era's system for the admitted reason that they were "faced with the emerging phenomenon of a single law firm filing thousands of virtually identical arbitration claims at once."  The system developed by New Era, with the help of Defendants, purposefully modeled its rules "after the bellwether approach used in federal multi-district litigation" to "allow the arbitrator to apply certain determinations from the bellwethers as '[p]recedent' in the remaining cases."

The advantage this provides to Defendants is obvious, and it would be expecting a New Era arbitrator to exhibit a superhuman resistance to ordinary human incentives to issue a ruling that sinks New Era's entire operation and his own career.  This conflict faced by New Era arbitrators is not simply a claimed "bias[] toward the repeat players that bring them business."  *Id.*  It's an obvious and understandable bias everyone has towards their own continued professional survival.

I don't think that obvious conflict of interest uniquely presented in this case can be ignored simply because in other cases courts have rejected arguments about very different types of *possible* biases by arbitrators.  The conflict of interest that would result here if we were to accept Live Nation's urging to punt all these threshold questions to the arbitrator would be both sui generis and inevitable. Thankfully our resolution of this case does not require us to figure out what, if anything, we would need to do about that. But I hesitate to think the right answer would be that we do nothing.

For all these reasons, I respectfully concur in the judgment.