LATHAM & WATKINS LLP
  Timothy L. O'Mara (Bar No. 212731)
    *tim.o'mara@lw.com*
  Andrew M. Gass (Bar No. 259694)
    *andrew.gass@lw.com*
  Alicia R. Jovais (Bar No. 296172)
    *alicia.jovais@lw.com*
  Samuel R. Jeffrey (Bar No. 347533)
    *sam.jeffrey@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095

*Attorneys for Defendants Ticketmaster L.L.C.*
*and Live Nation Entertainment, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>Live Nation Entertainment, Inc., and Ticketmaster LLC,<br><br>　　　　　Defendants. | Case No. 2:22-cv-00047-GW-GJS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>The Honorable George H. Wu<br><br>Hearing Date: April 10, 2025<br><br>Hearing Time: 8:30 am<br><br>Courtroom: 9D, 9th Floor |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

# <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ........................................................................................ 1

II. SUMMARY OF ALLEGATIONS .............................................................. 2

    A. Ticketmaster and Live Nation .......................................................... 2

    B. Plaintiffs and the Putative Class ...................................................... 2

    C. The Alleged Markets ........................................................................ 3

    D. Plaintiffs' Claims ............................................................................. 4

III. LEGAL STANDARD ................................................................................. 5

IV. ARGUMENT ............................................................................................. 5

    A. Plaintiffs Lack Antitrust Standing ................................................... 5

        1. Plaintiffs Do Not Allege Antitrust Injury ............................. 6

        2. Plaintiffs' Alleged Injury Is Indirect And Speculative ................................................................................ 9

    B. Plaintiffs' Conduct Theories Fail As A Matter Of Law ................... 11

        1. Plaintiffs Fail To Plausibly Allege A Tie ............................. 12

        2. Plaintiffs' "Leveraging" Theories Are Conclusory And Nonsensical ................................................................. 13

        3. The Conditional License And Ticket Transferability Limits Are Not Plausible Anticompetitive Conduct ........................................................ 14

        4. Plaintiffs' "Vertically-Arranged Boycott" Theory Falls Short Of Basic Pleading Requirements ...................... 16

    C. Plaintiffs' Section 1 Claim Fails For The Independent Reason That The Complaint Does Not Sufficiently Allege An Unlawful Agreement ......................................................... 17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

　　　　　D.　　Plaintiffs' Claims Related To Secondary Ticketing Fail
　　　　　　　　For Lack Of A Plausible Market ........................................................ 19

V.　　CONCLUSION ............................................................................................ 22

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Alaska Airlines v. United Airlines*,
948 F.2d 536 (9th Cir. 1991) ................................................................ 13

*Am. Ad Mgmt. v. Gen. Tel. Co.*,
190 F.3d 1051 (9th Cir. 1999) ...................................................... 5, 6, 7, 8

*Apple v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................. 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................... 5, 14

*Ass'n of Wash. Pub. Hosp. Districts v. Philip Morris*,
241 F.3d 696 (9th Cir. 2001) .......................................................... 8, 11

*Bakay v. Apple*,
2024 WL 3381034 (N.D. Cal. July 11, 2024), *appeal docketed*,
No. 24-5314 (9th Cir. Aug. 30, 2024) ...................................... 7, 8, 9, 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................. 14, 17, 18

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ............................................................ 12

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) .......................................................... 6, 10

*Cost Mgmt. Servs. v. Wash. Nat. Gas Co.*,
99 F.3d 937 (9th Cir. 1996) .......................................................... 13, 14

*De Jesus v. Sears, Roebuck & Co.*,
87 F.3d 65 (2d Cir. 1996) ............................................................. 12, 13

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ............................................................ 18

*Eagle v. Star-Kist Foods*,
812 F.2d 538 (9th Cir. 1987) ............................................................ 10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

*Eastman Kodak Co. v. Image Tech. Servs.,*
   504 U.S. 451 (1992) ........................................................................... 12

*Facebook v. Power Ventures,*
   2010 WL 3291750 (N.D. Cal. July 20, 2010) ................................... 15

*Fed. Trade Comm'n v. Facebook,*
   560 F. Supp. 3d 1 (D.D.C. 2021) ...................................................... 19

*Feitelson v. Google,*
   80 F. Supp. 3d 1019 (N.D. Cal. 2015)................................... 7, 8, 9, 10

*FTC v. Qualcomm,*
   969 F.3d 974 (9th Cir. 2020) .............................................................. 6

*Hernandez v. Select Portfolio,*
   2015 WL 3914741 (C.D. Cal. June 25, 2015) .................................. 20

*Hicks v. PGA Tour,*
   897 F.3d 1109 (9th Cir. 2018) ........................................................ 20

*hiQ Labs v. LinkedIn Corp.,*
   485 F. Supp. 3d 1137 (N.D. Cal. 2020) ........................................... 13

*Howard Hess Dental Labs. v. Dentsply Int'l,*
   602 F.3d 237 (3d Cir. 2010) ............................................................ 18

*Illinois Tool Works v. Indep. Ink,*
   547 U.S. 28 (2006) .......................................................................... 12

*In re Gilead Scis. Sec. Litig.,*
   536 F.3d 1049 (9th Cir. 2008)........................................................... 5

*In re Google Digital Advert. Antitrust Litig.,*
   2024 WL 988966 (S.D.N.Y. Mar. 7, 2024) ..................................... 11

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde,*
   466 U.S. 2 (1984) ............................................................................ 13

*Kendall v. Visa U.S.A.,*
   518 F.3d 1042 (9th Cir. 2008)..................................................... 17, 18

*Kennedy Theater Ticket Serv. v. Ticketron,*
   342 F. Supp. 922 (E.D. Pa. 1972)................................................... 16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

*Little v. Pac. Seafood Procurement, LLC*,
   2024 WL 2305603 (N.D. Cal. May 21, 2024) .................................................. 14

*Lorenzo v. Qualcomm*,
   603 F. Supp. 2d 1291 (S.D. Cal. 2009) ............................................................ 8

*M.A.P. Oil Co. v. Texaco*,
   691 F.2d 1303 (9th Cir. 1982) ........................................................................ 14

*Newcal Indus. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ........................................................................ 19

*People v. Waisvisz*,
   221 Ill. App. 3d 667 (1991) ............................................................................ 16

*Reilly v. Apple*,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022) .......................................................... 20

*Sambreel Holdings LLC v. Facebook*,
   906 F. Supp. 2d 1070 (S.D. Cal. 2012) ..................................................... 11, 15

*Serv. & Training v. Data Gen. Corp.*,
   963 F.2d 680 (4th Cir. 1992) .......................................................................... 12

