**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
 kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
 adamwolfson@quinnemanuel.com
William R. Sears (Bar No. 330888)
 willsears@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
 brantleypepperman@quinnemanuel.com
Robert B. Fuqua (Bar No. 335479)
 robfuqua@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

**KELLER POSTMAN LLC**
Warren D. Postman (Bar No. 33069)
 wdp@kellerpostman.com
1101 Connecticut Avenue, N.W., Suite 1100
Washington, D.C. 20036
Telephone:   (202) 918-1123

*Interim Co-Lead Class Counsel*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKOT HECKMAN, LUIS PONCE, JEANENE POPP, and JACOB ROBERTS, on behalf of themselves and all those similarly situated,<br><br>    Plaintiffs,<br><br>        vs.<br><br>LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER LLC,<br><br>    Defendants. | Case No. 2:22-cv-00047-GW-GJS<br><br>The Honorable George H. Wu<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing Date:    April 10, 2025<br><br>Hearing Time:    8:30 am<br><br>Courtroom:    9D, 9th Floor |

# **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.     INTRODUCTION .................................................................................................. 1

II.    SUMMARY OF ALLEGATIONS ...................................................................... 2

     A.    Defendants Dominate Concert Promotion and Ticketing for Major Concert Venues .................................................................................... 2

     B.    Defendants Deploy an Anticompetitive Scheme to Maintain Dominance and Extract Monopolistic Profits............................................. 3

          1.    Economic Threats and Retaliation Against Venues Undercut Ticketmaster's Primary Ticketing Competitors ........... 3

          2.    Long-Term Exclusive Deals Suppress Competition in the Primary Ticketing Services Market .............................................. 3

          3.    Defendants Weaponize Ticketmaster's Conditional Licenses To Harm Secondary Ticketing Competition ................. 4

          4.    Defendants' Restrictive Ticketing Technology Harms Secondary Ticketing Competitors .................................................. 5

     C.    Plaintiffs Bear the Cost of Defendants' Scheme By Paying Supracompetitive Fees Directly to Defendants ....................................... 5

III.   LEGAL STANDARD ......................................................................................... 6

IV.   ARGUMENT ...................................................................................................... 6

     A.    Plaintiffs Plausibly Allege Antitrust Standing.......................................... 6

          1.    Consumers That Directly Pay a Defendant Anticompetitively-High Fees Suffer Antitrust Injury ................. 7

          2.    Plaintiffs' Injuries Are Inextricably Intertwined with Defendants' Anticompetitive Conduct ........................................ 9

          3.    Plaintiffs' Direct Purchases from Defendants Cause Direct, Non-Speculative Damages ............................................. 10

     B.    Plaintiffs Plausibly Plead Anticompetitive Conduct Under Section 2 ................................................................................................. 12

          1.    Defendants Ignore That Anticompetitive Conduct Is Analyzed As A Whole, Rather Than As Its Constituent Parts ........................................................................................... 12

          2.    Plaintiffs Plausibly Allege Each Type of Anticompetitive Act.................................................................................................. 14

               (a)    Plaintiffs plausibly allege Defendants' tying ................... 14

      (b)    Plaintiffs plausibly allege Defendants' monopoly leveraging ......................................................... 15

      (c)    Plaintiffs plausibly allege Defendants used licenses and technology to suppress secondary ticketing competition ................................................................ 16

      (d)    Plaintiffs sufficiently detail their boycott allegations ...... 17

C.    Plaintiffs Adequately and Plausibly Identify the Concerted Action Underlying Their Section 1 Claim ............................................. 18

D.    Plaintiffs Plausibly Define a Relevant Market for Secondary Ticketing Services ........................................................................ 19

    1.    Plaintiffs Adequately Allege Ticketmaster's Market Power ...... 20

    2.    Plaintiffs Define a Market for Ticketing *Services*, Not Tickets ...................................................................... 21

    3.    Plaintiffs Adequately Allege a Major Concert Venue Submarket ................................................................... 21

V.    CONCLUSION ........................................................................ 22

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF AUTHORITIES

Page (s)

CASES

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
   190 F.3d 1051 (9th Cir. 1999) ...................................................................... 6, 7, 8

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
   2024 WL 918030 (S.D.N.Y. Mar. 2, 2024) ....................................................... 8

*Apple Inc. v. Pepper*,
   587 U.S. 273 (2019) ................................................................ 7, 8, 10, 11, 12

*Ass'n of Washington Pub. Hosp. Districts v. Philip Morris Inc.*,
   241 F.3d 696 (9th Cir. 2001) ........................................................................... 9

*Bakay v. Apple*,
   2024 WL 3381034 (N.D. Cal. July 11, 2024) ................................................... 9

*Balderas v. Countrywide Bank, N.A.*,
   664 F.3d 787 (9th Cir. 2011) .......................................................................... 14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................... 6, 19

*Biddle v. Walt Disney Co.*,
   696 F. Supp. 3d 865 (N.D. Cal. 2023) ............................................................ 21

*Blue Shield of Virginia v. McCready*,
   457 U.S. 465(1982) .................................................................................... 9, 10

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ........................................................................................ 22

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) .......................................................................... 12

*City of Anaheim v. S. California Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992) .................................................................. 12, 13

*Clayco Petroleum Corp. v. Occidental Petroleum Corp.*,
   712 F.2d 404 (9th Cir. 1983) ............................................................................ 6

*Complete Ent. Res. LLC v. Live Nation Ent., Inc.*,
   2017 WL 6512223 (C.D. Cal. Oct. 16, 2017) ...................................................... 13

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) ..................................... 12, 13

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*,
   99 F.3d 937 (9th Cir. 1996) .................................................................................. 15

*Datagate, Inc. v. Hewlett-Packard Co.*,
   60 F.3d 1421 (9th Cir. 1995) ................................................................................ 15

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) ................................................................................. 12

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ................................................................................ 19

*Don Copeland v. Energizer Holdings, Inc.*,
   716 F. Supp. 3d 749 (N.D. Cal. 2024) .................................................................. 19

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
   111 F.4th 337 (4th Cir. 2024) ............................................................................... 12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) .............................................................................................. 14

*Eberle v. City of Anaheim*,
   901 F.2d 814 (9th Cir. 1990) ................................................................................ 16

*Facebook v. Power Ventures*,
   2010 WL 3291750 (N.D. Cal. July 20, 2010) .................................................. 16, 17

*Feitelson v. Google Inc.*,
   80 F. Supp. 3d 1019 (N.D. Cal. 2015) .................................................................... 9

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
   852 F. Supp. 2d 1171 (N.D. Cal. 2012) ................................................................ 17

*GCIU-EMployer Ret. Fund v. Quad/Graphics, Inc.*,
   2016 WL 3027336 (C.D. Cal. May 26, 2016) ...................................................... 21

