1 LATHAM & WATKINS LLP
  Timothy L. O'Mara (Bar No. 212731)
2   *tim.o'mara@lw.com*
  Andrew M. Gass (Bar No. 259694)
3   *andrew.gass@lw.com*
  Alicia R. Jovais (Bar No. 296172)
4   *alicia.jovais@lw.com*
  Samuel R. Jeffrey (Bar No. 347533)
5   *sam.jeffrey@lw.com*
  505 Montgomery Street, Suite 2000
6 San Francisco, California 94111-6538
  Telephone: +1.415.391.0600
7 Facsimile: +1.415.395.8095

8 *Attorneys for Defendants Ticketmaster L.L.C.*
  *and Live Nation Entertainment, Inc.*

9

10

11

12

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

13

14 | Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated, | Case No. 2:22-cv-00047-GW-GJS |

15

16                    Plaintiffs,

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

17 v.

The Honorable George H. Wu

18

19 Live Nation Entertainment, Inc., and Ticketmaster LLC,

Hearing Date: April 10, 2025

20                    Defendants.

Hearing Time: 8:30 am

21

Courtroom: 9D, 9th Floor

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     ARGUMENT ................................................................................................... 1

    A.   Plaintiffs' Claims Related To Secondary Ticketing
        Services Fail ............................................................................................. 1

        1.   Plaintiffs' Market-Share Allegation Is Based On A
             Single, Fabricated Source ............................................................. 1

        2.   The Alleged Secondary Ticketing Services Market
             Is Implausible ................................................................................ 5

    B.   Plaintiffs Lack Antitrust Standing To Challenge Conduct
        In The Markets For Primary Ticketing And Concert
        Promotion Services ................................................................................. 7

        1.   Plaintiffs Do Not Allege Antitrust Injury ................................... 7

             a.   Plaintiffs Do Not Suffer Injury In The
                 Allegedly Restrained Markets ........................................... 8

             b.   Plaintiffs Do Not Satisfy The *McCready*
                 Test ................................................................................. 11

        2.   Plaintiffs' Alleged Injury Is Speculative And
             Indirect ........................................................................................ 13

    C.   Plaintiffs' Conduct Theories Fail As A Matter Of Law ................... 15

        1.   Plaintiffs Fail To Plausibly Allege A Tie ................................. 16

        2.   Plaintiffs Have Not Plausibly Pled "Leveraging"
             Theories ...................................................................................... 17

        3.   Plaintiffs' Ticket Transfer And Conditional
             License Allegations Fail .......................................................... 18

        4.   Plaintiffs' "Vertically-Arranged Boycott" Theory
             Falls Short Of Basic Pleading Requirements ......................... 19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

D.    Plaintiffs' Section 1 Claim Fails For The Independent
      Reason That The Complaint Does Not Sufficiently
      Allege An Unlawful Agreement ......................................................... 19

III.    CONCLUSION ............................................................................. 20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABC Servs. Grp. v. Health Net of Cal.*,
2020 WL 2121372 (C.D. Cal. May 4, 2020)........................................................ 8

*Adaptive Power Sols. v. Hughes Missile Sys.*,
141 F.3d 947 (9th Cir. 1998) .............................................................................. 13

*Am. Ad Mgmt. v. Gen. Tel.*,
190 F.3d 1051 (9th Cir. 1999)................................................................... 8, 11, 13

*Apple v. Pepper*,
587 U.S. 273 (2019) ............................................................................... 1, 10, 15

*Bakay v. Apple*,
2024 WL 3381034 (N.D. Cal. July 11, 2024), *appeal docketed*,
No. 24-5314 (9th Cir. Aug. 30, 2024) ............................................................ 10, 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................. 5

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982)................................................................................. 10, 11, 12

*Broam v. Bogan*,
320 F.3d 1023 (9th Cir. 2003).............................................................................. 6

*Byrd v. Cal. Superior Court*,
2009 WL 2031761 (N.D. Cal. July 7, 2009) ...................................................... 18

*Cargill v. Monfort of Colo.*,
479 U.S. 104 (1986) ............................................................................................. 8

*Cimline v. Crafco*,
2007 WL 4591957 (D. Minn. Dec. 28, 2007) ...................................................... 2

*City of Anaheim v. Southern California Edison*,
955 F.2d 1373 (9th Cir. 1992)........................................................................ 15, 16

*City of Groton v. Conn. Light & Power*,
662 F.2d 921 (2d Cir. 1981) ............................................................................... 16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

*City of Oakland v. Oakland Raiders*,
   20 F.4th 441 (9th Cir. 2021) .................................................................... 7, 14, 15

*Coronavirus Rep. v. Apple*,
   85 F.4th 948 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2526 (2024) .................... 9

*Dahlstrom v. Life Care Ctrs. of Am.*,
   2023 WL 4893491 (W.D. Wash. Aug. 1, 2023) ............................................... 18

*Datel Holdings v. Microsoft*,
   712 F. Supp. 2d 974 (N.D. Cal. 2010) ........................................................... 12

*De Jesus v. Sears, Roebuck & Co.*,
   87 F.3d 65 (2d Cir. 1996) ............................................................................ 16

*Dreamstime.com v. Google*,
   54 F.4th 1130 (9th Cir. 2022) ........................................................................ 1

*Fabbrini v. City of Dunsmuir*,
   544 F. Supp. 2d 1044 (E.D. Cal. 2008) ........................................................... 6

*FTC v. Facebook*,
   560 F. Supp. 3d 1 (D.D.C. 2021) ................................................................... 2

*FTC v. Qualcomm*,
   969 F.3d 974 (9th Cir. 2020) .................................................................... 8, 10

*Gredale v. Access Bio*,
   2023 U.S. Dist. LEXIS 205830 (C.D. Cal. Nov. 16, 2023) .............................. 19

*Hicks v. PGA Tour*,
   897 F.3d 1109 (9th Cir. 2018) ....................................................................... 7

*In re Amazon.com eBook Antitrust Litigation*,
   2024 WL 918030 (S.D.N.Y. Mar. 2, 2024) ..................................................... 11

*In re Google Digital Advert. Antitrust Litig.*,
   2024 WL 988966 (S.D.N.Y. Mar. 7, 2024) ..................................................... 16

*In re WellPoint Out-of-Network UCR Rates Litig.*,
   903 F. Supp. 2d 880 (C.D. Cal. 2012) ............................................................ 12

*Intergraph v. Intel*,
   195 F.3d 1346 (Fed. Cir. 1999) .................................................................... 16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

*Jacobsen v. Bank of Am., N.A.*,
  2010 WL 5140686 (W.D. Va. Dec. 13, 2010) ...................................................... 4

