# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 22-0047-GW-GJSx | Date | April 9, 2025 |
|---|---|---|---|
| Title | *Skot Heckman, et al. v. Live Nation Entertainment, Inc., et al.* | | |

| | |
|---|---|
| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:    IN CHAMBERS - TENTATIVE RULING ON DEFENDANTS' MOTION TO DISMISS [293]**

Attached hereto is the Court's Tentative Ruling on Defendants' Motion [293] set for hearing on April 10, 2025 at 8:30 a.m.

|  | : |
|---|---|
| Initials of Preparer | JG |

_**Skot Heckman et al v. Live Nation Ent., Inc. et al**_; Case No. 2:22-cv-00047-GW-(GJSx)
Tentative Ruling on Motion to Dismiss

Before the Court is Defendant's Motion to Dismiss (the "Motion"). _See_ Motion, Docket No. 293. The Court has considered the Motion, Plaintiff's opposition brief ("Opp.," Docket No. 301), and Defendant's reply brief ("Reply," Docket No. 305). For the reasons stated herein, the Court would **DENY** the Motion in part and **GRANT** it in part.

## I.    Background

On January 4, 2022, Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts (collectively, "Plaintiffs") brought this putative antitrust class action against Defendants Live Nation Entertainment, Inc. ("Live Nation") and Ticketmaster LLC ("Ticketmaster") (collectively, "Defendants") alleging various anticompetitive practices in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. _See generally_ Complaint, Docket No. 1. The Court's review of the Complaint reveals the following allegations.[1]

In 2010, Ticketmaster became a wholly-owned subsidiary of Live Nation. _Id._ ¶ 8. Live Nation is the largest live entertainment company in the world and "by far the largest and most dominant concert promoter for major concert venues." _Id._ ¶¶ 8, 21. It works with artists to finance tours and determines into which venue the tours will go through. _See id._ ¶¶ 10, 19, 21.[2] Ticketmaster is "the largest ticketing company in the United States" with a "market share exceeding 70% of primary ticketing services for major concert venues." _Id._ ¶¶ 7, 22. Because of the complexity associated with ticketing for large events, major concert venues typically use primary ticketing service providers like Ticketmaster rather than manage sales themselves, and Ticketmaster charges consumers a fee alongside each ticket they purchase. _Id._ ¶¶ 38-39. Defendants have leveraged their positions to maintain each other's dominance in their respective markets. _Id._ ¶ 9.

Subsidized by Ticketmaster's supracompetitive profits, Live Nation maintains its dominant position in the concert promotion services market by paying its clients exorbitant amounts, taking losses in this segment of the business in the "tens of millions of dollars annually." _Id._ ¶ 9.

---

[1] The well-pled facts therein are accepted as true for the purpose of this ruling. _See Sprewell v. Golden State Warriors_, 266 F.3d 979, 988 (9th Cir.), amended on denial of reh'g, 275 F.3d 1187 (9th Cir. 2001).

[2] "Artists today make 95% of their income from live music events and [] Live Nation is now the 'largest single financer' of artists worldwide." _Id._ ¶ 19.

Meanwhile, Live Nation threatens venues that if they do not use Ticketmaster as their primary ticketing service provider, Live Nation will limit the number of tours that go through the venue. *Id.* ¶ 9.[3]  This limits the ability of Ticketmaster's competitors to compete in the primary ticketing market and limits the options of venues. *Id.* ¶ 10.  Yet venues derive an advantage from this system as well because "Ticketmaster offers up-front payments and other subsidies [to venues] that can run into the millions of dollars that are conditioned on [long-term] exclusivity." *Id.* ¶ 42.  The harms of this system are thus borne largely by consumers, who pay "supracompetitive" fees that would not exist in a competitive market. *Id.* ¶ 11.  Ticketmaster has recently sought to expand its dominance into the secondary ticketing market through (1) a conditional license that limits the number of primary tickets a consumer can purchase and (2) mobile ticket technology that forces primary purchasers of Ticketmaster tickets seeking to resell their tickets to do so on Ticketmaster's platform, for which Ticketmaster collects a supracompetitive fee on both the resale and the purchase.  *Id.* ¶¶ 13-17.  Through this conduct, Ticketmaster's secondary ticketing volume has experienced "double-digit year over year growth for multiple years now, threatening to soon make Ticketmaster the largest secondary ticketing platform in the nation." *Id.* ¶ 18.  Plaintiffs seek to represent two classes: the "Primary Ticketing Services Consumer Class" and the "Secondary Ticketing Services Consumer Class."[4]

On March 8, 2022, Defendants moved to compel arbitration based upon an arbitration agreement contained in their terms of use.  *See* Motion to Compel Arbitration, Docket No. 30.  The Court granted Plaintiffs' request to conduct limited discovery related to the validity, unconscionability, and severability of the dispute-resolution provisions in the terms of use.  *See* Docket No. 50.  On August 10, 2023, the Court denied Defendants' motion to compel arbitration, finding the arbitration agreement was both procedurally and substantively unconscionable which

---

[3] This allegation is bolstered by filings made by the U.S. Department of Justice's Antitrust Division, which wrote: "venues throughout the United States have come to expect that refusing to contract with Ticketmaster will result in the venue receiving fewer Live Nation concerts or none at all. Given the paramount importance of live event revenues to a venue's bottom line, this is a loss most venues can ill-afford to risk." *Id.*

