Jordan D. Teti (Bar No. 284714)
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
jordan.teti@hoganlovells.com

Justin W. Bernick (*pro hac vice* forthcoming)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
justin.bernick@hoganlovells.com

*Attorneys for Non-Party Anschutz Entertainment Group, Inc.*

Neema T. Sahni (Bar No. 274240)
Jason T. Lueddeke (Bar No. 279242)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
nsahni@cov.com
jlueddeke@cov.com

*Attorneys for Non-Party Vivid Seats LLC*

Sean Gates
ILOVSKY GATES & CALIA LLP
155 N. Lake Avenue, Ste. 800
Pasadena, CA 91101
sean@illovskygates.com

Ronald F. Wick (*pro hac vice* application pending)
COHEN & GRESSER LLP
2001 Pennsylvania Avenue NW, Ste. 300
Washington, D.C. 20006
rwick@cohengresser.com

*Attorneys for Non-Party SeatGeek, Inc.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| SKOT HECKMAN, LUIS PONCE, JEANENE POPP, and JACOB ROBERTS, on behalf of themselves and all those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER LLC, <br><br> Defendants. | Case No. 2:22-cv-00047-GW-GJS <br><br> Hon. George H. Wu <br><br> **NON-PARTY COMPETITORS' MOTION TO AMEND THE PROTECTIVE ORDER** <br><br> Hearing Date:  May 15, 2025 <br> Hearing Time:  8:30 A.M. |

Prospective intervenors Anschutz Entertainment Group, Inc. ("AEG"), SeatGeek, Inc. ("SeatGeek"), and Vivid Seats LLC ("Vivid") (collectively, "Non-Party Competitors") are Defendants Live Nation Entertainment, Inc.'s ("Live Nation") and Ticketmaster LLC's ("Ticketmaster") direct competitors in ticketing services and, in the case of AEG, concert promotion services as well.

Non-Party Competitors have been subpoenaed to produce their discovery materials from a separate Government Action[1] and from a related pre-complaint government investigation of Defendants, to the extent those materials are relevant to the issues in this case. Those discovery materials consist of deposition testimony and hundreds of thousands of documents containing Non-Party Competitors' confidential information, including their most competitively sensitive business information at the core of their competition with Defendants.

This is a significant issue because the Stipulated Protective Order in this case (ECF No. 62, "Protective Order") would allow Defendants' employees, including in-house counsel who participate in or advise on competitive decision-making, to access Non-Party Competitors' competitively sensitive materials. Such disclosure threatens to irreparably harm Non-Party Competitors' ability to compete with Defendants and conflicts with the protective order in the Government Action. Disclosure of Non-Party Competitors' confidential business documents, ironically, could also facilitate the very antitrust violations this case challenges.

Accordingly, Non-Party Competitors respectfully request that the Court modify the Protective Order, as set forth in Exhibit 1, to prohibit: (1) disclosure of non-party materials designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" to any of Defendants' employees, including in-house counsel; and (2) disclosure of non-party materials designated "CONFIDENTIAL" to any of

---

[1] The "Government Action" refers to the antitrust lawsuit brought by the U.S. Department of Justice ("DOJ") and State Attorneys General against Defendants, captioned *United States et al. v. Live Nation Entertainment, Inc. & Ticketmaster L.L.C.*, No. 1:24-cv-03973-AS (S.D.N.Y).

NON-PARTY COMPETITORS' MOTION TO AMEND THE PROTECTIVE ORDER
CASE NO. 2:22-cv-00047-GW-GJS

Defendants' employees, except for three designated in-house counsel who certify that they do not participate in or advise on (a) competitive decision-making or (b) certain litigation involving non-parties whose confidential information they have accessed in this action.[2]

## BACKGROUND

The Government Action is based on certain antitrust claims that parallel, in part, the claims in this case. Among the parallels are allegations that Defendants have unlawfully achieved or maintained monopoly power by (i) threatening venues with a reduction in Live Nation tours if they did not select Ticketmaster as their primary ticketing service provider (*e.g.*, Complaint, ECF No. 1 ¶¶ 9, 57, 90, 94) and (ii) retaliating against venues that use a competing platform (*e.g.*, *id.* ¶¶ 91, 94), such as AXS (AEG's ticketing business), SeatGeek, or Vivid.

