# EXHIBIT 7

**VIA ECF**

The Honorable Arun Subramanian
United States District Court, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 15A
New York, NY 10007-1312

Re:   *United States, et al. v. Live Nation Entertainment, Inc., et al.,* No. 1:24-cv-03973

Dear Judge Subramanian:

Non-party Anschutz Entertainment Group, Inc. ("AEG"), through the undersigned counsel, respectfully submits this letter-motion in support of its proposed protective order amendment, which is attached hereto as **Exhibit A**, and its request that the Court sequester Daniel Wall from all non-party confidential materials.  AEG is a sports and live entertainment company that is uniquely positioned as Live Nation's primary competitor in both primary ticketing services and concert promotion services.  AEG has a substantial interest in this dispute, as the risk of disclosure or misuse of AEG's confidential material to Defendants threatens to irreparably harm AEG's ability to compete with Live Nation.

In response to compulsory process by Plaintiffs during the pre-suit investigation, AEG produced ***hundreds of thousands*** of documents, including from the files of senior management in ticketing and concert promotions, constituting AEG's most sensitive and competitively significant materials.  Among other things, AEG's documents include forward-looking strategic plans for its ticketing and promotions businesses, AEG's specific plans for innovation and product development of its ticketing solution, the detailed terms of tour and festival promotions offers that AEG makes ***to the same artists receiving competing offers from Live Nation***, documents detailing AEG's efforts ***to compete with Ticketmaster*** for primary ticketing contracts and future plans for doing so, and detailed data relating to AEG's pricing and costs for both its ticketing and concert promotion business units.

AEG's concerns with the protective order proposals and the related Court Order are two-fold.   In addition to Confidential and Highly Confidential information under the terms set forth in Plaintiffs' proposed Protective Order, there are categories of sensitive material that are ancillary to the issues of this litigation which are so central to AEG's competitive lifeblood that their exposure to *any* Live Nation employee needlessly endangers AEG.  This is true irrespective of whether those employees are in-house attorneys properly subject to the safeguards that Plaintiffs propose. *See* ECF No. 182_6 at 13–15 (providing no in-house counsel access to non-party Highly Confidential information under the Protective Order); *see also* ECF No. 182_7 at 12–15; 182_8 at 11–12.  Accordingly, AEG respectfully requests that this Court enter Non-Party AEG's Proposed Protective Order Amendment, attached hereto as **Exhibit A**, which provides that non-parties may limit Defendants' access to the following categories of materials to outside counsel only:
- The terms of AEG's concert promotion tour offers to or agreements with artists;
- The terms of AEG's primary ticketing offers to or agreements with venues;
- Strategic or business plans for primary ticketing or concert promotions;

1

- Planned or contemplated acquisitions in primary ticketing or concert promotions;
- AEG's non-public price or cost information in primary ticketing or concert promotions; and
- Any other non-public terms of dealing between AEG and artists, managers, agents, venues, promoters, or other third-parties.

Disclosure of these materials to Live Nation creates a substantial risk that discovery in this matter might facilitate the very antitrust violations that the lawsuit against Live Nation was intended to remedy. The extreme prejudice to AEG, as well as potential harm to consumers, venues, and artists, substantially outweighs any need that Live Nation would have for these materials in adequately supervising the litigation.

Separately, Daniel Wall's access to non-party confidential information as contemplated by this Court's above-referenced Order is deeply concerning. As a threshold matter, Mr. Wall concedes that he is intimately involved in competitive decision-making at Live Nation. ECF No. 184 at ¶ 8. This alone is sufficient to bar Mr. Wall from accessing confidential material produced by non-parties to a litigation. *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984) ("Competitive decision-making" is "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor."); *see, e.g., F.T.C. v. Advoc. Health Care Network*, 162 F. Supp. 3d 666, 670 (N.D. Ill. 2016) ("That risk [of disclosure to in-house counsel] is one that a party must, of necessity, endure. But it is not one that a nonparty ought to be forced to take where the party seeking the information is its foremost competitor . . . ."). This "broad and discerning" test does not distinguish involvement in "competitive decision-making" based on whether an individual's involvement is in a legal or business role. *See Advoc. Health Care Network*, 162 F. Supp. 3d at 669-70. The risk of inadvertent disclosure is the same in either context. *See Sullivan Mktg., Inc. v. Valassis Commc'ns, Inc.*, No. 93-6350, 1994 WL 177795, at *3 (S.D.N.Y. May 5, 1994) ("Though [in-house counsel] states that his input was limited to [antitrust] legal issues, [the Court is] not sanguine that inadvertent disclosure could be avoided under such circumstances.").

In every forum other than this Court, Mr. Wall has touted his business-oriented responsibilities, including "providing *strategic* counsel to [Live Nation]." *See, e.g.*, **Exhibit B (**emphasis added); ECF No. 182_5 at 3 ("Wall said his position . . . is 'intended to capture the high profile things that are happening at any moment in time'"); **Exhibit C** ("It's a bit of an unstructured role that allows me to help the senior management team with all sorts of issues that might arise in the regulatory and public affairs world . . . . My portfolio will include a lot more than antitrust issues."). In that strategic role, Mr. Wall does not sit within the legal department. Whereas he formerly provided antitrust guidance as outside counsel, he now reports "directly to Live Nation's CEO and President," Michael Rapino. ECF No. 184 at ¶ 8; *see also Norbrook Lab'ys Ltd. v. G.C. Hanford Mfg. Co.*, No. 03-165, 2003 WL 1956214, at *5 (N.D.N.Y. Apr. 24, 2003) (finding "serious risk of [an] inadvertent disclosure of confidential documents and information" when employee did "not directly participate in competitive decision-making," but "[sat] in the same room as those who are involved in competitive decision-making."). Once Mr. Wall has learned the competitive secrets of Live Nation's competitors he cannot unlearn them, and non-parties should not be forced to take the risk that Mr. Wall can properly compartmentalize their information from his guidance to

Defendants. *See Advoc. Health Care Network*, 162 F. Supp. 3d at 670 ("The inescapable reality is that once an expert—or a lawyer for that matter—learns the confidential information that is being sought, that individual cannot rid himself of the knowledge he has gained . . . ."). Mr. Wall has already demonstrated that he intends to use AEG's internal correspondence to make false public statements seeking to intimidate and exert competitive pressure on AEG during this lawsuit. *See* **Exhibit D** ("AEG . . . begged DOJ to file [this case]—because it doesn't want to pay artists market rates or convince venues to adopt its second-rate ticketing system exclusively.").

AEG takes little comfort in Mr. Wall's attestations that he has had access to confidential materials under protective orders during his long tenure as Live Nation's outside counsel without issue. ECF No. 184 at ¶ 9. It was precisely during Mr. Wall's representation that the United States Department of Justice  found that Live Nation repeatedly violated an existing consent decree by retaliating against venues for electing to use competing ticketing platforms. *See* Pls.' Mot. to Modify Final J. & Enter Am. Final J., *United States et al. v. Ticketmaster Ent., Inc., et al.*, 1:10-cv-00139 (D.D.C. Jan. 8, 2020), ECF No. 22, attached as **Exhibit E**, at 9 ("The United States has found that, since 2012, Defendants' executives have retaliated against or threatened venues throughout the United States in violation of the Final Judgment's Anti-Retaliation and Anti-Conditioning Provisions.").

Finally, Mr. Wall's access to confidential non-party information not only poses a significant threat that AEG's most sensitive and competitively consequential material will be disclosed to Live Nation's executives—but will also influence critical witness testimony in this litigation. Mr. Wall has established himself as Live Nation's primary spokesperson in the lead up to and wake of Plaintiffs' Complaint, authoring multiple public statements addressing Plaintiffs' claims and broader consumer concerns with the live entertainment industry. *See* **Exhibit F; Exhibit G**. In doing so, Mr. Wall asserts numerous facts—as opposed to legal arguments—that Plaintiffs will undoubtedly contest during this litigation because they are central to the lawsuit:
- "There is more competition than ever in the live events market."
- "Service charges on Ticketmaster are no higher than on SeatGeek, AXS, or other primary ticketing sites, and are frequently lower."
- "Concert promotion is not a highly profitable business . . . for Live Nation."
- "[W]hat Live Nation earns as a concert promoter can't be responsible for high ticket prices."
- "Ticketmaster competed and won contracts with [Oak View Group ("OVG's")] on the merits because OVG determined it was the best ticketing system available."
- "Very few concert venues want to have more than one [primary ticketing system] because they see it as not worth the added costs and complexity."

Plaintiffs have a right to cross-examine Mr. Wall regarding his statements, free from the influence of the broader discovery record, like any other fact witness that might testify in this litigation.

AEG is unaware of any prejudice that would befall Defendants in defending this litigation, which centers on Live Nation's *own* conduct, should their employees be unable to access the confidential information of competitors. Yet the risk to AEG (and its customers) is massive. For the foregoing reasons, AEG respectfully requests the entry of its proposed protective order amendment and sequestration of Mr. Wall from all non-party confidential materials.

Dated: July 25, 2024

Respectfully submitted,

**HOGAN LOVELLS US LLP**

*/s/ Justin W. Bernick*
Justin Bernick (*pro hac vice* forthcoming)
Molly Pallman (*pro hac vice* forthcoming)
555 13th St., NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
justin.bernick@hoganlovells.com
molly.pallman@hoganlovells.com

*/s/ Claude G. Szyfer*
Claude G. Szyfer
390 Madison Avenue
New York, New York 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
claude.szyfer@hoganlovells.com

*Attorneys for Anschutz Entertainment Group, Inc.*

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**LIVE NATION ENTERTAINMENT, INC.** and **TICKETMASTER L.L.C.**<br><br>Defendants. | Case No. 1:24-cv-03973 (AS)(SLC) [1:24-cv-03994 and 1:24-cv-04106] |

## PROTECTIVE ORDER AMENDMENT

This matter came before the Court on the motion of non-party Anschutz Entertainment Group, Inc. ("AEG"). The Court having found that good cause exists for the issuance of an appropriately tailored confidentiality order amendment governing the pre-trial phrase of this action and protecting the confidential information of non-parties from improper disclosure, the Court hereby amends the Protective Order entered in this action to include the following three paragraphs:

1. Any non-party producing any given Discovery Material or Investigation Material may designate as "Outside Counsel Eyes Only" only such portion of such material as consists of:

    a. The terms of AEG's concert promotion tour offers to or agreements with artists;

    b. The terms of AEG's primary ticketing offers to or agreements with venues;

    c. Strategic or business plans for primary ticketing or concert promotions;

1

d. Planned or contemplated acquisitions in primary ticketing or concert promotions;

e. AEG's non-public price or cost information in primary ticketing or concert promotions; and

f. Any other non-public terms of dealing between AEG and artists, managers, agents, venues, promoters, or other third-parties.

2. No person subject to this Order other than the producing person shall disclose any of the Discovery Material or Investigation Material designated by the producing party as Outside Counsel Eyes Only to any other person whomsoever, except to:

a. counsel for Plaintiffs, including any attorneys, paralegals, other professional personnel (including support and IT staff), and agents or independent contractors retained by Plaintiffs to assist in this action whose functions require access to the information;

b. outside counsel for Defendants retained specifically for this action, including any attorneys, paralegals, clerical and other assistants employed by such counsel and assigned to this matter;

c. outside vendors or service providers (such as copy-service providers, and document-management consultants) retained by a party to assist that party in this action, provided that they shall first execute the Non-Disclosure Agreement in the form annexed as an Exhibit to the Protective Order as Appendix A;

d. as to any document, its author, its custodian, its addressee and any other person indicated on the face of the document as having received a copy, or

2

any other individual from the producing person who the receiving party has a good-faith basis to believe, was the author, addressee, recipient, custodian, or source of the information;

    e.   any person retained by a party to serve as an expert witness or otherwise provide specialized advice to counsel in connection with this action, including employees of the firm with which the expert or person is associated or independent contractors who assist the person's work in connection with this action, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto as Appendix A;

    f.   any outside trial consultant (including, but not limited to, graphics consultants) provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto as Appendix A;

    g.   stenographers engaged to transcribe, and videographers engaged to record, depositions conducted in this action;

    h.   any special master, mediator, arbitrator, trustee, or monitor that the parties engage in this action or that the Court appoints; and

    i.   the Court and its support personnel.

