1  **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
2  Kevin Y. Teruya (Bar No. 235916)
     kevinteruya@quinnemanuel.com
3  Adam B. Wolfson (Bar No. 262125)
     adamwolfson@quinnemanuel.com
4  William R. Sears (Bar No. 330888)
     willsears@quinnemanuel.com
5  Brantley I. Pepperman (Bar No. 322057)
     brantleypepperman@quinnemanuel.com
6  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017-2543
7  Telephone:   (213) 443-3000
   Facsimile:   (213) 443-3100
8  **KELLER POSTMAN LLC**
9  Warren D. Postman (Bar No. 33069)
     wdp@kellerpostman.com
10  Jessica B. Beringer (*pro hac vice*)
     Jessica.beringer@kellerpostman.com
11  Alexios J. Dravillas (*pro hac vice*)
     ajd@kellerpostman.com
12  1101 Connecticut Avenue, N.W, Suite 1100
   Washington, D.C. 20036
13  Telephone:  (202) 918-1123
14  *Interim Co-Lead Class Counsel*

15            **UNITED STATES DISTRICT COURT**
16            **CENTRAL DISTRICT OF CALIFORNIA**
17            **WESTERN DIVISION**

18 | SKOT HECKMAN, LUIS PONCE, | Case No. 2:22-cv-00047-GW-GJS |
19 | JEANENE POPP, and JACOB | The Honorable George H. Wu |
20 | ROBERTS, on behalf of themselves and all those similarly situated, | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS** |
21 | | **CERTIFICATION AND** |
22 | Plaintiffs, | **APPOINTMENT OF CO-LEAD CLASS COUNSEL** |
23 | vs. | Hearing Date:   December 4, 2025 |
24 | | Hearing Time:   8:30 a.m. |
25 | LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER LLC, | Courtroom:   9D, 9th Floor |
26 | | **REDACTED VERSION OF** |
27 | Defendants. | **DOCUMENT PROPOSED TO BE** |
28 | | **FILED UNDER SEAL** |

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE** that on December 4, 2025, at 8:30 a.m., before the Honorable George H. Wu, of the United States District Court of the Central District of California, Western Division, 350 W. 1st Street, Courtroom 9D, 9th Floor, Plaintiffs Luis Ponce, Jeanene Popp, and Jacob Roberts ("Plaintiffs"),[1] on behalf of themselves and all others similarly situated, hereby move the Court for an order granting their Motion for Class Certification and Appointment of Co-Lead Class Counsel pursuant to Federal Rule of Civil Procedure 23.

Plaintiffs seek entry of an order: (1) certifying a proposed Rule 23(b)(3) class (the "Class"); (2) appointing Plaintiffs Mr. Ponce, Ms. Popp, and Mr. Roberts as representatives of the Class; and (3) appointing Quinn Emanuel Urquhart & Sullivan, LLP and Keller Postman LLC as Co-Lead Class Counsel.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all filed supportive declarations and exhibits, the records, pleadings and other documents on file in this action, and any argument that may be presented to the Court.

---

[1]  Plaintiff Skot Heckman has voluntarily withdrawn as a named representative in this action. He remains within the proposed class definition.

# **TABLE OF CONTENTS**

**Page**

I.  PRELIMINARY STATEMENT.................................................................1

II. BACKGROUND..................................................................................2

    A.  Common Evidence Shows Defendants Dominate Multiple Markets..........................................................................................2

        1.  Primary Ticketing Services for Major Concert Venues in the United States.......................................................3

        2.  Concert Promotion Services for Major Concert Venues in the United States.......................................................4

    B.  Common Evidence Confirms Defendants Maintain Their Dominance through Anticompetitive Conduct........................................5

        1.  Defendants' Long-Term Exclusive Deals ..................................5

        2.  Defendants Tied Primary Ticketing Services to Concert Promotion Services..........................................................6

III. LEGAL STANDARDS.........................................................................8

IV. ARGUMENT....................................................................................9

    A.  The Class Satisfies Rule 23(a)'s Requirements.......................................9

        1.  The Class Is Sufficiently Numerous............................................9

        2.  Plaintiffs Present Many Common Questions of Law and Fact...........................................................................9

        3.  The Named Plaintiffs' Claims Are Typical of the Class............10

        4.  The Named Plaintiffs Will Adequately Represent the Class .....10

    B.  The Class Satisfies Rule 23(b)(3)'s Requirements.................................11

        1.  Common Questions Predominate Under Rule 23(b)(3)............11

            (a)  Common Questions Predominate As To Market Definition and Power.........................................................12

            (b)  Common Questions Predominate As To Defendants' Anticompetitive Conduct..............................12

            (c)  Common Questions Predominate As To Antitrust Impact........................................................................14

            (d)  Common Questions Predominate As To Damages..........17

2.      Class Treatment Is the Superior Means for Resolving This Case .......................................................................... 19

C.      The Court Should Reaffirm Its Interim Class Counsel Appointment ...................................................................... 21

V.      CONCLUSION ................................................................................ 21

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF COUNSEL

1

## TABLE OF AUTHORITIES

2

**Page**

3

### Cases

4

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
   276 F.R.D. 364 (C.D. Cal. 2011)......................................................17, 19

5

6

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ..........................................................................12

7

8

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ........................................................................9, 11

9

*Baghdasarian v. Amazon.com, Inc.*,
   258 F.R.D. 383 (C.D. Cal. 2009).............................................................9

10

11

*Bateman v. Am. Multi-Cinema, Inc.*,
   623 F.3d 708 (9th Cir. 2010) ................................................................19

12

13

*Baten v. Michigan Logistics, Inc.*,
   2021 WL 4962103 (C.D. Cal. Oct. 25, 2021) ......................................11, 19

14

15

*Castro v. Sanofi Pasteur Inc.*,
   134 F. Supp. 3d 820 (D.N.J. 2015).........................................................12

