1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LATHAM & WATKINS LLP
  Timothy L. O'Mara (Bar No. 212731)
    *tim.o'mara@lw.com*
  Andrew M. Gass (Bar No. 259694)
    *andrew.gass@lw.com*
  Alicia R. Jovais (Bar No. 296172)
    *alicia.jovais@lw.com*
  Samuel R. Jeffrey (Bar No. 347533)
    *sam.jeffrey@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  +1.415.391.0600
Facsimile:  +1.415.395.8095

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Live Nation Entertainment, Inc., and Ticketmaster LLC,<br><br>Defendants. | Case No. 2:22-cv-00047-GW-GJS<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CO-LEAD CLASS COUNSEL**<br><br>The Honorable George H. Wu<br><br>Hearing Date: December 4, 2025<br><br>Hearing Time: 8:30 am<br><br>Courtroom: 9D, 9th Floor |

REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................... 1

II.   SUMMARY OF RELEVANT ALLEGATIONS ........................................ 5

III.  LEGAL STANDARD ............................................................................... 7

IV.   ARGUMENT ........................................................................................... 8

    A.   Plaintiffs Fail To Prove That Individualized Issues Will Not Predominate ................................................................................ 8

        1.   Individualized Impact Issues Predominate ............................... 8

            a.   Dr. Pathak's Model Cannot Demonstrate Common Impact ..................................................................... 9

            b.   Dr. Pathak's Alternative Approaches Also Fail to Demonstrate Common Impact ......................... 19

        2.   Individualized Violation Issues Predominate ........................ 21

            a.   Market Definition ................................................. 21

            b.   Tying And Coercion .............................................. 23

            c.   Exclusive Dealing ................................................ 25

        3.   Individualized Damages Issues Predominate ......................... 26

    B.   Additional Individualized Issues Weigh Against Predominance, Typicality, And Adequacy ...................................... 32

        1.   Individualized Statute-Of-Limitations Issues And Defenses Weigh Against Certification .................................... 32

        2.   At Least 30% Of The Putative Class Remains Bound To Arbitrate, Precluding Certification ........................ 33

V.    CONCLUSION ...................................................................................... 34

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

## TABLE OF AUTHORITIES

### CASES

*2311 Racing LLC v. Nat'l Basketball Ass'n*,
2025 WL 1793959 (S.D.N.Y. June 30, 2025)......................................................9

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ..............................................................................25

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007) ................................................................16, 20

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ..................................................................................3, 4, 7

*Am. Soc. of Composers, Authors & Publishers v. Showtime/The Movie
Channel, Inc.*,
912 F.2d 563 (2d Cir. 1990) ..............................................................................10

*Avilez v. Pinkerton Gov't Servs., Inc.*,
596 F. App'x 579 (9th Cir. 2015)........................................................................33

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ......................................................................8, 26

*Berman v. Freedom Fin. Network, LLC*,
400 F. Supp. 3d 964 (N.D. Cal. 2019) ...............................................................34

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
152 F.3d 588 (7th Cir. 1998)......................................................................19, 20

*Boumaiz v. Charter Commc'ns LLC*,
2021 WL 2189481 (C.D. Cal. May 19, 2021)....................................................34

*Cash v. Arctic Circle, Inc.*,
85 F.R.D. 618 (E.D. Wash. 1979) ......................................................................23

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ................................................................................5, 8, 31

*Dominguez v. UAL Corp.*,
666 F.3d 1359 (D.C. Cir. 2012) ........................................................................27

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

*Eastman v. Quest Diagnostics Inc.*,
724 F. App'x 556 (9th Cir. 2018)..........................................................25

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
301 F. Supp. 2d 612 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005)....................................................................................31

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023)..........................................................21, 23

*F.T.C. v. Elders Grain, Inc.*,
868 F.2d 901 (7th Cir. 1989)..........................................................3, 10

*FTC v. Meta Platforms Inc.*,
2023 WL 8629125 (N.D. Cal. Dec. 13, 2023)....................................21

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020)..........................................................25

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
695 F.3d 330 (5th Cir. 2012)..........................................................22

*Hale v. Brinker Int'l, Inc.*,
765 F. Supp. 3d 904 (N.D. Cal. 2025)..............................................24

*Heckman v. Live Nation Ent., Inc.*,
120 F.4th 670 (9th Cir. 2024)..........................................................33

*Heerwagen v. Clear Channel Commc'ns*,
435 F.3d 219 (2d Cir. 2006), *overruled on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008)..........................................4, 22, 23

*IBM Peripheral EDP Devices Antitrust Litig.*,
481 F. Supp. 965 (N.D. Cal. 1979), *aff'd*, 698 F.2d 1377 (9th Cir. 1983)..........................................................................................10

*In re Google Play Store Antitrust Litig.*,
2022 WL 17252587 (N.D. Cal. Nov. 28, 2022)....................................9

*In re Google RTB Consumer Priv. Litig.*,
2024 WL 2242690 (N.D. Cal. Apr. 4, 2024)........................................24

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) ....................................................16, 18, 19

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008), *as amended* (Jan. 16, 2009).........................8

*In re Kia Hyundai Vehicle Theft Litig.*,
  2024 WL 2104571 (C.D. Cal. Apr. 22, 2024)...................................32

*In re Live Concert Antitrust Litig.*,
  247 F.R.D. 98 (C.D. Cal. 2007) ................................................9

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012).........................................9, 22

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014) ................................................14

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir.
  2019)...........................................................................18

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) ..............................................4, 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010) ................................................32

*It's My Party, Inc. v. Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016).................................................4, 22

*Lah v. Shell Oil Co.*,
  50 F.R.D. 198 (S.D. Ohio 1970) ................................................23

*Lucas v. Breg, Inc.*,
  212 F. Supp. 3d 950 (S.D. Cal. 2016) ...........................................32

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008), *abrogated on other grounds by*
  *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008)....................12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

*Mora v. Harley-Davidson Credit Corp.*,
   2012 WL 1189769 (E.D. Cal. Apr. 9, 2012), *report and recommendation adopted*, 2012 WL 3245518 (E.D. Cal. Aug. 7, 2012) ................................................................................... 34

*O'Connor v. Uber Techs., Inc.*,
   904 F.3d 1087 (9th Cir. 2018) ..................................................... 33

*Oberstein v. Live Nation Ent., Inc.*,
   2021 WL 4772885 (C.D. Cal. Sept. 20, 2021), *aff'd*, 60 F.4th 505 (9th Cir. 2023) ...................................................................... 33

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ............................................. 8, 9, 17

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
   100 F. App'x 296 (5th Cir. 2004) .............................................. 31

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
   2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005) ........................................................... 17, 25

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
   536 F. Supp. 2d 1191 (C.D. Cal. 2008) ....................................... 22

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ...................................................................... 8

*United States v. Google*,
   687 F. Supp. 3d 48 (D.D.C. 2023) ............................................. 25

*Vizcarra v. Unilever United States, Inc.*,
   2023 WL 2364736 (N.D. Cal. Feb. 24, 2023) ................................ 9

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .............................................................. passim

*Ward v. Apple Inc.*,
   2018 WL 934544 (N.D. Cal. Feb. 16, 2018) ................................. 9

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
   208 F.3d 288 (1st Cir. 2000) ...................................................... 32

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

*White v. Symetra Assigned Benefits Serv. Co.*,
    104 F.4th 1182 (9th Cir. 2024)........................................................................2, 8

*Windham v. Am. Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977) (en banc)..................................................................3

**STATUTES**

15 U.S.C. § 15b.............................................................................................................32

**TREATISES**

5 Moore's Federal Practice—Civil § 23.45 (2025).............................................5, 23

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 392 (2024)...................9

Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1781 (3d ed.)............................23

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

# I.    INTRODUCTION

Plaintiffs assume the very thing they are required to prove to certify a class: that the Court can adjudicate their antitrust claims without individualized inquiries into the ticketing dynamics for tens of thousands of live concerts held at 1,300+ diverse venues across the country, each of which negotiated a unique ticketing contract. O'Mara Decl. ("O'Mara") Ex. 1 ("Johnson") ¶¶30, 39. Plaintiffs are wrong. Across an industry-wide sea of variation, Plaintiffs cannot show that common questions will predominate, so their motion fails.

