# EXHIBIT 1

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

HIGHLY CONFIDENTIAL

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

|  |  |
|---|---|
| SKOT HECKMAN, ET AL.,<br><br>Plaintiffs,<br><br>      v.<br><br>LIVE NATION ENTERTAINMENT, INC. AND TICKETMASTER LLC,<br><br>Defendants. | CASE NO. 2:22-CV-00047-GW-GJS |

## EXPERT REPORT OF DR. JOHN H. JOHNSON, IV

HIGHLY CONFIDENTIAL

# TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ................................................................................1

II.   QUALIFICATIONS ....................................................................................5

III.  PLAINTIFFS' ALLEGATIONS AND MY ASSIGNMENT ......................................6

IV.  DR. PATHAK'S METHODOLOGY CANNOT CONDUCT THE RELEVANT INQUIRY TO ASSESS ANTITRUST INJURY TO THE PROPOSED CLASS ......................................7

V.   DR. PATHAK'S METHODOLOGY IS BASED ON A SIMPLISTIC THEORY THAT DOES NOT ACCOUNT FOR THE VENUE-SPECIFIC COMPETITIVE DYNAMICS THAT DETERMINE THE FEES CONSUMERS PAY ..............................................................15
   A. Summary of Dr. Pathak's Proposed But-For World ................................... 15
   B. Dr. Pathak's Methodology Cannot Reliably Model the But-For World Because It Assumes Away Individualized Relationships Between Ticketmaster and Each Venue ............ 18
   C. Dr. Pathak's Analysis Ignores that Service Fees are Set Based on Individual Decisions Made by Venues and Their Bilateral Negotiations with Ticketmaster ....................... 29

VI.  DR. PATHAK'S METHODOLOGY IS PREDICATED ON THE EMPIRICALLY REJECTED ASSUMPTION THAT LOWER "PRICES" PAID BY INDIVIDUAL *VENUES* WOULD RESULT IN UNIFORMLY LOWER FEES FOR *CONSUMERS* ....................................40
   A. Case Study: Credit Union 1 Arena ........................................................ 43
   B. Case Study: Barclays Center .............................................................. 45
   C. Case Study: Pacific Amphitheatre (Orange County Fair) ........................... 47
   D. Case Study: ASM Global .................................................................. 49

VII. DR. PATHAK'S METHODOLOGY IS UNRELIABLE BECAUSE IT IS INCAPABLE OF ADDRESSING (OR EVEN IDENTIFYING) FEES PROPOSED CLASS MEMBERS PAID THAT COULD NOT HAVE BEEN AFFECTED BY THE ALLEGED CONDUCT .........................53

VIII. DR. PATHAK'S ASSESSMENT OF AVERAGE NET SERVICE FEES AND AVERAGE PROFIT MARGINS DOES NOT (AND CANNOT) DEMONSTRATE ANTITRUST IMPACT ON A CLASS-WIDE BASIS ....................................................................57
   A. Dr. Pathak's Analysis of Average "Net Service Fees" Does Not Show "Systematic" Increases in Service Feed Paid by Proposed Class Members and Cannot Show Antitrust Impact ....................................................................................... 57
   B. Dr. Pathak's Review of Live Nation's Aggregate Profit Margins is Not "Evidence of Competitive Impact" and Cannot Show Antitrust Impact, Much Less on a Class-Wide Basis ........................................................................................ 61

IX.  DR. PATHAK'S "SPORTS SERVICE FEE" REGRESSION IS UNRELIABLE AND DOES NOT SHOW ANTITRUST IMPACT, MUCH LESS ON A CLASS-WIDE BASIS .................................66
   A. Dr. Pathak's "Sports Service Fee" Regression is Conceptually Incapable of Demonstrating the Effects of the Alleged Conduct on a Class-Wide Basis............................... 67

**HIGHLY CONFIDENTIAL**

B. Statistical Testing of Dr. Pathak's "Sports Service Fee" Regression Contradicts His Conclusion of Class-Wide Impact................................................................... 71

X.    DR. PATHAK OFFERS A VARIETY OF OPINIONS BASED ON SELECTIVE READING OF DOCUMENTS AND ACADEMIC LITERATURE ....................................................73

A. Dr. Pathak's Selective Reading of "Documents and Testimony" is Not a Reliable Economic Methodology and Does Not Show Antitrust Impact................................ 73

B. Dr. Pathak's Discussion of "Economic Literature" Does Not (and Cannot) "Establish Common Impact"...................................................................................... 76

XI.   NAMED PLAINTIFFS' PURCHASES HIGHLIGHT THE VENUE-SPECIFIC COMPETITIVE DYNAMICS THAT DETERMINE FEES CONSUMERS PAY ....................................80

A. Tickets Purchased by Luis Ponce.................................................................... 82

B. Tickets Purchased by Jeanene Popp................................................................ 85

C. Tickets Purchased by Jacob Roberts ................................................................ 87

XII.  DR. PATHAK'S "DAMAGES" METHODOLOGY IS BASED ON FUNDAMENTALLY FLAWED ASSUMPTIONS AND IS UNRELIABLE................................................89

A. Dr. Pathak's "Cost" Benchmark is Divorced from the Services Ticketmaster Provided Venues and Cannot Reliably Estimate the But-For World ........................ 92

B. Dr. Pathak's Methodology Obscures Variation Across Venues and Generates an Unrealistic But-For World ............................................................................... 97

HIGHLY CONFIDENTIAL

## I.    EXECUTIVE SUMMARY

1.      I have been asked by counsel for the Defendants, Ticketmaster LLC ("Ticketmaster") and Live Nation Entertainment, Inc. ("Live Nation"), to provide an assessment of the analyses offered by Plaintiffs' expert Dr. Parag Pathak in support of Plaintiffs' motion for class certification.[1]  Based on my analysis, I have concluded that Dr. Pathak's opinions about the effects of the alleged conduct are based on an unreliable methodology that is detached from the realities of the primary ticketing services industry and does not appropriately account for the wide variation across relevant venues that purchased primary ticketing services, as well as their individual bilateral negotiations with Ticketmaster.  I have also concluded that Dr. Pathak's methodology does not show economic harm to all (or nearly all) consumers who purchased tickets for live entertainment that comprise the proposed class.  Lastly, I have concluded that Dr. Pathak's methodology cannot reliably estimate damages from the alleged conduct to members of the proposed class.

2.      Fundamentally, Dr. Pathak's analysis is based on a conflation of different "prices," as well as a misunderstanding of how (and by whom) those different "prices" are set.  Dr. Pathak recognizes that *venues* (not *consumers* that comprise the proposed class) purchase "primary ticketing services" from primary ticketers like Ticketmaster and others.  In contrast, proposed class members in this case purchase tickets to attend specific events, paying the face value of the ticket as well as any associated fees.  Primary ticketers do not unilaterally set the value of any of the components of the "all-in" price paid by proposed class members.  Rather, as Dr. Pathak acknowledges, ███████████████████████ ████████████████████████████████"[2] and negotiate with the primary ticketer on how these fees are to be split (among other terms).

3.      An assessment of what purported effect (if any) "greater competition between primary ticket service providers"[3] would have had on the service fee any proposed class member would have paid absent the alleged conduct (i.e., in the but-for world) requires an economic model capable of reliably conducting two separate inquiries.

- What competitive dynamics shaped the determination of Ticketmaster's "price" for primary ticketing services (i.e., the "share" of service fees it retained based on bilateral negotiations)

---

[1] Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Co-Lead Class Counsel, August 18, 2025 ("Class Certification Motion"); Expert Declaration of Parag Pathak, Ph.D. In Support of Plaintiffs' Motion for Class Certification, August 18, 2025 ("Pathak Declaration").

[2] Pathak Declaration, ¶¶37–38, emphasis added.

[3] Pathak Declaration, ¶139.

with respect to each venue in the *actual world* and how (if at all) would each bilateral negotiation have been different in the *but-for world*?

- What service fee (determined based on individual decisions made by venues and their bilateral negotiations with Ticketmaster) did any particular purchaser pay in the *actual world* when buying tickets to a particular event at a particular "major concert venue" and what service fees would that purchaser have paid in the *but-for world*?

Assessing antitrust impact to the proposed class would involve answering these questions for hundreds of venues that, over the 15-year proposed class period, hosted tens of thousands of concert events to which over 400 million tickets were sold.

4.     Dr. Pathak's methodology cannot be used to reliably conduct these types of inquiries. Rather than attempt to assess any of the factors that impact pricing decisions made by either Ticketmaster or the "major concert venues" at issue in the but-for world, Dr. Pathak simply asserts that Ticketmaster's "price" for primary ticketing services to all "major concert venues" would, on average, equal its "cost"—abstracting from how the ticketing industry works. Dr. Pathak then assumes that the "price" to all "major concert venues" would decrease by a uniform amount regardless of individual venues' negotiations with Ticketmaster—and that venues would *necessarily* reduce the service fees they charged to consumers by this *exact same* uniform decrease. That is, in Dr. Pathak's but-for world, every venue would choose to pass on to consumers the full amount of the purported "savings" from "greater competition" between primary ticketers.

5.     Dr. Pathak's methodology fails to account for the reality of how the services fees at issue are determined. As I discuss in **Section V**, these fees are *not* the result of some abstract "market-wide mechanism," as Dr. Pathak asserts.[4] Rather, they are the result of unilateral decisions made by the *hundreds* of relevant venues—which include NFL stadiums, arenas owned by NBA and NHL teams, large theaters, collegiate arenas, and amphitheaters—and their bilateral negotiations with Ticketmaster. Dr. Pathak's methodology does not account for the differences between venues. There is no reason to assume that, but-for the alleged conduct, Ticketmaster would simply price its "primary ticketing services" to *all* relevant venues based on Dr. Pathak's calculated "costs associated with ticketing"— rather than continue to determine the "price" of primary ticketing services through bilateral negotiations on the basis of a venue's size, bargaining position, and primary ticketing needs.

---

[4] Pathak Declaration, ¶183.

**HIGHLY CONFIDENTIAL**

6.       Not only did each venue's negotiation with Ticketmaster result in different "prices" for "ticketing services," but my empirical analysis also shows substantial variation in the service fees proposed class members paid across venues and over time.  Even for similar venues (i.e., venues of similar size that host similar types of events), service fees paid by ticket purchasers could (and did) vary.  In fact, service fees varied even for concerts that were part of the same artist's tour, because each venue made a distinct decision about what service fee to charge when it hosted that artist.  Dr. Pathak does not attempt to assess the different pricing decisions made by different "major concert venues," simply assuming that in the but-for world *all* of the venues at issue would reduce service fees by a uniform percentage in each year.  This assumes away the very inquiry relevant to determining how any alleged increase in the amount of "competition" between primary ticketers in the but-for world would have affected proposed class members.

7.       Dr. Pathak's methodology is also predicated on the empirically rejected assumption that "greater competition between primary ticket service providers" for *venues*' business would necessarily result in lower service fees for *consumers*.  As I discuss in **Section VI**, again abstracting from how the ticketing industry works, Dr. Pathak ignores evidence of venues *not* decreasing the service fees paid by consumers when Ticketmaster's "share" decreased.  This evidence shows that there is no uniform relationship between Ticketmaster's "share" and the service fees consumers pay.  That is, even where Ticketmaster's "share" of fees declined—as Dr. Pathak asserts it would under "greater competition"— there is not necessarily any reduction in what consumers pay.

8.       Because Dr. Pathak's methodology does not study the disparate negotiations between Ticketmaster and each "major concert venue," it cannot address the reality that some proposed class members paid service fees that were determined before the alleged conduct began.  As I discuss in **Section VII**, consumers that purchased tickets at venues with "legacy" contracts—i.e., contracts negotiated prior to the proposed class period—could not have been affected by the alleged conduct, even if their purchases themselves took place during the proposed class period.  However, Dr. Pathak's methodology cannot identify these cases, and simply a*ssumes* that *all* proposed class members (including these consumers) suffered antitrust impact.

9.       Ultimately, Dr. Pathak's failure to conduct a venue-by-venue assessment of strategic decisions with respect to service fees (or even propose a methodology capable of conducting such an assessment) renders his analysis incapable of determining antitrust impact and calculating damages.  He simply assumes *all* proposed class members suffered antitrust impact because, *on average*, Ticketmaster's "price" for primary ticketing services was higher than his calculation of Ticketmaster's average "cost."  That is, Dr. Pathak assumes *all* proposed class members who bought concert tickets at one of the "major

HIGHLY CONFIDENTIAL

concert venues" he identifies suffered antitrust impact without assessing *how* the "price" for primary ticketing services was determined for that venue or *how* (if at all) the service fees paid by consumers would change. This fundamental flaw undermines the reliability of Dr. Pathak's methodology.

10.    In addition to his flawed "cost" benchmark, Dr. Pathak presents a series of disparate analyses, none of which demonstrate antitrust impact on a class-wide basis. Dr. Pathak interprets a purported



as proof of common antitrust impact. As I discuss in **Section VIII**, the ███████████████████████ ███████████████████ that Dr. Pathak purports to find are not consistent across venues. For example, when I studied his "net service fees" on a venue-by-venue basis, ███████████████████████ ████████████████████████████████████ over this period. In addition, while Dr. Pathak only reviews aggregate profit margins that include non-relevant sales such as tickets sold outside of the United States and resale tickets (i.e., not the primary sale of the ticket), available evidence indicates that ████████████████████████████████████████ ████████████████████████ over the relevant period.

11.    Dr. Pathak incorrectly interprets the results of his "sports service fee" regression as a reflection of "class-wide" effects of "reduced exclusivity." As I discuss in **Section IX**, the basic premise of his regression model—that comparing service fees for sports and concert tickets can measure the effect of "reduced exclusivity"—fails to reflect the reality of how these tickets are sold. Dr. Pathak concedes the differences he purports to identify may be due to a fundamentally different "pricing problem" for different types of events and not entirely (or even at all) due to the anticompetitive "exclusivity" and "tying" that Plaintiffs allege. Further, when I apply his regression on a venue-by-venue basis, it does *not* find a uniform relationship between the service fees for sports and concert events. Dr. Pathak's model actually finds that ████████████████████████████████████████ ████████████████████████████—contrary to his theory of "reduced exclusivity" for these events. That is, Dr. Pathak's "sports service fee" regression cannot be used to show class-wide impact even if it could measure differences in purported "exclusivity."

12.    Dr. Pathak's review of selected documents in the record and theoretical economic literature does not establish common antitrust impact to the proposed class. As I discuss in **Section X**, his selective interpretation of documents is not a scientific approach to determining the effects of alleged anticompetitive conduct. The documents Dr. Pathak purports to interpret do not compare proposed class members' purchases in the actual world and a reliably constructed but-for world, nor are they "common" to the proposed class. Rather, these documents are relevant to, at most, a subset of the venues at issue (and at times only to a *single event*).

HIGHLY CONFIDENTIAL

13.     As I also discuss in **Section X**, Dr. Pathak's reliance on theoretical literature also offers no insight into the question of antitrust impact to all (or nearly all) proposed class members in this case, because it does not assess the facts of this case, the service fees any proposed class member paid, or what anyone would have paid in the but-for world.  In his discussion of the literature, Dr. Pathak also makes several claims about the ticketing industry that are contrary to available evidence, illustrating why broad assertions based on academic papers unrelated to the facts of this case cannot be a reliable methodology to show class-wide impact to the proposed class.

14.     As I discuss in **Section XI**, when applied to the purchases of the Named Plaintiffs, Dr. Pathak's methodology demonstrates the type of venue-specific inquiry relevant to determining if proposed class members suffered antitrust impact.  Named Plaintiffs purchased tickets with services fees ranging between ███████████ of the ticket face value.  Dr. Pathak's methodology cannot be used to determine impact for these three consumers (as well as all other proposed class members) as it cannot account for the regional nature of consumer demand or how that differing demand factors into the individual decisions made by each of his hundreds of "major concert venues" and their bilateral negotiations with Ticketmaster.  Given these flaws, Dr. Pathak's methodology cannot show antitrust impact to the proposed class, much less do so on a class-wide basis.

15.     As I discuss in **Section XII**, my analysis shows that Dr. Pathak's methodology is not reliable for calculating damages to the proposed class.  His methodology relies on a flawed "cost" benchmark and assumes a uniform reduction in service fees across the hundreds of "major concert venues" at issue in each year.  This approach ignores the venue-specific competitive dynamics that determine the service fees bilaterally negotiated between Ticketmaster and the *hundreds* of relevant venues.  Applying this uniform reduction in service fees generates an unrealistic but-for world where Ticketmaster's "net service fees" would be ████████████████████ sold to proposed class members.  Because the assumptions underlying Dr. Pathak's damages analysis are contradicted by real-world evidence, his analysis cannot be used to reliably calculate damages to the proposed class.

## II.    QUALIFICATIONS

16.     My name is John H. Johnson, IV.  I am the CEO of Edgeworth Economics, L.L.C. ("Edgeworth").  Edgeworth is a consulting firm that provides clients with objective expert economic and financial analysis for complex litigation and public policy debates.  Edgeworth's experts work in the areas of antitrust, data management, class certification, intellectual property, and labor and employment.  Edgeworth is headquartered in Washington, D.C.

HIGHLY CONFIDENTIAL

17.    I received my B.A. *magna cum laude* with highest distinction in Economics from the University of Rochester and my Ph.D. in Economics from the Massachusetts Institute of Technology ("MIT").  My areas of specialization at MIT were econometrics—the application of statistics to economics—and labor economics.  During my career as a professional economist, I have provided economic analysis in a wide range of litigation matters involving class certification, antitrust, labor and employment, damages calculation, and statistics.  Prior to my employment as an economic consultant, I was an Assistant Professor of Economics and Labor and Industrial Relations at the University of Illinois at Urbana-Champaign, where I taught courses in labor economics.  I have also taught and continue to teach as an Adjunct Professor at Georgetown University's Public Policy Institute, including a course on *Antitrust and Public Policy.*

18.    I have testified at trial, at evidentiary hearings, and at deposition, and provided consulting on a wide range of antitrust matters related to class certification, liability, and damages, as well as in antitrust cases involving claims both of coordinated behavior and monopolization.  My curriculum vitae, which includes a list of my previous antitrust (and other) expert testimony in the last four years and publications, is attached as **Appendix A** to this report.  I also have written numerous papers and given many talks on topics related to class certification, scientific standards in litigation, appropriate use of econometrics in litigation, and antitrust damages.  I previously was an Editor of the *Antitrust Law Journal.*  I submitted an amicus brief to the United States Supreme Court in *Comcast vs. Behrend* on the role of economic analysis in assessing the appropriateness of antitrust class certification.  I have been accepted as an expert in economics, econometrics, and statistics in Federal District Courts.[5]

## III.    PLAINTIFFS' ALLEGATIONS AND MY ASSIGNMENT

19.    Plaintiffs allege that the Defendants "have engaged in predatory and exclusionary conduct" to "monopolize the primary ticketing services market."[6]  Plaintiffs seek to certify the following "Primary Ticketing Services Consumer Class":[7]

---

[5] Edgeworth is compensated for my work and the work of my team relating to this litigation based on hourly rates. My rate is $1,525 per hour.  Payment for Edgeworth's services is not contingent upon my opinions or the outcome of this litigation.

[6] Complaint, January 4, 2022 ("Complaint"), ¶20.  Specifically, Plaintiffs allege anticompetitive conduct in the form of (i) Ticketmaster's "long-term exclusive deals" with "major concert venues," (ii) "tying" of Ticketmaster's "primary ticketing services" to Live Nation's "concert promotion services," and (iii) Defendants' "economic threats and coercion" of venues "if they chose a rival ticketing provider."  See also, Class Certification Motion, Sections II.B.1–II.B.3.

[7] Class Certification Motion, p. 1.  The Named Plaintiffs for the proposed class are Luis Ponce, Jeanene Popp, and Jacob Roberts (Complaint, ¶¶25–28; Class Certification Motion, footnote 1).

> All purchasers in the United States who directly purchased a primary ticket and paid associated fees for primary ticketing services for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation Entertainment, Inc. at any point since 2010.

I understand that Plaintiffs were also previously proposing a separate "Secondary Ticketing Services Consumer Class" but that they are not seeking certification of this class.[8]

20.    I have been asked by counsel for Defendants Ticketmaster and Live Nation to provide an assessment of the analyses offered by Plaintiffs' expert Dr. Parag Pathak in support of Plaintiffs' motion for class certification.  Specifically, I have been asked to assess whether Dr. Pathak's analysis is capable of (i) establishing proof of antitrust impact to all (or nearly all) proposed class members, and (ii) reliably estimating damages to the proposed class members caused by the alleged conduct.  For my analysis, I assume that Plaintiffs' allegations of "long-term exclusive deals" with venues, "tying," and "economic threats and coercion" of venues are true, but I do not assume that the various types of alleged conduct led any proposed class member to pay supra-competitive prices for any product.[9]

21.    In the course of preparing this report, I, and members of my team under my direction reviewed deposition testimony, documents in the litigation record, as well as publicly available information.  I also conducted analysis of data produced in this litigation.  Additionally, I reviewed Dr. Pathak's report, as well as the materials supporting his report and his deposition testimony.  A list of materials which I relied upon to develop my opinions is attached as **Appendix B** to this report.[10]

## IV.    DR. PATHAK'S METHODOLOGY CANNOT CONDUCT THE RELEVANT INQUIRY TO ASSESS ANTITRUST INJURY TO THE PROPOSED CLASS

22.    Dr. Pathak opines that "all or nearly all class members were harmed by the alleged conduct" based on what he describes as four "mutually reinforcing […] categories of evidence":[11]

- "Economic literature regarding exclusive dealing and tying arrangements."

- "Live Nation's ticketing fees both before and after its merger with Ticketmaster."

---

[8] Order Granting Joint Stipulation to Narrow Putative Class Claims, July 24, 2025, ¶1.

[9] A "supra-competitive price" is one that was elevated above levels that could have prevailed in the absence of the alleged anticompetitive conduct.

[10] I understand that I was provided access to the entire record as of the time of this report's writing.  If additional information is provided to me in this litigation, I will analyze it and consider it as part of my opinions and supplement this report, as appropriate.

[11] Pathak Declaration, ¶141.  Dr. Pathak offers additional opinions related to "relevant antitrust markets" and "market power." (see Pathak Declaration, ¶8).

- "Empirical analysis comparing the fees at concert events with fees at sporting events at the same venues."

- "Documents and deposition testimony produced by Defendants and third parties."

23.    The term "**antitrust harm**" or "**antitrust impact**" refers to economic injury caused to a Plaintiff by the Defendants' alleged illegal conduct.[12]  Plaintiffs allege antitrust impact in the form of an "overcharge," which refers to instances where a Plaintiff paid a higher price for a product than they would have paid in the absence of the alleged anticompetitive conduct.[13]  The counterfactual scenario where the alleged anticompetitive conduct did not occur is called the "**but-for world**," and the prices that would have been paid in that world are called "**but-for prices**."[14]

24.    As a threshold matter, none of Dr. Pathak's "categories of evidence" can show antitrust impact to all (or nearly all) proposed class members due to the alleged conduct in this case.  According to Dr. Pathak, the alleged conduct in this case involves (i) "Ticketmaster's exclusive contracts" and (ii) "Live Nation's tying of promotion services and Ticketmaster's ticketing services."[15]  While Dr. Pathak offers theories about "class-wide impact" and a purported calculation of "damages," he has no methodology for distinguishing the effects (if any) of "exclusivity" from those of "tying."  That is, if the Court determines that one course of conduct is anticompetitive but not the other, Dr. Pathak's theories and calculations cannot isolate any specific conduct.[16]

25.    Dr. Pathak asserts that "in the but-for-world, there would be greater competition between primary ticket service providers," and "[v]enues would have taken advantage of this competition between ticketers to demand lower prices and higher quality."[17]  Moreover, he asserts that "[c]ompetition drives prices towards costs, so a competitive market has prices near cost."[18]  Based on these assertions, Dr. Pathak purports to estimate Ticketmaster's costs "in the primary ticketing market"

---

[12] American Bar Association, Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues,* Third Edition, 2017 ("ABA Proving Antitrust Damages"), pp. 3–4.

[13] Hovenkamp, Herbert, "A Primer on Antitrust Damages," *University of Iowa Legal Studies Research Paper*, 2011, p. 27; ABA Proving Antitrust Damages, p. 6.

[14] ABA Proving Antitrust Damages, p. 4.

[15] Pathak Declaration, ¶138.

[16] Dr. Pathak testified that the "specific exercise" to distinguish damages due to only one of the exclusive dealing, tying, or coercion claims is "not one [that he] undertook."  He also stated that "all of these things are happening at the same time.  So it's a hypothetical that I didn't, you know, need to consider because that's not the record of the case." (Deposition of Parag Pathak, Ph.D., October 14, 2025 ("Pathak Deposition"), 62:23–64:20).

[17] Pathak Declaration, ¶139.

[18] Pathak Declaration, ¶179.

and use these "costs" as a "proxy for a competitive outcome" (i.e., Ticketmaster's "price" to "major concert venues" for primary ticketing services).[19] Dr. Pathak assumes that there would be an identical reduction in primary ticketing "prices" to all "major concert venues" in each year relative to the actual world.[20] Dr. Pathak then simply asserts that any reduction in *venues'* primary ticketing "prices" translates directly and identically into reductions in service fees paid by *consumers* (who are the proposed class members in this case).[21]

26.       First, Dr. Pathak's methodology is not based on any specific conception of how the ticketing industry would work in the but-for world.  In deposition, he testified that ticketers in the but-for world may operate under an "allocation model" or that exclusive contracts without "anticompetitive features" might still exist—despite Plaintiffs' allegations that "exclusivity" *is* one of the "anticompetitive features."[22]  Despite this ambivalent conception of what a supposedly competitive marketplace would look like, what business models ticketers (including those other than Ticketmaster) would implement, or how they would compete—only that everything would just generally happen "against the backstop of competition"[23]—Dr. Pathak claims that his average "cost" benchmark necessarily reflects the outcomes of that competition.

27.       Second, Dr. Pathak's analysis is based on a conflation of the different "prices" that are at issue, as well as a misunderstanding of how those different "prices" are set.  Dr. Pathak states that "[v]enues in the US contract with a primary ticketer to handle ticketing for concerts" and opines that "[p]rimary ticketing services at major US concert venues is a relevant antitrust product market."[24]  Put differently, Dr. Pathak recognizes that *venues* (not *consumers*) purchase "primary ticketing services" from primary ticketers.[25]  In contrast, proposed class members in this case purchase tickets to attend specific events,

---

[19] Pathak Declaration, ¶¶179, 181.  There is no basis for a but-for world where *all service fees* are set at cost.  See **Section XII** for a more detailed critique of Dr. Pathak's "cost" benchmark.

Throughout, I adopt Dr. Pathak's definition of "major concert venues."

[20] Pathak Declaration, ¶182.

[21] Primary ticket purchasers include both individual fans and ticket resellers.  Throughout my report, I refer to both as consumers, in line with Dr. Pathak's expert report (Pathak Declaration, ¶12).

[22] Pathak Deposition, 146:5–18, 161:14–162:2.

[23] Pathak Declaration 162:3-6.

[24] Pathak Declaration, ¶¶8, 21.

[25] In deposition, Dr. Pathak recognized that "primary ticketing services" are the logistics of providing tickets to fans and that venue negotiate contracts with ticket service providers to pay for this service while fans buy tickets rather than the inventory management system.  See Pathak Deposition, 68:20–25, 70:23–71:9, 99:18–23.  Dr. Pathak also offers the opinion that "concert promotion services at major US concert venues is a relevant antitrust product market" (Pathak Declaration, ¶8).  I note that proposed class members also did not purchase "concert promotion services."

HIGHLY CONFIDENTIAL

paying the face value of the ticket as well as any associated fees. However, in Dr. Pathak's opinion, the antitrust product market relevant to assessing Plaintiffs' claims is one in which consumers do not participate, involving products they do not buy.

28.     As Dr. Pathak describes, primary ticketers "collect the face value of the ticket, facility fee, service charge, and other fees from fans."[26] However, the primary ticketers do not unilaterally *set* the value of any of these components of the "all-in" price paid by proposed class members. Rather, venues determine these fees (unilaterally or based on negotiations with the primary ticketer) and negotiate with the primary ticketer on how these fees are to be split (among other terms), which are outlined in their contract with the primary ticketer.[27] In **Exhibit 1**, I illustrate the various components of what consumers pay when purchasing a ticket to a concert using a ticket for a 2015 concert at Camping World Stadium in Orlando, FL purchased by Named Plaintiff Jacob Roberts.

---

[26] Pathak Declaration, ¶21.

I focus my analysis on services fees (also referred to as a "convenience charge") as Dr. Pathak only analyzes these fees. I note that other types of fees are determined at the discretion of the venues and (i) retained in full by the venue (facilities fees) or (ii) split between the venue and Ticketmaster based on individual negotiations (processing fees) (Deposition of Jenny Johnson 30(b)(6) (Ticketmaster), June 3, 2025 ("Jenny Johnson 30(b)(6) Deposition"), 15:5–7, 22:11–13, 28:4–29:5).

[27] The venue's share includes "royalties" as well as fixed payments (e.g., signing bonuses and sponsorship payments) received from Ticketmaster.

HIGHLY CONFIDENTIAL

**EXHIBIT 1**
**ILLUSTRATION OF PRIMARY TICKET**
**PURCHASED BY NAMED PLAINTIFF JACOB ROBERTS**
**ROLLING STONES AT CAMPING WORLD STADIUM**
**JUNE 12, 2015**



Sources: Roberts Declaration; LNE-LIT24-000087587–7599, at 7591.

As this exhibit shows, Mr. Roberts paid an "all-in" price of $82 for this ticket—$69.50 face value (including the facility fee) and $12.50 in service fees.[28]  These service fees were set by Camping World Stadium and split between Ticketmaster and Camping World Stadium as negotiated in their 2015 contract:[29]

- Ticketmaster's "share" (i.e., the portion of fees that Ticketmaster retains) was  .

- The operator of Camping World Stadium retained the remaining portion of the service fee (i.e., ███ of Mr. Roberts' "all-in" price).

---

[28] Declaration of Jacob Roberts in Support of Plaintiffs' Motion for Class Certification and Appointment of Co-Lead Class Counsel, August 18, 2025 ("Roberts Declaration").  Camping World Stadium was previously called Orlando Citrus Bowl.  The face value of Mr. Robert's ticket ($69.50) includes a $2.00 facility fee, which is set and retained by the venue.