*Spectrum Sports v. McQuillan*,
   506 U.S. 447 (1993) .................................................................................. 14, 16

*Stubhub v. Golden State Warriors, LLC*,
   2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) .................................................. 20

*Tate v. PG&E*,
   230 F. Supp. 2d 1072 (N.D. Cal. 2002) .......................................................... 14

*Tellabs v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) .................................................................................. 15, 21

*Threshold Enters. Ltd. v. Pressed Juicery*,
   445 F. Supp. 3d 139 (N.D. Cal. 2020) ............................................................ 21

*Ticketmaster L.L.C. v. RMG Techs.*,
   536 F. Supp. 2d 1191 (C.D. Cal. 2008) .......................................................... 20

*United States v. Apple*,
   791 F.3d 290 (2d Cir. 2015) ........................................................................... 18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

*Verizon Commc'ns v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ............................................................................................ 11

*Vernor v. Autodesk*,
    621 F.3d 1102 (9th Cir. 2010) .......................................................................... 16

*William O. Gilley Enters. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) ........................................................................ 5, 10

**RULES**

Fed. R. Evid. 201(b) .............................................................................................. 21

**TREATISES**

30A C.J.S. Entertainment and Amusement (Dec. 2024 update) ............................ 16

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vi

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

## I.    INTRODUCTION

Plaintiffs invent a false vision of the live entertainment industry in which key players—including the world's most famous and powerful performers, the country's largest live event venues, and fierce competitors like SeatGeek and StubHub—are somehow trapped "under [the] monopolistic thumb" of Defendants Live Nation and Ticketmaster.  Complaint, ECF No. 1 ("Compl.") ¶ 18.  To hear Plaintiffs tell it, nearly every facet of Defendants' businesses—including their fifteen-year-old merger, their contracts with venues, their relationships with artists and resellers, and their ticketing technology itself—contributes to a sprawling "anticompetitive scheme" that has raised ticket fees for every primary and secondary ticket purchaser in the country since 2010.  Specifically, Plaintiffs allege that Defendants have (1) monopolized alleged markets for primary ticketing services and secondary ticketing services for major concert venues through exclusive venue contracts, tying, "leveraging," "misusing" a conditional license against ticket brokers, limiting ticket transferability, and "vertically-arranged boycotts," in violation of Sherman Act § 2; (2) attempted to monopolize those same markets via the same conduct, in violation of Sherman Act § 2; and (3) entered "one or more" unspecified agreements with "various major concert venues, ticket brokers, artists, and others," in violation of Sherman Act § 1.  *Id.* ¶¶ 143-184; 185-195; 196-207.

Plaintiffs' conspiratorial account of the industry bears no resemblance to reality.  But even accepting the deeply misinformed factual allegations as true, the Complaint fails to state a claim for four reasons.  ***First,*** as a threshold matter, Plaintiffs lack antitrust standing to challenge conduct in the alleged markets for primary ticketing and concert promotion *services* because, as end-user ticket buyers, they do not participate directly in those markets.  And even if they did, their theory of how Defendants' conduct toward *venues* supposedly impacts the ticket fees *consumers* pay is too speculative to support antitrust standing.  ***Second,*** Plaintiffs' Section 2 claims—which confusingly lump together two markets and five conduct

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

1

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

theories—are based on certain conduct that cannot as a matter of law support an antitrust violation.  Specifically, Plaintiffs' tying theories fail for want of a single buyer; their "leveraging" and "vertically-arranged boycott" theories fail to meet basic pleading standards; and their claims about the conditional license and ticket transferability limits disregard relevant law.  **Third,** Plaintiffs fail to allege any unlawful agreement with the specificity *Twombly* demands to state a Section 1 claim.  **And fourth,** Plaintiffs' claims related to an alleged market for "secondary ticketing services for major concert venues" fail because that is not a plausible market.

Plaintiffs' allegations are false.  But they are also legally infirm for the reasons herein.  The Court should dismiss the Complaint—or at the very least narrow it.

## II.    SUMMARY OF ALLEGATIONS

### A.    Ticketmaster and Live Nation

Ticketmaster is a ticketing company—it provides primary ticketing services to venues, helping them sell and service tickets to the events they host.  Compl. ¶¶ 22, 39.  It also provides secondary ticketing services to ticket resellers, allowing them to connect with (and resell to) potential purchasers.  *Id.* ¶¶ 22, 44.

Live Nation is a concert promotion company—it works with artists to finance live events and tours, providing services and upfront funds to the artist in exchange for a portion of the revenue if the event turns a profit.  *Id.* ¶¶ 34-35.

Ticketmaster and Live Nation merged in 2010.  *Id.* ¶ 8.

### B.    Plaintiffs and the Putative Class

Plaintiffs are four ticket purchasers (*i.e.*, fans) who allege that they paid "supracompetitive fees on primary and secondary ticket purchases from Ticketmaster's online platforms."  *Id.* ¶¶ 6, 25-28.  They seek to represent two classes of "end-user purchasers … who purchased [1] a primary ticket" or [2] "a secondary ticket" from Defendants for "an event at a major concert venue in the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1  United States" and "paid associated fees" since 2010.[1]  *Id.* ¶ 131.

2  ## C.    The Alleged Markets

3  Plaintiffs allege that Defendants have monopolized (or attempted to

4  monopolize) two nationwide services markets: (1) "primary ticketing services for

5  major concert venues" and (2) "secondary ticketing services for major concert

6  venues."  *Id.* ¶¶ 144, 186-187.

7  In the first, the customers are "major concert venue operators … who retain

8  primary ticketing service providers."  *Id.* ¶ 68(c).  "Major concert venues" are

9  defined as those "likely to generate a larger volume of commerce," "to have greater

10  seating capacity[,] and to be located closer to major metropolitan areas."  *Id.* ¶ 48.

11  All smaller venues are excluded.  Plaintiffs allege that "Ticketmaster has a market

12  share exceeding 70%" of this market.  *Id.* ¶ 7.

13  The second alleged market is for the provision of secondary ticketing services,

14  which provide "online platform[s] that allow[] ticket holders to post their ticket(s)

15  for sale," and "connect[] ticket resellers to ticket purchasers."  *Id.* ¶¶ 44, 66.

16  "[S]econdary ticketing services have unique purposes from primary ticketing

17  services:  the latter are meant to facilitate and run the original sale of tickets on a

18  venue's behalf, and the former are meant to facilitate ticket purchasers' resale of

19  their ticket(s) at a later date."  *Id.* ¶ 68(b).  The customers are not venues, but instead

20  "purchasers who bought a ticket and now wish to resell that ticket."  *Id*. ¶ 68(c).