*Hexcel Corp. v. Ineos Polymers, Inc*,
   2010 WL 11520539 (C.D. Cal. Feb. 23, 2010) .................................................... 11

*High Tech. Careers v. San Jose Mercury News*,
    996 F.2d 987 (9th Cir. 1993) .............................................................. 20

*Kendall v. Visa U.S.A. Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ............................................................ 18

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ........................................... 12, 14

*Kickflip, Inc. v. Facebook, Inc.*,
    999 F. Supp. 2d 677 (D. Del. 2013) .................................................... 16

*Klein v. Facebook, Inc.*,
    580 F. Supp. 3d 743 (N.D. Cal. 2022)................................... 20, 21, 22

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ................................................................ 6

*In re Live Concert Antitrust Litig.*,
    247 F.R.D. 98 (C.D. Cal. 2007) .......................................................... 11

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ............................................................................ 17

*In re Musical Instruments & Equipment Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ............................................................ 19

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021) .............................................................................. 11

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) .............................................................. 8

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ............................................... 19, 20, 22

*Ostrofe v. H.S. Crocker Co.*,
    740 F.2d 739 (9th Cir. 1984) .............................................................. 10

*Pac. Steel Grp. v. Com. Metals Co.*,
    600 F. Supp. 3d 1056 (N.D. Cal. 2022)............................................... 20

*Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*,
    768 F.3d 938 (9th Cir. 2014) .......................................................... 6, 11

*Rumble, Inc. v. Google LLC*,
    2022 WL 3018062 (N.D. Cal. July 29, 2022) ....................................... 13

*Sambreel Holdings LLC v. Facebook*,
    906 F. Supp. 2d 1070 (S.D. Cal. 2012) ........................................ 16, 17

*Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*,
    951 F.2d 1158 (9th Cir. 1991) ............................................. 10

*Zulily, LLC v. Amazon.com, Inc.*,
    2024 WL 5262903 (W.D. Wash. Dec. 31, 2024) ............................... 17

**RULES / STATUTES**

15 U.S.C. § 1 .......................................................... 1, 18

15 U.S.C. § 2 .................................................... 12, 13, 15, 17

Fed. R. Civ. P. 8 ..................................................... 19, 21

Fed. R. Civ. P. 9(b) .................................................... 1, 18

Fed. R. Civ. P. 11 .................................................... 17, 20

## I.    **<u>INTRODUCTION</u>**

Plaintiffs' 75-page, fact-laden Complaint details how Defendants excluded competition in the live music ticketing industry since 2010 through a web of exclusive contracts, economic threats, technological barriers, and coercive restraints. This damaged consumers (*i.e.*, Plaintiffs and the putative classes) when Defendants directly overcharged them supracompetitive fees with each ticket they purchased. This is a straightforward antitrust theory (and, indeed, Judge Fischer of this District denied ***summary judgment*** in a similar case against Defendants). Nevertheless, Defendants seek dismissal based on several arguments that, if anything, show why this case is more appropriate for trial than summary disposition.

Defendants first argue that consumers lack antitrust standing. That is baffling because the nature of Defendants' ticketing services is to directly sell tickets to consumers and directly charge them (supracompetitive) fees. Long-held precedent—including the Supreme Court's decision in *Apple v. Pepper* (which Defendants do not even mention)—confirms this direct-purchaser relationship is the quintessential basis for antitrust standing.

Defendants next try to isolate their conduct into different "buckets" and argue that none, in isolation, are anticompetitive. These arguments are wrong on the merits, but also because Ninth Circuit law holds that anticompetitive conduct must be viewed *holistically*. Defendants' arguments misconstrue the Complaint and/or raise factual disputes that cannot be resolved now.

Next, Defendants argue that to adequately allege "concerted action" for Section 1 purposes, Plaintiffs must essentially satisfy Rule 9(b)'s heightened pleading standard by describing the specific terms of each of Defendants' approximately 12,000 anticompetitive agreements. That is not the law, and in any event, Plaintiffs provide the necessary allegations of *who* (Defendants and venues, ticket brokers, artists, and others), *what* (agreements to use Ticketmaster for ticketing services), when (from 2010-present), *where* (the U.S.), and *how* (Defendants' various anticompetitive acts)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1    sufficient to provide notice of what agreements are at issue for this claim.

2        Finally, Defendants argue Plaintiffs do not plausibly define the relevant market

3    for "secondary ticketing services for major concert venues" based on Defendants' view

4    of the facts rather than a plain reading of Plaintiffs' allegations. This is yet another

5    premature and improper factual dispute.

6        Defendants' Motion should be denied in full.

7    **II.    SUMMARY OF ALLEGATIONS**

8        **A.    Defendants Dominate Concert Promotion and Ticketing for Major**

9             **Concert Venues**

10       In 2010, Live Nation Entertainment and Ticketmaster merged to create the

11   world's largest, most powerful live music company. Compl. ¶¶ 8, 57. Ticketmaster

12   provides primary ticketing services, where it pays a venue for the right to sell its tickets,

13   and then charges concertgoers fees alongside the face value of each ticket they buy. *Id.*

14   ¶¶ 11, 23(b), 39-42, 61-65, 86. Live Nation was primarily a concert promoter,

15   representing most top touring acts worldwide. *Id.* ¶¶ 8, 36, 54. Concert promoters

16   provide services to artists, but also to venues. *Id.* ¶¶ 23(a), 34-37, 73-74. More recently,

17   Ticketmaster expanded into secondary ticketing, where it facilitates the resale of tickets

18   and again directly charges fees to each purchaser. *Id.* ¶¶ 12-17, 43-46, 66-72, 97-113.

19       Before the merger, Live Nation and Ticketmaster competed in primary ticketing.

20   *Id.* ¶¶ 55-56. Ticketmaster dominated that market, but Live Nation was encroaching.

21   *Id.* ¶¶ 52-56. To remove this competitive threat, Ticketmaster merged with Live Nation.

22   *Id.* ¶ 57. The U.S. Department of Justice ("DOJ") and seventeen states recognized the

23   merger's anticompetitive risks and sued to block it, citing competitive concerns

24   regarding both primary and secondary ticketing services. *Id.*

25       To address these concerns, Defendants entered into a consent decree with

26   numerous requirements, including prohibitions from punishing or threatening venues

27   with fewer concerts if they chose not to use Ticketmaster as their ticketing provider.

28   *Id.* The consent decree was set to expire in 2020, but DOJ extended it after finding

Defendants secretly and repeatedly violated it over many years. *Id*. ¶ 58.

**B.    Defendants Deploy an Anticompetitive Scheme to Maintain Dominance and Extract Monopolistic Profits**

After the merger, Defendants anticompetitively cemented Ticketmaster's monopoly in primary ticketing services and sought to expand it into secondary ticketing services. *Id*. ¶¶ 9-19, 61-72, 86-113. Plaintiffs allege each facet of this scheme in significant detail.