*Kaufman v. Time Warner*,
  836 F.3d 137 (2d Cir. 2016) ........................................................................... 5

*Klein v. Facebook*,
  580 F. Supp. 3d 743 (N.D. Cal. 2022) ............................................................. 2

*Kohls v. Ellison*,
  2025 WL 66514 (D. Minn. Jan. 10, 2025) ........................................................ 4

*Korea Kumho Petrochemical v. Flexsys Am.*,
  2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ..................................................... 2

*Lorenzo v. Qualcomm*,
  603 F. Supp. 2d 1291 (S.D. Cal. 2009) .......................................................... 11

*Masimo v. Tyco Health Care Grp.*,
  2004 WL 5907538 (C.D. Cal. June 10, 2004) ................................................. 16

*McCabe Hamilton & Renny v. Matson Terminals*,
  2008 WL 2437739 (D. Haw. June 17, 2008) ..................................................... 1

*Newcal Indus. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ......................................................................... 9

*NorthBay Healthcare Grp. v. Kaiser Found. Health Plan*,
  838 F. App'x 231 (9th Cir. 2020) ................................................................... 12

*Ostrofe v. H.S. Crocker*,
  740 F.2d 739 (9th Cir. 1984) ......................................................................... 12

*Race Tires Am. v. Hoosier Racing Tire*,
  614 F.3d 57 (3d Cir. 2010) ........................................................................... 13

*Staley v. Gilead Scis.*,
  2020 WL 5507555 (N.D. Cal. July 29, 2020) ................................................. 16

*Ticketmaster L.L.C. v. RMG Techs.*,
  536 F. Supp. 2d 1191 (C.D. Cal. 2008) ........................................................... 9

*United States v. Live Nation*,
  No. 1:24-cv-03973 (S.D.N.Y.) ........................................................... 9, 13, 17

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

*William O. Gilley Enters. v. Atl. Richland*,
    588 F.3d 659 (9th Cir. 2009) ................................................................ 14

*Yellow Pages Cost Consultants v. GTE Directories*,
    951 F.2d 1158 (9th Cir. 1991) .............................................................. 14

**RULES**

Fed. R. Evid. 201(b) .................................................................................. 5

**OTHER AUTHORITIES**

Archita Ruby Arun, *Ticketmaster's Monopoly Undermines Fair
    Competition in Live Entertainment Ticketing*, 9 J. Bus. & Econ.
    Dev. 128 (2024) ............................................................................. 2, 3, 4

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2024) ............................. 3

StubHub Holdings, Inc., Registration Statement Under the Securities
    Act of 1933 (Form S-1) (Mar. 21, 2025) ............................................... 4

U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales:
    Market Characteristics and Consumer Protection Issues* (2018) ....................... 4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vi

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

# I.    INTRODUCTION

Plaintiffs' Opposition only highlights the flaws Defendants identified in the Complaint.  Plaintiffs ignore black-letter law—which the Ninth Circuit reaffirmed after *Apple v. Pepper*, 587 U.S. 273 (2019)—that only parties who experience injury *in the allegedly restrained market* have antitrust standing.  They fail to explain how ticket-buying fans participate in what the Complaint repeatedly alleges is a *venue-facing* market—not a fan-facing market.  They ignore fatal defects in their individual theories of conduct—even conceding some of those defects by failing to address them at all.  They fall short of basic pleading standards for alleging agreements or their anticompetitive effects.  And they do not (and cannot, without running away from their Complaint) explain how a secondary ticketing services market limited to "major concert venues" is plausible.  Most egregiously, they continue to press baseless allegations about Defendants' market share in secondary ticketing services—allegations whose sole "support" is a high-school student's paper that, in turn, rests on inapposite and non-existent sources.

The Court should dismiss Plaintiffs' claims.

# II.    ARGUMENT

## A.    Plaintiffs' Claims Related To Secondary Ticketing Services Fail

Plaintiffs' secondary ticketing claims fail twice over: (1) Plaintiffs do not plausibly allege monopoly power in the purported market, and (2) that market is implausible, including because it contradicts Plaintiffs' own allegations.

### 1.    *Plaintiffs' Market-Share Allegation Is Based On A Single, Fabricated Source*

Plaintiffs' Section 2 secondary ticketing claims "require[]" that Defendants possess monopoly power in the alleged market for secondary ticketing services. *Dreamstime.com v. Google*, 54 F.4th 1130, 1137 (9th Cir. 2022).  But alleging the possession of monopoly power is merely a legal conclusion which must be accompanied by "some factual predicate" to avoid dismissal.  *McCabe Hamilton &*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

*Renny v. Matson Terminals*, 2008 WL 2437739, at *8 (D. Haw. June 17, 2008).  And where that "factual predicate" is a claim about the defendant's market share, it must be supported by "some *facts*," *Korea Kumho Petrochemical v. Flexsys Am.*, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) (while market share need not be "quantif[ied] … with precision," plaintiff "must assert some *facts* in support of its assertions of market power").

Here, the Complaint's sole "factual predicate" for market share is the bare assertion that, "[o]n information and belief," Ticketmaster's share of the alleged secondary market "exceeds 60%," Compl. ¶ 22; *see also id.* ¶¶ 46, 71; *id.* ¶ 146 ("at least 60%").  That claim is difficult to square with Plaintiffs' allegation that Ticketmaster *is not the nation's largest secondary ticketer*. *Id.* ¶ 18 (alleging that Ticketmaster's supposed conduct "*threaten[s] to soon make* Ticketmaster the largest secondary ticketing platform in the nation" (emphasis added)).  Plaintiffs' conclusory market-share allegation appears to be tailored to monopoly thresholds, but even on those terms it fails.  *See FTC v. Facebook*, 560 F. Supp. 3d 1, 17 (D.D.C. 2021) ("To merely allege that a defendant firm has somewhere over 60% share of an unusual, nonintuitive product market … is not enough."); *Cimline v. Crafco*, 2007 WL 4591957, at *5 (D. Minn. Dec. 28, 2007) (allegation that defendant "has a sufficient share of the relevant market … is simply a label, and a label will not do" (cleaned up)).  There still needs to be some factual basis for the alleged market share.[1]

Recognizing this, Plaintiffs now cite a single purported piece of "evidence support[ing]" their market-share allegation: an article asserting that Ticketmaster controlled "50-60% of the secondary market in the U.S. as of 2022."  Archita Ruby

---

[1]  In *Klein v. Facebook*, 580 F. Supp. 3d 743 (N.D. Cal. 2022), which Plaintiffs cite for the proposition that a "rough estimation" of market share "with no explanation of how that estimation was made" is sufficient, the plaintiffs actually "provide[d] two independent methods for measuring Facebook's market share and explain[ed] why each method results in a market share that exceeds 80%."  *Id.* at 778; *see* ECF No. 301 at 20-21.