[4] The "Primary Ticketing Services Consumer Class" is defined as "[a]ll end-user purchasers in the United States who purchased a primary ticket and paid associated fees for primary ticketing services for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation Entertainment, Inc. at any point since 2010." Complaint ¶ 131.  The "Secondary Ticketing Services Consumer Class" is defined as "[a]ll end-user purchasers in the United States who purchased a secondary ticket and paid associated fees for secondary ticketing services for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation Entertainment, Inc. at any point since 2010." *Id.*

thereby made it unenforceable. *See Heckman v. Live Nation Ent., Inc.*, 686 F. Supp. 3d 939, 969 (C.D. Cal. 2023). On September 9, 2023, Defendants appealed that order to the Ninth Circuit. *See* Docket No. 212. The same day, Defendants moved to stay the case pending resolution of the appeal on arbitrability as mandated by *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 738 (2023), *see* Docket No. 213, which the Court granted, *see* Docket No. 229. On October 28, 2024, the Ninth Circuit issued a published opinion affirming this Court's ruling. *See Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 690 (9th Cir. 2024). Defendants then petitioned for a rehearing and for a rehearing en banc, which the Ninth Circuit denied and then issued a final mandate.

With a decision on Defendants' interlocutory appeal rendered, this Court lifted the stay on December 9, 2024 and ordered the parties to file a joint report addressing future proceedings in this litigation. *See* Docket No. 262. In the status report, Defendants argued that the Court should stay the case due to a similar antitrust action brought by the United States Department of Justice ("DOJ") and Attorneys General from 39 states and the District of Columbia against Defendants in the United States District Court for the Southern District of New York (the "Public Enforcer Action"). *See* Docket No. 269; *United States et al v. Live Nation Entertainment, Inc. et al*, Case No. 1:24-cv-03973-AS (S.D.N.Y.). The Court denied the motion to stay without prejudice. *See* Docket Nos. 283-84.[5] Now before the Court is Defendants' Motion to Dismiss.

## II.    **Legal Standard**

Under Federal Rule of Civil Procedure 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Under Rule 12(b)(6), the court must: (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable

---

[5] In denying the motion to stay, it was noted that, not only was this lawsuit filed more than two years before the Public Enforcer Action, but:

In the Public Enforcer Action, Defendants moved to transfer venue from the Southern District of New York to the District of Columbia, which was denied . . . . Defendants did not move, however, to stay the later-filed Public Enforcer Action or to transfer it to the Central District of California, where the instant action had long been pending and where both Defendants have their principal place of business.

Docket No. 283 at 3 of 10.

inferences to be drawn from them. *See Sprewell*, 266 F.3d at 988; *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). In its consideration of the motion, the court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Twombly*, 550 U.S. at 561-63 (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief). "[I]n antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976); *but see Twombly*, 550 U.S. 544.

Under Federal Rule of Civil Procedure 15(a)(2), federal courts are instructed to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). A district court, however, may in its discretion deny leave to amend "due to 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

III.  **Discussion**

Section 1 of the Sherman Act prohibits unreasonable contracts or combinations in restraint of trade. 15 U.S.C. § 1. To state a claim under § 1, a private plaintiff must allege "(1) an agreement, conspiracy, or combination between two or more entities, (2) an unreasonable restraint of trade, (3) anticompetitive effects within the relevant market, and (4) a resulting antitrust injury suffered by the claimant." *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 889 (N.D. Cal. 2012), *order vacated in part on reconsideration*, No. 3:10-cv-04429-EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012) (citing *Queen City Pizza, Inc. v. Domino's Pizza*, 124 F.3d

430, 442 (3d Cir. 1997)).

Section 2 of the Sherman Act prohibits monopolization and attempts to monopolize. 15 U.S.C. § 2. In order to state a claim for monopolization under this provision, a plaintiff must allege: "(1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury." *Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010). A claim for attempted monopolization, requires allegations of the defendant's "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury." *Cost Management Services*, 99 F.3d at 949; *California Computer Prods., Inc. v. Int'l Bus. Machines Corp.*, 613 F.2d 727, 735 (9th Cir. 1979); *United States v. Microsoft Corp.*, 253 F.3d 34, 80 (D.C. Cir. 2001).

Defendants argue that (1) Plaintiffs lack antitrust standing; (2) their Section 1 claim fails for the independent reason that the Complaint does not sufficiently allege an unlawful agreement; (3) their claims related to secondary ticketing fail for lack of a plausible market; and (4) their conduct theories fail as a matter of law. *See generally* Motion.