In the Government Action, Non-Party Competitors, between them, have produced deposition testimony and hundreds of thousands of documents in response to pre-complaint Civil Investigative Demands ("CIDs") issued by the DOJ and have produced (or will produce) a substantial volume of additional documents, data, and deposition testimony. Trell Decl., ¶ 3; Raghu Decl., ¶ 4; Epstein Decl., ¶ 4. Non-Party Competitors have produced (or will produce) documents such as forward-looking strategic plans for their ticketing businesses, including their public relations strategies with respect to the Government Action; their specific plans for innovation and enhancement of their ticketing solutions; their efforts to compete with Ticketmaster for ticketing contracts and future plans for doing so, including correspondence and discussions of sales calls with venues for whose business they compete with Ticketmaster and their bids for ticketing contracts in direct competition with Ticketmaster; and detailed data relating to pricing and costs. Trell Decl., ¶¶ 4-

---

[2] The Protective Order, stipulated by the parties, invites non-parties to seek additional protections as needed, as the Non-Party Competitors are seeking herein. ECF No. 62 ¶ 9(a).

NON-PARTY COMPETITORS' MOTION TO AMEND THE PROTECTIVE ORDER
CASE NO. 2:22-cv-00047-GW-GJS

5; Raghu Decl., ¶ 5; Epstein Decl., ¶ 4. In addition, AEG has produced similar documents for its promotions business, which contain sensitive information such as public relations and marketing strategies, plans that describe strategies for competing against Live Nation, pricing and cost data, and the detailed terms of tour and festival promotions offers that AEG makes to the same artists receiving competing offers from Live Nation. Trell Decl., ¶¶ 4-5.

To protect Non-Party Competitors' competitive interests, the court in the Government Action, over Defendants' objections, entered a protective order prohibiting (1) disclosure of non-party Highly Confidential[3] materials to Defendants' employees; and (2) disclosure of non-party Confidential[4] information to Defendants' employees, except for two designated in-house counsel who certify that they do not participate or advise on competitive decision-making and legal matters involving non-parties whose confidential information they have accessed in the Government Action. Government Action Protective Order,[5] Ex. 3, ¶¶ 7-8; *see also* Exs. 4 & 5 (Defendants' Objections); Exs. 6, 7, 8, & 9  (Non-Party Competitors' Responses); Ex. 10 (July 29, 2024 Hr'g Tr.) at 10:16-11:8.

On February 18, 2025, Plaintiffs here moved to intervene and seek modification of the Government Action Protective Order to obtain access to all discovery materials in the Government Action. Pls.' Mot. to Intervene, Ex. 11. AEG and Vivid opposed that motion, in part due to the concern that the Protective Order

---

[3] "Highly Confidential" information under the Government Action Protective Order includes "trade secrets, including non-public, commercially sensitive customer lists," "financial, marketing, or strategic business planning information," and "information regarding prices, costs, or margins." Ex. 3 ¶ 2.

[4] "Confidential" information under the Government Action Protective Order includes stale, non-public "financial information," "material relating to ownership or control of any non-public company," and "business plans," among others. Ex. 3 ¶ 3.

[5] The Government Action Protective Order was subsequently amended on November 15, 2024, to permit Defendants to disclose to certain employees limited information regarding allegations of anticompetitive conduct made against them to non-parties.

in this case (1) allows the disclosure of "CONFIDENTIAL" non-party materials— "trade secrets or other confidential research, development, or commercially sensitive information"—to *any* employees of Defendants to whom disclosure is reasonably necessary for this action; and (2) allows the disclosure of non-party materials designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY"—"the disclosure of which . . . would create a substantial risk of serious and irremediable harm to the Producing Party or its clients"—to up to three in-house counsel who oversee this action, regardless of whether those attorneys are involved in competitive decision-making.[6] ECF No. 62 ¶¶ 2.3, 2.7, 7.2 & 7.3; *see also* Exs. 13 (AEG's Opposition), 14 (Vivid's Opposition). That motion remains pending.[7]