3. Daniel Wall's access to non-party Discovery Material or Investigation Material shall be limited to Discovery Material or Investigation Material that does not bear a Confidential, Highly Confidential, or Outside Counsel Eyes Only designation.

# EXHIBIT B





# LIVE NATION ENTERTAINMENT HIRES LONGTIME ADVISOR DAN

# WALL TO CORPORATE AFFAIRS TEAM





Live Nation Entertainment, the world's leading live entertainment company, today announced that Dan Wall has joined the company as Executive Vice President for Corporate and Regulatory Affairs, a position that will allow him to continue providing strategic counsel to the company. Wall has been a key advisor to Live Nation for more than 12 years, previously providing guidance as lead outside counsel while a partner at global law firm Latham & Watkins. Wall retired from Latham & Watkins earlier this week.

"Live Nation has been a special client to me, so about three years ago I floated the idea of this continuing relationship," said Wall. "I am grateful to Michael and Joe for allowing me to continue our work together and I am excited by the challenge."

"Dan has been a trusted advisor and partner and he will no doubt continue to be a valuable asset to the team," said Michael Rapino, President and Chief Executive Officer, Live Nation Entertainment.

# READ MORE ABOUT

CORPORATE

About

Biz at LN

Empowered by LN

Leadership

Careers

Life at Live Nation

Work at Live Nation

Resources

News

# EXHIBIT C

Learn more about



My News  🔍  ☰

Legal Industry | People Moves | Regulatory Oversight | Competitive Intelligence | Legal Industry

# Live Nation hires ex-Latham antitrust chief Dan Wall

By **Sara Merken**

February 6, 2023 9:11 AM EST · Updated a year ago

  



The logo and trading information for Live Nation Entertainment is displayed on a screen on the floor at the New York Stock Exchange (NYSE) in New York, U.S., May 3, 2019. REUTERS/Brendan McDermid
*Purchase Licensing Rights* 🗗

**Companies**    Law Firms

🔒  **Live Nation Entertainment Inc**

    Follow

🔒  **Ticketmaster Advance Tickets, L.l.c.**

    Follow

Feb 6 - Live Nation Entertainment has hired one of its former longtime outside attorneys, veteran antitrust lawyer Dan Wall, as the Ticketmaster owner faces U.S. antitrust scrutiny.

Wall, who retired from law firm Latham & Watkins last week, joins Live Nation as executive vice president for corporate and regulatory affairs, the Beverly Hills, California-based company said in a Thursday announcement.

Live Nation said Wall, a former chair of Latham's antitrust practice, was a "key advisor" to the company for more than 12 years while at the law firm.

Wall said in an interview Friday that he first discussed joining Live Nation in an advisory role with company executives more than three years ago, before delaying his retirement from Latham when the pandemic took hold. He officially retired from the firm on Jan. 31.

Wall said his position, which is not in the company's legal department, is "intended to capture the high-profile things that are happening at any moment in time," including fallout from a botched sale of Taylor Swift concert tickets last year.

Advertisement · Scroll to continue

Latham represented Live Nation in its merger with Ticketmaster in 2010. The Justice Department allowed the deal to move forward on condition the companies abide by conditions to keep ticket prices in check.

The entertainment company has faced increased regulatory scrutiny from U.S. lawmakers in recent months, including after Ticketmaster was forced to cancel a planned ticket sale to the general public for Swift's tour after more than 3.5 billion requests from fans, bots and scalpers overwhelmed its website in November.

Advertisement · Scroll to continue

Fans and lawmakers have criticized Ticketmaster, accusing it of having too much control over the market for concert tickets. Ticketmaster has denied any anticompetitive practices and remains under a consent decree with the Justice Department following its 2010 merger.

Live Nation president and chief financial officer Joe Berchtold told a U.S. Senate Judiciary Committee hearing last month that he apologized to fans.

Advertisement · Scroll to continue

At Latham, Wall was also a leader of the defense team for American Airlines Group at trial last year in Boston in the Justice Department's case to block its partnership with rival JetBlue Airways Corp. A judge has not yet ruled in the case. Other clients have included insurance broker Aon plc and technology company Broadcom Inc.

Rich Trobman, chair and managing partner of Latham, in a statement said Wall "is a brilliant antitrust lawyer and a preeminent practitioner" who played a key role in the firm's antitrust practice.

Jumpstart your morning with the latest legal news delivered straight to your inbox from The Daily Docket newsletter. Sign up here.

Additional reporting by Mike Scarcella

Our Standards: The Thomson Reuters Trust Principles. ⎆

Purchase Licensing Rights



**Sara Merken**
Thomson Reuters

Sara Merken reports on the business of law, including legal innovation and law firms in New York and nationally.

 

## Read Next / Editor's Picks

Attorney Pay
**Legal Fee Tracker: Quinn Emanuel fights to keep $185 million award in Obamacare case**
10:02 PM UTC

Judiciary
**Panel calls for suspension to continue for 97-year-old US appeals judge**
July 25, 2024

Legal Innovation
**Law firm Clifford Chance reports record revenue with US boost**
July 24, 2024

People Moves
**Former EY executive joins law firm Dentons as global CEO**
July 24, 2024

# EXHIBIT D



SUBSCRIBE



TRENDING TOPICS ▶ MUSIC EARNINGS | LEGAL AND TRIAL NEWS | LABEL MARKET S

• VAI Resort Taps Tixr for $1B Hotel & Amphitheater Comple ...          • Inside the Ambitious Radio Strategy Tha

WELCOME TO
BILLBOARD P



The music industry's No. 1 source
analysis, executive power lists, a
nbe

NEED PR                                                                                              CO

Ad Loading

**LEGAL NEWS**   05/31/2024

# AEG CEO Jay Marciano Calls Live Nation A Monopoly, Predicts DOJ Victory in Lawsuit

Marciano shared his assessment of the government's antitrust lawsuit in a memo to staff on Friday.

BY DAVE BROOKS



Jay Marciano Lester Cohen

Ad Loading

AEG chairman/CEO **Jay Marcian**
agrees with the U.S. Department
and Ticketmaster up, according
Friday (May 31). In the memo, tl
"preventing other businesses fro
suffer the consequences."

In the two-page email, Marciano
for addressing alleged monopolistic behavior in the concert business, noting

"the entire ecosystem of our industry" is at stake as the case winds its way through the U.S. legal system.

"Notwithstanding its claims about its profit margins or its market share, it is a monopoly, and it uses its monopoly power to impose its will on the live entertainment business," wrote Marciano of Live Nation, later writing, "We strongly believe that DOJ's lawsuit will succeed and ultimately bring sweeping changes."

## Trending on Billboard

*Billboard* obtained a copy of the email, which can be read in full below.

In a statement sent to *Billboard*, **Dan Wall**, Live Nation's executive vp for corporate and regulatory affairs,
antitrust protects competition, n
advance their own interests. AE(
file it — because it doesn't want t
to adopt its second-rate ticketing
service charges are hypocritical s
if it really cared about that. Self-
antitrust cases, but rightly ignor(

Ad Loading

An AEG spokesman did not respond to a request for comment regarding the letter.

*From: Office of Jay Marciano*

*No doubt all of you are closely following the ongoing media coverage in the wake of the Department of Justice lawsuit against Live Nation and Ticketmaster. As I mentioned in my note from last week, we spent the last few days carefully reviewing the DOJ filing, as well as Live Nation's subsequent response to the complaint.*

*AEG has long maintained that Ticketmaster has a monopoly in the U.S. ticketing marketplace and uses that monopoly power to subsidize Live Nation's content businesses, preventing other businesses from competing in those areas and leaving consumers to suffer the consequences. This lawsuit is not simply DOJ suing to break up a monopoly; at stake is the entire ecosystem of our industry, one that has long suffered from a badly broken ticketing model. As you know, the cornerstone of Live Nation's monopoly is Ticketmaster's exclusive ticketing contracts with the vast majority of major concert venues in the United States. These agreements block competition and innovation and result in higher ticketing fees, denying artists the ability to choose who will ticket their shows and how much their fans should pay.*

*Following the DOJ filing, Live Nation issued several public comments in service of its ongoing strategy to maintain its dominance – unfairly blaming others for industry problems they have created, making false and misleading statements, and dismissing the significance of the case. Artists, venues, and brokers are not responsible for the broken live entertainment business mod*

*in this country – that responsibᵢ*
*its claims about its profit margi*
*it uses its monopoly power to in*
*business. Live Nation may clain*
*that's only because it deploys thᵢ*
*outspend what the concert mark*
*this with the goal of removing cᵢ*
*using its continued control of co*
*through venue exclusives.*

Ad Loading

The DOJ's case is serious and reflects widespread sentiment among 30 attorneys general from across the country, numerous media outlets, industry commentators, consumer groups, and antitrust experts that Live Nation's conduct violates the law and harms competition and consumers. While it may take some time, we strongly believe that DOJ's lawsuit will succeed and ultimately bring sweeping changes resulting in increased competition and more innovation and choice that benefits fans, artists, and our entire industry. DOJ's lawsuit means that artists will have a choice in who tickets their concerts, that the ticketing fees consumers pay will be lower, and ultimately that artists and fans will have access to what we all want: more and higher quality live entertainment experiences at a price that fans can afford. We look forward to each and every one of you helping us lay the groundwork now for the future of the industry.

Let's not get distracted by Live Nation spin. Instead, let's stay focused on continuing to execute at the highest level, and preparing for a future state of the industry: a world with more competition, more innovation, artist and consumer choice, lower ticketing fees, and more music.
Jay

**UPDATE:** This story was updated on May 31 at 2:50 p.m. ET with a statement from Live Nation.

## MORE FROM PRO

Ad Loading

Case 2:21-cv-00973-WAKES Document 103-12 Filed 07/24/25 Page 24 of 106 107
Case 2:24-cv-04979-WAKES Document 21-1 Filed 05/24/25 Page 2 of 51
Page ID #:5887

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.

*Plaintiff,*

v.

TICKETMASTER ENTERTAINMENT, INC., and LIVE NATION ENTERTAINMENT, INC.,

*Respondents.*

Case: 1:10-cv-00139-RMC
Assigned to: Collyer, Rosemary M.
Assign. Date: 1/25/2010
Description: Antitrust

## MOTION TO MODIFY FINAL JUDGMENT AND ENTER AMENDED FINAL JUDGMENT

Plaintiff United States respectfully moves this Court to modify the Final Judgment and enter the proposed Amended Final Judgment. The United States and Defendants Live Nation Entertainment, Inc. ("Live Nation") and Ticketmaster Entertainment, Inc. ("Ticketmaster," collectively "Defendants"), have jointly agreed to modify the Final Judgment in this matter to address the United States' allegations that Defendants have repeatedly violated the Final Judgment since at least 2012, as set forth in the concurrently filed memorandum in support of this Motion, which Defendants deny.

Specifically, the United States and Defendants have agreed to: (i) extend certain provisions by five and one half years, to December 31, 2025; (ii) clarify the parties' obligations under Section IX of the Final Judgment; (iii) strengthen the compliance provisions, including appointment of an independent monitor and imposition of certain monitoring, notice and reporting obligations on Defendants; (iv) add new provisions intended to make future investigation and enforcement of the

1

Case 2:21-cv-00439-WBS D Document 03221-12 Filed 07/15/24 Page 26 of 27 106107
Case 1:10-cv-00139-RMC    Document 121    Filed 01/08/20    Page 2 of 24
Page ID #:5889

Final Judgment more effective; and (v) order Defendants to pay the United States' fees and costs associated with investigation and prosecuting this Motion.