16

17

*In re da Vinci Surgical Robot Antitrust Litigation*,
   2025 WL 964879 (N.D. Cal. March 31, 2025) .......................................13, 16

18

19

*In re Disposable Contact Lens Antitrust Litig.*,
   329 F.R.D. 336 (M.D. Fla. 2018) ...........................................................18

20

21

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
   2020 WL 1180550 (D. Kan. Mar. 10, 2020)..............................................13

22

23

*Giuliano v. Sandisk Corp.*,
   2015 WL 10890654 (N.D. Cal. May 14, 2015) ..........................................12

24

25

*In re Glumetza Antitrust Litig.*,
   336 F.R.D. 468 (N.D. Cal. 2020) .......................................................12, 17

26

27

*Hawaii v. Standard Oil Co. of Cal.*,
   405 U.S. 251 (1972) ............................................................................8

28

*In re High-Tech Emp. Antitrust Litig.*,
     985 F. Supp. 2d 1167 (N.D. Cal. 2013)................................................................10

*In re High-Tech Employee Antitrust Litigation*,
     289 F.R.D. 555 (N.D. Cal. 2013) ........................................................................14

*Iola Favell et al. v. Univ. of S. Cal., et al.*,
     2025 WL 1774715 (C.D. Cal. May 13, 2025)........................................................9

*Just Film, Inc. v. Buono*,
     847 F.3d 1108 (9th Cir. 2017) ..............................................................................10

*Le v. Zuffa, LLC*,
     2023 WL 5085064 (D. Nev. Aug. 9, 2023)............................................................14

*Lytle v. Nutramax Lab'ys, Inc.*,
     114 F.4th 1011 (9th Cir. 2024)....................................................9, 11, 17, 18, 19

*Mora v. Harley-Davidson Credit Corp.*,
     2012 WL 1189769 (E.D. Cal. Apr. 9, 2012)........................................................10

*Noohi v. Johnson & Johnson Consumer Inc.*,
     --- F.4th ---, 2025 WL 2089582 (9th Cir. July 25, 2025)........................9, 17, 19

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
     31 F.4th 651 (9th Cir.) (2022) .............................................8, 9, 11, 12, 14, 17

*Ruiz Torres v. Mercer Canyons Inc.*,
     835 F.3d 1125 (9th Cir. 2016) ..............................................................................11

*Sali v. Corona Reg'l Med. Ctr.*,
     909 F.3d 996 (9th Cir. 2018) ..................................................................................9

*Sherman v. CLP Res., Inc.*,
     2020 WL 2790098 (C.D. Cal. Jan. 30, 2020)........................................................9

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
     264 F.R.D. 603 (N.D. Cal. 2009) ........................................................................13

*Staton v. Boeing Co.*,
     327 F.3d 938 (9th Cir. 2003) ................................................................................11

*In re Tableware Antitrust Litig.*,
     241 F.R.D. 644 (N.D. Cal. 2007) ........................................................................14

*Tait v. BSH Home Appliances Corp.*,
   289 F.R.D. 466 (C.D. Cal. 2012)........................................................................11

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 291 (N.D. Cal. 2010), *abrogated on other grounds by In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012)................................18

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
   209 F.R.D. 159 (C.D. Cal. 2002)......................................................................10

*Traylor v. Avnet, Inc.*,
   257 F.R.D. 521 (D. Ariz. 2009).........................................................................18

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) .........................................................................................11

*Vaquero v. Ashley Furniture Indus., Inc.*,
   824 F.3d 1150 (9th Cir. 2016) ..........................................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ...........................................................................................9

*In re Wellbutrin Sr Direct Purchaser Antitrust Litig.*,
   2008 WL 1946848 (E.D. Pa. May 2, 2008) ......................................................18

*In re Wellbutrin XL Antitrust Litig.*,
   282 F.R.D. 126 (E.D. Pa. 2011) .......................................................................12

*Wyler Summit P'ship v. Turner Broad. Sys., Inc.*,
   235 F.3d 1184 (9th Cir. 2000) ..........................................................................17

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
   2023 WL 3440399 (N.D. Cal. May 12, 2023) ....................................................9

*Zinser v. Accufix Rsch. Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ..........................................................................19

### **Rules**

Fed. R. Civ. P. 23(a)(2)......................................................................................9

Fed. R. Civ. P. 23(a)(3)....................................................................................10

Fed. R. Civ. P. 23(a)(4)....................................................................................10

Fed. R. Civ. P. 23(b)(3) ...................................................................9, 11, 19

Fed. R. Civ. P. 23(b)(3)(A) .......................................................................19

Fed. R. Civ. P. 23(b)(3)(B) .......................................................................19

Fed. R. Civ. P. 23(b)(3)(C) .......................................................................20

Fed. R. Civ. P. 23(b)(3)(D) .......................................................................20

## **Statutes**

15 U.S.C. §§ 1–2 ......................................................................................11

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    PRELIMINARY STATEMENT

This is a straightforward case for class certification. The evidence shows that Defendants Live Nation Entertainment, Inc. and its subsidiary Ticketmaster L.L.C. ("Defendants")—"the largest live entertainment company in the world," "the largest producer of live music concerts in the world," and "the world's biggest ticketing company"—have dominated the relevant markets for years through anticompetitive means: long-term exclusive dealing contracts, tying arrangements, and economic threats and coercion that have strangled competition. Through this conduct, Defendants built "an incredible moat around the castle." Ex. 1 at -964.