Plaintiffs do not dispute:

- Millions of putative class members bought tickets to different concerts at 1,300+ different venues over the 15+ year class period, ECF 471-1 ("Mot.") 9; Johnson ¶¶30, 39;

- Venues—*not Ticketmaster*—set the ticketing fees that class members paid, often on a show-by-show basis, ECF 471-33 ("Pathak") ¶37; Johnson ¶¶50-62;

- Ticketmaster's share of those venue-determined fees was set through individualized negotiation with each venue at different times, with Ticketmaster often getting a percentage of fees set *later* by the venue in its discretion, Johnson ¶¶41-54;

- The relevant venues range from powerful NFL stadiums with 80,000+ seats to a 750-person nightclub, and bring their own business priorities and leverage to bear when setting ticketing fees and negotiating Ticketmaster's share of those fees, *id.* ¶¶39, 45, 47; and

- Because Plaintiffs define their venue market by revenue, it is ever-changing—roughly 40% of "major concert venues" appeared in the market for just one or two years of the class period, *id.* ¶39.

No standardized set of terms applied to all venues in Plaintiffs' alleged market and no common policy determined the fees consumers paid. Rather, highly

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

differentiated negotiations resulted in hundreds of bespoke ticketing arrangements that reflect the individual dynamics of each negotiation and each venue's unique ticketing requirements—and often maximize venues' discretion. *E.g.*, *id.* ¶¶41-54.

Against this backdrop, Plaintiffs have done almost nothing to show how they can prove on a class-wide basis—in "one stroke"—that Defendants' conduct was both anticompetitive *and* harmed each class member. *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011).  Instead, they simply assert that Defendants' alleged conduct "inflat[ed] Ticketmaster's fees to supracompetitive levels nationwide, which led to virtually every consumer paying an illegal overcharge." Mot. 1.  But Plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23"—including that common issues will predominate over individualized inquiries.  *White v. Symetra Assigned Benefits Serv.*, 104 F.4th 1182, 1192 (9th Cir. 2024); Mot. 9.  They cannot.

The most glaring flaw is Plaintiffs' failure to establish a reliable, class-wide method for proving antitrust impact in the face of the venue-by-venue variation inherent in Ticketmaster's individualized negotiations.  A typical class-certification plaintiff would confront real-world variation head-on—devising an impact and damages regression that controls for key variables that influence price and costs (*e.g.*, concert type, venue size, service needs, geographic location), and then arguing that, having addressed such natural variation, whatever remains must be the "anticompetitive effect."  Plaintiffs skip past that, relying instead on an expert, Dr. Pathak, who opts for simple arithmetic.  Dr. Pathak (1) assumes, based on economic theory, that without the alleged conduct Ticketmaster would have priced its services for every venue exactly at cost, with zero profit; (2) estimates the cost of providing ticketing services by cherry-picking a *single* 2008 rate from a failed contract that did *not* accurately reflect the cost of ticketing; (3) adds an "average variable cost" that he holds fixed across all venues in all years, ignoring that variable costs fluctuate wildly by venue size and location, as well as the particular services

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

provided to each; (4) assumes Ticketmaster would have made the same multi-million dollar upfront payments to win each venue's business that it made in the real world, while receiving up to ███ *less* in return; and then (5) subtracts this cost "benchmark" from real-world prices to measure the supposed "impact" of Defendants' alleged violations.

If impact could be demonstrated this easily—by theorizing a "perfect[ly]" competitive world where price equals costs; setting an artificially low benchmark for those costs; and then doing basic subtraction—antitrust classes would always be certified. But Rule 23's bar is not so low. Rule 23 "in practice exclude[s] most claims," *Am. Express v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013), and there is no "'presumption' in favor of class action treatment for anti-trust suits," *Windham v. Am. Brands*, 565 F.2d 59, 64 n.6 (4th Cir. 1977) (en banc). Dr. Pathak's approach does not carry Plaintiffs' burden. It does not address the fact that venues, not Ticketmaster, set total ticketing fees, often on a show-by-show basis. It sheds no light on the venue-by-venue variation in how ticketing fees are split between the venue and Ticketmaster, or how any given venue would adjust its pricing behavior in response to a reduction in Ticketmaster's share. Nor could it—both because it is not the type of model that courts rely on to certify classes as wildly diverse as this one, and because it is based on a host of unsupported and counterfactual assumptions.

***First***, Dr. Pathak's assumption that, absent Defendants' alleged conduct, prices would fall to costs flouts the law's recognition that "[n]o market fits the economist's model of perfect competition." *F.T.C. v. Elders Grain*, 868 F.2d 901, 907 (7th Cir. 1989). ***Second***, his benchmark rests on a fixed-cost metric plucked from a single 2008 ticketing contract that an arbitrator ruled *vastly underestimated the costs of providing primary ticketing*—plus a simple average of variable costs from *less than half* of the years in the class period. Dr. Pathak's attempt to cast that rudimentary guesstimate as representative of what *all* ticketing services should have

cost for *all* US venues over a 15-year period in which ticketing technology changed dramatically does not meet Rule 23's "stringent" standards. *Am. Express*, 570 U.S. at 234. And because Dr. Pathak also assumes that Ticketmaster would still have paid venues ███████████ in upfront payments, his model actually predicts a world in which Ticketmaster would have *lost* money on over ███████████ sold. Johnson ¶148. ***Third***, Dr. Pathak ignores the way fees are actually set in the ticketing industry and assumes every venue would have passed all savings from Ticketmaster's reduced fee share on to fans, disregarding contrary empirical evidence. ***Fourth***, because Dr. Pathak assumes artificially low costs and fails to measure or control for *non-violation* variables, his method produces damages where, according to Plaintiffs' own theory, there should be none. Those false positives confirm that the model is not measuring impacts from Defendants' alleged violations, which "shred[s] the plaintiffs' case for certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013). Without a reliable way to demonstrate class-wide impact—and the knock-on failure to model damages reliably—Plaintiffs cannot satisfy Rule 23(b)'s predominance inquiry. *Id.* at 254 ("No damages model, no predominance, no class certification.").

But Plaintiffs' failure to demonstrate common impact is not the only fatal flaw. Individualized inquiries will predominate on violation, too.

The caselaw reflects consensus—bolstered by common sense—that "[c]oncertgoers will typically not travel out of their region to attend a concert in response to higher ticket prices in their area." *It's My Party v. Live Nation*, 811 F.3d 676, 682 (4th Cir. 2016). In other words, for fans, the relevant market is local/regional, not nationwide. That, without more, defeats predominance with respect to a national consumer class—the only class Plaintiffs seek to certify—because each class member would need to prove the elements of their claims as to their own local market. *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228-31 (2d Cir. 2006), *overruled on other grounds by Teamsters Local 445 Freight*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

*Div. Pension Fund v. Bombardier*, 546 F.3d 196, 201 (2d Cir. 2008).

Moreover, at the heart of Plaintiffs' claims are allegations that Defendants threatened and coerced individual venues into exclusive ticketing agreements, including by tying concert promotion to primary ticketing. Where—as here—plaintiffs' claims do not rest on a single, common agreement, tying and coercion are quintessentially individualized inquiries that cannot be addressed on a class-wide basis. *See* 5 Moore's Federal Practice—Civil § 23.45 (2025) (collecting authority). Any trial of these claims would depend almost entirely on individualized inquiries into the dynamics of each venue negotiation across various time periods and geographic regions. And, as part of that inquiry, Defendants would be entitled to prove, for example, that any given venue *preferred* Ticketmaster and *wanted* an exclusive contract (as many venues testified) along with any other non-coercive reasons they might have accepted one. Those inquiries would not rest on evidence common to the class, and the Court's findings for any particular venue/contract could not be applied across the other 1,300+ venues in the alleged market.

The above issues defeat predominance, but two other points bear mention. Plaintiffs' 15-year class period far exceeds the Sherman Act's four-year statute of limitations, and adjudicating their conclusory fraudulent concealment theory would require the Court to decide still more individualized issues. And much of the class—but not Plaintiffs—remains subject to binding arbitration agreements that bar participation in this (or any) class action.

The Court has a "duty to take a 'close look'" at whether Plaintiffs' allegations satisfy Rule 23's requirements. *Comcast v. Behrend*, 569 U.S. 27, 34 (2013). Here, that "rigorous analysis" requires denial. *Id.* at 33.

## II.    SUMMARY OF RELEVANT ALLEGATIONS

Plaintiffs' Sherman Act claims rest on three categories of alleged conduct directed toward venues. *First*, Plaintiffs allege that Defendants "locked up the vast majority of major concert venues through exclusive primary ticketing contracts."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

Mot. 5.  *Second*, Plaintiffs claim that Defendants "backstop[ped] their exclusive dealing" by "tying" "primary ticket services to concert promotion services." *Id.*  6. *Finally*, Plaintiffs reframe their tying theory as "economic threats and coercion," alleging that Defendants "threatened venues with the loss of Live Nation concerts if they chose a rival ticketing provider." *Id.*  7.