[29] LNE-LIT24-000087587–7599, at 7591.  Based on this contract, ████████████████████████
████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL

29.     In Dr. Pathak's construct of the but-for world, "greater competition between primary ticket service providers" would lead Ticketmaster's "share" to be less than ███ for Mr. Roberts' ticket—because, supposedly, Camping World Stadium would have been able to negotiate a lower rate. Moreover, in this but-for world, Mr. Roberts (who did not buy "primary ticketing services," but rather bought a ticket using the primary ticketer selected by the venue) would have paid less than $12.50 in service fees because Camping World Stadium (the venue) would have chosen to charge him less. However, as Dr. Pathak acknowledges, ████████████████████████████████████ ███████████████"[30]  That is, the amount the proposed class member pays is determined by the venue, not by Ticketmaster.[31]  Despite this, Dr. Pathak's analysis purports to study the "price" to venues (i.e., Ticketmaster's "share" which is bilaterally negotiated between Ticketmaster and the venue), not what ticket purchasers pay (which is determined by the venue).

30.     In this case, the proposed class consists of consumers who paid service fees on the primary tickets they purchased.  An assessment of what effect (if any) "greater competition between primary ticket service providers" would have had on the service fees any proposed class member would have paid in the but-for world requires an economic model capable of reliably conducting two separate inquiries.

- **Inquiry 1:** Factors affecting the bilateral negotiations between Ticketmaster and each "major concert venue" to determine Ticketmaster's "share" of service fees—i.e., the portion indicated by the dark blue bar in **Exhibit 1**.  Specifically:

  - What competitive dynamics shaped the determination of Ticketmaster's "share" with respect to each venue in the *actual world*?

  - How (if at all) would each bilateral negotiation have been different in the *but-for world* with "greater competition between primary ticket service providers," and how would

---

[30] Pathak Declaration, ¶¶37–38.

When asked to define an "event," Dr. Pathak testified that "[t]he event is a concert that is taking place at a major concert venue […and he is] focused on concerts, tickets to concerts at major concert venues."  He also testified that sport events at "major concert venues" are not included in his definition (Deposition of Parag Pathak, Ph.D., October 14, 2025 ("Pathak Deposition"), 14:1–15:19).  As I describe in **Section V**, negotiations between venues and Ticketmaster involve ticketing for both concert and non-concert events and there is no reason to assume that, but-for the alleged conduct, this aspect of the negotiations would change.

[31] See e.g., Ticketmaster's 2015 contract with Camping World Stadium, which states that the ██████████████ █████████████████████████████████ (LNE-LIT24-000087587–7599, at 7591).

HIGHLY CONFIDENTIAL

Ticketmaster's negotiated "share" with respect to each venue differ in the but-for world?

- **Inquiry 2:** How the bilateral negotiations between Ticketmaster and each "major concert venue" affect the total service fees consumers pay—i.e., the sum of the dark blue and light blue bars in **Exhibit 1**. Specifically:

    - What service fees (determined based on individual decisions made by venues and their bilateral negotiations with Ticketmaster) did any particular purchaser pay in the *actual world* when buying tickets to a particular concert event at a particular "major concert venue"?

    - What service fees would that purchaser have paid in the *but-for world* and how (if at all) would each venue adjust their fee in response to their negotiations with Ticketmaster under "greater competition between primary ticket service providers"?

Assessing antitrust impact to the proposed class would involve answering these questions for hundreds of venues that, over the 15-year proposed class period, hosted tens of thousands of concert events to which over 400 million tickets were sold.[32]

31.    Dr. Pathak's methodology cannot be reliably used to conduct either of these inquiries. With respect to inquiry 1, Dr. Pathak's methodology does not study the factors affecting the bilateral negotiations between Ticketmaster and each of the hundreds of "major concert venues" at issue. In fact, Dr. Pathak simply assumes a but-for world in which Ticketmaster would set the "price" to venues at its average "cost"—and that this "price" would be lower across venues by a uniform percentage in each year as compared to the actual world.[33] Dr. Pathak's assumption is based solely on a theory that when there is "competition," it would be the case that "prices approach costs,"[34]—not on empirical analysis of the ticketing industry or competitive conditions at issue in this case. In reality, available evidence

---

[32] These counts are based on Ticketmaster's sales data for concert events at Dr. Pathak's defined "major concert venues" from 2015 to 2024—the period he analyzes. Plaintiffs do not define what constitutes a "major concert venue," although Dr. Pathak defines this term to mean "the top 500 US concert venues by ticket sales" in a given year (Pathak Declaration, ¶118).

[33] Pathak Declaration, ¶182; Pathak Deposition, 45:21–47:11, 114:10–115:8, 194:8–195:5. Dr. Pathak testified that the average cost in his but-for world is the sum of the fixed cost and variable cost components of provisioning a ticket (Pathak Deposition, 180:7–21).

[34] Pathak Deposition, 205:1–5. I discuss the flaws in this theory in **Sections V.A** and **XII**.

shows the existence of substantial variation in Ticketmaster's negotiations with individual "major concert venues" and its resulting "share" from the fees the venues charged to ticket purchasers.[35]

32.    With respect to inquiry 2, Dr. Pathak's methodology also does not reflect how (if at all) the bilateral negotiations between Ticketmaster and each "major concert venue" affect the total service fees proposed class members paid.  Despite acknowledging that the ███████████████████████ ████████████████████████████████████  Dr. Pathak only attempts to model *Ticketmaster's "share"*—not *service fees paid by consumers*.[36]  Again, instead of empirically analyzing the issue, Dr. Pathak asserts a theory that venues must necessarily charge lower service fees to consumers because demand slopes downward—i.e., venues would necessarily lower prices in order to sell more tickets.[37]  Available evidence shows substantial variation in the service fees proposed class members paid across venues and over time.  The evidence also shows that there is no uniform relationship between Ticketmaster's "share" and the service fees ticket purchasers pay.  For example, even if Ticketmaster's "share" declines—as Dr. Pathak asserts it would under "greater competition"— there would not necessarily be any reduction in what ticket purchasers pay, much less a uniform reduction across hundreds of venues and tens of thousands of events.

33.    Put simply, there is no "market-wide mechanism" that uniformly determines service fees, like Dr. Pathak asserts.  Rather, these fees are the result of decisions made by the *hundreds of* different venues, their individual negotiations with Ticketmaster, and factors that are unrelated to their negotiations with Ticketmaster.  Dr. Pathak's methodology is predicated on the empirically rejected assumption that "greater competition" between primary ticketers for *venues'* business would result in uniformly lower service fees for *consumers*.  Given these flaws, Dr. Pathak's methodology cannot show antitrust impact to the proposed class, much less do so on a class-wide basis.

---

[35] Dr. Pathak repeatedly relies on "predictions" of his economic theories to assert various supposed "mechanisms" of class-wide injury, and claims that there was "no need" for him to test these theories using empirical analysis (See, for example, Pathak Deposition, 216:2–21).  However, asserting a simplistic or inapplicable theory cannot replace reliable analysis of empirical data, particularly when the theory does not comport with the reality of what that data shows.  For example, as economist Milton Friedman explained "the only relevant test of *validity* of a hypothesis is comparison of its predictions with experience" and "[o]nly factual evidence can show whether it is 'right' or 'wrong'" (Milton Friedman, "The Methodology of Positive Economics," In *Essays In Positive Economics*, 1966, pp. 3–16, 30–43, at pp. 8–9).

[36] Pathak Declaration, ¶¶37–38.  I focus my analysis on services fees (also referred to as convenience fees) as Dr. Pathak only analyzes these fees.

[37] Pathak Deposition 210:11–212:11, 216:2–21 (Q. "[h]ave you done any empirical analysis to validate that the venues will pass on the savings from the primary ticketer to the consumer? [… A. …] the answer to your question is there was no need for me to do that empirical analysis given what the theoretical predictions are.")  I discuss the flaws in this theory in **Section VI**.

HIGHLY CONFIDENTIAL

## V.    DR. PATHAK'S METHODOLOGY IS BASED ON A SIMPLISTIC THEORY THAT DOES NOT ACCOUNT FOR THE VENUE-SPECIFIC COMPETITIVE DYNAMICS THAT DETERMINE THE FEES CONSUMERS PAY

### A.  Summary of Dr. Pathak's Proposed But-For World

34.    Dr. Pathak's but-for world is constructed based on the simple assertion that "competition drives prices towards costs, so a competitive market has prices near cost."[38]  That is, Dr. Pathak's but-for world abstracts entirely from how the ticketing industry works in the actual world and imposes "cost-based" pricing.  His methodology assumes that in the but-for world:[39]

- Ticketmaster's "price" for primary ticketing services to all "major concert venues" would, on average, equal its cost;

- "Greater competition" between primary ticketers would uniformly reduce all venues' "price" in each year relative to the actual world (e.g. ███████████████████ ████████████ than they did in the actual world regardless of their individual negotiations with Ticketmaster); and

- Venues would *necessarily* reduce the service fees they charged to consumers by this *exact same* uniform reduction (i.e., every venue would choose to pass through the full amount of the purported savings from "greater competition" between primary ticketers).

35.    Dr. Pathak's theoretical "cost" benchmark assumes that *any* "price" higher than his estimated cost is due to the alleged conduct.  That is, his benchmark does not account for *any* other factors that determine the "price" of primary ticketing services.  As an American Bar Association treatise states:[40]

> Market outcomes are often the result of a complex interaction among a large number of factors.  For example, market prices were likely affected by a wide variety of demand and supply factors unrelated to the alleged anticompetitive act.  Isolating and measuring the effect of an alleged anticompetitive act on price (or on other market outcomes) requires properly accounting for these other factors.  **Otherwise, one might attribute to the alleged anticompetitive act the effect of one or more of these other factors or miss the effects of the act in question by failing to control for a relevant factor.**

---

[38] Pathak Declaration, ¶179.

[39] Pathak Declaration, ¶¶179, 181, 182, 209.

[40] ABA Proving Antitrust Damages, p. 123, emphasis added.

HIGHLY CONFIDENTIAL

Dr. Pathak does not attempt to control for *any* demand and supply factors that may impact the bilaterally negotiated "prices" paid by venues.  Instead, he simply assumes, based a simplistic theory, that the outcome of these individualized negotiations would be, on average, equal to Ticketmaster's "costs."

36.     Dr. Pathak's assertion that "costs" are a "proxy for a competitive outcome" (i.e., the but-for price) is based on the assumption that, but-for the alleged conduct, Ticketmaster and venues would negotiate a "price" for primary ticketing services at its "costs."[41]  Dr. Pathak claims that, "[b]ecause competition tends to drive prices towards cost, using an estimate of the direct costs of ticketing is an appropriate benchmark."[42]  For the purpose of constructing his benchmark, Dr. Pathak does not just assume "competition tends to drive prices *towards* cost," he is assuming that absent the alleged conduct prices would be driven *to* costs—a theoretical construct that is unsupported by the available evidence.[43]

37.     The evidence Dr. Pathak offers also rejects his conception of the but-for world under supposedly "greater competition."  Dr. Pathak asserts that "the closest proxy to competitive conditions in the primary ticketing market is when Live Nation entered and competed with Ticketmaster during the 2008-2009 period."[44]  He points to the "exclusive" primary ticketing agreement negotiated in 2008 between Live Nation and SMG, which he describes as "a large, sophisticated venue operator."[45]  This contract, which Dr. Pathak describes as revealing "what might have occurred in a market free from anticompetitive exclusive contracts," ███████████████████████████████████████ ██████████████████.[46]  The contract indicates that ███████████████████████████████████████

---

[41] Pathak Declaration, ¶181.  Dr. Pathak asserts that his "cost" benchmark is "another estimate of what a competitive outcome would have been in a more competitive market."

[42] Pathak Declaration, ¶209.

[43] Dr. Pathak assumes that Ticketmaster's price would be equal to their average total costs (Pathak Deposition, 180:7–21).  Firms setting prices at their average total costs in the long run is a feature of the theoretical construct of a "perfectly competitive market" ("In the long run, firms can adjust their levels of capital so that they can enter this market.  Short-run profits or losses induce firms to enter or leave the market until price is driven down to the minimum long-run average cost" (Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition, 2015, ("Carlton & Perloff"), p. 85).  However, "perfect competition is rarely, if ever, encountered in the real world" because it is a construct that is based on assumptions (such as perfectly homogenous products and perfect information) that do not exist in the real world (Carlton & Perloff, p. 81).  Dr. Pathak himself argues that in "the case of Ticketmaster, if a new, more efficient ticketing provider entered the market without exclusive contracts in place, competition would likely *not* be perfect" (Pathak Declaration, ¶148, emphasis added).

[44] Pathak Declaration, ¶171.

[45] Pathak Declaration, ¶176; LNE-LIT24-000029987–9999.  Dr. Pathak characterizes SMG as a "large, sophisticated venue operator" and this contract as an agreement between "two sophisticated parties" (Pathak Declaration, ¶176).  That is, Dr. Pathak acknowledges that in his but-for world, "sophisticated" venue operators—such as the "major concert venues" that are at issue in this matter—would enter into exclusive contracts with primary ticketers.

[46] Pathak Declaration, ¶174.

**HIGHLY CONFIDENTIAL**

████████████████████████████████████████.[47]  Moreover, Dr. Pathak claims that in a market free from the alleged conduct, "negotiation is taking place against the backstop of competition, putting […] pressure on prices such that prices will approach costs."[48]  That is, the entrance of a single competitor (Live Nation) results in his purported "backstop of competition"—and this supposedly resulted in Ticketmaster offering "more attractive renewal terms to customers with expiring contracts."[49]  However, Dr. Pathak ignores that there are contracts in the actual world that are negotiated against a similar "backstop of competition" (and in fact often involving more than just one competitor) during the proposed class period.  For example:



- Ticketmaster's internal documents show that ████████████████████████ ████████████████████"[50]

- ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ ████████████[51]████████████████████ ████████████████████████████████ ████████████████████████

- ████████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████[52]

Dr. Pathak does not analyze the "backstop of competition" affecting any bilateral negotiation between a venue and Ticketmaster in the actual world.  Rather, he simply assumes the conclusion that any tickets

---

[47] The contract outlines that ████████████████████████████ ████████████████████████████████████████████████████████████████

[48] Pathak Declaration 162:3–6. He also claims that negotiation against such a "backstop" of competition "could result in an exclusive arrangement" (Pathak Deposition, 161:23–24).

[49] Pathak Declaration, ¶174.  Dr. Pathak testified that when Live Nation entered there were still "exclusive contracts by Ticketmaster" so Live Nation's actual entry is not "all the way to a but-for world of strong competitive forces" (Pathak Deposition, 193:1–6).  However, Dr. Pathak fails to explain why this is different from the but-for world he envisions where exclusive contracts could still exist (Pathak Deposition, 146:5–18, 161:14–162:2).

[50] LNE22-000583728–3771, at 3767, 3769.

[51] LNE-LIT24-002787885–7889, at 7886.

[52] See **Exhibit 10** below.

HIGHLY CONFIDENTIAL

purchased at any "major concert venue," subject to any contract, negotiated under any set of competitive circumstances, were all impacted by the conduct Plaintiffs allege. Ultimately, Dr. Pathak's conception of the but-for world is untethered from the reality of how the ticketing industry works and from the evidence he himself presents.

### B. Dr. Pathak's Methodology Cannot Reliably Model the But-For World Because It Assumes Away Individualized Relationships Between Ticketmaster and Each Venue

38.     To answer the first set of questions I describe above—i.e., what competitive dynamics shaped the determination of Ticketmaster's "share" in the *actual world* and how (if at all) these would be different in the *but-for world*—it is necessary to understand how Ticketmaster and venues determine how to share the revenue generated from service fees. Dr. Pathak acknowledges that "Ticketmaster's ticketing fees in the real-world exhibit variation […] across venues and time periods."[53] However, his methodology does not account for the reasons *why* there is variation in the "prices" of primary ticketing across venues. In fact, the hundreds of "major concert venues" at issue—which include NFL stadiums, arenas owned by NBA and NHL teams, large theaters, collegiate arenas, and amphitheaters[54]—are different in size, negotiating position, and "primary ticketing" needs. Dr. Pathak's proposed methodology does not account for the differences he acknowledges exist between venues[55]—or how these differences shape the bilateral negotiations between Ticketmaster and each venue. Dr. Pathak simply asserts that his proposed "benchmark preserves such variation in a method that does not require venue or customer specific inquiry."[56]

39.     While Dr. Pathak purports to define "major concert venues" as "the top 500 US concert venues by ticket sales," which venues he includes in his definition actually vary from year to year.[57]  For

---

[53] Pathak Declaration, ¶¶182–183.

[54] See **Appendix C** for a summary of the relevant "major concert venues" included in Dr. Pathak's damages analysis from 2015–2024.  See also, Live Nation 2024 10-K, pp. 6–7; Pathak Declaration, ¶16.

As David Marcus (Executive VP of Global Music at Ticketmaster) testified, "[s]ports clients, sports teams are typically owners of or principal tenants of venues.  So they are often primary ticketing clients" (Deposition of David Marcus 30(b)(6) (Ticketmaster), June 17, 2025 ("Marcus 30(b)(6) Deposition"), 11:3–15. ███████████████████████████████████████████████████████████████████████████████

[55] For example, Dr. Pathak acknowledges that venues can differ across "operational costs, facility quality, local market characteristics, management practices, and Ticketmaster's relationship with individual venue" (Pathak Declaration, ¶190).

[56] Pathak Declaration, ¶183.

[57] Pathak Declaration, ¶118.  For example, 108 of Dr. Pathak's "major concert venues" in 2010 are not "major concert venues" in 2011—a "turnover" rate of 22 percent.  In fact, even after excluding 2020 and 2021 because

(continued on next page . . .)

HIGHLY CONFIDENTIAL

example, despite existing throughout the proposed class period, Dr. Pathak identifies Credit Union 1
Arena, a 10,000-capacity multi-purpose arena at the University of Illinois at Chicago as a "major
concert venue" in five of the 15-year class period (2010–2013 and 2016).[58]  Dr. Pathak defines Cat's
Cradle, a less than 1,000-capacity venue in Carrboro, NC, as a "major concert venue" in one year
(2010).[59]  Over the proposed class period, Dr. Pathak identifies over 1,300 different "major concert
venues"—only 25 percent of which, by his definition, are "major concert venues" in ten or more years,
and approximately 40 percent of which are only "major concert venues" for one or two years (like Cat's
Cradle).[60]  Dr. Pathak offers no explanation as to why venues would be "major" in certain years but not
others—or why consumers who bought tickets to see a concert at a venue in one year are in the
proposed class, but those that bought tickets to a concert at the same venue the following year are not.[61]

40.      Dr. Pathak acknowledges that there are different types of venue, which have different customer
demand, ticketing requirements, and cost structures.[62]  In **Exhibit 2**, I summarize certain differences
across types of "major concert venues" that Dr. Pathak includes in his damages analysis.  For example,
theaters are indoor venues with smaller capacities (generally between 1,000 and 6,500 people), whereas
amphitheaters are seasonal outdoor venues that may be able to hold as many as tens of thousands of
people.[63]  Different types of venues also put on different types of content.  For example,


.[64]

---

many venues canceled events due to the COVID-19 pandemic, on average, over 20 percent of Dr. Pathak's
"major concert venues" turned over from one year to the next during the proposed class period.

[58] Credit Union 1 Arena, "About," https://www.creditunion1arena.com/about/.

[59] Cat's Cradle, "About," https://catscradle.com/about/.

[60] This includes 129 venues that are only "major concert venues" in 2020, when many venues canceled events due
to the COVID-19 pandemic (approximately ten percent of his defined "major concert venues").  Of the over
1,300 "major concert venues" that he identifies, Dr. Pathak's damages estimate includes 652 "major concert
venues" ticketed by Ticketmaster from 2015 to 2024.

[61] Dr. Pathak testified in deposition that the reason why he "wanted to have an annual definition is, things change.
Management changes, venue conditions change" (Pathak Deposition, 80:5–13).  However, this does not explain
why a venue such as Credit Union 1 Arena, a 10,000 seat venue, which has been managed by the University of
Illinois since at least the start of the class period would not be a "major concert venue" after 2016 (LNE-LIT24-
000062100–2132).

[62] Pathak Declaration, ¶16; Pathak Deposition, 110:13–112:3.

[63] Live Nation 2024 10-K, pp. 6–7.

[64]

**HIGHLY CONFIDENTIAL**

**EXHIBIT 2**
**"MAJOR CONCERT VENUES" INCLUDED IN DR. PATHAK'S DAMAGES ANALYSIS**
**BY VENUE TYPE**
**2024**

| Venue Type | Description | Count of Venues | Examples |
|---|---|---|---|
| [a] | [b] | [c] | [d] |
| Amphitheater | Generally outdoor venues used primarily in the summer season | 74 | The Greek Theatre (Los Angeles, CA) with capacity 5,900<br>PNC Music Pavilion (Charlotte, NC) with capacity 18,000 |
| Arena NBA/NHL | Multi-purpose indoor venues that host local professional sports teams | 39 | State Farm Arena (Atlanta, GA) with capacity 15,500<br>United Center (Chicago, IL) with capacity 20,000 |
| Arena | Multi-purpose indoor venues without a major sports team | 59 | Now Arena (Hoffman Estates, IL) with capacity 11,800<br>Rupp Arena (Lexington, KY) with capacity 20,500 |
| Theater | Indoor venues primarily for music events, also host theatrical performances | 48 | Linda Ronstadt Music Hall (Tucson, AZ) with capacity 2,200<br>MGM Music Hall at Fenway (Boston, MA) with capacity 5,000 |
| NFL | Stadiums that house local professional sports teams | 24 | Soldier Field (Chicago, IL) with capacity 63,500<br>MetLife Stadium (East Rutherford, NJ) with capacity 82,500 |
| All Other Venue Types | Includes different types of venues such as clubs, casinos, MLS ballparks, etc. | 114 | Borgata Event Center (Atlantic City, NJ) with capacity 3,200<br>DICK'S Sporting Goods Park (Commerce City, CO) with capacity 27,000 |
| **All Venue Types** | | **358** | |

Notes: Of the 500 venues Dr. Pathak identifies as "major concert venues" in 2024, 142 are not ticketed by Ticketmaster or are not included in his damages analysis. These are not counted in this exhibit.

Top five venue types shown in this exhibit are ordered by total concert tickets sold from 2015 to 2024. See **Exhibit C-1** for a similar summary for 2015–2024.

Source: See backup materials for full list of sources.

41.     Because it ignores venue-specific factors that determine the portion of total service fees charged for events at different venues that Ticketmaster retains, Dr. Pathak's methodology fails to reliably model Ticketmaster's "share" absent the alleged conduct. There are multiple approaches by which the service fee split between Ticketmaster and each venue may be determined. ████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████[65]████████████████

████████████████████████████████.[66]

---

[65] Declaration of Cole Gahagan, April 11, 2016 ("Gahagan Declaration"), ¶18; Jenny Johnson 30(b)(6) Deposition, 25:1–4. See also, Pathak Declaration, ¶¶35–38.

[66] Negotiations around service fees are only one part of a broader contract negotiation that sets the terms under which Ticketmaster provides ticketing services. For example, contracts include ████████████████ ████████████████████████████ (see for example, LNE-LIT24-000112602–2641, at 2619, 2626, 2627, 2630)

HIGHLY CONFIDENTIAL

42.    **Exhibit 3** illustrates contractual revenue sharing terms with several "major concert venues."

**EXHIBIT 3**
**EXAMPLES OF SERVICE FEE REVENUE SHARING CONTRACT TERMS**
**FOR CONCERT EVENTS**
**2010 – 2024**



Notes: Venues which changed names during the period are classified by the current in-use venue name. Credit Union 1 Arena was known as the UIC Pavilion until 2018.  Kaseya Center was known as American Airlines Arena until 2021.  Enterprise Center was known as Scottrade Center until 2018.  PHX Arena was known as the Footprint Center until February 2025.

Sources: LNE-LIT24-000062100–2132 (Credit Union 1 Arena); LNE-LIT24-001167035–7054 (Barclays Center); LNE-LIT24-000082607–2660 (Kaseya Center); LNE-LIT24-000092497–2539 (Enterprise Center); LNE-LIT24-000109137–9156 (Fox Theater); LNE-LIT24-000112602–2641 (Allegiant Stadium); LNE-LIT24-001494711–4715 (Kia Forum and Intuit Dome); LNE-LIT24-000133929–3954 (PHX Arena); Pathak turnover (ticketing data); UIC Athletics Website, http://uicflames.com/news/2018/11/15/gen-credit-union-1-arena.aspx; NBC Miami, https://www.nbcmiami.com/news/local/aaa-ftx-or-miami-dade-arena-breaking-down-what-weve-called-newly-named-kaseya-center/3009120/; Enterprise Center Website, https://www.enterprisecenter.com/about-us; National Basketball Association Website, https://www.nba.com/news/all-30-nba-arenas-by-team; Hockey Reference Website, https://www.hockey-reference.com/arenas/; Sports Business Journal, https://www.sportsbusinessjournal.com/Articles/2025/02/18/suns-arena-set-for-name-change/.

HIGHLY CONFIDENTIAL

43.     As this exhibit shows, the nature of how service fees were split between venues and Ticketmaster varied from agreement to agreement.  For example, ███████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████[67]  As Jenny Johnson (VP Commercial Strategy at Ticketmaster) testified, the portion of the service fees that Ticketmaster retained "can vary pretty widely.  Generally, ██████████████████████████████[68]

44.     In addition to negotiating what portion of the service fees each party retains, venues may solicit fixed payments from Ticketmaster.[69]  These payments include ████████████,[70] ████████

---

[67] See for example, ██████████████████. (LNE-LIT24-000062100–2132, at 2129).

[68] Jenny Johnson 30(b)(6) Deposition, 24:18–21.  See also, Deposition of Patti-Anne Tarlton (Live Nation), April 4, 2025, 89:7–19.

Dr. Pathak's own analysis suggests that ████████████████████████████████████ ██████████████████████████ (Pathak Declaration, Table 3).

[69] As Marla Ostroff (Managing Director North America at Ticketmaster) testified, ████████████████ (Deposition of Marla Ostroff (Ticketmaster), March 27, 2024 ("Ostroff Deposition"), 215:12–216:3).

As I describe in **Section XII**, Dr. Pathak assumes that signing bonuses and sponsorship payments would be *identical* in the but-for world absent exclusive agreements between Ticketmaster and venues.  Dr. Pathak does not describe why Ticketmaster would provide the *same* payments absent securing the rights to sell the *same* number of tickets (i.e., the estimated number of tickets that would be sold over the life of the contract).

[70] Ostroff Deposition, 211:5–15.  See, for example, LNE-LIT24-003579439–9478, at 9440–9441 ████████ ██████████████████████████████████ Cascades Amphitheater is located in Ridgefield, WA and run by Quincunx of Washington (Cascades Amphitheater Website, https://www.ridgefieldamphitheater.com/information/)); LNE-LIT24-000066561–6596, at 6564 ██████████ ████████████████████████████████

HIGHLY CONFIDENTIAL



45.     The terms of a particular venue's agreement with Ticketmaster are in part a function of that venue's relative bargaining power.[78]  Relatively larger venue operators may use their importance to

---



[71] Ostroff Deposition, 213:21–214:18.  See, for example, LNE-LIT24-000849939–9949, at 9940

[72] Ostroff Deposition, 215:6–11
                              See also, Deposition of Jenny Johnson (Ticketmaster), April 17, 2025 ("Jenny Johnson Deposition"), 116:1–17.

[73] For example,
                              (Ostroff Deposition, 213:12–20).

[74] See, for example,

[75]

[76]

[77]

[78] "Bargaining power" refers to individual buyers' and sellers' abilities to exert influence over each other.

HIGHLY CONFIDENTIAL

Ticketmaster to get more favorable terms and/or refuse a price increase.[79]  As Jared Smith (former
Global President at Ticketmaster) testified, ████████████████████████████████████
████████████  ████████████████████████████████████[81]  Although Dr. Pathak
asserts that "individual venues lack sufficient bargaining power to negotiate favorable terms,"[82]
available evidence shows how individual venues could (and did) leverage their bargaining power in
their negotiation with Ticketmaster.  For example,



---

[79] Venue operators may own multiple venues as well as sports teams which also negotiate with primary ticketers.
    For example, Madison Square Garden Entertainment Corp. owns venues Madison Square Garden, Radio City
    Music Hall, the Beacon Theatre, and the Chicago Theater as well as sports teams like the New York Liberty, the
    New York Knicks, and the New York Rangers (LNE-LIT24-000519583–9683, at 9583).

[80] Deposition of Jared Smith (Ticketmaster), July 18, 2025 ("Smith Deposition"), 134:7–22.

[81] Smith Deposition, 134:7–22.

[82] Pathak Declaration, ¶153.







HIGHLY CONFIDENTIAL



46.     Dr. Pathak provides no assessment or analysis of the negotiations (or contracts) between Ticketmaster and individual venues to determine any venue's level of bargaining power.  In fact, Dr. Pathak defines "major concert venues" as "the top 500 US concert venues by ticket sales" in each year.[96]  That is, by definition, these venues include the largest concert venues in the United States.  Moreover, an individual  "venue" may not be a standalone entity but rather a part of a multi-billion-dollar organization like the Brooklyn Nets (which own the Barclays Center),[97] Monumental Sports & Entertainment (owners of the Washington Capitals and Wizards, among other sports teams—as well as Capital One Arena),[98] and Pennsylvania State University.[99]  Despite having conducted no relevant analysis to support his assertion, Dr. Pathak nonetheless claims that all "major concert venues" in his analysis "lack sufficient bargaining power to negotiate favorable terms" with Ticketmaster.[100]

47.     The terms of a particular venue's agreement with Ticketmaster are also shaped by that venue's preferences and priorities.  As Jared Smith (former Global President at Ticketmaster) testified, ███ ████████████████████████████████████████████████████████████████ [101]  Notably, what exactly constitutes the "primary ticketing services" that a venue buys from Ticketmaster varies contract by contract, with different venues having different requirements for its primary ticketing provider.  As Dr. Pathak acknowledges, "[a] venue considers fee structures, reliability, marketing capabilities, data analytics, ability to manage capacity, ability to prevent fraud and ability to handle the expected volume of sales when evaluating ticketing service providers."[102]  In fact, venues issue RFPs to solicit bids from

---

[95] ██████████████████████████████████████████

[96] Pathak Declaration, ¶118.