21  Plaintiffs allege that the buyers of secondary tickets "may not … know if they are

22  purchasing a primary or secondary ticket at the time of sale."  *Id.* ¶ 102.  Although

23  secondary ticketing services are not provided to venues and do not differ based on

24  venue size, this market too is limited to "major concert venues."  *Id.* ¶ 68.  On

25  "information and belief," Plaintiffs allege that Ticketmaster's share of this market

26

27

28

[1]    A substantial number of putative class members are subject to enforceable arbitration agreements with Defendants.  Defendants expressly reserve—and do not waive—all rights to compel arbitration under those agreements.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1    "exceeds 60%."  *Id.* ¶ 22.

2        Plaintiffs also allege a third market for the provision of "concert promotion

3    services for major concert venues," in which the customers are artists.  *Id.* ¶¶ 34,

4    73-74.  Plaintiffs do not allege a monopolization claim in this market; instead, they

5    allege this market is part of a tying arrangement.  *Id.* ¶ 165.

6        **D.    Plaintiffs' Claims**

7        Plaintiffs allege that Defendants have monopolized and attempted to

8    monopolize the primary and secondary ticketing services markets in violation of

9    Section 2 by engaging in five forms of conduct.  Defendants allegedly (1) "entered

10   into long-term exclusive dealing arrangements with venues with respect to the

11   provision of primary and secondary ticketing services"; (2) "leveraged" their

12   "monopoly power in [the alleged] relevant markets" to further monopolize those

13   markets; (3) "misuse[d]" Ticketmaster's conditional license against ticket brokers,

14   and further "appl[ied] technological limitations on primary ticket transferability" to

15   exclude rivals from secondary ticketing; (4) unlawfully tied (a) concert promotion

16   services and primary ticketing services, and (b) primary ticketing services and

17   secondary ticketing services; and (5) engaged in some unspecified "vertically-

18   arranged boycott."  *Id.* ¶¶ 148, 155-156, 161-162, 164-173, 174-184; *see also id.*

19   ¶¶ 186-187 (same conduct for attempted monopolization).  The alleged conduct

20   primarily involves Defendants' interactions with *venues*, *rival ticketers*, and *ticket*

21   *brokers*—not end-user ticket purchasers like Plaintiffs.

22       Plaintiffs also allege that Defendants violated Section 1 by "enter[ing] into

23   one or more" agreements with "various venues, ticket brokers, artists, and others."

24   *Id.* ¶¶ 197-198.  Except for generic, non-specific references to Ticketmaster's

25   ticketing contracts with venues, and some nebulous agreement with three ticket

26   brokers that is alleged on "information and belief" in one sentence, Plaintiffs never

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1  say what these supposed Section 1 agreements are, when they were made, or who

2  specifically was involved.  *Id.* ¶¶ 86-89, 105, 196-207.

## III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  And, "in an antitrust case, a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles." *William O. Gilley Enters. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009).

## IV.    ARGUMENT

### A.    Plaintiffs Lack Antitrust Standing

Plaintiffs' claims regarding primary ticketing services and concert promotion services fail because Plaintiffs lack antitrust standing to challenge conduct in those alleged markets.  As the Ninth Circuit has explained:

> Section 4 of the Clayton Act authorizes the award of damages under the antitrust laws [to] "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws …."  This provision is quite broad, and if "[r]ead literally, could afford relief to all persons whose injuries are causally related to an antitrust violation."  The Supreme Court has determined, however, that Congress did not intend § 4 to have such an expansive scope.  Therefore, courts have constructed the concept of antitrust standing, under which they "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them," to determine whether a plaintiff is a proper party to bring an antitrust claim.

*Am. Ad Mgmt. v. Gen. Tel. Co.*, 190 F.3d 1051, 1054 (9th Cir. 1999) (internal citations omitted).  To determine whether a plaintiff has antitrust standing, courts consider five factors: (1) whether the plaintiff has suffered an "antitrust injury"; (2) the directness of the injury; (3) the speculative nature of the harm; (4) the risk of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

duplicative recovery; and (5) the complexity in apportioning damages. *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455-56 (9th Cir. 2021). Here, Plaintiffs fail to satisfy at least the first, second, and third factors.

### 1.    *Plaintiffs Do Not Allege Antitrust Injury*

The first factor—antitrust injury—requires a plaintiff to plausibly allege: (a) unlawful conduct causing (b) an injury to the plaintiff that (c) flows from what makes the conduct unlawful, and (d) is of the type the antitrust laws were intended to prevent. *Id.* at 456. "[T]he antitrust injury analysis must begin with the identification of the defendant's specific unlawful conduct." *Am. Ad Mgmt.*, 190 F.3d at 1055. This is in part because antitrust injury "requires the plaintiff to have suffered its injury *in the market where competition is being restrained*." *Id.* at 1057 (emphasis added). "Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in *another* market do not suffer antitrust injury." *FTC v. Qualcomm*, 969 F.3d 974, 992 (9th Cir. 2020) (emphasis added).

Here, Plaintiffs allege that competition has been restrained in markets for "primary ticketing services" and "concert promotion services" for "major concert venues." But Plaintiffs do not allege that they participate in, or that they suffered their purported injuries in, either of those markets. Instead, Plaintiffs are downstream, end-user ticket purchasers (*i.e.*, consumers of *tickets*), *see* Compl. ¶ 131; they are not consumers of primary ticketing *services* or concert promotion *services*.

The consumers of primary ticketing services are "major concert venue operators." *Id.* ¶ 68(c). In this market, ticketing companies provide services *to venues*—not to end-user ticket purchasers. *Id.* ¶ 7 ("Ticketmaster provides primary ticketing services to … venues."); *see also id.* ¶ 68(a) (primary ticketing services are "for venues"); *id.* ¶ 68(c) ("the customers for primary ticketing services" are "major concert venue operators … who retain primary ticketing service providers"); *id.* ¶ 39

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

6

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1    ("Primary ticketing service providers contract with venues to manage and sell

2    primary ticket inventory.").  Plaintiffs are not venues.

3          The consumers of concert promotion services are artists and their managers.

4    *Id.* ¶¶ 31, 34.  In this market, "[t]he [artist's] manager or booking agent contracts

5    with promoters … to secure payment terms for artists as compensation for their live

6    performances."  *Id.* ¶ 34; *see also id.* ¶ 84 (alleging that "[a]rtists look to concert

7    promotion service providers").  Plaintiffs are not artists or artist managers.

8          Because Plaintiffs do not allege that they participated in—let alone suffered

9    injury in—the primary ticketing and concert promotion *services* markets that they

10   allege were restrained, Plaintiffs have not alleged that they suffered a legally

11   cognizable antitrust injury.  *Am. Ad Mgmt.*, 190 F.3d at 1057.  That is fatal—

12   "antitrust injury is necessary … to establish [antitrust] standing."  *Id.* at 1055.