**1.    Economic Threats and Retaliation Against Venues Undercut Ticketmaster's Primary Ticketing Competitors**

Major concert venues typically use primary ticketing service providers rather than manage sales themselves, as ticketing for major events is complex. *Id*. ¶¶ 38-39. Post-merger, Live Nation pressured venues to use Ticketmaster. *Id*. ¶¶ 9-10, 90-95, 158-63. As DOJ later found, "venues throughout the United States have come to expect that refusing to contract with Ticketmaster will result in the venue receiving fewer Live Nation concerts or none at all." *Id*. ¶¶ 9, 90. Public statements from Live Nation's CEO/President confirm this dynamic is real and widely understood. *Id*. ¶¶ 9, 95.

So do statements and evidence from other industry participants. *Id*. ¶¶ 91-95. AEG, the second-largest primary ticketing provider, informed DOJ (with written evidence) that Defendants warned venues AEG manages they would lose major shows if they did not use Ticketmaster. *Id*. ¶ 92. Other examples show threats and retaliation against venues were common. *Id*. ¶¶ 93, 94(a)-(f). Defendants do not argue this evidence fails to provide: (a) detailed examples of Defendants' alleged conduct; or (b) plausible inferences that Defendants anticompetitively coerced industry participants to use Ticketmaster.

**2.    Long-Term Exclusive Deals Suppress Competition in the Primary Ticketing Services Market**

Beyond (and often alongside) their threats and retaliation, Defendants also utilize long-term exclusive agreements to exclude and restrain primary ticketing

competition. *Id*. ¶¶ 7, 41, 90, 148-54. Ticketmaster's agreements can exceed ten years in length and involve over 12,000 venues with a renewal rate "exceeding 100%," because there is no effective competition to Ticketmaster when these contracts expire. *Id*. ¶¶ 7, 41, 53, 62, 81, 89.

To induce concert venues to enter into exclusive dealing agreements (beyond the aforementioned coercion), Ticketmaster offers up-front payments and subsidies/kickbacks that can run into the millions. *Id*. ¶¶ 42, 61, 86, 88. Those payments bar entry from smaller competitors and also help maintain Ticketmaster's dominance. *Id*. ¶¶ 42, 61, 86-89. Defendants can pay these outsized fees because of the monopoly margins captured through ticketing fees. *Id*. ¶¶ 9, 76.

Venues typically compete on price to attract artists, often by offering lower ticketing fees for fans. *Id*. ¶ 88. However, by joining the Ticketmaster network, a venue aligns with its competitors and no longer needs to compete on ticketing fees. *Id.*

For a rival to take substantial market share, it would have to track every contract nationwide, persuade venues to leave the Ticketmaster network, pay massive up-front fees, match Ticketmaster's supracompetitive ticketing fees without Defendants' market power, and repeat this process thousands of times over the years. *Id*. ¶¶ 64, 88-90. Ticketmaster's over 100% annual renewal rate for exclusive venue deals confirms this is not a realistic competitive strategy. *Id*. ¶¶ 7, 41, 53, 62, 81, 88-90.

### 3.   Defendants Weaponize Ticketmaster's Conditional Licenses To Harm Secondary Ticketing Competition

Ticketmaster utilizes a conditional license to grant access to its online platform; Defendants have improperly weaponized it to capture market share for secondary ticketing services. *Id*. ¶¶ 13-14, 103-05, 113. Under the license, Ticketmaster prohibits users from purchasing large quantities of primary tickets at once. *Id*. ¶¶ 13, 103. If they do, Ticketmaster may revoke their license, ban them, or reduce their ticket-buying priority by slowing their purchases. *Id.* Defendants claim this is pro-consumer, but have been exposed for using it not to fight brokers, but to coerce them into exclusively

reselling through Ticketmaster's secondary platform. *Id*. ¶¶ 13-14, 104, 126(c).

As publicly reported, Defendants reserve primary tickets for brokers to purchase and resell. *Id*. ¶ 104. They facilitate this through "ticket banks" primarily serving brokers. *Id*. Brokers who comply receive primary tickets through ticket banks; those who refuse are blocked from the platform under the conditional license. *Id*. ¶ 105.

### 4.    Defendants' Restrictive Ticketing Technology Harms Secondary Ticketing Competitors

Ticketmaster strengthens its grip on secondary ticketing by restricting primary purchasers from transferring tickets outside its platform. *Id*. ¶¶ 15, 106-113. The primary tool for this restriction is Ticketmaster's "SafeTix" technology, which prevents resale on competing platforms and harms competition and consumers. *Id*.

Historically, electronic tickets could be freely transferred, whether for resale or gifting. *Id*. ¶ 108. But Ticketmaster embeds restrictions into its primary ticketing system, allowing transfers *only* through *its* secondary marketplace. *Id*. ¶¶ 15, 109. This effectively coerces resellers into using Ticketmaster's secondary ticketing platform. *Id*.

Like its conditional license, Ticketmaster deploys SafeTix for anticompetitive purposes—namely, preventing consumers from using other secondary ticketing platforms. *Id.* ¶¶ 111-13.

### C.    Plaintiffs Bear the Cost of Defendants' Scheme By Paying Supracompetitive Fees Directly to Defendants

The burden of Defendants' anticompetitive conduct falls on consumers, not concert venues. *Id.* ¶¶ 11, 17, 40, 65, 96, 114-23. Ticketmaster's entire business model is to directly charge consumers fees for ticketing services on the tickets they buy, else miss out on tickets entirely. *Id*. ¶ 114. Furthermore, Defendants' practices increase prices for consumers. *Id*. ¶¶ 17, 65, 114-23. As the U.S. Government Accountability Office confirmed, markets free from Ticketmaster's control offer significantly lower ticketing fees. *Id.* ¶¶ 11, 122. While U.S. venues had ticketing fees averaging 22%— and reaching 38%—venues in the U.K., where promoters contract with multiple ticket

sellers, saw fees of just 10-15%. *Id.* ¶¶ 11, 117, 122. In the primary ticketing market, a study of major venues that host both concerts and sporting events likewise shows that Ticketmaster's fees on concert tickets are materially higher than for sporting events at the same venue, if Ticketmaster lacks exclusivity. *Id.* ¶¶ 115-16.

The same pattern holds with secondary ticketing. *Id.* ¶¶ 118-23. Ticketmaster's competitors charge lower fees, which should make them the preferred choice for concertgoers. *Id.* ¶ 119. Yet, instead of losing market share, Ticketmaster has grown it in secondary ticketing. *Id.* ¶¶ 17-18, 23(b), 67, 120. This is not the result of fair competition but of Defendants' unlawful scheme, which forces consumers to transact using Ticketmaster's secondary ticketing platform. *Id.* ¶¶ 104-11. Absent Defendants' conduct, Ticketmaster's secondary market growth would stagnate and consumers would pay lower prices with more options. *Id.* ¶ 119.