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

Arun, *Ticketmaster's Monopoly Undermines Fair Competition in Live Entertainment Ticketing*, 9 J. Bus. & Econ. Dev. 128, 128 (2024) (cited at ECF No. 301 at 20). But "50-60%" (a) does not support Plaintiffs' allegation that Defendants' market share *exceeds* 60% and (b) is not enough anyway. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 532c (2024) ("[W]e would presume that market shares below 50 or 60 percent do not constitute monopoly power.").

In all events, the article does not support a good-faith allegation about anything. To start, the author is evidently a high-school student. *See* https://rubyarun.com/ (last visited Mar. 24, 2025) (see "Home" tab for description of author as "[a] student at [a Chicago-area] High School"; see "Author" tab highlighting cited article). Furthermore, as counsel discovered when they tried to investigate the author's dubious claim about Ticketmaster's secondary market share, over half of the article's cited sources appear to be outright fabrications. *See* Declaration of T. O'Mara in Further Support of Defs.' Mot. to Dismiss ("O'Mara Decl.") ¶¶ 2-3. For example, one "source" the author cites for the market share estimate on which Plaintiffs rely is:

> Williams, R. *Monopolistic Dynamics in the Entertainment Ticketing Industry*. Journal of Market Competition, vol. 12, no. 3, Apr. 2021, pp. 123-139. Available from: (accessed 10 November 2023). https://doi.org/10.1016/j.jmc.2021.04.005

Arun, *supra*, at 131 & n.11. This source does not exist. The link leads nowhere, and searching Google for "Monopolistic Dynamics in the Entertainment Ticketing Industry," or even the "Journal of Market Competition" yields no results, other than the Arun article itself. *See* O'Mara Decl. ¶ 3. The same appears true of at least 10 of the 19 citations, *id.*, and many of the rest show clear errors, even if the source exists.

Ironically, the *only* source Arun cites for a secondary market share that both

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

(a) exists and (b) discusses secondary market share *undermines* Plaintiffs' allegation.  That is a 2018 report by the U.S. Government Accountability Office (GAO) (cited by Arun, *supra*, at 129 & n.3) which states that a Ticketmaster competitor, StubHub, claims 50% share in secondary ticketing:

> In the secondary market—where resale occurs—[many] companies are active, but **StubHub estimated it held roughly 50 percent of market share** as of 2017. According to Moody's Investors Service, Ticketmaster … **held the second-largest market share** as of 2016.

U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales: Market Characteristics and Consumer Protection Issues*, 4 (2018) (emphases added).[2] Needless to say, if Ticketmaster is the second-largest secondary ticketing company, it is not a monopolist.

In short, the only "information" underlying Plaintiffs' "information and belief" is an unsupported claim by a high schooler undermined by the only on-point source she cited.  Even at the pleading stage, no court needs to credit an assertion of monopoly power that rests on a foundation as flawed and discredited as Plaintiffs' here.  *See Jacobsen v. Bank of Am., N.A.*, 2010 WL 5140686, at *3 (W.D. Va. Dec. 13, 2010) ("Although the court owes the complaint a presumption of truth, it need not accept as true that which is demonstrably false.").  To the contrary, courts "do not, and should not, 'make allowances for a [party] who cites to fake, nonexistent, misleading authorities.'"  *Kohls v. Ellison*, 2025 WL 66514, at *5 (D. Minn. Jan. 10, 2025) (alteration in original) (citation omitted).

As Plaintiffs' unsubstantiated "belief" is insufficient, the Court should dismiss

---

[2]  Just last week, StubHub filed a Form S-1 Registration Statement for an initial public offering in which it stated:  "We believe we are the leader in the $18 billion North American secondary ticketing market based on our [gross merchandise sales] for 2024 as compared to similar metrics of our largest competitors for 2024."  StubHub Holdings, Inc., Registration Statement Under the Securities Act of 1933 (Form S-1), at 10 (Mar. 21, 2025), available at https://www.sec.gov/Archives/edgar/data/1337634/000119312525060140/d2258 49ds1.htm.

Plaintiffs' secondary-ticketing claims in their entirety for their glaring failure to allege any facts that would "nudge[]" their monopoly-power allegations "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see, e.g.*, *Kaufman v. Time Warner*, 836 F.3d 137, 148 (2d Cir. 2016) (affirming dismissal where complaint alleged "no particular facts bearing on [defendant's] share of the [relevant] market" (emphasis omitted)).

### 2.    *The Alleged Secondary Ticketing Services Market Is Implausible*

Plaintiffs' secondary market claims fail for the independent reason that the alleged secondary ticketing services market is implausibly limited to "major concert venues." Compl. ¶ 47. As Defendants explained, the fact that tickets sold on secondary platforms cross every conceivable form of live entertainment and are venue-size agnostic is "not subject to reasonable dispute," Fed. R. Evid. 201(b), and is easily confirmed by looking at the tickets available at any given time on any of the major secondary ticketing platforms, including StubHub, Vivid Seats, and SeatGeek. ECF No. 293-1 at 21-22.

In response, Plaintiffs attempt to rewrite their Complaint—trimming words, rearranging sentences, and contorting the plain meaning of their allegations in an effort to justify their artificial market definition. Plaintiffs now insist that the Complaint "explains that, for both primary ***and*** secondary ticketing, concerts 'require a specific type of ticketing service, and that major concert venues in particular require even more specialized ticketing services.'" ECF No. 301 at 21-22 (quoting Compl. ¶ 49). That characterization of the Complaint is incorrect: It does *not* allege that major concert venues require specialized secondary ticketing services. What Plaintiffs actually allege is that "'major concert venues require more sophisticated *primary* ticketing services than other venues.'" Compl. ¶ 50 (emphasis added) (citation omitted). That is consistent with Plaintiffs' allegations that (a) *primary* ticketers "need to be equipped to handle massive online traffic"

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

associated with "'high-demand events,'" and (b) *primary* ticketers provide "'back-end' inventory management systems" to venues and "on-the-ground ticketing services at the actual event." *Id.* ¶¶ 50, 39, 68(f); *see also id.* ¶ 49 (discussing a Ticketmaster graphic entitled "**PRIMARY** MARKET SIZING" (emphasis added)).