### A. Antitrust Standing

"Section 4 of the Clayton Act authorizes the award of damages under the antitrust laws: 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.'" *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999) (quoting 15 U.S.C. § 15(a) (1999)). While the provision might appear quite broad, "Congress did not intend to provide a private remedy for all injuries that might conceivably be traced to an antitrust violation," *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 448 (9th Cir. 1985), and the Supreme Court has devised a test to determine whether a plaintiff is a proper party to bring an antitrust claim. In deciding whether a plaintiff has antitrust standing, courts consider: (1) whether the plaintiff has suffered an "antitrust injury," which is an injury of the type the antitrust laws were intended to prevent, flowing from that which makes defendants' acts unlawful; (2) the directness of the injury; (3) the speculative nature of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *American Ad*

*Management, Inc.*, 190 F.3d at 1054 (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535-46 (1983)).  To conclude that there is antitrust standing, "a court need not find in favor of the plaintiff on each factor," but the Supreme Court has noted that "[a] showing of antitrust injury is necessary, but not always sufficient."  *Id.* at 1055 (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n. 5 (1986)) (internal quotation marks omitted).  Still, while an "antitrust injury" generally "requires the plaintiff to have suffered its injury in the market where competition is being restrained," the Supreme Court has "carved a narrow exception to the market participant requirement for parties whose injuries are 'inextricably intertwined' with the injuries of market participants."  *Id.* at 110 n.5 (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982)).

Defendants argue that Plaintiffs lack antitrust standing because they fail to allege an antitrust injury, and their alleged injury is both indirect and speculative.  *See* Motion at 5-11. According to Defendants, "Plaintiffs allege that competition has been restrained in markets for 'primary ticketing services' and 'concert promotion services' for 'major concert venues,'" but because Plaintiffs do not participate in either of those markets and suffer their alleged injuries downstream, they lack standing.  *Id.* at 6-7.  Defendants point to cases like *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015) and *Bakay v. Apple*, No. 24-cv-00476-RS, 2024 WL 3381034 (N.D. Cal. July 11, 2024) to suggest that such downstream injuries are insufficient to provide standing.  *Id.* at 7-8.  Defendants further argue that the "inextricably intertwined" exception does not apply because Plaintiffs are neither the "direct victims" of the alleged conduct, nor the "necessary means" by which it was carried out.  *Id.* at 8-9 (citing *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1300-01 (S.D. Cal. 2009).

As Defendants recognized in their Reply, Judge Subramanian denied Defendants' motion to dismiss in the Public Enforcer Action on March 14, 2025, ruling on the antitrust standing issue as well as the plausibility of a tying claim.  *See* Public Enforcer Action, Docket No. 483.   In relevant part, the decision stated as follows:

> True, the complaint in this case carves the primary-ticketing market into several different markets, and as Live Nation points out, the consumers didn't participate in those markets where the alleged anticompetitive acts took place. But looking to substance, and putting antitrust legalese to the side, the thrust of the complaint is that Live Nation engaged in a variety of exclusionary conduct to maintain its monopoly over primary-ticketing services, and consumers suffered injury by using those services and getting overcharged. Whatever market definitions one employs,

6

where a defendant unlawfully maintains its monopoly over a product through a course of exclusionary conduct focusing on that product, consumers of that product alleging that they were overcharged suffer a cognizable injury. In this situation, as *DDAVP* and *McCready* confirm, the consumers' injury is "clearly foreseeable," "inextricably intertwined" with the anticompetitive conduct, and "flows from that which makes [the] defendants' acts unlawful." *McCready*, 457 U.S. at 479, 484 (citation omitted); *see also* [*In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009)]. Rejecting a claim of antitrust injury under these circumstances—on the pleadings no less—would "engraft artificial limitations on the § 4 remedy," precisely what the Supreme Court has forbidden. *McCready*, 457 U.S. at 472.

*Id.* at 6.

Defendants previously argued that this case should be stayed because it "overlaps substantially" with the Public Enforcer Action, stating: "Both cases assert violations of Section 1 and Section 2 of the Sherman Act based on similar—and sometimes identical—alleged markets and conduct. Both plaintiff groups purport to represent ticket purchasers, and both plaintiff groups seek treble damages on those ticket purchasers' behalf." *See* Docket No. 269 at 11. Defendants went on to compare the language in the two complaints, highlighting the similarities in the alleged markets, alleged conduct, consumers represented, and damages sought. *See id.* But here, Defendants seek to distance the case before the Court from the Public Enforcer Action, arguing that "[u]nlike the plaintiffs in [the Public Enforcer Action], who explicitly pled distinct venue-facing *and fan-facing* markets related to primary ticketing, Plaintiffs here have alleged *only* a venue-facing market in which primary ticketers offer services to 'major concert venue operators.'" Reply at 9 (emphasis in original).

But this argument ignores Judge Subramanian's statement that "[w]hatever market definitions one employs, where a defendant unlawfully maintains its monopoly over a product through a course of exclusionary conduct focusing on that product, consumers of that product alleging that they were overcharged suffer a cognizable injury." *See* Public Enforcer Action, Docket No. 483 at 6; *see also* Opp. at 7 ("Primary and secondary ticketing service providers **sell tickets to consumers and directly charge them (supracompetitive) fees for those ticketing services**.") (emphasis in original). The distinction Defendants attempt to make does not impact Judge Subramanian's conclusion. Furthermore, Defendants make hardly any effort to demonstrate how Plaintiffs are not the "direct victim[s]" of the alleged conduct under *McCready*'s test of inextricable intertwinement. *See McCready*, 457 U.S. at 479; Reply at 8-9. Plaintiffs have plainly alleged that consumers bear the brunt of the harm of Defendants' anticompetitive practices, yet

Defendants claim there was no such averment. *Compare* Complaint ¶ 11 ("[T]he anticompetitive harm and costs from Defendants' acts are not shouldered by concert venues; consumers have that unenviable privilege.") *with* Motion at 8 ("[T]here are no allegations that end-user ticket purchasers were the 'direct victims' [of the alleged monopolization].").  Additionally, much like Judge Subramanian, the Court finds Defendants' citations to cases like *Bakay* and *Feitelson* unavailing due to the more tangential connections in those cases between the alleged injuries and the markets in which they were supposedly felt.[6]  *See* Public Enforcer Action, Docket No. 483 at 6.  The Court finds that Plaintiffs have alleged an antitrust injury.