On March 6, 2025, Plaintiffs issued subpoenas to Non-Party Competitors seeking documents and deposition testimony that Non-Party Competitors produced in the Government Action and related pre-complaint government investigation, to the extent they relate to the issues in this case. *See, e.g.*, Exs. 15 (AEG Subpoena), 16 (AXS Subpoena), 17 (SeatGeek Subpoena), 18 (Vivid Subpoena). Non-Party Competitors requested modification of the Protective Order to ensure their confidential materials would receive the same protections that they receive under the Government Action Protective Order. *See* Ex. 19 (SeatGeek Letter). Plaintiffs

---

[6] SeatGeek did not oppose the motion, but filed a letter raising similar concerns and proposing changes to the Government Action Protective Order to address those concerns. Ex. 12.

[7] In response to the Non-Party Competitors' concerns, Plaintiffs filed an *ex parte* motion here to amend the Protective Order to at least prohibit disclosure of Non-Party Competitors' "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" materials to Defendants' employees, including in-house counsel. ECF No. 298. Defendants opposed that motion, arguing that their in-house counsel must have access to the Highly Confidential information to defend their case because they need the "assistance of in-house advisors who know the businesses well." ECF No. 299 at 12. This Court denied Plaintiffs' *ex parte* motion, finding that Plaintiffs—unlike Non-Party Competitors—stipulated to the Protective Order and had not shown "good cause" for breaking their original agreement with Defendants. ECF No. 300.

consented to the request. Defendants opposed. *See* Ex. 20 (Defendants' Email).

## ARGUMENT

## I. GOOD CAUSE EXISTS FOR NON-PARTY COMPETITORS' PROPOSED AMENDMENTS TO THE PROTECTIVE ORDER

The court may issue a protective order to protect a person from annoyance, embarrassment, oppression, or undue burden or expense, including "that a trade secret or other confidential, research, development, or commercial information not be revealed or be revealed in a specified way." Fed. R. Civ. P. 26(c)(1)(G). The movant must show good cause by demonstrating a specific harm or prejudice that will result from the disclosure. *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004). District courts have "very broad discretion in fashioning discovery orders under [Rule 26(c)]." *Osband v. Woodford*, 290 F.3d 1036, 1042 (9th Cir. 2002) (citation omitted). In doing so, the court should take account of the nonparty status of the movant in making its good cause determination, and "the 'necessary' restriction may be broader when a nonparty is the target of discovery." *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980).

Here, Non-Party Competitors' proposed amendments to the Protective Order are necessary to protect their competitive interests. The operative Protective Order allows for non-party materials designated "CONFIDENTIAL" to be disclosed to Defendants' employees, regardless of whether disclosure of those materials would cause Non-Party Competitors irreparable competitive harm, and regardless of those employees' participation in other litigation or competitive decision-making. Moreover, the Protective Order allows Defendants' outside counsel to act as the sole arbiter of which of Defendants' employees, including business personnel, are "reasonably necessary for this Action" and therefore may access materials designated as "CONFIDENTIAL." ECF No. 62 ¶ 7.2.

The Protective Order further permits disclosure of materials that Non-Party Competitors designate "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES

ONLY"—by definition, materials that contain Non-Party Competitors' most competitively sensitive information—to up to three in-house counsel of Defendants' choosing, *even if those attorneys routinely advise on matters of competition with Non-Party Competitors. See* ECF No. 62 ¶ 7.3. Defendants have already made clear that they intend to disclose this information to two in-house counsel for whom there is ample evidence of their involvement in competitive decision-making, as discussed below.