Notice and comment period is not required under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) ("Tunney Act"). The proposed modifications serve the purpose of the original Final Judgment by clarifying its terms and enhancing the United States' ability to monitor and enforce compliance; they do not alter the essence of the remedy. The Court may enter the proposed Amended Final Judgment upon a finding that the modifications are in the public interest. *United States v. Western Elec. Co.*, 900 F. 2d 283, 305 (D.C. Cir. 1990); *United States v. Baroid Corp.*, 130 F. Supp. 2d 101, 103 (D.D.C. 2001).

No Plaintiff State has indicated its opposition to the Motion at this time. The United States began meeting and conferring with Plaintiff States on December 5, 2019, regarding appropriate relief to seek in connection with the United States' allegations against Live Nation.[1] After subsequently meeting and conferring with Plaintiff States regarding the Proposed Amended Final Judgment on multiple occasions, the United States requested that any Plaintiff State that intended to oppose this Motion notify the United States no later than January 6, 2020.[2] In response, Plaintiff States Arizona, California, Iowa, Ohio, Tennessee, Wisconsin and Washington expressly declined to inform the United States whether or not they would oppose this Motion;[3] Texas and Nevada represented they do not oppose this Motion;[4] and, as of the time of this filing, no other State had indicated that it would oppose the Motion.[5]

---

[1] Declaration of Meagan K. Bellshaw ¶ 2.
[2] *Id.* ¶¶ 2-3.
[3] *Id.* ¶ 5-6.
[4] *Id.* ¶ 4.
[5] *Id.* ¶ 8.

2

The United States does not oppose the Moving States' motion to extend[6] the deadline by two weeks to allow the Moving States to pursue relief that does not undermine the modifications agreed to by the United States and Defendants as set forth in the Proposed Amended Final Judgment.

Dated: January 8, 2020                    Respectfully submitted,

                                          _____/s/ Meagan K. Bellshaw_____
                                          MEAGAN K. BELLSHAW (CA Bar #257875)
                                          MONA S. K. HAAR (DC Bar # 986789)
                                          LEE F. BERGER (DC Bar # 482435)
                                          SARAH LICHT (DC Bar #1021541)
                                          CRAIG D. MINERVA (DC Bar # 991020)
                                          U.S. Department of Justice
                                          Antitrust Division
                                          Media, Entertainment and Professional Services
                                          Section
                                          450 Fifth St., N.W., Suite 4000
                                          Washington, D.C. 20530

---

[6] Unopposed Motion to Extend Deadline to File Proposed Amendments to Final Judgment, Dkt. 20 (Jan. 8, 2020).

3

Case 2:21-cv-04000-RGK-SmC   Document 603-1   Filed 07/15/24   Page 29 of 107

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.<br><br>*Plaintiff,*<br><br>v.<br><br>TICKETMASTER ENTERTAINMENT, INC., and LIVE NATION ENTERTAINMENT, INC.,<br><br>*Defendants.* | Case: 1:10-cv-00139-RMC<br>Assigned to: Collyer, Rosemary M.<br>Assign. Date: 1/25/2010<br>Description: Antitrust |

## PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION TO MODIFY FINAL JUDGMENT AND ENTER AMENDED FINAL JUDGMENT

Defendants have repeatedly and over the course of several years violated this Court's July 30, 2010, Final Judgment. That Final Judgment permitted Live Nation Entertainment, Inc. ("Live Nation")[1] and Ticketmaster Entertainment, Inc. ("Ticketmaster") to merge, but prohibited the merged company from retaliating against concert venues for using another ticketing company, or conditioning or threatening to condition Live Nation's provision of concerts and other live events on a venue's purchase of Ticketmaster's ticketing services. While Defendants promptly consummated their merger, they have failed to live up to their end of the bargain. Specifically, Defendants have repeatedly conditioned and threatened to condition Live Nation's provision of live concerts on a venue's purchase of Ticketmaster ticketing services, and they have retaliated against venues that opted to use competing ticketing services – all in violation of the plain language of the decree. Indeed, Defendants' well-earned reputation for threatening behavior and retaliation

---

[1] Following the merger, Live Nation changed its name to Live Nation Entertainment, Inc.

1

Case 2:21-cv-04009-WB-S Document 60321-1 Filed 07/15/24 Page 29 of 106107
Case 1:10-cv-00139-RMC Document 22-1 Filed 01/08/25 Page 3 of 24
Page ID #:5892

in violation of the Final Judgment has so permeated the industry that venues are afraid to leave Ticketmaster lest they risk losing Live Nation concerts, hindering effective competition for primary ticketing services. To protect venues that have provided evidence regarding Live Nation's conditioning and retaliatory conduct, the United States does not identify the affected customers below.[2]

Defendants deny the United States' allegations. However, to address the United States' concerns and prevent violations of the Final Judgment in the future, Defendants have agreed to modify the Final Judgment as set forth in the concurrently filed Proposed Amended Final Judgment and do not oppose the United States' Motion. For the Court's convenience, a redline comparison of the July 30, 2010, Final Judgment and the Amended Final Judgment is attached hereto as Exhibit 1.

In short, although the United States believes the Final Judgment is clear as written, to put a stop to Defendants' conduct and to remove any doubt about Defendants' obligations under the Final Judgment going forward, the United States and Defendants propose to modify the Final Judgment to add certain clarifying language. In addition, to ensure that American consumers get the benefit of the bargain reached in 2010 and ordered by this Court, the parties propose to extend the term of the relevant provisions of the Final Judgment term by five- and one-half years, until December 31, 2025. Most primary ticketing contracts last for three to five years. Thus, a five- and one-half-year extension of the Final Judgment would ensure that at least one full cycle of most venue ticketing contracts would be free from Defendants' coercive tactics and give true competition a chance to take hold.

---

[2] The United States can provide additional information regarding the venues and evidence underlying Live Nation's alleged violations at the Court's request.

Case 2:21-cv-04375-VAP-SP Document 221-1 Filed 07/15/24 Page 30 of 106
Case 1:10-cv-00139-RMC Document 221-1 Filed 01/08/20 Page 3 of 24
Page ID #:5893

To ensure compliance with the Final Judgment going forward, Defendants have also agreed to submit to certain monitoring provisions, including appointment of an independent monitoring trustee, designating an antitrust compliance officer, reporting and investigating potential violations, and notifying employees and customers of Defendants' obligations under the Final Judgment and encouraging all parties to report potential violations to the Department of Justice. The United States believes these provisions are particularly important in this case in light of Defendants' disregard for the Final Judgment's prohibitions over the past seven years. Finally, to further encourage compliance, Defendants have also agreed to certain changes to make enforcement of the Final Judgment more efficient in the future, including lowering the standard of proof necessary to establish a violation and providing the United States with a four-year look back period to bring contempt actions against Defendants.

Together, these modifications will clarify and strengthen the Final Judgment while the extension gives it a chance to work as intended and promote competition in the primary ticketing industry. Notice and comment period is not required under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) ("Tunney Act").[3] The proposed modifications serve the purpose of the original Final Judgment by clarifying its terms and enhancing the United States' ability to monitor and enforce compliance; they do not alter the essence of the remedy.

No Plaintiff State has indicated its opposition to the Motion at this time. The United States began meeting and conferring with Plaintiff States on December 5, 2019, regarding appropriate relief to seek in connection with the United States' allegations against Live Nation.[4] After subsequently meeting and conferring with Plaintiff States regarding the Proposed Amended Final

---

[3] *See* discussion *infra* Part V.
[4] Declaration of Meagan K. Bellshaw ¶ 2.

3

Case 2:21-cv-04030-AS-ES Document 60321-12 Filed 07/25/24 Page 2 of 2106107
Case 1:10-cv-00139-RMC Document 21-2 Filed 01/08/20 Page 7 of 24
Page ID #:5894

Judgment on multiple occasions, the United States requested that any Plaintiff State that intended to oppose this Motion notify the United States no later than January 6, 2020.[5]  In response, Plaintiff States Arizona, California, Iowa, Ohio, Tennessee, Wisconsin and Washington expressly declined to inform the United States whether or not they would oppose this Motion; [6] Texas and Nevada represented they do not oppose this Motion;[7] and, as of the time of this filing, no other State had indicated that it would oppose the Motion.[8]

The United States does not oppose the Moving States' motion to extend[9] the deadline by two weeks to allow the Moving States to pursue relief that does not undermine the modifications agreed to by the United States and Defendants as set forth in the Proposed Amended Final Judgment.

## I.    DEFENDANTS' COMMITMENT TO THE 2010 FINAL JUDGMENT

In 2009, Live Nation and Ticketmaster were separate companies leading different segments of the live entertainment industry.  Live Nation was then and remains today the largest concert promoter in the United States.  As a promoter, Live Nation contracts with artists to arrange and market their concerts, assuming the associated financial risks or gains from the concerts' success or failure, and frequently selects the venue at which to stage concerts.  Ticketmaster has been the largest primary ticketing service provider for major concert venues in the United States for at least three decades.  As a primary ticketing provider, Ticketmaster enters into exclusive contracts with

---

[5] *Id.* ¶¶ 2-3.
[6] *Id.* ¶ 5-6.
[7] *Id.* ¶ 4.
[8] *Id.* ¶ 8.
[9] Unopposed Motion to Extend Deadline to File Proposed Amendments to Final Judgment, Dkt. 20 (Jan. 8, 2020).

venues to provide them with a range of services necessary for the initial sale of tickets to concertgoers, and earns significant profits from fees imposed on each ticket sold.

In February 2009, Live Nation and Ticketmaster entered into an agreement to merge the two companies into a combined Live Nation Entertainment. Throughout 2009, the Division conducted a pre-complaint civil investigation into the proposed merger. The Division ultimately concluded that, without modifications, the proposed merger would likely harm competition in the primary ticketing market, resulting in higher fees and less innovation and services for venues and consumers and making it difficult for smaller firms to compete against the merged company's combined offerings.

On January 25, 2010, the United States and seventeen Plaintiff States filed a civil antitrust Complaint in this Court seeking to enjoin the proposed merger of Live Nation and Ticketmaster.[10] At the same time, the parties agreed to a proposed Final Judgment designed to eliminate the acquisition's anticompetitive effects.[11] That proposed Final Judgment contained a variety of terms and commitments negotiated between the parties. Both Ticketmaster and Live Nation stipulated that the Court could enter the Final Judgment and committed to comply with its terms.

In the proposed Final Judgment, Ticketmaster and Live Nation committed to refrain from several practices in exchange for permission to merge. As relevant here, Defendants agreed in Section IX of the Final Judgment not to:

> 1. Retaliate against a Venue Owner because it is known to Defendants that the Venue Owner is or is contemplating contracting with a company other than Defendants for Primary Ticketing Services [hereinafter "Anti-Retaliation Provision"]; and

---

[10] Compl. (Dkt. 1). Seventeen states joined the initial complaint, which was later amended to add two additional Plaintiff States. *See* Am. Compl. (Dkt. 5).

[11] [Proposed] Final Judgment (Jan. 25, 2010) (Dkt. 1-1). A revised [Proposed] Final Judgment was filed June 29, 2010, to add two additional Plaintiff States. *See* Dkt. 14-1.

Case 2:21-cv-04936-AES Document 60-21-12 Filed 07/25/24 Page 3 of 24 PageID 5896
Case 1:10-cv-00139-RMC Document 221-1 Filed 01/06/25 Page 34 of 107
Page ID #:5896

    2. Condition or threaten to Condition the Provision of Live Entertainment Events to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for Primary Ticketing Services [hereinafter "Anti-Conditioning Provision"].