Common proof shows that Defendants' anticompetitive conduct harmed millions of consumers by inflating Ticketmaster's primary ticketing service fees to supracompetitive levels nationwide, which led to virtually every consumer paying an illegal overcharge to Defendants. This is quintessential common impact based on common evidence, with common questions predominating the proof for every affected consumer. In other words, this is the prototypical Rule 23(b)(3) case. Plaintiffs therefore seek to certify the following class:

> All purchasers in the United States who directly purchased a primary ticket and paid associated fees for primary ticketing services for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation Entertainment, Inc. at any point since 2010.[2]

The requirements of Rule 23 are satisfied here. Common questions predominate over individual inquiries and are capable of being resolved with common evidence. This evidence includes documents and testimony from Defendants and third parties, as

---

[2] Excluded from the Class are: "Defendants; the officers, directors or employees of Defendants; any entity in which any defendant has a controlling interest; any affiliate, legal representative, heir or assign of Defendants; federal, state or local governmental entities; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; and any juror assigned to this action." Dkt. 461.

well as economic analysis and opinions from MIT Professor of Economics Parag Pathak and industry analysis from insider Dean Budnick. The named Plaintiffs are typical of the class, they and their counsel are more than adequately pursuing the claims, and this case cannot be resolved through other means.

Plaintiffs assembled this record on an extremely compressed schedule, despite Defendants' systematic efforts to delay it at every turn. That the record so overwhelmingly demonstrates common issues predominate underscores the strength of Plaintiffs' case—and there is more evidence yet to come.

For these reasons, Plaintiffs respectfully request that the Court grant class certification and that the Court appoint Quinn Emanuel Urquhart & Sullivan, LLP and Keller Postman LLC as Co-Lead Class Counsel.

## II.    BACKGROUND

Before joining forces, Live Nation was the largest concert promoter in the country, and Ticketmaster was the dominant provider of primary ticketing services. Ex. 2, p. 2; Budnick ¶ 45. In 2008–2009, the two competed in ticketing, with Live Nation launching its own ticketing service. Budnick ¶ 43. In January 2010, they merged and eliminated that competition. Ex. 2, p.7. The result was a single firm with unmatched control over both concert promotion and ticketing—power it has since used to suppress competition.

### A.    Common Evidence Shows Defendants Dominate Multiple Markets

Market definition presents a pure question of common proof. Plaintiffs' evidence includes the opinions of Prof. Pathak, an MIT professor who is known for his work in market design and is a recipient of the John Bates Clark award—an award for economists, second only to the Nobel prize in prestige. As Prof. Pathak shows, there are two relevant markets: (1) primary ticketing services for major concert venues, and (2) concert promotion services. Prof. Pathak's economic analysis of these markets relies entirely on industry-wide data, documents, and economic principles that apply uniformly across all Class members—no individual inquiry is required. Plaintiffs also

offer evidence from industry expert Dean Budnick, who has studied and published on the live music industry for decades, whose opinions all class members may rely upon.

### 1. Primary Ticketing Services for Major Concert Venues in the United States

In primary ticketing, venues contract with providers like Ticketmaster to sell tickets to fans. Pathak ¶ 21; Budnick ¶ 13. Primary ticketing service providers collect the ticket's face value and other fees from fans. Pathak ¶ 21; Budnick ¶¶ 14–16. They remit the face value to the promoter and the facility fee to the venue and earn revenue from other fees. Pathak ¶ 21, 40; Budnick ¶ 26.

Plaintiffs will establish the relevant market for primary ticketing services using common evidence. Prof. Pathak demonstrates that major concert venues constitute a distinct market because no relevant group of customers—artists, venues, or fans—can switch to alternatives when prices rise. Prof. Pathak confirms this by applying well-accepted analytical frameworks used to define antitrust markets. *See* Pathak ¶¶ 85–94. As to Defendants' power in this market, he analyzes both direct evidence, such as a firm's ability to sustain supra-competitive profits or degrade product quality, and indirect evidence, such as a firm's market share and barriers to entry. *See id*. ¶¶ 104–131.

Regarding direct evidence, ███████████████████████

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF COUNSEL

1    ██████████████████████████████████████████ SeatGeek's

2    corporate representative testified that in the past 15 years, Ticketmaster has become

3    "more a lagger in technology than [] a leader." Ex. 7 at 153:15–23.

4         As for indirect evidence, ██████████████████████████

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████████

8         Defendants' documents bolster this conclusion: ████████████

9    ████████████████████████████████████████████████████

10   ██████████████████████ Multiple independent analysts echoed this. Ex. 9 at -273

11   ("Live Nation is well insulated from competition due to a number of barriers to entry");

12   Ex. 10 at -180 ("[Live Nation's] scale provides it with excellent barriers to entry").

### 2. Concert Promotion Services for Major Concert Venues in the United States

Plaintiffs present similar common proof for the concert promotion market. Their experts explain how concert promotion services for major concert venues is a relevant market. Pathak ¶ 95–97; Budnick ¶ 10. Artists and their managers work with promoters like Live Nation to advertise and host shows. Ex. 11, p. 4. Promoters contract with venues to organize performances and earn revenue from ticket sales. Pathak ¶ 31; Budnick ¶ 10. Promoters serve both artists and venues—financing tours, guaranteeing artist payments, providing logistical and marketing support, and securing talent to drive venue ticket sales. Pathak ¶ 31; Budnick ¶¶ 10, 12. If promoter prices increase, most major venues could not switch to alternatives. Pathak ¶ 96. Major concert venues and artists depend on promoters. *Id.* ¶ 96–97; Budnick ¶ 10.

Using the same common analytical framework, Prof. Pathak concludes that Live Nation has significant market power in this market, ████████████████████████

██████████████████████████████████████████████████████

████████████████████████ Defendants' own statements confirm this. Live Nation

CEO Michael Rapino told investors in 2011 that "although we didn't brag about this during the DOJ years, we're larger than every other promoter in the world combined. So, we have incredible market power around the world." Ex. 1 at -956.