Plaintiffs allege a market for "primary ticketing services for major concert venues in the United States."  *Id*. 3-4.  Plaintiffs define "major concert venues"— not an industry term—as the "top 500 US concert venues by ticket sales" each year, Pathak ¶118, meaning that the venues in the alleged market fluctuate wildly from year to year.  Indeed, only about 25% of the venues in this gerrymandered "market" are in it for even 10 years of the 15-year class period, and a remarkable ~40% of the venues are in it for just 1-2 years.  Pathak ¶118; Johnson ¶39.  Consequently, the class captures countless tickets sold under ticketing contracts entered while the venue was *not* in the market that Plaintiffs claim was subject to the anticompetitive conduct.

If this case was not a class action, Plaintiffs' claims would require each individual plaintiff to prove anticompetitive conduct *and* impact—the latter by answering the following:

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

At what venue did the plaintiff see a show?

What was the service fee on their ticket?

Under the operative ticketing agreement, how much of the service fee did Ticketmaster receive?

How much of *that* amount was the result of anticompetitive conduct impacting *that* venue?
- *I.e.*, accounting for any upfront payments made by Ticketmaster to the venue, did Ticketmaster retain "too much"?

Consequently, for a class to be certified, Plaintiffs must prove that the underlying conduct can be proved and *each* of these questions can be answered for *every* class member on a class-wide basis—despite the fact that service fees are set by venues on a show-by-show basis and Ticketmaster's share of fees was determined through individual negotiations over 15+ years. *See infra* IV.A.1.a.(2).

## III.   LEGAL STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart*, 564 U.S. at 348. For that reason, Rule 23 "imposes stringent requirements." *Am. Express*, 570 U.S. at 234. "[C]ertification is proper only if" the Court "'is satisfied, after a rigorous analysis'"—which may "overlap with the merits"—that Plaintiffs have met Rule 23's stringent requirements. *Wal-Mart*, 564 U.S. at 350-51.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

## IV.    ARGUMENT

### A.    Plaintiffs Fail To Prove That Individualized Issues Will Not Predominate

For a Rule 23(b)(3) class, Plaintiffs must show that "common, aggregation-enabling" issues are "more prevalent or important than… non-common, aggregation-defeating, individual issues." *White*, 104 F.4th at 1192.    Rule 23's predominance requirement is "demanding." *Comcast*, 568 U.S. at 34.  The inquiry must consider both the evidence Plaintiffs would offer to prove their claims *and* the evidence Defendants could offer to substantiate individualized defenses—which Defendants are "entitled to litigate," *Wal-Mart*, 564 U.S. at 367; *see Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 458 (2016) (courts cannot give "defendants different rights in a class proceeding than they could have asserted in an individual action").

To prove their claims, Plaintiffs would need to establish: "(i) the existence of an antitrust violation; (ii) 'antitrust injury' or 'impact' flowing from that violation…; and (iii) measurable damages." *Olean Wholesale Grocery Coop. v. Bumble Bee Foods*, 31 F.4th 651, 666 (9th Cir. 2022).    Here, individual inquiries will predominate as to each element.  Defendants address impact first, as the flaws in Plaintiffs' impact model alone preclude certification.

### 1.    *Individualized Impact Issues Predominate*

For Plaintiffs to prevail, "every class member must prove at least some antitrust impact resulting from the alleged violation[s]." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008).  "[W]here fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance." *Bell Atl. v. AT&T*, 339 F.3d 294, 302 (5th Cir. 2003).

Plaintiffs present what they call a "classic overcharge theory" of antitrust injury in which they compare ticketing fees "in the actual world" to a "but-for world with greater competition."  Mot. 14.  Specifically, Plaintiffs' expert, Dr. Pathak,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

1  presents a "quantitative analys[i]s," *id.* 15, where he compares (1) net fees paid by
2  consumers in the real world, to (2) a hypothetical world of "perfect" competition
3  where price equals cost. And because actual prices exceed costs, Plaintiffs declare
4  class-wide impact.

5      Rule 23 "commands" "a hard look at the soundness of statistical models that
6  purport to show predominance." *Rail Freight*, 725 F.3d at 255. This requires "a
7  thorough review of Plaintiffs' theory and methodology," *Ward v. Apple*, 2018 WL
8  934544, at *3 (N.D. Cal. Feb. 16, 2018), to decide if it is "'capable of showing class-
9  wide antitrust impact' in light of 'factors that may undercut the model's
10  reliability'"—like "erroneous inputs," "unsupported assumptions," "or nonsensical
11  outputs such as false positives,'" *In re Google Play Store Antitrust Litig.*, 2022 WL
12  17252587, at *4 (N.D. Cal. Nov. 28, 2022) (quoting *Olean*, 31 F.4th at 666 n.9).[1]
13  All three flaws plague Dr. Pathak's approach.

14          a.    **Dr. Pathak's Model Cannot Demonstrate Common**
15                **Impact**

16      Dr. Pathak claims to establish class-wide impact primarily by comparing real-
17  world ticketing fees to a but-for world benchmark. Mot. 15. But the "major
18  difficulty" in using a benchmark "is finding a suitable one"—which must be "similar
19  to the [real world] in all respects but for the impact of the antitrust violation." Phillip
20  E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 392 (2024). Without a suitable
21
22  _____
23  [1]  Plaintiffs recently argued that Defendants would, "at best, raise a battle of the
     experts," which they claimed the Court "may not resolve" at this stage. ECF 486
24   at 1-2 (citing *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 111 (C.D. Cal.
     2007)). But that has not been the law since *Wal-Mart*. *See In re Live Concert*
25  *Antitrust Litig.*, 863 F. Supp. 2d 966, 970 (C.D. Cal. 2012) (explaining that the
     "legal standard" that had "precluded the Court from undertaking a meaningful
26  analysis of… the representations of the parties' respective experts" was "no longer
     in effect" after *Wal-Mart*). The question here is not whether Dr. Pathak's
27  testimony is admissible, but whether it passes the "rigorous assessment" the Court
     "*must* make" to certify a class. *Olean*, 31 F.4th at 666 (emphasis added); *see also*
28  *Vizcarra v. Unilever United States*, 2023 WL 2364736, at *7 (N.D. Cal. Feb. 24,
     2023) (court "may not conclude that the commonality requirement is met merely
     because" expert evidence "is admissible").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                         9

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

1   benchmark, the method fails. *See 2311 Racing v. Nat'l Basketball Ass'n*, 2025 WL

2   1793959, at *4 (S.D.N.Y. June 30, 2025). Here, Dr. Pathak admits that he does not

3   derive his benchmark from "another market with the same features… but without

4   the alleged anticompetitive conduct." Pathak ¶171. Instead, he attempts to create

5   one from a combination of economic theory (on price in a "perfect[ly]" competitive

6   market) and cherry-picked data points (on Ticketmaster's costs).

7        Dr. Pathak begins by asserting that "a competitive market has prices near

8   cost," Pathak ¶179, and therefore in a but-for, competitive world, Ticketmaster's

9   price to venues (*i.e.*, its "net service fees") would equal its costs.[2] But Dr. Pathak's

10  economics-textbook utopia does not translate to the real world. To the contrary, it

11  is well established that "[n]o market fits the economist's model of perfect

12  competition—implying an infinite number of sellers having identical costs, a

13  perfectly homogeneous product, and perfectly informed buyers." *Elders Grain*, 868

14  F.2d at 907; *see also Am. Soc. of Composers, Authors & Publishers v. Showtime/The*

15  *Movie Channel*, 912 F.2d 563, 577 (2d Cir. 1990) ("[T]he antitrust laws do not

16  compel such a pristine form of competition."). By setting these wholly indefensible

17  parameters for the but-for price, Dr. Pathak's benchmark fails from the start.