[97] LNE-LIT24-003196488–6562, at 6488 ██████████████████

[98] LNE-LIT24-000875358–5397, at 5358 ████████████████████  Monumental Sports, "Brands," https://monumentalsports.com/brands/.

[99] LNE-LIT24-003116172–6226, at 6172 ████████████████████

[100] Pathak Declaration, ¶153.  Dr. Pathak testified that he did not assess the specifics that might make one contract different from another.  (Pathak Deposition, 102:24–105:19).

[101] Smith Deposition, 133:10–17.

[102] Pathak Declaration, ¶88.

HIGHLY CONFIDENTIAL

primary ticketers, which outline the parameters of the specific services a venue requires.[103]  For example,



- A 2020 RFP for Angel of the Winds Arena included evaluation criteria for ticketing services such as a "vendor's ability to supplement […] marketing and sponsorship needs," "control of messaging of consumer touch points," and ability to "generate several revenue streams."[107]

As these examples indicate, venues have different requirements in terms of what products and services they purchase from Ticketmaster, as well as different preferences and abilities to negotiate how Ticketmaster is compensated.[108]  As one internal Ticketmaster presentation noted, ▮▮▮▮▮▮▮▮

---

[103] In certain cases, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (Jenny Johnson Deposition, 172:11–19).  Other venues may choose not to put out a formal RFP but will instead take informal proposals from multiple TSPs (Deposition of Geoffrey Carns (Ticketmaster), May 14, 2025, 36:5–14).

[104] LNE-LIT24-004058229–8276, at 8239–8245.

[105] Gahagan Declaration, Exhibit E ▮▮▮▮▮▮▮▮▮▮▮), pp. 65–74. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ (p. 67).

[106] Gahagan Declaration, Exhibit F (City of Kansas City RFP), pp. 76–90. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ (pp. 98–100).

[107] Pathak Declaration, footnote 161 (citing Angel of the Winds Arena, "Request for Proposal – Ticketing," p. 2, https://www.angelofthewindsarena.com/assets/doc/RFP-Angel-Of-The-Winds-Arena-updated-cm-2020.02.26-20fe13b8df.pdf).

[108] "Major concert venues" also compare primary ticketers in terms of their service offering, including observing competing technology and enrolling in product demonstration programs before accepting an offer.  (See, for example, LNE2019-CID-1115857–5858, at 5857 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ LNE-LIT24-001979298–9304, at 9298 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮

(continued on next page . . .)

██████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████[109]

48.     There is no reason to assume (as Dr. Pathak does) that, but-for the alleged conduct, Ticketmaster would price its "primary ticketing services" to *all* relevant venues based on his calculated single, average cost "associated with ticketing" given the variety of services offered to different relevant venues.[110]  By only attempting to model "prices" paid by venues on *average*—and equating "prices" with average "costs"— Dr. Pathak does not assess these venue-specific factors that determine Ticketmaster's "share" of service fees and simply assumes them away for each of the hundreds of relevant venues in the actual world (e.g., the venues' bargaining power and service requirements) —and

---

Additionally, to the extent a venue or its ticketing needs change over time, Dr. Pathak still assumes the "same competitive benchmark."  For example, during the proposed class period, Hard Rock Live in Hollywood, FL underwent a substantial renovation project that closed the venue for over a year from March 2018 through most of October 2019.  As part of this renovation, the venue capacity was increased and several amenities including various premium seating options and upgraded technical features were added.  From 2022 through 2024, after the renovation and closings due to the COVID-19 pandemic, this venue hosted more than double the number of concert events per year compared to before the renovation.  Dr. Pathak's methodology assumes the "same competitive benchmark" would be relevant for this venue in south Florida that underwent a substantial renovation and the *hundreds* of other venues he identifies as "major concert venues." (Hard Rock Hollywood, FL Website (https://casino.hardrock.com/hollywood/newsroom/2019/10/seminole-hard-rock-hotel--casino-hollywood-to-debut-125-million-hard-rock-live; https://casino.hardrock.com/hollywood/newsroom/2017/10/iconic-guitar-hotel-tower-going-upat-seminole-hard-rock-hotel--casino-hollywood)).

[109] LNE-LIT24-003370331–0376, at 0361.  This same presentation notes that interview ████████████████████████ ████████████████████████████████████████████ (LNE-LIT24-003370331–0376, at 0362).

[110] For example, Scott Wampold (VP of Client Development at Ticketmaster) testified that ████████████████████████ ████████████████████████████████████████████████████████████████ (Deposition of Scott Wampold (Ticketmaster), November 12, 2019 ("Wampold Deposition"), 21:11–15, 191:2–8).  Additional products and services available to venues include, ████████████████████████████████████████████████████████████████ (Wampold Deposition, 189:12–22).  Ticketmaster also offers ████████████████████████████ Jenny Johnson further testified that the services Ticketmaster provides are "client-specific, based on whatever needs" they have (Jenny Johnson Deposition, 24:14–21).  Jenny Johnson also testified that ████████████████████████████ (Jenny Johnson Deposition, 116:21–117:3).  Dr. Pathak also testified that the services Ticketmaster provides venues can differ venue by venue. (Pathak Deposition, 110:13–112:3).

Dr. Pathak purports to calculate Ticketmaster's but-for cost as the cost of "providing a ticket," which "has a fixed component and a variable component."  Specifically, he uses ████████████████████████████████████ and applies these uniformly across all venues in his damages calculation.  Dr. Pathak testified that he does not consider fixed payments to a venue to be "a cost."  Rather, he included fixed payments to venues in his damages calculations as "an adjustment to ensure that the venues are—their economics is unchanged." (Pathak Deposition, 176:12–181:3, 184:21–185:12).

its "share" of service fees in the but-for world.  Dr. Pathak acknowledges that "[f]ee variations exist across venues and time periods in the current market," but he is incorrect that his average benchmark analysis "preserves such variation."[111]  Simply applying the same average, annual percentage reduction to *all venues* does not answer the relevant question of how each venue and Ticketmaster would have negotiated the split of service fees in the but-for world.[112]

### C. Dr. Pathak's Analysis Ignores that Service Fees are Set Based on Individual Decisions Made by Venues and Their Bilateral Negotiations with Ticketmaster

49.     To answer the second set of questions I describe above—i.e., how (if at all) did the bilateral negotiations between Ticketmaster and each "major concert venue" affect the total service fees consumers paid—it is necessary to understand how service fees are set.  Dr. Pathak asserts that his "cost" benchmark "demonstrates that competitive pressure operates through systematic, market-wide mechanisms," and that the "systematic nature of this competitive effect supports the conclusion that all or nearly all Class members would benefit from competitive pressure through the same pricing mechanisms."[113]

50.     Put simply, there is no "systematic, market-wide mechanism" governing what service fees consumers attending events at different venues pay.  Each venue determines the service fees it charges, and Dr. Pathak has presented no evidence of any "mechanism" that links one venue's decisions with respect to service fees to another's—much less that links the decisions of all the hundreds of "major concert venues" at issue.  The factors that affect the fees paid by proposed class members at each venue depend on that venue's decisions and their specific negotiations with Ticketmaster.[114]  For example, a venue may unilaterally choose to charge a specific level of service fees because of the demand for its events or determine to charge a specific service fee to cover its operational costs.

---

[111] Pathak Declaration, ¶183.

[112] Dr. Pathak asserts that, because he calculates a "percentage reduction" in fees, "consumers paying a positive fee to Ticketmaster in the real world were harmed through a common mechanism" (Pathak Declaration, ¶182).  While it is mathematically correct that multiplying "a positive fee" by a positive percentage reduction results in a positive number, this does not answer the question of which (if any) proposed class members were harmed by the alleged conduct.

[113] Pathak Declaration, ¶183.

[114] Dr. Pathak agrees that "venues set the service fee that the consumer pays on an event-by-event basis but must pay Ticketmaster a fee set in the contract" (Pathak Declaration, ¶37).  Further, Marla Ostroff testified that ███ ██████ (Ostroff Deposition, 158:15–24).

51.    **Exhibit 4** illustrates the different ways service fees are determined.

**EXHIBIT 4**
**EXAMPLES OF SERVICE FEES CONTRACT TERMS**
**AT CONCERT EVENTS**
**2010 – 2024**



Notes: Venues which changed names during the period are classified by the current in-use venue name.  All venues are
included in Dr. Pathak's "major concert venues" designation for the year immediately following the contract listed.
Service fee terms are considered to have "varied" if there is variation in service fees at concert events by a category other
than time. Credit Union 1 Arena was known as the UIC Pavilion until 2018.  Lumen Field is a stadium complex run by
First & Goal Inc.  Fiserv Forum was known as Wisconsin Entertainment and Sports Center until 2018. PHX Arena was
known as the Footprint Center until February 2025.

Sources: LNE-LIT24-000062100–2132 (Credit Union 1 Arena); LNE-LIT24-000070798–0803 (Lumen Field); LNE-
LIT24-000078275–8286 (Ironstone Amphitheater); LNE-LIT24-002763958–3991 (Tivoli Theater); LNE-LIT24-
000101497–1552 (Fiserv Forum); LNE-LIT24-000112602–2641 (Allegiant Stadium); LNE-LIT24-003603207–3237
(Orpheum Theater); LNE-LIT24-000133929–3954 (PHX Arena); Pathak turnover (ticketing data); UIC Athletics
Website, http://uicflames.com/news/2018/11/15/gen-credit-union-1-arena.aspx; Seattle Seahawks Website,
https://www.seahawks.com/team/facilities/lumen-field/; ESPN Website,
https://www.espn.com/nba/story/_/id/24201677/milwaukee-bucks-fiserv-reach-deal-arena-naming-rights; Sports
Business Journal, https://www.sportsbusinessjournal.com/Articles/2025/02/18/suns-arena-set-for-name-change/;
National Basketball Association Website, https://www.nba.com/news/all-30-nba-arenas-by-team; Hockey Reference
Website, https://www.hockey-reference.com/arenas/.

HIGHLY CONFIDENTIAL

52.    As this exhibit shows, some venues may choose to not outline service fees to consumers in their contracts with Ticketmaster and ███████████████████████████████████ ████ "[115] For example, ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ [116] As Jenny Johnson (VP Commercial Strategy at Ticketmaster) testified ████████████████████████████████ ██████████████████████████████ [117] **Exhibit 4** also shows that service fees may vary over time and based on the face value of tickets.  For example, █████████ ████████████████████████████████████████████████ ████████████████████████████

53.    Available evidence also indicates that exceptions to the negotiated service fees may be requested and made by venues and/or content providers for specific events—potentially lowering the fees charged to proposed class members.  For example,

- ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████ [118]

- ████████████████████████████████████ ████████████████████████. [119]

- ████████████████████████████████████ ████████████████████████████████████ ██ ██ ████████████████████████████████████████████ ██████████████████████████████ . [121]

---

[115] Jenny Johnson 30(b)(6) Deposition, 29:3–5.

[116] Jenny Johnson 30(b)(6) Deposition, 28:8–17.

[117] Jenny Johnson 30(b)(6) Deposition, 28:18–24. Jenny Johnson further testified that ████████████████████████ ████████████████████████████ (Jenny Johnson 30(b)(6) Deposition, 29:6-9).

[118] LNE-LIT24-004058229–8276, at 8253.

[119] LNE-LIT24-002768920–8973 (████████████████████ at 8970.

[120] LNE-LIT24-000082261–2279 (████████████████ at 2266.

[121] LNE-LIT24-002915481.

HIGHLY CONFIDENTIAL



54.      Ultimately, a combination of individualized factors—including each venue's unilateral decision-making, its negotiation with Ticketmaster, as well as the particular set of applicable exceptions—determine what any proposed class member paid in service fees.  These service fees are *not* the result of some abstract "market-wide mechanism" as Dr. Pathak asserts.  There is no reason to assume (as Dr. Pathak does) that "major concert venues" would uniformly reduce their service fees by an *identical* percentage in the but-for world.  As Dr. Pathak recognizes, there are "venue-year factors that could affect pricing including operational costs, facility quality, local market characteristics, management practices, and Ticketmaster's relationship with individual venues"[124]—yet he nonetheless assumes there would be a uniform reduction in "prices" at all "major concert venues" in the but-for world.

55.      Dr. Pathak also does not address how the hundreds of venues he has identified as "major"— which varied across dimensions including type, capacity, and location—determined the service fees they charged to proposed class members.  My empirical analysis of service fees paid by consumers for concerts at "major concert venues" shows substantial differences in service fees paid across venues, including for concerts from the same tour.[125]  These differences illustrate the individualized (not "systematic") economic factors that affected fees proposed class members paid.  Dr. Pathak's "cost" benchmark analysis does not even attempt to account for how these individualized factors affected service fees paid and thus cannot determine what service fees would have prevailed in the but-for world.

---

[122] LNE-LIT24-000131110–1153 (⬛⬛⬛⬛⬛⬛⬛⬛⬛), at 1128.

[123] LNE-LIT24-001606728–6787 (⬛⬛⬛⬛⬛⬛⬛⬛⬛), at 6763.

[124] Pathak Declaration, ¶190.

[125] For my empirical analysis of service fees paid by consumers I use the same data and restrictions that Dr. Pathak uses for his "sports service fee" regression but do not require that the "major concert venues" host sports events (as well as concert events).

HIGHLY CONFIDENTIAL

56.      Empirical analysis of service fees shows the outcomes of the different pricing decisions made by the hundreds of venues at issue.  Even for similar venues (i.e., venues of similar size that host similar types of events), service fees paid by ticket purchasers could (and did) vary.  In fact, fees varied even for concerts that were part of the same artist's tour, because each venue made a distinct decision about what service fees to charge when it hosted that artist.[126]

57.      For example, **Exhibit 5** shows the distribution of service fees as a share of face value for concerts held at 17 venues as part of Taylor Swift's Eras Tour in 2023.  In the exhibit, the "bubbles" show the different service fees and the black "X"s show the average service fee.  (Both measures are shown as a percent of ticket face value.)  All of the Ticketmaster ticketed "major concert venues" that were part of Taylor Swift's tour in 2023 were NFL stadiums with seating capacities over 50,000, but as the black "X"s in this exhibit show, the average service fees for concerts within the same tour still varied *across* venues.

---

[126] As Jared Smith (former President of Ticketmaster) testified, ███████████████████████
████████████████████████████████████ (Smith Deposition, 88:19–92:12).  See also, ███████
███████████████████████████████████████████████████████████ Deposition of
Richard Best (Live Nation), March 19, 2025, 49:24–52:8.

HIGHLY CONFIDENTIAL

**EXHIBIT 5**
**DISTRIBUTION OF SERVICE FEES AS A PERCENT OF FACE VALUE**
**TAYLOR SWIFT TOUR**
**2023**



Notes: Limited to concert events at venues Dr. Pathak identified as relevant "major concert venues" ordered by event date. For events held at the same venue on consecutive days, I only show the first day in this exhibit.

Each "bubble" represents a service fee level, rounded to the nearest 1 percent, that tickets were purchased at and the size of the bubble represents the volume of tickets at that service fee level. Each black "X" indicates the average service fee for a concert event at a specific venue. See **Exhibit D-87** for a summary of the full distributions for these events.

Source: Pathak turnover (ticketing data).

58.    The variation in service fees shown in **Exhibit 5** reflects different decisions made by each venue and each venue's negotiations with Ticketmaster. For example, ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████.[127] As the exhibit shows, ██████████████████████████████████

---

[127] LNE-LIT24-000112602–2641 (████████████████████), at 2626.

HIGHLY CONFIDENTIAL



59.    In contrast, ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████.[128]  In line with this contract,
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████.
Contrary to Dr. Pathak's assertions, there is no "market mechanism" that affected fees Taylor Swift fans in both Las Vegas and Detroit paid.  Rather, each venue's independent decision-making resulted in consumers in these two cities paying service fees under distinct structures.

60.    I use Drake's tour in 2023 as another example to show how the individualized nature of venue's decision-making means that consumers pay different service fees even for concert events on the same artist's tour.[129]  For example, Drake's tour in 2023 was largely hosted at NBA/NHL arenas, such as the United Center in Chicago, IL and TD Garden in Boston, MA.  **Exhibit 6** shows the distribution of service fees across the events on this tour.  As this exhibit shows:



---

[128] LNE-LIT24-000082318–2324 (████████████████████████████), at 2319; LNE-LIT24-000044265–4300 (████████████████████████████), at 4270–4271.

[129] See **Appendix D** for similar charts for other tours held in different types of venues in other years.

[130] LNE-LIT24-000097509–7517 (████████████████████), at 7511.

[131] ████████████████████████████████████████████████

[132] LNE-LIT24-001685413–5444 (████████████████████████), at 5418.

HIGHLY CONFIDENTIAL



Dr. Pathak's unsubstantiated theory is that a purported "market-wide mechanism" would not only result in uniformly lower "prices" to all "major concert venues"—but that these venues would also uniformly lower the service fees to consumers in the but-for world.  However, this empirical analysis shows that, even for the same event, these two venues do not uniformly set service fees paid by consumers.  That is, the service fees paid by consumers in the actual world contradict his theory of a "market-wide mechanism" that effects these fees.

HIGHLY CONFIDENTIAL

EXHIBIT 6
DISTRIBUTION OF SERVICE FEES AS A PERCENT OF FACE VALUE
DRAKE TOUR
2023



Notes: Limited to concert events at venues Dr. Pathak identified as relevant "major concert venues" ordered by event date. For events held at the same venue on consecutive days, I only show the first day in this exhibit.

Each "bubble" represents a service fee level, rounded to the nearest 1 percent, that tickets were purchased at and the size of the bubble represents the volume of tickets at that service fee level. For these events, 8███████████████ ████████████████████████████████████████ and are not shown. Each black "X" indicates the average service fee for a concert event at a specific venue. See **Exhibit D-88** for a summary of the full distributions for these events.

Source: Pathak turnover (ticketing data).

61.    **Exhibit 7** shows a similar analysis of service fees across venues played by Matchbox Twenty in 2023, most of which were amphitheaters. Unlike NFL stadiums and arenas, amphitheaters are often outdoor venues that do not host professional sports events and are specifically designed for concert events.[133] As part of this tour, Matchbox Twenty performed at over 40 separate "major concert venues"

---

[133] Live Nation's 2024 10-K states, "Amphitheaters are generally outdoor venues with between 5,000 and 30,000 seats that are used primarily in the summer season. We believe they are popular because they are designed specifically for concert events, with premium seat packages and better lines of sight and acoustics" (Live Nation 2024 10-K, p. 6; Pathak Declaration, ¶16).

HIGHLY CONFIDENTIAL

ticketed by Ticketmaster and, of those shown in the exhibit, average service fees █████████ ████████████████. Moreover, ████████████████████████████████ ████████████████████████. For example,



- ████████████████████████████████████████
  █████████████████████████████████
  ████████████████████████ ████████████
  █████████████████████████.

- ████████████████████████████████████████
  ██████████████████████████████████████
  ████████████████████████████████████████
  ███████████████████████████████
  ████████████████████████████████████
  ████████████████████.

This illustrates how an individual venue's particular decisions and bilateral negotiations with Ticketmaster can result in different service fees even for the same event at two similar venues (i.e., amphitheaters hosting the same event) with similar fee structures (i.e., ████████" in their contracts). Again, this empirical analysis contradicts Dr. Pathak's theory of a "market wide mechanism" that determines what service fees consumers pay. As this analysis shows, the service fees paid by individual consumers depends on venue specific factors.

---

[134] LNE-LIT24-000108000–8030 (███████████████████████), at 8022. ████████████
████████████████████████ (LNE-LIT24-000108000–8030, at 8022).

[135] LNE-LIT24-000125334–5363 (████████████████████████████████), at 5348. ████████████
████████████████████

HIGHLY CONFIDENTIAL

**EXHIBIT 7**
**DISTRIBUTION OF SERVICE FEES AS A PERCENT OF FACE VALUE**
**MATCHBOX TWENTY TOUR**



Notes: Limited to concert events at venues Dr. Pathak identified as relevant "major concert venues" ordered by event date. For this tour, I limit the exhibit to the first 20 "major concert venues." For events held at the same venue on consecutive days, I only show the first day in this exhibit.

Each "bubble" represents a service fee level, rounded to the nearest 1 percent, that tickets were purchased at and the size of the bubble represents the volume of tickets at that service fee level. For these ███████████████████ ███████████████████████████████ and are not shown. Each black "X" indicates the average service fee for a concert event at a specific venue. See **Exhibit D-89** for a summary of the full distributions for these events.

Source: Pathak turnover (ticketing data).

62.    Taken together, these empirical analyses show that service fees paid by proposed class members varied even between similar venues that hosted *the same concert* as part of the same tour. This finding is consistent with the individualized nature of how service fees are set across venues. Although Dr. Pathak acknowledges that service fees vary across venues, he still theorizes that there is some shared "pricing mechanism" linking the decisions of his hundreds of "major concert venues," and *all* these venues would uniformly lower service fees to consumers in the but-for world.[136] Contrary to his theory,

---

[136] Pathak Declaration, ¶183.

when I study the service fees proposed class members actually paid across venues, I find wide variation in service fees, which are determined based on the specific venues' individual determination and their bilateral negotiations with Ticketmaster.  This shows that there is no "market-wide mechanism" that uniformly determines service fees across these venues—nor is there any reason to assume that such a mechanism would impact these service fees uniformly in the but-for world.

## VI.    DR. PATHAK'S METHODOLOGY IS PREDICATED ON THE EMPIRICALLY REJECTED ASSUMPTION THAT LOWER "PRICES" PAID BY INDIVIDUAL *VENUES* WOULD RESULT IN UNIFORMLY LOWER FEES FOR *CONSUMERS*

63.    Dr. Pathak asserts that "[i]n the but-for-world, there would be greater competition between primary ticket service providers," and "[v]enues would have taken advantage of this competition between ticketers to demand lower prices and higher quality."[137]  Dr. Pathak simply assumes that "greater competition" for primary ticketing services for venues would lead to all venues unilaterally (and uniformly) lowering service fees to consumers.[138]  This assumption fails to address the real-world data showing venues *not* reducing service fees to consumers even when Ticketmaster's "share" declines.[139]

64.    As Dr. Pathak acknowledges, both "venues and ticketers possess some degree of market power and add separate markups" to the face value of the ticket.[140]  Despite this, Dr. Pathak does not attempt to model the "markup" that venues would have set in the but-for world.  Rather, he simply assumes that all venues' revenue from service fees in the but-for world would be *exactly* the same as it was in the actual world.[141]  This assumes away the very inquiry necessary to determine how any differences in "competition" in the but-for world would have affected proposed class members.  For example, in a

---

[137] Pathak Declaration, ¶139.  See also, Pathak Deposition, 161:1–13.

[138] When asked in deposition about what he has done "to validate that the venues will pass on the savings from the primary ticketer to the consumer," Dr. Pathak testified that this conclusion is a "consequence of simple economic logic" which he "looked in textbooks about" and for which "there was no need for [him] to do that empirical analysis, given what theoretical predictions are." (Pathak Deposition, 216:2–21).

[139] Dr. Pathak argues that "[i]ndividual consumers do not negotiate prices with Defendants," and thus "all or nearly all Class members were harmed by Defendants' conduct" (Pathak Declaration, ¶140).  This is a *non sequitur*, as individual consumers negotiating with Ticketmaster is not somehow a pre-requisite for there being, or not being, class-wide antitrust injury.  For example, if a venue negotiated terms that prevented Ticketmaster from receiving supracompetitive fees, consumers that saw a show at that venue would not have been injured.  They do not need to have individually negotiated with Ticketmaster to avoid injury.

[140] Pathak Declaration, ¶193.

[141] "In particular, I assume venues would have received the same amounts in contractual signing bonuses, contractual sponsorship payments, base service charge related royalties, and base service charge related rebates as they received in the actual world" (Pathak Declaration, ¶212).

hypothetical situation where there was more competition for primary ticketing services, one possibility is that venues would be able to extract greater concessions from primary ticketers like Ticketmaster, SeatGeek, and others—e.g., in the form of higher signing bonus/sponsorship payments and/or a higher share of service fees.  In this scenario, *venues* may be better off from additional competition among primary ticketers.  However, Dr. Pathak fails to explain how this would translate into *individual eventgoers* paying lower service fees given that ████████████████████████████████████ ████████████████████"[142]

65.    Dr. Pathak claims that his assumption is conservative[143] because greater "competition between venues could have led to lower facility-imposed fees in the but-for-world."[144]  That is, his but-for world conceives not only of "greater competition" among *primary ticketers*—which is what Plaintiffs allege— but also among *venues*.  However, there is no allegation in this matter that *venues* have behaved anticompetitively—such that this behavior would need to be removed in the but-for world—and Dr. Pathak has not offered any evidence or analysis to support his claim of "greater competition" between venues in his proposed but-for world.  Moreover, Dr. Pathak's speculation that additional competition between venues "could have" led to venues retaining less revenue from service fees ignores *how* venues compete with each other in the real world.  As Dr. Pathak describes, "[v]enues compete with each other to book artists and events."[145]  Given that venues compete to attract events, there is no reason to assume that in the but-for world venues would choose to lower fees to consumers rather than, for example, offering more favorable terms to artists or promoters.  For example,

- Live Nation's 2024 10-K states that, "[i]n markets where we own or operate a venue, we compete with other venues to serve artists likely to perform in that general region."[146]

- ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████  ██████████████████████████████
  ████████████████████████████████████████████████

---

[142] Pathak Declaration, ¶¶37–38.

[143] Pathak Declaration, ¶212.

[144] Pathak Declaration, ¶212.

[145] Pathak Declaration, ¶153.

[146] Live Nation 2024 10-K, p. 8.

[147] ████████████████████████████

HIGHLY CONFIDENTIAL



- Michael Rapino (CEO at Live Nation) testified that ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████████ ██████████████[149]

- ████████████████████████████████████████ █████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████

These examples suggest that even in a world with "greater competition" among primary ticketers, there is no basis to assume (as Dr. Pathak has) that any reduction in Ticketmaster's "share" would be necessarily and uniformly passed through by the venue to consumers in the form of lower service fees. Rather, these examples suggest one possibility is that venues may use those "savings" to more vigorously compete to attract artists. Another possibility is that the venue would simply retain the "savings" from Ticketmaster's reduced "share" and neither spend it on attracting talent or lowering consumers' total service fees. While these possibilities cannot exist in Dr. Pathak's but-for world—which equates any reduction in Ticketmaster's "share" with an identical reduction in consumers' service fees—the empirical analysis I describe below shows they do exist in the real world. Put differently, Dr. Pathak's methodology is based on assumptions that are rejected by real world evidence, which renders it unreliable.[152]

---

[148] ████████████████████████████████████

[149] Deposition of Michael Rapino (Live Nation), October 29, 2019, 120:9–121:4.

[150] ██████████████████████████████████████

[151] ████████████████████████████████

[152] Dr. Pathak testified that his opinion was "an elementary result from competition economics" for which there was "no reason for [him] to do [any data analysis]" (Pathak Deposition, 206:6–208:21). Put simply, Dr. Pathak's theory does not comport with empirical reality.

HIGHLY CONFIDENTIAL

### A. Case Study: Credit Union 1 Arena

66.     Credit Union 1 Arena is located on the campus of the University of Illinois Chicago ("UIC") in Chicago, Illinois and is one of the "major concert venues" identified by Dr. Pathak.[153]



67.     According to Dr. Pathak's conception of the but-for world, ████████████ ████████████████████████████████, would result not only in the decline of the ticketer's "price" to the venue, but also in an identical reduction in service fees paid by consumers.  In **Exhibit 8**, I show the average service fees and Ticketmaster's "share" of these service fees for concert events at Credit Union 1 Arena.[159]  For example, ████████████████ ████████████████████████████████.[160]

---

[153] Credit Union 1 Arena has a capacity of approximately 10,000 seats and, from 2015 through 2024 when Ticketmaster data is available, Dr. Pathak treats it as a "major concert venue" only in 2016 (Credit Union 1 Arena Website, https://www.creditunion1arena.com/).  However, because of his inconsistent definition of what constitutes a "major concert venue," he does not treat it as such in any other year from 2015 through 2024.  Nonetheless, this example illustrates the fundamental flaw in Dr. Pathak's conception of how the competition at issue works.

[154] LNE-LIT24-002609643–9646, at 9645.

[155] LNE-LIT24-002609643–9646, at 9645.

[156] LNE-LIT24-002787885–7889, at 7886.

[157] LNE-LIT24-002787885–7889, at 7886.

[158] LNE-LIT24-000115912–5945, at 5935.

[159] For the analysis in this section, I account for fixed payments paid to the venue when calculating Ticketmaster's "share" of service fee revenue per ticket.  These payments are part of the negotiation process and can lower the "price" the venue pays Ticketmaster for ticketing services and therefore lower its overall share of service fee revenue.

[160] To calculate Ticketmaster's "share" of service fees, I first calculate Ticketmaster's per-ticket service fee revenue for concert events (consistent with Dr. Pathak's "net service fee" calculation).  I then calculate the per-ticket fixed payments that Ticketmaster paid to the venue and deduct this from Ticketmaster's per-ticket service

(continued on next page . . .)

HIGHLY CONFIDENTIAL

**EXHIBIT 8**
**AVERAGE ANNUAL SERVICE FEES AND TICKETMASTER'S "SHARE"**
**CONCERT EVENTS AT THE CREDIT UNION 1 ARENA**
**2019 – 2024**



Note: This exhibit includes the last non-COVID year of the previous contract and all years afterwards for the relevant venue, irrespective of if Dr. Pathak identifies it as a "major concert venue" in that year. From 2015–2024, Credit Union 1 Arena is identified as a "major concert venue" only in 2016.

Source: Pathak turnover (financial data).

68.    This exhibit shows two important elements of the competitive dynamic between venues and ticketers. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

fee revenue to arrive at Ticketmaster's per-ticket "share." The per-ticket fixed payment includes the signing bonuses and sponsorship payments included in Dr. Pathak's damages calculation and allocates them across all ticket sales (excluding vouchers, upsells, parking, and memberships) at the venue in a year.

[161] I use 2019 as my comparison year as it is the last full year of the previous contract prior to the COVID-19 pandemic.

Highly Confidential



████    This analysis not only illustrates the venue by venue (and contract by contract) inquiry relevant to
assessing how "competition" affects Ticketmaster's "share" of service fees, but it directly contradicts
Dr. Pathak's fundamental assumption that *any* reduction in Ticketmaster's "share" *must* necessarily and
uniformly result in lower service fees for proposed class members.