13         <u>*Alleged Injury Arising In Downstream Retail Market*</u>.  It is legally irrelevant

14   that Plaintiffs may participate in some separate, downstream retail market where the

15   price of tickets was allegedly impacted indirectly.  That is not enough to satisfy the

16   antitrust injury requirement.

17         *Feitelson v. Google*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015), is illustrative.

18   There, the court addressed antitrust claims based on allegedly anticompetitive

19   agreements between Google and smartphone manufacturers.  *Id*. at 1022.  Plaintiffs

20   were consumers in the downstream retail market for cell phones and alleged that

21   they paid inflated prices due to the upstream anticompetitive contracts.  *Id.* at

22   1027-28.  The court held that plaintiffs lacked antitrust standing because they alleged

23   "supracompetitive pricing in Android phones, which is not the market in which the

24   alleged anticompetitive conduct occurred."  *Id.* at 1027-28.

25         *Bakay v. Apple*, 2024 WL 3381034 (N.D. Cal. July 11, 2024), *appeal

26   docketed*, No. 24-5314 (9th Cir. Aug. 30, 2024), is also instructive.  There, consumer

27   plaintiffs alleged that Apple and web browser developers unlawfully agreed that the

28   developers would not release their own browser engines on iOS, which in turn led

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1   to consumers paying "supracompetitive iPhone prices." *Id.* at *2, *7. The court

2   concluded that plaintiffs lacked antitrust standing because their alleged injury did

3   not occur in the market in which competition was allegedly restrained: "[T]he site

4   of Plaintiffs' injury [was] the smartphone market, while Apple's alleged

5   anticompetitive conduct occur[ed] in the U.S. mobile browser market." *Id.* at *7.

6   Thus, even though plaintiffs "directly purchase[d] their iPhones from Apple, and, in

7   turn, directly bought iOS from Apple," "[w]hat matter[ed] [was] whether Plaintiffs'

8   alleged injury in the smartphone market amount[ed] to a claim of antitrust injury in

9   the U.S. mobile browser market." *Id.* The court held it did not. *Id.*

10  So too here. Plaintiffs do not allege that their purported injury occurred in the

11  markets for primary ticketing or concert promotion services that they claim were

12  restrained. Rather, their alleged injury—higher ticket fees—supposedly occurred in

13  a different, downstream, *retail* market for tickets. This mismatch requires dismissal.

14  *Feitelson*, 80 F. Supp. 3d at 1027-28; *Bakay*, 2024 WL 3381034 at *7; *Ass'n of*

15  *Wash. Pub. Hosp. Districts v. Philip Morris*, 241 F.3d 696, 705 (9th Cir. 2001)

16  (affirming dismissal for lack of antitrust injury where, although plaintiffs allegedly

17  were "potential participants" in market where allegedly anticompetitive conduct

18  occurred, their "*injuries* were not experienced in [that] market, but rather in [a

19  different] market").

20  <u>*The "Inextricably Intertwined" Exception Does Not Apply*</u>. There is "a

21  narrow exception to the market participant requirement for parties whose injuries

22  are 'inextricably intertwined' with the injuries of market participants." *Am. Ad*

23  *Mgmt.*, 190 F.3d at 1057 n.5. "This exception applies when the [plaintiff] can be

24  considered the 'direct victim' of [the alleged conduct] or the 'necessary means' by

25  which [it] was carried out." *Lorenzo v. Qualcomm*, 603 F. Supp. 2d 1291, 1300-01

26  (S.D. Cal. 2009). Here, there are no allegations that end-user ticket purchasers were

27  the "direct victims" or somehow the "means" by which Ticketmaster supposedly

28  monopolized the upstream services markets. Instead, Plaintiffs' theory is that

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

Defendants engaged in anticompetitive conduct directed at venues, rival ticketers, and ticket brokers, where the alleged subsequent effect in the downstream retail market was higher ticket fees. That is not enough for antitrust standing. *See, e.g.*, *Feitelson*, 80 F. Supp. 3d at 1027-28; *Bakay*, 2024 WL 3381034 at \*7.

### 2.    *Plaintiffs' Alleged Injury Is Indirect And Speculative*

The second and third factors in the antitrust standing test—directness of injury and speculative nature of harm—also require dismissal. Plaintiffs allege that they paid higher ticket fees. *E.g.*, Compl. ¶ 114. But for most of the conduct alleged in the Complaint, Plaintiffs plead no theory of causation that links the challenged conduct to higher ticket fees. The only conduct that Plaintiffs attempt to connect to their alleged harm is Ticketmaster's exclusive agreements with venues, which Plaintiffs claim are the "primary source" of Ticketmaster's "dominance" and, therefore, Plaintiffs' alleged injury.[2] *Id.* ¶ 61. In a single paragraph, Plaintiffs allege (1) Ticketmaster *overpays* venues with "up-front payments, plus kickbacks of a portion of fan-paid ticketing services fees," which (2) somehow reduces price competition between "comparable" venues "in the same region," which (3) somehow leads to higher, "less consumer-friendly" ticketing fees. *Id.* ¶ 88. Plaintiffs' theory is that (4) if this anticompetitive conduct were stopped, and Ticketmaster paid venues *less* money, then (5) venues would respond by *reducing* ticketing fees for consumers. *See id.*

*First*, one thing is indisputable: Consumers are not direct victims in that causal chain. To support antitrust standing, "[t]he chain of causation between the injury and the alleged restraint in the market should lead directly to the 'immediate

---

[2]  It is unclear whether Plaintiffs think venues are victims or accomplices. Plaintiffs allege that venues are protected from price competition by "joining the Ticketmaster network of venues," and that they "shar[e] in Ticketmaster's monopoly profits." *Id.* ¶ 88. But elsewhere, Plaintiffs allege that Defendants engage in "rampant intimidation and anticompetitive coercion" of venues. *Id.* ¶ 91. These contradictory allegations imply very different—indeed, likely conflicting—chains of causation.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1  victims' of any alleged antitrust violation." *Eagle v. Star-Kist Foods*, 812 F.2d 538,

2  541 (9th Cir. 1987).  Here, it does not.  *See Feitelson*, 80 F. Supp. 3d at 1028 (no

3  antitrust injury where plaintiffs were "at least one step removed from the preclusive

4  effect" of agreements "at the core of [their] antitrust claims").