## III. <u>LEGAL STANDARD</u>

A complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In evaluating a motion to dismiss, the Court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). "[D]ismissals for failure to state a claim are disfavored in antitrust actions," *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 406 (9th Cir. 1983), and "must be accompanied by leave to amend unless amendment would be futile." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 983 (9th Cir. 2000).

## IV. <u>ARGUMENT</u>

### A. <u>Plaintiffs Plausibly Allege Antitrust Standing</u>

Antitrust standing assesses whether a given plaintiff "is a proper plaintiff" to bring suit. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1060 (9th Cir. 1999). To determine antitrust standing, courts consider: (1) whether a plaintiff has suffered an "antitrust injury"; (2) the directness of the injury; (3) the speculative

measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *Id.* at 1054 (9th Cir. 1999) (cleaned up).

Importantly, the Court "need not find in favor of the plaintiff on each factor" and no single factor is dispositive. *Id*. at 1055. That matters because Defendants only challenge the first three factors (Mot. at 6), ignoring the fourth and fifth indisputably favor Plaintiffs. There is no risk of duplicative recovery because Plaintiffs (*i.e.*, consumers) are the only class of persons able to seek overcharges for supracompetitive ticketing service fees on tickets ***they*** purchase. Apportioning damages will likewise be straightforward, as Ticketmaster directly sells tickets to consumers and the supracompetitive fees consumers directly pay Ticketmaster are listed separately from the face value of tickets. Compl. ¶¶ 45, 68(d), 121. Defendants' arguments on the first three factors fail.

### 1.    <u>Consumers That Directly Pay a Defendant Anticompetitively-High Fees Suffer Antitrust Injury</u>

Defendants' argument that Plaintiffs lack antitrust injury because they do not "participate in" or have not "suffered their" injuries in either the primary or secondary ticketing services markets is easily rejected. (Mot. at 7.) Primary and secondary ticketing service providers ***sell tickets to consumers and directly charge them (supracompetitive) fees for those ticketing services***. Compl. ¶¶ 11, 17, 39-40, 44-45, 65, 96, 114-23.  Primary and secondary ticket purchasers (*i.e.*, Plaintiffs) therefore necessarily "participate" and "suffered their" injuries in the at-issue relevant markets.

The Supreme Court's decision in *Apple Inc. v. Pepper*, 587 U.S. 273 (2019) confirmed decades of precedent that consumers suffer antitrust injury if they directly pay a defendant supracompetitive prices stemming from its anticompetitive practices. 587 U.S. at 281-83. *Pepper* controls here, yet Defendants never mention it.

In *Pepper*, consumers sued Apple for monopolizing the iPhone app aftermarket by forcing iPhone owners to only use Apple's App Store, reducing competition between app stores and maintaining Apple's ability to charge app developers

supracompetitive commissions. 587 U.S. at 277. The plaintiffs alleged this led developers to charge higher prices for their apps (to account for the higher commission). *Id.* Like Defendants here, Apple argued its conduct was directed at upstream developers (like venues here) and those upstream developers set the prices for their apps, so consumers lacked antitrust standing. *Id.* at 281. The Supreme Court disagreed, because consumers directly paid ***Apple*** for their apps and ***Apple*** allegedly caused those higher prices through its conduct. *Id.* at 282.

So, too, here. Defendants mischaracterize the fees as for ***tickets***, rather than for primary and secondary ***ticketing services***. (Mot. at 8.) Based on that characterization, they argue primary and secondary ticketing services have only one customer—the ticket seller—ignoring that there are multiple categories of customers for these services. Ticketmaster's business model is to directly sell tickets to Plaintiffs and ***also*** directly charge them fees for ***primary and secondary ticketing services***—fees Plaintiffs allege were supracompetitive due to Defendants' misconduct. Compl. ¶¶ 11, 17, 25-28, 40, 65, 96, 114-23. Under *Pepper*, that ends the inquiry. 587 U.S. at 285.

Since *Pepper*, courts have routinely held that consumers have antitrust standing when they directly pay the defendant supracompetitive fees stemming from its misconduct—regardless of whether those acts were committed against other market participants. *E.g.*, *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2024 WL 918030, at *1-3 (S.D.N.Y. Mar. 2, 2024) (consumer antitrust standing where they paid supracompetitive prices for e-books and Amazon's conduct was directed against e-book publishers); *see also In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1156 (9th Cir. 2019) (explaining direct purchaser standing under *Pepper*: "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. However, C may sue B if B is an antitrust violator") (cleaned up); *Ad Mgmt.*, 190 F.3d at 1057 ("Not surprisingly, courts routinely recognize the antitrust claims of market participants other than consumers or competitors.").

Defendants' citations (Mot. at 7-8) do not hold otherwise, and in fact make

Plaintiffs' point. *Bakay v. Apple*, 2024 WL 3381034 (N.D. Cal. July 11, 2024), involved allegations Apple restrained competition in the U.S. mobile browser market, which increased prices in the smartphone market. *Id*. at *1-2. The court found no antitrust injury because the plaintiffs' injury occurred in a different market than the anticompetitive conduct. *Id*. at *7. This holding is problematic under *Pepper*, but even if it survives appeal, ***here*** Plaintiffs allege their injury occurred in the same markets as Defendants' anticompetitive conduct because, as noted, primary and secondary ticketing services are services to sell tickets to consumers and directly charge them (supracompetitive) fees for those services. Compl. ¶¶ 11, 17, 40, 65, 96, 114-23.

Next, *Feitelson v. Google Inc*., 80 F. Supp. 3d 1019 (N.D. Cal. 2015), did not involve a direct purchase from the defendant; it was about Google ***search*** agreements with original equipment manufacturers ("OEMs") and supposed overcharges the ***OEMs*** charged plaintiffs as a result. *Id*. at 1023-24. The alleged injury's attenuated nature made it too remote for antitrust standing. *Id*. at 1028.

Similarly, in *Ass'n of Washington Pub. Hosp. Districts v. Philip Morris Inc.*, 241 F.3d 696 (9th Cir. 2001), hospitals claimed that "[defendants'] conspiracy to suppress the development of less harmful tobacco products indirectly resulted in [plaintiffs] incurring increased health care expenses." *Id*. at 705. This indirect relationship was too remote for antitrust standing. *Id*.

In contrast to each of these cases, Plaintiffs directly pay Defendants supracompetitive fees for the ticketing services in question.

## 2. <u>Plaintiffs' Injuries Are Inextricably Intertwined with Defendants' Anticompetitive Conduct</u>

Even if *Pepper* and similar precedent were not dispositive, Defendants acknowledge a plaintiff suffers antitrust injury, regardless of its "market participant" status, if its harm is "inextricably intertwined" with a defendant's monopolistic scheme. This principle, too, dooms Defendants' standing arguments under settled law.