Claiming that all these attributes apply to secondary ticketing does not even make sense. Secondary ticketing is overwhelmingly a "B-to-C" ("business-to-consumer") business in which the buyers are fans, not venues. *See* Compl. ¶ 68(c). There is no reason to believe that what venues care about with regard to primary ticketing systems matters in the least to fans looking to buy secondary tickets. *See id.* ¶ 68(f) (alleging that secondary ticketers "must … provide a platform with very different services and functionality" as compared to primary ticketers). Nor is there any basis for thinking that fans looking to buy secondary tickets would ever pause to ask, "Which marketplaces serve this kind of venue?" This venue-size limitation on the definition of the secondary market is just a contrivance—words in a brief that don't even track what the Complaint says. *See Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to … a memorandum in opposition to a defendant's motion to dismiss." (citation omitted)); *Fabbrini v. City of Dunsmuir*, 544 F. Supp. 2d 1044, 1050 (E.D. Cal. 2008) ("[S]tatements in [an] opposition brief cannot amend the Complaint.").

Plaintiffs' Complaint is clear as to what secondary ticketers do: They provide "an online platform that allows ticket holders to post their ticket(s) for sale," permitting "[t]he ticket holder/seller [to] determine[] the sale price for the ticket." Compl. ¶ 66. In other words, secondary ticketing services are "[s]imilar to online auction websites like eBay." *Id.* In that context, it makes no sense to argue (as Plaintiffs now do, citing nothing in the Complaint and giving no examples) that the venue-size distinction reflects "market reality" in secondary ticketing because "[n]ot all secondary ticketing service providers can provide services for major concert

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1    venues" and only "[t]hose that can are within th[e] relevant market."  ECF No. 301
2    at 22.  The secondary ticketing service provided—reselling a ticket to a live event
3    on the Internet—is the same regardless of event type (sports, comedy, concerts, etc.)
4    or venue size, and the Complaint nowhere explains why reselling a secondary ticket
5    for a concert at a "major concert venue" is in any way distinct from reselling any
6    other secondary ticket.  Nor do Plaintiffs allege a single secondary ticketer that does
7    not—let alone cannot—facilitate resales for events at "major concert venues."  In
8    reality—as demonstrated by the judicially noticeable websites of StubHub, Vivid
9    Seats, SeatGeek, or any of Defendants' many other competitors in secondary
10   ticketing, *see* ECF No. 293-1 at 21—secondary ticketers are event-type and venue-
11   size agnostic.

12        This leaves Plaintiffs right back where they started: with a market in which
13   no one but a high-school student suggests Defendants have more than 30% share.
14   The Court should not credit Plaintiffs' secondary market which, as alleged, is "not
15   natural, artificial, and contorted to meet [Plaintiffs'] litigation needs."  *Hicks v. PGA*
16   *Tour*, 897 F.3d 1109, 1121 (9th Cir. 2018) (internal quotation marks omitted).
17   Instead, Plaintiffs' own allegations, "judicial experience[,] and common sense"
18   require dismissal.  *Id.* at 1117.

19   **B.    Plaintiffs Lack Antitrust Standing To Challenge Conduct In The**
20   **Markets For Primary Ticketing And Concert Promotion Services**
21        Plaintiffs lack antitrust standing to challenge conduct in the alleged markets
22   for primary ticketing services and concert promotion services because: (1) they fail
23   to allege antitrust injury; and (2) their theory of harm is speculative and indirect.  *See*
24   ECF No. 293-1 at 5-11.  Plaintiffs' efforts to cure their pleading defects by contorting
25   their allegations and ignoring relevant case law fail.

26        **1.    *Plaintiffs Do Not Allege Antitrust Injury***

27        Although Plaintiffs argue that "no single factor" in the antitrust standing
28   analysis "is dispositive," ECF No. 301 at 7, antitrust injury "is mandatory," *City of*

1  *Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021); *see also Cargill v.*
2  *Monfort of Colo.*, 479 U.S. 104, 110 n.5 (1986) ("A showing of antitrust injury is
3  necessary, but not always sufficient, to establish standing under [Clayton Act] § 4.").
4  Plaintiffs fail to allege it here.

a.    <u>Plaintiffs Do Not Suffer Injury In The Allegedly Restrained Markets</u>

7  Plaintiffs do not plausibly allege that they suffered an injury "in the market[s]
8  where competition is being restrained"—a prerequisite for antitrust injury.  *Am. Ad*
9  *Mgmt. v. Gen. Tel.*, 190 F.3d 1051, 1057 (9th Cir. 1999); *see FTC v. Qualcomm*, 969
10 F.3d 974, 992 (9th Cir. 2020) ("'Parties whose injuries, though flowing from that
11 which makes the defendant's conduct unlawful, are experienced in another market
12 do not suffer antitrust injury.'" (citation omitted)).

13 As Defendants explained, Plaintiffs do not allege that they participate in the
14 market for concert promotion services.  ECF No. 293-1 at 6-7.  Plaintiffs concede
15 the point by failing to respond.  *E.g., ABC Servs. Grp. v. Health Net of Cal.*, 2020
16 WL 2121372, at *5 (C.D. Cal. May 4, 2020) ("[F]ailure to address an argument in
17 opposition briefing constitutes a concession of that argument.").  As a result,
18 Plaintiffs lack standing to challenge conduct in that market.

19 As for primary ticketing services, the Complaint alleges a *venue-facing*
20 market—*not* a fan-facing market.  ECF No. 293-1 at 6-7; *e.g.*, Compl. ¶ 68(c) ("the
21 customers for primary ticketing services" are "major concert venue operators … who
22 retain primary ticketing service providers"); *see also, e.g., id.* ¶¶ 7, 68(a).  The
23 services provided in a venue-facing market are different from those provided in a
24 fan-facing market:  For venues, primary ticketing service providers "act as [venues']
25 distributor agent," providing "a number of back-end and front-end services" to their
26 venue clients, *id.* ¶ 68(c), whereas for fans, primary ticketing service providers offer
27 a platform (usually a website) where fans can purchase tickets.  Plaintiffs—who are
28 fans, not venues—do not suffer injury in the *venue-facing* market they allege.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1    Plaintiffs first respond by arguing that primary ticketers "sell tickets to

2 consumers and directly charge them … fees for those ticketing services," so

3 therefore fans "necessarily 'participate' … in the at-issue relevant markets."  ECF

4 No. 301 at 7 (emphasis omitted).  This argument ignores the market Plaintiffs have

5 actually pled.  Unlike the plaintiffs in *United States v. Live Nation*, who explicitly

6 pled distinct venue-facing *and fan-facing* markets related to primary ticketing,

7 Plaintiffs here have alleged *only* a venue-facing market in which primary ticketers

8 offer services to "major concert venue operators."  *Compare* Am. Compl. ¶¶ 164,

9 175, *United States v. Live Nation*, No. 1:24-cv-03973 (S.D.N.Y. Aug. 30, 2024),

10 ECF No. 257 (alleging distinct markets for "provision of primary ticketing services

11 to major concert venues" and "provision of primary concert ticketing offerings to

12 fans at major concert venues"), *with* Compl. ¶ 68(c) *and* ECF No. 293-1 at 6-7

13 (collecting allegations pleading venue-facing market).