The Court would also agree with Plaintiffs that the injuries they claim are neither indirect nor speculative under the second and third prongs of the antitrust standing inquiry.  Plaintiffs assert the fairly straightforward theory that "Defendants anticompetitively prevented competition in primary and secondary ticketing services, thereby immunizing Ticketmaster from price competition and allowing it to charge inflated fees." Opp. at 11.  Defendants suggest that because the market for primary ticketing is a "rights market," "one would expect increased competition among primary ticketers to drive up-front payments to venues higher, amplifying [fees]."  Reply at 14.  But this argument flies in the face of the study by the United States Government Accountability Office cited in Plaintiffs' Complaint, which concluded that "markets that are not encumbered by Ticketmaster's monopoly over ticketing services demonstrate much lower prices for consumers."  Complaint ¶¶ 11, 114-22.  Plaintiffs' alleged economic theory is therefore plausible, and their injuries under that theory are direct and non-speculative.  Defendants' remaining arguments about the specific effects of certain changes in the market invoke fact disputes that need not be resolved at the motion to dismiss stage.  Finally, Defendants do not challenge Plaintiffs' assertions that there is limited risk of duplicative recovery and low complexity in apportioning damages under the fourth and fifth prongs of the antitrust standing inquiry.  In conclusion, the Court finds that the Plaintiffs have established antitrust standing.

### B.  Unlawful Agreement Under Section 1

Defendants also argue that Plaintiffs' Section 1 claim fails because it does not sufficiently allege an unlawful agreement.  Motion at 17-18.

---

[6] In *Bakay*, Apple identified eight steps between its alleged misconduct and Plaintiffs' injury, demonstrating that Plaintiffs were not the direct victims of the alleged misconduct. *Bakay*, 2024 WL 3381034, at *6.  In *Feitelson*, there were numerous "supply chain levels" between Defendants and the end-consumer Plaintiffs. *Feitelson*, 80 F. Supp. 3d at 1028.  The theory of the alleged harm in the case currently before the Court is far less tangential.

"To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). "[S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made… [in other words,] enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 545.

Defendants assert that Plaintiffs' allegations regarding agreements between Defendants and "various venues, ticket brokers, artists, and others" are conclusory and lack details such as "which specific agreements they are challenging, who was involved, when the agreements were supposedly made, or what anyone actually agreed to do." Motion at 17. Furthermore, specifically concerning the alleged exclusive agreements between Defendants and venues, Defendants argue that Plaintiffs have failed to plead the "rim" between venues of the "hub-and-spoke conspiracy" and failed to plead that any specific venue agreement substantially forecloses competition. *Id.*

Plaintiffs assert that their allegations regarding Defendants' agreements with venues and ticket brokers are more than sufficient to meet the standard enunciated in *Twombly*, citing large swaths of the Complaint. Opp. at 19. Plaintiffs' basic theory regarding the contracts between Defendants and venues is as follows:

> Ticketmaster's original steps were as follows. First, it shifted who paid the fees for a primary ticketing service provider's services. Before Ticketmaster, venues typically paid such fees. Since Ticketmaster, fans have paid those fees. Second, Ticketmaster began paying venues large up-front fees to secure rights to service their primary ticketing, payments that Ticketmaster earned back (in multiples) over the life of its contract. These twin steps fundamentally altered the market for primary ticketing services, because they created an economic misalignment between the venues and their fans. Provided as they were with large up-front sums and drastically-reduced costs for ticketing services, venues were far more willing to enter primary ticketing service contracts—particularly long-term exclusive deals—with Ticketmaster, because they made more money and were not punished by their fans as a result.

Complaint ¶ 86. Plaintiffs further argue that "[s]ubstantially all of the nation's major concert venues have entered into long-term exclusive agreements with primary ticketing service providers—well over 70% with Ticketmaster," which enjoys a "renewal rate 'exceeding 100%,'

because there is no effective competition to Ticketmaster when these long-term exclusive dealing contracts expire." *Id.* ¶ 41.  They highlight statements by the DOJ that "venues throughout the United States have come to expect that refusing to contract with Ticketmaster will result in the venue receiving fewer Live Nation concerts or none at all… a loss most venues can ill-afford to risk." *Id.* ¶ 90.  They go on to mention further concerns voiced by Senators and the DOJ about these agreements.  *See id.* ¶¶ 91, 93.  Defendants do not sufficiently contend with any of these allegations.