Such disclosure creates a substantial risk that discovery in this matter will facilitate the very antitrust violations that this lawsuit seeks to remedy. For example, disclosure of Non-Party Competitors' research and development, especially the trade secrets that are the foundation of their ticketing platforms, could give Defendants' an unfair competitive advantage. *See, e.g.*, Trell Decl., ¶ 6; Raghu Decl., ¶ 7; Epstein Decl., ¶ 7. Disclosure of Non-Party Competitors' proposals for ticketing contracts to venues, as well as their negotiations and internal analyses of those proposals, could allow Defendants to manipulate competition with Non-Party Competitors for long-term exclusive contracts for Ticketmaster's services. Trell Decl., ¶ 6; Raghu Decl., ¶ 7. Disclosure of AEG's internal discussions of its tour offers and how it structures those offers to compete against Defendants could directly disadvantage AEG and further facilitate Defendants' dominance in tour promotions. *See, e.g.*, Trell Decl., ¶ 6. Disclosure of Non-Party Competitors' internal discussions of competitive priorities and strategies could allow Defendants to interfere with their future business prospects in key markets and verticals. Raghu Decl., ¶ 7; Epstein Decl., ¶ 7. Disclosure of non-party pricing and costs could allow Defendants to determine a price point to drive out competitors. *See, e.g.*, Trell Decl., ¶ 6; Epstein Decl., ¶ 7. Simply put, the Protective Order, as drafted, would allow Defendants' employees to see some of the most commercially sensitive, non-public information of their direct competitors, causing substantial and irreparable harm.

The potential for competitive harm is exacerbated by the fact that this case,

NON-PARTY COMPETITORS' MOTION TO AMEND THE PROTECTIVE ORDER
CASE NO. 2:22-cv-00047-GW-GJS

like the Government Action, is largely about Defendants' history of withholding promotions content from, threatening, and otherwise retaliating against companies that do business with Defendants' competitors. SeatGeek has produced and will produce documents discussing or containing such allegations, made by venues to SeatGeek in confidence. Raghu Decl. ¶ 8. If the market were to learn that venues' contracts and other communications with Defendants' competitors were disclosed to Defendants' senior management, Non-Party Competitors' ability to market their competing products would be hindered even further. *See Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 531 (N.D. Cal. 2000) ("Even a seemingly insignificant risk of disclosure cannot be ignored due to the threat of significant potential injury. . . . . [The confidential] information could be used to . . . compete for its customers, or interfere with its business plan and thereby gain a competitive advantage in the marketplace."); *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1483 (Fed. Cir. 1986) (similar).

Moreover, many of Non-Party Competitors' confidential materials were produced in response to the DOJ's investigative CIDs. Producing information in a private action presents different risks and burdens than responding to DOJ CIDs, and the DOJ is "given wide latitude when issuing CID's." *Associated Container Transp. (Australia) Ltd. v. United States*, 705 F.2d 53, 58 (2d Cir. 1983). For instance, the scope of non-party responses to CIDs may be broader than in a private action, as a non-party is more likely to be in a cooperative posture, especially where it is unknown whether the documents produced will ever be used outside of the government investigation. Here, Non-Party Competitors produced their confidential materials in reliance on the DOJ's promise to seek a protective order in the Government Action that prevents competitively sensitive information being shared with competitors. DOJ's Opp'n to Mot. to Intervene, Ex. 21 at 10.

Defendants should not be allowed to use the existence of a parallel private action to gain access to Non-Party Competitor materials that the court in the

7

Government Action has prohibited them from receiving. To do so would chill "future non-party cooperation in . . . future government investigations." *Id*. at 3. "If release is likely to cause persons in the particular or future cases to resist involvement where cooperation is desirable, that effect should be weighed against the presumption of access." *Id*. (quoting *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995)). Thus, Non-Party Competitors' reliance on the Government Action Protective Order is additional "good cause" to grant their proposed amendment to the Protective Order in this case. Furthermore, Non-Party Competitors are now reticent to produce additional materials in the Government Action for the fear that materials produced there would end up in the hands of their direct competitor by virtue of this action.