On July 30, 2010, after conducting its independent review under the Tunney Act, this Court entered the Final Judgment, giving Defendants' commitments the force of law. In entering its order, the Court found "the essence of this Final Judgment is…the imposition of certain conduct restrictions on defendants, to assure that competition is not substantially lessened."[12] The Court also retained "jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate . . . to modify any of its provisions, to enforce compliance, and to punish violations of its provisions."[13]

## II.    DEFENDANTS' VIOLATIONS OF THE FINAL JUDGMENT

The United States has found that, since 2012, Defendants' executives have retaliated against or threatened venues throughout the United States in violation of the Final Judgment's Anti-Retaliation and Anti-Conditioning Provisions. These violations began shortly after the decree was entered in 2010 and have recurred throughout its term, with the most recent known violation occurring as late as March 2019. As a result of this conduct, venues throughout the United States have come to expect that refusing to contract with Ticketmaster will result in the venue receiving fewer Live Nation concerts or none at all. Given the paramount importance of live event revenues to a venue's bottom line, this is a loss that most venues can ill-afford to risk. As a result, many venues are effectively required to contract with Ticketmaster to obtain Live Nation concerts on reasonable terms, limiting the ability of Ticketmaster's competitors to compete in the primary ticketing market and harming venues that would benefit from increased competition.

---

[12] Final Judgment at 2.
[13] Final Judgment § XIV.

6

*Venue A*

Defendants violated both the Anti-Conditioning and Anti-Retaliation Provisions during negotiations with Venue A by first threatening to withhold concerts from Venue A if Venue A did not contract with Ticketmaster, and then refusing to book concerts at Venue A for a year in retaliation for its selection of a competing ticketer.

In 2017, Venue A issued a request for proposals ("RFP") for a new, two-year exclusive primary ticketing contract. Ticketmaster submitted a proposal and met with Venue A's ticketing committee. Although Venue A's RFP included a request only for ticketing services and not for live content, the Live Nation promoter responsible for deciding where in the region to place Live Nation concerts attended the meeting with Venue A along with two Ticketmaster employees. At the meeting, the Live Nation promoter explicitly threatened to withhold concerts from Venue A if it did not select Ticketmaster. A few weeks later, when Venue A informed the Live Nation promoter that it planned to select a competing ticketer that had offered better financial terms, the promoter responded that the competitor's offer would not be better than Ticketmaster's if Venue A did not receive as many Live Nation shows. The Live Nation promoter went on to specify that Live Nation would not book shows at Venue A unless it had no other options in the market.

Before Venue A's decision not to contract with Ticketmaster, Live Nation estimated that for the next several years it would book three to four shows per year at Venue A. But in the year following Venue A's switch to Ticketmaster's competitor, Live Nation promoted zero shows at Venue A. Venue A understood that Live Nation's decision to book zero shows at Venue A was retaliation for not selecting Ticketmaster as its primary ticketer.

7

Case 2:24-cv-03973-MAS-ES Document 21-12 Filed 07/05/24 Page 36 of 107
Case 1:10-cv-00139-RMC Document 21 Filed 04/08/24 Page 36 of 24
Page ID #:5898

*Venue B*

Defendants violated both the Anti-Conditioning and Anti-Retaliation Provisions during negotiations to provide primary ticketing services to Venue B. In 2017, Venue B evaluated offers for primary ticketing services from Ticketmaster and several competitors. When Venue B informed Live Nation that it was planning to choose Ticketmaster's competitor, Ticketmaster's Vice President for Client Development threatened to withhold all Live Nation concerts from Venue B if it did not renew its contract with Ticketmaster. The Ticketmaster VP told Venue B that "if you move in that direction, you won't see any Live Nation shows." Ticketmaster's Executive Vice President and Co-Head of Sports for NBA and NHL Arenas made a similar threat to Venue B, telling it that Live Nation's CEO would never put one of his shows on sale through that particular Ticketmaster competitor.

Despite Defendants' threats, Venue B initially selected a Ticketmaster competitor as its primary ticketing provider. Before Venue B's ticketing decision, Live Nation and Venue B discussed potential bookings approximately once per week. But when Venue B opted to go with Ticketmaster's competitor, Live Nation stopped contacting the arena about any possible concerts or booking shows at Venue B. For unrelated reasons, one month later Venue B agreed to contract with Ticketmaster. Immediately thereafter, Live Nation began to get "geared back up" to bring concerts to Venue B, because Venue B was "back in the family."

*Venue C*

Defendants twice violated the Anti-Conditioning Provision by threatening to blacklist Venue C from all future Live Nation shows after Venue C decided to contract with Ticketmaster's competitor for primary ticketing services. According to a Venue C executive, Ticketmaster's President warned the executive that if Venue C went with a competing ticketer, Ticketmaster's

8

Case 2:24-cv-03973-ABAS Document 221-1 Filed 07/15/24 Page 36 of 107
Case 1:10-cv-00139-RMC Document 221-1 Filed 04/08/24 Page 36 of 107
Page ID #:5899

response "would be 'nuclear'" and "though he would deny it if I repeated it, Live Nation would never do a show in our building, that they would find other places for their content . . . ." Following a conversation with Ticketmaster's President, a second Venue C executive reported that Ticketmaster and Live Nation "will not do any business whatsoever with our stadium" and that Ticketmaster was "drawing a line in the sand and picking this as their 'hill to die on.'" The Venue C executive went on to state his understanding that Venue C was "now on 'the black list.'"

### *Venue D*

Defendants violated the Final Judgment when a senior Ticketmaster executive in charge of Sports for NBA and NHL Arenas threatened to withhold concerts at Venue D if Ticketmaster was not selected as its primary ticketing provider. In September 2018, Venue D began evaluating primary ticketing providers in advance of the expiration of its Ticketmaster contract. When Venue D told Ticketmaster that it was considering other primary ticketers, Ticketmaster's executive told Venue D that if it chose another primary ticketer, its Live Nation concert volume would be put at risk because Live Nation concerts would either skip the market altogether or play at another venue. Later, the senior executive reiterated his threat if that Venue D went with another primary ticketing provider, Live Nation would pull concerts from Venue D and reduce the volume of shows held there.

Despite receiving a competitive bid from a Ticketmaster competitor, Venue B determined that the risk of contracting with a ticketer other than Ticketmaster was too great. Venue D renewed its contract with Ticketmaster for primary ticketing services.

### *Venue E*

Defendants violated the Final Judgment by threatening to condition Venue E's access to Live Nation concerts on the selection of Ticketmaster as the arena's ticketing provider and then

9

Case 2:21-cv-00037-WBS Document 22-1 Filed 07/15/21 Page 37 of 107
Case 1:10-cv-00139-RMC Document 221-1 Filed 04/08/25 Page 138 of 107
Page ID #:5900

retaliating by withholding Live Nation content after Ticketmaster was not selected. Beginning in early 2012, the President of Live Nation Arenas threatened on multiple occasions to divert Live Nation concerts away from Venue E if it did not select Ticketmaster as its primary ticketer. After Venue E did not select Ticketmaster, two Live Nation executives – the President of Live Nation Arenas and the local Live Nation President in charge of placing concerts in the region – repeatedly threatened that Venue E would not get Live Nation shows unless it switched to Ticketmaster.

When Venue E refused to switch to Ticketmaster despite these threats, Live Nation followed through on its threats and retaliated against Venue E by reducing the number of concerts played there. Indeed, between 2011 and 2015, Live Nation shows playing at Venue E dropped by an average of almost fifty percent.

### *Venue F*

Defendants violated the Final Judgment by retaliating against Venue F after the arena switched from Ticketmaster to a competing ticketer. Immediately after learning that Venue F had switched ticketers, Ticketmaster's President contacted the local Live Nation President responsible for placing concerts in the region to suggest that Live Nation book more shows at Venue F's nearby rival venue. In the two years following Venue F's move to a Ticketmaster competitor for primary ticketing, Live Nation significantly reduced the number of shows promoted at Venue F in retaliation.

## III. THE UNITED STATES AND DEFENDANTS HAVE AGREED TO CLARIFY, MODIFY, AND EXTEND THE FINAL JUDGMENT TO ADDRESS THE UNITED STATES' CONCERNS

As set forth in the proposed Amended Final Judgment, Defendants have agreed to undertake certain steps to address the United States' concerns and help prevent future violations of the Final Judgment.

10

*First*, Live Nation has agreed to extend by five- and one-half years, until December 31, 2025, Section IX of the Final Judgment, as modified, as well as certain interrelated provisions: Section I (jurisdiction); Section II (definitions); Section III (applicability of the Final Judgment); Section XI (compliance inspection); Section XII (notification of related acquisitions), Section XIII.A.(no reacquisition of divested assets), Section XIV (retention of jurisdiction); Section XV (expiration as modified), and Section XVI (public interest determination). As explained above, because most primary ticketing contracts last for three to five years, a five- and one-half-year extension of the Final Judgment would ensure that at least one full cycle of most venue ticketing contracts would be free from Defendants' coercive tactics and give true competition a chance to take hold.

*Second,* Live Nation has agreed to modify the decree to add language clarifying the specific conduct prohibited by the Anti-Retaliation and Anti-Conditioning Provisions. While the United States believes these provisions were always clear and unambiguous, for the avoidance of doubt, these revisions make even clearer that Live Nation is not merely prohibited from withholding or threatening to withhold *all* concerts as a condition of Section IX; rather, conditioning, threatening to condition, or retaliating with respect to one or more concerts is sufficient to violate the Final Judgment. The definition of "Provision of Live Entertainment Events" has been similarly modified to make clear that the definition encompasses not only the services necessary to put on a concert at a venue, but also the concerts themselves – an interpretation supported by the plain language of the original decree but that Defendants nevertheless have disputed. The Anti-Conditioning Provision has been modified so that in the future there can be no doubt that Defendants are prohibited from threatening to withhold one or more concerts from a venue if the venue does not use Ticketmaster for primary ticketing services. Finally, the proposed modification

11

to the last paragraph of Section IX.A. makes clear that Plaintiffs do not need to identify particular shows that have been withheld to establish retaliation. None of these proposed modifications changes the conduct prohibited by the Final Judgment; they simply serve to clarify pre-existing parameters of the prohibited conduct for avoidance of doubt in the future.

*Third*, Live Nation has agreed to appointment of an independent Monitoring Trustee charged with "the power and authority to monitor Defendants' compliance with the terms of" the Proposed Amended Final Judgment, as well as "other powers as the Court deems appropriate." To that end, the Monitoring Trustee's responsibilities include investigating and reporting on Defendants' compliance with the Proposed Final Judgment, including providing periodic reports to Plaintiffs, and recommending appropriate remedies should violations occur. The Monitoring Trustee shall be selected by the United States, after consultation with Defendants and Plaintiff States, and approved by the Court upon application by the United States.