### B. Common Evidence Confirms Defendants Maintain Their Dominance through Anticompetitive Conduct

Common evidence shows that Defendants use exclusive contracts, coercive tying arrangements, and economic threats to block rivals and entrench their control over the relevant markets to the detriment of fans.

### 1. Defendants' Long-Term Exclusive Deals

Ticketmaster's market dominance is self-reinforcing. Its net renewal rates for exclusive deals exceed 100% year after year, reflecting competitors' rare and dwindling opportunities to compete. *See* Ex. 19 at -993 (Live Nation CEO: "for the seventh consecutive year, we'll have a net renewal rate of over 100%"). With only a small fraction of ticket volume ever up for renewal, and Ticketmaster winning nearly all of it, rivals cannot grow enough to pose a real threat. Pathak ¶¶ 149–60.

## 2. Defendants Tied Primary Ticketing Services to Concert Promotion Services

To backstop their exclusive dealing, Defendants have leveraged their dominance in concert promotion to coerce venues into exclusive ticketing deals with Ticketmaster. Major venues rely on concert promoters to rent their space and sell tickets. Pathak ¶ 96; Budnick ¶ 10. Defendants exploit this dependence by tying Ticketmaster's services to Live Nation-promoted concerts. *See* Ex. 20 at -188 (venue noting it should approach Defendants as a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Frequently, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮

These arrangements benefit Defendants—and harm competition—by allowing them to land exclusive ticketing deals through a bundle with content. As Live Nation's CEO explained, "you can bundle the business . . . you can talk about why it's a great idea to have ticketing – Ticketmaster – ticket your building and Live Nation be your content partner . . . That's how generally we'll win a business." Ex. 27 at -258. For

Case No. 2:22-cv-00047-GW-GJS

venues considering a competing primary ticketing provider, the message is clear: rejecting Ticketmaster means losing Live Nation shows. ███████████████

███████████████████████████████████████████████████████

### 3. Defendants' Economic Threats and Coercion

Relatedly, common evidence shows that Ticketmaster routinely threatened venues with the loss of Live Nation concerts if they chose a rival ticketing provider. This is a credible threat because venues depend on concerts promoted by Live Nation. Budnick ¶ 57; █████████████████████████████████████

████ ; Ex. 30 at -426 ("Ticketmaster typically has an upper hand in negotiating with venues, as it also controls access to the talent. If the firm declines to use Ticketmaster, then [Live Nation] can elect to take its talent to an alternative venue"). Venues must accept Ticketmaster as a ticketing provider or risk losing the shows they need to stay afloat. ████████████████████████████████████████████

████████████████████████████ Budnick ¶¶ 53–61. Live Nation's CEO acknowledged this coercive dynamic when discussing a hypothetical venue departure: "we can do what's right for our business . . . Maybe that venue won't be the best economic place anymore because we don't have all the revenue." Ex. 27 at -258.

Defendants regularly warned venues they would lose access to shows unless they used Ticketmaster. For example, █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████  ████████  ███████  █████  ███████████  ██  █████  ███████  █████

████████████████████████████████████████████████████████

Even when no explicit threat is issued, venues understand the consequences of leaving Ticketmaster. As the CEO of SeatGeek testified before the Senate Judiciary Committee: "Competition will continue to be suppressed even if [Live Nation] never makes another threat, because venues understand the consequences they risk should they switch ticketing providers." Ex. 30 at -427; Ex. 37 at -724 ("bundling lets Live Nation pressure venues without ever uttering a threat . . . It's just implied"). ████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████

Discovery is ongoing, and probative evidence continues to pour in. Just a week before this motion was filed, Plaintiffs obtained deposition testimony describing the impact of Defendants' coercive tactics: ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

## III. <u>LEGAL STANDARDS</u>

The Supreme Court has long recognized that class actions play a vital role in private enforcement of the antitrust laws. *See Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972). To certify a class, Plaintiffs must satisfy, by a preponderance of the evidence, Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663–64 (9th Cir.) (2022) (en banc). Plaintiffs must also meet one of Rule 23(b)'s

standards—here, Rule 23(b)(3), which requires that common questions predominate and that a class action is superior to other methods. *Id*. at 665; Fed. R. Civ. P. 23(b)(3).

Merits questions may be considered only insofar as they bear on Rule 23's requirements. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Class certification is "merely to decide a suitable method of adjudicating the case." *Noohi v. Johnson & Johnson Consumer Inc*., --- F.4th ---, 2025 WL 2089582, at *4 (9th Cir. July 25, 2025). It should not be a mini-trial on the merits. *Id*. Thus, "the possibility that a plaintiff will be unable to prove his allegations" is not a basis for denying certification. *Sali v. Corona Reg'l Med. Ctr*., 909 F.3d 996, 1004–05 (9th Cir. 2018); *Lytle v. Nutramax Lab'ys, Inc*., 114 F.4th 1011, 1025 (9th Cir. 2024) ("Requiring that class action plaintiffs actually prove classwide injury at this stage would improperly conflate the class certification inquiry with the merits."). "Any doubts . . . about class certification should be resolved in favor of certification." *Baghdasarian v. Amazon.com, Inc*., 258 F.R.D. 383, 386 (C.D. Cal. 2009).

## IV.    ARGUMENT

### A.    The Class Satisfies Rule 23(a)'s Requirements

#### 1.    The Class Is Sufficiently Numerous

The Class includes millions of Class members. Pathak ¶ 10 & Table 9. That satisfies Rule 23(a)(1). *Sherman v. CLP Res., Inc*., 2020 WL 2790098, at *4 (C.D. Cal. Jan. 30, 2020) (Wu, J.) (numerosity met "when a class includes at least 40 members").

#### 2.    Plaintiffs Present Many Common Questions of Law and Fact

Commonality requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A common question is one that is that can "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). "[E]ven a single common question will do." *Iola Favell et al. v. Univ. of S. Cal., et al.*, 2025 WL 1774715, at *3 (C.D. Cal. May 13, 2025) (Wu, J.) (quotation marks omitted).