18       Having theorized that price should equal costs, Dr. Pathak next attempts to

19  work out what those costs should be. Critically, because Dr. Pathak presumes that

20  everything separating real-world price and but-for world costs is "damages," if his

21  cost benchmark is unreliable (*i.e.*, if he underestimates Ticketmaster's costs), then

22  his methodology will convert real-world costs into "damages." Dr. Pathak starts

23  with a single real-world datapoint: a failed 2008 ticketing contract between Live

24  Nation and CTS Eventim. *Id.* ¶180. He takes the per-ticket licensing fee from that

---

2   While Dr. Pathak suggests "price *approaches* costs" in his but-for world, O'Mara
    Ex. 2 at 169:1, his methodology actually sets price *equal* to his assessment of
    costs, which is the hallmark of "[t]heoretical 'perfect' competition." *In re IBM
    Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 989-90 (N.D. Cal.
    1979), *aff'd*, 698 F.2d 1377 (9th Cir. 1983).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

10

contract—■■■, adjusted for inflation—and asserts that it provides a realistic estimate of the fixed cost of ticketing services "in a market free from anticompetitive exclusive contracts." *Id.* ¶¶171-74, 180. That's demonstrably false. *See infra* IV.A.1.a.(1). To this, he adds a calculation of Ticketmaster's average per-ticket variable costs from 2017 to 2022 (without explaining why those years can stand in for the other nine, and despite estimating variable costs for some venues as high as ■■■ per ticket, O'Mara Ex. 3, "Variable Cost Summary"); and arrives at what he deems "a conservative estimate" of "what a competitive outcome would have been in a more competitive market." *Id.* ¶¶179-81. Thus, Dr. Pathak's approach requires the Court to accept two false premises at the outset: that price equals costs in a "competitive" world (*i.e.*, ticketing companies would earn no profit), and that Dr. Pathak's but-for costs are reasonable. Neither proves true.

Dr. Pathak then does some simple arithmetic, subtracting the purported annual average but-for cost from his assessment of real-world ticketing prices, and labels the percentage difference between the two a but-for "percentage reduction." *Id.* ¶182. Next, he asserts that the net service fees on every single ticket each year would have been lower by that same but-for "percentage reduction," multiplies that reduction by total net fees, and concludes that all "consumers paying a positive fee to Ticketmaster in the real world were harmed." *Id.* ¶182, 215.

This final step (applying the same "percentage reduction" to service fees for every ticket from every venue across the country) ignores the huge economic variations across different venues, in different locations, hosting distinct concerts—all of which can affect the prices paid by consumers. It is black-letter law that "[d]issimilarities within the proposed class… have the potential to impede the generation of common answers." *Wal-Mart*, 564 U.S. at 350. And yet Dr. Pathak does not study these dissimilarities at all, much less measure and control for them. Instead, he relies on aggregate "proof" that says nothing about any particular venue's pricing decisions—either generally or for the individual events class members

1   attended.  By simply plotting the same assumed, artificially low but-for per-ticket

2   cost against a multitude of distinct venue negotiations and decisions, his model does

3   not explain any (much less all) of the relevant variables that lawfully impact real-

4   world prices.  This violates the fundamental principle that plaintiffs cannot use Rule

5   23 to "conform the law to the proof" by easing the legal requirements that would

6   otherwise apply in an individual case, *McLaughlin v. Am. Tobacco*, 522 F.3d 215,

7   220 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem.*,

8   553 U.S. 639 (2008), or to convert countless messy, real-world individual claims

9   into a simple, abstract "Trial by Formula," *Wal-Mart*, 564 U.S. at 367.  The Court

10  can and should reject Plaintiffs' oversimplified approach for this reason alone, even

11  setting aside the many flawed inputs and counterfactual assumptions that Dr. Pathak

12  relies on.

13         The fundamental flaws of Dr. Pathak's benchmark are exemplified by three

14  points:

15                        *(1)    Dr. Pathak's Fixed Costs Are Artificially Low*

16         Even if Dr. Pathak's approach were valid, his attempt to construct a cost

17  benchmark is fatally flawed.  The first problem is that the 2008 Eventim contract he

18  relies on does not represent the "fixed cost of developing or purchasing" a platform

19  competitive with Ticketmaster's, as Dr. Pathak claims.  *Id.* ¶180.  Just the opposite:

20  That deal was a ███████████████ for Eventim, the intended builder of that

21  ticketing system.  Indeed, a neutral arbitrator found Eventim to have ███████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████."  O'Mara

25  Ex. 4 ¶¶3, 219, 330.

26         As the arbitrator held, ███████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████,'

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

1    ██████████████████ *Id.* ¶191.  Eventim was unable to do so, and ████████

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████

5    ████████████████ *Id.* ¶¶211, 216; *see also id.* ¶¶252-320 ████████

6    ██████████████████████████████████████ *id.* ¶343 ████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████

9        If the Eventim contract is proof of anything, then, it is that ████-a-ticket

10   was nowhere near the requisite ████████████████ to support a competitive

11   ticketing service in 2008.[3]

12       Further, even a less obviously flawed benchmark from 2008 could say nothing

13   about costs through 2025, which have changed over time, including as ticketers like

14   Ticketmaster developed more advanced—and more resource-intensive—features,

15   like ever-more-elaborate fraud-protection and bot-fighting capabilities.   O'Mara

16   Ex. 5 at 8 (since merger, Defendants "have invested over $1 billion in capital"

17   focusing on "bots" and "eliminat[ing] fraud"); Johnson ¶142.   Dr. Pathak does

18   nothing to address these changes; he simply adds a basic inflation adjustment.

19   Pathak ¶180.  And by comparing prices in the real world (where ticketing companies

20   must account for their actual costs when negotiating, and where Ticketmaster's

21   financial reporting ████████████████████████████████████████████

22

---

23   [3]  Dr. Pathak claims that the benchmark's reliability is confirmed by comparable
24   numbers in a contemporaneous ticketing contract between Live Nation and venue-
     manager SMG.   Pathak ¶¶176-81.   But this is circular—Live Nation was
25   contracting to provide SMG with the ticketing service it licensed from Eventim,
     so it is unsurprising that the SMG price tracked the Eventim contract.
26   Furthermore, ██████████████████████████████████████████████ .
     O'Mara Ex. 4 ¶259 ████████████████████████████████████████
27   ██████████████████████████████████████████████████████████
     ; *see also* Johnson ¶37 (contrary
28   to Dr. Pathak's but-for world, ████████████████████████████
     ████ .

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

n███, Johnson ¶139) to prices in a hypothetical world where costs are pegged to an artificially low fixed cost from years earlier, Plaintiffs *guarantee* that their model will yield an "overcharge." *See In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014) (rejecting expert analysis that "assume[d] the very proposition" it was "offer[ed]… to show").

(2)    *Dr. Pathak Ignores How Fan-Facing Fees Are Actually Set*

Two facts about ticket prices are critical to understanding why Plaintiffs' motion fails.  First, Ticketmaster does not set ticket prices paid by fans:  "[T]he band sets the [face value] ticket price.  The service fee level is set by the venue." Pathak ¶14 n.10.  To reiterate:  *The venue, not Ticketmaster, sets fan-facing fees, typically on a per-ticket, show-by-show basis*.[4]  Dr. Pathak admits this:  ███████████
████████████████████████████████████████ Pathak ¶¶36-39. Second, the split of the ticketing fees between a given venue and Ticketmaster is the result of complex, bilateral negotiations, and turns on many individualized factors, including ████████████████████████████████████████████
██████████████ *See* O'Mara Ex. 6 at 35-38.  In these negotiations, venues pursue their particular goals and use their individual leverage differently—*e.g.,*███
████████████████████████████████████████████████
██████████████████████ *Id.* at 35 ██████████████
████████████████████████████████████████████████
██████████ Johnson ¶¶45-47.

Dr. Pathak does not dispute any of this, but he ignores what it means for his impact model.  Specifically, if increased competition reduced Ticketmaster's fee, that benefit would flow first to the *venue*.  In turn, the *venue* would decide whether

---

[4]  Venues choose between multiple strategies to set fee ███████████████
███████████████████████████████████████ O'Mara
Ex. 6 at 36-38.

to pass any savings on to fans. But Plaintiffs have not shown—and cannot show—that all differently-situated venues would have responded to this theoretical reduction in Ticketmaster's fees in the same way. Instead, Dr. Pathak relies on what he calls an "introductory economics textbook" theory, O'Mara Ex. 2 at 212:24, which predicts that the "systematic nature of… competitive effect[s]" means "that all or nearly all Class members would benefit from competitive pressure through the same pricing mechanisms" because every venue would pass along all ticketing cost savings to fans, Pathak ¶183.[5] But Dr. Pathak admitted in deposition that, while he has "looked in textbooks," he has done *no empirical analysis of any kind* to assess whether this "elementary" theory holds true in the ticketing industry. O'Mara Ex. 2 at 207:12; 216:2-21 (Q: "[H]ave you done any empirical analysis to validate that the venues will pass on the savings from the primary ticketer to the consumer?" A: "[T]here was no need for me to do that empirical analysis given what the theoretical predictions are."). But if he had, he would have found abundant real-world evidence that confirms just the opposite: Venues in Plaintiffs' alleged market do *not* inevitably pass any savings along to fans. Consider the following case studies.