### B. Case Study: Barclays Center

69.    The Barclays Center in Brooklyn, New York is one of the "major concert venues" identified by
Dr. Pathak.[162] ████████████████████████████████████

70.    ████████████████████████████████████
████████████████████████████.    In fact, as I show in **Exhibit 9**, ████████████
████████████████████████████
███████████████.

---

[162] In addition to hosting concert events, it is also home to two basketball teams (the Brookyln Nets and the New
York Liberty) and negotiates tickets for all of these events together (Barclays Center Website,
https://www.barclayscenter.com/center-info/about-us).

[163] LNE-LIT24-003196488–6562. ████████████████████
██████████████ (Ticketmaster opportunities data).

[164] LNE-LIT24-001596450–6464. ████████████████████
████████████████ (Ticketmaster opportunities data).

[165] LNE-LIT24-000851455–1463, at 1455.

[166] ████████████████████ LNE-LIT24-001596450–6464, at 6454.

[167] Pathak turnover (financial data).

HIGHLY CONFIDENTIAL

**EXHIBIT 9**
**AVERAGE ANNUAL SERVICE FEES AND TICKETMASTER'S "SHARE"**
**CONCERT EVENTS AT THE BARCLAYS CENTER**
**2020 – 2024**



Notes: This exhibit includes the last non-COVID year of the previous contract and all years afterwards for the relevant venue, irrespective of if Dr. Pathak identifies it as a "major concert venue" in that year.  From 2015–2024, Barclays Center is identified as a "major concert venue" in 2015–2024.  Ticketmaster and Barclays Center did not have a contract in 2022—approximately 77,000 concert tickets were sold by

Source: Pathak turnover (financial data).

46

HIGHLY CONFIDENTIAL

### C. Case Study: Pacific Amphitheatre (Orange County Fair)

71.    The Pacific Amphitheatre is a "major concert venue" located on the Orange County Fairgrounds in Costa Mesa, CA.[168] ███████████████████████████

████████████████████████████████████  ██████████████

████████████████████████████████

██████████  ████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

---

[168] Pacific Amphitheatre Box Office Website, https://pacamp.com/tickets/box-office/.

Despite having a smaller capacity than Credit Union 1 Arena (8,000 vs. 10,000), Dr. Pathak treats Pacific Amphitheatre as a "major concert venue" in seven years of the proposed class (Pacific Amphitheatre Website, https://www.costamesaamphitheatre.com/information/; Credit Union 1 Arena Website, https://www.creditunion1arena.com/).

[169] LNE-LIT24-000099573; LNE-LIT24-003607063. ███████████████████████████████
████████████████████ 3 (Ticketmaster opportunities data).

[170] LNE-LIT24-000623139–3142, at 3139.

████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████
(LNE-LIT24-000623139–3142, at 3139, 3141).

[171] LNE-LIT24-003607063.

**HIGHLY CONFIDENTIAL**

**EXHIBIT 10**
**ANNUAL AVERAGE CONSUMER SERVICE FEES AND TICKETMASTER'S "SHARE"**
**CONCERT EVENTS AT PACIFIC AMPHITHEATRE**



Notes: This exhibit includes the last non-COVID year of the previous contract and all years afterwards for the relevant venue, irrespective of if Dr. Pathak identifies it as a "major concert venue" in that year.  From 2015–2024, Pacific Amphitheatre is identified as a "major concert venue" in 2017–2019 and 2021–2024. There are no tickets sales in 2020 as the Pacific Amphitheatre was closed due to the COVID-19 pandemic (OC Fair Website, https://ocfair.com/updates/faqs/). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ticketmaster opportunities data).

Source: Pathak turnover (financial data).

72.     This example provides another illustration of Dr. Pathak's flawed conception of the but-for world.  "Competition" between primary ticketers for individual venues may potentially reduce the "prices" venues pay for primary ticketing.  In fact, such competition occurred in the actual world. However, this competition does not necessarily lead to the venue passing through all (or even any) of the "savings" in the form of lower service fees to consumers.  In fact, service fees may increase even as Ticketmaster's "share" declines—meaning the venue simply makes more revenue per ticket in service

HIGHLY CONFIDENTIAL

fees.[172]  Determining how (if at all) "greater competition" from primary ticketers would affect any venue's "price" involves a venue-by-venue analysis that Dr. Pathak has not conducted.  Determining how (if at all) this would in turn affect proposed class members (who are consumers, not venues) involves additional analysis that Dr. Pathak's "cost-based" methodology does not (and cannot) conduct.

### D. Case Study: ASM Global

73.     Dr. Pathak asserts that "individual venues lack sufficient bargaining power to negotiate favorable terms" and that "the correct economic framework views venues as numerous, small buyers facing a dominant seller."[173]  He draws this conclusion based on the supposed showing that "no major concert venue represents more than 2.8% of the concert ticket value at major concert venues over the 2010-2024 period."[174]  This claim is economically nonsensical.  What Dr. Pathak appears to be claiming is that when compared against over 1,300 *other* "major concert venues," no *individual* "major concert venue" stands out to him as unusually large.  But this says nothing about whether any individual major venue—many of which are owned by professional sports teams, major universities, and multi-billion-dollar corporations—does or does not have "bargaining power" in negotiations with Ticketmaster.

74.     Dr. Pathak's "framework" makes no economic sense given the available real-world evidence. For example, as I discussed above, Ticketmaster witness testimony suggests that ███████████████ ████████████████████████████████████████████"[175]  Additional available evidence also shows that Ticketmaster ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████     ████████████████████████████████████████

---

[172] Service fees charged by a venue can also vary from event to event, meaning a change in the mix of events over time can cause a change in the average service fees charged to consumers. ███████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

[173] Pathak Declaration, ¶153.

[174] Pathak Declaration, ¶152, Figure 4.

[175] Smith Deposition, 133:10–17.

[176] LNE-LIT24-003496664–6670, at 6664.

[177] LNE-LIT24-003496664–6670, at 6664.  ASM Global was purchased by Legends Global in August 2024 (Legends Global Website, https://legendsglobal.com/legends-completes-acquisition-of-asm-global/).

HIGHLY CONFIDENTIAL



Dr. Pathak's general assertion that "individual venues lack sufficient bargaining power to negotiate favorable terms"[182] simply ignores this evidence.

75.    According to Ticketmaster, █████████████████████████████



---

[178] LNE-LIT24-000425354–5355.

[179] Pathak Declaration, ¶176; LNE-LIT24-003496664–6670, at 6664.

[180] LNE-LIT24-000242681–2684, at 2682.

[181] LNE-LIT24-001123550–3554, at 3350–3351; Ticketmaster Website, https://business.ticketmaster.com/why-ticketmaster/our-story/.

[182] Pathak Declaration, ¶153.

[183] LNE-LIT24-000425354–5355, at 5355.

[184] LNE-LIT24-004193769–3779, at 3769.

[185] LNE-LIT24-003496664–6670, at 6667.

[186] LNE-LIT24-004193769–3779, at 3771; LNE-LIT24-003496664–6670, at 6667.

- ███████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████
███████████████████████████

███████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████

76. **Exhibit 11** shows ████████████████████████████
█████████████████████████████████████
███ ██ ████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████. This yet again shows that Dr. Pathak's fundamental assumption about venues' lack of bargaining power is incorrect, as is his assumption that "competition" for primary ticketing must necessarily result in lower service fees to consumers.

---

[187] LNE-LIT24-004193769–3779, at 3771; LNE-LIT24-003496664–6670, at 6667.



[188] LNE-LIT24-004193769–3779, at 3778.  James L. Knight Center is an ASM venue visited by Named Plaintiff Luis Ponce in 2022 (Declaration of Luis Ponce in Support of Plaintiffs' Motion for Class Certification and Appointment of Co-Lead Class Counsel, August 18, 2025 ("Ponce Declaration"), p. 2).

HIGHLY CONFIDENTIAL

**EXHIBIT 11**
**ANNUAL AVERAGE CONSUMER SERVICE FEES AND TICKETMASTER'S "SHARE"**
**CONCERT EVENTS AT JAMES L. KNIGHT CENTER**
**2019 – 2024**



Notes: This exhibit includes the last non-COVID year of the previous contract and all years afterwards for the relevant venue, irrespective of if Dr. Pathak identifies it as a "major concert venue" in that year.  From 2015–2024, James L. Knight Center is identified as a "major concert venue" in 2015–2024.  See **Appendix E** for charts showing a similar analysis for additional ASM venues.

Source: Pathak turnover (financial data).

77.     Dr. Pathak's broad assertions about how "greater competition" in the but-for world would supposedly lead to "lower prices" for consumers is untethered from the reality of the "competition" and "prices" relevant to Plaintiffs' claims.  Not only would "competition" among primary ticketers for a particular venue's business relate to "prices" that *venue* would pay in the but-for world, but any effect of such competition on the venue's prices would not automatically or necessarily translate into the "prices" *consumers* buying tickets to see performances at that venue would pay.  Dr. Pathak's methodology is incapable of analyzing (i) how (if at all) each bilateral negotiation between a given "major concert venue" and Ticketmaster would have been different in the but-for world with "greater competition," and (ii) how (if at all) each venue would adjust its service fee in response to its negotiations with Ticketmaster in the but-for world.

HIGHLY CONFIDENTIAL

### VII.    DR. PATHAK'S METHODOLOGY IS UNRELIABLE BECAUSE IT IS INCAPABLE OF ADDRESSING (OR EVEN IDENTIFYING) FEES PROPOSED CLASS MEMBERS PAID THAT COULD NOT HAVE BEEN AFFECTED BY THE ALLEGED CONDUCT

78.    Dr. Pathak's assumes the conclusion that "all or nearly all class members were injured" based on the four "categories of evidence" he presents.[189]  However, a basic but fundamental flaw undermines each of these "categories" as a reliable methodology for assessing antitrust impact—none of Dr. Pathak's "categories of evidence" show that proposed class members paid higher service fees due to the alleged "exclusivity" and "tying" at issue in this case.  This flaw is illustrated by the fact that many venues entered into contracts with Ticketmaster *before* the alleged conduct began—which remained in place *after* it began.  Consumers that purchased tickets at venues with these "legacy" contracts in effect could not have been affected by conduct Plaintiffs allege, even if their purchases themselves took place during the proposed class period.[190]

79.    As an example,



A consumer purchasing a ticket (and paying associated service fees) to see a concert at the ▮▮▮▮▮ in 2015, for example, would be a

---

[189] Pathak Declaration, ¶141.

[190] While Plaintiffs allege that the January 2010 merger between Live Nation and Ticketmaster "eliminated" competition "in ticketing" that existed in 2008–2009, Dr. Pathak testified that "anticompetitive conduct existed before 2010"—specifically that "[t]he exclusive dealing predates 2010" (Class Certification Motion, p. 2; Pathak Deposition, 48:5–9).

I note that the alleged "tying" could not exist before 2010 and the merger between Live Nation and Ticketmaster.  That is, at least one aspect of the alleged conduct did not exist when these contracts were negotiated.  While Dr. Pathak testified that "exclusivity" has been a practice as far back as the 1980s, he does not offer the opinion that the "*anticompetitive conduct*" Plaintiffs allege in this matter began then (Pathak Deposition, 52:3–16).  Dr. Pathak also does not present any analysis to suggest that the "price" for "primary ticketing services" was elevated prior to the start of the proposed class period—testifying that his "assignment was to look from 2010 to present and examine the anticompetitive effects of Ticketmaster from 2010 to present" (Pathak Deposition, 47:13–22).

Dr. Pathak himself points to exclusive contracts prior to 2010, which he describes as "competitive."  For example, Dr. Pathak's own "historical competitive benchmark"—a single 2008 contract between Live Nation and SMG—is "exclusive" (LNE-LIT24-000029987–9999, at 9989).  Similarly, Dr. Pathak argued that "[f]aced with emerging competition" from Live Nation in 2008–2009, Ticketmaster "began offering 'more attractive renewal terms'" (Pathak Declaration, ¶174).  If these "legacy" contracts are "competitive," Dr. Pathak's methodology must be able to identify them and the proposed class members that could not have been harmed by the anticompetitive conduct alleged by Plaintiffs in this case.

[191] According to Dr. Pathak, "this brief period of competition reveals what might have occurred in a market free from anticompetitive exclusive contracts" (Pathak Declaration, ¶174).

[192] LNE-LIT24-000027689–7720.

member of the proposed class.  However, it could not be the case that those fees were at *supra-competitive* levels due to the alleged conduct, because the conduct Plaintiffs allege was not happening during the *competitive* period when the contract governing the terms of the 2015 purchase went into effect.[193]  The same would be true for any contract signed prior to the proposed class period—in a period without the alleged conduct.

80.    **Exhibit 12** provides 25 examples of contracts between venues and Ticketmaster that were signed prior to the start of the proposed class period and extended into the class period.  Consumers who purchased tickets for events at one of these venues while these contracts were in effect could not have been impacted by the alleged "exclusivity" and "tying."[194]  However, Dr. Pathak's "categories of evidence" do not even recognize this issue exists, much less provide for a way to study or address it.  Because he simply *assumes* that *all* proposed class members suffered antitrust impact—a conclusion that does not derive in any specific way from the calculations and data analyses he has performed—Dr. Pathak's approach treats all proposed class members who *could not have been injured* as having *necessarily been injured*.  This type of "false positive" result (i.e., finding "impact" where none could exist) invalidates the entirety of Dr. Pathak's methodology.

---

[193] Dr. Pathak's methodology finds "damages" for tickets purchased at AT&T Stadium as well as other "major concert venues" that signed contracts with Ticketmaster prior to the proposed class period.  For example, I find that for just three venues with "legacy" contracts that extended into the proposed class period, Dr. Pathak's "cost" benchmark finds "damages" on over ███████ tickets, amounting to over ███████ in "damages" from 2015 onward—for AT&T Stadium in 2015, Cadence Bank Arena in 2015, and Amalie Arena between 2015 and 2018.  Prior to 2015, Dr. Pathak's "damages" are based on "back-casting" total damages across all venues.

To the extent the contracts for these venues (or any other "legacy" contract) was amended or extended during the contract period, the terms of such agreements would have to be reviewed to determine if they differed from the pre-class period contracts.

[194] Available Pollstar data indicates that approximately ███████ concert tickets were sold at these specific venues, in years that Dr. Pathak identifies them as "major concert venues," from the start of the proposed class period through the contract end dates identified in **Exhibit 12**.  Even for a narrower set of these contracts, for example those that started between September 2008 (when Live Nation signed an agreement with SMG) and the beginning of the proposed class period, there are approximately ███████ concert tickets sold during the proposed class period.

I note that these venues are not defined by Dr. Pathak as "major concert venues" in all years.  As I discuss above, Dr. Pathak offers no explanation as to why venues would be "major" in certain years but not others (see ¶39, *supra*).  Moreover, the concert tickets sold at these specific venues are not necessarily the only tickets that could not have been impacted by the alleged conduct.  An analysis of contracts for each individual "major concert venue" would be required in order to determine if any individual "major concert venue" was potentially impacted by the alleged conduct.

HIGHLY CONFIDENTIAL

**EXHIBIT 12**
**EXAMPLES OF CONTRACTS FOR "MAJOR CONCERT VENUES"**
**SIGNED BEFORE THE PROPOSED CLASS PERIOD**
**AND EXTENDING INTO THE CLASS PERIOD**



Note: Includes new contracts or contract amendments signed prior to the start of the proposed class period and extending into the class period.

Venues included are those that Dr. Pathak ever identifies as relevant "major concert venues."

Source: See backup materials for full list of sources.

81.    A related issue is that venues could (and did) extend the negotiated pre-conduct contracts during the proposed class period.  With these renegotiations, Ticketmaster's "share" of service fees (i.e., the "price" of "primary ticketing services" that Dr. Pathak studies) could (and did) remain the same or even decrease—giving a larger share of these fees to the venues.  For example,

- 

---

[195] LNE-LIT24-████████████████ The contract also included a $30,000 annual sponsorship allowance.

(continued on next page . . .)

**HIGHLY CONFIDENTIAL**



Dr. Pathak's "categories of evidence" are incapable of identifying instances of "legacy" contract renegotiations that resulted in more favorable service fee sharing for the venue, much less for the consumers buying tickets at that venue. His analysis can neither identify nor quantify the prevalence of proposed class members that purchased tickets at venues where Ticketmaster's "share" of service fees was less than the "share" negotiated in a period without the alleged conduct. In addition to offering an analysis incapable of analyzing this issue, Dr. Pathak does not even attempt to explain why *all* proposed class members that purchased tickets at any "major concert venue" that retained even more in service fees compared to the pre-period must *necessarily* have suffered antitrust injury.

82.    Ultimately, Dr. Pathak's failure to conduct a venue-by-venue assessment of the bilateral negotiations between Ticketmaster and venues that determine the "price" of primary ticketing and how

---

I focus my analysis on service fees and the fixed payments identified by Dr. Pathak. However, when negotiating contracts, ███████████████████████████████████████████████ ██████████████████████████████ (see for example LNE-LIT24-000053491–3520, at 3519).

[196] LNE-LIT24-000078743–8747, at 8746.

[197] LNE-LIT24-000052684–2725, at 2684, 2687, 2723.

[198] LNE-LIT24-000074574–4583; LNE-LIT24-000099232–9251.

[199] LNE-LIT24-000099232–9251, at 9233, 9250.

(if at all) these negotiations impact the service fees paid by consumers (or even propose a methodology capable of conducting such an assessment) renders his analysis incapable of determining antitrust impact and damages. His methodology is incapable of determining that a consumer purchasing a ticket for an event at ▇▇▇▇▇▇▇▇ in 2015—and many other consumers purchasing tickets at the hundreds of venues at issue over the 15-year proposed class period—could *not* have suffered antitrust injury because those terms were set under "legacy" contracts with Ticketmaster.

83.    While Dr. Pathak testified that "[t]he exclusive dealing predates 2010," he does not offer the opinion that the *anticompetitive conduct* Plaintiffs allege in this matter began then. Moreover, he claims that when "[f]aced with emerging competition" from Live Nation in 2008–2009, Ticketmaster "began offering 'more attractive renewal terms.'"[200] If even a subset of the "legacy" contracts negotiated prior to the proposed class period is "competitive," Dr. Pathak's methodology must be able to identify these and the proposed class members that could not have been harmed by the conduct alleged by Plaintiffs in this case. Instead, his methodology assumes without testing that *all* proposed class members did. It is also incapable of determining whether a consumer purchasing a ticket to see concerts at venues that had the same (or better) "price" from Ticketmaster as their "legacy" contracts suffered antitrust injury. Again, his methodology simply assumes that they *all* did, without conducting the inquiry. This fundamental flaw undermines the reliability of Dr. Pathak's methodology.

## VIII.    DR. PATHAK'S ASSESSMENT OF AVERAGE NET SERVICE FEES AND AVERAGE PROFIT MARGINS DOES NOT (AND CANNOT) DEMONSTRATE ANTITRUST IMPACT ON A CLASS-WIDE BASIS

### A.    Dr. Pathak's Analysis of Average "Net Service Fees" Does Not Show "Systematic" Increases in Service Feed Paid by Proposed Class Members and Cannot Show Antitrust Impact

84.    To support his claim that "systematic fee increases demonstrate market-wide impact," Dr. Pathak points to his analysis of "net service fees," which he calculates as Ticketmaster's "share" of service fees before accounting for fixed payments made to venues.[201] Based on a simple comparison of average "net service fees" in 2015 and 2024, Dr. Pathak claims that (i) "Ticketmaster's net service fees have increased over time across all major concert venues" and (ii) an "increase in net fees over time is

---

[200] Pathak Deposition, 48:5–9; Pathak Declaration, ¶174.

[201] Pathak Declaration, ¶¶184–185. Dr. Pathak also calculates what he describes as "gross base service fees," which include the portion of the service fees retained by the venue. Based on this analysis, Dr. Pathak claims that "[s]ervice fees that Ticketmaster charges fans have increased over time," which is misleading as *venues* (not Ticketmaster) sets these fees (Pathak Declaration, ¶106).

consistent with the alleged anticompetitive conduct creating market-wide effects affecting all or nearly all Class members."[202]

85.    Even taken at face value, the mere observation of average "net service fees" being higher in 2024 than in 2015 is not evidence of antitrust impact, much less evidence that all (or nearly all) proposed class members suffered antitrust impact.  For example:

- Using 2015 as a basis for comparison yields no information about the effect of the alleged anticompetitive conduct because the alleged conduct was *already occurring* in 2015.  Thus, any change relative to 2015 could *only* be the result of factors *other* than the alleged conduct.

- Relatedly, Dr. Pathak's simple comparison of "net service fees" over time does not control for *any* factor that may affect these fees—such as, e.g., changes in demand for ticketing over time, changes in the services that any specific venue demanded from Ticketmaster, changes in the set of venues Ticketmaster served, and changes related to the COVID-19 pandemic.[203]  He provides no basis for his assumption that *any* change in "net service fees" can *only* be caused by the allegedly anticompetitive conduct.[204]

- Dr. Pathak simply ignores that his measure of "net service fees" *declined* in 2016 and again in 2017—and then remained unchanged in 2018.[205]  While he claims any supposed increase

---

[202] Pathak Declaration, ¶¶184–185.

[203] For example, ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████   City of Orlando, FL in charge of operations for the Kia Center, Camping World Stadium, and other venues.

[204] Dr. Pathak asserts that "increases in gross and net fees occurred during a period where computing costs were decreasing and there was a general shift to lower cost digital ticketing"—although his analysis does not attempt to control for how any "computing costs" affected Ticketmaster's cost of doing business (Pathak Declaration, ¶107).  Dr. Pathak relies on a Producer Price Index for machinery and equipment for computers.  Not only is this not a measure of Ticketmaster's cost of doing business, but it cannot reflect any other changes in relevant economic factors that occurred between 2015 and 2024.  For example, Ticketmaster personnel have testified about ██████████████████████████████████████████.  See, for example, Deposition of Clay Luter 30(b)(1) (Ticketmaster), June 5, 2025, 136:16–21 ████████████████████████████████ ███████████████████████████████████████████████

[205] Pathak Declaration, Table 3.

HIGHLY CONFIDENTIAL

is "consistent with exclusive contracts and tying having anticompetitive effect[],"[206] he provides no explanation of why his own analysis is showing several years of *decreases* in this measure in the proposed class period.

- Dr. Pathak's calculation of average "net service fees" fails to account for fixed payments Ticketmaster made to venues, which is an important level of competition between ticketers for venues' business.[207] In fact, the signing bonuses and sponsorship payments Dr. Pathak himself identifies were, on average, ███████████████████████████████. Increasing signing bonus and sponsorship payments are indicative of more competition, not less.

86.     Dr. Pathak's analysis of aggregate "net service fees" is invalid because it does not "envision the manner in which a particular market would have developed, assuming that the antitrust violation did not occur and *holding every other feature of the actual world constant*."[208] It also does not support his assertion that Ticketmaster's "net service fees" have increased "across all major concert venues" or that there are "market-wide effects affecting all or nearly all Class members."[209] Put simply, even if Dr. Pathak's analysis was reliable (which it is not), comparing *average* rates of "net service fees" cannot inform the question *all* (or even most) major concert venues experienced increased "net service fees."

87.     Dr. Pathak's analysis of average "net service fees" obscures substantial variation in these metrics across venues.[210] I conducted a statistical test that compared Ticketmaster's "share" at each major concert venue as a percentage of ticket face value in 2015 to that in 2024 for concert events.[211] The results of this test are summarized in **Exhibit 13**.

---

[206] Pathak Declaration, ¶184. Even if "net service fees" increased, which they did not monolithically across venues or over time, this is not proof of anticompetitive conduct. In fact, the entire comparison of Dr. Pathak's analysis is *within* the class period—i.e., the alleged conduct was happening both in 2015 and in 2024.

[207] See ¶44, *supra*. For example, Marla Ostroff (Managing Director North America at Ticketmaster) testified that ███████████████████████████████████████████████████ ███████████████████████ (Ostroff Deposition, 211:5–21).

[208] ABA Proving Antitrust Damages, p. 89, emphasis added.

[209] Pathak Declaration, ¶¶184–185.

[210] Dr. Pathak's failure to account for fixed payments to venues obscures additional variation, as these payments varied across "major concert venues." For example, ███████████████████ ████████████████████████████████████████████████████████████

[211] I performed a standard statistical test called a "t-test" to test whether Ticketmaster's event-level "share" (i.e., "net service fees" after accounting for fixed payments) increased, decreased, or remained unchanged from 2015 to 2024 for each venue with available data.

(continued on next page . . .)

HIGHLY CONFIDENTIAL

**EXHIBIT 13**
**CHANGE IN TICKETMASTER'S VENUE-LEVEL "SHARE" OF SERVICE FEES**
**2015 – 2024**



Notes: Limited to concert events at "major concert venues" as defined by Dr. Pathak with at least ten concert events in both 2015 and 2024 after removing outliers.  In each year, fixed payments are allocated across all tickets for each "major concert venue" (see footnote 160, *supra*).  Like Dr. Pathak's calculation of "net service fees," Ticketmaster's "share" is calculated as a percent of face value.

Source: Pathak turnover (financial data).

88.      Across "major concert venues," Ticketmaster's "share" of service fees, as a percent of face value, ███████████████████████████████████████████████████████████████ ██████████████████████████ [212]  For example:

_____

(See, for example, *Econometrics: Legal, Practical, and Technical Issues,* American Bar Association, 2nd Ed., 2014, pp. 96–97; Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010, pp. 78–79.)

[212] Not all relevant venues were Ticketmaster customers in both 2015 and 2024, which is another flaw with Dr. Pathak's simple comparison.

When I expand the analysis to compare Ticketmaster's "share" for each venue's first year of available data compared to its last year of data, I similarly find that Ticketmaster's "share" ███████████
(continued on next page . . .)

HIGHLY CONFIDENTIAL



This testing on a venue-by-venue basis contradicts Dr. Pathak's claim that "net service fees" have "increased over time across all major concert venues."[213]

89.    Dr. Pathak's analysis of average "net service fees" is flawed and does not show any "systematic" increases in fees, nor can it "demonstrate[] that Ticketmaster has been able to increase the fees paid by consumers across major concert venues."[214]  Nor does Dr. Pathak perform any analysis to show that even in the instances where a venue's "net service fees" (i.e., Ticketmaster's "share") changed, that those changes necessarily resulted in proposed class members paying different service fees.

**B.  Dr. Pathak's Review of Live Nation's Aggregate Profit Margins is Not "Evidence of Competitive Impact" and Cannot Show Antitrust Impact, Much Less on a Class-Wide Basis**

90.    Dr. Pathak asserts that a purported increase in aggregate profit margins over time "is consistent with the degree of competition affecting market performance and consumer pricing across major concert venues."[215]  Specifically, Dr. Pathak states that "Live Nation's adjusted operating income ('AOI') margin for 2009, the period during which it competed with Ticketmaster, was 15.3%" while "Live Nation's ticketing AOI margin has increased over time and was 37.6% in 2024."[216]  Like his assessment

_____

█████████████████ .  This analysis is limited to venues that are identified as "major concert venues" by Dr. Pathak in at least two years and have at least ten concert events in each of those two years.

[213] Pathak Declaration, ¶184.

[214] Pathak Declaration, ¶185.

[215] Pathak Declaration, ¶186.

[216] Pathak Declaration, ¶186, Table 1.  "Adjusted operating income is a measure of profitability that takes operating income and makes adjustments such as subtracting non-recurring expenses or unusual gains or losses" (Pathak Declaration, footnote 75 (citing Live Nation 2024 10-K, p. 33)). Dr. Pathak does nothing to isolate the

(continued on next page . . .)

HIGHLY CONFIDENTIAL

of average "net service fees," Dr. Pathak's comparison of Live Nation's aggregate profit margins between two specific years suffers from the same defects. Dr. Pathak has not constructed a reliable but-for world, nor has he controlled for *any* other reasons that aggregate profits may have been higher in 2024 than in 2009.

91.    Dr. Pathak's basic point appears to be that Live Nation was—on average—"more profitable" in 2024 than in 2009, and that this purportedly provides evidence of "market-wide effects" of the alleged conduct.[217] This is another example of Dr. Pathak inappropriately using average metrics to make claims about supposed effects on individual venues and consumers. First, Ticketmaster did not have contracts with the same venues in 2024 as it did in 2009. Comparing average "profitability" measured across different sets of venues provides no information about what happened to "profitability" with respect to any individual venue. ████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████[218] In **Exhibit 14**, I show an excerpt of a Ticketmaster analysis prepared ██████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████    By looking at aggregate, average margins, Dr. Pathak necessarily obscures this variation across venues.

---

effect of primary ticketing competition on Live Nations's 2009 margins as opposed to any other economic factors, such as (for example) the economic recession in 2008-2009.

[217] Pathak Declaration, ¶186.

[218] LNE2019-CID-0106676. ████████████████████████████████
██████████████████████████████████

HIGHLY CONFIDENTIAL

**EXHIBIT 14**
**TICKETMASTER GROSS MARGIN PER TICKET**
**FOR VENUES WITHIN THE SAME SEGMENT AS APE**



Source: LNE2019-CID-0106676 (tab "Deal Overview").

92.    Dr. Pathak has also not provided any evidence that margins increased across all "major concert venues."  The same internal analysis illustrates that Ticketmaster estimated that ▮▮▮▮▮▮▮▮▮▮



---

[219] LNE-LIT24-005147244 (tab "Slides"). ▮▮▮▮▮▮▮▮▮▮▮▮

(LNE-LIT24-000165091–5097, at 5091.  See also, LNE-LIT24-002743628–3685 ▮▮▮▮▮ at 3631).

HIGHLY CONFIDENTIAL



Dr. Pathak's analysis does not account for this variation in margins across venues and time and instead attributes, without analysis, the aggregate increase in profit margins to anticompetitive conduct and then further assumes that the effect is class-wide.

93.      Dr. Pathak's comparison of Live Nation's profitability over time is not even limited to the ticketing business Plaintiffs allege was subject to anticompetitive conduct.  His table represents Live Nation's entire "Ticketing" segment and include commerce unrelated to sales to the proposed class, including:

- International ticket sales;[222]

- Resale tickets (i.e., tickets sold in the secondary market);[223]

- Ticket sales at venues that Dr. Pathak does not define as "major concert venues;" and

- All events, including non-concert events for sports teams, museums and cultural institutions, performing arts venues, and theaters.[224]

This is another reason why inferring "market-wide effects" from Dr. Pathak's summary of margins over time is a flawed and unreliable exercise.  For example, Dr. Pathak purports to calculate "damages" for 67 million tickets sold in 2024.[225]  This represents around 20 percent of the 331 million tickets sold by

---

[220] LNE-LIT24-004630561 ██████████████████████████████████████ ██████ ).