5      *Second*, Plaintiffs' theory that exclusive ticketing contracts lead to higher

6  ticketing fees rests on a causal chain that is wholly speculative.  Venues are not

7  powerless when it comes to ticketing fees.  To the contrary, Plaintiffs admit that

8  venues (a) "take a portion of the fees added to the face value of tickets," and

9  (b) "help set ticketing fees for their shows."  Compl. ¶¶ 37, 88.  In that world, if

10  Ticketmaster reduced its fee payments to a venue, the economically rational

11  response would be for the venue to raise its portion of the ticketing fees to make up

12  for the lost revenue.  At best, Plaintiffs have admitted that there are multiple inputs

13  to setting ticketing fees, and they merely speculate regarding the outcome of

14  modifying just one variable in that complex equation.  *See City of Oakland*, 20 F.4th

15  at 460-61 (affirming dismissal for lack of antitrust standing given "speculative links

16  in the chain of causation" between alleged restraint and injury).

17      More fundamentally, Plaintiffs' causal theory is simply implausible.  There is

18  no dispute that the primary ticketing services market is a rights market, where venues

19  sell the rights to ticket their events to ticketing companies.  More competition in

20  rights markets implies that sellers will be paid more for their rights, which, in turn,

21  increases costs in the supply chain and puts *upward* pricing pressure on everyone

22  downstream.  This means that Plaintiffs' causal theory—that more competition

23  among ticketing providers would result in lower consumer fees—is diametrically

24  opposed to economic reality and, therefore, grounds for dismissal.  *See William O.*

25  *Gilley Enters.*, 588 F.3d at 662 ("[A] court must determine whether an antitrust claim

26  is 'plausible' in light of basic economic principles.").

27      *Third*, Plaintiffs' injury is also too indirect because their allegations establish

28  "the existence of an identifiable, more-directly harmed class of [alleged] victims."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1   *Bakay*, 2024 WL 3381034, at *7; *see also Philip Morris*, 241 F.3d at 701 (courts ask

2   "whether there are more direct victims of the alleged wrongful conduct who can be

3   counted on to vindicate the [antitrust] law[s]").  The Complaint rests on conduct that

4   supposedly harmed *venues*, *rival ticketers*, and *ticket brokers*.  *E.g.*, Compl. ¶ 10

5   (alleging harm to rival primary ticketers and venues); *id.* ¶ 94 (alleging harm to

6   venues); *id.* ¶ 14 (alleging Defendants "force[d] secondary ticket brokers into

7   agreeing to exclusively use Ticketmaster's secondary ticketing platform"); *id.* ¶ 105

8   (similar); *id.* ¶ 113 (alleging harm to ticketing competitors).  The existence of these

9   "more-directly harmed" entities with "incentive to sue" for antitrust violations

10  "weighs against granting standing" to Plaintiffs, who are plainly "more remote."

11  *Bakay*, 2024 WL 3381034, at *7.

12       For all these reasons, Plaintiffs lack antitrust standing, and are not the proper

13  plaintiffs to bring the claims they allege.

14  **B.    Plaintiffs' Conduct Theories Fail As A Matter Of Law**

15       Most of Plaintiffs' conduct claims would fail even if they had antitrust

16  standing.   Plaintiffs bring Section 2 claims for monopolization and attempted

17  monopolization.  It is well settled that "[t]he mere possession of monopoly power …

18  is … not unlawful"; instead, it must be "accompanied by an element of

19  anticompetitive *conduct*."  *Verizon Commc'ns v. L. Offs. of Curtis V. Trinko, LLP*,

20  540 U.S. 398, 407 (2004).   Anticompetitive conduct is conduct that lacks "a

21  legitimate  business  purpose"  and  "makes  sense  only  because  it  eliminates

22  competition."  *Sambreel Holdings LLC v. Facebook*, 906 F. Supp. 2d 1070, 1081

23  (S.D. Cal. 2012).  Plaintiffs allege certain conduct that is not anticompetitive as a

24  matter of law, and those legally baseless theories of monopolization should be

25  dismissed.  *See, e.g.*, *In re Google Digital Advert. Antitrust Litig.*, 2024 WL 988966,

26  at  *10,  *12  (S.D.N.Y.  Mar.  7,  2024)  (dismissing  "individual  theories  of

27  anticompetitive conduct," such as "the leveraging claim asserted as part of Count I

28  [for monopolization]" and "any claim involving Google's encryption of user IDs").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

### 1.  *Plaintiffs Fail To Plausibly Allege A Tie*

Tying occurs when "the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008).  In other words, it is the forced imposition of a second product on a buyer who would prefer to buy the first standing alone.  *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 464 n.9 (1992).  Plaintiffs allege two purported ties: (1) Defendants "condition[] the provision of concert promotion services on the use of primary ticketing services from Ticketmaster," and (2) Defendants "condition[] the provision of primary ticketing services on the use of secondary ticketing services from Ticketmaster."  Compl. ¶¶ 165, 170.  Both are incoherent:  It makes no sense that concert *promotion* services provided to *artists* could somehow be conditioned on *venues'* agreement to use Ticketmaster's *ticketing* services.  Similarly, it makes no sense to speak of tying primary and secondary ticketing services since the former is an inventory management and marketing product provided to *venues*, whereas the latter is a platform used by *ticket resellers*—i.e., anyone reselling a ticket, which can run the gamut from professional ticket brokers to everyday fans whose plans change.

Doctrinally, neither tying theory satisfies the "fundamental principle" that "an illegal tying arrangement requires that at least two products and/or services be purchased by *the same individual*."  *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (emphasis added); *see also Illinois Tool Works v. Indep. Ink*, 547 U.S. 28, 34-35 (2006) (the "essential characteristic of an invalid tying arrangement" requires a single "buyer" of two products); *Serv. & Training v. Data Gen. Corp.*, 963 F.2d 680, 685-86 (4th Cir. 1992) (tying claim failed because buyers of the tying product "do not even purchase" the tied product).

Plaintiffs' first alleged tie fails for want of a single buyer.  Plaintiffs allege that *artists* (through their managers or booking agents) purchase Live Nation's concert promotion services.  *E.g.*, Compl. ¶¶ 31, 34.  But these same buyers do not

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

purchase Ticketmaster's primary ticketing services.  Instead, Plaintiffs allege that *venues* purchase primary ticketing services. *E.g.*, *id.* ¶¶ 38-39.  Because "there are two different consumer groups"—and therefore "no tying of products directed at the same consumer group"—Plaintiffs' first tying theory "makes no sense." *hiQ Labs v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1153-54 (N.D. Cal. 2020).