In *Blue Shield of Virginia v. McCready*, 457 U.S. 465(1982), a consumer sued

her insurer for conspiring with psychiatrists to boycott psychologists. *Id*. at 469-70. Although the scheme was directed against psychologists, it harmed consumers when Blue Shield denied reimbursement for psychologist treatment. *Id*. at 479. In finding antitrust injury, the Supreme Court rejected the argument that the plaintiff's injury was too remote simply because the anticompetitive conduct was directed at another market. *Id*. at 479, 484. Under *McCready*, the Ninth Circuit recognizes antitrust injury where wrongful conduct in one market inextricably causes harm in another. *Ostrofe v. H.S. Crocker Co*., 740 F.2d 739, 746 (9th Cir. 1984) ("Although [plaintiff] was not a competitor or consumer in the labels market, the injury he sustained was such an integral part of the scheme to eliminate competition in that market as to constitute 'antitrust injury'").

Here, Plaintiffs allege Defendants undermined competition in each relevant market *so they could directly charge consumers supracompetitive fees for primary and secondary ticketing services*. Compl. ¶¶ 11, 17, 40, 65, 96, 114-23. That harm is not just "inextricably intertwined" with Defendants' anticompetitive conduct—it is the entire point. Under *McCready*, Plaintiffs are the direct victims of Defendants' conduct and the harm to them is the necessary means by which that conduct was carried out.

### 3.    Plaintiffs' Direct Purchases from Defendants Cause Direct, Non-Speculative Damages

Defendants argue: (1) Plaintiff are not "direct victims," (2) their injuries are speculative, and (3) other individuals are better suited to sue. (Mot. at 9-11.) Each fails.

First, "direct purchasers—that is, those who are the 'immediate buyers from the alleged antitrust violators—may sue.'" *Pepper*, 587 U.S. at 280. Defendants sold tickets to Plaintiffs and directly charged them supracompetitive fees for primary and secondary ticketing services as part of that transaction—Plaintiffs are thus direct purchasers with antitrust standing. *Id*.; *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp*., 951 F.2d 1158, 1162 (9th Cir. 1991) ("directness in the antitrust context means close in the chain of causation") (cleaned up).

Second, Defendants claim Plaintiffs' injuries are speculative and implausible. (Mot. at 9-10.) Plaintiffs' causal theory, however, is straightforward: Defendants anticompetitively prevented competition in primary and secondary ticketing services, thereby immunizing Ticketmaster from price competition and allowing it to charge inflated fees. Compl. ¶¶ 7, 9-19, 61-72, 86-123. Among other things, Plaintiffs cite empirical data substantiating this allegation. *Id.* ¶¶ 11, 115-22. That more than suffices for damages. *Hexcel Corp. v. Ineos Polymers, Inc*, 2010 WL 11520539, at *4 (C.D. Cal. Feb. 23, 2010) (denying motion to dismiss; monopolist's overcharge "not speculative because it can be measured directly by the overcharge"); *In re Live Concert Antitrust Litig*., 247 F.R.D. 98, 153 (C.D. Cal. 2007) (rejecting pleading challenge to supracompetitive ticket fee damages; "neither too indirect nor too speculative").

Defendants' contrary arguments simply invoke fact disputes. They argue that if Ticketmaster lowered its fees, venues would somehow offset the benefit to consumers by increasing their own take of the fees. (Mot. at 10.) This conflicts with the Complaint's well-pleaded allegations. Defendants also argue more competition among ticket providers would be worse for consumers. *Id.* This, too, contradicts Plaintiffs' well-pleaded allegations and is legally impermissible because antitrust law "precludes inquiry into … whether competition is good or bad." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 95 (2021) (cleaned up). At best, Defendants raise competing factual inferences that must be resolved in Plaintiffs' favor. *Retail*, 768 F.3d at 945.

Third, Plaintiffs are best situated to pursue this suit because the core effect of Defendants' monopolistic scheme is extracting supracompetitive fees for primary and secondary ticketing services ***from consumers***. Compl. ¶¶ 11, 17, 40, 65, 96, 114-23. Defendants' suggestion that "venues, rival ticketers, and ticket brokers" are better situated plaintiffs ignores those entities would be limited to lost profits while consumer-plaintiffs are entitled to the difference between the price they paid and the competitive price. These are "fundamentally different theories of harm." *Pepper*, 587 U.S. at 287. Under Defendants' argument, in every case involving exclusion of

competitors resulting in higher prices to consumers, only competitors could sue, which is not the law. *Id.*; *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) (taking Defendants' approach would "likely [] leave a significant antitrust violation undetected or unremedied") (cleaned up).

## B.    Plaintiffs Plausibly Plead Anticompetitive Conduct Under Section 2

Defendants next argue "[m]ost" of Plaintiffs' Section 2 claims for monopolization and attempted monopolization fail the "anticompetitive conduct" requirement. (Mot. at 11.) That requirement is met if the challenged conduct "tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). "The metes and bounds of when such behavior impermissibly crosses the line from competitive to violative" is "a highly contextual analysis" typically unsuitable for a motion to dismiss. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019). Here, Defendants try to break up the conduct Plaintiffs challenge into different buckets and then argue Plaintiffs do not plausibly allege that ***some*** (but not all) of these separate categories are anticompetitive. (Mot. at 12-17.) These arguments fail, both because they ask the Court to perform an improper analysis and because they ignore the law and Plaintiffs' allegations.

## 1.    Defendants Ignore That Anticompetitive Conduct Is Analyzed As A Whole, Rather Than As Its Constituent Parts

It is black-letter law that "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).[1]

---

[1] *See also Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024) ("As the Supreme Court expressed in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), it is a misapplication of antitrust doctrine for a court to treat a plaintiff's allegations of anticompetitive conduct 'as if they were five completely separate and unrelated

Similarly, Judge Fischer of this District denied summary judgment on similar antitrust claims against Defendants because their attempts to compartmentalize "plaintiff's legal theory of anticompetitive harm [into] a preexisting legal 'box'" were not supported by law or economics. *Complete Ent. Res. LLC v. Live Nation Ent., Inc.*, 2017 WL 6512223, at *3 (C.D. Cal. Oct. 16, 2017) ("*Songkick*"). Defendants nevertheless ask this Court to err by doing so.

Taking the Complaint as a whole, Plaintiffs plausibly allege an overarching anticompetitive scheme involving overlapping and interconnected conduct:

1. Exclusive dealing arrangements with major concert venues to exclude Ticketmaster's competitors. Compl. ¶¶ 7, 41, 90, 148-54.

2. Threatening disloyal venues, partners, and ticket brokers who consider transacting with a Ticketmaster competitor to coerce them into using Ticketmaster. *Id.* ¶¶ 9, 90-95, 158-63.