14    Even if Plaintiffs had alleged a *fan-facing* market for primary ticketing

15 services (which they have not), they would fare no better.  As an initial matter, given

16 the Complaint's overwhelming focus on venue-facing services, *e.g.*, Compl. ¶¶ 7, 9,

17 68(a)-(c), 89, any fan-facing market for primary ticketing services "[l]ack[s]

18 sufficient clarity to state an antitrust claim plausibly," *Coronavirus Rep. v. Apple*,

19 85 F.4th 948, 956 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2526 (2024).  In any event,

20 a properly defined market must include not only "the product at issue" (primary

21 ticketing services for fans), but also "all economic substitutes."  *Newcal Indus. v.

22 Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  Yet Plaintiffs' allegations

23 demonstrate that, from a *fan's* perspective, primary and secondary ticketing services

24 are reasonably interchangeable—after all, Plaintiffs allege that consumers "may not

25 even know if they are purchasing a primary or secondary ticket at the time of sale."

26 Compl. ¶ 102.  Plaintiffs' Complaint is bereft of allegations about why a fan would

27 prefer to use primary ticketing services as opposed to secondary ticketing services,

28 so any fan-facing market for primary ticketing services fails.  *See, e.g.*, *Ticketmaster*

LATHAM&WATKINS␣␣␣
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1  *L.L.C. v. RMG Techs.*, 536 F. Supp. 2d 1191, 1197 (C.D. Cal. 2008) ("The Court is

2  reasonably sure that … [a consumer] would not care whether her ticket was

3  purchased through Ticketmaster in the 'retail' market or from a ticket broker in the

4  'resale' market ... as long as she is able to attend the [event].").

5  Plaintiffs further claim that *Apple v. Pepper* resolves the issue of antitrust

6  injury in their favor.  ECF No. 301 at 7-8.  But *Pepper* involved *Illinois Brick*'s

7  direct-purchaser rule—a wholly separate aspect of the antitrust standing analysis.

8  *See Pepper*, 587 U.S. at 276 ("We merely hold that the *Illinois Brick* direct-purchaser

9  rule does not bar these plaintiffs."); *see also Blue Shield of Va. v. McCready*, 457

10 U.S. 465, 476 (1982) (explaining that *Illinois Brick*'s "restriction" on recovery is

11 "[a]nalytically distinct from … the conceptually more difficult question 'of which

12 persons have sustained injuries *too remote* from an antitrust violation to give them

13 standing to sue for damages under § 4'" (brackets and citation omitted)).  Indeed,

14 the phrase "antitrust injury" appears nowhere in *Pepper*, and, after *Pepper*, the Ninth

15 Circuit reaffirmed the established rule that an antitrust injury must occur *in the*

16 *allegedly restrained market*.  *Qualcomm*, 969 F.3d at 992.  *Illinois Brick* and *Pepper*

17 address the question of which persons in the allegedly restrained market directly

18 purchase from the defendant.  They do not address the analytically distinct question

19 here, *i.e.*, whether parties *outside* the allegedly restrained market suffer a cognizable

20 antitrust injury.

21 For present purposes, it is therefore irrelevant that, under *Illinois Brick*,

22 Plaintiffs may be direct purchasers in some market *other than* the allegedly

23 restrained market.  That was the holding in *Bakay v. Apple*, 2024 WL 3381034, at

24 *7 (N.D. Cal. July 11, 2024), *appeal docketed*, No. 24-5314 (9th Cir. Aug. 30, 2024).

25 As *Bakay* explained, "the issue is not whether Plaintiffs are direct or indirect

26 purchasers of the iPhone.  What matters is whether Plaintiffs' alleged injury in the

27 smartphone market amounts to a claim of antitrust injury in the U.S. mobile browser

28 market. … The iPhone users in *Pepper* sustained injuries *in the same market* as the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1    upstream app developers, that is, in the app market." *Id.* (emphasis added).  "Those

2    circumstances [were] absent" in *Bakay*. *Id.*  And they are absent here, too:  Plaintiffs

3    are fans who do not suffer injury in the venue-facing market pled in the Complaint.

4                  b.    Plaintiffs Do Not Satisfy The *McCready* Test

5           Plaintiffs are wrong to claim, ECF No. 301 at 9-10, that their alleged injury—

6    higher ticketing fees—is "'inextricably intertwined' with the injuries of market

7    participants"—here, venues—under *McCready*.  *Am. Ad Mgmt.*, 190 F.3d at 1057

8    n.5 (citation omitted).  That "narrow exception," *id.*, requires that Plaintiffs be (a) the

9    "direct victim[s]" of the challenged conduct, or (b) "the 'necessary means' by which

10   [it] was carried out," *Lorenzo v. Qualcomm*, 603 F. Supp. 2d 1291, 1301 (S.D. Cal.

11   2009) (citation omitted).  Plaintiffs are neither.

12          Plaintiffs are not the "direct victims" of allegedly anticompetitive conduct

13   directed at venues, rival ticketers, and ticket brokers.  Plaintiffs' response is to claim

14   that Ticketmaster's desire to charge higher fees "is the entire point" of conduct

15   directed at other actors in other markets.  ECF No. 301 at 10.  But that is not the test:

16   "The availability of the § 4 remedy … is not a question of the specific intent of the

17   conspirators."  *McCready*, 457 U.S. at 479.   The question is whether Plaintiffs here

18   are "direct victims."  They are not.  *See infra* at Section II.B.2.[3]

19          Nor is Plaintiffs' purported injury (higher fees) "necessary" to Defendants'

20   allegedly anticompetitive conduct.   *McCready* illustrates the point.   There, the

21   plaintiff alleged that Blue Shield had unlawfully conspired with psychiatrists to

22   exclude psychologists from the psychotherapy market by refusing to reimburse most

23   psychology services.  457 U.S. 469-70.  Because patients, and not Blue Shield, paid

24

25   _____

26   [3]   Plaintiffs rely on *In re Amazon.com eBook Antitrust Litigation*, 2024 WL 918030
      (S.D.N.Y. Mar. 2, 2024), ECF No. 301 at 8, but that case bears little resemblance

27   to this one.  Plaintiffs are not online book purchasers complaining that provisions
      in the contracts between Amazon and book publishers have a one-to-one effect of
      raising consumer prices.  Instead, as explained below, Plaintiffs contend that, but

28   for the anticompetitive conduct alleged in the upstream market, the structure of
      that market might look completely different.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO                                              11