Plaintiffs have identified the what, how, and why of the agreements between Defendants and venues, and they have generally alleged the who, when, and where.[7]  *See Don Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 764 (N.D. Cal. 2024) ("the Ninth Circuit's rejection of [the] complaint [in *Kendall*] that pleaded no evidentiary facts and answered none of these questions does not mean that antitrust plaintiffs must answer all of these questions to state a claim… [because] at the pleading stage the plaintiffs need not allege every possible detail about an agreement in order to raise a reasonable inference that one exists."); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.7 (9th Cir. 2015) (explaining that "circumstantial evidence" can "support the reasonable inference of an agreement" and "take a complaint from merely possible to plausible").  Furthermore, contrary to Defendants' assertions, it is not necessary for Plaintiffs to allege agreements between venues as a part of the alleged anticompetitive conduct.  *See Musical Instruments* ("a rimless hub-and-spoke conspiracy… is a collection of purely vertical agreements… [that] may yet unreasonably restrain trade.").  Nor is it necessary to allege the details of each agreement.  Plaintiffs' Section 1 claim regarding agreements between Defendants and venues is therefore not defeated for failure to sufficiently allege an unlawful agreement.

Regarding the ticket broker agreements, Defendants argue again that "Plaintiffs do not say which specific agreements they are challenging, who was involved, when the agreements were supposedly made, or what anyone actually agreed to do."  Motion at 18.  Plaintiffs respond by referring to paragraphs 105 and 118 of the Complaint, which lay out the relevant allegations.  Opp.

---

[7] Defendants quibble over the exact number of agreements alleged, but the lack of an exact figure does not mean the Plaintiffs have not put forth "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement[s]."  *Twombly*, 550 U.S. at 545.  Furthermore, as Plaintiffs state: "It would be absurd to require Plaintiffs to identify the exact terms of all of Defendants' approximately 12,000 agreements, and imposing that requirement would perversely benefit Defendants for the sheer breadth of their anticompetitive scheme."  Opp. at 19.

at 18-19.  Plaintiffs claim that Defendants "regularly set[] aside primary tickets for ticket brokers, so those brokers can purchase and then resell those tickets" on Ticketmaster's platform, allowing Defendants to collect fees on both the sale and the resale.  Complaint ¶ 104.  They further assert that while ticket brokers, like DTI, Dynasty, and Eventellect, would prefer to resell the tickets on another platform with lesser fees, Ticketmaster will only "allocate primary tickets for a broker… if that broker agrees it will resell its tickets through Ticketmaster's secondary ticket platform" and will otherwise "try to keep the broker off its platform."  *Id.* ¶ 105.  Plaintiffs go on compare the lower fees of Ticketmaster's competitors to the higher fees of Ticketmaster and conclude that "a rational ticket reseller, unencumbered by Defendants' anticompetitive [agreements], would choose Ticketmaster's competitors, not Ticketmaster, if they want to maximize the profits they make from ticket resales."  *Id.* ¶ 119.  Defendants take issue with the fact that the number of agreements and the exact number of brokers is not alleged, but Plaintiffs have identified the what, how, who, and why of the agreements between Defendants and brokers, and they have generally alleged the when.  Plaintiffs' Section 1 claim regarding agreements between Defendants and ticket brokers is therefore not defeated for failure to sufficiently allege an unlawful agreement.  *See Don Copeland*, 716 F. Supp. 3d at 764; *Musical Instruments*, 798 F.3d at 1194 n.7.

Regarding alleged monopolistic agreements between Defendants and "artists or others," as averred in paragraph 197 of the Complaint, Plaintiffs make no effort to contend with Defendants' assertion that such allegations lack the requisite detail.  The Court would agree and would grant the Motion as to that limited portion of the Plaintiffs action, unless the Plaintiffs convince the Court otherwise at the hearing.

### C.  Secondary Ticketing Market

Defendants assert that all of Plaintiffs' claims relating to secondary ticketing fail because "(1) Plaintiffs do not plausibly allege monopoly power in the purported market, and (2) that market is implausible, including because it contradicts Plaintiffs' own allegations."  Reply at 1.

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'  That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market."  *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008).  Still, "[t]here is no requirement that these elements of the antitrust claim be pled with specificity… [and] [a]n antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that

11

the alleged market suffers a fatal legal defect." *Id.* "Allegations of a relevant market and market power generally pass the test at the pleading stage unless the market definition is 'facially unsustainable.'" *Biddle v. Walt Disney Co.*, 696 F. Supp. 3d 865, 882 (N.D. Cal. 2023) (citing *Newcal*, 513 F.3d at 1045).

In *Newcal*, the Ninth Circuit stated the relevant market: (i) must be "a product market," not one defined by consumers; (ii) must encompass the product as well as "all economic substitutes for the product"; and (iii) may include a submarket if it is "economically distinct from the general product market." *Newcal*, 513 F.3d at 1045. Submarkets are identified by indicia like "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). "Defining the relevant market requires identifying those competitors who have the actual or potential ability to deprive each other of significant levels of business… [but] [t]he process of defining the relevant market is [generally] a factual inquiry for the jury." *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993).

Market power may be demonstrated through two types of proof: (1) "direct evidence of the injurious exercise of market power [such as] evidence of restricted output and supracompetitive prices," or (2) "circumstantial evidence" showing that "the defendant owns a dominant share of the market" and "there are significant barriers to entry." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). A showing that the defendant has a market share of greater than 65% typically is sufficient to "establish a prima facie case of market power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997). "Numerous cases hold that a market share of less than 50 percent is presumptively insufficient to establish market power," but "[w]hen the claim involves attempted monopolization, most cases hold that a market share of 30 percent is presumptively insufficient to establish the power to control price." *See Rebel Oil Co.*, 51 F.3d at 1438 (finding that a defendant's "market share of 44 percent is sufficient as a matter of law to support a finding of market power, if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing."). "There is no authority which suggests that antitrust plaintiffs must explain in their complaints how they calculated market share… [and] [c]ourts have repeatedly held that a rough estimation of the defendant's market share, with no explanation of how that estimation was made, is sufficient at the pleading stage."

*Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 778 (N.D. Cal. 2022).

The Court will first consider the existence of the market before considering Defendants' alleged monopolization of it.  Plaintiffs allege that Defendants have monopolized or attempted to monopolize a submarket of the secondary ticketing services market that includes only major concert venues.[8]  Complaint ¶¶ 14, 66.  Defendants argue that limiting the market to major concert venues is implausible, in part because "[t]he fact that content sold on secondary ticketing platforms crosses every conceivable form of live entertainment and is venue size-agnostic is 'not subject to reasonable dispute' … [since] secondary ticketing platforms provide, and resellers use, secondary ticketing services in exactly the same way, regardless of whether the tickets at issue are for an event at the largest stadium or the smallest club."  Motion at 21-22 (citing Fed. R. Evid. 201(b)).  In other words, Plaintiffs fail to articulate why "reselling a secondary ticket for a concert at a 'major concert venue' is in any way distinct from reselling any other secondary ticket" and they do not "allege a single secondary ticketer that does not—let alone cannot—facilitate resales for events at 'major concert venues.'"  Reply at 6-7.

Plaintiffs assert that they have shown that a market limited to major concert venues is plausible, both in terms of primary and secondary ticketing services.  They point to allegations in the Complaint, stating that "[t]he websites of ticketing service providers that service these venues need to be equipped to handle massive online traffic."  Complaint ¶ 50.  Plaintiffs also highlight statements by artists and industry publications, suggesting that major concert venues constitute a distinct category.  *Id.* ¶ 51.  While the Court has some questions about Plaintiffs' contention, it nevertheless finds the market definition provided by Plaintiffs is sufficient for the pleading stage, considering the fact that Plaintiffs "need not necessarily establish in the complaint[] that the alleged submarket is economically distinct from the general product market," *Newcal*, 513 F.3d at 1045, and the fact that while the secondary ticketing market for major venues may not generally be a natural submarket, in this case, Plaintiffs have alleged that Defendants' attempted domination of this submarket is derived from their domination of primary ticketing services for major concert venues, which the parties agree is a natural submarket.  For this reason, the Court would not dismiss claims related to the secondary ticketing market for lack of market plausibility.

---

[8] Major concert venues are defined as "facilit[ies] suitable for hosting events of the most successful artists and the largest concert tours" and are distinguished by the fact that they are "likely to have greater seating capacity and to be located closer to major metropolitan areas."  Complaint ¶ 48.

Regarding market share, Plaintiffs assert that "[o]n information and belief, Ticketmaster's share of secondary ticketing services for major concert venues in the U.S. already exceeds 60%," and that if Defendants continue with their current behavior, it "would give Ticketmaster well over 70-80% of the market." Complaint ¶¶ 22, 46, 69, 71, 146. Defendants assert that this figure was drawn "out of thin air" with no citations to any studies. Motion at 19. Plaintiffs state in opposition that dismissal would be inappropriate as their allegation was facially plausible, citing a paper by Archita R. Arun that estimated Defendants' share of the secondary ticketing services market at 50-60%. Opp. at 20 (citing Archita R. Arun, *Ticketmaster's Monopoly Undermines Fair Competition in Live Entertainment Ticketing*, 9 J. Bus. Econ. Dev. 128, 128 (2024)). Defendants, in their Reply, claim that the article appears to have been written by a high school student,[9] includes many sources that may not exist, and none of the locatable sources that seem to suggest the market share that Plaintiffs allege. Reply at 3-4.

While the Court is wary of crediting articles that do not appear to adhere to generally accepted research standards, "[c]ourts have repeatedly held that a rough estimation of the defendant's market share, with no explanation of how that estimation was made, is sufficient at the pleading stage." *Klein*, 580 F. Supp. 3d at 778. Plaintiffs' inclusion of this article in their opposition was unnecessary, and the Court need not consider it in evaluating the strength of Plaintiffs' allegations of market power. Furthermore, Defendants' argument that Plaintiffs' market share allegations are contradictory is unconvincing because it is not necessarily inconsistent to say that Ticketmaster is not the largest secondary ticketer generally, *see* Complaint ¶ 18, but it is the largest secondary ticketer for major concert venues, *see, e.g.,* Complaint ¶ 22. The Court finds that Plaintiffs' allegations that Ticketmaster controls 60% of the alleged submarket, in conjunction with its allegations that Ticketmaster has grown despite higher fees than competitors in a market that disfavors new market entrants, *see* Complaint ¶¶ 7, 119, 120; *Korea Kumho Petrochemical v. Flexsys Am.*, No. 3:07-cv-01057-MMC, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008), is sufficient at this stage to allege market power. However, Plaintiffs' allegations will need to meet

---

[9] While Defendants claim that Archita R. Arun was a high school student when the article was written, the biography note in the article states: "Archita Ruby Arun is the founder and CEO of Mission: MathMinds, a nonprofit applying economics and behavioral economics to solve access barriers to math education for girls in disadvantaged communities . . . . Ruby collaborates with institutions like the UN and Goldman Sachs to design scalable models that address the intersection of education and economics." 9 J. Bus. Econ. Dev. At 133. While the author may have been a teenager, she apparently may have also been an accomplished one.

a stiffer test in later stages of the case.