## II. DANIEL WALL'S AND KIMBERLY TOBIAS'S ACCESS TO CONFIDENTIAL MATERIALS RISKS IRREPARABLE HARM TO NON-PARTY COMPETITORS

"Courts commonly issue protective orders limiting access to sensitive information to [outside] counsel and their experts." *Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*, 242 F.R.D. 552, 555 (C.D. Cal. 2007) (citing *Vesta Corset Co. v. Carmen Founds., Inc.*, 1999 WL 13257, at *3 (S.D.N.Y. Jan. 13, 1999)). Limiting access is appropriate where (a) "the information is a 'trade secret' or other confidential, research, development, or commercial information . . . and (b) . . . its disclosure would be harmful to the party's [competitive] interest." *Nalco Co., LLC v. Carota*, 2022 WL 17219976, at *7 (C.D. Cal. Feb. 13, 2022) (quoting *Nutratech*, 242 F.R.D. at 554-55). The opposing party then must show that the individuals it seeks to allow to review the competitor's materials (1) are not competitive decision-makers and (2) cannot use the materials for commercial advantage. *Id.* at *9-11.

Here, Defendants seek to disclose Non-Party Competitors' commercially sensitive, non-public information to two in-house attorneys, Daniel Wall and Kimberly Tobias. Defendants unsuccessfully sought to disclose this material to the same two individuals in the Government Action, after conceding that Mr. Wall and Ms. Tobias could not make the required certification that they do not participate or

advise on competitive decision-making or legal matters involving non-parties whose confidential information they sought to access in the Government Action. Defs.' Letter, Ex. 22; *see also* Oct. 29, 2024 Hr'g Tr. at 26:5-11, Ex. 23 (stating that it would be inappropriate for Defendants' in-house counsel to access Confidential materials if they cannot satisfy the criteria).

**Daniel Wall**

Daniel Wall's access to non-party confidential information as contemplated by the Protective Order is improper and concerning. Mr. Wall serves as Executive Vice President, Corporate and Regulatory Affairs at Live Nation. ECF 299-2 ¶ 1. In this role, Mr. Wall has conceded that he is intimately involved in Defendants' competitive decision-making. *Id* ¶ 5. Regardless of whether Mr. Wall's involvement is pursuant to a legal or business role, this fact alone is sufficient to bar Mr. Wall from accessing confidential material produced by non-parties to a litigation. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1471 (9th Cir. 1992) (finding that plaintiff's counsel's "employment would necessarily entail advising his employer in areas relating to [Defendant's] trade secrets," and "in-house counsel was thus involved in the kind of 'competitive decisionmaking' that counsels against disclosure"); *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984) ("Competitive decision-making" is "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor."). The risk of inadvertent disclosure is the same in either a legal or business context. *See F.T.C. v. Advoc. Health Care Network*, 162 F. Supp. 3d 666, 669-70 (N.D. Ill. 2016) (Involvement in "[C]ompetitive decision-making" creates risk of inadvertent disclosure whether an in-house counsel's involvement is in a legal or business role); *Sullivan Mktg., Inc.v. Valassis Commc'ns, Inc.*, 1994 WL 177795, at *3 (S.D.N.Y. May 5, 1994) ("Though [in-house counsel] states that his input was limited to [antitrust] legal issues, [the

Court is] not sanguine that inadvertent disclosure could be avoided under such circumstances.").

A court must consider "whether . . . counsel could lock-up trade secrets in his mind, safe from inadvertent disclosure . . . once he read the documents." *Brown Bag*, 960 F.2d at 1471. It is unrealistic to expect that Mr. Wall, having learned such facts as the product features competitors are considering, the confidential pricing and terms of venues' ticketing contracts with competing ticketers, and their efforts to win additional business from Ticketmaster, could "lock up" such competitively valuable information in advising on "competition-related issues" or other matters within his purview. *See* ECF 299-2 ¶ 5.

Indeed, outside this Court, Mr. Wall has touted his business-oriented responsibilities, including "providing strategic counsel to [Live Nation]."[8] In that strategic role, Mr. Wall does not sit within the legal department but reports "directly to Live Nation's CEO and President." ECF No. 299-2 ¶ 5; *see also Intel*, 198 F.R.D. at 530 ("Concerns about [the risk of inadvertent disclosure] are exacerbated by [in-house counsel's] interaction with general managers of Intel's business units."); *Norbrook Lab'ys Ltd. v. G.C. Hanford Mfg. Co.*, 2003 WL 1956214, at *5 (N.D.N.Y. Apr. 24, 2003) (similar). In fact, in the course of its day-to-day operations, AEG has observed Mr. Wall to be involved in Defendants' business operations. *See* Ex. 24 (Live Nation employee seeking Mr. Wall's approval before proposing financial terms to another promoter for an amphitheater deal); Ex. 25 (Mr. Wall instructing a Ticketmaster employee to ask another promoter to not offer certain tier of tickets in a specific location).