*Fourth*, Live Nation has agreed to take certain steps to help ensure future compliance with the Final Judgment, including:

(i) Appoint an Antitrust Compliance Officer;

(ii) Provide a copy of the Amended Final Judgment to relevant employees along with a cover letter explaining the prohibited conduct and requiring each employee to certify that he or she has read, understands and will abide by the terms of the Amended Final Judgment and that he or she is unaware of any violations;

(iii) For the first year, conduct semi-annual compliance training programs, followed by annual training thereafter, with all training programs to be approved by the Department of Justice in its sole discretion;

(iv) Annually communicate to relevant employees that they may disclose information regarding actual or potential violations to the Antitrust Compliance Officer or the Monitoring Trustee without reprisal or adverse consequences;

(v) Provide notice and a copy of the Amended Final Judgment to every actual or potential venue customer within thirty days of entry along with a cover letter encouraging customers to contact the Department of Justice if they are or become

12

aware of any potential violations and waiving any contractual obligation the venue may have to provide notice to Live Nation or Ticketmaster about any such contacts;

(vi)    Provide notice and a copy of the Amended Final Judgment to every actual or potential venue customer at the beginning of any negotiation related in whole or in part to primary ticketing services along with a cover letter encouraging the venue to contact the Department of Justice if they are or become aware of any potential violations and waiving any contractual obligation the venue may have to provide notice to Live Nation or Ticketmaster about any such contacts;

(vii)   Notify Plaintiffs and the Monitoring Trustee within seven days of learning of any violations or potential violations of the Amended Final Judgment;

(viii)  If the Antitrust Compliance Officer or Defendants' management learn of a potential violation, promptly notify the Monitoring Trustee, investigate and, if necessary, terminate or appropriately modify any violative conduct;

(ix)    Within thirty days of Defendants' management or the Antitrust Compliance Officer's learning of any violation or potential violation, provide Plaintiffs a statement describing the violation or potential violation;

(x)     Maintain all documents related to violation or potential violation for a period of five years;

(xi)    Establish a whistleblower protection policy;

(xii)   Annually certify in writing to Plaintiffs Defendants' compliance with the Final Judgment; and

(xiii)  Maintain and produce to Plaintiffs upon request a list of all employees who received the annual compliance training and a copy of all materials distributed as part of that training.

Together, these steps are intended to promote compliance with the Proposed Amended Final Judgment's provisions and to make the enforcement of this Court's Order as effective as possible. Similar provisions are now generally included as a matter of course in Antitrust Division consent decrees aimed at preventing anticompetitive conduct.[14]

---

[14] *See, e.g.* Final Judgment, *United States v. Sinclair Broadcast Group, Inc., et al.*, 1:18-cv-02609-TSC, Dkt. 34 (D.D.C. May 22, 2019); Final Judgment, *United States v. Knorr-Bremse AG, et al.*, 1:18-cv-00747-CKK, Dkt. 19 (D.D.C. July 11, 2018); Final Judgment, *United States v. DirecTV Group Holdings, LLC, et al.*, 2:16-cv-08150-MWF-E, Dkt. 41 (C.D. Cal. Oct. 2, 2017); Final Judgment, *United States v. Apple, Inc. et al.*, 1:12-cv-02826-DLC, Dkt. 119 (S.D.N.Y. Sept. 6, 2012).

13

Case 2:24-cv-03973-VAS Document 321-12 Filed 07/15/24 Page 41 of 107
Case 1:10-cv-00139-RMC Document 22 Filed 01/08/20 Page 17 of 24 06107
Page ID #:5904

*Fifth*, Live Nation has agreed to incorporate four new procedural provisions designed to promote compliance and make the enforcement of the Amended Final Judgment as effective as possible. With the exception of the penalty provision, the United States is seeking to include these provisions in all newly proposed final judgments in antitrust matters, and it has already included them by agreement with parties in 7 of its recent proposed consent decrees in civil merger and civil non-merger cases.[15] As part of these modifications, Defendants have agreed that in any future civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Amended Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence.

The parties also affirm that the Proposed Amended Final Judgment was drafted to restore competition that would otherwise have been harmed by the underlying merger between Ticketmaster and Live Nation. Defendants agree that they may be held in contempt if they fail to comply with any provision of the proposed Amended Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Moreover, Defendants have agreed to pay a penalty of one million dollars per violation of each of the Anti-Retaliation and Anti-Conditioning Provisions in relation to negotiations with a venue during a single contracting cycle. This penalty is intended to incentivize Live Nation's

---

[15] *See, e.g.,* [Proposed] Final Judgment, *U.S. et al. v. Deutsche Telekom AG, et al.,* 1:19-cv-2232, Dkt. 2-2 (D.D.C. July 26, 2019); Proposed Final Judgment, *U.S. et al., v. Nexstar Media Group, Inc., et al.,* 1:19-cv-2295, Dkt. 2-2 (D.D.C. July 31, 2019); Final Judgment, *U.S. v. Amcor Ltd., et al.,* 1:19-cv-1592, Dkt. 21 (D.D.C. Sept. 11, 2019); Final Judgment, *U.S. v. Canon Inc., et al.,* 1:19-cv-1680, Dkt. 12 (D.D.C. Oct. 8, 2019); Final Judgment, *U.S. v. Harris Corp., et al.,* 1:19-cv-1809, Dkt. 10 (D.D.C. Oct. 10, 2019); [Proposed] Final Judgment, *U.S. v. Symrise AG, et al.,* 1:19-cv-3263, Dkt. 2-2 (D.D.C. Oct. 30, 2019); Proposed Final Judgment, *U.S. v. NACAC,* 1:19:cv-3706, Dkt. 2-2 (D.D.C. Dec. 12, 2019).

compliance with the Amended Final Judgment while lowering the United States' burden to prove specific damages resulting from any specific violation.

Finally, the parties have agreed that the United States may file an action against Defendants for violating the Amended Final Judgment for up to four years after the Amended Final Judgment has expired or been terminated. This provision is meant to address, *inter alia*, instances where evidence that a violation of the Amended Final Judgment occurred during the term of the Amended Final Judgment is not discovered until after the Amended Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Amended Final Judgment has expired or been terminated. This provision, therefore, makes clear that the United States may still challenge a violation that occurred during the term of the Amended Final Judgment for four years after the Amended Final Judgment has expired or been terminated.

*Sixth*, Live Nation has agreed to reimburse the United States $3 million for its costs and attorney fees incurred in investigating and prosecuting this action.

## IV. MODIFICATION OF THE FINAL JUDGMENT IS IN THE PUBLIC INTEREST

### A. Legal Standard

On July 30, 2010, the Court held that entry of the Final Judgment was in the public interest and entered its Order.[16] This Court has jurisdiction to modify the Final Judgment pursuant to Section XIV of the Final Judgment,[17] Federal Rule of Civil Procedure 60(b)(5), and its inherent

---

[16] Final Judgment § XVI ("Entry of this Final Judgment is in the public interest.")

[17] Section XIV of the Final Judgment states that the Court "retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary and appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions."

Case 2:21-cv-00465-WSS Document 221-1 Filed 07/15/21 Page 45 of 107
Case 1:10-cv-00155-RMC Document 22-1 Filed 04/08/24 Page 198 of 24
Page ID #:5906

authority to enforce its lawful orders, including "the power to construe and interpret the language

of the judgment"[18] and to modify a decree of injunctive relief.[19]  Moreover, the Final Judgment

expressly contemplates the Court's authority to grant an extension, providing that the decree would

expire ten years from the date of entry "[u]nless this Court grants an extension."[20]

Where, as here, the parties have consented to a proposed modification of an antitrust

judgment, the issue before the Court is whether modification is in the public interest.[21]  The Court

should "approve an uncontested modification so long as the resulting array of rights and

obligations is within the zone of settlements consonant with the public interest today."[22]  The

"district court may reject an uncontested modification only if it has exceptional confidence that

adverse antitrust consequences will result – perhaps akin to the confidence that would justify a

court in overturning the predictive judgments of an administrative agency."[23]

---

[18] *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 12 (D.D.C. 2004).

[19] *New York v. Microsoft*, 531 F. Supp. 2d 141, 167 (2008) (quoting *United States v. Western Elec. Co.*, 46 F.3d 1198, 1202 (D.C.Cir.1995) (finding that in addition to authority under a final judgment, "[t]he Court may also modify the Final Judgments under its power in 'equity to modify a decree of injunctive relief," which the D.C. Circuit has described as "long-established, broad, and flexible.").

[20] Final Judgment § XV.

[21] As discussed below in Section VI, the requirements of the Tunney Act, 15 U.S.C. §§ 16(b)-(h), do not apply to actions such as this one.  Courts nevertheless should apply in this context a "public interest" standard of review akin to the review standard embodied in the Tunney Act because that standard pre-dates the Tunney Act and therefore applies even where the Act does not.  *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C. Cir. 1995) (In passing the Tunney Act, "Congress did not purport to alter antitrust precedent applying the public interest in reviewing consent decrees."); *cf. also United States v. Am. Cyanamid Co.*, 719 F.2d 558, 565 & n. 7 (2d Cir. 1983) (the "court must, of course, consider protection of the 'public interest'"; the "Tunney Act… provides useful guidance to the courts in deciding how modification procedures should be addressed"); *United States v. Swift & Co.*, No. 58 C 613, 1975 WL 864, at *3 (N.D. Ill. Jan. 17, 1975) (applying "public interest" review – but not the Tunney Act – to a jointly proposed modification to antitrust consent decree).

[22]  *United States v. Western Elec. Co.*, 900 F. 2d 283, 307 (D.C. Cir. 1990) ("*Western Elec. I*").

[23] *United States v. Western Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) ("*Western Elec. II*").

16

Case 2:21-cv-00376-WASES Document 321-1 Filed 07/25/24 Page 45 of 107
Case 1:10-cv-00155 RMC Document 22-1 Filed 04/08/20 Page 20 of 24
Page ID #:5907

The public interest standard to be applied by the district court is the same one used in reviewing an initial proposed consent judgment in a government antitrust case.[24] It has long been recognized that the United States has broad discretion in settling antitrust litigation on terms that will best serve the public interest in competition.[25]

Respectfully, the Court's role in determining whether the initial entry of a consent decree is in the public interest is not to determine what decree would best serve society, but only to determine whether entering the proposed decree would be in the public interest. It should so determine and enter the proposed decree unless it cannot find that the government's explanation of why the proposed decree would be in the public interest is reasonable, or finds that the government has abused its discretion or failed to discharge its duty to the public.[26] The Court's role is to "insur[e] that the government has not breached its duty to the public in consenting to the decree."[27] As the public interest standard for reviewing a modification to a consent decree is the same as for deciding whether initially to enter the decree, the Court should conclude that modifying the Final Judgment is in the public interest if the United States has offered a reasonable explanation

---

[24] *See Western Elec. I*, 900 F.2d at 295; *United States v. American Telephone & Telegraph Co.*, 552 F. Supp. 131,147 n.67 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 406 U.S. 1001 (1983).

[25] *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995) (stating that government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest").

[26] *See Microsoft*, 56 F.3d at 146062; *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981).

[27] *Bechtel*, 648 F.2d at 666; *see also Microsoft*, 56 F.3d at 1461 (examining whether "the remedies [obtained in the Final Judgment] were not so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

of why the modification vindicates the public interest in competitive markets, and there is no showing of abuse of discretion affecting the United States' recommendation.

**B.     The Proposed Modification Will Advance the Public Interest**

To date, Live Nation's repeated violations of the Final Judgment's prohibitions against retaliatory and threatening behavior have undermined Section IX's purpose – namely, to promote competition in the primary ticketing industry.[28]  Many venues depend on revenue generated by live events, including concerts, and a single concert can generate hundreds of thousands of dollars in revenue for a venue, including dollars earned from concessions, parking, merchandise, and ticketing fees.  As the largest concert promoter in the country, Live Nation is thus a critical source of live concerts that many venues can ill afford to alienate.  Even when Ticketmaster's competitors make competitive offers for a venue's primary ticketing contract, they are often unsuccessful, in part because venues know that by selecting a Ticketmaster competitor for primary ticketing services they risk having their show counts reduced or eliminated in retaliation.

Indeed, Defendants' violations have so permeated the industry that venues now fear retaliation and expect conditioning from Live Nation as a matter of course if they do not contract with Ticketmaster.  As a result, Defendants' actions have deterred entry into primary ticketing and foreclosed current competitors from winning venues' primary ticketing contracts.  At the same time, the presence of competitors in the primary ticketing market, even hamstrung as they are by Defendants' actions, has already resulted in better pricing and terms for venues by forcing Ticketmaster to improve its offer in response to competition.

The proposed modifications to the Final Judgment are in the public interest.  Extending Section IX and other relevant provisions by five- and one-half years will finally give the Final

---

[28] Final Judgment § IX, entitled "Promote Competition."