"The commonality requirement is often met in antitrust cases[.]" *In re Xyrem*

*(Sodium Oxybate) Antitrust Litig.*, 2023 WL 3440399, at *4 (N.D. Cal. May 12, 2023). This case is no different. Plaintiffs' claims raise many common issues, including market definition, monopoly and market power, and Defendants' anticompetitive conduct and its effects. Any one of these suffices. *See In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (commonality met, as "[a]ntitrust liability alone constitutes a common question").

### 3.    The Named Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) requires that the named Plaintiffs' claims be "typical" of the Class's. Fed. R. Civ. P. 23(a)(3). Though claims "need not be substantially identical" to satisfy this requirement. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (citations omitted). Typicality is established where, as here, "plaintiffs and all class members alleg[e] the same antitrust violations by defendants." *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002) (citations omitted). Plaintiffs are direct purchasers that used Defendants' primary ticketing services and paid fees to Defendants, just like the rest of the Class. *See* Ponce ¶¶ 2-4; Popp ¶¶ 2-4; Roberts ¶¶ 2-6. They and the rest of the proposed Class bring the same antitrust claims, against the same Defendants, based on the same conduct and legal theories, resulting in the same type of injury.[3]

### 4.    The Named Plaintiffs Will Adequately Represent the Class

Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This turns on whether the named Plaintiffs have any conflicts with the Class and whether they will prosecute the

---

[3]  To the extent Defendants argue that some Class members may be subject to different arbitration provisions, that is no bar to certification. "The possibility that [defendant] may seek to enforce agreements to arbitrate with some of the putative Class members does not defeat class certification. . . . [It] does not predominate over the many common issues necessary to determine [defendant's] liability to the Class." *Mora v. Harley-Davidson Credit Corp.*, 2012 WL 1189769, at *13 (E.D. Cal. Apr. 9, 2012), *report and recommendation adopted*, 2012 WL 3245518 (E.D. Cal. Aug. 7, 2012).

1   case vigorously. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

2       Each named Plaintiff meets that standard. They have no conflicts with the Class.

3   Ponce ¶ 5; Popp ¶ 5; Roberts ¶ 7. They retained experienced counsel and have litigated

4   this case for years, successfully opposing Defendants' motions to compel arbitration

5   and to dismiss. *See Baten v. Michigan Logistics, Inc*., 2021 WL 4962103, at *5 (C.D.

6   Cal. Oct. 25, 2021) (Wu, J.) (finding adequacy satisfied where "Plaintiff and his

7   counsel clearly have committed resources to this litigation, having already successfully

8   litigated multiple motions and an appeal to the Ninth Circuit").

9   **B.    The Class Satisfies Rule 23(b)(3)'s Requirements**

10      **1.    Common Questions Predominate Under Rule 23(b)(3)**

11      To certify a damages class under Rule 23(b)(3), Plaintiffs must show that

12  "questions of law or fact common to class members predominate over any questions

13  affecting only individual members." Fed. R. Civ. P. 23(b)(3). This "predominance

14  inquiry… 'asks whether the common, aggregation-enabling, issues in the case are more

15  prevalent or important than the non-common, aggregation-defeating, individual

16  issues.'" *Lytle*, 114 F.4th at 1023 (citation omitted). Common questions involve

17  evidence that applies class-wide, while individual questions require evidence that

18  varies by class member. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

19  Predominance is not about counting issues, and certification is appropriate even if some

20  matters must be tried individually. *See Ruiz Torres v. Mercer Canyons Inc*., 835 F.3d

21  1125, 1134 (9th Cir. 2016); *Tyson*, 577 U.S. at 453. Courts evaluate expert evidence

22  "in light of the criteria for class certification and the current state of the evidence,"

23  recognizing that class certification should not become a mini-trial on the merits. *Tait

24  v. BSH Home Appliances Corp*., 289 F.R.D. 466, 495 (C.D. Cal. 2012); *see also Amgen*,

25  568 U.S. at 466.

26      The inquiry begins with the elements of Plaintiffs' claims. *Olean*, 31 F.4th at

27  665. Plaintiffs bring claims for monopolization (Count I), attempted monopolization

28  (Count II), and unreasonable restraints of trade (Count III) under Sections 2 and 1 of

1  the Sherman Act, respectively. Dkt. 1 ¶¶ 143–207. Each requires proof of (1) a

2  violation, (2) resulting antitrust injury, and (3) damages. *Olean*, 31 F.4th a 665–66. As

3  the Supreme Court has observed, "[p]redominance is a test readily met in certain cases

4  alleging . . . violations of the antitrust laws[,]." *Amchem Prods., Inc. v. Windsor*, 521

5  U.S. 591, 625 (1997). This case is no exception.

6          (a)    Common Questions Predominate As To Market Definition
7                 and Power

8          To establish the markets for concert promotion and for primary ticketing services

9  for major concert venues, Plaintiffs will rely on expert analysis from Prof. Pathak as

10  well as documentary evidence. *See* Pathak ¶¶ 85–102. None of this differs by Class

11  member. *See Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 846 (D.N.J. 2015)

12  (predominance met, as "[d]efining the relevant market focuses on common data, expert

13  analysis, and economic tests; such proof generally does not vary by class member.").

14          Defendants' power in these markets can also be proved by common evidence.

15  Prof. Pathak measures this power by assessing market shares (approximately ███ in

16  concert promotion, ███ in primary ticketing), substantial barriers to entry, increased

17  prices, decreased quality, and excluded competitors. *Supra* Section II.A. All Class

18  members may rely on these analyses. *See In re Wellbutrin XL Antitrust Litig.*, 282

19  F.R.D. 126, 140 (E.D. Pa. 2011) (predominance met, as "monopoly power" was an

20  issue for which all class members would "us[e] the same documents, witnesses, and

21  other evidence"); *Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *17 (N.D. Cal.