*Barclays Center*. ███████████████████████████ ███████████ Johnson ¶69. ████████████████████ ██████████████. *Id.* ████ ██████████████████████████████████ ███████████████████████████████████ █████████████████████ *Id.* ¶69-70. If Dr. Pathak were right that "competitive pressure would" "benefit" "all or nearly all Class members," ████████████ ████████████████████████████████████ Pathak ¶183. But instead, ██████████████████████████████. Johnson ¶70.

---

[5]  O'Mara Ex. 2 at 214:23-215:4 (Q: "Is it your testimony that a hundred percent of the reduction in fees always goes to fans?" A: "[E]ven where we have a monopolist [venue], they would pass on cost reductions to fans. That is my testimony.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

*ASM*.  ██████████████████████████████████  If

Plaintiffs are right that exclusive contracts stifled competition and drove up fan-

facing fees,████████████████████ should cause fans to pay less.  But when ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████  *Id.* ¶¶73-77, Appendix E.[6]

Unlike Dr. Pathak's model, these examples are not purely theoretical.  Nor are

they outliers.  *E.g.*, Johnson ¶¶66-68, 71-72 (additional examples).    They

demonstrate unequivocally that ████████████████████████████

████████████████████████████████████, which would result

in no antitrust impact for tickets purchased at those venues.  That, in turn, illustrates

why antitrust plaintiffs "may not meet [their] burden by simply" citing "economic

theory." *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 253 F.R.D. 478,

496 (N.D. Cal. 2008).  Because Dr. Pathak's model does not account for venues'

real-world role in setting fan-facing fees, it cannot predict impact on a class-wide

basis.  And "[w]ithout a viable methodology for establishing class-wide impact,

determining the price any [class member] would have paid in the but-for world—a

necessary step to show impact and injury—will likely require highly individualized

proof." *Allied Orthopedic Appliances v. Tyco Healthcare Grp.*, 247 F.R.D. 156, 173

(C.D. Cal. 2007).

---

[6]  Multiple venues also testified that without exclusive contracts, they would expect

████████████████████████████  O'Mara Ex. 7 at 73:4-75:2; *see also* O'Mara Ex. 8 at 62:21-63:5

(agreeing that ██████████████████████████████████████

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

                         **(3)**     *Dr. Pathak Does Not Control For Non-Violation Variables And Generates Impermissible False Positives*

Class certification cannot rest on expert evidence that "demonstrate[s] nonsensical results such as false positives, *i.e.*, injury to class members who could not logically have been injured by a defendant's conduct." *Olean*, 31 F.4th at 666 n.9. Yet that is exactly what Dr. Pathak's model does.

The most obvious example involves tickets sold during the class period for events at "major concert venues" under multi-year ticketing contracts negotiated *before* the alleged anticompetitive conduct began in 2010—*i.e.*, during what Plaintiffs describe as the "real period of competition." Mot. 16. Venues often seek multi-year ticketing deals to maximize their leverage for large upfront payments. *See Ticketmaster v. Tickets.Com*, 2003 WL 21397701, at *5 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005); Pathak ¶19 n.29. Ticketmaster enters such multi-year contracts every year, and has done so since before the class period began.   Johnson ¶80 (25 relevant multi-year contracts signed before 2010). Defendants continued to provide ticketing services to many "major concert venues" under these contracts after their 2010 merger, when Plaintiffs argue Defendants "*began* their [alleged] scheme."   Mot. 17-18 (emphasis added).   Indeed, Ticketmaster serviced approximately ███████████ concert tickets during the class period under just 25 of these legacy contracts with "major concert venues." Johnson ¶80 n.194.  Under Plaintiffs' theory, these contracts could not have been affected by the allegedly anticompetitive conduct that started *after* the merger and therefore would not show impact/damages in any reliable model.[7]  And yet they do.

---

[7]   In deposition, Dr. Pathak theorized that such contracts could have been affected by the exclusive contracting in the ticketing industry that pre-dated Defendants' merger (while conceding that he drew no conclusions about this because it "wasn't [his] assignment").  O'Mara Ex. 2 at 47:13-48:19.  But regardless, those contracts could not have been affected by the post-2010 tying and coercion allegations, and Dr. Pathak admitted that his model has no way to "identify the damages that are

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

1  Dr. Pathak's model yields ▆▆▆▆ in "damages" derived from contracts that pre-

2  date Defendants' merger and the challenged conduct.  Johnson ¶79 n.193; *see In re*

3  *Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 127 (D.D.C. 2017)

4  (denying certification where plaintiffs failed to demonstrate that "damages model

5  does not show false positives"), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019).  Dr. Pathak

6  does not exclude these purchases from his calculations.

7      These legacy contracts are not the only instance in which Dr. Pathak's

8  methodology produces "damages" where, according to Plaintiffs' theory, there can

9  be none.  Plaintiffs' case concerns exclusive ticketing contracts for concerts at major

10  US venues.  Yet, Dr. Pathak's oversimplified model would find damages on fees

11  paid at venues with *non-exclusive* contracts, fees paid at venues *outside* Plaintiffs'

12  alleged market (including the smallest clubs), and fees paid on *sporting* tickets.  To

13  be crystal clear, Dr. Pathak's model will find "damages" on the fees paid on *every*

14  *ticket sold by Ticketmaster* because his methodology applies the exact same

15  "reduction in service fees" across the board in any given year.  For example, in 2015,

16  Dr. Pathak's methodology predicts that for every single ticket that Ticketmaster sold

17  (regardless of exclusivity, concerts vs. sports, "major" vs. non-"major" venue, and

18  other variations in venue type, size, or location), ▆▆▆ of the net service fees were an

19  "overcharge."  *See* Pathak ¶215.  This one-size-fits-all, every-ticket-was-"damaged"

20  result is the direct consequence of a "model" grounded in aggregate numbers, where

21  any real-world price above an artificially low cost benchmark equals "damages."

22  But a model that *assumes* impact on every sale since 2010 cannot be used to *prove*

23  impact on every sale since 2010.  Instead, it "evade[s] the very burden" it must

24  "shoulder—*i.e.*, that there is a common methodology to measure impact across

25  individual products and specific direct purchasers."  *GPU*, 253 F.R.D. at 493.

26

27

28

---

specific only to the [alleged] tying and coercion."  *Id.* at 64:4-20; *see infra* IV.A.3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

b.    **Dr. Pathak's Alternative Approaches Also Fail to
Demonstrate Common Impact**

While the benchmark analysis is the core of Dr. Pathak's approach, he also purports to bolster that analysis by: (1) "examin[ing] economic literature regarding exclusive dealing and tying arrangements"; (2) "conduct[ing] an empirical analysis comparing the fees at concert events with fees at sporting events at the same venues" which are "*potentially* subject to greater competition" and less "exclusivity"; (3) examining whether Ticketmaster's average net service fees and aggregate profit margins have increased over time; and (4) "examin[ing] documents and deposition testimony." Pathak ¶141 (emphasis added). These alternative approaches are even more obviously deficient.

*First*, Dr. Pathak's tour of the "economic literature," *id.* ¶¶142-70—almost all of it decades old, and none of it specific to Defendants or this case—is plainly inadequate. Plaintiffs "may not meet their burden by simply" citing to "economic theory." *GPU*, 253 F.R.D. at 496; *see also* Johnson ¶¶114-20.

*Second*, Dr. Pathak's sports regression is completely undercut by his candid admission that it "*does not eliminate the possibility that venues are solving a different pricing problem for sports events*" which "contributes to or leads to lower sports fees than concert fees." Pathak ¶192 (emphasis added); O'Mara Ex. 2 at 149:21-24. The possibility that something other than the challenged conduct is responsible for the observed price differences is precisely what Dr. Pathak would need to eliminate to demonstrate impact. *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) ("Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm… do not provide a rational basis for a judgment.").[8]

---

[8]  The primary non-liability reason is obvious:  Many sports venues are *owned and operated by the team itself*, and therefore derive revenue from the face value, not

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Third*, Dr. Pathak claims that Ticketmaster's net service fees and aggregate profit margins have increased over time, and this is "consistent with exclusive contracts and tying having anticompetitive effects." Pathak ¶¶184-86. This simple "consistent with" observation is not evidence of antitrust impact, let alone market-wide impact, because Dr. Pathak provides zero analysis of the critical question—*i.e.*, *why fees and margins have allegedly gone up*. Dr. Pathak does not purport to study—let alone control for—any lawful, competitive reason that fees and margins might have gone up over time (*e.g.*, changes in demand, changes in services provided). Johnson ¶¶84-95. That alone makes his observation meaningless. Moreover, Dr. Pathak uses aggregates and averages to obscure the fact that whether Ticketmaster's fees and margins went up or down over time varies dramatically by venue and for different time periods, making the exercise doubly incapable of offering insight into market-wide impact. *Id.*

And *fourth*, Dr. Pathak's presentation of a handful of cherry-picked documents, Pathak ¶¶56-78, 195-206, (supplemented by Plaintiffs' overlapping selection, Mot. 14-15) likewise cannot prove class-wide impact because he ignores contrary documents—and badly misinterprets the few he selects.[9] *See* Johnson ¶¶108-13 (demonstrating contrary evidence, including in the same documents Dr. Pathak cites); *Tyco*, 247 F.R.D. at 173 (denying certification where expert "cherry-pick[ed]" "predictions and conclusions most consistent with and helpful to Plaintiffs' theory of the case, ignoring equally reliable predictions and conclusions found in the very same internal documents").