[221] LNE-LIT24-005334201 (████████████████████████████████████████ ████████████████████████. (LNE-LIT24-005338335–8337, at 8335).

[222] Live Nation 2024 10-K, p. 31.

[223] Live Nation 2010 10-K, p. 7.

[224] Live Nation 2010 10-K, p. 6.

[225] Pathak Declaration, Table 9.

HIGHLY CONFIDENTIAL

Live Nation's "Ticketing" segment in that year.[226]  That is, approximately 80 percent of the ticket sales underlying the 37.6 percent profit margin Dr. Pathak cites for 2024 are—by his own treatment of the data—not relevant to the proposed class.  Even putting aside all the other flaws of this analysis, Dr. Pathak has simply not measured Ticketmaster's "profitability" on tickets sold to the proposed class.

94.    Dr. Pathak's flawed conclusion of changes in "market performance" is also in contrast with Ticketmaster's internal reporting, which ███████████████████████████████████████████ ████████████████████████████



95.    Despite Dr. Pathak's assertions, changes in Live Nation's aggregate profit margins over time are not "consistent with the degree of competition affecting market performance and consumer pricing across major concert venues."[229]  The variation in relevant profit margins across venues resulting from individualized negotiations between those venues and Ticketmaster does not suggest impact "across major concert venues."  Further, his simple comparison fails to study the service fees at issue that were actually paid by proposed class members and cannot be used to determine whether those service fees increased as the result of the alleged conduct.  Reporting aggregate profit margins cannot isolate the effect of the alleged conduct from other factors that might cause average "Ticketing" profit margins (which include sales of non-relevant tickets) to increase.

---

[226] Live Nation 2024 10-K, p. 5.  Depending on the year, the tickets that Dr. Pathak purports to find damages for account for between 14 percent (in 2020) and 21 percent (in 2022) of total ticket sales reported by Live Nation.

[227] LNE22-000583728–3771, at 3767, 3769.

[228] LNE22-000495092–5126, at 5123. ██████████████████████████████ ███████████████████████████████████ (Deposition of Darren McInnes (Live Nation), June 5, 2025, 135:23–136:15).

[229] Pathak Declaration, ¶186.

HIGHLY CONFIDENTIAL

IX. **DR. PATHAK'S "SPORTS SERVICE FEE" REGRESSION IS UNRELIABLE AND DOES NOT SHOW ANTITRUST IMPACT, MUCH LESS ON A CLASS-WIDE BASIS**

96.    Dr. Pathak claims that the availability of season tickets for sports events "potentially provides a competitive restraint on the fees that can be charged" for single game sports tickets.[230]  He argues that the existence of season tickets for sporting events—which teams typically sell without fees—results in "reduced exclusivity" for the single game tickets sold by Ticketmaster.[231]  He further argues that "events subject to reduced exclusivity, such as sports events, should show systematically lower fees than events subject to greater or full exclusivity, such as concerts, at the same venues."[232]  Based on this premise, Dr. Pathak presents a regression analysis that purports to find, on average, that "sporting events have lower service fees than concert events."[233]  He claims that the results of this regression analysis "demonstrates market-wide rather than venue-specific effects."[234]

97.    Dr. Pathak argues that this analysis "supports the conclusion that exclusive dealing and tying create common impact affecting all or nearly all Class members."[235]  This is incorrect for the same reasons I discussed above with respect to his "net service fee" and comparison of aggregate margins. To the extent Dr. Pathak's "sports fee regression" is informative of anything relating to the effects of the alleged conduct (which it is not), the *average* result it purports to find is uninformative about whether *all* (or even many) proposed class members suffered antitrust impact.  In fact, Dr. Pathak's regression analysis cannot be "common" to all proposed class members because many of his "major concert venues" do not even host sporting events, a requirement a venue needs to satisfy to be included in his regression.  Indeed, his analysis includes only 360 venues—less than 60 percent of the venues ticketed by Ticketmaster which he calls "major concert venues."[236]  Again, to the extent Dr. Pathak's "sports fee

---

[230] Pathak Declaration, ¶187.

[231] Pathak Declaration, ¶188.

[232] Pathak Declaration, ¶188.

[233] Pathak Declaration, ¶189.  Specifically, Dr. Pathak presents a "regression analysis where the percentage of face value charge as service fees to consumers is the dependent variable and a dummy for if the event is a sporting event is an indicator variable […] include[ing] venue-year fixed effects."  Dr. Pathak applies this model to (i) "all major concert venues that had any amount of sporting tickets" and (ii) the "top 30 sporting venues by number of sports tickets."

[234] Pathak Declaration, ¶191.

[235] Pathak Declaration, ¶194.

[236] Dr. Pathak's damages estimate includes 652 "major concert venues" ticketed by Ticketmaster from 2015 to 2024.

regression" is informative of anything relating to venues that host sports events, it does not even purport to study venues—such as some theaters and amphitheaters—that do not.[237]

98.     Even taking the incorrect design and premise of Dr. Pathak's analysis as given, it does *not* show that "reduced exclusivity" causes consumers to pay lower service fees.[238]  As I describe below, statistical testing I have conducted directly contradicts Dr. Pathak's claim of "market-wide effects" on service fees charged to proposed class members.

### A.  Dr. Pathak's "Sports Service Fee" Regression is Conceptually Incapable of Demonstrating the Effects of the Alleged Conduct on a Class-Wide Basis

99.     The basic premise underlying Dr. Pathak's regression model—that sports tickets have "reduced exclusivity" relative to concert tickets—fails to reflect the reality of how these tickets are sold.  There is no "exception to exclusivity" for sports tickets.  The season tickets that Dr. Pathak points to are sold exclusively by the relevant sports team.[239]  That is, all of the sports tickets he discusses are sold exclusively: the single-game tickets are sold exclusively by a primary ticketer and the season tickets are sold exclusively by the team.[240]  Given that there is no "reduced exclusivity" for sports tickets, Dr. Pathak's regression analysis does not (and cannot) answer the question of whether "exclusivity" leads to higher service fees.  At most, and ignoring all its flaws, Dr. Pathak's "sports service fee" regression shows that service fees—which are determined by individual venues and their bilateral negotiations with Ticketmaster—are different, on average, for different types of events.

100.    Dr. Pathak acknowledges that his analysis "**does not eliminate the possibility that venues are solving a different pricing problem for sports events** and that either contributes to or leads to lower

---

[237] In order for season tickets to "potentially provide[] a competitive restraint on the fees that can be charged" for single game sports tickets, as Dr. Pathak assumes, they would have to be substitutes for single game tickets (Pathak Declaration, ¶187).  This assumption does not match the reality of how these tickets are sold.  For example, Ticketmaster's contracts with venues ████████████████████████████████████ (see, for example, LNE-LIT24-000063908–3953 (Kia Center), at 3913; LNE-LIT24-000062100–2132 (████████ at 2100, 2118).

[238] Pathak Declaration, ¶188.

[239] Live Nation 2024 10-K, p. 6 ("While we generally have the right to sell a substantial portion of our clients' tickets, venue and promoter clients often sell and distribute a portion of their tickets in-house through their box office and season ticket programs").

[240] Ticketmaster's contracts with sports team ███████████████████████████████████████ LNE-LIT24-000108190–8195 (████████), at 8192; Fox 35 Orlando, https://www.fox35orlando.com/news/new-sign-appears-to-reveal-amway-centers-new-name).

sports fees than concert fees."[241]  That is, he concedes that the differences he purports to identify may be the result of a fundamentally different business "problem," and not entirely (or even at all) the result of anticompetitive "exclusivity" and "tying" that Plaintiffs allege.  Individual venues choosing to price concert and sports events at different levels does not reflect differences in "ticketing exclusivity" across these events.  Rather than assessing the variation in decisions made by individual venues, Dr. Pathak claims that "sports teams and artists have similar incentives" to "attract repeat fans."[242]  However, the general assertion that both sports teams and artists are incentivized to sell as many tickets as possible is meaningless since it does not follow that a *venue must* make the same pricing decision for different types of events.  As David Marcus (Executive VP of Global Music at Ticketmaster) testified, the "nature of a sports season is very different from a concert performance," and there are "different dynamics in the way those events are priced."[243]  Further, many venues that host sports teams are owned or operated by the teams themselves.[244]  As Marla Ostroff (Managing Director North America at Ticketmaster) testified, ████████████████████████████████████████████████████████████

████████████████████████████████████████[245]

101.    Dr. Pathak's assumption—that the difference in average service fees he purports to find between sports and concerts events is the result of "reduced exclusivity"—is belied by the results of his own regression.  While his model includes ten years of data, it attempts to estimate only a single average difference between sports and concert events over the entire period.  Whether or not this is appropriate to do can be tested statistically.  Specifically, I adjusted Dr. Pathak's model to allow it to find different effects for each year of his analysis.  That is, rather than forcing the model to find a single average

---

[241] Pathak Declaration, ¶192, emphasis added.  Dr. Pathak further testified that he "concede[s] that this analysis does not eliminate the possibility that venues are solving a different pricing problem for sports events" (Pathak Deposition, 149:13–24).

[242] Pathak Declaration, ¶192.  However, in his deposition, Dr. Pathak contradicted this assertion instead testifying that "repeat fans" were actually part of the *differences* between sports events and concerts.  Specifically, he testified that the "repeat fans" a sports team is trying to attract are "distinct from" fans that want to attend "a concert that happens in a town once a year," which could lead to different determinations on the service fee levels for these events (Pathak Deposition, 145:9–18).

[243] Marcus 30(b)(6) Deposition, 11:3–12:23.  Mr. Marcus explained these differences testifying that "[t]here are different marketing models and advertising models in how those tickets are made available to consumers or how consumers discover those events" and that the platform requirements for sports and concerts differ, "the distinct platforms that might be used by a promoter with an artist client launching a tour would be different than the platforms that a team with a 42-game season would use."

[244] Pathak Declaration, ¶193.  See also, Marcus 30(b)(6) Deposition, 11:3–15; ██████████████████████████

[245] Ostroff Deposition, 150:14–24.  See Marcus 30(b)(6) Deposition, 21:17–22:3 ("[C]oncert economics are much tighter than they are in sports" because "concert ticket grosses drive the concert industry" while "[s]ports teams don't make most of their money from selling tickets.  They make most of their money from television and other revenue sources").

HIGHLY CONFIDENTIAL

difference between sports and concert service fees across the entire period—which Dr. Pathak's model estimates to be ██████████—I allowed his model to test for variation from year to year.

102.    **Exhibit 15** shows the result of this test.  In this exhibit, each bar represents the estimated difference in service fees for sports and concert events in a given year.  If the estimated difference is statistically significant (i.e., not due to random chance), it is shown as a solid bar, while the statistically *in*significant results are shown as shaded bars.  A positive bar means that sports service fees are higher, on average, in a given year—while a negative bar means that sports service fees are lower, on average. For example, Dr. Pathak's model finds ███████████████████████████████████ ████████████████████████████████████████████████████ That is, Dr. Pathak's own model, even accepting all its flaws, suggests there was *no* difference in service fees for sports and concert events for ███████████████ he studied.

HIGHLY CONFIDENTIAL

**EXHIBIT 15**
**RESULTS OF DR. PATHAK'S "SPORTS SERVICE FEE" REGRESSION**
**BY YEAR**



Notes: This analysis uses Dr. Pathak regression model and data from his Table 8, allowing for the effect of his sports indicator to vary by year.  Standard errors are clustered at the venue level.  Statistical significance determined at a conventional 5 percent level.

Source: Pathak turnover (ticketing data).

103.    If Dr. Pathak's model were identifying the effect of "reduced exclusivity" due to season tickets, which by his own admission it is not, it should find concert service fees to be consistently higher.[246]  It does not.  In fact, whatever Dr. Pathak's model is measuring only appears starting in 2021, the year in which live events were being held consistently again after the COVID-19 pandemic.[247]  As Dr. Pathak acknowledges, his model could simply be showing that "venues are solving a different pricing problem

---

[246] Pathak Declaration, ¶191.

[247] As discussed above, ███████████████████████████████████

for sports events" due to differences in demand from consumers for different types of events following the pandemic.[248] Dr. Pathak decision to interpret this result as being "consistent with Ticketmaster's exclusive contracts leading to higher service fees for all consumers" in no way follows from the results the model actually generates.[249]

### B. Statistical Testing of Dr. Pathak's "Sports Service Fee" Regression Contradicts His Conclusion of Class-Wide Impact

104.     Even ignoring the conceptual flaws in the design and interpretation of Dr. Pathak's regression analysis, its result represents an *average* across all 360 venues included in his analysis over the 10-year period he studies.  An average difference in service fees between concerts and sports events across hundreds of venues does not, for example, reflect whether the proposed class members that went to see Taylor Swift's 2023 Eras Tour at Soldier Field in Chicago, IL were differently situated than the proposed class members who went to see the same show at a different NFL stadium, such as U.S. Bank Stadium in Minneapolis, MN.  Nor does it reflect whether the proposed class members that went to concerts at venues that did not host sports events were differently situated.  The average *necessarily* masks this type of event and venue variation.

105.     According to Dr. Pathak, "reduced exclusivity" for sports events should result in "systematically lower fees than events subject to greater or full exclusivity, such as concerts, at the same venues."[250]  This proposition is testable by comparing service fees between different kinds of events venue-by-venue, not in the aggregate.  I have conducted this test by adjusting Dr. Pathak's regression model to allow it to compare sports and concert service fees separately for each venue.[251]  I summarize the results of this test in **Exhibit 16**.  In this exhibit, each bar represents the difference in service fees between sports and concert events that Dr. Pathak's model estimates for an individual venue.  If Dr. Pathak's model finds that service fees are lower for sports events compared to concerts, the bar for that venue will be negative (i.e., below the horizontal axis).  Venues where Dr. Pathak's model finds that service fees are *higher* for sports events compared to concerts have bars that are positive (i.e., above the horizontal axis).  For example, ███████████████████████████████ ████████████████████████████████████████████████████████████████.

---

[248] Pathak Declaration, ¶192.

[249] Pathak Declaration, ¶192.

[250] Pathak Declaration, ¶188.

[251] I note this venue-by-venue approach is consistent with Dr. Pathak's Appendix D, which shows the varied relationship between service fees for sports and concert events on a venue-by-venue basis.

HIGHLY CONFIDENTIAL



**EXHIBIT 16**
**RESULTS OF DR. PATHAK'S "SPORTS SERVICE FEE" REGRESSION**
**BY VENUE**
**2015 – 2024**



Notes: This analysis uses Dr. Pathak regression model and data from his Table 8, allowing for the effect of his sports indicator to vary by venue. Robust standard errors. Statistical significance determined at a conventional 5 percent level.

Source: Pathak turnover (ticketing data).

106.    Dr. Pathak's model estimates that, on average, sports events have service fees that are two percentage points lower than fees for concert events, as shown by the dotted black line in the exhibit. However, when Dr. Pathak's model is not forced to estimate a single average difference, it finds a wide range of estimates that vary substantially across venues. For example, Dr. Pathak's model estimates that:

-

HIGHLY CONFIDENTIAL



107.    As these results show, even accepting Dr. Pathak's flawed theory that what his model measures is the effect of "reduced exclusivity" for sports events, more than *half* of the venues in his analysis do *not* have higher average service fees for concerts than for sports.  These results contradict his conclusion that his "analytical framework," which he purports measures the effects of the "systematic nature of exclusive dealing and tying" on fees, "applies across all concert events and all venues, regardless of individual consumer preferences or venue-specific characteristics."[254]  If Dr. Pathak were to apply his analysis on a venue by venue basis he would find different effects of supposed "reduced exclusivity" for proposed class members that went to see Taylor Swift at Soldier Field in Chicago, IL than those who went to see the same show at U.S. Bank Stadium or another concert at Mississippi Coliseum.  That is, Dr. Pathak's "sports service fee" regression cannot be used to show class-wide impact even if it could measure differences in purported "exclusivity."

## X.    DR. PATHAK OFFERS A VARIETY OF OPINIONS BASED ON SELECTIVE READING OF DOCUMENTS AND ACADEMIC LITERATURE

### A.    Dr. Pathak's Selective Reading of "Documents and Testimony" is Not a Reliable Economic Methodology and Does Not Show Antitrust Impact

108.    Dr. Pathak claims that "Defendants' internal documents confirm" class-wide impact "by showing recognition of market-wide competitive effects, systematic strategic approaches, and implementation of business models designed to maintain market control."[255]  Dr. Pathak further argues that Defendants' internal documents provide "insight" into whether the alleged conduct "operated through systematic market-wide mechanisms or individual venue-specific arrangements."[256]  However,

---

[252] The SAP Center is the home of the NHL team San Jose Sharks.  See, SAP Center, https://www.sapcenter.com/.

[253] There is one venue for which Dr. Pathak's model is unable to estimate an effect as his outlier limitations excluded all records for sports events at this venue.

[254] Pathak Declaration, ¶194.

[255] Pathak Declaration, ¶195.

[256] Pathak Declaration, ¶196.

none of the handful of documents Dr. Pathak has arbitrarily selected prove that any proposed class member was overcharged as a result of the alleged conduct, much less that all (or nearly all) were.

109.    Showing that Defendants' alleged conduct caused any proposed class members to be overcharged involves comparing the fees that class member paid in the actual world to what they would have paid in the but-for world.  Dr. Pathak asserts that internal Ticketmaster documents can be used as "common evidence" that "Defendants charged supracompetitive fees"[257] but the documents he references do not compare class members' actual and but-for worlds.  For example, Dr. Pathak points to a document that ███████████████████████████████████████████, suggesting that the differences between jurisdictions should be interpreted as being *solely* caused by the conduct Plaintiffs allege.[258]  Consistent with his arbitrary and selective presentation of documentary evidence, Dr. Pathak does not present the portion of the same document that undermines his interpretation, stating that ████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████[259]

110.    Aside from the document discussing ██████████████████████████, Dr. Pathak's discussion of purportedly "common evidence" that "Defendants charged supracompetitive fees" only references documents that discuss pricing at Live Nation owned or operated venues.[260]  To the extent Ticketmaster and Live Nation negotiated specific service fee terms at these venues (which account for less than 20 percent of his identified "major concert venues" in any year from 2015 to 2024), this suggests "venue-specific arrangements" rather than any "market-wide mechanism"[261] as these documents do not relate to relevant "major concert venues" not owned or operated by Live Nation.

---

[257] Pathak Declaration, Section VI.D.1.

[258] Pathak Declaration, ¶198 (citing LNE-LIT24-000920820–0845, at 0845).  Dr. Pathak incorrectly refers to these service fees as "Ticketmaster's fees."  As I discuss in **Section V**, Ticketmaster does not unilaterally set these fees, nor does it retain the majority of these fees.

[259] LNE-LIT24-000920820–0845, at 0836, emphasis removed, italics added.

In fact, Dr. Pathak himself stated that he is "not aware of another market with the same features as primary ticketing services to major concert venues in the US," meaning that a simple comparison of fees in the United States to those in other jurisdictions would not be appropriate (Pathak Declaration, ¶171).

[260] Pathak Declaration, ¶¶199–201.

[261] Live Nation and Ticketmaster ████████████████ (see, for example, LNE-LIT24-001199754–9776, at 9764).

111.    Dr. Pathak also claims that "examples of venues and artists complaining that fees charged to consumers were higher for Ticketmaster than for competitors" can be used as "common evidence."[262] An individual venue or artist "complaining" about fees is not proof that any individual class member was overcharged—much less that all (or nearly all) were.  Venues or artists may complain even when the fees consumers paid were the outcomes of a competitive process.  Dr. Pathak cites two examples of "complaints," ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████[263]  Even if these examples of "complaints" were evidence of supra-competitive service fees, which they are not, Dr. Pathak presents no reason why it would be appropriate to extrapolate from these specific examples to the entire proposed class.

112.    The documents Dr. Pathak references in his discussion of "innovation" being supposedly "stymied" also do not make any point about class-wide antitrust impact.  Dr. Pathak claims that "Ticketmaster has acknowledged that its products lack innovation" and that it "does not offer a higher-quality user experience than its competitors" pointing to internal documents comparing its services to competitors.[264]  His interpretation of the selected documents he presents as some sort of global "acknowledgement" by Ticketmaster that "its product lacks innovation" is nonsensical.  In fact, evidence indicates that Ticketmaster invested into the continued advancement of its products.[265]  Nor does Dr. Pathak make any showing that the conduct Plaintiffs allege (as opposed to any other reason) resulted in any supposedly "stymied innovation," or that any supposedly "stymied innovation" resulted in any proposed class member paying supra-competitive service fees.

113.    Dr. Pathak's broad assertions about supposedly "stymied innovation" fail to assess how Ticketmaster's customers viewed their offerings and ignore evidence that venue operators viewed Ticketmaster's products and services as superior to other primary ticketers.  For example, ████████████ ███████████████████████████████████████████████████████████

---

[262] Pathak Declaration, ¶202.

[263] Pathak Declaration, ¶¶202–203.  While Dr. Pathak states that one of these venues, ████████, falls into his "major concert venue" definition in two years of the 15-year proposed class period—2012 and 2021, neither E████ nor the other ████████████ venues *ever* appear in his list of "major concert venues" in any year (Pathak Declaration, footnote 309).

[264] Pathak Declaration, ¶204.

[265] Joe Berchtold (President and CFO at Live Nation) testified that ████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████ (Deposition of Joe Berchtold (Live Nation) ("Berchtold Deposition"), July 24, 2025, 15:2–7, 33:17–34:17).

HIGHLY CONFIDENTIAL

██████████████████████████████████████████████████

████████████████████████ [266]  As with his other selective reading of "documents and testimony," Dr. Pathak's discussion of "stymied innovation" or "decreased quality" is not a reliable economic methodology and does not show antitrust impact to the proposed class. [267]

### B. Dr. Pathak's Discussion of "Economic Literature" Does Not (and Cannot) "Establish Common Impact"

114.    Dr. Pathak asserts that the "economic literature on exclusive dealing, particularly when combined with tying, demonstrates that these practices operate through systematic market-wide mechanisms […] rather than through individualized negotiations or venue-specific arrangements." [268] Dr. Pathak also claims that "ties, to the extent used by Defendants during the class period, would exacerbate the effects of Defendants' conduct." [269]  Ultimately, economic literature cannot "establish common impact" because it is not assessing the specific facts of this case, the actual prices proposed class members paid, or the prices that would have been paid in the but-for world.  Put differently, the academic papers Dr. Pathak cites cannot establish whether or not Mr. Ponce, Ms. Popp, Mr. Roberts, or any other proposed class member overpaid relative to a but-for world.  Likewise, Dr. Pathak makes several claims about the ticketing industry that are contrary to available evidence, illustrating why broad assertions based on academic papers unrelated to the facts of this case cannot be a reliable methodology to show class-wide impact.

115.    For example, Dr. Pathak asserts that "exclusive dealing creates systematic market-wide effects," stating that "Ticketmaster's exclusive contracts with concert venues" remove "competitive pressure that

---



[266] ████████████████████████████████████ See also, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ .
Additionally, venues that did not use Ticketmaster's ticketing platform still reported preferring it over competitors.  For example, ████████████████████████████████████████████████████████████████████████ (LNE-LIT24-000633334–3337, at 3336).

[267] Dr. Pathak purports to present "common evidence" that the alleged conduct "stymied innovation" in Section VI.D.3 of his report.  He also discusses purportedly "decreased quality" in Sections V.A.3, presenting a similar selective reading of documents.

[268] Pathak Declaration, ¶142.

[269] Pathak Declaration, ¶161.

would otherwise constrain its pricing and service quality."[270]  However, Dr. Pathak fails to address the
available evidence that Ticketmaster competed with other primary ticketers for venues' business.[271]  Dr.
Pathak's own discussion of Ticketmaster's "renewal rate" suggest that ██████████████████
███████████████████████████████████████████████████████████████
████████.[272]

116.    In **Section VI**, I presented a series of case studies showing that venues used competitive offers
(or threats of switching to competitors) to negotiate more favorable terms with Ticketmaster.  As Dr.
Pathak himself states, "Ticketmaster described its deal with ████████████████████████
███████████████████████████████████████████████████████████████[273]

This type of evidence directly contradicts Dr. Pathak's claim that his reading of academic papers serves
as proof that Defendants' alleged conduct "operate[s] through systematic market-wide mechanisms,"
instead highlighting the "individualized negotiations or venue-specific arrangements."[274]

117.    Dr. Pathak also claims that "individual venues lack sufficient bargaining power to negotiate
favorable terms,"[275] which ignores the reality that venue operators like Madison Square Garden, ASM,
or NFL teams are large buyers that are able to extract concessions.  As I described in detail in **Section**

---

[270] Pathak Declaration, Section VI.A.1, ¶143.

[271] Dr. Pathak argues that "[w]hen potential competitors are not seen as credible threats, they cannot effectively
constrain buyers' decisions about whether to accept exclusive contracts" (Pathak Declaration, ¶158).  However,
available evidence shows that (i) "major concert venues" switched to other primary ticketers during the relevant
period and (ii) Ticketmaster viewed these other ticketers as competitors.



See, for example, LNE-LIT24-005309686–9695, at 9686, 9695 (████████████████████
████████████████ LNE-LIT24-003378370–8384 at 8383 ███████████████
████████████████████

Ticketmaster's internal assessments of competition from SeatGeek demonstrated this aggressiveness.  For
example, █████████████████████████████████████████████████████
███████████████████████████████████████████ (LNE-
LIT24-000633334–3337 at 3334, 3336; Cleveland.com Website, https://www.cleveland.com/entertainment/
2020/11/seatgeek-named-new-ticketing-provider-for-cavaliers-rocket-mortgage-fieldhouse.html.  See also,
Section **VI.B**, which discusses ████████████████████████████████

Ticketmaster personnel also testified to ███████████████████████████████████
██████████████████ Jenny Johnson Deposition, 42:20–43:12, 96:23–97:13; Wampold Deposition,
172:15–173:5, 174:14–177:19).

[272] Pathak Declaration, ¶156.

[273] Pathak Declaration, ¶154 (citing LNE2019-CID-0106676).

[274] Pathak Declaration, ¶142.

[275] Pathak Declaration, ¶153.

HIGHLY CONFIDENTIAL

**V.B**, venues negotiated a variety of terms with Ticketmaster, often leveraging their bargaining power to negotiate more favorable terms.  Moreover, this claim ignores the variation in negotiations and bargaining power across venues.  For example, Dr. Pathak himself cites an example of Ticketmaster offering ███████████████████████████ discussed above.  This is exactly the "individualized negotiations or venue-specific arrangements" that Dr. Pathak simply asserts he does not need to account for.  If his methodology cannot show that APE paid higher "price" to Ticketmaster due to the alleged conduct—and his reading of academic papers cannot do this—then it cannot answer the relevant question of whether or not proposed class members in ███████ that purchased concert tickets from ███ suffered antitrust harm.

118.     Dr. Pathak also asserts that "real-life evidence of venues asking for exclusive deals is not indicative of their preferred arrangement."[276]  This assertion ignores his own argument that "literature in economics recognizes that **exclusive contracts can serve procompetitive purposes** by protecting relationship-specific investments that cannot be contractually specified."[277]  In fact, Dr. Pathak concedes that "exclusivity" has been an industry practice as far back as the 1980s, decades before the start of the alleged conduct.[278]  Available evidence also shows that █████████████████████████████
████████████████████████████████████████████████████████████████[279]

Testimony from venue owners and operators discuss their own █████████████████████████
███████████     For example,

- ███████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████

---

[276] Pathak Declaration, ¶159.  Dr. Pathak testified it is possible that venues would agree to exclusive contracts in his but-for world (Pathak Deposition, 145:20–146:18, 161:1–162:6).

[277] Pathak Declaration, ¶165, emphasis added.  Marla Ostroff (Managing Director at Ticketmaster) testified that ████████████████████████████████████████████████████████████████████████
███████████████ (Ostroff Deposition, 111:3–9).

[278] Pathak Declaration, ¶¶19, 171.

Dr. Pathak's own "historical competitive benchmark" is not actually free of "exclusivity."  In fact, the single contract he cites—a 2008 contract between Live Nation and SMG—is ██████████████ (LNE-LIT24-000029987–9999, at 9989).

[279] See, for example, ████████████████████████████████████████████
███████████████████████

[280] ██████████████████████████████

**HIGHLY CONFIDENTIAL**



119.     Dr. Pathak's assertions based on his review of academic literature ignore the factual record in this matter and "appl[y] across the entire Class" only in the sense that they ignore variation in individual venues' preferences, strategies, and bargaining positions.[284]  Dr. Pathak concedes that, in fact, at least some venues *may* prefer exclusivity even in the but-for world.[285]  However, he presents no analysis of what terms any venue may have negotiated in the but-for world, or how those terms would have affected the services fees consumers would have paid when buying tickets to see concerts at those venues.  In fact, he does not even present a methodology that would be capable of conducting such an assessment.

120.     Dr. Pathak also does not address the individualized issues raised by the documents that presents as being purportedly "consistent with Live Nation tying access to its artists with Ticketmaster's ticketing services."[286]  Dr. Pathak provides 13 examples involving individual venues that he believes are



[281] ████████████████████████.

[282] ████████████████████

[283] ████████████████████████████████████████

[284] Pathak Declaration, ¶170.

[285] Pathak Declaration, ¶169.

[286] Pathak Declaration, ¶65.  I note that the Pollstar data Dr. Pathak prepared includes information reflecting the concert promoter.  Using Dr. Pathak's determination for which concerts at "major concert venues" were ticketed by Ticketmaster and this promoter information, I find that Live Nation promoted many shows which were not ticketed by Ticketmaster and venues that did not always use Ticketmaster for concerts still hosted Live Nation promoted shows.  For example, (i) Ticketmaster was not the primary ticketer for more than 6,000 concerts Live Nation promoted at "major concert venues" from 2015 to 2024, and (ii) in 2024, there were concerts promoted

(continued on next page . . .)

consistent with the "tying" allegations.[287]  However, he has not provided any analysis to determine which of the hundreds of "major concert venues" at issue were (or were not) faced with an alleged "tie" in the actual world, nor has he modeled a but-for world where any such "tie" for individual venues is removed.  Simply asserting "systematic market-wide mechanisms" based on a selective presentation of individual documents—as Dr. Pathak has done—is not a reliable approach how (if at all) the but-for worlds for the hundreds of venues at issue may have been different from the actual world.