Plaintiffs' second alleged tie suffers from the same fatal defect.  Plaintiffs allege that Defendants "condition[] the provision of primary ticketing services on the use of secondary ticketing services from Ticketmaster."  Compl. ¶ 170.  But, again, Plaintiffs fail to allege that two services are forced onto a single buyer.  To the contrary, Plaintiffs emphasize that "the customers for secondary ticketing services for events at major concert venues *are distinct from* the customers for primary ticketing services for events at major concert venues":  "[M]ajor concert venue operators" purchase primary ticketing services, while consumers of secondary ticketing services are "purchasers who bought a ticket" they "now wish to resell." *Id.* ¶ 68(c) (emphasis added).  Allegations that two distinct buyers purchase two distinct products cannot support a tying claim as a matter of law. *E.g.*, *De Jesus*, 87 F.3d at 71; *hiQ Labs*, 485 F. Supp. 3d at 1153-54.

Finally, both tying claims also fail because Plaintiffs do not allege that a "substantial volume of commerce is foreclosed" by either alleged tie. *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984); Compl. ¶¶ 164-173 (tying claim, no substantial foreclosure alleged).

### 2. *Plaintiffs' "Leveraging" Theories Are Conclusory And Nonsensical*

The Ninth Circuit rejects "leveraging" as "an independent theory of liability under Section 2." *Alaska Airlines v. United Airlines*, 948 F.2d 536, 547 (9th Cir. 1991).  Consequently, leveraging can support liability only where "there is a dangerous probability" that the challenged conduct will create a monopoly in a second market. *Cost Mgmt. Servs. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 952 (9th Cir.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1    1996).

2    Here, Plaintiffs' "leveraging" allegations—consisting of three short

3    paragraphs, Compl. ¶¶ 155-157—are nothing more than "[t]hreadbare recitals of the

4    elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556

5    U.S. at 678.  Because Plaintiffs do no more than "couch[]" a legal conclusion as

6    factual allegations, they fail to state a claim.  *Id.* (quoting *Bell Atl. Corp. v. Twombly*,

7    550 U.S. 544, 555 (2007)).

8    Plaintiffs' leveraging theories would fail even if the Court excused their

9    pleading failures.  Leveraging "requires 'the existence of two separate product or

10   service markets.'"  *Little v. Pac. Seafood Procurement, LLC*, 2024 WL 2305603, at

11   *4 (N.D. Cal. May 21, 2024) (quoting *M.A.P. Oil Co. v. Texaco*, 691 F.2d 1303,

12   1306 (9th Cir. 1982)).  Here, Plaintiffs allege, in part, that Defendants use their

13   (purported) monopoly power in the market for primary ticketing services to

14   monopolize that *same* market.  Compl. ¶¶ 155-156.  That circular theory fails.

15   Plaintiffs also claim "on information and belief" that Defendants have

16   leveraged their monopoly power in the alleged markets for primary ticketing and

17   concert promotion services to monopolize the alleged market for secondary ticketing

18   services.  *Id.* ¶ 156.   In the Ninth Circuit, "[i]t is not enough … merely to obtain a

19   competitive advantage in the second market." *Tate v. PG&E*, 230 F. Supp. 2d 1072,

20   1081 (N.D. Cal. 2002).  Rather, leveraging requires a dangerous probability of

21   monopolizing a second market, *Cost Mgmt. Servs.*, 99 F.3d at 952, which in turn

22   requires "inquiry into the relevant product … market" and the defendant's alleged

23   power in it, *Spectrum Sports v. McQuillan*, 506 U.S. 447, 459 (1993).  Here, the

24   secondary ticketing services market fails as a matter of law, so Plaintiffs cannot

25   plead a dangerous probably of monopolizing it.  *See infra* Section IV.D.

26       **3.    *The Conditional License And Ticket Transferability Limits Are Not Plausible Anticompetitive Conduct***

27

28   Next, Plaintiffs attempt to recast as antitrust violations (i) a commonplace

platform use license, and (ii) alleged ticket transfer restrictions.  Compl. ¶¶ 97-113, 161-162, 175-176, 187.  Neither constitutes anticompetitive conduct.

*First*, Plaintiffs claim that Ticketmaster "misuse[s]" its conditional license to "coerce[] ticket brokers and other ticket resellers not to work with other secondary ticketing service providers."  *Id.* ¶¶ 103-105, 161.  According to Plaintiffs, "[t]he conditional license allows users to view Ticketmaster's site and access its contents only if they agree to a bevy of restrictions that prevent brokers from purchasing tickets from Ticketmaster and then reselling them on rival secondary ticketing platforms."  *Id.* ¶ 103.  Nonsense.  The Court can read Ticketmaster's Conditional License for itself—it is a provision in Ticketmaster's Terms of Use—and there is no credible argument that it conditions use of Ticketmaster's site on not dealing with Ticketmaster's rivals.  *See* ECF No. 31-29 at 88-89.[3]  It is a run-of-the-mill platform license that allows users to view Ticketmaster's website in exchange for users' agreement not to engage in misconduct, such as infecting the platform with computer viruses.  *Id.*  Conditional use licenses like this one are commonplace and regularly enforced.  *See Facebook v. Power Ventures*, 2010 WL 3291750, at *13-14 (N.D. Cal. July 20, 2010) (rejecting Section 2 counterclaim based on allegedly anticompetitive enforcement of terms governing use of Facebook's website); *Sambreel Holdings*, 906 F. Supp. 2d at 1075-78, 1080 (Facebook may "dictate the terms on which it will permit its users to take advantage of the Facebook social network" and may "require that its users disable certain products before using its website").

*Second*, Plaintiffs allege that Ticketmaster uses its "mobile ticket technology" (*e.g.*, SafeTix) to impose "technological limits on primary ticket transferability."  Compl. ¶¶ 15, 106-111, 162.  That is false.[4]  But even if it were true, ticket transfer

---

[3]  In resolving a motion to dismiss, courts can consider "documents incorporated into the complaint by reference."  *Tellabs v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

[4]  SafeTix is a secure mobile ticketing technology that features an encrypted barcode

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

15

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

restrictions are commonplace, reflecting tickets' legal status as mere licenses, not property rights. *E.g.*, *Kennedy Theater Ticket Serv. v. Ticketron*, 342 F. Supp. 922, 925 (E.D. Pa. 1972) ("Admission tickets have been uniformly defined as revocable licenses."); 30A C.J.S. Entertainment and Amusement § 88 (Dec. 2024 update) ("[T]he purchase of a ticket to a sports or entertainment event typically creates nothing more than a revocable license."). Simply put, because tickets are licenses, it has long been held that "an event sponsor may impose restrictions on the transferability of tickets which it issues." *People v. Waisvisz*, 221 Ill. App. 3d 667, 671 (1991); *see also* 30A C.J.S. Entertainment and Amusement § 90 (same); *cf. Vernor v. Autodesk*, 621 F.3d 1102, 1111-12 (9th Cir. 2010) (discussing "significant transfer restrictions" as a hallmark of a license).