3. Forcing venues to use Ticketmaster's ticketing services. *Id.* ¶¶ 9-10, 164-73.

4. Using Defendants' dominance in primary ticketing and concert promotion markets to suppress rivals. *Id.* ¶¶ 9, 35-36, 52, 73-79, 155-57.

5. Coercing venues to boycott Ticketmaster's competitors. *Id.* ¶¶ 9, 41, 90, , 174-84.

Defendants do not argue Plaintiffs fail to allege exclusive dealing. (Mot. at 12-17.) Their motion thus solely challenges whether Plaintiffs' ***other*** allegations suffice for an antitrust claim. But, given these various acts are part of an alleged greater scheme involving anticompetitive conduct Defendants do ***not*** contest, their argument fails for this reason alone. *Continental Ore*, 370 U.S. at 698-99; *Anaheim*, 955 F.2d at 1376; *Songkick*, 2017 WL 6512223, at *3; *Rumble, Inc. v. Google LLC*, 2022 WL 3018062, at *1–3 (N.D. Cal. July 29, 2022) (denying motion to dismiss Section 2 claim based on multiple "subtheories" where plaintiffs adequately pled one sub-theory).

---

lawsuits,' effectively 'tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'").

### 2. Plaintiffs Plausibly Allege Each Type of Anticompetitive Act

Even were the Court to separately analyze the anticompetitive conduct Defendants do challenge, Plaintiffs sufficiently allege each. Defendants challenge these allegations primarily as implausible, but their arguments merely present competing factual disputes, which must be resolved in Plaintiffs' favor. *Balderas v. Countrywide Bank, N.A.*, 664 F.3d 787, 791 (9th Cir. 2011) (if "the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings."); *Keurig*, 383 F. Supp. 3d at 239.

### (a) Plaintiffs plausibly allege Defendants' tying

"[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 n. 9 (1992). Similar to their antitrust injury argument, Defendants primarily challenge Plaintiffs' tying allegations by asserting there is a mismatch between Plaintiffs and the buyers of the services Defendants provide, and thus no "single buyer" affected by Defendants' tying conduct. (Mot. at 12-13.) This ignores the Complaint, which describes a "single buyer" (*i.e.*, a common buyer) of both services for each tie.

First is Defendants' concert promotion/primary ticketing tie. As Plaintiffs allege, concert promotion services include, *inter alia*, routing a concert tour through a ***venue***, contracting with the ***venue***, and marketing the concert for the ***venue***. Compl. ¶ 35. This advertising benefits the artist (Mot. at 12-13), but it also is a service to the ***venue*** because it helps the venue generate concession, parking, and other on-premises sales. Compl. ¶ 37. Primary ticketing services likewise involve a ***venue*** hiring the service provider to sell their tickets to consumers (and charge those consumers fees for doing so). *Id.* ¶¶ 38-40. Defendants thus provide both services to the same buyer: the venue. Defendants' arguments about ***artists*** ignore the Complaint's plain allegations about

*venues*, and they do not argue that if there is a "single buyer" for this tie, then Plaintiffs' actual tying allegations are inadequate or implausible.

Next is Defendants' primary/secondary ticketing service tie, which largely focus on ticket brokers (professional resellers). Defendants argue there is no "single buyer" for this tie because supposedly only major concert venue operators buy primary ticketing services, while supposedly only ticket brokers or other resellers buy secondary ticketing services. (Mot. at 13.) That is incorrect under the Complaint's plain allegations, which confirm primary and secondary ticketing services have multiple categories of customers, and ticket brokers are a common "buyer" of both. Indeed, ticket brokers buy primary ticketing services as ticket *buyers* and then buy secondary ticketing services as ticket *sellers*. Compl. ¶¶ 100, 105. They are thus a "single buyer" of both services; they just have a different role in the transaction when using primary versus secondary ticketing services. *Id.* And Defendants' coercion under this tie harms secondary ticket *purchasers* by leading to supracompetitive ticketing service fees. *Id.* ¶ 17.

Finally, Defendants argue Plaintiffs do not allege a "substantial volume" of commerce was foreclosed by Defendants' conduct, but they do. Compl. ¶¶ 167, 172. Plaintiffs allege a "not insubstantial" amount of commerce was "affected," which is the literal standard for tying. *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1422–24 (9th Cir. 1995) (reiterating "not insubstantial" amount of commerce "affected" standard for tying).

(b)    Plaintiffs plausibly allege Defendants' monopoly leveraging

In the Ninth Circuit, monopoly leveraging "remains a viable theory under Section 2," and is actionable when a wrongdoer "attempt[s] to use monopoly power in one market to monopolize another market." *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 951 (9th Cir. 1996). Defendants argue (Mot. at 14) the Complaint contains only "three short paragraphs" regarding leveraging, ignoring over 60 earlier paragraphs of well-pleaded factual allegations supporting the theory. Compl. ¶¶ 9, 22-

1    23, 36, 38, 41-82, 86, 97-113, 144-47.[2] By failing to address that conduct, Defendants'

2    strawman argument fails, and they cannot raise a leveraging argument on that conduct

3    for the first time on reply. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990)

4    (parties "cannot raise a new issue for the first time in their reply briefs").

5         Defendants' arguments about the secondary ticketing services market also fail.

6    (Mot. at 14.) As explained in Section IV.D., Plaintiffs adequately define that market.

7    To the extent Defendants assert leveraging requires more than a mere "competitive

8    advantage" in that market, Plaintiffs adequately allege Defendants' power (or, at the

9    least, dangerous probability of obtaining that power) in it, as also explained *infra*.

10              (c)   <u>Plaintiffs plausibly allege Defendants used licenses and

11                    technology to suppress secondary ticketing competition</u>

12        Defendants next argue (Mot. at 14-16) that Plaintiffs do not plausibly allege

13   Defendants anticompetitively used conditional licenses and ticketing technology to

14   stifle secondary ticketing competition. Their arguments, however, raise only factual

15   disputes that cannot be resolved now.

16        For example, Defendants argue that "read[ing] Ticketmaster's Conditional

17   License for itself" shows it does not prevent brokers from using competitor platforms.

18   (Mot. at 15.) But what Plaintiffs ***allege*** is that Ticketmaster selectively invokes its

19   conditional license to keep brokers off its primary platform unless they agree to use its

20   secondary ticketing platform, even though they would prefer rival platforms. Section

21   II.B.3., *supra*. The question is not whether Defendants have a valid basis to exclude

22   brokers entirely, but whether their selective and conditional invocation of that license

23   harms secondary ticketing by coercing brokers into using Ticketmaster's secondary

24   ticketing platform.[3] *Kickflip, Inc. v. Facebook, Inc*., 999 F. Supp. 2d 677, 685–86 (D.

25

26   [2]  For example, the conduct discussed in the previous tying section is "leveraging,"
     even if not specifically "tying" under that doctrine.