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

psychologists in the first instance, "[d]enying reimbursement to subscribers … was *the very means* by which it [was] alleged that Blue Shield sought to achieve its illegal ends." *Id.* at 475, 479 (emphasis added). In other words, McCready's injury was the *mechanism* for Blue Shield's allegedly anticompetitive conduct—not its *effect*.[4]

This case is unlike *McCready* because Plaintiffs' purported injury (higher fees) is the supposed *effect* of Defendants' allegedly anticompetitive conduct—not the "very means" by which Defendants allegedly restrained competition. Or, as Plaintiffs aptly put it, "Plaintiffs allege Defendants undermined competition in each relevant market *so they could directly charge consumers supracompetitive fees* …." ECF No. 301 at 10 (emphasis altered); *see also, e.g.,* Compl. ¶¶ 7 ("Ticketmaster charges supracompetitive fees *made possible by* its dominant market position." (emphasis added)), 65 ("Ticketmaster's market power in primary ticketing services *is evidenced by* the high and supracompetitive fees that it charges for such services." (emphasis added)). As a result, Plaintiffs' alleged injury doesn't fall within *McCready*'s exception. *See, e.g.*, *Datel Holdings v. Microsoft*, 712 F. Supp. 2d 974, 994 (N.D. Cal. 2010) (rejecting *McCready*'s application where it was "questionable whether Plaintiff could allege in good faith that it was necessary for Defendant to exclude Plaintiff's unauthorized accessories from the Aftermarket in order to gain a monopoly in the Online Market" because plaintiff already "allege[d] that Defendant possessed substantial power in the Online Market *and then* 'deployed' that power to control subsidiary markets" (emphasis added)); *In re WellPoint Out-of-Network*

---

[4] So too in *Ostrofe v. H.S. Crocker*, 740 F.2d 739 (9th Cir. 1984). The Ninth Circuit found antitrust injury there not because "wrongful conduct in one market inextricably cause[d] harm in another," ECF No. 301 at 10, but because Ostrofe had been forced to resign after refusing to implement a price-fixing scheme—so that "his discharge was a necessary means to achieve the conspirators' illegal end as well as an integral and inextricable part of the anticompetitive scheme," 740 F.2d at 742, 746. *See also, e.g.*, *NorthBay Healthcare Grp. v. Kaiser Found. Health Plan*, 838 F. App'x 231, 236 (9th Cir. 2020) (*McCready* "applie[d]" because plaintiff's "alleged financial injuries were the very means by which it was alleged that Defendants sought to achieve [their] illegal ends" (cleaned up)).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1    *UCR Rates Litig.*, 903 F. Supp. 2d 880, 908 (C.D. Cal. 2012) (similar).[5]

2    Judge Subramanian's recent order in *United States v. Live Nation*, No. 1:24-

3    cv-03973 (S.D.N.Y. Mar. 14, 2025), ECF No. 483, does not hold otherwise.  Most

4    importantly—and unlike the Complaint here—the plaintiffs there actually alleged a

5    fan-facing market.  *See supra* at Section II.B.1.a.  The venue-facing market here

6    raises different questions.    Further, although Judge Subramanian invoked

7    *McCready*, he did not conclude that charging allegedly supracompetitive fees was

8    "necessary" to Defendants' alleged monopolization of the market for primary

9    ticketing services.  *See United States v. Live Nation*, ECF No. 483 at 4-6.

10    Ultimately, Plaintiffs claim injury as downstream consumers in a market

11    separate from the one where the challenged conduct allegedly occurred.    If

12    *McCready*'s "narrow" exception covered their claims, that exception would swallow

13    the rule.  "Congress did not intend § 4 to have such an expansive scope."  *Am. Ad*

14    *Mgmt.*, 190 F.3d at 1054.

15    ### 2.    *Plaintiffs' Alleged Injury Is Speculative And Indirect*

16    Plaintiffs independently fail to allege antitrust standing because their theory

17    of injury is both speculative and indirect.

18    "Antitrust claims must make economic sense."    *Adaptive Power Sols. v.*

19    *Hughes Missile Sys.*, 141 F.3d 947, 952 (9th Cir. 1998).  Yet Plaintiffs' *ipse dixit*

20    theory of causation contradicts the very nature of the market they allege, making it

21    fatally speculative.  Plaintiffs claim that "Defendants anticompetitively prevented

22    competition in primary and secondary ticketing services, thereby immunizing

23    _____

24    [5]  To the extent Plaintiffs try to recast their Complaint as alleging that charging
higher fees *is* the "very means" by which Defendants restrained competition—for

25    example, by positing that Ticketmaster needs to charge higher fees to be able to
make "large up-front" payments to venues to secure exclusive contracts—that

26    would make their antitrust injury problem worse, not better.  Offering better
financial terms than a competitor to win an exclusive contract is the very essence

27    of competition and thus cannot inflict antitrust injury.  *See, e.g., Race Tires Am.*
*v. Hoosier Racing Tire*, 614 F.3d 57, 79, 83 (3d Cir. 2010) (offering financial

28    incentives to win exclusive contract is competition and does not cause antitrust
injury).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

Ticketmaster from price competition and allowing it to charge inflated fees." ECF No. 301 at 11. Such a theory might be plausible in a non-rights market, but here, it fails to account for the market dynamics that Plaintiffs themselves allege. Specifically, Plaintiffs claim that Ticketmaster *overpays* venues, reducing price competition between venues and leading to higher ticketing fees. Compl. ¶ 88. But Plaintiffs nowhere explain why, if Ticketmaster paid venues *less* money, venues would respond by reducing ticketing fees for consumers—instead of *raising* them to make up the loss. Moreover, the market for primary ticketing services *is* a rights market, where venues sell the rights to ticket their events. *Id.* ¶ 41. So, as Defendants explained, one would expect increased competition among primary ticketers to drive up-front payments to venues *higher*, amplifying the fee-increasing dynamic Plaintiffs posit. ECF No. 293-1 at 10.[6] In short, Plaintiffs' causation theory is simply "too speculative to establish antitrust standing." *City of Oakland*, 20 F.4th at 459.

Plaintiffs' only response is to accuse Defendants of raising "fact disputes." ECF No. 301 at 10. But, even at the pleadings stage, an antitrust claim must be "'plausible' in light of basic economic principles." *William O. Gilley Enters. v. Atl. Richfield*, 588 F.3d 659, 662 (9th Cir. 2009) (citation omitted). Here, Plaintiffs' claims are not.[7]

Nor are Plaintiffs' claimed injuries sufficiently direct. Plaintiffs admit that "directness in the antitrust context means close in the chain of causation." ECF No. 301 at 10 (quoting *Yellow Pages Cost Consultants v. GTE Directories*, 951 F.2d

---

[6] This is not an "inquiry into … whether competition is good or bad," as Plaintiffs claim. ECF No. 301 at 11. It is a basic and necessary question of whether the competitive dynamics, as Plaintiffs describe them, would result in their paying less in their alleged but-for world—in other words, the fundamental antitrust analysis.