### D. Conduct Theories

"'The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not itself unlawful; instead, it is an important element of the free-market system.'" *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (quoting *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (internal alterations omitted). "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful [under § 2] unless it is accompanied by an element of anticompetitive conduct." *Verizon*, 540 U.S. at 407. "Accordingly, plaintiffs are required to prove anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market." *Qualcomm*, 969 F.3d at 990 (internal quotation marks and citation omitted). "Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985)).

Here, Plaintiffs allege that "Defendants have willfully acquired and maintained monopoly power for Ticketmaster in the relevant markets, by means of predatory, exclusionary, and anticompetitive conduct, including but not limited to [1] long-term exclusive dealing arrangements, [2] leveraging, [3] coercion of disloyal customers, ticket brokers, and others, [4] tying arrangements, and [5] vertically-arranged boycotts." Complaint ¶ 147. Defendants argue that most of Plaintiffs' conduct claims fail because the conduct alleged is not anticompetitive as a matter of law and should be dismissed; they specifically address (1) both tying arrangement theories, (2) the leveraging theory, (3) the coercion theory, and (4) the vertically-arranged boycott theory. Motion at 11. Plaintiffs point out that Defendants do not argue that Plaintiffs have failed to allege an "exclusive dealing" theory, and they therefore assert that because the other acts described in the Complaint are "part of an alleged greater scheme involving anticompetitive conduct Defendants do not contest," there is no reason for the Court to dismiss any anticompetitive act alleged in the Complaint. Opp. at 12-13.

While courts must consider the "overall combined effect" of a defendant's conduct, if all plaintiffs allege are "a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing," and "a finding of some slight wrongdoing in certain areas need not by itself

add up to a violation." *City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992). Accordingly, it is the court's role to evaluate the plausibility of each category of alleged anticompetitive conduct while considering them in the aggregate. *See Crowder v. LinkedIn Corp.*, No. 4:22-cv-00237-HSG, 2023 WL 2405335, at *3 (N.D. Cal. Mar. 8, 2023); *see also In re Google Digital Advert. Antitrust Litig.*, No. 1:21-md-03010-PKC, 2024 WL 988966, at *10-12 (S.D.N.Y. Mar. 7, 2024) (dismissing individual theories of anticompetitive conduct at the motion to dismiss stage). Still, "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

     *1. Tying Claim*

     "A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market … [by] condition[ing] the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Cascade Health Solutions*, 515 F.3d at 912. The Supreme Court has held that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms [because] [w]hen such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

     The parties agree that there exists a "fundamental principle of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased *by the same individual*." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (emphasis added). They dispute whether the two tying arrangements alleged in the Complaint satisfy the "single buyer" requirement. The first alleged tie regards concert promotion and primary ticketing services; the Complaint alleges: "Defendants have conditioned the provision of concert promotion services on the use of primary ticketing services from Ticketmaster." Complaint ¶ 165. The second alleged tie regards primary and secondary ticketing services; the Complaint alleges: "Defendants have conditioned the provision of primary ticketing services on the use of secondary ticketing services from Ticketmaster." *Id.* ¶ 170.

Regarding the first alleged tie, Defendants argue that Plaintiffs' theory is non-sensical as the Complaint alleges that *artists* purchase concert promotion services (through their agents) while *venues* purchase primary ticketing services. Motion at 12-13. Plaintiffs argue that while Live Nation's concert promotion services benefit the artist, such services also directly involve venues, which contract with Live Nation, receive rental payments from Live Nation to host concerts, and receive downstream benefits like "concession, parking, and other on-premises sales." Opp. at 14; *see* Complaint ¶ 35. The parties do not dispute that the Complaint alleges that venues are the buyers of primary ticketing services. Plaintiffs thus claim that venues are the "single buyer." Opp. at 14. At this time, the Court would find that, based on the intertwinement between Live Nation and venues during concert promotion as outlined above, Plaintiffs' theory that venues are a buyer of both concert promotion services and primary ticketing services is plausible, and thus, the Court would not dismiss this theory. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1057 ("[T]he court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds.").

Defendants argue that the second tying theory also fails for lack of a single buyer. They state that major concert venue operators buy primary ticketing services and ticket brokers or other resellers buy secondary ticketing services, citing to passages in the Complaint that seem to argue that "'the customers for secondary ticketing services for events at major concert venues *are distinct from* the customers for primary ticketing services for events at major concert venues.'" Motion at 13 (citing the Complaint ¶ 68(c)) (emphasis added). Plaintiffs argue that this misconstrues the Complaint, and that they have plainly alleged that ticket brokers buy both primary ticketing services and secondary ticketing services. Opp. at 15 (citing the Complaint ¶¶ 100, 105). While the Complaint appears to be inconsistent on this point, Plaintiffs do argue in it that ticket brokers buy primary ticketing services as ticket buyers and then buy secondary ticketing services as ticket sellers. *See id.* Despite the apparent inconsistency, this is sufficient to overcome Defendants' "single buyer" challenge.