Non-Party Competitors take little comfort in Mr. Wall's attestations that he had access to confidential materials under protective orders during his long tenure as Defendants' outside counsel. ECF No. 299-2 ¶ 4. It was precisely during that tenure

---

[8] https://www.livenationentertainment.com/2023/02/live-nation-entertainment-hires-longtime-advisor-dan-wall-to-corporate-affairs-team/

that the DOJ found that Defendants had repeatedly violated an existing consent decree by retaliating against venues for using competing ticketing platforms. *See* DOJ's Mot. to Modify Final J., Ex. 26 at 9.

Mr. Wall's access to confidential non-party information would also influence critical witness testimony in this litigation. Mr. Wall has established himself as Defendants' primary spokesperson in the lead-up to and wake of the Government Action, authoring multiple public statements addressing the DOJ's claims and broader consumer concerns with the live entertainment industry. *See* Exs. 27 & 28; *see also* ECF No. 299-2 ¶ 7. In doing so, Mr. Wall asserts numerous facts—as opposed to legal arguments—that Plaintiffs will undoubtedly contest during this litigation because they are central to this lawsuit, including assertions disparaging Non-Party Competitors:

- "There is more competition than ever in the live events market." https://www.livenationentertainment.com/2024/05/update-breaking-down-the-doj-lawsuit/.
- "Service charges on Ticketmaster are no higher than on SeatGeek, AXS, or other primary ticketing sites, and are frequently lower." *Id.*
- "Ticketmaster competed and won contracts with [Oak View Group ('OVG')] on the merits because OVG determined it was the best ticketing system available." *Id.*
- SeatGeek lost a venue contract to Ticketmaster because "SeatGeek's technology and service were not up to the task of servicing major onsales." *Id.*
- "Concert promotion is not a highly profitable business . . . for Live Nation." https://www.livenationentertainment.com/2024/03/the-truth-about-ticket-prices/.
- "[W]hat Live Nation earns as a concert promoter can't be responsible for high ticket prices." *Id.*

- "Very few concert venues want to have more than one [primary ticketing system] because they see it as not worth the added costs and complexity." *Id*.

- "No one does astroturf advocacy better than the resale industry. It's because they can't possibly stand up and say, 'Our business is about ticket scalping and we're proud of it.' But it is: 100% for Vivid, 90+% for StubHub, and 80+% for SeatGeek . . . ." https://x.com/DanWallLN/status/1869832266144460866.

- Mr. Wall "characterized the ticket resale industry as a 'Napster-like ticket model' and 'gigantic rip off' that he said often doubles the price of a ticket with no resulting benefit for the artist. 'We're the only major company in the industry that is trying to take the sides of the artists and the fans,' Wall said." https://pluribusnews.com/news-and-events/tech-group-slams-live-nation-for-ticket-legislation-lobbying/.

Plaintiffs have a right to cross-examine Mr. Wall regarding his statements, free from the influence of the broader discovery record, like any other fact witness that might testify. And while Mr. Wall is free to express his opinions about the relative strengths and weaknesses of Defendants' and their competitors' products, and to try to shape investor, regulator, and public opinion in favor of his employer, it would be inappropriate for him to do so with unfettered access to confidential competitor information disclosed in this case.

As Defendants' primary spokesman, moreover, Mr. Wall's access to competitors' confidential materials—including their public relations strategy *against Defendants*—could provide a commercial advantage to Defendants. Trell Decl., ¶ 6; Epstein Decl., ¶ 7; *Cummins-Allison Corp. v. SBM Co.*, 2013 WL 12250448, at * 3 (D. Haw. Nov. 8, 2013) (when "documents contain information about competition strategies," "granting in-house counsel access to the confidential information would be inappropriate"). For example, Mr. Wall has already demonstrated that he intends

to use AEG's internal correspondence to make public statements seeking to intimidate and exert competitive pressure on AEG, as well as to control the narrative surrounding Defendants' anticompetitive practices. *See* Ex. 29 ("AEG . . . begged DOJ to file [the Government Action]—because it doesn't want to pay artists market rates or convince venues to adopt its second-rate ticketing system exclusively.").