18

Case 2:21-cv-04972-WLS Document 321-1 Filed 07/85/24 Page 46 of 107
Case 1:10-cv-00135-RMC Document 21-1 Filed 04/08/20 Page 22 of 24
Page ID #:5909

Judgment a chance to work as intended. Most primary ticketing contracts last for three to five years. A five- and one-half-year extension of the Final Judgment would therefore ensure that at least one full cycle of most venue ticketing contracts would be free from Defendants' coercive tactics and give true competition a chance to take hold.

The remaining modifications are also in the public interest because they clarify the prohibited conduct, strengthen the penalties associated with non-compliance while simultaneously lowering the United States' burden to seek relief in the future, and improve all parties' ability to monitor and enforce compliance by instituting notice and investigation obligations and appointing both internal (Antitrust Compliance Officer) and external (Monitoring Trustee) monitors to oversee Defendants' conduct. Moreover, requiring Defendants to provide notice of the Amended Final Judgment's prohibitions to venues should help educate venues and reduce fear of retaliation, allowing venues to feel increased freedom to choose a non-Ticketmaster primary ticketer. By forcing Defendants to actually adhere to the Final Judgment, it is likely that Ticketmaster's actual and potential competitors will be more likely and able to compete successfully for venue clients, engendering better deals for venues as a result of increased competition.

## V. A PUBLIC COMMENT PERIOD IS UNNECESSARY

Consistent with the recent practice of courts in this district,[29] the United States does not propose to publish the proposed Amended Final Judgment for notice and public comment. The

---

[29] In certain past cases, the United States has voluntarily applied – with agreement from the parties – procedures consistent with the Tunney Act to major modifications of consent decrees because those procedures can help facilitate thorough exposition and review. *See, e.g., United States v. Western Elec. Co.*, 900 F. 2d 283, 305 (D.C. Cir. 1990) ("Western Elec. I") (in which the parties voluntarily agreed to apply Tunney Act procedures to the modification at issue). Courts in this district, however, have modified final judgments without requiring a period for public notice and comment. *See, e.g., United States et al. v. Verizon Communications, Inc., et al.*, Civil Action No. 1:08-cv-01878 (D.D.C. April 8, 2011, Judge Emmet Sullivan) (extending

Case 2:21-cv-04972-WB-ES Document 321-12 Filed 07/15/21 Page 48 of 107
Case 1:10-cv-00155-RMC Document 22-1 Filed 04/08/20 Page 23 of 24
Page ID #:5910

Tunney Act requires, among other things, that "any proposal for a consent judgment submitted by the United States" be filed with the court and published in the Federal Register, as well as in newspapers of general circulation, at least 60 days prior to the effective date of such judgment.[30] The Tunney Act further requires that any written comments relating to the proposed consent judgment, and any responses by the United States to those comments, be filed with the court and published in the Federal Register prior to entry of the proposed consent judgment.[31] These procedures are designed to facilitate a public interest determination "[b]efore entering any consent judgment proposed by the United States."[32] The language of the Tunney Act does not require that modifications to a consent judgment be subject to these same procedures.

In this case, prior to the entry of the original Final Judgment, the United States complied with the procedures of the Tunney Act and certified its compliance with the Court.[33]

Here, the proposed modifications are intended only to clarify the prohibitions on Defendants' conduct that are already contained in the Final Judgment entered by this Court. Similarly, the new enforcement and monitoring provisions simply strengthen the United States'

---

the term of transition services agreements); *United States v. Cemex, S.A.B. de C.V. and Rinker Group Ltd*, Civil Action No. 1:07-cv-00640 (D.D.C. November 28, 2007, Judge Royce Lamberth) (substituting a 40-year lease of real property for a sale of that property); *United States v. Halliburton and Dresser Industries*, Civil Action No. 98-2340 (D.D.C. March 13, 2000, Judge Thomas Penfield Jackson) (substituting access to one test well for access to a different test well). Two courts outside of this district have further held that the Tunney Act is not applicable to judgment termination proceedings, suggesting that those courts would not view the Tunney Act as applicable to minor judgment modifications. *United States v. American Cyanamid Co.*, 719 F.2d, 558, 565 n.7 (2d Cir. 1983); *United States v. General Motors Corp.*, 1983-2 Trade Cas. ¶ 65,614 at 69,093 (N.D. Ill. 1983). *But see United States v. Motor Vehicle Mfrs. Ass'n*, 1981-2 Trade Cas. ¶ 64,370 (C.D. Cal. 1981).

[30] 15 U.S.C. § 16(b)-(c).
[31] 15 U.S.C. § 16(d).
[32] 15 U.S.C. § 16(e).
[33] Certificate of Compliance with Provisions of the Antitrust Procedures and Penalties Act, Dkt. 14-2 (June 29, 2010).

Case 2:21-cv-00473-JES Document 321-1 Filed 07/15/21 Page 49 of 107
Case 1:10-cv-00155-RMC Document 22 Filed 01/08/20 Page 24 of 24
Page ID #:5911

ability to monitor Defendants' conduct and to challenge that conduct in the future, discouraging future violations. Moreover, extending the Final Judgment by five- and one-half-years is intended to effectuate the parties' original bargain by making up for time lost to Defendants' violative conduct. Finally, the Court previously found the underlying Final Judgment to be in the public interest. Thus, no notice or public comment period is necessary for a determination that the proposed modification is in the public interest.

## VI. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court enter the proposed Amended Final Judgment submitted with this motion.

Dated: January 8, 2020

Respectfully submitted,

___/s/ Meagan K. Bellshaw_____
MEAGAN K. BELLSHAW (CA Bar #257875)
MONA S. K. HAAR (DC Bar # 986789)
LEE F. BERGER (DC Bar # 482435)
SARAH LICHT (DC Bar #1021541)
CRAIG D. MINERVA (DC Bar # 991020)
U.S. Department of Justice
Antitrust Division
Media, Entertainment and Professional Services Section
450 Fifth St., N.W., Suite 4000
Washington, D.C. 20530

# EXHIBIT F



# UPDATE: BREAKING DOWN THE DOJ LAWSUIT

  



*This post has now been updated with additional analysis...*

By Dan Wall, Executive Vice President, Corporate and Regulatory Affairs, Live Nation Entertainment, Inc

- **THIS LAWSUIT AGAINST LIVE NATION AND TICKETMASTER WON'T REDUCE TICKET PRICES OR SERVICE FEES.**

- **THERE IS MORE COMPETITION THAN EVER IN THE LIVE EVENTS MARKET – WHICH IS WHY TICKETMASTER'S MARKET SHARE HAS DECLINED SINCE 2010.**

- **NET PROFITS SHOW LIVE NATION AND TICKETMASTER DO NOT WIELD MONOPOLY POWER.**

# • THIS LAWSUIT DISTRACTS FROM REAL SOLUTIONS THAT WOULD DECREASE PRICES AND PROTECT FANS – LIKE LETTING ARTISTS CAP RESALE PRICES.

The Department of Justice and a group of State Attorneys General have now filed the much-anticipated antitrust suit against Live Nation and Ticketmaster.  This follows intense political pressure on DOJ to file a lawsuit, and a long-term lobbying campaign from rivals trying to limit competition and ticket brokers seeking government protection for their business model of scooping up concert tickets and jacking up the price.

The complaint—and even more so the press conference announcing it—attempt to portray Live Nation and Ticketmaster as the cause of fan frustration with the live entertainment industry. Despite admitting that "[t]he face values of tickets are typically set or approved by artists," it blames concert promoters and ticketing companies—neither of which control ticket prices—for high ticket prices. It ignores everything that is actually responsible for higher ticket prices, from rising production costs, to artist popularity, to 24/7 online ticket scalping that reveals the public's willingness to pay far more than primary ticket prices. It blames Live Nation and Ticketmaster for high service charges—and just the fact that there are fees—but ignores that Ticketmaster retains only a modest portion of those fees. In fact, primary ticketing is one of the least

expensive digital distributions in the economy.



In light of these data, Assistant Attorney General Kanter's dodge of a reporter's question about how much Ticketmaster contributes to fees was telling.

It is also absurd to claim that Live Nation and Ticketmaster wield monopoly power.  The defining feature of a monopolist is monopoly *profits* derived from monopoly *pricing*.  Live

Nation in no way fits the profile. Service charges on Ticketmaster are no higher than on SeatGeek, AXS, or other primary ticketing sites, and are frequently lower. In fact, when Ticketmaster loses a venue to SeatGeek, service charges usually go up substantially. And even accounting for sponsorship, an advertising business that helps keep ticket prices down, Live Nation's overall net profit margin is at the low end of profitable S&P 500 companies.

Case 2:21-cv-04375-WAES Document 321-1 Filed 07/24/25 Page 57 of 106
Case 2:21-cv-04375-WAES Document 321-12 Filed 07/24/25 Page 58 of 107
Page ID #:5920



## Live Nation Entertainment Inc. and S&P 500 Companies

Last Full Fiscal Year Ending on or before February 3, 2024

The trendlines confirm Live Nation's lack of market power. Every year, competition in the industry drives Live Nation to earn lower take rates from both concert promotion and ticketing. The company is profitable and growing because it helps grow the industry, not because it has market power that squeezes more profit from less output.

In the weeks leading up to today, we met several times with the DOJ front office. It was evident in our discussions that they just did not want to believe the numbers.  The data conflicted too much with their preordained narrative that Live Nation belongs in the ranks of the other "tech monopolists" they have targeted.

At bottom, we are another casualty of this Administration's decision to turn over antitrust enforcement to a populist urge that simply rejects how antitrust law works.  Some call this "Anti-Monopoly", but in reality it is just anti-business.  A central tenet of this worldview is that antitrust should target companies that have grown large enough that in some nebulous way they "dominate" markets—even if they attained their size

through success in the marketplace, not practices that harm consumers, which is the actual focus of antitrust laws. One of the most jaw-dropping parts of today's complaint is the assertion that there are "barriers to entry" because "artists naturally prefer to work with a promoter who is successful in promoting many high-demand shows at popular venues"—namely, Live Nation. That is a supreme expression of competition on the merits, winning by being better. But to this group it's anticompetitive.

The new thinking is also waging war on vertical integration, generally and particularly in the case of so-called "dominant platform companies." There is no legal basis for objecting to vertical integration on such grounds. Antitrust law views vertical

integration as *procompetitive* in most circumstances. As the leading antitrust treatise states, "vertical integration is ubiquitous and … [in] the great majority of cases no anticompetitive consequences can be attached to it." And, critically, Live Nation can offer and has offered fans, artists, venues and the rest of the live entertainment ecosystem better prices and better services than they would receive if these complementary businesses were separated. Ticketmaster in particular is a far better, more artist- and fan-focused business under Live Nation's ownership than it ever was as a standalone company. The complaint is entirely devoid of any response to that inescapable fact—because DOJ has no answer for it.

The Obama Administration saw things differently. It allowed Live Nation and Ticketmaster to merge, and in defending that position acknowledged that there was no legal basis for challenging the vertical aspects of the merger—specifically, allowing a large concert promoter to combine with a large ticketing company. In one filing, it said that it had "determined that it could not prove that the vertical integration resulting from the merger would significantly harm competition in the concert promotion market." There is no factual basis for concluding otherwise today.

Assistant Attorney General Kanter's defense of seeking a breakup at today's press conference provided no reasoning to support a breakup. First, he has his antitrust law wrong, because the DOJ has far more power

to challenge a merger, which is unlawful if it is *likely* to be anticompetitive, than under the monopoly standard which requires evidence of actual anticompetitive effects. So the DOJ cannot shrug off the fact that it allowed Live Nation and Ticketmaster to merge because, as it admitted, it could not prove even a likelihood of anticompetitive effects. And even in this complaint, DOJ does not contend the merger was unlawful. It is just pandering to the crowd with a request for relief that, in my opinion, it cannot possibly hope to achieve under these circumstances.