22  May 14, 2015) (same).

23          (b)    Common Questions Predominate As To Defendants'
24                 Anticompetitive Conduct

25          Trial will focus on Defendants' anticompetitive conduct, which readily lends

26  itself to common evidence because it "turns on *defendants'* conduct . . . *not* on

27  individual class members." *See In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475

28  (N.D. Cal. 2020) (emphases in original). "Common liability issues such as conspiracy

or monopolization have, almost invariably, been held to predominate over individual issues." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) (citation omitted). That is true for Defendants' conduct here too.

**Exclusive dealing.** To establish Defendants' anticompetitive exclusive-dealing agreements and their effects, Plaintiffs will rely on class-wide evidence, including the agreements themselves and documents and testimony from Defendants and other market participants. *See, e.g.*, Ex. 39 at 18 (Defendants' interrogatory response admitting that "the majority of Ticketmaster's primary ticketing contracts include some form of 'exclusivity' provision."). That proof is the same for every Class member. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig*., 2020 WL 1180550, at *52 (D. Kan. Mar. 10, 2020) (predominance satisfied for "exclusive dealing claim"); *In re da Vinci Surgical Robot Antitrust Litigation*, 2025 WL 964879, at *7–8 (N.D. Cal. March 31, 2025) (same).

**Tying.** Defendants have also engaged in unlawful tying, a well-established antitrust violation that occurs when a firm uses its dominance in one market to compel purchases in another. As described above, Defendants dominate both concert promotion and primary ticketing services for major concert venues. *See* Section II.B.2. They leveraged that dominance by conditioning access to Live Nation-promoted concerts (the tying product) on venues' agreement to use Ticketmaster as their exclusive primary ticketing services provider (the tied product). *Id*. Plaintiffs will prove these tying arrangements through common evidence, including internal emails, contracts, and testimony from Defendants, competitors, and other market participants. Section II.B.2 describes illustrative examples. None of this evidence varies by Class member. *See, e.g.*, *da Vinci*, 2025 WL 964879, at *7 (common questions predominated regarding tying claim).

**Defendants' threats and coercion**. Defendants have cemented their market dominance by routinely threatening venues with the loss of Live Nation content if they considered a competing ticketing provider. *Supra* Section II.B.3. These threats worked

because venues depend on Live Nation content, as shown above. *Id.*; Ex. 26 79:12–13; Ex. 27 at -258. Plaintiffs will rely on common evidence like this to prove Defendants reinforced their exclusive ticketing deals through a pattern of coercion and threats. Class members would use this same evidence to prosecute their claims individually, confirming that common issues predominate. *See In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 651–52 (N.D. Cal. 2007) (defendants' boycott conduct satisfied predominance requirement); *Le v. Zuffa, LLC*, 2023 WL 5085064, at *23–25 (D. Nev. Aug. 9, 2023) (similar, as to defendants "coercive tactics" and "threats").

(c)    Common Questions Predominate As To Antitrust Impact

"Antitrust impact"—commonly referred to as "antitrust injury"—is the "fact of damage" resulting from violations of the antitrust laws. *In re High-Tech Employee Antitrust Litigation*, 289 F.R.D. 555, 565 (N.D. Cal. 2013) (citation omitted). The question before the Court is whether each member of the Class can rely on common proof to show antitrust impact of any amount. *Olean*, 31 F.4th at 679. The answer is yes, based on Prof. Pathak's analyses and the record.

The Class consists of direct purchasers who bought a primary ticket from Defendants and paid associated primary ticketing fees for an event at a major concert venue. Dkt. 461. All Class members thus paid Ticketmaster's fees in the actual world. Prof. Pathak explains that in a but-for world with greater competition, Defendants would have lowered their prices—*i.e.*, the fees charged to Class members. Pathak ¶¶ 138-39, 178. Because that competitive world was foreclosed by Defendants' anticompetitive conduct, all Class members were overcharged by the difference between supracompetitive fees actually paid and the fees Class members would have paid in a competitive market. This is a classic overcharge theory that courts routinely certify. *See* 6 Newberg and Rubenstein on Class Actions § 20:28 (6th ed.) (overcharge cases "often rely on facts common across the class[.]").

Defendants' own materials provide ample evidence of common impact. As just one example, ███████████████████████████████████████████████████████

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF COUNSEL

1  ████████████████████████████ That control stems in part from the

2  "incredible moat" of barriers to entry Defendants built to entrench their monopoly. Ex.

3  1 at -964. Other common evidence shows that Defendants' coercive tying arrangements

4  affected a wide range of tickets. ████████████████████████████

5  ███████████████████████████████████████████████;

6  Ex. 27 at -258. ████████████████████████████

7  ████████████████████████████████████████████

8  ██████████████████. This evidence establishes that Defendants used their decade-plus

9  monopoly to raise prices, stifle competition and output, and degrade service quality by

10 squashing rivals and innovation—impacts that each class member felt.

11       Prof. Pathak builds on this rich evidentiary record. He surveys the relevant

12 economic literature and explains how it confirms that every class member was harmed.

13 Pathak ¶¶ 142–70. As he demonstrates: "The economic literature on exclusive dealing,

14 particularly when combined with tying, demonstrates that these practices operate

15 through systematic market-wide mechanisms that affect all consumers, rather than

16 through individualized negotiations or venue-specific arrangements. … This

17 competitive harm operates through market wide mechanisms and affects all or nearly

18 all Class members." *Id*. ¶ 142.

19       Prof. Pathak also conducts quantitative analyses confirming that all members of

20 the class were impacted by Defendants' anticompetitive conduct.