None of these alternatives, together or separately, meets Plaintiffs' burden to demonstrate common impact.

---

just the fees. Johnson ¶¶96-107 (also highlighting other flaws).

[9] For example, Dr. Pathak misreads a text exchange as evidence of Ticketmaster's "coercion," where in fact the document shows ████████████████████████ ████████████████████████. *See* O'Mara Ex. █.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

## 2.    *Individualized Violation Issues Predominate*

Individualized issues also predominate on other key elements of Plaintiffs' claims, including market definition and Plaintiffs' conduct theories.

### a.    **Market Definition**

As a "threshold step," Plaintiffs' antitrust claims will require them to define "the relevant market in which the alleged restraint occurs." *Epic Games v. Apple*, 67 F.4th 946, 974 (9th Cir. 2023).   Here, Plaintiffs fail to define a ticket-related consumer market that could support certifying a national class.

"The relevant market for antitrust purposes is determined by (1) the relevant product market and (2) the relevant geographic market." *FTC v. Meta Platforms*, 2023 WL 8629125, at *8 (N.D. Cal. Dec. 13, 2023).   The geographic market is the "region where 'consumers can practically turn for alternative sources of the product.'" *Id.*   Plaintiffs purport to define a national market for primary ticketing services using a SSNIP analysis. Pathak ¶¶85-94, 98-101.  Under that methodology, "[a]n economist proposes a *narrow* geographic and product market definition and then iteratively *expands* that definition until a hypothetical monopolist in the proposed market would be able to profitably make a small but significant non-transitory increase in price ('SSNIP')." *Epic Games*, 67 F.4th at 975 (emphasis added).  "At each step, if consumers would respond to a SSNIP by making purchases outside the proposed market definition," "the proposed market definition is too narrow." *Id.*

Here, Dr. Pathak does the reverse, starting with a large market and simply assuming that it is no smaller.  He posits that "[g]eographic barriers and travel costs place limits on… customers' ability to switch between US and non-US markets" and claims that the SSNIP test confirms this—but he never examines, let alone explains, why those same considerations do not *also* discourage would-be concertgoers from traveling *within* the US.   Pathak ¶100.   In other words, Dr. Pathak "never meaningfully considered any *narrower* definition" of the geographic market, or

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

whether narrower geographic markets might raise individualized inquiries across the proposed class. *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 987 (C.D. Cal. 2012); *see* Pathak ¶¶98-101; O'Mara Ex. 2 at 96:3-9; 97:23-25 (even local "travel costs affect substitution" but "there's no explicit SSNIP on the sub-national potential market definition"; he "didn't feel the need to do that").

Dr. Pathak's conclusory analysis contradicts multiple courts' recognition that "[c]oncertgoers will typically not travel out of their region to attend a concert in response to higher ticket prices in their area." *It's My Party*, 811 F.3d at 682; *see also Heerwagen*, 435 F.3d at 228 ("[T]here is little cross-elasticity of demand for live… concert tickets between geographic areas."); *Ticketmaster v. RMG Techs.*, 536 F. Supp. 2d 1191, 1197 (C.D. Cal. 2008) (doubting that tickets in one city are substitutes for tickets in another city).[10]   Indeed, Dr. Pathak admitted in deposition that a fan's willingness to travel to a different city or region to attend a concert— *i.e.*, the cross-elasticity of demand—"depends" on "things specific to the fan and their interest in watching a given artist," including "who the artist is," "whether the artist is coming to your geographic area," "what the alternatives are," and "things specific to the venue, the artist, the geography"—none of which he tested or controlled for.  O'Mara Ex. 2 at 100:5-25; *see also* Johnson ¶¶121-25 (discussing evidence that demand for concerts is regional).

Courts regularly deny class certification where plaintiffs seek to certify a national class but the market is localized.  *See Heerwagen*, 435 F.3d at 228-31, 235; *Funeral Consumers All. v. Serv. Corp. Int'l*, 695 F.3d 330, 348-50 (5th Cir. 2012). This Court should do the same:  The existence of "[l]ocal markets for tickets sales"

---

[10] Although Plaintiffs purport to define a market for primary ticketing *services* and not primary *tickets*, "the ticketing service is simply the necessary intermediary that enables consumers to access what they actually want"—concerts.  Pathak ¶92. Or, as Dr. Pathak put it at deposition, "[f]ans are buying tickets."  O'Mara Ex. 2 at 99:23; *see also* Pathak ¶92 ("Demand for ticketing services is derived demand because it stems from consumers' underlying desire to attend a specific live concert event rather than from any inherent value in the ticketing service itself.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS
22

means that "particular proof—specific to individual members of the putative class who reside in different geographic markets—would predominate," and no national class can be certified. *Heerwagen*, 435 F.3d at 228-29 (denying class certification for a consumer class brought against predecessor company to Live Nation).

### b. Tying And Coercion

Coercion is a required element of Plaintiffs' tying and coercion theories, which assert that venues who want Live Nation-promoted events must agree to use Ticketmaster, and venues who use other ticketers are "punished" with the loss of Live Nation-promoted events. Compl. ¶¶159, 165, 186, 198-9; Mot. 6-8; *see Epic*, 67 F.4th at 995 ("[A]bsent any coercion, there would be no tie.").

But whether Defendants coerced venues into using Ticketmaster "is not one question"—it is a "separate question[] of fact" for *each* venue, which precludes class treatment. *Lah v. Shell Oil*, 50 F.R.D. 198 (S.D. Ohio 1970). That is because "[i]n the absence of an express [tying] agreement," which is not present here, "questions of the existence of the tie and of coercion would require individualized fact-finding, and common questions of fact and law could not be said to predominate." *Cash v. Arctic Circle*, 85 F.R.D. 618, 620 (E.D. Wash. 1979); *see also* 5 Moore's Federal Practice—Civil § 23.45 (2025) (similar); Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1781 n.31 (3d ed.) (collecting cases reflecting majority rule). The ticketing agreements Plaintiffs challenge are not uniform—they are bespoke contracts resulting from individualized negotiations and they vary considerably, both between venues and across the putative class period. Johnson ¶¶41-62, 85; *see, e.g.*, O'Mara Ex. 10 at 60 ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ It is beyond dispute that there is no express requirement in Live Nation's promotion contracts requiring venues to use Ticketmaster. Nor can Plaintiffs demonstrate some unwritten but universal policy, given that more than 6,000 Live Nation-promoted shows at "major concert venues"

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

during the class period have been serviced by ticketers other than Ticketmaster.
Johnson ¶120 n.286 (also noting Live Nation-promoted shows took place at 82% of
"major concert venues" not exclusively ticketed by Ticketmaster in 2024).  This
makes sense, because it is the artist's team—not the promoter—that ultimately
"decides where they want to play."  O'Mara Ex. 12 at 41:24-42:7; O'Mara Ex. 13 at
51:6-51:12.