## XI.    NAMED PLAINTIFFS' PURCHASES HIGHLIGHT THE VENUE-SPECIFIC COMPETITIVE DYNAMICS THAT DETERMINE FEES CONSUMERS PAY

121.    The Named Plaintiffs are three individual consumers who, based on their declarations, purchased eleven tickets out of the over 400 million tickets Dr. Pathak includes in his damages estimate.[288]  Dr. Pathak asserts a "US market for primary ticketing to major concert venues" that "is not broader than the US."[289]  This assertion is inapposite with respect to assessing antitrust injury to the Named Plaintiffs (and other proposed class members) in at least two ways.

122.    First, Named Plaintiffs did not buy (and are not claiming economic injury on) "primary ticketing."  As I have discussed, "primary ticketing" is a broad term that reflects products and services purchased by *venues*.  Second, Dr. Pathak's assertion with respect to this supposed market being "not broader than the US" fails to assess the question of whether it (or any market in which proposed class members actually participated) is more *narrow* than the U.S.[290]

123.    Dr. Pathak acknowledges the regional nature of live music performance.  For example, he testified that "venues are in different competitive positions based on their [geographic] position"

---

by Live Nation at 192 (or 82 percent) of the 234 "major concert venues" that used both Ticketmaster and a different ticket service provider for concerts.

[287] Pathak Declaration, ¶¶66–78.

[288] Pathak Declaration, Table 9; Ponce Declaration; Declaration of Jeanene Popp in Support of Plaintiffs' Motion for Class Certification and Appointment of Co-Lead Class Counsel, August 18, 2025 ("Popp Declaration"); Roberts Declaration.  Receipts for Named Plaintiffs Luis Ponce and Jeanene Popp show that they purchased multiple tickets for certain events listed in their declarations (PONCE_LNE_006712–6713; PONCE_LNE_006768–6769; POPP_LNE_009683–9688).

[289] Pathak Declaration, ¶¶99–100.

[290] For example, Dr. Pathak asserts that "[g]eographic barriers and travel costs place limits on artists' and customers' ability to switch between US and non-US markets for major concert venue ticketing," but ignores the same types of limits within the United States—e.g., between Seattle, WA and Jacksonville, FL or Omaha, NE and New York City, NY. (Pathak Declaration ¶100)

In **Appendix G**, I show a map with all of Dr. Pathak's "major concert venues" in 2023 and those for which Named Plaintiffs purchased concert tickets.

HIGHLY CONFIDENTIAL

because of differences in consumer demand, the types of artists that can be attracted, and operational costs for the venue.[291]  He also testified that there is a trade-off between "price versus the incidence of travel costs" for fans and that the venue, artist, geography (distance to the nearest show), and fan specific characteristics (such as desire to see the artist and income level) all play a role in the willingness of a fan to travel for a show.[292]  Nonetheless, Dr. Pathak conceded that he did not test whether venues in one part of the U.S. could profitably increase service fees without enough consumers switching to venues in other parts of the U.S., and claimed there was no "need to do that analysis" to determine that the scope of relevant competition is national.[293]

124.    The Named Plaintiffs' own purchases illustrate the need for this analysis.  For each show that Named Plaintiffs attended, they chose to attend the particular show on the tour at the venue that was closest to them geographically.  For example, in 2022, Named Plaintiff Luis Ponce attended the Enanitos Verdes show at the James L. Knight Center in Miami, FL approximately 35 miles away from his home.  In 2022, Enanitos Verdes played at six other Ticketmaster "major concert venues," the closest of which to Mr. Ponce was 713 Music Hall approximately 950 miles away in Houston, TX.  Despite his assertion about national markets, Dr. Pathak presents no evidence that if the James L. Knight Center were to increase the service fees it charged, Named Plaintiff Luis Ponce would instead travel 950 miles to the next closest venue to see the same act (or any of the other venues, that were even further away).

125.    In addition to illustrating the regional nature of demand, the service fees paid by Named Plaintiffs highlight the venue-specific factors I have described above.[294]  The Named Plaintiffs purchased their 11 tickets from six venues out of hundreds of "major concert venues" identified by Dr.

---

[291] Pathak Declaration, ¶¶16, 190.  When asked in deposition about differences between venues in New York City and Omaha, Dr. Pathak testified that "the venues are in different competitive positions based on their [geographic] position, New York versus Omaha, the demand patterns they experience from consumers.  New York is a very large market relative to Omaha, and the types of artists they can attract is very different in, say, New York than Omaha."  Dr. Pathak was also asked about operating costs for venues in different regions and testified that "[costs f]or running the venue—say, like the labor cost of running the venue would likely be different between New York and Omaha" (Pathak Deposition, 93:8–94:4).

[292] Pathak Deposition, 98:18–23, 100:13–25.

[293] Pathak Deposition, 97:17–98:3, 98:18–99:2.

[294] As I describe in Section V above, a combination of individualized factors—including each venue's unilateral decision-making, its negotiation with Ticketmaster, as well as the particular set of applicable exceptions—determine what any proposed class member paid in service fees.

Pathak (less than one percent of these venues).  All six of these venues are in the respective Named Plaintiff's state of residence (Ohio and Florida).[295]  Based on their declarations,[296]

- Luis Ponce purchased four tickets for two events at two venues in Florida, paying service fees of approximately 31 percent of the ticket face value for these events.

- Jeanene Popp purchased three tickets for two events at two venues in Ohio, paying service fees of 16 percent of the ticket face value at one venue and 44 percent at the other.

- Jacob Roberts purchased four tickets for four events at two venues in Florida, paying service fees between 11 and 19 percent of the ticket face value for these events.

Just these eight transactions (involving 11 tickets) across six venues highlight the differences in the service fees different venues charge for tickets to live events.

126.    Below, I show additional empirical analysis of the service fees for events to which the Named Plaintiff purchased tickets.  These analysis shows at an individualized level that the service fees paid are *not* the result of some abstract "market-wide mechanism," as Dr. Pathak asserts, but rather of unilateral decisions made by each venue.

### A.  Tickets Purchased by Luis Ponce

127.    As I have discussed, Dr. Pathak's methodology is predicated on the empirically rejected assumption that "greater competition" between primary ticketers (who compete for venue's, not the consumer's, business) would result in uniformly lower service fees paid by consumers.  The experience of Named Plaintiff Luis Ponce illustrates this failure of Dr. Pathak's analysis.

128.    Mr. Ponce purchased tickets to two concerts in 2022, one of which was for an Enanitos Verdes concert at the James L. Knight Center in Miami, FL.[297]  In **Exhibit 17**, I show the distribution of service fees for concerts on Enanitos Verdes' 2022 tour which spanned seven "major concert venues" from July 2022 through August 2022.[298]

---

[295] See **Appendix G** for a map of Ticketmaster ticketed venues that Dr. Pathak considers "major concert venues" in 2023.

[296] Ponce Declaration, p. 2; Popp Declaration, p. 2; Roberts Declaration, p. 2.  Receipts for Named Plaintiffs Luis Ponce and Jeanene Popp show that they purchased multiple tickets for certain events listed in their declarations (PONCE_LNE_006712–6713; PONCE_LNE_006768–6769; POPP_LNE_009683–9688).

[297] PONCE_LNE_006712–6713.

[298] See **Appendix F** for similar charts for each Named Plaintiff purchase.

**HIGHLY CONFIDENTIAL**

**EXHIBIT 17**
**DISTRIBUTION OF SERVICE FEES AS A PERCENT OF FACE VALUE**
**ENANITOS VERDES TOUR**



Notes: Limited to concert events at venues Dr. Pathak identified as relevant "major concert venues" ordered by event date. For events held at the same venue on consecutive days, I only show the first day in this exhibit.

Each "bubble" represents a service fee level, rounded to the nearest 1 percent, that tickets were purchased at and the size of the bubble represents the volume of tickets at that service fee level. For these events, ███████████████ ██████████████████████████████████████████████████ and are not shown. Each black "X" indicates the average service fee for a concert event at a specific venue. See **Exhibit F-14** for a summary of the full distributions for these events.

Source: Pathak turnover (ticketing data).

HIGHLY CONFIDENTIAL

As this exhibit shows, the average service fees paid for concerts within this tour varied across the different venues ███████████████████████████████████████ ███████████████████████████████ as indicated by the variation in the level of the black "X"s.  Service fees varied even across attendees of a single concert.  For example, while ███████████████████████████████████████ ███████████████████████████████████ ███████████████████████████ Specifically,



129.    Dr. Pathak offers no methodology capable of assessing antitrust impact to Mr. Ponce.  The economic literature he cites cannot distinguish or assess Mr. Ponce's individual experience from those of any other individual.  His "sports service fee" regression actually finds that average service fees for concert events at the James L. Knight Center were *lower* than those for sports events.  Rather, Dr.

---

[299] LNE-LIT24-004193769–3779, at 3778.  In fact, ████████████████████████████████████ ██████████████ ee **Exhibit 11**).

[300] LNE-LIT24-004193769–3779 (████████████████), at 3770.

[301] LNE-LIT24-005727108–7161 (███████████████████), at 7135.

Highly Confidential

Pathak simply asserts that Mr. Ponce should have paid ███████ less in service fees—as should have every other proposed class member who bought tickets to every other show at every other venue in 2022—so that Ticketmaster's "net service fees" would have equaled its average "costs."[302]

### B. Tickets Purchased by Jeanene Popp

130.    Named Plaintiff Jeanene Popp purchased tickets to two concerts in 2022 and 2023, one of which was for an Alter Bridge concert at Andrew J. Brady Music Center in Ohio.[303]  In **Exhibit 18**, I show the distribution of service fees for this concert and others on Alter Bridge's tour in 2023 which spanned ten "major concert venues."

---

[302] Pathak Declaration, Table 9.

[303] Popp Declaration, p. 2; POPP_LNE_008321–8325.

HIGHLY CONFIDENTIAL

**EXHIBIT 18**
**DISTRIBUTION OF SERVICE FEES AS A PERCENT OF FACE VALUE**
**ALTER BRIDGE TOUR**



Notes: Limited to concert events at venues Dr. Pathak identified as relevant "major concert venues" ordered by event date. For events held at the same venue on consecutive days, I only show the first day in this exhibit.

Each "bubble" represents a service fee level, rounded to the nearest 1 percent, that tickets were purchased at and the size of the bubble represents the volume of tickets at that service fee level. For these events, ███████████ ███████████ and are not shown. Each black "X" indicates the average service fee for a concert event at a specific venue. See **Exhibit F-12** for a summary of the full distributions for these events.

Source: Pathak turnover (ticketing data).

As this exhibit shows, the average fee paid for concerts within this tour varied across different venues ███████████████████████████████████████████████████ ███████████████████████████) as indicated by the variation in the level of the black X's. Additionally, ███████████████████████████████████████

**HIGHLY CONFIDENTIAL**



131.    This example again illustrates how each venue's unilateral decision-making and its negotiation with Ticketmaster results in a wide variation of service fees paid by class members. For example, [redacted] [redacted] In other words, this means for a ticket of the same face value, a proposed class member purchasing a ticket at The Paramount would pay a different service fee than a different proposed class member purchasing a ticket with the same face value at Harrah's Cherokee Center.

132.    Again, Dr. Pathak offers no methodology capable of assessing antitrust impact to Jeanene Popp on the [redacted] service fee paid at the Alter Bridge show. The economic literature he cites cannot distinguish or assess Jeanene Popp's individual experience from those of any other individual. His "sports service fee" regression is inapposite because the Andrew J. Brady Music Center did not host sports events. Rather, Dr. Pathak simply asserts that Jeanene Popp should have paid [redacted] less in service fees—as should have every other proposed class member who bought tickets to every other show at every other venue in 2023—so that Ticketmaster's "net service fees" would have equaled its average "costs."[305]

### C. Tickets Purchased by Jacob Roberts

133.    Jacob Roberts purchased tickets for four concerts, three of which were all held at the Hard Rock Live in Hollywood, FL—two in 2015 and the third in 2023, including a Billy Idol concert in 2015.[306] In **Exhibit 19**, I show Billy Idol's concerts in 2015 that spanned eight different "major concert venues"

---

[304] LNE-LIT24-000065034–5058 ([redacted]), at 5055; LNE-LIT24-000061785–1812 ([redacted]), at 1809.

[305] Pathak Declaration, Table 9.

[306] Roberts Declaration, p. 2. ROBERTS_LNE_000548–0549. The face value of Mr. Roberts ticket ($69.00) for the Billy Idol concert at Hard Rock Live in Hollywood, FL on September 21, 2015 includes a $4.00 facility fee, which is set and retained by the venue.

**HIGHLY CONFIDENTIAL**

and had average service fees (indicated in the exhibit by the black "X"s) that varied from ███████ ████████████████████████████████████████████████████████████████

**EXHIBIT 19**
**DISTRIBUTION OF SERVICE FEES AS A PERCENT OF FACE VALUE**
**BILLY IDOL TOUR**



date.  For events held at the same venue on consecutive days, I only show the first day in this exhibit.

Each "bubble" represents a service fee level, rounded to the nearest 1 percent, that tickets were purchased at and the size of the bubble represents the volume of tickets at that service fee level.  Each black "X" indicates the average service fee for a concert event at a specific venue.  See **Exhibit F-10** for a summary of the full distributions for these events.

Source: Pathak turnover (ticketing data).

For example, taking the specific concert that Named Plaintiff Jacob Roberts purchased a ticket for—the

Billy Idol concert at Hard Rock Live in Hollywood, FL on September 21, 2015 (shown in purple)—

HIGHLY CONFIDENTIAL



In contrast,

134.    Again, Dr. Pathak offers no methodology capable of assessing antitrust impact to Mr. Roberts on the ▮▮▮▮ service fee paid at the Billy Idol show.  The economic literature he cites cannot distinguish or assess Mr. Roberts' individual experience from those of any other individual.  Rather, Dr. Pathak simply asserts that Mr. Roberts' should have paid ▮▮▮▮ less in service fees—as should have every other proposed class member who bought tickets to every other show at every other venue in 2015—so that Ticketmaster's "net service fees" would have equaled its average "costs."[309]

## XII.    DR. PATHAK'S "DAMAGES" METHODOLOGY IS BASED ON FUNDAMENTALLY FLAWED ASSUMPTIONS AND IS UNRELIABLE

135.    Dr. Pathak's damages calculation is based on a theory that "competition drives prices towards costs, so a competitive market has prices near cost,"[310] and an assumption that any service fees retained by Ticketmaster above his estimated per-ticket "cost" constitutes "damages" to the proposed class. Specifically, his analysis is based on the following assumptions about the but-for world:

- All venues would earn the same amount of revenue from service fees as they do in the actual world.[311]

---

[307] LNE-LIT24-000035803–5826 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), at 5806; LNE-LIT24-000066870–6871 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), at 6870.

[308] LNE-LIT24-000067738–7859 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), at 7788.  As I discuss above in **Section V.B**, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (LNE-LIT24-000519583–9683, at 9642–9644).

[309] Pathak Declaration, Table 9.

[310] Pathak Declaration, ¶179.

[311] Pathak Declaration, ¶212.

- Ticketmaster's "share" of service fees would equal Dr. Pathak's per-ticket "cost" benchmark, which ranges from ███████████████ , across all "major concert venues."[312]

- Ticketmaster would make the same fixed payments to venues as it did in the actual world.[313]

- *Any* revenue Ticketmaster generated in the actual world in these years that was above Dr. Pathak's estimate of total but-for "cost"—including average per-ticket cost and fixed payments—would accrue to venues as "savings" in the but-for world.[314]

- Venues would return the *entirety* of these "savings" to consumers. That is, the service fees venues would charge to consumers in the but-for world would be reduced by the *entire* reduction in Ticketmaster's "share."[315]

Each of these assumptions is contradicted by real-world evidence.

136.    First, there is no basis to assume, as Dr. Pathak does, that venues would receive the same amount in revenue (from fee sharing and fixed payments like signing bonuses and sponsorship payments) in the actual and but-for worlds. Dr. Pathak describes the but-for world as one where "Ticketmaster's exclusive contracts" potentially may not exist, or where they may exist but against some "backstop of competition" and/or without some "anticompetitive features."[316] However, he also acknowledges that "[m]any venues receive up-front payments from ticketers in *return for exclusivity*."[317] That is, Dr. Pathak's assumes an unrealistic theoretical world in which venues need not

---

[312] Pathak turnover (Annual BFW Service Fees.xlsx).

[313] Pathak Declaration, ¶212.

[314] Pathak Declaration, ¶212. He "assume[s] venues would have received the same amounts in contractual signing bonuses, contractual sponsorship payments, base service charge related to royalties, and base service charge related rebates as they received in the actual world."

[315] For 2010 to 2014 (where he claims almost ███████ in damages), Dr. Pathak simply "back-casts" damages using the relationship between 2015–2024 damages and "major concert venue" gross ticket value over time from the Pollstar data. (Pathak Declaration, ¶215, Table 9, footnote 322). That is, he assumes that no analysis of 2010–2014 pricing, contracting, or any other economic conditions is required to be able to extrapolate damages from 2015–2024.

[316] Dr. Pathak testified that in the but-for world, exclusive contracts without "anticompetitive features" might still exist, despite Plaintiffs' allegations that "exclusivity" *is* one of the "anticompetitive features." However, he still claims that his average "cost" benchmark necessarily reflects the outcomes of what a supposedly competitive marketplace that includes "exclusive contracts without anticompetitive features" would look like (Pathak Deposition, 146:5–18, 161:14–162:6).

[317] Pathak Declaration, ¶19, emphasis added. Dr. Pathak cites to the testimony of Marla Ostroff (Managing Director North America at Ticketmaster), who explained that ████████████████████████████████████

(continued on next page . . .)

HIGHLY CONFIDENTIAL

negotiate exclusive contracts but where the fixed payments to venues that correspond to that "exclusivity" in the actual world would be unchanged.

137.    Second, there is no basis to assume, as Dr. Pathak does, that venues would return the *entirety* (or even *any*) of service fee "savings" to consumers—or that none of the other elements of consumers' "all-in" price would change.  For example, Dr. Pathak simply asserts that economic theory tells him artists and promoters would necessarily not increase the face values of tickets, and venues would necessarily not increase their portion of service fees or any of the other fees they charge consumers.[318] Not only is there no basis for these assumptions, but as I showed in **Section VI**, venues do not necessarily lower the total service fees to consumers in response to a reduction in Ticketmaster's "share."

---

████████████████████████████████████████████████████████ (Pathak
Declaration, footnote 31 (citing Ostroff Deposition, 111:2–9)).

[318] Pathak Declaration, ¶214.  Dr. Pathak asserts that "in the but-for world, artists and promoters would not adjust ticket face values" because artists "would face the same underlying demand from consumers."  As a simple illustration consider an event where a consumer paid an "all-in" price of $100, of which $5 was Ticketmaster's service fee "share."  If Ticketmaster's service fee "share" is reduced to $1, he asserts that the artists would be unable to increase the ticket's face value by $4, such that the "all-in" price of $100 (which the consumer was already willing to pay) remains unchanged.

Dr. Pathak testified that rather than keep the "all-in" price unchanged (and increase their own share of the "all-in" price), the "venue would be able to accommodate more quantity" by adding additional shows or that there "could be some other thing that is sold to fans that would be in the venue's interest and would be able to reach more fans because the costs are lower" (Pathak Deposition, 211:3–22).  Even putting aside the absence of any support as to why this must *necessarily* be the case, Dr. Pathak simply assumes that venues and artists can "accommodate more quantity" in some abstract way, even for sold out shows.  For example, he speculated that an artist playing in Gillette Stadium outside of Boston would simply add a "third day" to a stop that they had played at for two days if "prices go down" (Pathak Deposition, 210:11–211:1).  However, this speculation—and his overall theory—is based on no analysis of whether it would be possible to "add" any shows at any venue at any point in time, or whether changing their schedules in response to changing service fees is something that artists and venues do in the real world.  For example, Taylor Swift's 2023 Eras tour sold out shows across the country, including three shows at Gillette stadium (CBS News, https://www.cbsnews.com/boston/news/taylor-swift-the-eras-tour-foxboro-gillette-stadium/).  Dr. Pathak's theory implies that in the but-for world, Taylor Swift would *necessarily* add more shows to *all* of her tour dates to "accommodate more quantity" at purportedly lower prices than she charged in the actual world—despite the fact that her tour had 149 total shows in the actual world (Statista Website, https://www.statista.com/chart/31033/key-figures-from-swifts-the-eras-tour/).

According to Pollstar data, one-third of shows at his "major concert venues" that were ticketed by Ticketmaster from 2015 to 2024 sold out.  Dr. Pathak's speculative theory fails to explain why, in instances where shows were already sold out at actual world prices, a reduction in Ticketmaster's "share" must necessarily reduce the "all-in" price every consumer paid and increase the quantity of tickets sold.

HIGHLY CONFIDENTIAL

### A. Dr. Pathak's "Cost" Benchmark is Divorced from the Services Ticketmaster Provided Venues and Cannot Reliably Estimate the But-For World

138.    Dr. Pathak purports to estimate two components of Ticketmaster's costs in the "primary ticketing market" and uses these costs as a "proxy for a competitive outcome" (i.e., Ticketmaster's price to "major concert venues" for primary ticketing services):[319]

- For the "fixed cost of creating a ticketing system," Dr. Pathak assumes ███ per ticket adjusted for inflation," based on the licensing fee negotiated between Live Nation and CTS Eventim AG ("Eventim") in 2007 for the use of Eventim's technology to sell primary tickets.[320]

- For "variable costs,"[321] Dr. Pathak points to "Live Nation's documents," which he asserts show that "variable costs were ███ per ticket."[322]

From these two components, Dr. Pathak estimates Ticketmaster's costs "in the primary ticketing market" to vary "from approximately ███████████ per ticket.[323]

139.    Dr. Pathak's assumption that "an exclusive license for ticketing software"[324] between Live Nation and Eventim is a reasonable benchmark for Ticketmaster's fixed costs in the but-for world is based on multiple unreliable assumptions.  First, this "cost" benchmark is out of line with Ticketmaster's own cost calculations, which suggests significantly higher fixed costs.  For example, █ ████████████████████████████████████ ████████████████████████████ ███████████████.[325]

---

[319] Pathak Declaration, ¶181.

[320] Pathak Declaration, ¶¶175, 179–180, footnote 282.

[321] Pathak Declaration, ¶¶177, 179.

[322] Pathak Declaration, ¶181.  Dr. Pathak's calculation of variable costs is limited to the 2017–2022 period.

[323] Pathak Declaration, ¶181.

[324] Pathak Declaration, ¶175.

[325] LNE-LIT24-000418415–8439, at 8418.  Dr. Pathak's but-for all in cost is ██████████████████ which includes fixed cost, variable cost, and fixed payments (signing bonuses and sponsorship payments).

I note that Dr. Pathak limited his variable cost calculations to U.S. ticketing on the Host system for Arenas, Stadiums, Arts, Venue & Promoter, Clubs, and Live Nation Owned and Operated business segments. Consequently, this measurement of fixed costs calculated by Ticketmaster is based on the same universe of tickets he deems relevant to the alleged class (see, for example, LNE22-000037097 and Pathak turnover (Annual BFW Service Fees.xlsx)).

(continued on next page . . .)

HIGHLY CONFIDENTIAL

140.    This substantial difference between Ticketmaster's own fixed costs and Dr. Pathak's "benchmark" reflects the fact that the "ticketing software" license Eventim provided Live Nation as part of their 2007 agreement is a different product than the ticketing services Ticketmaster provides to venues, which include software, hardware, and other services.[326]  Eventim's ███ per ticket fee covered ██████████████████████████████████████████████████ s[327]—but did not include, for example, ███████████████████████████████████.[328]  That is, the "cost" Dr. Pathak uses in his "damages" analysis is for something other than what Ticketmaster provides its clients.

141.    Dr. Pathak also describes Eventim as providing Live Nation with a "world-class ticketing platform."[329]  However, in a subsequent arbitration between the parties, an arbitrator found that Eventim breached this contract by *not* providing Live Nation with a ████████████████████████████████

---

Using Ticketmaster's measure of its fixed costs for 2016 and 2017 rather than Dr. Pathak's flawed ███ 5 per ticket measure reduces his calculated "damages" in those two years by ██████.  This suggests that, even putting aside all the other problems with it, Dr. Pathak's estimate of damages for the proposed class period is overstated by ████████ as a result of just using an incorrect measure of fixed costs.  As I describe in this section, Dr. Pathak's damages methodology cannot be used to reliably estimate damages overall or for class member purchases at individual venues.  This sensitivity solely illustrates the unreliable nature of his but-for fixed cost estimate and does not imply that class members were damaged or that Dr. Pathak's methodology can measure such alleged damages.

[326] For example, Ticketmaster's contract with the Barclays Center ███████████████████████████████ ████████████████████████████████████████████████████████ (LNE-LIT24-006374732–4778, at 4736–4738, 4740–4741, emphasis removed).

[327] LNE22-002017758–7783, at 7758–7764. ████████████████████████████████ LNE22-002017758–7783, at 7761–7762).

[328] As the contracted stated ██████████████████████████████████████████████████████ ████████████████████████ (LNE22-002017758–7783, at 7764).

Further, the licensing fee Dr. Pathak points to is only one part of the entire contract between Live Nation and Eventim.  The contract also covers ████████████████████████████████ ████████████████████ (LNE22-002017758–7783, at 7766–7774).  For example, ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ (LNE22-002017758–7783, at 7766).  That is, Dr. Pathak simply assumes the $0.45 per ticket fee accounts for all costs of "creating a ticketing system" without considering how it was set in the context of the broader negotiation between Live Nation and Eventim that resulted in this contract.

[329] Pathak Declaration, ¶180.

HIGHLY CONFIDENTIAL

███████████████████████████.”[330]   That is, Eventim did not provide the "world-class" ticketing service required by Live Nation for ████ per ticket.  This is an artificial number that has no relevance to Ticketmaster's costs, yet it forms the foundation of Dr. Pathak's ████████ "damages" calculation.[331]

142.     Dr. Pathak assumes that the only change in fixed cost over time can be captured by allowing this fee to increase with inflation (i.e., allowing the ████ per ticket fee to increase to ████ in 2024).[332]  This assumption ignores the investments Ticketmaster has made to improve its ticketing system for its clients during the alleged class period.  For example,



- Joe Berchtold (President and CFO at Live Nation) testified that ███████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

███████████████████[333]

- In an ██████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

───────────────────────

[330] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

[331] Pathak Declaration, ¶¶180–181.

[332] Pathak Declaration, ¶¶175, 180.  Dr. Pathak asserts that his "cost" benchmark is conservative because his "approach allows for fees in the but-for world to increase over time despite falling costs of computerized systems and a move towards digital marking" (Pathak Declaration, ¶183).  To support this claim, Dr. Pathak relies on a Producer Price Index for machinery and equipment for computers—which by definition tracks prices for "electronic computers," "computer storage devices," and "computer peripheral equipment and parts" and does not include other actual costs associated with ticketing such as the software itself.  (See, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/release/tables?rid=46&eid=145667#snid=144063).

[333] Berchtold Deposition, 15:2–7, 33:17–34:17.

**HIGHLY CONFIDENTIAL**

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

- Marla Ostroff (Managing Director of North America) testified that ██████████████
████████████████████████████████████████████████
████████████████████████████ [335]

Put simply, there is no reason to assume that Eventim's fee is a reliable benchmark for Ticketmaster's fixed costs given the difference in service offerings and Ticketmaster's investments over time.

143.    Dr. Pathak further claims that he "err[s] on the side of understating the impact of the alleged anticompetitive conduct" by using his "cost" benchmark (which is between ████████████ per ticket) rather than the "ticketing fees […] negotiated by SMG and Live Nation" during what he describes as a "brief period of competition."[336]  However, Dr. Pathak does not analyze actual "ticketing fees" paid under the Live Nation / SMG contract.  In fact, this contract does not even specify a specific amount as a measure of "ticketing fees"—only that (i) ████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████.[337]  Dr. Pathak instead points to a
██████████████████████████████████████████████████████

---

[334] LNE-LIT24-006526637–6748, at 6648–6649, 6667–6670.

[335] Ostroff Deposition, 20:20–21, 332:7–24.

[336] Pathak Declaration, ¶¶174, 181, 211.  Dr. Pathak repeatedly asserts that he "err[s] on the side of understating damages" but there is no basis for this assertion.  For example, Dr. Pathak asserts that the estimate of ████ per ticket "will also tend to overstate Ticketmaster's fixed costs" and is "a conservative estimate of fixed costs" as it includes "variable expenses" and "profit for CTS Eventim" (Pathak Declaration, ¶180).  However, Dr. Pathak simply asserts this with no analysis of Ticketmaster's cost structure.

[337] LNE-LIT24-000029987–9999, at 9990.  I note that in this contract that Dr. Pathak identifies as "competitive," Live Nation's "share"—████████████████████████████████—is *higher* than Dr. Pathak himself finds Ticketmaster's "share" to be during the proposed class period ███████████████ depending on the year) (Pathak Declaration, Table 3).

Dr. Pathak also ignores that ██████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████.  LNE-LIT24-000032709–2721, at 2709–2710.

HIGHLY CONFIDENTIAL

██████████████████████████████████.[338]  That is, ████████████████████████

██████████████████████████████████████—it is not the "price" Live Nation

charged SMG for primary ticketing services.

144.    While Dr. Pathak chose to assess the Live Nation / SMG agreement (which does not lay out a

specific "price" for primary ticketing services), he ignored other contracts Ticketmaster negotiated

during the same "competitive period" which did include the negotiated "price."  In 2008 and 2009, Dr.

Pathak claims that when "[f]aced with emerging competition, Ticketmaster adjusted its business

practices" and offered "more attractive renewal terms to customers with expiring contracts."[339]  In fact,

my assessment of contracts negotiated during Dr. Pathak's "competitive" period had ██████████

████████████████████████████.  For example,

- ████████████████████████████████████████████████████████
  ██████████████████████████████████████████████
  ████████████████

- █ ██████████████████████████████████████
  ██████████████████████████████████

These contracts show substantially higher "competitive prices" paid by venues than Dr. Pathak's "true-

up payment" ████████████) or "cost" benchmark ████████████████).  They also indicate

is that there was not one "price" Ticketmaster (or other ticketers) charged venues in his "competitive

period."  Dr. Pathak's simplistic damages methodology that relies on his single, average "cost"

benchmark cannot account for this variation across venues or the reality of actual negotiated prices

during this period.