Finally, Plaintiffs' allegations regarding Ticketmaster's conditional license and ticket transfer technology are irrelevant because they are directed at their claim for attempted monopolization of the secondary ticketing services market. Because that market fails as a matter of law, there can be no claim for attempted monopolization of it. *See infra* Section IV.D; *Spectrum Sports*, 506 U.S. at 459 ("[D]emonstrating the dangerous probability of monopolization in an attempt case … requires inquiry into the relevant product … market.").

### 4. *Plaintiffs' "Vertically-Arranged Boycott" Theory Falls Short Of Basic Pleading Requirements*

Plaintiffs' "vertically-arranged boycott" theory fails because it is vague, conclusory, and lacks specific allegations of an agreement to boycott Ticketmaster's competitors. Plaintiffs claim that Defendants have "induced and coerced venues to boycott Ticketmaster's competitors for the provision of primary ticketing services"

---

that refreshes every 15 seconds. It creates a verified ticket that protects buyers from fraudulent tickets. It does not have anything to do with restricting transferability or precluding resale on rival ticketing platforms. To the contrary, Ticketmaster provides this technology free to ticket purchasers, and ticket purchasers can use it to validate resale tickets regardless of what platform they are purchased on. If the Complaint or any amended complaint goes forward with allegations that Ticketmaster uses SafeTix to restrict ticket transferability, Defendants will file a Rule 11 motion to address this issue.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

and have "agreed with and induced and/or coerced ticket brokers and other ticket resellers to boycott Ticketmaster's competitors for the provision of secondary ticketing services."   Compl. ¶¶ 174, 175.[5]  Yet the Complaint fails to specify who agreed to boycott whom, when, and how—thus omitting even the most basic information required to plead an unlawful agreement.  *See Twombly*, 550 U.S. at 555; *Kendall v. Visa U.S.A.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008).

Plaintiffs further claim—again without basic details—that Defendants "agreed with and/or coerced artists into preventing primary ticket purchasers from working with other secondary ticketing service providers."  Compl. ¶ 176.  This allegation is particularly obscure—and far-fetched.  What role do artists play in this scenario?  Are they victims or accomplices?  How were they "coerced"?  Which artists "prevented" which ticket buyers from "working with" other secondary platforms, and how?  Plaintiffs do not say.  Because Plaintiffs "plead[] only ultimate facts … and legal conclusions"—and not "the necessary evidentiary facts to support those conclusions"—their boycott theory fails.  *Kendall*, 518 F.3d at 1047-48.

## C.   Plaintiffs' Section 1 Claim Fails For The Independent Reason That The Complaint Does Not Sufficiently Allege An Unlawful Agreement

Plaintiffs' Section 1 claim is nothing but a conclusory repackaging of their Section 2 claims, labeled as "one or more contracts, combinations, or conspiracies."  Compl. ¶¶ 197-207.  It fails to satisfy *Twombly* and must be dismissed.

Plaintiffs allege that "Defendants and various venues, ticket brokers, artists, and others have entered into one or more contracts, combinations, or conspiracies" (or have been "induced or coerced" to do so) "to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Ticketmaster in the relevant markets for primary and secondary

---

[5] Similar to Plaintiffs' allegations about venues, it is unclear whether ticket brokers are victims or accomplices of the supposed boycott—which is yet another reason the boycott allegations fail to satisfy *Twombly*.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

ticketing services for major concert venues." *Id.* ¶¶ 197-198. Plaintiffs further allege that these agreements "include but are not limited to long-term exclusive dealing arrangements, tying arrangements, and vertically-arranged boycotts." *Id.* ¶ 200. Plaintiffs do not say which specific agreements they are challenging, who was involved, when the agreements were supposedly made, or what anyone actually agreed to do. Nor do they explain whether the "various venues, ticket brokers, artists, and others" (whoever "others" are) are accomplices or victims of the alleged conduct. These failures alone are grounds for dismissal. *See Twombly*, 550 U.S. at 556-57 ("conclusory allegation[s] of agreement" are insufficient); *Kendall*, 518 F.3d at 1047 (requiring plausible allegations about the "specific time, place, or person[s] involved in the alleged conspiracies").

To the extent Plaintiffs' Section 1 claim is based on Ticketmaster's exclusive agreements with venues, it fails for an additional reason. If Plaintiffs are attempting to allege some broader conspiracy among Ticketmaster and *multiple* venues, they do not come close to pleading the facts required to state a claim for such a conspiracy. *See United States v. Apple*, 791 F.3d 290, 314 n.15 (2d Cir. 2015) (existence of a "rim" of horizontal agreements among the "spokes" is a required element of any hub-and-spoke conspiracy). At best, Plaintiffs plead "a bare assertion of conspiracy"—which "will not suffice." *Twombly*, 550 U.S. at 556. And if Plaintiffs are trying to challenge Ticketmaster's agreements with *individual* venues under Section 1, they do not even attempt to plead that any specific venue agreement substantially forecloses competition, as would be required to state such a claim. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 205-10 (4th Cir. 2002) (finding that plaintiff failed to state a Section 1 claim based on Microsoft's series of exclusive licenses with original equipment manufacturers, and explaining that *each individual license* needed to be analyzed separately to determine whether plaintiff alleged that each harmed competition); *Howard Hess Dental Labs. v. Dentsply Int'l*, 602 F.3d 237, 255-56 (3d Cir. 2010) (series of bilateral contracts with common hub is not a

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

single conspiracy under Section 1; plaintiff must allege that *each agreement* harmed competition).

### D. Plaintiffs' Claims Related To Secondary Ticketing Fail For Lack Of A Plausible Market

Plaintiffs allege that Defendants have monopolized or attempted to monopolize a market for secondary ticketing services, claiming that Ticketmaster has a 60% share of this market. Compl. ¶¶ 22, 46, 71, 146. Plaintiffs pulled this figure out of thin air, citing nothing and offering no explanation for it. It is categorically wrong.[6] Courts dismiss monopolization claims grounded in baseless allegations of market share. *See Fed. Trade Comm'n v. Facebook*, 560 F. Supp. 3d 1, 17-18 (D.D.C. 2021) (collecting cases and explaining that "bare" assertions of market share "in excess of 60%" are insufficient to plead market power).

Setting Plaintiffs' false market share allegations aside, it is not even clear what Plaintiffs mean by a market for "secondary ticketing services for major concert venues." Compl. ¶¶ 46-47. For instance, there are a few allegations suggesting that customers in this market include not just resellers, but also ticket "purchasers." *See id.* ¶ 44 ("secondary ticketing service providers … connect[] ticket resellers to ticket purchaser, and provid[e] services *to both*" (emphasis added)); *id.* ¶ 68 ("customers for secondary ticketing services [are] secondary ticket sellers *and* purchasers" (emphasis added)). If that is the case, then the product would include secondary *tickets*, not just ticketing *services*. On the other hand, the Complaint repeatedly states that this is a ticketing *services* market for ticket resellers. *See id.* ¶¶ 44, 66-68. Both formulations fail.