27

28   [3]  Defendants' citations, *Facebook v. Power Ventures* and *Sambreel Holdings LLC v.
     Facebook* (Mot. at 15), involved universally-enforced website terms, unlike Plaintiffs'

1  Del. 2013) (denying motion to dismiss, as pretextually banning plaintiff, rather than

2  others, from site anticompetitive under Section 2).

3      Next, regarding ticketing transferability, Defendants argue the technological

4  limitations they impose are "commonplace" and "protect[] buyers." (Mot. at 14-16 &

5  16 n.4.) For one, that is an improper dispute of what Plaintiffs **allege**: Defendants'

6  claimed "safety" and "procompetitive" justifications are pretextual, and Defendants

7  deploy these technological limits to prevent resale of the ticket on a rival's secondary

8  ticketing platform, which stymies competition. Compl. ¶¶ 103-11.[4] And even to the

9  extent Defendants **argue** there are justifications for their technological limitations, "the

10 existence of valid business reasons in antitrust cases is generally a question of fact not

11 appropriate for resolution at the motion to dismiss stage." *Free FreeHand Corp. v.*

12 *Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1182 (N.D. Cal. 2012) (citations omitted); *see*

13 *also Zulily, LLC v. Amazon.com, Inc.*, 2024 WL 5262903, at *15 (W.D. Wash. Dec.

14 31, 2024) (similar).

15          (d)    Plaintiffs sufficiently detail their boycott allegations

16     Defendants forced various market participants to boycott Ticketmaster's

17 competitors in the primary and secondary ticketing services markets. Compl. ¶¶ 7, 9,

18 13-14, 41, 90, 104-11. This is a well-recognized form of anticompetitive conduct.

19 *Lorain Journal Co. v. United States*, 342 U.S. 143, 148-49 (1951).

20

21 detailed allegations of selective enforcement for anticompetitive ends. Moreover,

22 unlike here, the plaintiffs in *Power Ventures* "merely assert[ed] that Facebook's actions

23 are anticompetitive because Defendants have alleged so," without supporting facts.

24 2010 WL 3291750, at *14 (N.D. Cal. July 20, 2010). Likewise, the claim in *Sambreel*

25 *Holdings* was "factually limited to an interaction between *Facebook and Sambreel*,"

   rather than (like here) market-wide harm. 906 F. Supp. 2d 1070, 1080 (S.D. Cal. 2012)

   (emphasis in original).

26 4   Defendants threaten a Rule 11 motion on these facts (Mot. at 16), oddly ignoring

27 their own website states SafeTix restricts sales to Ticketmaster's secondary ticketing

28 platform or within its app. https://business.ticketmaster.com/harness-the-power-of-safetix-in-2025/.

Likely recognizing this, Defendants do not attack this conduct's plausibility, but instead essentially argue Plaintiffs' allegations must satisfy Rule 9(b)'s heightened pleading requirement. (Mot. at 16-17.) This vastly overstates Plaintiffs' burden at this stage, and ignores the Complaint's actual allegations. Because these arguments overlap with Defendants' Section 1 arguments—which also concern Plaintiffs' allegations of coerced agreements and are virtually identical regarding the specificity required—Plaintiffs address them in the following Section.

### C.   Plaintiffs Adequately and Plausibly Identify the Concerted Action Underlying Their Section 1 Claim

Under Section 1, a plaintiff must plead facts plausibly demonstrating: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States[]; (3) which actually injures competition." *Kendall v. Visa U.S.A. Inc*., 518 F.3d 1042, 1047 (9th Cir. 2008).

In the primary ticketing services market, Plaintiffs allege Defendants entered long-term exclusive contracts with over 12,000 venues (nearly 70% of the nation's major concert venues) to suppress competition and maintain their market dominance. Compl. ¶¶ 7, 41, 53, 62, 81, 89. These contracts are not a product of competition but instead spawn from coercive threats and outsized up-front payments that serve as barriers to entry for competitors, foreclosing rival ticketing services and restraining trade. *Id*. ¶¶ 9, 41, 86-95.

In the secondary ticketing services market, Plaintiffs allege Defendants reached anticompetitive agreements with major ticket brokers, including entities like DTI, Dynasty, and Eventellect. *Id*. ¶ 105. Even though Ticketmaster's secondary platform imposes higher fees and is therefore a less attractive option, brokers are coerced into agreeing to use it in exchange for access to Ticketmaster's "ticket banks"—inventory competing secondary platforms cannot access or control. *Id*. These agreements do not reflect a competitive marketplace. *Id*. They restrain and harm competitors in the

1   secondary market, causing consumers to pay supracompetitive fees. *Id.* ¶ 118.

2         These allegations meet Rule 8's "short and plain statement" requirement. Yet
3   Defendants suggest *Twombly* and *Kendall* require Plaintiffs to plead precise details of
4   every single agreement. They do not; they require only "enough factual matter (taken
5   as true) to suggest that an agreement was made," which is "enough fact to raise a
6   reasonable expectation that discovery will reveal evidence of illegal agreement." 550
7   U.S. at 556. Plaintiffs have satisfied this requirement, as they identified the who, what,
8   when, where, and how of the agreements at issue—Ticketmaster's agreements with
9   venues and ticket brokers throughout the U.S. from 2010 through the present. Nothing
10  more is required. *Don Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 762–
11  65 (N.D. Cal. 2024) (denying *Kendall*-based dismissal arguments on this basis). It
12  would be absurd to require Plaintiffs to identify the exact terms of all of Defendants'
13  approximately 12,000 agreements, and imposing that requirement would perversely
14  benefit Defendants for the sheer breadth of their anticompetitive scheme.

15        Defendants also claim (citing Fourth Circuit precedent) that Plaintiffs must
16  allege some horizontal agreement among the 12,000 venues to plausibly state a claim.
17  (Mot. at 18.) But the Ninth Circuit **rejects** this argument and the cases Defendants cite;
18  "a collection of purely vertical agreements" is still "a conspiracy [that] may yet
19  unreasonably restrain trade." *In re Musical Instruments & Equipment Antitrust Litig.*,
20  798 F.3d 1186, 1192 n.3 (9th Cir. 2015) (declining to follow Defendants' case, *Dickson
21  v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002). Plaintiffs amply allege that here.

22        **D.    Plaintiffs Plausibly Define a Relevant Market for Secondary
23              Ticketing Services**

24        A relevant market encompasses the group of competitors "who have actual or
25  potential ability to deprive each other of significant levels of business." *Newcal Indus.,
26  Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (citation omitted). Market
27  definition is ultimately "a factual inquiry for the jury," determined only after examining
28  "the 'commercial realities' faced by consumers," and courts routinely deny **summary**

*judgment* based on similar arguments. *See*, *e.g.*, *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). That is why dismissal at the pleading stage is only proper if "it is apparent from the face of the complaint that the alleged market suffers a fatal **legal** defect." *Newcal*, 513 F.3d at 1045 (emphasis added).

Notably, in challenging Plaintiffs' allegations regarding the secondary ticketing services market, Defendants do not allege Plaintiffs fail to adequately allege a market defined by reasonable interchangeability; *i.e.* the hallmark of market definition. *Newcal*, 513 F.3d at 1045. Instead, they throw a hodgepodge of arguments that either ignore the Complaint entirely, or ask the Court to make factual determinations now on a motion to dismiss. Each fail.

### 1.   Plaintiffs Adequately Allege Ticketmaster's Market Power

Defendants argue Plaintiffs cannot allege Ticketmaster has a 60% share of secondary ticketing services for major concert venues (Mot. at 19), but this is not a basis for dismissal because the allegation is facially plausible. Contrary to Defendants' baseless assertions,[5] ample evidence supports this allegation. *E.g.*, Archita R. Arun, *Ticketmaster's Monopoly Undermines Fair Competition in Live Entertainment Ticketing*, J. Bus. Econ. Dev. 128, 128 (2024) (Ticketmaster controls "50-60% of the secondary market in the U.S. as of 2022."). Furthermore, as relevant to Plaintiffs' attempted monopolization claim, less than 60% share is sufficient, and Defendants find no fault with Plaintiffs' allegation that "eliminating [Ticketmaster's secondary ticketing competitors] via the acts described herein would give Ticketmaster well over 70-80% of the market." Compl. ¶ 69. That suffices. *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1073 (N.D. Cal. 2022) ("plausible allegation of sufficient market share is usually sufficient to withstand a motion for dismissal" when market power is challenged); *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 778 (N.D. Cal. 2022) ("rough estimation of the defendant's market share, with no explanation of how

---

[5] Defendants resort to a Rule 11 threat here, too. (Mot. at 19 n.6.) If Defendants proceed with that unfounded motion, Plaintiffs will seek reimbursement for costs in responding.

that estimation was made, is sufficient at the pleading stage"); *GCIU-EMployer Ret. Fund v. Quad/Graphics, Inc.,* 2016 WL 3027336, at *3 (C.D. Cal. May 26, 2016) (collecting cases, facts pleaded on information and belief proper under Rule 8).

### 2.  Plaintiffs Define a Market for Ticketing *Services*, Not Tickets

Defendants misread the Complaint to manufacture an argument that Plaintiffs' defined market must exclude the actual tickets sold on secondary platforms because tickets are the same product, whether sold on primary or secondary platforms. (Mot. at 20.) Plaintiffs, however, define a market for secondary ticketing *services*, where competitors offer "an online platform that allows ticket holders to post their ticket(s) for sale."[6] Compl. ¶ 66. Unlike primary ticketing services, which resemble box office sales and include inventory management, secondary ticketing services reflect "auction websites like eBay," where "[t]he ticket holder/seller determines the sale price," and buyers use the platform to find tickets for events they want to attend. *Id*. Defendants' focus on *tickets* is thus a red herring. Defendants' argument would be like requiring a plaintiff challenging a food delivery service monopolist to prove that the meals themselves constitute a distinct market. That is obviously not the law. *See also Biddle v. Walt Disney Co*., 696 F. Supp. 3d 865, 882 (N.D. Cal. 2023) ("Allegations of a relevant market … generally pass the test at the pleading stage unless the market definition is 'facially unsustainable.'").

### 3.  Plaintiffs Adequately Allege a Major Concert Venue Submarket

Finally, Defendants challenge Plaintiffs' definition of the secondary ticketing services market on the ground that limiting it to "major concert venues" is "implausible." (Mot. at 21-22.) This argument contradicts the Complaint, which

---

[6]  Plaintiffs adequately define the secondary ticketing services market. They explain, *inter alia*, how there is industry recognition by customers and other market participants of secondary ticketing services as a distinct market, how secondary ticketing services feature "distinct pricing models" and "specialized vendors," and why other sorts of products are not reasonable substitutes. Compl. ¶¶ 66-69. That suffices. *Klein*, 580 F. Supp. 3d at 765-76 (relevant market well-pled based on *Brown Shoe* factors).

explains that, for both primary **and** secondary ticketing, concerts "require a specific type of ticketing service, and that major concert venues in particular require even more specialized ticketing services." Compl. ¶ 49. These platforms must withstand "massive online traffic" when "bombarded by thousands of fans and ticket brokers struggling to scoop up seats for top-tier performances." *Id*. ¶ 50. Industry players also distinguish between "major" and "minor" concert venues, reflecting commercial realities. *Id*. ¶ 51. These allegations leave no room for Defendants' claim that the distinction is implausible, let alone constitute a "fatal legal defect" required for dismissal. *Newcal*, 513 F.3d at 1045; *Klein*, 580 F. Supp. 3d at 765–76.

Defendants suggest a "major concert venue" submarket is implausible merely because **some** secondary ticketing platforms can process transactions for venues of any size. But this confuses technical capability with market reality, and the latter governs the submarket boundaries. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Not all secondary ticketing service providers can provide services for major concert venues. Those that can that are within this relevant market because only they "have actual or potential ability to deprive each other of significant levels of business." *Newcal*, 513 F.3d at 1045.

## V.    **CONCLUSION**

Defendants' Motion should be denied.

1  Dated:  March 5, 2025

2

3  By

Respectfully submitted,

/s/ Kevin Y. Teruya

4  QUINN EMANUEL URQUHART &
SULLIVAN, LLP
5  Kevin Y. Teruya (Bar No. 235916)
 kevinteruya@quinnemanuel.com
6  Adam B. Wolfson (Bar No. 262125)
 adamwolfson@quinnemanuel.com
7  William R. Sears (Bar No. 330888)
 willsears@quinnemanuel.com
8  Brantley I. Pepperman (Bar No. 322057)
 brantleypepperman@quinnemanuel.com
9  Robert B. Fuqua (Bar No. 335479)
 robfuqua@quinnemanuel.com
10  865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
11  Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

12  KELLER POSTMAN LLC
Warren D. Postman (Bar No. 33069)
13  wdp@kellerpostman.com
1101 Connecticut Avenue, N.W., Ste. 1100
14  Washington, D.C. 20036
Telephone:  (202) 918-1123
15

16  *Interim Co-Lead Class Counsel*

17

18

19

20

21

22

23

24

25

26

27

28

## **SIGNATURE ATTESTATION**

I am the ECF user whose identification and password are being used to file the foregoing document. Pursuant to Civil Local Rule 5-4.3.4(a)(2)(i), I, Kevin Y. Teruya, attest that I have obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: March 5, 2025

*/s/ Kevin Y. Teruya*
_____
Kevin Y. Teruya

# <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated, certifies that this brief contains 6,998 words and complies with the word limit of L.R. 11-6.1.


Dated: March 5, 2025

*/s/ Kevin Y. Teruya*
_____

Kevin Y. Teruya