[7] Plaintiffs' invocation of "empirical data" does not move the needle. ECF No. 301 at 11. Plaintiffs have alleged multiple inputs to setting ticketing fees, and generic fee comparisons do not shore up the "speculative links in [Plaintiffs'] chain of causation," *City of Oakland*, 20 F.4th at 460-61.

1158, 1162 (9th Cir. 1991)).  Yet the speculative links in Plaintiffs' causal chain—
*i.e.*, that increased competition for the right to ticket venues' shows would somehow
cause Ticketmaster to pay venues *less* for that right, and that venues would in turn
respond to that lost revenue by *lowering* their own share of ticketing fees—illustrate
that Plaintiffs' theory of harm is impermissibly "'secondary, consequential, or
remote.'"  *City of Oakland*, 20 F.4th at 458 (citation omitted).

    Plaintiffs again invoke *Pepper*.  ECF No. 301 at 10.  But *Pepper* considered a
*distribution* chain under the *Illinois Brick* direct-purchaser doctrine, not a *causal*
chain for purposes of antitrust standing.  *E.g.*, 587 U.S. at 280-81.  Because *Pepper*
considered a different question, its rule is inapposite.  So it is unsurprising that
*Pepper* did not dispense with the general rule that the existence of a more directly
harmed class of alleged victims weighs against antitrust standing.  *See City of
Oakland*, 20 F.4th at 459 (reiterating, after *Pepper*, that "the existence of … more
direct victims … counsel[s] against [a plaintiff's] standing"); *accord Pepper*, 587
U.S. at 276 ("We merely hold that the *Illinois Brick* direct-purchaser rule does not
bar these plaintiffs from suing Apple under the antitrust laws.").  That more direct
victims may have a "different theor[y] of harm," ECF No. 301 at 11 (citation
omitted), is not dispositive.  *See City of Oakland*, 20 F.4th at 451, 459 (cities who
purchased NFL teams, whose injury would be having paid supracompetitive prices,
were more direct victims than Oakland, whose alleged injuries sounded primarily in
lost investment value, income, and tax revenue).

**C.    Plaintiffs' Conduct Theories Fail As A Matter Of Law**

    Plaintiffs first defend their legally infirm conduct theories with the bold
assertion that the Court cannot review them at all because they allegedly feature in
"an overarching anticompetitive scheme" and are therefore protected from dismissal
by the 33-year-old, pre-*Twombly* decision in *City of Anaheim v. Southern California
Edison*, 955 F.2d 1373, 1376 (9th Cir. 1992).  ECF No. 301 at 12-13.  *Anaheim* does
not hold what Plaintiffs say.  It is in fact among the many cases holding that "a

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

finding of some slight wrongdoing in certain areas need not by itself add up to a violation." 955 F.2d at 1376; *see also City of Groton v. Conn. Light & Power*, 662 F.2d 921, 928-29 (2d Cir. 1981) ("[W]e reject the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act."). *Anaheim* does *not* stand for the position that Plaintiffs can plead multiple, legally deficient conduct theories and insulate them from review by labeling them a "scheme." *Cf. Masimo v. Tyco Health Care Grp.*, 2004 WL 5907538, at *5 (C.D. Cal. June 10, 2004) (noting at summary judgment that *Anaheim* "does not allow for clearly legal acts to be thrown into the mix to bolster a plaintiff's antitrust case"); *Intergraph v. Intel*, 195 F.3d 1346, 1366-67 (Fed. Cir. 1999) ("[T]he 'factual components' of a case should be viewed together, not the pieces of legal theory." (citation omitted)).

Indeed, courts regularly analyze individual conduct allegations for their legal sufficiency, and dismiss those that fall short. *See, e.g.*, *In re Google Digital Advert. Antitrust Litig.*, 2024 WL 988966, at *8-12 (S.D.N.Y. Mar. 7, 2024) (dismissing individual theories of anticompetitive conduct); *Staley v. Gilead Scis.*, 2020 WL 5507555, at *11-19 (N.D. Cal. July 29, 2020) (dismissing individual theories and noting that "[o]ften, a plaintiff asserts a single cause of action that is predicated on more than one liability theory, and a court eliminates one theory through a motion to dismiss"). The Court should do the same here.

### 1.    *Plaintiffs Fail To Plausibly Allege A Tie*

Plaintiffs do not dispute the "fundamental principle" that tying requires a single buyer. *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (citation omitted); *see* ECF No. 293-1 at 12; ECF No. 301 at 14-15. At a minimum, that concession dooms their first tying theory.

As Defendants explained, Plaintiffs' first purported tie (concert promotion services and primary ticketing services) fails because the Complaint alleges that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

*artists* (through their managers or booking agents) purchase Live Nation's concert promotion services, while *venues* purchase Ticketmaster's primary ticketing services.  ECF No. 293-1 at 12-13; *see* Compl. ¶¶ 31, 34, 38-39.  Despite those allegations, Plaintiffs now claim to have alleged that *venues* hire promoters, and that artists incidentally "benefit[]."  ECF No. 301 at 14-15.  That late-breaking theory directly contradicts the Complaint, which alleges that an artist's "manager or booking agent" hires a promoter to "promote[] the concert to the public, which requires several different types of work," including "contract[ing] with" venues by "pay[ing] … a fixed fee (rental payment) to host the concert at the venue."  Compl. ¶¶ 34-35.  In other words, Plaintiffs allege that *promoters* pay *venues* for their services—not the other way around.  This defeats the first purported tie.[8]

Plaintiffs' second alleged tie (primary and secondary ticketing services) fails for the same reason, plus another.  First, as Defendants explained, the Complaint alleges that "the customers for secondary ticketing services for events at major concert venues are distinct from the customers for primary ticketing services for events at major concert venues."  Compl. ¶ 68(c); *see* ECF No. 293-1 at 13.  But even setting aside that fatal flaw, Plaintiffs' second alleged tie is no more than a garden-variety restriction on whether and how tickets can be resold.  As Defendants explained, transfer restrictions on tickets—which are revocable licenses—are commonplace and lawful.  *See* ECF No. 293-1 at 15-16 (collecting authorities).  Plaintiffs offer no response—conceding the point.

### 2.    *Plaintiffs Have Not Plausibly Pled "Leveraging" Theories*

As Defendants explained, Plaintiffs' "leveraging" allegations are fatally conclusory.  ECF No. 293-1 at 14.  Plaintiffs respond by invoking "over 60 earlier

---

[8]    Considering a different alleged tie, Judge Subramanian held that the complaint in *United States v. Live Nation* adequately alleged that *artists* are the consumers for both large amphitheaters and concert-promotion services.  *United States v. Live Nation*, ECF No. 483 at 3-4.  That conclusion has no bearing on the question before this Court—which is whether *this* Complaint adequately alleges that *venues* are the consumers for concert promotion services.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

paragraphs" of their Complaint without any explanation as to how the allegations in those paragraphs support a plausible leveraging theory. ECF No. 301 at 15-16. But it is not enough to merely "'reallege[] and incorporate[] by reference the allegations'" in "'preceding paragraphs,'" and "district courts routinely dismiss vague complaints in which courts must guess which facts support which claim." *Dahlstrom v. Life Care Ctrs. of Am.*, 2023 WL 4893491, at *9 (W.D. Wash. Aug. 1, 2023) (citation omitted). Even reviewing the 60-plus paragraphs that Plaintiffs cite, it remains entirely unclear which allegations support their "leveraging" theory, as opposed to merely describing their alleged markets or alleging other types of conduct. In short, Plaintiffs "leav[e] it to the court to sort through [dozens of paragraphs] of the complaint to match facts to claims." *Byrd v. Cal. Superior Court*, 2009 WL 2031761, at *11 (N.D. Cal. July 7, 2009). "This the court [need] not do." *Id.*

Moreover, Plaintiffs' theory that Defendants use their alleged monopoly power in the primary ticketing services market to monopolize that same market is circular. ECF No. 293-1 at 14. Again, Plaintiffs concede the point by failing to respond.

As to their leveraging theories concerning the secondary market, Plaintiffs do not explain what facts, if any, support a "dangerous probability" of Defendants monopolizing that market. ECF No. 301 at 16. At best, Plaintiffs claim Defendants have a 60% market share of secondary ticketing services, but as explained, *supra* at Section II.A.1, they cite only a high-school student's paper that relies on inapposite and non-existent citations to support that contention.

### 3.  *Plaintiffs' Ticket Transfer And Conditional License Allegations Fail*

Plaintiffs argue that their allegations about ticket transfer restrictions should proceed because there are questions of fact about Defendants' procompetitive justifications. ECF No. 301 at 17. But even ignoring the falsity of Plaintiffs'

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

SafeTix allegations, Plaintiffs utterly ignore—and therefore concede—Defendants' *legal* argument that event tickets are revocable licenses whose transferability can be lawfully limited. *See supra* at Section II.C.1; ECF No. 293-1 at 15-16.

Moreover, Plaintiffs' ticket transfer allegations relate only to secondary ticketing services, for which Plaintiffs' monopoly power allegations and market definition fail. *See supra* at Section II.A. The same is true of Plaintiffs' conditional license allegations.

### 4. Plaintiffs' "Vertically-Arranged Boycott" Theory Falls Short Of Basic Pleading Requirements

Plaintiffs' "vertically-arranged boycott" theory is so vague that not even Plaintiffs themselves can articulate who agreed to boycott whom from what. Instead, they obscurely state that Defendants "forced various market participants to boycott Ticketmaster's competitors," and then reference their Section 1 claim. ECF No. 301 at 17-18. Plaintiffs' vague allegations are plainly insufficient to plead a boycott, including because their Section 1 claim also fails. *See infra* at Section II.D.

### D. Plaintiffs' Section 1 Claim Fails For The Independent Reason That The Complaint Does Not Sufficiently Allege An Unlawful Agreement

Plaintiffs' Opposition addresses only their Section 1 allegations concerning long-term exclusive contracts with venues and agreements with ticket brokers. *See* ECF No. 301 at 18-19. Plaintiffs have thus abandoned any claims resting on agreements involving artists or "others." *See* Compl. ¶¶ 176, 197; *Gredale v. Access Bio*, 2023 U.S. Dist. LEXIS 205830, at *17 n.5 (C.D. Cal. Nov. 16, 2023) (Wu, J.) (noting that "Plaintiff's opposition failed to address any of [Defendant's] Rule 12(b)(6) arguments, and thus conceded that its claims are deficient").

As for the alleged agreements with brokers, Plaintiffs apparently mean to challenge the aggregate effect of a series of bilateral agreements. *Cf.* ECF No. 301 at 18-19. That is not clear from the Complaint, and Plaintiffs cannot amend their allegations through their Opposition. *E.g.*, Compl. ¶¶ 197 ("Defendants and various

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

venues, ticket brokers, artists, and others have entered into one or more contracts, combinations, or conspiracies"), 198 ("Defendants have induced or coerced various major concert venues, ticket brokers, artists, and others to enter into one or more contracts, combinations, or conspiracies"), 201 ("Defendants' conduct has had an anticompetitive effect").  In any event, Plaintiffs do not plausibly plead that the aggregate effect of some unspecified number of alleged agreements with mostly-unspecified brokers, who account for the resale of some unspecified number of tickets, unlawfully restrains trade.  *Id.* ¶ 105.

As for the venue agreements, the Complaint is again unclear whether Plaintiffs are attempting to challenge those agreements in the aggregate.  But even if they are, Plaintiffs now purport to challenge "contracts with over 12,000 venues." ECF No. 301 at 18.  According to the Complaint, that represents the *total* number of Ticketmaster's exclusive ticketing contracts—not the number of contracts with "major concert venues."  *E.g.*, Compl. ¶ 62.  Yet Plaintiffs' Opposition nowhere explains how contracts with *non*-major concert venues could unlawfully restrain trade "in the relevant markets for primary and secondary ticketing services for major concert venues."  *Id.* ¶ 201.

Plaintiffs' ambiguous, conclusory Section 1 allegations fail to state a claim.

## III.    CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss.

*[Signature on following page]*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1 | Dated:  March 26, 2025

Respectfully Submitted,

LATHAM & WATKINS LLP

By: _/s/ Timothy L. O'Mara_

Timothy L. O'Mara

505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  +1.415.391.0600
tim.o'mara@lw.com

*Attorneys for Defendants
Live Nation Entertainment, Inc.
and Ticketmaster L.L.C.*

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS

1

2

**CERTIFICATE OF COMPLIANCE**

3

4

5

The undersigned, counsel of record for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C., certifies that this brief contains 6,585 words, which complies with the word limit of L.R. 11-6.1.

6

7     Dated: March 26, 2025                    */s/ Timothy L. O'Mara*

8                                                Timothy L. O'Mara

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

DEFS.' REPLY IN SUPPORT OF
MOTION TO DISMISS
CASE NO. 2:22-CV-00047-GW-GJS