Defendants make two other arguments to defeat the second tying claim. They first argue that Plaintiffs fail to allege that a "substantial volume of commerce is foreclosed" by the tie, *see* Motion at 13, but this is plainly false, *see* Complaint ¶¶ 167, 172 (alleging that "Defendants' conduct has affected a not insubstantial amount of interstate commerce . . . ."). Finally, Defendants argue that transfer restrictions on tickets are "commonplace and lawful," and they claim that

Plaintiffs have not responded to this argument. Reply at 17. This is an assertion that Defendants originally made in the section of the brief regarding Plaintiffs' coercion theory, and the Court will consider it in that context below. Based on that analysis below, the Court **DENIES** the Motion with regard to both tying claims.

> ### 2. *Leveraging Claim*

Monopoly leveraging "remains a viable theory" for an attempted monopolization or monopolization claim under Section 2 of the Sherman Antitrust Act, to extent that "monopoly leveraging" is defined as "an attempt to use monopoly power in one market to monopolize another market." *Cost Management Services*, 99 F.3d at 951. Plaintiffs allege that Defendants use their monopoly power in the primary ticketing market for major concert venues and concert promotion services market to monopolize the market for secondary ticketing services for major concert venues. Complaint ¶ 156.[10] Defendants argue firstly that Plaintiffs have not pled with enough detail, citing to three paragraphs of the Complaint; these paragraphs incorporate the allegations of many previous paragraphs, and the Court finds this argument frivolous. Defendants also argue, as above, that the claim must fail because "the secondary ticketing services market fails as a matter of law" and that even if it does exist, "it is not enough, the Ninth Circuit held, merely to obtain a competitive advantage in the second market [and] the firm must at least attempt to monopolize the second market." *See* Motion at 14; *Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1081 (N.D. Cal. 2002). This argument also fails, as discussed above; Plaintiffs have, at this stage, adequately alleged Defendants' power in the secondary ticketing market for major concert venues. The Motion is thus **DENIED** with regard to the leveraging claim.

> ### 3. *The Conditional License and Ticket Transferability Limits*

Plaintiffs allege that (1) through "the misuse of Ticketmaster's conditional license, Defendants have agreed with and/or coerced ticket brokers and other ticket resellers not to work with other secondary ticketing service providers," and (2) by "building in and applying technological limitations on primary ticket transferability, Defendants have agreed with and/or

---

[10] Plaintiffs also appear to allege that Defendants use their monopoly power in the primary ticketing market and concert promotion services market to monopolize the market for primary ticketing services. *See* Complaint ¶ 156. Defendants argue that this claim is circular and fails because two separate markets are required. Motion at 14. While it is possible that Plaintiffs are arguing that Defendants leverage their monopoly power from just the concert promotion services market to monopolize the market for primary ticketing services, this is not clear from the Complaint, and Plaintiffs do not address the circularity argument in their Opposition. At the hearing, they should do so.

coerced artists into preventing primary ticket purchasers from working with other secondary ticketing service providers." Complaint ¶¶ 161-62. Defendants argue that conditional use licenses like theirs are "commonplace and regularly enforced" and that they do not impose the alleged limits on ticket transferability and even if they did, such limitations are also "commonplace." Motion at 15-16. Once again, Defendants argue that these arguments are irrelevant in any case because these coercion claims are "directed at their claim for attempted monopolization of the secondary ticketing services market . . . [which] fails as a matter of law." *Id.* at 16.

The Court finds Defendants' arguments are insufficient to prevent Plaintiffs' conditional licensing theory from surviving the pleading stage. Defendants misunderstand Plaintiffs' allegations that while a conditional license may be acceptable, Ticketmaster selectively invokes it. *See* Complaint ¶ 105 ("Ticketmaster will allocate primary tickets for a broker to a ticket bank *if* that broker agrees it will resell its tickets through Ticketmaster's secondary ticket platform. If the broker does not agree, then Ticketmaster will use the conditional license to try to keep the broker off its platform."). Defendants do not appear to contend with this argument. Additionally, Plaintiffs' assertions regarding ticket transferability are also plausible, *see, e.g.,* Complaint ¶ 104, especially considering that they are alleging certain safety features/explanations are pretextual and "the existence of valid business reasons in antitrust cases is generally a question of fact not appropriate for resolution at the motion to dismiss stage." *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1182 (N.D. Cal. 2012) (internal quotation marks and citation omitted). Defendants appear to ignore this argument as well. The Motion is thus **DENIED** with regard to the conditional license and ticket transferability claims.

### 4. *Vertically-Arranged Boycott Theory*

Finally, Plaintiffs allege that (1) "Defendants have induced and coerced venues to boycott Ticketmaster's competitors for the provision of primary ticketing services," and (2) Defendants have utilized "exclusive dealing contracts with major concert venues," the "conditional license," and "technological limitations on primary ticket transferability" to coerce resellers and artists to boycott other secondary ticket services providers. *See* Complaint ¶¶ 174-76. The first theory is adequately alleged, as analyzed above in Section III.B. The second theory is significantly intertwined with that above regarding the conditional license and ticket transferability limits, and the Court finds that it too has been adequately alleged. *See* Complaint ¶¶ 104-111. The Motion with regard to the vertically-arranged boycott theory is thus **DENIED**.

**IV.    <u>Conclusion</u>**

Based on the foregoing discussion, the Court **DENIES** the Motion.