**Kimberly Tobias**

Kimberly Tobias should also be precluded from accessing non-party confidential information. Ms. Tobias serves as the Senior Vice President of Litigation for Defendants. ECF No. 299-3 ¶ 1. Ms. Tobias states that she provides legal advice regarding contracts, pricing, and "product or service offerings." *Id.* ¶ 4. While she attests that she is "not involved in competitive decision-making . . . from a business perspective," conspicuously absent from her declaration is any statement that she is *not* involved in competitive decision-making from a legal perspective. *See id.* Moreover, she provides legal advice to Defendants as to litigation, regulatory compliance, and intellectual property licensing issues, *id*, and some of her litigation matters involve Non-Party Competitors. Ex. 22.

*Intel* makes clear that her roles create an unacceptable risk of disclosure for Non-Party Competitors. Ms. Tobias's "involvement in licensing through litigation constitutes competitive decisionmaking, because her advice and counsel necessarily affect licensing decisions." *Intel*, 198 F.R.D. at 530. "In the current litigation, licensing agreements, technical information, and marketing materials will be produced" in response to Plaintiffs' subpoena. *Id*.; *see also* Trell Decl., ¶¶ 5-6; Epstein Decl., ¶ 4. Her access to such confidential information would provide Defendants "a competitive advantage in negotiating related licenses in the future." *Intel*, 198 F.R.D. at 530.

Ms. Tobias also states that she previously has had access to confidential material. ECF No. 299-3 ¶ 5. But "her good intentions are insufficient to prevent inadvertent disclosure of confidential information because it is not possible for

13

counsel to 'lock-up trade secrets in [her] mind[.]'" *Intel*, 198 F.R.D. at 530 (quoting *Brown Bag*, 960 at 1471-72). Her involvement in Defendants' intellectual property and influence over whether Defendants will pursue litigation against another business entity "presents a real risk that [she] will find [herself] in the 'untenable position' of either refusing [her] employer legal advice or revealing [Non-Party Competitors'] sensitive information." *Pinterest, Inc. v. Pintrips, Inc.*, 2014 WL 5364263, at * 3 (N.D. Cal. Oct. 21, 2014); *see also Adobe Systems, Inc v. Davachi.*, 2011 WL 2610170, at *5 (N.D. Cal. July 1, 2011) ("The concern for inadvertent disclosure is particularly acute where the party seeking access to the information is a direct competitor.").

III.   **THERE IS NO LEGITIMATE REASON FOR DEFENDANTS' IN-HOUSE COUNSEL OR EMPLOYEES TO ACCESS NON-PARTY CONFIDENTIAL MATERIALS**

Providing Mr. Wall or Ms. Tobias—or any non-lawyer employees—access to non-parties' commercially sensitive information is not necessary for the defense of this action. *Advocate Health Care Network* is instructive. 162 F. Supp. 3d at 667. There, the protective order precluded disclosure of "Highly Confidential" information to in-house counsel "involved in competitive decision-making." *Id*. at 669-70. Third parties, the defendants' competitors, moved to amend the protective order to preclude such disclosure to *any* in-house counsel. *Id*. at 667. In granting that motion, the court stated that the preeminent concern is the potential for inadvertent disclosure, explaining that "merely insisting that one is not 'involved in competitive decision-making' cannot pretermit inquiry into the underlying facts or serve as a shibboleth the mere invocation of which permits access to Highly Confidential information." *Id*. at 669. Rather, "the critical question is: why is it 'essential' . . . that in-house counsel, as opposed to outside counsel, review [the third-parties' commercially sensitive information]." *Id.* at 672; *see also Adobe Sys.*, 2011 WL 2610170, at *5 ("Adobe has not really said why—given competent outside counsel—its ability to litigate is prejudiced (not merely made more difficult to manage).").

NON-PARTY COMPETITORS' MOTION TO AMEND THE PROTECTIVE ORDER
CASE NO. 2:22-cv-00047-GW-GJS

Here, no prejudice would befall Defendants in defending this litigation—which does not center on non-parties' conduct—should their in-house counsel or other employees lack access to competitors' confidential information. Yet, as noted above, the risk to Non-Party Competitors is severe. Defendants have argued that their defense in this case requires the "assistance of in-house advisors who know the businesses well." ECF No. 299 at 12-13 (citing *United States v. Sungard Data Sys., Inc.*, 173 F. Supp. 2d 20, 21 (D.D.C. 2001)). But surely, the seasoned counsel from Latham & Watkins, who have represented Defendants for at least fifteen years since Live Nation and Ticketmaster merged in 2010, are or will be able to become sufficiently familiar with Defendants' businesses to defend them, as they have been in the Government Action. Unlike in *Sungard*, discovery in this case is just beginning, and Defendants' outside counsel have ample time to prepare their defense. *See* 173 F. Supp. 2d at 21. And even *Sungard* prohibited in-house counsel from "any involvement in any matter even where there was no more than a potential risk that they might inadvertently use the confidential information." *Id*. at 22. The risk to Non-Party Competitors here is not merely potential; it currently *exists* and is *ongoing* because Mr. Wall reports directly to Defendants' executives and Ms. Tobias handles Defendants' intellectual property and licensing issues. Mr. Wall and Ms. Tobias cannot unlearn non-party confidential information from this matter when advising on other legal matters involving Non-Party Competitors.

If the Court is concerned that it might become essential to disclose materials to Mr. Wall, Ms. Tobias or others, it can permit Defendants to seek relief from the Court on a document-specific showing of need that outweighs the non-party's confidentiality interest.

## CONCLUSION

For the foregoing reasons, Non-Party Competitors respectfully request the entry of their proposed Protective Order amendment.

Dated:  April 11, 2025                    By:

                                          */s/ Jordan D. Teti*
                                          Jordan D. Teti (Bar No. 284714)
                                          HOGAN LOVELLS US LLP
                                          1999 Avenue of the Stars, Ste. 1400
                                          Los Angeles, CA 90067
                                          jordan.teti@hoganlovells.com

                                          Justin W. Bernick (*pro hac vice*
                                          forthcoming)
                                          HOGAN LOVELLS US LLP
                                          555 Thirteenth Street, NW
                                          Washington, D.C. 20004
                                          justin.bernick@hoganlovells.com

                                          *Attorneys for Non-Party Anschutz
                                          Entertainment Group, Inc.*


                                          By:

                                          */s/ Sean Gates*
                                          Sean Gates
                                          ILOVSKY GATES & CALIA LLP
                                          155 N. Lake Avenue
                                          Suite 800
                                          Pasadena, CA 91101
                                          sean@illovskygates.com

                                          Ronald F. Wick (*pro hac vice* application
                                          pending)
                                          COHEN & GRESSER LLP
                                          2001 Pennsylvania Avenue NW
                                          Suite 300
                                          Washington, D.C.  20006
                                          rwick@cohengresser.com

                                          *Attorneys for Non-Party SeatGeek, Inc.*

16

By:

/s/ Neema T. Sahini
Neema T. Sahni
Jason T. Lueddeke
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone:  (424) 332-4800
Facsimile:  (424) 332-4749
nsahni@cov.com
jlueddeke@cov.com

*Attorneys for Non-Party Vivid Seats LLC*

NON-PARTY COMPETITORS' MOTION TO AMEND THE PROTECTIVE ORDER
CASE NO. 2:22-cv-00047-GW-GJS

**SIGNATURE ATTESTATION**

I am the ECF user whose identification and password are being used to file the foregoing document. Pursuant to Civil Local Rule 5-4.3.4(a)(2)(i), I, Jordan D. Teti, attest that I have obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: April 11, 2025

By:
/s/ Jordan D. Teti
Jordan D. Teti

NON-PARTY COMPETITORS' MOTION TO AMEND THE PROTECTIVE ORDER
CASE NO. 2:22-cv-00047-GW-GJS