It is also important that the "other conduct" in this complaint is either exactly what the Obama DOJ addressed in the 2010 Consent Decree or has nothing to do with vertical integration. It is, instead, a grab bag of

disconnected alleged practices that could never justify the type structural relief DOJ seeks.

## OAK VIEW GROUP

The complaint makes two principal claims concerning Live Nation's relationship with the Oak View Group ("OVG"), a venue management company. The first qualifies as disingenuous, in that it is premised on the idea that OVG was a serious potential rival to Live Nation in *concert promotion*. OVG owns and manages venues. It has never been a concert promoter, nor aspired to be one— which is precisely the point being made in the email DOJ quotes. DOJ's claim is based on two incidents in which Live Nation and OVG were discussing what to do when an OVG venue wanted to book an occasional show

itself on a dark night. To portray that as an agreement not to compete in concert promotion is farcical—particularly when the complaint defines the relevant promotions market as a market for regional or national tours, and explicitly disavows the suggestion that "self-supply" of shows from venue owners is part of that market.

Regardless, OVG's behavior as a venue operator is fully consistent with every major arena and stadium in the country—they need to have an in house booker who helps fill otherwise dark nights, but they have no interest in systematically taking on the risk of guarantees that could be in the millions of dollars for a show or tens of millions of dollars for a tour.

DOJ also claims it was anticompetitive for Ticketmaster to compete for and win a ticketing contract OVG offered. The theory is that the contract gave Ticketmaster an unfair advantage in securing the business of independent venues that were managed by OVG because it creates financial incentives for OVG to "advocate for" Ticketmaster. But there is nothing remotely anticompetitive about that. Commercial arrangements that involve incentive or marketing payments are common throughout this industry (and many others). Venue management companies like OVG and ASM are in a position to advocate for a variety of service providers, including but by no means limited to ticketing companies. So there is competition for the business opportunities at both the venues they own, which they control, and the venues

they manage, which they don't control but can potentially influence. Ticketmaster competed and won the contract on the merits because OVG determined it was the best ticketing system available.

# THREATENING SILVER LAKE

This claim reveals not only a disregard for the facts, but also deep hypocrisy. The current DOJ and FTC have been vocal critics of private equity companies making multiple investments in the same industry because of competitive "entanglements." So was Live Nation CEO Michael Rapino when, after it had already made an investment in OVG, Silver Lake Partners decided to invest in the Australian live entertainment company, TEG. Rapino's complaint was fundamentally the same as the DOJ/FTC concern with private

equity rollups: it created a conflict between OVG, which had become a close partner to Live Nation, and TEG. So, in December 2021 when a TEG employee wrote to say that it did not intend to compete with Live Nation in the U.S., Rapino replied to Silver Lake's management that he did not care about TEG, but still had a problem with Silver Lake's decision to make multiple conflicting investments in the industry.

There is no truth that this brief exchange had anything to do with Silver Lake's decision to sell its stake in TEG.

## EXCLUSIVE CONTRACTING

The suit challenges exclusive ticketing contracts between venues and ticketing companies. That is a practice that has been

prevalent in the primary ticketing business for decades. In fact, DOJ investigated it in the Clinton Administration and chose not to challenge it because their investigation revealed that venues—the consumers of primary ticketing services—preferred it.

That is still how venues see it, and for good reason. Primary ticketing systems encompass much more than what a fan experiences when buying a ticket online. They are complex venue box office management systems, and each is unique. Very few concert venues want to have more than one because they see it as not worth the added costs and complexity. So, the decision for nearly all concert venues is not whether to have two or more ticketing services providers, but rather which one provider to choose. And

because that is how a venue looks at the world, it is no surprise that *they*—the venues—want to adopt the contracting structure and create the bidding dynamics that will get them the best possible deal from their most desired provider.  Competitive bidding for exclusive rights is the proven way for venues to create bidding pressure and maximize the value of their ticketing rights.  In other words, exclusivity is a *product* of *competition* for venues, not an anticompetitive practice.

## SERIAL PROMOTER ACQUISITIONS

Another part of the Complaint asserts that Live Nation has violated the law by acquiring, in serial fashion, a number of other concert promoters.  The theory is evidently that competition has been thwarted because, but for these acquisitions, the promoters would

have acted as significant competitors to Live Nation's own concert promotion business.

That premise is factually incorrect. During the time period at issue (roughly the last ten years or so), Live Nation has never acquired any U.S. promoter that could plausibly be viewed as a meaningful potential competitor in the alleged national touring market.  Look at the example Attorney General Garland raised: Live Nation's 2016 acquisition of AC Entertainment in Knoxville, Tennessee.  This was an acquisition of one promoter, who was in his 60s and looking to retire.  He approached Live Nation looking to find a good, long-term home for his employees. Live Nation did not have a Knoxville office, so for $15 million it made the deal. Seriously? The DOJ is challenging that?

In fact, most of our M&A activity in the U.S. has been targeted at discrete areas in which we effectively had no meaningful presence at all—most notably promoting festivals, rather than standard shows or tours—or seizing opportunities to expand into new geographies. A number of these deals, like AC Entertainment, have been with promoters who were on the cusp of retiring and were looking for an alternative to winding down the business. The notion that these acquisitions somehow materially altered the competitive landscape in any way that would be problematic is wholly untenable.

## AMPS

The Complaint has a variety of allegations around Live Nation's conduct with respect to amphitheaters it operates. Most surprisingly,

the DOJ has alleged that it is anticompetitive tying for Live Nation to exclusively book its own amps. That is legally specious. First, if that is tying, then it is pervasive across the industry. Countless promoters exclusively book venues they own or operate. But it is not tying, legally; DOJ's tying verbiage is an effort to circumvent the bedrock antitrust principle that no business, even a monopolist, has a duty to deal with competitors. The Supreme Court has repeatedly affirmed this principle, and the narrow exceptions to it do not apply to this case. Live Nation—and every other vertically-integrated promoter/venue owner—has a nearly unqualified right not to deal with rivals.

The baseless nature of this claim is amplified by the fact that we have—contrary to what

DOJ alleges—allowed artists promoted by others to play our amps, and that, as we told DOJ repeatedly, we plan on voluntarily "opening" our amps to artists promoted by others.  The claim, therefore, is not only legally groundless but practically pointless.

## CONTENT LEVERAGING AND BARCLAYS

For all of DOJ's rhetoric about seeking "structural remedies" (i.e., a break up of the company), the vast bulk of the conduct the Complaint describes has nothing to do with the combination of a concert promoter and a ticketing company living under one roof. There is one exception, however, which is the set of allegations about threatening or retaliatory conduct by Live Nation, the concert promoter, if venues switch away from Ticketmaster.

Case 2:24-cv-04979-WAS Document 103-12 Filed 07/14/25 Page 74 of 106
Case 2:24-cv-04979-WAS Document 121-1 Filed 05/24/25 Page 75 of 107
Page ID #:5937

This is among the core behavior regulated by the consent decree that DOJ agreed to in connection with the merger of Live Nation and Ticketmaster almost 15 years ago. I have written in detail about the context and background of that agreement <span style="color:red">elsewhere</span>, and won't reprise that history here. For present purposes, the key thing to appreciate is that for the past four years, a Monitor appointed by DOJ itself has been keeping close tabs on Ticketmaster's negotiations with venues and ensuring that the company is not using concert "content" to drive ticketing deals. During that period, covering thousands of such deals, exactly one instance of potential concern has come to the Monitor's attention. Otherwise, the Monitor has praised Live Nation for its compliance program and an exemplary record of compliance.

The one instance of a potential violation is about the Barclays Center in Brooklyn (referenced but not named in the complaint). What the Complaint alleges about that drama is generally untrue. The short version of a long story is that Barclay's switched from Ticketmaster to SeatGeek. Six months before that happened, Barclays hired a major New York law firm to threaten us with contract claims and consent decree violations for reducing Live Nation show counts should Barclays switch to SeatGeek. We were scrupulously careful about documenting the business reasons why literally every show in the NY area over the relevant period went to the venue it wound up at.  This contemporaneous record unequivocally disproves the contention that there was even a single instance of retaliatory re-routing or

anything like it.  And as has been reported elsewhere, SeatGeek's technology and service were not up to the task of servicing major onsales, resulting in Barclays firing SeatGeek, essentially for cause.

More significantly, though, even if DOJ's version of the Barclay's story were true (which it is not), violating the consent decree with respect to *one venue out of thousands* would not amount to a violation of the antitrust laws, which famously concern themselves with "competition, not competitors."  There is a reason this is the only example actually identified in the complaint: despite 18 months of investigation, DOJ found nothing else. At the end of the day, nothing about this isolated incident (which DOJ willfully mischaracterizes) or anything else in this complaint affords any

basis for DOJ to disregard, undo and upend the deal it made approving the Live Nation-Ticketmaster merger and its own statements to a federal judge that complaints about that vertical combination lacked merit.

## CONCLUDING THOUGHTS

Live Nation is in the business of bringing the joy of live entertainment to people and to that end connecting artists to fans and supporting a productive live entertainment ecosystem. That is what we do—better than anyone else —and what we will continue to do as we challenge this lawsuit.  Is the ticketing marketplace confusing to consumers?  Yes, it certainly is.  And we have been very clear in the halls of Congress and at the DOJ that we favor genuine reforms that would actually help fans get tickets at the price the artist has

set for them to pay. Fans want to see the bands and sports teams they love, and it infuriates them that tickets sell out on Ticketmaster and are then available by the hundreds on secondary online sites at double and triple the cost. But the Government has chosen to do nothing about this. Instead, it has filed a case which misleads the public into thinking that ticket prices will be lower if something is done about Live Nation and Ticketmaster. DOJ is not helping consumers with their actual problems. This is why the government has never been less popular— because they pretend they are fixing your problems when instead they are pandering to a narrow set of political interests.

For additional facts and downloadable graphics please visit:

livenationentertainment.com/facts

# READ MORE ABOUT

CORPORATE

**About**

Biz at LN

Empowered by LN

Leadership

**Careers**

Life at Live Nation

Work at Live Nation

**Resources**

News

Investors

Leadership

# EXHIBIT G



# THE TRUTH ABOUT TICKET PRICES

  



By Dan Wall

In the ongoing antitrust attacks on Live Nation and Ticketmaster, a constant theme is that their alleged "monopolies" are responsible for high ticket prices.  Rhetorically, that's understandable, because if you want to rile up fans against Live Nation and Ticketmaster, there is no better way than to blame them for something you know fans dislike. But is there really a connection between any of these

antitrust arguments and prices for concert tickets?  That's the subject of today's post.

The starting point is what Live Nation and Ticketmaster actually do.  What roles do they play in the concert industry and what power does that give them to influence ticket prices?  We'll start with Ticketmaster, since it tends to get the lion's share of the blame for high ticket prices even though, as we shall see, it has the least influence over prices.

## HOW TICKETING WORKS

Ticketmaster and other "primary ticketing companies" provide the technology and services that venues need to manage and market shows, sell tickets, and validate tickets for entry.  Typically, one primary ticketing

company provides these services for all events at a given venue. The chosen ticketing company then interfaces with consumers on online marketplaces, not to sell inventory of their own, but as agents of the venues selling tickets priced by performers and production entities. Fans tend not to understand that. They think of Ticketmaster as an enormous ticket retailer that acquires vast quantities of tickets and puts them up for sale at prices Ticketmaster determines – an assumption that makes it easy to blame Ticketmaster for high ticket prices. But that's not true.

Tickets are actually priced by artists and teams. It's their show, they get to decide what it costs to get in. The NFL tickets on Ticketmaster were priced by the home teams,

concert tickets were priced by the performer's business teams, Monster Jam tickets were priced by its producer (Feld Entertainment), and so forth.

## THE TRUTH ABOUT FEES

The argument that Ticketmaster is responsible for high prices is really about service charges.  The practice in the U.S. for decades has been to break down the cost of admission into a "face value" sum and one or more fees added to face value.  There is a common perception that service charges are "junk fees" and that Ticketmaster sets the fees and pockets the money.  Again, that's not true.

Service charges are added to the face value of concert tickets because two important players in the concert ecosystem – venues and primary ticketing companies – get little or nothing out of the revenues derived from the ticket's face value. That money goes mostly to the performers, secondarily to cover certain show costs, and if anything is left over to the promoters. So, the practice developed to add a percentage service charge to a ticket's face value to pay the venue for hosting the event and the primary ticketing company for servicing venues and distributing tickets. The add-on nature of the service fee is annoying to many fans and fuels the narrative that these are junk fees. But they are not junk fees for the simple reason that the venues and ticketing companies have costs associated with the services they

provide to help produce the show. They provide value and one way or another will be compensated for it.

Fans are also told that service charges are Ticketmaster's way of raising ticket prices.  In fact, Ticketmaster does not set service charges, venues do, and most of the money goes to the venues.  Let's break that down.

Primary ticketing service charges are a product of the hundreds of contracts that exist between venues and their exclusive ticketing providers.  They are not uniform, but a typical contract will provide that in exchange for its services and some guaranteed cash payments to the venue, the ticketing company will get a stated percentage of the service charge the venue

intends to impose, a dollar-per-ticket fee, or some combination of the two.  The venue decides on the service fees.  During the ticketing contract bidding process, the venue tells the bidding ticketing companies that it intends to charge certain fees, and the ticketing companies structure their offers accordingly.

However the contract turns out, the *venue* gets most of the service fee, not Ticketmaster or any other primary ticketing company.  In fact, the venue normally gets around two-thirds of the service charge and in many cases a facility fee as well.  So, if fees add, say, 30% to the face value of a ticket, the primary ticketing company is getting perhaps a quarter of that – something in the range of 5-7%.  And the primary ticketing company is

not *making* 5-7% per ticket as profit because it has costs to cover, not the least of which are the guaranteed payments to the venue it needed to promise to win the contract. A primary ticketing company's profit per ticket is closer to 2% of the average ticket price, a figure far too low to be the cause of high ticket prices.

But let's ignore costs and just ask whether getting a 5-7% commission on the sale of a concert ticket is abnormal or unreasonable. In today's economy we have a lot of data points about what digital distribution usually costs. We can, for example, compare Ticketmaster's 5-7% commission rate with what other digital distribution platforms charge. The fact is that the 5-7% fee that primary ticketing companies earn on ticket

sales is *extremely low* by the standards of digital distribution. Here's how it stacks up against a collection of other fees charged by online marketplaces.




If distribution makes up 25%, 37% or 50% of what a consumer pays for something, of course it bears some responsibility for the ultimate price. But at just 5-7%, there is no rational basis for thinking that primary ticketing companies are the cause of high

concert ticket prices. They charge too little, and even if one were to assume — without any evidence — that there is some amount of unjustified "monopoly profit" in a 5-7% commission, it could not affect ticket prices by more than one or two percent at worst. So the narrative that Ticketmaster fees are responsible for high ticket prices makes no sense. There is no way that's true.

## THE ROLE OF THE PROMOTER

Now let's consider Live Nation in its role as a concert promoter. The arguments we hear about Live Nation's role in concert pricing are inconsistent. Some claim that Live Nation is so powerful in concert promotion that it can dictate what artists charge; others claim that Live Nation can raise its prices to artists, and

Case 2:21-cv-04003-WAS Document 203-1 Filed 07/24/24 Page 92 of 106
Case 2:21-cv-04003-WAS Document 211-12 Filed 07/24/25 Page 93 of 107
Page ID #:5955

this gets passed through to fans in higher ticket prices. Neither argument is plausible.

Concert promoters provide an array of services related to putting on memorable and financially successful concerts. They help the performers secure the right venues, negotiate deals with venues and others, advise on pricing, market the shows, and manage the countless details involved in hosting a concert. But promoters don't get paid for their services directly, the way a lawyer or an accountant might. Concert promoters invest in the show or tour by guaranteeing the performers a certain amount of money on the hope and expectation that there will be some profit for the promoter after the performers have been paid and all show costs have been covered. Promoters, in other words, are risk

takers: they bankroll the show hoping it turns out to be profitable, but the risks they take make their compensation uncertain.

Promoters do not set ticket prices.  They care deeply about pricing, and are usually quite sophisticated about it, because the offers they make to artists necessarily anticipate and depend on the number of, and prices for, tickets likely to be sold.  Think about a simple guarantee to an artist of $100,000 for one show at a 5,000 seat venue:  there is no way for a responsible promoter to offer that guarantee without at least a general understanding of what those 5,000 tickets will sell for.  This is the same reason why the investors on *Shark Tank* ask potential partners how much they charge for their

products.  If your money is at risk, you pay attention to pricing.

Nevertheless, promoters don't set prices, artists do.  The artist and her business team listen to the promoter's input and then decide.  This is the case even with a promoter as large as Live Nation or AEG.  Furthermore, if you want to talk about a promoter's pricing incentives, the last thing a concert promoter wants to do is charge too much for a show.  That is a surefire way for the promoter to lose money.  The promoter's incentive is to find the sweet spot that balances ticket revenues and the probability of a sellout.  That's what gives promoters a reasonable chance of making money on the show.

There is even less merit to the idea that the promoter's take from a concert pushes up ticket prices. Concert promotion services are not remotely expensive enough, let alone profitable enough, to have that effect.

A promoter's compensation is the product of numerous terms in its contract with an artist. The most important are the guarantee to the artist, the artist percentage of revenues after ticket sales exceed the guarantee, and the terms defining the expenses that the promoter is allowed to recover. The guarantee is a fixed amount paid by the promoter to the artist regardless of whether the promoter loses money. For example, a band might be guaranteed $100,000, in which case it will be paid $100,000 irrespective of whether the concert makes

money.  The band may even make more if the show is successful, however, because through the artist percentage the band will also be entitled to a substantial part of any net ticket revenues.  Nowadays, it's common for top artists to get 90% or more of the net ticket revenues.  The promoter gets only what remains after the guarantee, other show costs, and the artist's percentage have been paid out.  That depends critically on how many tickets are sold, which is unknown until the night of the show.  To further complicate things, every deal is different, and artists vary widely by their popularity and bargaining power.  Promoter "prices" — whatever one chooses that to mean — vary from deal to deal.

What we can say is that concert promotion is not a highly profitable business, even for Live Nation. In its annual reports, Live Nation reports billions of dollars of *revenue* for its Concerts segment because the acts it promotes sell billions of dollars in tickets. But Live Nation's own *income* as a concert promoter is less than 2% of concert revenues. The Concerts segment's adjusted operating income margin in 2023 was 1.7%.

On that basis alone it is obvious that what Live Nation earns as a concert promoter can't be responsible for high ticket prices. It is not taking nearly enough of the ticket revenue to force up ticket prices meaningfully. And despite all the talk that Live Nation is becoming more and more powerful, the secular trend in the industry is that artists are

getting an increasingly large share of ticket revenues. Concert promotion is an attractive business today largely because of its relationship to selling corporate sponsorships — an advertising business in which money comes neither from artists nor fans, but rather from big corporations.

We are left, then, with a ticketing distribution "monopoly" that charges a fraction of what most digital platforms charge and a concert promotions "monopoly" with a 1.7% AOI margin. And neither sets ticket prices.

## WHAT REALLY CAUSES HIGH TICKET PRICES

The real explanations for high ticket prices are well-understood and have very little to do

with Live Nation or Ticketmaster.  They begin with the economic conditions that explain most pricing:  supply and demand.  For a small percentage of concerts — the high-profile ones — consumer demand *greatly* exceeds the supply of available tickets.  This is obvious at the apex of the industry, where stars like Taylor Swift, Beyoncé, Ed Sheeran, Bruce Springsteen and Harry Styles could easily sell out far more shows than they could realistically play.  But it's not just them.  For the top 5-10% of touring artists, demand is regularly well in excess of the supply of tickets.  We are fortunate that artists in this category choose not to exercise their full pricing power; otherwise, they would charge the much higher prices we see on resale markets.  But basic economics applies to

concert tickets too, so strong demand naturally leads to higher ticket pricing.

Closely related to this is the phenomenon of concerts becoming premier "experience goods." Much has been written about the advent of the "experience economy," in which economic value has shifted progressively from the production and supply of goods, to the delivery of services, and now to the staging of experiences. Music, whether recorded or live, is by its nature experienced, but plainly the live experience is richer and in economic terms more valuable. Concerts also have the potential to become spectacles, whether though elaborate staging and production or a consumer buzz that makes them "the place to be." This factor is magnified by social media, which in addition

to creating demand through ongoing connections to artists, allows concerts to be shared experiences when fans upload videos and "Instagrammable moments" to their social media platforms.  The experience value of concerts has been increasing for decades, and with it the price of tickets.

Artists have also become more dependent on touring income over the last 25 years — the factor that Alan Krueger, who served as the Chairman of President Barack Obama's Council of Economic Advisers, cited as "the primary reason why concert prices have risen so much since the late 1990s."  This is the direct result of a precipitous decline in the value of recorded music when streaming (and unauthorized duplication) led to drastically lower record sales, which in turn led record

companies to withdraw from their traditional role bankrolling touring.  In that environment, concerts could no longer be loss leaders to sell albums.  They became the artist's principal source of income, and priced accordingly.

## HOW RESALE IMPACTS PRICES

Finally, the rise of today's mammoth online resale markets has profoundly affected concert pricing.  It has done so by undermining to a degree the longstanding practice of performers to substantially *underprice* tickets to their performances, especially the best seats to the hottest shows.  Artists underprice tickets for several reasons, but mostly out of regard for their fans.  There is a kind of social compact

between performers and their devoted fans to charge them fair prices, not whatever the market will bear. StubHub and the resale marketplaces that followed it changed that forever by presenting artists with 24/7 reminders of what the true market value for their tickets is — and that when they don't charge those prices scalpers will find ways to acquire tickets and resell them at full market value. That unquestionably affects what artists charge. They still don't charge what the market will bear, not even for the best seats, but most charge more for the best seats than they would in the absence of all that scalping.

The common thread to all these factors is that they have nothing to do with who the promoter is or who sells tickets to the show.

What Taylor Swift charges has nothing to do with whether she is promoted by Live Nation (which she is not) or Louis Messina of AEG (which she is).  What Beyoncé charges has nothing to do with whether Ticketmaster or SeatGeek serves the venues she chooses to play.  Either way, the performer's business team will work with their chosen promoter and try to come up with the pricing strategy that strikes the right balance between the economic returns from the tour and doing right by their fans.  The first part of that will turn mainly on data-driven judgments about demand.  How did the performer's last tour sell, and at what prices?  What are comparable artists charging in similar venues in this tour cycle?  How strong is demand for concerts generally at this time?  Does the artist have recent hit songs — or a following

that shows up every tour cycle regardless of recent hits?  It may also be affected by venue considerations; for example, amphitheaters have lawn seating that traditionally commands low prices.  The point, again, is that nothing turns on who the promoter or ticketing company is.  Neither has the power to set prices, and the identity of the promoter or ticketing company is unrelated to the actual determinants of pricing.

Statements to the effect that Live Nation and Ticketmaster "keep ticket prices high" are just flat wrong.  Anyone with a basic understanding of the industry knows this.  Those who perpetuate this falsehood are cynical at best.  They do a disservice to consumers and to rational political discourse.

# READ MORE ABOUT

CORPORATE

**About**

Biz at LN

Empowered by LN

Leadership

**Careers**

Life at Live Nation

Work at Live Nation

**Resources**

News

Investors

Leadership

Contact

**Apps**