21       ***First***, he uses the 2008–2009 period, when Live Nation briefly competed with

22 Ticketmaster in primary ticketing, to develop a benchmark for competitive pricing.

23 Then, ████████████████████████████████

24 ████████████████████████████████████

25 ████████████████████████████████████

26 ████████████████████████████████████

27 ██████████████████. Prof. Pathak uses this benchmark, adjusted for

28 inflation, to model the fixed cost of ticketing services in a but-for world untainted by

Defendants' anticompetitive conduct. This approach is conservative because it likely *overstates* Defendants' fixed costs, meaning costs would be even *lower* in the but-for world. Pathak ¶ 180. Prof. Pathak then uses Defendants' actual-world cost data to estimate its variable costs in the but-for world. Prof. Pathak confirms the reliability of this benchmark by comparing it to another actual market outcome: ███████, during the only real period of competition, which provides another estimate of Defendants' costs, and is comparable to the estimate Prof. Pathak uses in his model. *Id.* ¶¶ 176, 177, 211.

Having utilized actual market conditions and actual-world data to construct a reliable benchmark, Prof. Pathak then compares that to actual-world fees to model fee reductions applicable to all Class members. His model preserves variation across venues and time periods without requiring individualized inquiry. *Id.* ¶ 183.

**Second**, Prof. Pathak documents a consistent increase in Ticketmaster's net service fees, from ███ of face value in 2015 to ███ in 2024, demonstrating market-wide overcharges across all major concert venues *Id.* ¶¶ 184–85 & Table 3. He found that Live Nation's ticketing profits rose in parallel, with margins increasing from ███ during the pre-merger years to ███ by 2024. *Id.* ¶¶ 45; 186.

**Third**, Prof. Pathak tests these conclusions by performing a regression analysis that shows ████████████████████████████████████████. This provides empirical evidence of Defendants' exclusive dealing's impact. ████████████████████████████████████████████████████████████

Prof. Pathak's rigorous and multi-faceted analyses easily—separately and collectively—show common impact across the Class. No individualized inquiry is needed. Courts often credit similar impact analyses—surveys of the relevant literature, benchmark or "before-and-after" studies, and regressions showing overcharges—in certifying antitrust classes. *See, e.g.*, *da Vinci*, 2025 WL 964879, at *11 (common use

of expert economist's opinion established predominance as to antitrust impact); *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 374 (C.D. Cal. 2011) (Wu, J.) (similar, based on expert's regression analysis). Any competing expert methodologies put forward by Defendants will likewise present class-wide issues for the jury. *Wyler Summit P'ship v. Turner Broad. Sys., Inc*., 235 F.3d 1184, 1192 (9th Cir. 2000) ("Weighing the credibility of conflicting expert witness testimony is the province of the jury"); *Olean*, 31 F.4th at 681 (plaintiff class does not "have to first establish that it will win the fray in order to gain certification") (quotation omitted).

(d)    Common Questions Predominate As To Damages

To satisfy predominance, a plaintiff need only offer "a model that estimates the damages attributable to the antitrust injury," even if damages are later allocated individually. *In re Glumetza Antitrust Litig*., 336 F.R.D. at 479 (cleaned up). Ninth Circuit precedent is clear that "damage calculations alone cannot defeat certification." *Vaquero v. Ashley Furniture Indus*., *Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016); *see also Lytle,* 114 F.4th at 1025 ("Nor is there a requirement that class action plaintiffs actually prove that classwide damages exist in order to obtain class certification.").

Recent precedent also confirms that a full *Daubert* analysis of a proposed damages methodology is "premature" at class certification; the relevant question is whether the model is likely to generate common answers. *Noohi*, 2025 WL 2089582, at *4; *see also Lytle,* 114 F.4th at 1024 ("[C]lass action plaintiffs may rely on an unexecuted damages model" so long as it is "able to reliably calculate damages in a manner common to the class at trial."). Prof. Pathak's analysis passes this standard with flying colors, offering a reliable and common methodology to calculate both class-wide and individual damages attributable to Defendants' anticompetitive conduct.

A standard method for calculating damages in antitrust cases is the "before-and-after" method, which compares prices during the period affected by anticompetitive conduct with those from a more competitive period to estimate overcharges. Here, the relevant conduct dates back to 2010, when Defendants, following their merger, began

their scheme of exclusive dealing, tying, and coercive threats.[4] *See* Section II.B.

To establish a benchmark for competitive pricing, Prof. Pathak relies on the ███████████████████████████████████████████ adjusted for inflation, to measure fixed costs. Pathak ¶¶ 209-215. Prof. Pathak then adds variable costs as reflected in Defendants' internal documents. *Id.* This methodology is reliable because it incorporates market-tested evidence of what prices look like in a more competitive world. Prof. Pathak's reliance on Defendants' own real-world variable cost data is likewise reasonable and reliable, and if anything understates damages by ignoring that Defendants would face further competition in the but-for world. *Id.*

Using this benchmark, Prof. Pathak's before-and-after model estimates class-wide damages of ██████ easily satisfying predominance. *See, e.g.*, *In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 421 (M.D. Fla. 2018) (before-and-after damages model in antitrust class action sufficed to show predominance concerning damages); *In re Wellbutrin Sr Direct Purchaser Antitrust Litig.*, 2008 WL 1946848, at *8–9 (E.D. Pa. May 2, 2008) (same).

Prof. Pathak's model can also be used to calculate individual class members' damages. Pathak ¶¶ 216–222. He demonstrates how his model accounts for actual-world variation in ticket prices—*i.e.*, the fact that each class member did not pay identical amounts for the face value of a ticket or its associated fees. *Id.* ¶¶ 217–221. As Prof. Pathak explains, his methodology preserves that variation across venues and time periods without requiring venue or customer-specific inquiry. *Id.* ¶ 222. This

---

[4]    Plaintiffs may recover damages since 2010 because Defendants fraudulently concealed their conspiracy by, *inter alia*, maintaining they were complying with a DOJ consent decree when in fact they were violating it. *See infra* at Section II.B.3. In any event, the statute of limitations is at most a merits issue that turns on common evidence and thus poses no impediment to certification. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal. 2010), *abrogated on other grounds by In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012) ("common issues will predominate the fraudulent concealment question."); *Traylor v. Avnet, Inc.*, 257 F.R.D. 521, 527 (D. Ariz. 2009) (similar).

common, market-wide methodology supports his conclusion that all class members were harmed through the same pricing mechanism. *Id.* ¶ 222.

Courts have certified classes with far less rigorous, and less developed, models than this one, even at much later stages of a case. *See Noohi*, 2025 WL 2089582, at *4 (finding expert's survey methodology sufficient at class certification even though expert "had not yet finally worded the questions or executed the survey."); *Lytle*, 114 F.4th at 1029 ("[T]he vast majority of district courts in our circuit to consider the question have found that a damages expert need not fully execute his or her proposed conjoint analysis before it can be relied upon at class certification.").

### 2.    Class Treatment Is the Superior Means for Resolving This Case

"After predominance comes superiority." *Baten*, 2021 WL 4962103, at *7 (Wu, J.). The superiority requirement assesses whether a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In making this determination, courts consider "a non-exhaustive list of factors relevant to the superiority inquiry." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 713 (9th Cir. 2010). Each favors certifying the Class here.

*First*, courts consider "the class members' interests in individually controlling the prosecution or defense of separate actions[.]" Fed. R. Civ. P. 23(b)(3)(A). "Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001). That is the case here. *See* Pathak Table 9. This Court has previously found superiority in an antitrust case where, like this one, "the damages of individual direct purchasers are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress." *See In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 375 (C.D. Cal. 2011) (Wu, J.).

*Second,* courts consider "the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(B).

While some public enforcers are pursuing parallel antitrust claims against Defendants in the Southern District of New York (the "Public Enforcer Action")—including *parens patriae* damages claims for residents of certain states—those proceedings do not displace this action. As this Court has recognized, Plaintiffs filed their case well before the Public Enforcer Action, and seek damages on behalf of a nationwide class. In contrast, the State Attorneys General assert *parens patriae* claims only for residents of a limited number of states and territories. Thus, "regardless of the outcome of the Public Enforcer Action, there will inevitably be damages claims in this case for class members from at least 24 states and all U.S. territories." Dkt. 283 at 6. The Public Enforcer Action should have no material bearing on whether this case should proceed as a class action or instead as millions of individual suits.

*Third*, courts assess "the desirability or undesirability of concentrating the litigation of the claims in the particular forum[.]" Fed. R. Civ. P. 23(b)(3)(C). As this Court has recognized, "both Live Nation and Ticketmaster maintain their principal place of business in" this District, "Defendants' terms of use contain a forum selection clause requiring any lawsuit against Defendants by their customers to be brought" in this District, and much "of the documents and other stuff is here" in this District. Dkt. 283 at 7; Ex. 42 at 14. Therefore, centralizing the Class's claims and doing so in a collective action—before this Court, which has presided over this case for years—is the fairest, most efficient, and superior method for these proceedings.

*Finally*, courts gauge "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). Here, there are no unique difficulties. To the contrary, ***not*** certifying the Class and requiring each Class member to proceed individually would compound manageability difficulties for the parties and the Court by creating millions of duplicative lawsuits.

C.    **The Court Should Reaffirm Its Interim Class Counsel Appointment**

The Court previously appointed Quinn Emanuel and Keller Postman as Interim Co-Lead Class Counsel. Dkt. 276. Both firms have substantial experience litigating complex class actions and antitrust matters. Teruya ¶¶ 3-17; Postman ¶¶ 3-11. Since their appointment, and even before it, they have vigorously advanced the Class's interests, committing significant time and resources. Among other things, they defeated Defendants' motion to compel arbitration (before both this Court and the Ninth Circuit), overcame a motion to dismiss, and pushed discovery forward with both Defendants and non-parties. Teruya ¶¶ 18-22; Postman ¶¶ 12-16. Under Rule 23(g), the Court should make its interim appointment permanent and formally designate Quinn Emanuel and Keller Postman as Co-Lead Class Counsel.

**V.    CONCLUSION**

Plaintiffs respectfully request that the Court certify the proposed Class, appoint the named Plaintiffs as Class representatives, and appoint Quinn Emanuel and Keller Postman as Co-Lead Class Counsel.

Dated:  August 18, 2025

Respectfully submitted,

By      */s/ Kevin Y. Teruya*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kevin Y. Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
William R. Sears (Bar No. 330888)
  willsears@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
  brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

KELLER POSTMAN LLC
Warren D. Postman (Bar No. 33069)
  wdp@kellerpostman.com
Jessica B. Beringer (*pro hac vice*)
  Jessica.beringer@kellerpostman.com
Alexios J. Dravillas (*pro hac vice*)
  ajd@kellerpostman.com
1101 Connecticut Avenue, N.W., Ste. 1100
Washington, D.C. 20036
Telephone:  (202) 918-1123

*Interim Co-Lead Class Counsel*

**<u>SIGNATURE ATTESTATION</u>**

I am the ECF user whose identification and password are being used to file the foregoing document. Pursuant to Civil Local Rule 5-4.3.4(a)(2)(i), I, Kevin Y. Teruya, attest that I have obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.


Dated: August 18, 2025                          */s/  Kevin Y. Teruya*
                                        _____
                                                Kevin Y. Teruya

1

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated, certifies that this brief contains 6,987 words and complies with the word limit of L.R. 11-6.1.

Dated: August 18, 2025                           /s/ *Kevin Y. Teruya*

                                                                 Kevin Y. Teruya