Even if, contrary to the evidence, Plaintiffs could establish some
"presumption" of coercion, that would only "beg[]" the "important question" of
whether Defendants' "rebuttal case [would] generate questions that are susceptible
to different answers depending on the class member."  *Hale v. Brinker Int'l*, 765 F.
Supp. 3d 904, 907 (N.D. Cal. 2025).  Here, Defendants would be entitled to introduce
individualized evidence that (i) a particular venue *chose* Ticketmaster—not because
it was coerced, but because Ticketmaster provides superior service—and (ii) Live
Nation does not threaten to or actually withhold content from any venue that uses
other ticketers.  Such evidence is not hypothetical; it is abundant.[11]  And it raises the
kind of individualized inquiries that defeat class certification.  *E.g.*, *Hale*, 765 F.
Supp. 3d at 915-18 (denying certification where defendant could offer individualized
evidence refuting coercion); *see In re Google RTB Consumer Priv. Litig.*, 2024 WL

---

[11] *E.g.*, O'Mara Ex. 14 at 197:2-19, 260:17-261:13 ██████████████ O'Mara
Ex. 15 at 317:16-318:3 ████████████ O'Mara Ex. 16 at 47 ████████████
█████████████ O'Mara Ex. 17 at 29-30 ████
████████ O'Mara Ex. 7 at 114 ████████████
████████████ 'Mara Ex. 18
at 66:24-67:4 (████████████████████████████████████████████
████████████████████████ *id.* at
39:15-18 █████████████████████ O'Mara Ex. 19 at 59:15-18
(████████████████████████████████ O'Mara Ex. 20 at 65:20-21
(████

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

2242690, at \*11-14 (N.D. Cal. Apr. 4, 2024) (not certifying some claims because of consent-based defenses).

### c.    Exclusive Dealing

"Because there are well-recognized economic benefits to exclusive dealing arrangements… an exclusive dealing arrangement is not per se illegal." *FTC v. Qualcomm*, 969 F.3d 974, 1003 (9th Cir. 2020).  Rather, for both their Section 1 and 2 claims, Plaintiffs must show that Defendants' alleged conduct *actually foreclosed* a "substantial share" of competition.  *Allied Orthopedic Appliances v. Tyco Health Care Grp.*, 592 F.3d 991, 996 & n.1 (9th Cir. 2010); *Eastman v. Quest Diagnostics*, 724 F. App'x 556, 558 (9th Cir. 2018).  Here, this inquiry will turn on the specific terms of *individual* venue contracts, like duration, terminability, and scope of exclusivity.  *E.g.*, *Tickets.Com*, 2003 WL 21397701, at \*5.  And even if Plaintiffs could make that showing, Defendants would then be entitled to show a procompetitive justification, including that exclusive contracts have "greater efficiency or enhanced consumer appeal." *Qualcomm*, 969 F.3d at 991; *see, e.g.*, *United States v. Google*, 687 F. Supp. 3d 48, 74-76 (D.D.C. 2023) (competition for contract and whether purchasers preferred exclusivity relevant to procompetitive justifications).  The individualized evidence and arguments would vary across venues, geography, and time, including whether each venue:

- "[P]refer[ed] long term exclusive contracts for their own reasons," *Tickets.com*, 2003 WL 21397701, at \*5; *e.g.*, Johnson ¶118 (citing evidence that venues want exclusivity);

- "[H]a[d] the economic power to resist long term contracts if it were in their interests to do so," *Tickets.com*, 2003 WL 21397701, at \*5; *e.g.*, Johnson ¶45 (collecting examples of venues exercising leverage during negotiations);

- Received bids from multiple ticketers, *Tickets.com*, 2003 WL 21397701, at \*4; *e.g.*, Johnson ¶¶45, 66-72 (discussing competition for particular contracts).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

Whatever answers those analyses generated for a particular ticket purchase would not resolve those same questions for *all* purchases from *other* venues in *different* geographic markets—let alone assess competitive conditions across the *15-year* class period.  Again, the potential for variation is not hypothetical.  As the ███████████████████████████████████████ testified, █████████ ███████████████████████████████████████████████████ O'Mara Ex. 21 at 96:25-97:6. ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████. O'Mara Ex. 6 at 25-26, 35-36. ██████████████████████████████████████████████ ██████████████████████████ *Id.*; *see also* Johnson ¶85 (upfront payments ████████████████████████ The competitive conditions for a venue contract struck in 2015 therefore say little about those struck in 2024, presenting inherently individualized inquiries which Plaintiffs offer no way to resolve on a class-wide basis.

### 3.    *Individualized Damages Issues Predominate*

"Class treatment… may not be suitable… where the formula by which the parties propose to calculate individual damages is clearly inadequate." *Bell Atl.*, 339 F.3d at 307.  Here, Plaintiffs have no realistic way to calculate damages for each class member.  To be sure, they have proposed a formula:



Pathak ¶217.  That formula is "clearly inadequate."

*First*, the "Percentage Reduction" is calculated using the same flawed,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

26

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

1   aggregate cost/price guesstimate as Plaintiffs' impact model. *Id.* ¶¶215-22. The

2   formula therefore "piles speculation atop speculation," *Dominguez v. UAL*, 666 F.3d

3   1359, 1364 (D.C. Cir. 2012), by assuming, *inter alia*, that:

4       1. Ticketmaster would charge only its costs and no more;

5       2. Ticketmaster's fixed costs would be pegged to the artificially low

6          Eventim licensing fee;

7       3. Ticketmaster's variable costs would be held constant at ▇▇▇▇ for

8          every venue—despite Dr. Pathak admitting that the "costs of

9          providing" different "contracts would differ," O'Mara Ex. 2

10         at 111:11-112:3, and demonstrating that costs vary widely

11         (reaching as high as ▇▇▇ per ticket, O'Mara Ex. 3, "Variable Cost

12         Summary"));

13      4. Every venue would pass on every cent of Ticketmaster's reduced but-

14         for fee to fans for every show; and

15      5. Ticketmaster would still make the same ▇▇▇▇▇▇▇▇ upfront

16         payments to venues despite receiving up to ▇▇▇ ess in ticketing fees.

17  None of these assumptions holds water. *See supra* Section IV.A.1; Johnson ¶¶36,

18  47-48, 65, 136, 138-44.

19      *Second*, even if these assumptions were true, Plaintiffs' damages formula does

20  not—and cannot—reliably calculate individual damages because it applies the same

21  "percentage reduction" to net service fees for every venue each year, "regardless of

22  venue, artist, or individual consumer characteristics." Pathak ¶222. By only

23  reporting damages in the aggregate, as Dr. Pathak does, Pathak ¶215, he masks the

24  obvious problems inherent in his approach. Indeed, applying this same percentage

25  reduction to *actual* transactions at *actual* venues produces nonsensical results.

26      Consider Dr. Pathak's damages calculation applied to the Kaseya Center in

27  2022, where Plaintiff Ponce attended a concert:

28      1. Dr. Pathak first calculates the "net services fees" retained by

Ticketmaster in the real world—for this venue, ███ per ticket.

2. He then determines that a ███ reduction in Ticketmaster's "net service fees" across all "major concert venues" is required to make Ticketmaster's fees equal to his "cost" benchmark (*i.e.*, his estimated fixed costs, variable costs, and total signing bonus/sponsorship payments in 2022).

3. Applying the ███ reduction to Ticketmaster's ███ real-world share at the Kaseya Center, Dr. Pathak's analysis indicates that Ticketmaster should have received just ███ per ticket, and the extra ███ earned in the real world are "damages."

But Dr. Pathak's simplified cost/price model also calculates the other side of the ledger—*i.e.*, what he assumes it would have *cost* Ticketmaster to earn this ███ per ticket. What does that show? For this same venue and year, Dr. Pathak assumes Ticketmaster's costs are equal to the Eventim fixed costs ███ per ticket), his assumed static variable cost ███ per ticket), *and* the venue-specific bonus/sponsorship payments (███ per ticket) that Dr. Pathak "assumes" would remain the "same," Pathak ¶212, for a total cost to Ticketmaster of ███ per ticket. Johnson ¶146.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

1    In other words, in Dr. Pathak's but-for world, Ticketmaster would have

2 receive ███████ n service fees at a cost of ██████—and therefore lost ██████ on Plaintiff

3 Ponce's ticket *and every other ticket sold at the Kaseya Center that year*:

**EXHIBIT 20**
**DR. PATHAK'S DAMAGES CALCULATION**
**KASEYA CENTER**



Notes: Following Dr. Pathak's damages calculation, fixed payments in 2022 are allocated across concert
tickets for the Kaseya Center (Pathak Declaration, footnote 319).

Source: Pathak turnover (financial data).

23 Johnson ¶146.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

29

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

The figure below illustrates the same calculation for Camping World Stadium where Plaintiff Roberts attended an event in 2015:



**EXHIBIT 21**
**DR. PATHAK'S DAMAGES CALCULATION**
**CAMPING WORLD STADIUM**
2015

Source: Pathak turnover (financial data).

Johnson ¶147.  Here, Dr. Pathak's but-for costs to Ticketmaster are ▮▮▮▮ er ticket, but his but-for "competitive" price is only ▮▮▮▮ per ticket—meaning Ticketmaster, once again, would suffer a loss on every ticket sold at that venue.

These are not aberrations.  But-for prices that are below even Dr. Pathak's artificially low estimate of Ticketmaster's costs are widespread in his analysis.  In each year, Dr. Pathak's but-for "net services fees" are below "costs" for between ▮▮ ▮▮ "major concert venues."  *Id.* ¶148.  Across the full period analyzed (2015 to 2024), Dr. Pathak's methodology purports to find but-for "net services fees" below

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

30

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

1  "cost" for over ██████████████████████████████. *Id.* A

2  formula that produces damages by assuming Ticketmaster would enter into ticketing

3  deals year after year that lose money on █████████████ of ticket sales is not a

4  reliable methodology for calculating damages.

5      As these examples demonstrate, the record flatly refutes Dr. Pathak's

6  assertion that individual damages calculations would "require[] no individual

7  analysis of Class members' circumstances, preferences, or venue-specific

8  factors." Pathak ¶222. In the real world, fan-facing fees vary wildly venue by venue

9  and concert by concert. Indeed, they differ even for *different shows at the same*

10  *venue*, and even for *different concerts in the same tour*. Johnson ¶¶50-62, 128-34,

11  Appendix D. Dr. Pathak admitted in deposition that "[t]he costs of providing…

12  contracts" can differ on a "venue to venue" basis, O'Mara Ex. 2 at 111:18-112:3, yet

13  that is not accounted for in his methodology. By failing to control for (i) the

14  multiple, real-world, non-liability variables that affect Ticketmaster's fixed costs,

15  variable costs, and fee shares; and (ii) each venue's price-setting behavior, Dr.

16  Pathak has "erroneously presume[d] that all [variations] are damages." *El Aguila*

17  *Food Prods. v. Gruma*, 301 F. Supp. 2d 612, 625-26 (S.D. Tex. 2003). Without "a

18  reliable formula" that can "measure antitrust damages for each of the many

19  thousands of members of the proposed class," the class cannot be certified. *Piggly*

20  *Wiggly Clarksville v. Interstate Brands*, 100 F. App'x 296, 300 (5th Cir. 2004).

21      *Finally*, even if Dr. Pathak's methodology were capable of measuring

22  damages, it does not disaggregate the effects of Plaintiffs' three conduct theories.

23  While none of these theories is suitable for class-wide adjudication, if the Court

24  rejects only a subset, Plaintiffs will have a new problem: Their overcharge

25  methodology makes no attempt to model the impact of each individual theory. "[A]

26  model purporting to serve as evidence of damages in this class action must measure

27  only those damages attributable to that theory." *Comcast*, 569 U.S. at 35. "If the

28  model does not even attempt to do that, it cannot possibly establish that damages are

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

31

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* Accordingly, should the Court reject *any* of Plaintiffs' theories on liability or impact grounds, it cannot certify the class as to the remainder because Plaintiffs have proposed no viable method of ascribing damages to each theory.

### B. Additional Individualized Issues Weigh Against Predominance, Typicality, And Adequacy

#### 1. Individualized Statute-Of-Limitations Issues And Defenses Weigh Against Certification

"[A] necessity for individualized statute-of-limitations determinations invariably weighs against class certification." *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000). The Sherman Act's statute of limitations is "four years after the cause of action accrued." 15 U.S.C. § 15b.

Plaintiffs insist that they can nonetheless "recover damages since 2010 because Defendants fraudulently concealed their conspiracy" and "the statute of limitations is at most a merits issue that turns on common evidence." Mot. 18 n.4. But this is not accurate where, as here, the question is not whether Defendants successfully concealed *one* anticompetitive act from all class members (*e.g.*, a price-fixing conspiracy, as in Plaintiffs' authority, *see In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010)), but rather whether and how Defendants concealed *numerous, distinct* alleged acts affecting each of their individual ticketing contracts. *See Lucas v. Breg*, 212 F. Supp. 3d 950, 971-72 (S.D. Cal. 2016) (denying class certification where generalized proof could not be used to determine whether class members were on inquiry notice for fraudulent concealment tolling). Here, the necessity of "deciding the claim-specific affirmative [statute of limitations] defenses as to" millions of class members "weighs strongly against predominance." *In re Kia Hyundai Vehicle Theft Litig.*, 2024 WL 2104571 (C.D. Cal. Apr. 22, 2024) (denying certification).

## 2. *At Least 30% Of The Putative Class Remains Bound To Arbitrate, Precluding Certification*

Finally, certification is improper where, as here, the putative class includes members who "agree[d] to arbitrate their claims and to waive their right to participate in a class action." *O'Connor v. Uber Techs.*, 904 F.3d 1087, 1094 (9th Cir. 2018).

Plaintiffs seek to certify a class of all ticket purchasers "since 2010." Mot. 1. But between June 14, 2011 and July 2, 2021, Ticketmaster's Terms of Use—to which every ticket purchaser must agree—included an arbitration agreement and class action waiver consistently held to be enforceable. ECF 31 ¶¶7-27; *Oberstein v. Live Nation Ent.*, 2021 WL 4772885, at *3-9 (C.D. Cal. Sept. 20, 2021), *aff'd*, 60 F.4th 505 (9th Cir. 2023). The named Plaintiffs are in court because they agreed to a *different* arbitration provision (the "New Era Terms"), which this Court held was unenforceable. ECF 30-1 at 3; ECF 202; *Heckman v. Live Nation Ent.*, 120 F.4th 670 (9th Cir. 2024). That decision does not affect the continued enforceability of previous versions of Defendants' arbitration provision. ECF 202 at 1 (distinguishing *Oberstein*). And for *at least 30%*—████████████—of the accounts used to buy tickets since 2014, there is no evidence that the purchaser *ever* agreed to the New Era Terms. *See* Ritter Decl. at 1. That means those putative class members remain subject to an enforceable arbitration agreement and cannot pursue their claims here.[12]

The inclusion of ████████ of ineligible class members also makes Plaintiffs atypical and inadequate class representatives. When a class "include[s] individuals who signed class action waivers," a named plaintiff not subject to such an agreement "is not an adequate representative," "and her claim lacks typicality." *Avilez v. Pinkerton Gov't Servs.*, 596 F. App'x 579, 579 (9th Cir. 2015). In such

---

[12] Defendants reserve the right to move to compel arbitration as to any class members subject to enforceable arbitration agreements.

1  cases, the putative class "should not be certified." *Berman v. Freedom Fin. Network*,

2  400 F. Supp. 3d 964, 987 (N.D. Cal. 2019).[13]

3  **V.    CONCLUSION**

4      The Court should deny Plaintiffs' Motion.

5

6  Dated:  October 20, 2025                   Respectfully Submitted,

7                                             LATHAM & WATKINS LLP

8                                    By:  */s/ Timothy L. O'Mara*

9                                         Timothy L. O'Mara

10                                        505 Montgomery Street, Suite 2000
                                          San Francisco, California  94111-6538
11                                        Telephone:  +1.415.391.0600
                                          tim.o'mara@lw.com

12                                        *Attorneys for Defendants*
                                          *Live Nation Entertainment, Inc. and*
13                                        *Ticketmaster L.L.C.*

14

15

16

17

18

19

20

21

22

23  _____

24  [13] Plaintiffs defensively cite (Mot. 10 n.3) *Mora v. Harley-Davidson Credit Corp.*,
    2012 WL 1189769 (E.D. Cal. Apr. 9, 2012).  But *Mora* predates *Avilez*,
25  *O'Connor*, and the ensuing recognition that "Ninth Circuit precedent forecloses…
    the proposition that a named plaintiff who has not signed an arbitration agreement
26  can represent a class that includes persons who have signed arbitration
    agreements." *Boumaiz v. Charter Commc'ns*, 2021 WL 2189481, at *6 (C.D. Cal.
27  May 19, 2021).  Additionally, *Mora* relied on the defendant's failure to "present[]
    any evidence" of "valid, enforceable arbitration agreements with any putative
28  Class members."  2012 WL 1189769, at *13.  Here, under *Oberstein* and as
    demonstrated in the Ritter Declaration, over 30% of purchasers since 2014 remain
    subject to an indisputably binding arbitration agreement.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

34

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS

1

## CERTIFICATE OF COMPLIANCE

2

3        The   undersigned,   counsel   of   record   for   Defendants   Live   Nation

4  Entertainment, Inc. and Ticketmaster L.L.C., certifies that this brief contains 9,969

5  words, which complies with the Court's order of October 14, 2024.  ECF 487.

6

7  Dated: October 20, 2025                                  */s/ Timothy L. O'Mara*

8                                                            Timothy L. O'Mara

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

35

DEFS.' OPP. TO MOT. FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL
CASE NO. 2:22-cv-00047-GW-GJS