---

[338] Pathak Declaration, ¶176.  Dr. Pathak acknowledges that this is a "temporally distant" benchmark and has provided no evidence to establish that the nature of primary ticketing, in terms of competition, product offerings, etc., was the same in 2008 as it was over the 15-year proposed class period (Pathak Declaration, ¶171).

[339] Pathak Declaration, ¶174.  Dr. Pathak states that "[f]aced with emerging competition, Ticketmaster adjusted its business practices.  The company began offering 'more attractive renewal terms to customers with expiring contracts than it had customarily offered in order to lock customers into long-term deals before Live Nation could sign them.'"

[340] LNE-LIT24-000052250–2279, at 2275, 2277. ████████████████████████████████
████████████████████████████████

[341] LNE-LIT24-000052860–2874 at, 2860, 2867, 2871. ████████████████████
████████████████████████████████████████████████████████
████████████████  Amalie Arena is the home of the Tampa Bay Lightning (ESPN Website, http://score-origin.espn.com/nhl/story/_/id/45967335/lightning-home-renamed-benchmark-international-arena).

HIGHLY CONFIDENTIAL

### B. Dr. Pathak's Methodology Obscures Variation Across Venues and Generates an Unrealistic But-For World

145.    Dr. Pathak's "damages" calculation involves him determining "the percentage reduction [in Ticketmaster's service fee revenue] required to reach" his estimated "cost" benchmark for each year.[342] Dr. Pathak assumes that this percentage reduction is *identical* across all "major concert venues" in a given year.[343]  He then states that he could apply this identical annual percentage reduction "[f]or each individual Class member."[344]  However, given the substantial variation across venue-specific agreements in the actual world, applying a single average reduction in fees to purportedly model the but-for world obscures important variation and generates economically nonsensical outcomes.  In fact, for many venues, Dr. Pathak's methodology suggests that Ticketmaster's "share" would be *below* its "costs."[345]

146.    **Exhibit 20** shows Dr. Pathak's damages calculation for 2022, applied to the Kaseya Center in Miami, FL where Named Plaintiff Luis Ponce attended a concert.

- First, Dr. Pathak calculates the "net service fees" as Ticketmaster's "share" of service fees on aggregate without accounting for fixed payments made to venues.[346]  For the Kaseya Center in this example, Ticketmaster retained an average of ███ per ticket, as shown by the full height of the orange bar.

- Dr. Pathak then determines that a █████████ reduction in Ticketmaster's total "net service fees" across all "major concert venues" is required to make these fees equal to his "cost" benchmark (i.e., his estimated fixed costs, variable costs, and the total signing bonus and sponsorship payments made by Ticketmaster to all "major concert venues" in 2022).

- Dr. Pathak then applies this same average percent reduction in "net service fees" to all "major concert venues."  Applying this reduction to the Kaseya Center results in a but-for "net service fee" of ████ per ticket, as shown by the solid part of the orange bar.

---

[342] Pathak Declaration, ¶182.

[343] Pathak Deposition, 114:17–115:4.  Dr. Pathak's methodology assumes that the average percentage reduction would further apply identically to every venue and every individual proposed class member (Pathak Declaration, ¶¶216–222; Pathak Deposition, 114:24–115:4).

[344] Pathak Declaration, ¶216.

[345] Dr. Pathak limits his analysis to service fees and two types of fixed payments, which I do as well to illustrate this issue.  However, as I have discussed, Ticketmaster and venues negotiate simultaneously negotiate other terms relating to, for example, resale tickets and marketing allowances.

[346] Pathak Declaration, ¶¶184, 216.

**HIGHLY CONFIDENTIAL**

- For this same venue and year, following Dr. Pathak's calculation, the but-for "cost" is ████
  per ticket, which includes his estimated fixed costs ████6 per ticket) and variable costs
  (████ per ticket) as well as the actual venue-specific fixed payments (████ per ticket) that
  Dr. Pathak assumes would have been identical in the but-for world.[347]

That is, Dr. Pathak's methodology suggests that in the but-for world, Ticketmaster would negotiate
terms with the Kaseya Center that would result in it covering approximately █████ its costs.

---

[347] As Dr. Pathak testified, "total signing bonuses and sponsorship payments […] varies venue by venue" (Pathak
Deposition, 128:13–129:5).

HIGHLY CONFIDENTIAL

**EXHIBIT 20**
**DR. PATHAK'S DAMAGES CALCULATION**
**KASEYA CENTER**
**2022**



Notes: Following Dr. Pathak's damages calculation, fixed payments in 2022 are allocated across concert tickets for the Kaseya Center (Pathak Declaration, footnote 319).

Source: Pathak turnover (financial data).

This exhibit also illustrates the fundamentally flawed assumptions underlying Dr. Pathak's methodology. For example, Dr. Pathak assumes that Ticketmaster would still pay the Kaseya Center the same fixed payment of ███ per ticket that it did in the actual world—despite this payment being ███████ fees it would earn.[348]

147.    **Exhibit 21** shows a similar illustration for Camping World Stadium in Orlando, FL where Named Plaintiff Jacob Roberts attended an event in 2015. As this exhibit shows,

---

[348] Pathak Declaration, ¶212. Dr. Pathak "assume[s] venues would have received the same amount in contractual signing bonuses [and] contractual sponsorship payments."

HIGHLY CONFIDENTIAL

- Dr. Pathak calculates "net service fees" of ▮▮▮ per ticket for this venue and year in the actual world, as shown by the full height of the orange bar.

- He applies a uniform reduction of ▮▮▮▮▮▮ in Ticketmaster's total "net service fees," which results in a but-for "net service fee" of ▮▮▮ for Camping World Stadium, as shown by the solid part of the orange bar.

- For this venue and year, Dr. Pathak's but-for "cost" is ▮▮▮ per ticket, which includes his estimated fixed costs ▮▮▮ per ticket) and variable costs ▮▮▮▮ ticket).[349]

That is, Dr. Pathak's methodology suggests that in the but-for world, Ticketmaster would negotiate terms with Camping World Stadium that would result in it covering approximately ▮▮▮▮ of its costs.

---

[349] Dr. Pathak's calculated "fixed cost" and "variable cost" include fractions of a cent, such that when displayed as rounded numbers the two components will not equal to his total "but-for" cost.

HIGHLY CONFIDENTIAL

**EXHIBIT 21**
**DR. PATHAK'S DAMAGES CALCULATION**
**CAMPING WORLD STADIUM**
**2015**



Source: Pathak turnover (financial data).

148.     While the examples above illustrate Dr. Pathak's calculation, the issue they raise—i.e.,
supposed but-for prices that are below Ticketmaster's costs—is widespread in Dr. Pathak's analysis.  In
each year, I find that the but-for "net service fees" are below "cost"—as they are for the Kaseya Center
and Camping World Stadium—for between ███████ "major concert venues.[350]  Across the full period
of Dr. Pathak's analysis (from 2015 to 2024), Dr. Pathak's methodology purports to find but-for "net
service fees" below "cost" for over ████████████████████████████████████.
Dr. Pathak provides no explanation of why Ticketmaster would enter contracts that would generate
losses for such a substantial portion of its ticketing business.  Rather, this result is an indication that Dr.
Pathak's methodology is not reliable for assessing the effects of the conduct Plaintiffs allege.

---

[350] This excludes 2020 when many venues were closed due to the COVID-19 pandemic.  In this year, I find over
████████ where but-for "net service fees" are below "cost."

**HIGHLY CONFIDENTIAL**

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 20th day of October, 2025 in McLean, VA.

Dr. John H. Johnson, IV

HIGHLY CONFIDENTIAL

**Appendix A.**

HIGHLY CONFIDENTIAL



1111 19th Street NW
Washington, DC 20036
+1 202 559 4388
jjohnson@edgewortheconomics.com

October 2025

# John H. Johnson IV

### E D U C A T I O N

Massachusetts Institute of Technology
PhD, Economics, 1999

University of Rochester
BA, *magna cum laude* with Highest Distinction in Economics, 1995
Phi Beta Kappa

### C U R R E N T   E M P L O Y M E N T

Edgeworth Economics, Washington, DC
Chief Executive Officer, Partner, September 2009-present

### E M P L O Y M E N T   H I S T O R Y

Edgeworth Economics, Washington, DC
President, September 2009-December 2018

Georgetown University, Washington, DC
Affiliated Professor, Georgetown Public Policy Institute, 2008-2011
Adjunct Professor, McCourt School of Public Policy, Fall 2022

Criterion Economics, LLC, Washington, DC
President, March 2009-September 2009

NERA Economic Consulting, Washington, DC
Vice President, 2005-2009
Senior Consultant, 2003-2005
Consultant, 2001-2003

University of Illinois at Urbana-Champaign, Champaign, IL
Assistant Professor of Economics and of Labor & Industrial Relations, 1999-2001

HIGHLY CONFIDENTIAL

### A P P O I N T M E N T S

District of Columbia Board on Professional Responsibility
Hearing Committee Member, April 2023-present

National Archives Foundation
Board of Directors, March 2018-present

Appleseed Pro Bono Network
Board of Directors, June 2011-December 2018
Chair, Board of Directors, March 2016-March 2018
Chair-Elect, February 2015-February 2016
Chair of Nominating Committee, February 2013-January 2015

Antitrust Law Journal
Associate Editor, June 2011-May 2013
Assistant Editor, June 2010-May 2011

Hawaii Appleseed Center for Law and Economic Justice
Board of Directors, February 2013-January 2016

American Bar Association Antitrust Agriculture and Food Committee
Vice Chairman, June 2013-July 2014

### T E A C H I N G   E X P E R I E N C E

Georgetown University/McCourt School of Public Policy Courses
- o   Antitrust and Public Policy
- o   Masters in Public Policy: Thesis Research Seminar
- o   The Law and Economics of Labor Discrimination Public Policy

University of Illinois at Urbana-Champaign Courses
- o   Labor Problems
- o   Women in the Labor Market
- o   Graduate Labor Economics

LinkedIn Learning
- o   Data Analytics for Business Professionals
- o   Using Data Effectively and Reliably with AI Analytics

### A W A R D S   A N D   H O N O R S

Good Apple Award, Appleseed Foundation, September 2021
Finalist, Entrepreneur of the Year, Mid-Atlantic Region, Ernst & Young, 2017
Pro Bono Innovator Award, Appleseed Pro Bono Network, 2012
Pro Bono Practice Award Recipient, Akin Gump Strauss Hauer and Feld, 2012
Finalist, Competition Economist of the Year, Global Competition Review, 2012
"Top Young Competition Economist," Global Competition Review, 2012

HIGHLY CONFIDENTIAL

### MEMBERSHIPS

Society of Human Resources Management
American Association for Public Opinion Research
American Economic Association
American Statistical Association
American Bar Association
- o   Labor and Employment Section
- o   Antitrust Section
Canadian Bar Association
International Association of Privacy Professionals
National Association of Forensic Economists
Society of Labor Economists

### TESTIMONY AND EXPERT REPORTS
#### PRIOR FOUR YEARS

*Mayor and City Council of Baltimore on behalf of itself and all others similarly situated v. Merck Sharpe and Dohme Corp.*

Case No. 2:23-cv-00828-GAM
Expert Report, September 29, 2025.

*Jolene Furdek and Jonathan Ryan v. Amazon.com, Inc., a Delaware Corporation, and Apple INC., a California Corporation,* United States District Court for the Western District of Washington at Seattle.

Case No:2:22-cv-01599-KKE
Expert Report, August 14, 2025.

*CareFirst of Maryland, Inc. Group Hospitalization and Medical Services, Inc. and CFA, LLC d/b/a CareFirst Administrators, on behalf of themselves and all others similarly situated v. Johnson & Johnson and Janssen Biotech, Inc.,* United States District Court for the Eastern District of Virginia

Case No. 2:23-ccv-00629-JKW-LRL
Expert Report, June 25, 2025.
Deposition, July 24, 2025.

*In re: Caustic Soda Antitrust Litigation, Relates to Indirect Purchaser Action*, United States District Court for the Western District Of New York

Case No: 1:10-cv-00385-EAW-MJR
Expert Report, November 28, 2022.
Deposition, January 11, 2023.
Declaration, June 18, 2025.

*In Re Outpatient Medical Center Employee Antitrust Litigation.,* United States District Court for the Northern District of Illinois, Eastern Division.
Case No. 1:21-cv-00305-SRH-YBK
Expert Report, April 16, 2025.
Deposition, May 7, 2025.

HIGHLY CONFIDENTIAL

*Pamela Wimbish and Patricia Onken v. IBM, Inc.,* United States District Court, Southern District of New York.
> Case No. 23 CV 08327
> Expert Report, March 14, 2025.
> Deposition, April 29, 2025

*Giang Bui vs. Cargill Incorporated, Cargill Meat Solutions Corporation, Cargill Limited, JBS USA Food Company, Swift Beef Company, JBS Packerland Inc., JBS Canada ULC, Tyson Foods, Inc., Tyson Fresh Meats, Inc., and National Beef Packing Company, LLC.* Supreme Court of British Columbia.
> File No. S221365
> Affidavit, March 13, 2024.
> Deposition, October 11, 2024.

*Xockets Inc. v. Nvidia Corporation, Microsoft Corporation, and RPX Corporation,* United States District Court for the Western District of Texas, Waco Division.
> Case No. 6:24-CV-00453-LS
> Declaration, October 9, 2024.

*In the Matter of the Arbitration Between National Football League Players Association v. National Football League*
> Expert Report, January 19, 2024.
> Deposition, March 8, 2024.
> Expert Report, April 19, 2024.
> Declaration, June 14, 2024.
> Deposition, July 19, 2024.
> Trial Testimony, August 6, 2024.

*In re: Generic Pharmaceuticals Pricing Antitrust Litigation,* United States District Court for the Eastern District of Pennsylvania
> Case No. 2:16-MD-02724
> In re: Clomipramine Cases, DPP Case: 16-CM-27241
> Clomipramine Expert Report, February 2, 2024.
> Deposition, April 24, 2024.
> Reply Report, June 17, 2024.

*In re: Generic Pharmaceuticals Pricing Antitrust Litigation,* United States District Court for the Eastern District of Pennsylvania
> Case No. 2:16-MD-02724
> In re: Clobetasol Cases, DPP Case: 16-CB-27241
> Clobetasol Expert Report, February 2, 2024.
> Deposition, April 24, 2024.
> Reply Report, June 17, 2024.

.
*In re: EpiPen Direct Purchaser Litigation*, United States District Court District of Minnesota
> Case No. 20-CV-00827-ECT-JFD
> Expert Report, June 1, 2023.
> Reply Report, July 5, 2023.
> Deposition, October 25, 2023.
> Expert Report, April 12, 2024.

HIGHLY CONFIDENTIAL

*Jennifer Nosalek, Randy Hirschorn and Tracey Hirschorn, individually and on behalf of all others similarly situated, v. MLS Property Information Network, Inc., Anywhere Real Estate Inc. (f/k/a Realogy Holdings Corp.), Century 21 Real estate LLC, Coldwell Banker Real Estate LLC, Sotheby's International Realty Affiliates LLC, Better Homes and Gardens Real Estate LLC, Era Franchise Systems LLC, HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, RE/MAX LLC, Polzler & Schneider Holdings Corporation, Integra Enterprises Corporation, RE/MAX of New England Inc., RE/MAX Integrated Regions, LLC, and Keller Williams Realty, INC.,* United States District Court for The District of Massachusetts.

 Case No. 1:20-cv-12244-PBS
 Declaration with M. Kheyfets, March 26, 2024.

*The Icon at Panorama, LLC v. Southwest Regional Council of Carpenters, et al.,* United States District Court Central District of California,

 Case No. 2:19-cv-00181
 Expert Report, February 13, 2024.
 Deposition, March 18, 2024.

*State of Washington v. Tyson Foods, Inc. et al.,* State of Washington King County Superior Court.

 Case No. 21-2-14174-5 SEA.
 Expert Report, February 1, 2024.
 Deposition, March 14, 2024.

*Tarah Kye Borozny, et al. vs. RTX Corporation, Pratt & Whitney Division, et al.,* United States District Court, District of Connecticut

 Case No. 3:21-cv-1657 (SVN)
 Expert Report, January 29, 2024.
 Deposition, February 29, 2024.

*In re: Broiler Chicken Antitrust Litigation,* United States District Court for the Northern District of Illinois, Eastern Division

 Case No. 1:16-cv-08637
 Expert Report, January 22, 2021.
 Deposition, March 23-24, 2021.
 Supplemental Expert Report, May 20, 2021.
 Expert Report, February 21, 2022.
 Evidentiary Hearing, May 11, 2022.
 Deposition, June 30 – July 1, 2022.
 Supplemental Expert Report, August 11, 2023.
 Supplemental Expert Report, October 2, 2023.
 Supplemental Expert Report, February 2, 2024.
 Supplemental Expert Report, June 7, 2024.

*In re: Rail Freight Surcharge Antitrust Litigation (No. II),* United States District Court for the District of Columbia.

 MDL Docket No. 2925, Misc. No. 20-8 (BAH)
 *Environmental Protection & Improvement Company LLC v. Union Pacific Railroad Company, et al.,*
 Case No. 1:22-cv-02587.
 Expert Report, December 13, 2023.

*In re: Rail Freight Surcharge Antitrust Litigation (No. II),* United States District Court for the District of Columbia.

 MDL Docket No. 2925, Misc. No. 20-8 (BAH).
 Expert Report, *August 15, 2023.*
 Deposition, November 8, 2023.

HIGHLY CONFIDENTIAL

*In re: Surescripts Antitrust Litigation*, United States District Court for the Northern District of Illinois
        Case No. 1:19-cv-06627
        Expert Report, September 14, 2023.
        Deposition, October 12, 2023.

*Laronda Rasmussen, et al. vs. The Walt Disney Company,* Superior Court of the State of California, County of Los Angeles
        Case No. 19STCV10974
        Expert Report, September 8, 2023.
        Deposition, October 2, 2023.

*In re: Watkins Incorporated v. McCormick & Company, Incorporated.,* United States District Court of Minnesota.
        Case No. 15-cv-2688 (DSD/BRT).
        Expert Report, January 7, 2021.
        Deposition, February 3, 2021.
        Trial Testimony, August 28, 2023.

*In re: Folgers Coffee Marketing Litigation,* United States District Court for the Western District of Missouri, Central Division
        Case No: 21-2984-MD-C-BP
        Expert Report, December 9, 2022.
        Deposition, January 31, 2023.
        Declaration, July 17, 2023.

*Nicholas Marcus Thompson, Jennifer Phillips, Michelle Herbert, Kathy Samuel, Wagna Celidon, Duane Guy Guerra, Stuart Philp, Shalane Rooney, Daniel Malcolm, Alain Babineau, Bernadeth Betchi, Carol Sip, Monica Agard and Marcia Banfield Smith vs. His Majesty The King.* Canada Federal Court.
        File No. T-1458-20
        Affidavit, September 30, 2022.
        Affidavit, February 28,2023.
        Deposition, July 14, 2023.

*In re: Caustic Soda Antitrust Litigation,* United States District Court for the Western District Of New York
        Case No: 1:19-cv-00385-EAW-MJR
        Expert Report, June 27, 2022.
        Deposition, July 29, 2022.
        Sur-reply Expert Report, December 27, 2022.
        Deposition, January 23, 2023.
        Evidentiary Hearing, June 5-6, 2023.
        Declaration, October 17, 2024.

*In re: Distribution of Cable Royalty Funds, Before the Copyright Royalty Judges,* Washington, DC
        Consolidated Docket Number 16-CRB-0009 CD (2014-17)
        Expert Report, July 1, 2022.
        Rebuttal Testimony, November 2, 2022.
        Hearing Testimony, March 21-23, 2023.

Highly Confidential

*Nicholas Marcus Thompson, Jennifer Phillips, Michelle Herbert, Kathy Samuel, Wagna Celidon, Duane Guy Guerra, Stuart Philp, Shalane Rooney, Daniel Malcolm, Alain Babineau, Bernadeth Betchi, Carol Sip, Monica Agard and Marcia Banfield Smith vs. Her Majesty The Queen.* Canada Federal Court.
      File No. T-1458-20
      Affidavit, September 7, 2022.

*Steves and Sons, Inc., v. JELD-WEN, Inc.,* United States District Court for the Eastern District of Virginia, Richmond Division
      Case No. 3:16-cv-00545-REP
      Declaration, March 21, 2022.
      Declaration, June 9, 2022.
      Declaration, July 8, 2022.

*International Construction Products LLC, v. Caterpillar Inc., Komatsu America Corp., Associated Auction Services, LLC d/b/a Cat Auction Services,* United States District Court for the District of Delaware.
      Case No.: 15-108-RGA.
      Expert Report, November 15, 2021.
      Deposition, December 8, 2021.

*In re: Rail Freight Surcharge Antitrust Litigation (MDL-I),* United States District Court for the District of Columbia.
      Case No. 1:07-mc-00489.
      Expert Report, January 22, 2013.
      Deposition, May 31, 2013.
      Supplemental Expert Report, April 15, 2021.
      Deposition, November 16, 2021.

*Pamela La Fosse, et al. v. Sanderson Farms*, United States District Court for the Northern District of California
      Case No. 19-cv-06570-RS (N.D. Cal. Jul. 2, 2020)
      Expert Report, September 17, 2021.
      Deposition, October 15, 2021.

## PUBLICATIONS

## BOOKS

Everydata: The Misinformation Hidden in the Little Data You Consume Every Day
      Bibliomotion, Inc., with Mike Gluck, New York, NY, 2016.

## ARTICLES

"The Evolution of DOJ's Views on No-Poach Litigation."
      *Antitrust Magazine,* Vol.36, No. 3. with James Mutchnik and Charles Fields, Summer 2022.

"Are Pandemic Sellers Actually Violating Price-Gouging Laws?,"
      *Law 360* with G. Korenko and M. Milner, April 3, 2020.

"Turning Daubert on Its Head: Efforts to Ban Hypothesis Testing in Antitrust Class Actions."
      *Antitrust Magazine.* Vol. 30, No. 2, Spring 2016. with Laila Haider and Gregory K. Leonard.

HIGHLY CONFIDENTIAL

"Tis the Season: Data Breaches and Data Analytics", (with Michael Kheyfets and Matthew Milner), Privacy Law 360 (November 2014)

"The Economic Underpinnings of Comcast v. Behrend", (with Laila Haider), Competition Law 360 (April 2013).

Brief of Economists Amici Curiae Before the United States Supreme Court, Comcast Corporation, et al. vs. Caroline Behrend, et al. (with Gregory K. Leonard and Laila Haider), August 24, 2012.

"Economic Analysis in Indirect Purchaser Class Actions." Antitrust Magazine. Vol. 26, No 1, Fall 2011.

"Systemic Discrimination: Let the Statistics Talk" (with Kara Gorski) Employment Law 360 (November 2011).

"Rigorous Analysis of Class Certification Comes of Age" (with Gregory Leonard) Antitrust Law Journal (2011).

"Causality and Damages Estimation in Antitrust Litigation: A Case Study" (with Michael Kheyfets and Matthew Milner). *Antitrust Report*. Issue 1, 2011.

"Antitrust Damages" (with Joseph Ostoyich) in Calculating and Proving Damages. Law Journal Press, New York, NY. 2011.

"Empirical Evidence and Class Certification in Labor Market Antitrust Cases"
(with Jesse David and Paul Torelli) *Antitrust Magazine*. Fall 2010. Volume 25. Number 1.

"The Increasing Relevance of Expert Testimony in the Wake of *Hydrogen Peroxide"* (with Boris Vabson and Matthew Milner) *The Antitrust Practitioner,* September 2010.

"The Standards for Class Certification Expert Testimony After *In Re Hydrogen Peroxide Antitrust Litigation*" *Antitrust Report*, Issue 2, 2009.

"In the Eye of the Beholder: Junk Science in Antitrust Class Certification." (with Gregory Leonard) *Antitrust Magazine*. August 2008.

"A Regression Primer for Labor Practitioners." (with Kristin Terris), *Labor and Employment Law,* 2008.

"Frictions and Sticking Points: Applying the Textbook Model to the Analysis of Cost Pass-Through in Indirect Purchaser Class Actions." (with Gregory Leonard) *Antitrust Insights*, Winter 2008.

"Economic Evidence in Criminal Cartel Cases." in Economics of Antitrust: Complex Issues in a Dynamic Environment, ed. Lawrence Wu ((New York: National Economic Research Associates, 2007).

"Common Principles of Antitrust Damages Estimation," *The Antitrust Report*. Issue 1, 2007.

"Don't Feed the Trolls" (with Gregory Leonard, Christine Meyer, and Ken Serwin). *Les Nouvelles*, September 2007*.*

"Economics and the Rigorous Analysis of Class Certification in Antitrust Cases." (with Gregory K. Leonard) *Journal of Competition Law and Economics* 2007; doi: 10.1093/joclec/nhm009

"Separating Fact from Fiction: Recent Trends in Wage and Hours Litigation." *Labor and Employment Law*, Spring 2007, Vol. 35, No. 3.

HIGHLY CONFIDENTIAL

"Downstream Discovery in Antitrust Class Actions." (with Laila Haider and Ian Simmons). *The Antitrust Practitioner*. July 2006.

"The Economics of Patent Policy: A Review of Recent Empirical Studies" in *Economic Approaches to Intellectual Property Policy, Litigation, and Management*, ed. Gregory K. Leonard and Lauren J. Stiroh. (New York: National Economic Research Associates, 2005).

"The Use of Event Studies in Intellectual Property Litigation" (with Vinita Juneja) in *Economic Approaches to Intellectual Property Policy, Litigation, and Management*, ed. Gregory K. Leonard and Lauren J. Stiroh. (New York: National Economic Research Associates, 2005).

"Do Long Work Hours Contribute to Divorce?" *Topics in Economic Analysis & Policy*: Vol. 4: No. 1, Article 24, October 2004.

"The Impact of Federal Overtime Legislation on Public Sector Labor Markets." *Journal of Labor Economics*, January 2003.

"Death by Lethal Injunction: National Emergency Strikes Under the Taft-Hartley Act." (with Michael LeRoy), *Arizona Law Review*, Spring 2001.

"Effects of Work-Related Absences on Families: Evidence from the Gulf War." (with Joshua Angrist), *Industrial and Labor Relations Review*, October 2000.


## KEYNOTE AND BOOK PRESENTATIONS


Everydata: The Misinformation Hidden in the Little Data in your Everyday Life

- o   University of South Carolina, February 2018
- o   Consumer Electronics Show, January 2017
- o   Chief Legal Counsel Association, October 2016
- o   TEDx Buffalo, October 2016
- o   Busboys and Poets, July 2016
- o   Huntington Book Review, July 2016
- o   O2 Labs, June 2016
- o   Latham & Watkins, June 2016
- o   Piper Marbury Institute, June 2016
- o   Vinson & Elkins, June 2016
- o   Government Acquire Conference, June 2016
- o   TJ-STAR Research Symposium, Thomas Jefferson High School, June 2016
- o   1919 Investment Club, May 2016
- o   Sagamore Institute, May 2016
- o   Ball State Town and Gown Speaker Series, May 2016

HIGHLY CONFIDENTIAL

- o Ice Miller, May 2016
- o Inside Self Storage World Exposition, April 2016
- o Securities and Exchange Commission University, April 2016
- o Arkansas Literary Festival, April 2016
- o Central High School, Little Rock, Arkansas, April 2016
- o University of Illinois College of Business, April 2016
- o University of Michigan School of Law, March 2016

## ECONOMICS PRESENTATIONS

"Keeping Secrets Amidst Increased Employee Mobility"
        American Bar Association Spring Meetings, April 2025

"Algorithmic Pricing in Antitrust"
        Venable, March 2025.
        Axinn, April 2025.

"Antitrust Class Actions 101"
        Jenner Block, October 2024
        Freshfields, December 2024

"Economics of MLS: Assessing Value and Competition" (with M. Kheyfets).
        CMLS 2023 Conference, Championing MLS, New Orleans, LA. October 5, 2023

"Value of MLS"
        cMLS Legal Summit, July 2023.

"Economic Outlook Roundtable"
        cMLS Bring it to the Table Conference, April 2023.

"Does Economics Matter in Criminal Antitrust Cases?
        ABA Antitrust Spring Meetings, March 2023.

"Moving Economic Thinking: Minority Rights and Competition"
        Kirkland Antitrust & Competition Institute, March 2023.

"Introduction to Economic Consulting"
        MIT Labor Economics Lunch, April 2022.

"Recent Trends and Strategies in HR Analytics."
        Law Firm HR Roundtable. October 2021.

"Economics of Class Certification"
        Weil, July 2021, with Michael Kheyfets and David Colino

"HR Analytics in Uncertain Times: Using Data to Guide Your Path Forward"
        Human Capital Institute. Webcast Series. June 2020 with Chuck Fields

Highly Confidential

"Apples and Economics: Is Illinois Brick Obsolete?"
  American Bar Association, April 2020

"HR Data Analytics: Introductory Course"
  Latham and Watkins, November 2019, with Chuck Fields

"Reverse Payment Settlements: Explaining 'Large and Unexplained.'"
  American Bar Association, April 2018.

"Data Analytics for Business Professionals"
  LinkedIn Learning, January 2018.

"Economic Analysis of Antitrust Class Actions"
  McMillan, with Matt Milner and Sophie Meadows, June 2017.

"Working with Experts in Litigation"
  Kirkland & Ellis, September 2016.

"Class Actions & Litigation Roundup: Recent Data Breach Cases, Mega Privacy Actions, TCPA and Texting Suits, and Assessing What Claims Are Worth"
  ACI Advanced Global Legal & Compliance Forum on Cyber Security & Data Privacy and Protection, with Douglas Meal and Ronald Raether, Washington, DC, January 2015.

"Class Action Litigation Update 2014"
  DC Bar Association Continuing Legal Education Program, December 2014.

"The Importance of Data in Commercial Litigation"
  Edgeworth Economics Webinar Forum Series, with Michael Kheyfets and Belinda Lee, June 2014.

"Law Firm Economics." With Steven Schulman.
  Akin Gump Strauss Hauer and Feld, May 21, 2014.

"Statistical Analysis: How to Determine If Your Hiring, Pay, Promotion and Termination Patterns Are Defensible."
  California Employment Law Council Annual Meeting, with Paul Evans and Krissy Katzenstein.  Santa Clara, CA. November 2013.

"An Economist in the Courtroom." Georgetown University Alumni Association Webinar, with Chuck Fields, Washington, DC October 2013.

"New Supreme Court Cases on Evidentiary Standards: When do Plaintiffs Need to Prove What, and How Do They Need to Do That?" Law Seminars International Ninth Annual Comprehensive Conference on Class Actions and other Aggregate Litigation. Seattle, Washington. May 2013

"How to Utilize Pro Bono Financial Experts: The Benefits to Clients and Public Interest Organizations". ABA Equal Justice Conference, St. Louis, Missouri. May 2013.

"Pay Equity: Are You Prepared for the EEOC and the OFCCP?" Jones Day Government Contractor Labor and Employment Discussion Group, McLean, Virginia, April 2013.

"Battle of the Experts: A Plaintiff and Defense Lawyer's How To On Working With Economists in Antitrust Cases." The Bar Association of San Francisco, San Francisco, CA, July 2012.

Hɪɢʜʟʏ Cᴏɴꜰɪᴅᴇɴᴛɪᴀʟ

"*Wage and Hours Class Actions After Dukes v. Walmart*" ACI Wages and Hours Class and Consumer Action
Conference, New York, NY May 2012.

"*Wal-Mart Stores, Inc. v. Dukes and Antitrust Class Actions*" Panel Discussant, American Bar Association Civil and
Criminal Procedure Committee, New York, NY, September 2011.

"What's This Case Really Worth?" American Bar Association  EEO Labor and Employment Committee Meetings,
New Orleans, LA, April 2011.

"The Future of U.S. Antitrust: Do Landmark Changes Portend a Turbulent Future?" ABA SIL International Law
Committee Teleconference., with Ethan Litwin and Samuel Miller., November 2010.

District of Columbia National Institute of Trial Advocacy Advanced Trial Advocacy Program, Faculty.
Washington, DC.  October 2010.

"The Intersection of Economics and Statistics in Employment and Health Care Litigation."
Epstein Becker and Green, New York City. September 2010 with Chuck Fields and Matthew Milner.

"Pharmaceutical Patent Litigation: Economic and Data Issues."
Duane Morris, Washington, DC September 2010 with Jesse David and Matthew Milner.

"The Influence of Daubert on Expert Testimony."
Duane Morris, Philadelphia, PA, September 2010 with Matthew Milner.

"The Evolution of an Expert Report in a Complex Damages Case"
Bingham McCutchen, Los Angeles, CA, January 2010, with Jesse David and Matthew Spitzer
Womble Carlyle, Washington, DC, February 2010, with Paul Torelli and Kara Gorski
Buchanan Ingersol and Rooney, Philadelphia, PA, April 2010 with Matthew Milner, Kara Gorski, and Jesse
David.

"Lawyer and Consultant Perspectives on Working Effectively and Efficiently with Testifying and Consulting Experts."
Law Seminars International Litigating Employment Class Actions Conference.
Washington, D.C., April 6, 2009 with Carter DeLorme.
San Francisco, CA, July 27, 2009 with Christopher Martin.

"The Economics of Large Corporate Law Firms." Building a Better Legal Profession National Conference of Student
Leaders.
Stanford University School of Law, Palo Alto, CA, April 3, 2009.

"The Debate Over the Billable Hour: A Rigorous Look at Competing Law Firm Profitability Models,"
Eighth Annual Legal Malpractice & Risk Management Conference, Chicago, March 5, 2009

"Economic Approaches to Wrongful Termination and Labor Discrimination Litigation,"
Orrick, Herrington & Sutcliffe, February 17, 2009, with Laila Haider

"Where's the Value: The ACC Model of Law Firm Profitability." with Matthew Milner and Frank Kyei-Manu.
Womble Carlyle Sandridge & Rice, PLLC. November 24, 2008.

HIGHLY CONFIDENTIAL

"Differences in Difference Estimation in Antitrust Cases."
    Skadden, Arps, Meager, and Flom, Washington, DC. November 17, 2008
    with Gregory Leonard and Fei Deng
    Hogan & Hartson, Washington, D.C., February 2009 with Fei Deng

"What's in an Average? Misleading Statistics in Labor and Employment Litigation."
    Biltimore Hotel, Los Angeles, California, October 23, 2008
    with Kristin Terris, Elizabeth Newlon, and Travis Gemoets

    Mayflower Hotel, Washington, DC, November 13, 2008
    with Laila Haider and Johnine Barnes

    Gibson, Dunn & Crutcher, January 28, 2009
    with Laila Haider

"The Economics of Class Actions." with Gregory Leonard and Anne Gron.
    Drinker Biddle, Chicago, Illinois, September 2008.
    O'Melveny and Myers, October 2008.

"The Supreme Court and Antitrust Economics."
    NERA Antitrust and Trade Regulation Seminar, Santa Fe, NM. July 2008 (panel moderator).

"Recent Evolution of Class Certification Standards."
    56th American Bar Association Antitrust Law Spring Meeting, March, 2008.

"Don't Be Afraid: Statistics for OFCCP Audits."
    Virginia State Society of Human Resource Management Conference, October 2007.

"Antitrust Econometrics." with Michael Egge.
    Latham and Watkins Antitrust Academy, Orlando, FL. March 2007.

"Effectively Working with Statistical Experts."
    Jones Day, Washington, DC. February 2007.

"Antitrust Class Certification" with Laila Haider,
    Weil, Gotshal, and Manges, New York City, January 2007.

"The Post E-Bay World and Patent Damages" with Lynn Malinoski and Rodger Smith,
    Law Seminars International Conference on Proving and Calculating Patent Damages,
    Philadelphia, PA, October 30, 2006.

"Statistical Detection of Cheating: The Chicago Black Sox Scandal of 1919"
    Frameworks for Effectively Presenting and Impeaching Cutting Edge Expert Testimony
    Edward Bennett Williams Inns of the Court, Washington, DC,
    October 19, 2006.

"Cutting Edge Econometrics in Antitrust Class Certification."
    NERA Antitrust and Trade Regulation Seminar, Santa Fe, NM, July 2006.

HIGHLY CONFIDENTIAL

"Patent Trolls and Injunctive Relief."
     NERA Economic Consulting Intellectual Property Practice Presentation.
     Villard Mansion, New York City, June 2006.

"The Economics of Antitrust Class Certification.
     Cadwalader, Wickersham & Taft, New York City, December 2005;
     Hogan & Hartson, Washington, DC, January 2006;
     O'Melveny & Myers, Washington, DC, February 2006.

"The Economics of Reasonable Royalties."
     Hunton & Williams , Washington, DC, November 2005.

"The Role of Economists in Intellectual Property Litigation."
     Hunton & Williams (with George Korenko), Washington, DC, November 2004.

*Special Ethics Concerns in Class Actions.*
     Federal Trade Commission Conference on Protecting Consumer Interests in Class Actions,
     Washington, DC, September 2004.

"Class Certification: Theory and Practice."
     NERA Antitrust and Trade Regulation Seminar, Santa Fe, NM, July 2003.

"The Role of Economists in Litigation."
     Williams and Connolly (with James Jordan), Washington, DC, May 2003.

"The Economics of Antitrust Damage Estimation."
     Wilmer, Cutler and Pickering, Washington, DC, January 2003.

Academic Seminars (1999-2001):

University of Illinois, Williams College, MIT, Mathematica Policy Institute, University of California at Berkeley, Princeton University, McGill University, Urban Institute, American Economic Association Meetings, National Bureau of Economic Research.

HIGHLY CONFIDENTIAL

**Appendix B.**

HIGHLY CONFIDENTIAL

## MATERIALS RELIED UPON

\* I incorporate by reference all materials in Dr. Pathak's expert report and turnover production.


### Court Filings

ICC International Court of Arbitration Case No. 17040/VRO/AGF, Partial Final Award, June 11, 2013

Declaration of Cole Gahagan, April 11, 2016

Complaint, January 4, 2022

Order Granting Joint Stipulation to Narrow Putative Class Claims, July 24, 2025

Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Co-Lead Class Counsel, August 18, 2025

Declaration of Luis Ponce in Support of Plaintiffs' Motion for Class Certification and Appointment of Co-Lead Class Counsel, August 18, 2025

Declaration of Jeanene Popp in Support of Plaintiffs' Motion for Class Certification and Appointment of Co-Lead Class Counsel, August 18, 2025

Declaration of Jacob Roberts in Support of Plaintiffs' Motion for Class Certification and Appointment of Co-Lead Class Counsel, August 18, 2025

### Expert Reports

Expert Declaration of Parag Pathak, Ph.D. In Support of Plaintiffs' Motion for Class Certification, August 18, 2025

### Depositions

Deposition of Clay Luter 30(b)(1) (Ticketmaster), June 5, 2025

Deposition of Darren McInnes (Live Nation), June 5, 2025

Deposition of David Marcus 30(b)(6) (Ticketmaster), June 17, 2025

Deposition of Doug Thornton (ASM), June 12, 2025, LEGENDS-HECK-00000208–0565

Deposition of Geoffrey Carns (Ticketmaster), May 14, 2025

Deposition of Jared Smith (Ticketmaster), July 18, 2025

Deposition of Jason Wright (Washington Commanders), May 14, 2025

Deposition of Jenny Johnson (Ticketmaster), April 17, 2025

Deposition of Jenny Johnson 30(b)(6) (Ticketmaster), June 3, 2025

Deposition of Joe Berchtold (Live Nation), July 24, 2025

Deposition of Marla Ostroff (Ticketmaster), March 27, 2024

Deposition of Matthew Caldwell, April 10, 2025

Deposition of Michael Marion, May 16, 2025

HIGHLY CONFIDENTIAL

Deposition of Michael Rapino (Live Nation), October 29, 2019

Deposition of Parag Pathak, Ph.D., October 14, 2025

Deposition of Patrick Nagle (Village of Rosemont), June 16, 2025

Deposition of Patti-Anne Tarlton (Live Nation), April 4, 2025

Deposition of Richard Best (Live Nation), March 19, 2025

Deposition of Ronald VanDeVeen (MetLife Stadium), July 15, 2025

Deposition of Scott Wampold (Ticketmaster), November 12, 2019

Deposition of Sharif Talukder (San Antonio Spurs), April 16, 2025

Deposition of Walter Johnson (City of Orlando), June 3, 2025

**Articles, Books, and Additional Sources**

American Bar Association, Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic
Issues, Third Edition, 2017

Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, Fourth Edition, 2015

Econometrics: Legal, Practical, and Technical Issues, American Bar Association, 2nd Ed., 2014

Hovenkamp, Herbert, "A Primer on Antitrust Damages," University of Iowa Legal Studies Research
Paper, 2011

Milton Friedman, "The Methodology of Positive Economics," In Essays In Positive Economics, 1966

Peter Davis and Eliana Garcés, Quantitative Techniques for Competition and Antitrust Analysis,
Princeton University Press, 2010

**Data**

LNE-LIT24-DAT-000093 (Ticketmaster Primary Ticketing Data)

LNE-LIT24-DAT-000148 (Ticketmaster Opportunities Data)

HIGHLY CONFIDENTIAL

**Bates Numbered Documents**

| | |
|---|---|
| LNE2019-CID-0106676 | LNE-LIT24-000059505–9542 |
| LNE2019-CID-1115857–5858 | LNE-LIT24-000060088–0119 |
| LNE22-000037097 | LNE-LIT24-000061785–1812 |
| LNE22-000495092–5126 | LNE-LIT24-000062100–2132 |
| LNE22-000583728–3771 | LNE-LIT24-000063908–3953 |
| LNE22-002017758–7783 | LNE-LIT24-000065034–5058 |
| LNE-LIT24-000023448–3482 | LNE-LIT24-000066561–6596 |
| LNE-LIT24-000023953–3982 | LNE-LIT24-000066870–6871 |
| LNE-LIT24-000027363–7395 | LNE-LIT24-000067738–7859 |
| LNE-LIT24-000027689–7720 | LNE-LIT24-000070798–0803 |
| LNE-LIT24-000027807–7836 | LNE-LIT24-000074574–4583 |
| LNE-LIT24-000029987–9999 | LNE-LIT24-000078275–8286 |
| LNE-LIT24-000032709–2721 | LNE-LIT24-000078743–8747 |
| LNE-LIT24-000035803–5826 | LNE-LIT24-000082261–2279 |
| LNE-LIT24-000040653–0686 | LNE-LIT24-000082318–2324 |
| LNE-LIT24-000041141–1179 | LNE-LIT24-000082607–2660 |
| LNE-LIT24-000043385–3421 | LNE-LIT24-000087587–7599 |
| LNE-LIT24-000044265–4300 | LNE-LIT24-000092497–2539 |
| LNE-LIT24-000048170–8194 | LNE-LIT24-000097509–7517 |
| LNE-LIT24-000049326–9380 | LNE-LIT24-000099232–9251 |
| LNE-LIT24-000049449–9477 | LNE-LIT24-000099573 |
| LNE-LIT24-000049715–9747 | LNE-LIT24-000101497–1552 |
| LNE-LIT24-000050155–0188 | LNE-LIT24-000106960–6977 |
| LNE-LIT24-000051284–1308 | LNE-LIT24-000107730–7743 |
| LNE-LIT24-000051556–1559 | LNE-LIT24-000108000–8030 |
| LNE-LIT24-000051780–1811 | LNE-LIT24-000108190–8195 |
| LNE-LIT24-000051923–1957 | LNE-LIT24-000109137–9156 |
| LNE-LIT24-000052250–2279 | LNE-LIT24-000112602–2641 |
| LNE-LIT24-000052684–2725 | LNE-LIT24-000115912–5945 |
| LNE-LIT24-000052860–2874 | LNE-LIT24-000122108–2145 |
| LNE-LIT24-000053491–3520 | LNE-LIT24-000125334–5363 |
| LNE-LIT24-000056747–6755 | LNE-LIT24-000131110–1153 |
| LNE-LIT24-000058364–8383 | LNE-LIT24-000133929–3954 |

**HIGHLY CONFIDENTIAL**

LNE-LIT24-000165091–5097

LNE-LIT24-000242681–2684

LNE-LIT24-000416162–6164

LNE-LIT24-000418415–8439

LNE-LIT24-000425354–5355

LNE-LIT24-000519583–9683

LNE-LIT24-000623139–3142

LNE-LIT24-000633334–3337

LNE-LIT24-000849939–9949

LNE-LIT24-000851455–1463

LNE-LIT24-000875358–5397

LNE-LIT24-000920820–0845

LNE-LIT24-001123550–3554

LNE-LIT24-001167035–7054

LNE-LIT24-001199754–9776

LNE-LIT24-001336077–6084

LNE-LIT24-001494711–4715

LNE-LIT24-001596450–6464

LNE-LIT24-001606728–6787

LNE-LIT24-001685413–5444

LNE-LIT24-001971168–1171

LNE-LIT24-001979298–9304

LNE-LIT24-002609643–9646

LNE-LIT24-002743628–3685

LNE-LIT24-002763958–3991

LNE-LIT24-002768920–8973

LNE-LIT24-002787885–7889

LNE-LIT24-002796091–6092

LNE-LIT24-002915481

LNE-LIT24-003080148–0155

LNE-LIT24-003116172–6226

LNE-LIT24-003196488–6562

LNE-LIT24-003370331–0376

LNE-LIT24-003378370–8384

LNE-LIT24-003496664–6670

LNE-LIT24-003579439–9478

LNE-LIT24-003601862–2069

LNE-LIT24-003603207–3237

LNE-LIT24-003607063

LNE-LIT24-004058229–8276

LNE-LIT24-004193769–3779

LNE-LIT24-004630561

LNE-LIT24-005147244

LNE-LIT24-005304819

LNE-LIT24-005309686–9695

LNE-LIT24-005334201

LNE-LIT24-005338335–8337

LNE-LIT24-005727108–7161

LNE-LIT24-006374732–4778

LNE-LIT24-006526637–6748

PONCE_LNE_006712–6713

PONCE_LNE_006768–6769

POPP_LNE_008321–8325

POPP_LNE_009683–9688

ROBERTS_LNE_000548–0549

SG-HECKMAN-00000255–0333

## **Websites**

ABC7 Chicago, https://abc7chicago.com/post/hoffman-estates-sears-centre-renamed-now-arena/6260910/

ABC7 Chicago, https://abc7chicago.com/post/toyota-park-in-bridgeview-to-be-renamed-seatgeek-stadium/3366299/

HIGHLY CONFIDENTIAL

Angel of the Winds Arena, "Request for Proposal – Ticketing," https://www.angelofthewindsarena.com/assets/doc/RFP-Angel-Of-The-Winds-Arena-updated-cm-2020.02.26-20fe13b8df.pdf

Barclays Center Website, https://www.barclayscenter.com/center-info/about-us

Broward Center Website, https://www.browardcenter.org/about/performing-arts-center-authority

Cascades Amphitheater Website, https://www.ridgefieldamphitheater.com/information/

Cat's Cradle, "About," https://catscradle.com/about/

CBS News Boston, https://www.cbsnews.com/boston/news/taylor-swift-the-eras-tour-foxboro-gillette-stadium/

Cleveland Browns Website, https://www.clevelandbrowns.com/news/browns-and-huntington-bank-announce-20-year-partnership-that-includes-stadium-naming-rights

Cleveland.com, November 12, 2020, https://www.cleveland.com/entertainment/ 2020/11/seatgeek-named-new-ticketing-provider-for-cavaliers-rocket-mortgage-fieldhouse.html

Credit Union 1 Arena Website, https://www.creditunion1arena.com/

Credit Union 1 Arena, "About," https://www.creditunion1arena.com/about/

Delaware North Website, https://www.delawarenorth.com/what-we-do/venue-development-management/

Enterprise Center Website, https://www.enterprisecenter.com/about-us

ESPN Website, http://score-origin.espn.com/nhl/story/_/id/45967335/lightning-home-renamed-benchmark-international-arena

ESPN Website, https://www.espn.com/nba/story/_/id/24201677/milwaukee-bucks-fiserv-reach-deal-arena-naming-rights

ESPN Website, https://www.espn.com/nfl/story?id=9508985&src=desktop

ESPN Website, https://www.espn.com/nhl/story/_/id/9463921/san-jose-sharks-hp-pavilion-renamed-sap-center

Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/release/tables?rid=46&eid=145667#snid=144063

Florida Citrus Sports Website, https://floridacitrussports.com/stadium/

Fox 35 Orlando, December 20, 2023, https://www.fox35orlando.com/news/new-sign-appears-to-reveal-amway-centers-new-name

Gainbridge Fieldhouse Website, https://www.gainbridgefieldhouse.com/events/pacers

Grossinger Motors Arena Website, https://www.grossingermotorsarena.com/about-us/history

Hard Rock Hollywood, FL Website, https://casino.hardrock.com/hollywood/newsroom/2017/10/iconic-guitar-hotel-tower-going-upat-seminole-hard-rock-hotel--casino-hollywood

Hard Rock Hollywood, FL Website, https://casino.hardrock.com/hollywood/newsroom/2019/10/seminole-hard-rock-hotel--casino-hollywood-to-debut-125-million-hard-rock-live

Herald-Tribune, https://www.heraldtribune.com/story/sports/nhl/2025/08/13/amalie-arena-new-name-benchmark-international-tampa-bay-lightning/85642263007/

Hockey Reference Website, https://www.hockey-reference.com/arenas/

Legends Global Website, https://legendsglobal.com/legends-completes-acquisition-of-asm-global/

Live Nation 2010 10-K

Live Nation 2024 10-K

Louisville, KY Website, https://www.gotolouisville.com/directory/iroquois-amphitheater-event-venues

MetLife Stadium Website, https://www.metlifestadium.com/events/seating-maps-fan-guide

Miami Today News Website, https://www.miamitodaynews.com/2025/07/16/plaza-behind-kaseya-center-on-the-way-three-decades/

Monumental Sports, "Brands," https://monumentalsports.com/brands/

National Basketball Association Website, https://www.nba.com/news/all-30-nba-arenas-by-team

NBC Miami, https://www.nbcmiami.com/news/local/aaa-ftx-or-miami-dade-arena-breaking-down-what-weve-called-newly-named-kaseya-center/3009120/

NBC Washington, https://www.nbcwashington.com/ news/local/verizon-center-changes-name-to-capital-one-arena/24224/

Now Arena Website, https://www.nowarena.com/about/about-us

OC Fair Website, https://ocfair.com/updates/faqs/

Pacific Amphitheatre Box Office Website, https://pacamp.com/tickets/box-office/

Pacific Amphitheatre Website, https://www.costamesaamphitheatre.com/information/

PNC Music Pavilion Website, https://specialevents.livenation.com/venues/pnc-music-pavilion

Pollstar Website, https://news.pollstar.com/2010/02/05/dodge-arena-now-state-farm/

Rose Bowl Stadium Website, https://www.rosebowlstadium.com/

SAP Center, https://www.sapcenter.com/

Seattle Seahawks Website, https://www.seahawks.com/team/facilities/lumen-field/

Soldier Field Website, https://www.soldierfield.com/stadium-info/about

Sports Business Journal, https://www.sportsbusinessjournal.com/Articles/2025/02/18/suns-arena-set-for-name-change/

State Farm Arena Website, https://www.statefarmarena.com/about-the-arena/quick-facts

Statista Website, https://www.statista.com/chart/31033/key-figures-from-swifts-the-eras-tour/

The Greek Theatre Website, https://www.lagreektheatre.com/venue-info

The Town Hall Website, https://www.thetownhall.org/

Ticketmaster Website, https://business.ticketmaster.com/why-ticketmaster/our-story/

Tucson Symphony Orchestra Website, https://www.tucsonsymphony.org/plan-your-visit/linda-ronstadt-music-hall/

UIC Athletics Website, http://uicflames.com/news/2018/11/15/gen-credit-union-1-arena.aspx

UK Athletics Website, https://ukathletics.com/facilities/rupp-arena/

**HIGHLY CONFIDENTIAL**

United Center Website, https://www.unitedcenter.com/chicago-sky-to-host-2025-indiana-fever-games-at-united-center/

Valley Central, https://www.valleycentral.com/news/new-name-for-state-farm-hidalgo-arena/

Visit Denver Website, https://visitdenver.com/listing/dicks-sporting-goods-park/5512/

Visit Pittsburgh Website, https://www.visitpittsburgh.com/directory/ppg-paints-arena/

Visitatlanticcity Website, https://www.visitatlanticcity.com/listing/borgata-hotel-casino-%26-spa/4780/

WCBI, https://www.wcbi.com/bancorpsouth-merges-with-cadence-bank-changes-signs-on-buildings/

HIGHLY CONFIDENTIAL

**Appendix C.**

**HIGHLY CONFIDENTIAL**

**EXHIBIT C-1**
**"MAJOR CONCERT VENUES" INCLUDED IN DR. PATHAK'S DAMAGES ANALYSIS**
**BY VENUE TYPE**
**2015 – 2024**

| Venue Type | Description | Count of Venues | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] | [j] | [k] | [l] |
| Amphitheater | Generally outdoor venues used primarily in the summer season | 58 | 67 | 64 | 67 | 68 | 5 | 79 | 72 | 76 | 74 |
| Arena NBA/NHL | Multi-purpose indoor venues that host local professional sports teams | 34 | 33 | 36 | 35 | 37 | 34 | 39 | 40 | 40 | 39 |
| Arena | Multi-purpose indoor venues without a major sports team | 48 | 57 | 52 | 53 | 56 | 55 | 53 | 62 | 59 | 59 |
| Theater | Indoor venues primarily for music events, also host theatrical performances | 41 | 48 | 47 | 54 | 58 | 70 | 43 | 52 | 47 | 48 |
| NFL | Stadiums that house local professional sports teams | 20 | 22 | 24 | 26 | 17 | 0 | 18 | 27 | 23 | 24 |
| All Other Venue Types | Includes different types of venues such as clubs, casinos, MLS ballparks, etc. | 83 | 80 | 91 | 93 | 88 | 75 | 94 | 100 | 108 | 114 |
| **All Venue Types** | | **284** | **307** | **314** | **328** | **324** | **239** | **326** | **353** | **353** | **358** |

Notes: Of the 500 venues Dr. Pathak identifies as "major concert venues" in each year, approximately 180 in each year are not ticketed by Ticketmaster or are not included in his damages analysis. These have been excluded from the exhibit.

Top five venue types shown in this exhibit are ordered by total concert tickets sold from 2015 to 2024.

Sources: Pathak turnover (financial and ticketing data); Live Nation 2024 10-K, pp. 6–7; Jenny Johnson Deposition, 12:17–14:7, 18:5–13, 20:23–21:14, 22:7–23:12.

HIGHLY CONFIDENTIAL

**Appendix D.**

HIGHLY CONFIDENTIAL

EXHIBIT D–1



**HIGHLY CONFIDENTIAL**

EXHIBIT D–2



HIGHLY CONFIDENTIAL

EXHIBIT D–3



**HIGHLY CONFIDENTIAL**

EXHIBIT D–4



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–5**



HIGHLY CONFIDENTIAL

**EXHIBIT D–6**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–7**



HIGHLY CONFIDENTIAL

EXHIBIT D–8



HIGHLY CONFIDENTIAL

EXHIBIT D–9



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–10**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D−11**



HIGHLY CONFIDENTIAL

**EXHIBIT D–12**



HIGHLY CONFIDENTIAL

**EXHIBIT D–13**

**HIGHLY CONFIDENTIAL**

**EXHIBIT D–14**



HIGHLY CONFIDENTIAL

**EXHIBIT D–15**

**HIGHLY CONFIDENTIAL**

**EXHIBIT D–16**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–17**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–18**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–19**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–20**

HIGHLY CONFIDENTIAL

EXHIBIT D–21

HIGHLY CONFIDENTIAL

**EXHIBIT D–22**

HIGHLY CONFIDENTIAL

**EXHIBIT D–23**



HIGHLY CONFIDENTIAL

**EXHIBIT D–24**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–25**

HIGHLY CONFIDENTIAL

**EXHIBIT D–26**

**HIGHLY CONFIDENTIAL**

**EXHIBIT D–27**

HIGHLY CONFIDENTIAL

**EXHIBIT D–28**



HIGHLY CONFIDENTIAL

**EXHIBIT D–29**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–30**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–31**

HIGHLY CONFIDENTIAL

**EXHIBIT D–32**

HIGHLY CONFIDENTIAL

**EXHIBIT D–33**

HIGHLY CONFIDENTIAL

**EXHIBIT D–34**

**HIGHLY CONFIDENTIAL**

**EXHIBIT D–35**



HIGHLY CONFIDENTIAL

**EXHIBIT D–36**



HIGHLY CONFIDENTIAL

**EXHIBIT D–37**

**HIGHLY CONFIDENTIAL**

**EXHIBIT D–38**

HIGHLY CONFIDENTIAL

**EXHIBIT D–39**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–40**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–41**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–42**



HIGHLY CONFIDENTIAL

**EXHIBIT D–43**

**HIGHLY CONFIDENTIAL**

**EXHIBIT D–44**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–45**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D–46**



HIGHLY CONFIDENTIAL

EXHIBIT D–47



HIGHLY CONFIDENTIAL

**EXHIBIT D–48**



**HIGHLY CONFIDENTIAL**



HIGHLY CONFIDENTIAL



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



HIGHLY CONFIDENTIAL

EXHIBIT D-83



**HIGHLY CONFIDENTIAL**

**EXHIBIT D-84**



HIGHLY CONFIDENTIAL

EXHIBIT D-85



**HIGHLY CONFIDENTIAL**

EXHIBIT D-86



**HIGHLY CONFIDENTIAL**

**EXHIBIT D-87**



HIGHLY CONFIDENTIAL

EXHIBIT D-88



**HIGHLY CONFIDENTIAL**

**EXHIBIT D-89**



**HIGHLY CONFIDENTIAL**

**EXHIBIT D-90**



HIGHLY CONFIDENTIAL

EXHIBIT D-91



**HIGHLY CONFIDENTIAL**

**EXHIBIT D-92**



HIGHLY CONFIDENTIAL

EXHIBIT D-93



**HIGHLY CONFIDENTIAL**

EXHIBIT D-94



HIGHLY CONFIDENTIAL

EXHIBIT D-95



**HIGHLY CONFIDENTIAL**

EXHIBIT D-96



**HIGHLY CONFIDENTIAL**

**EXHIBIT D-97**



HIGHLY CONFIDENTIAL

Appendix E.

HIGHLY CONFIDENTIAL

EXHIBIT E-1



HIGHLY CONFIDENTIAL

EXHIBIT E-2

HIGHLY CONFIDENTIAL

EXHIBIT E-3

HIGHLY CONFIDENTIAL

EXHIBIT E-4

**HIGHLY CONFIDENTIAL**



**Appendix F.**

HIGHLY CONFIDENTIAL

**EXHIBIT F−1**



HIGHLY CONFIDENTIAL

EXHIBIT F–2

**HIGHLY CONFIDENTIAL**

EXHIBIT F–3

**HIGHLY CONFIDENTIAL**

**EXHIBIT F–4**



HIGHLY CONFIDENTIAL

**EXHIBIT F−5**

**HIGHLY CONFIDENTIAL**

**EXHIBIT F–6**



**HIGHLY CONFIDENTIAL**

**EXHIBIT F–7**

**HIGHLY CONFIDENTIAL**

**EXHIBIT F-8**

**HIGHLY CONFIDENTIAL**

**EXHIBIT F-9**

**HIGHLY CONFIDENTIAL**

**EXHIBIT F-10**

**HIGHLY CONFIDENTIAL**

**EXHIBIT F-11**

**HIGHLY CONFIDENTIAL**

**EXHIBIT F-12**

**HIGHLY CONFIDENTIAL**

**EXHIBIT F-13**

**HIGHLY CONFIDENTIAL**

**EXHIBIT F-14**



**HIGHLY CONFIDENTIAL**

EXHIBIT F-15



HIGHLY CONFIDENTIAL

**Appendix G.**

Highly Confidential

**Exhibit G-1**
**Map of Dr. Pathak's "Major Concert Venues"**
**2023**



Notes: I show Dr. Pathak's "major concert venues" in 2023 that were ticketed by Ticketmaster.  I choose this year as it is one of only two years where all six of the venues where the Named Plaintiffs made purchases are classified as "major" by Dr. Pathak.  Venues where Named Plaintiffs made purchases are shown as red asterisks.  Named Plaintiffs Luis Ponce and Jacob Roberts are both residents of Florida and attended events at "major concert venues" in central and southern Florida.  Named Plaintiff Jeanene Popp is a resident of Ohio and attended events in the same state as well.  The hundreds of remaining "major concert venues" are shown as black dots.

Sources: Pathak turnover (ticketing data); Roberts Declaration, p. 2; Ponce Declaration, p. 2; Popp Declaration, p. 2.