A properly defined relevant market must "encompass the product at issue as well as all economic substitutes." *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038,

---

[6]  In any credibly defined market related to secondary ticket sales, Ticketmaster's market share will not exceed 30%. Plaintiffs cannot allege otherwise consistent with their Rule 11 obligation. If the Complaint or any amended complaint goes forward with allegations that Ticketmaster's share of such a market is 60%, Defendants will file a Rule 11 motion to address this issue.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1   1045 (9th Cir. 2008).  Economic substitutes are reasonably interchangeable products

2   with sufficient cross-elasticity of demand—*i.e.*, those with similar uses "considering

3   the price, characteristics[,] and adaptability of the competing commodities." *Reilly*

4   *v. Apple*, 578 F. Supp. 3d 1098, 1106 (N.D. Cal. 2022).  Dismissal is appropriate

5   where "judicial experience and common sense" indicate that the alleged market is

6   "not natural, artificial, and contorted to meet [the plaintiff's] litigation needs." *Hicks*

7   *v. PGA Tour*, 897 F.3d 1109, 1117, 1121 (9th Cir. 2018).

8        With respect to secondary *tickets*, Plaintiffs' alleged secondary market does

9   not include primary tickets.  Compl. ¶¶ 66-69.  But the Complaint admits—as it

10  must—that primary and secondary tickets are functionally indistinguishable to the

11  buyer:  "[C]onsumers can now purchase primary or secondary tickets … and may

12  not even know if they are purchasing a primary or secondary ticket at the time of

13  sale." *Id.* ¶ 102.[7]  Indeed, multiple courts have reached this conclusion:  Whether a

14  ticket is purchased directly from the original issuer or indirectly from a reseller

15  makes absolutely no difference, because the "primary" vs. "secondary"

16  nomenclature does not change the nature of the ticket—what the consumer is buying

17  is a license to enter the event, whether the ticket is being sold for the first time or the

18  tenth.  *See Stubhub v. Golden State Warriors, LLC*, 2015 WL 6755594, at *3 (N.D.

19  Cal. Nov. 5, 2015*)* ("[A] 'primary' ticket to a Warriors game and a 'secondary' ticket

20  to a Warriors game are 'commodities reasonably interchangeable by consumers for

21  the same purposes' … as both primary and secondary tickets are used for the purpose

22  of obtaining entry to a Warriors game."); *Ticketmaster L.L.C. v. RMG Techs.*, 536

23  F. Supp. 2d 1191, 1197 (C.D. Cal. 2008) ("The Court is reasonably sure that …

24  [a consumer] would not care whether her ticket was purchased through Ticketmaster

---

[7]  Where relevant market allegations are "internally contradictory," they cannot stand.  *Apple v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008) (dismissing claims); *Hernandez v. Select Portfolio*, 2015 WL 3914741, at *10 (C.D. Cal. June 25, 2015) ("Contradictory allegations … are inherently implausible.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1   in the 'retail' market or from a ticket broker in the 'resale' market ... as long as she

2   is able to attend the [event].").  For this reason, to the extent Plaintiffs' secondary

3   ticketing services market purports to include secondary *tickets*, it fails.

4         With respect to secondary *services*, the alleged market fails because Plaintiffs

5   implausibly limit it to "major concert venues."  Compl. ¶ 20.  They define a "major

6   concert venue" as "a facility suitable for hosting events of the most successful artists

7   and the largest concert tours."  *Id.* ¶ 48.  These venues are supposedly distinct

8   because they generate "a larger volume of commerce," offer "greater seating

9   capacity," and are located close to "major metropolitan areas."  *Id*.  Plaintiffs assert

10  that Ticketmaster and artists "internally categorize[] concerts as a specific type of

11  ticketing," and that major concert venues require "more sophisticated *primary*

12  ticketing services than other venues."  *Id*. ¶¶ 49-51 (emphasis added).

13        All of that is irrelevant to *secondary* ticketing services.  Unlike primary

14  ticketing services, which are a *business-to-business* offering provided to venues,

15  secondary ticketing services are a *business-to-consumer* offering that anyone can

16  provide without offering primary ticketing services and without having any

17  relationships with venues—large or small.  *See id.* ¶ 44 (secondary ticketing

18  platforms are simply "online platforms connecting ticket resellers to ticket

19  purchasers").  The fact that content sold on secondary ticketing platforms crosses

20  every conceivable form of live entertainment and is venue size-agnostic is "not

21  subject to reasonable dispute," Fed. R. Evid. 201(b), and is easily confirmed by

22  looking at the tickets available at any given time on any of the major secondary

23  ticketing platforms, including StubHub (https://www.stubhub.com/), Vivid Seats

24  (https://www.vividseats.com/), and SeatGeek (https://seatgeek.com/).  *See*

25  *Threshold Enters. Ltd. v. Pressed Juicery*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020)

26  ("[W]ebsites and their contents may be judicially noticed" for their "existence and

27  content"); *Tellabs*, 551 U.S. at 322.  This means that all of the alleged distinguishing

28  characteristics of "major concert venues" have zero relevance to secondary ticketing

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

services.  Indeed, Plaintiffs admit that "[f]or *primary* ticketing service providers, the platform is venue-specific."  *Id.* ¶ 68(f) (emphasis added).  By contrast, "secondary ticketing service providers … provide a platform with very *different* services and functionality," focused on "connecting sellers and purchasers"—*not* providing "venue-specific" services.  *Id.* (emphasis added).  In other words, secondary ticketing platforms provide, and resellers use, secondary ticketing services in exactly the same way, regardless of whether the tickets at issue are for an event at the largest stadium or the smallest club.  Venue size is an artificial, implausible way to divide the alleged market.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion.

Dated:  January 27, 2025                      Respectfully Submitted,

LATHAM & WATKINS LLP

By:  */s/ Timothy L. O'Mara*

Timothy L. O'Mara

505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  +1.415.391.0600
tim.o'mara@lw.com

*Attorneys for Defendants*
*Live Nation Entertainment, Inc. and*
*Ticketmaster L.L.C.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C., certifies that this brief contains 6,997 words, which complies with the word limit of L.R. 11-6.1.


Dated: January 27, 2025                              */s/ Timothy L. O'Mara*

                                                      Timothy L. O'Mara

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

MEM. OF POINTS & AUTHS.
ISO MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS