# EXHIBIT 2

**In the Matter Of:**

*HECKMAN v*

*LIVE NATION ENTERTAINMENT, INC.*

---

*PARAG PATHAK, PH.D.*

*October 14, 2025*

---



1

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3
    SKOT HECKMAN, LUIS PONCE,      )
 4  JEANENE POPP, AND JACOB        )
    ROBERTS, ON BEHALF OF          )
 5  THEMSELVES AND ALL THOSE       )
    SIMILARLY SITUATED,            )
 6                                 ) Case No.
                        Plaintiffs,) 2:22-cv-00047-GW-GJS
 7                                 )
        vs.                        )
 8                                 )
    LIVE NATION ENTERTAINMENT,     )
 9  INC., and TICKETMASTER LLC,    )
                                   )
10                      Defendants.)
    _____)
11

12


13      *** HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY ***

14               VIDEOTAPED DEPOSITION OF

15                   PARAG PATHAK, PH.D.

16         TUESDAY, OCTOBER 14, 2025, 9:35 A.M. ET

17               VIA ZOOM VIDEOCONFERENCE

18

19

20

21

22

23  STENOGRAPHICALLY REPORTED BY:
    CHERYL HAAB SCOTT, RDR, CRR, CCRR
24  CA CSR No. 13600
    WA CCR No. 3499
25  NV CCR No. 1003
```

2

1                   UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3
SKOT HECKMAN, LUIS PONCE,      )
4   JEANENE POPP, AND JACOB     )
ROBERTS, ON BEHALF OF          )
5   THEMSELVES AND ALL THOSE    )
SIMILARLY SITUATED,            )
6                               ) Case No.
                    Plaintiffs,) 2:22-cv-00047-GW-GJS
7                               )
        vs.                     )
8                               )
LIVE NATION ENTERTAINMENT,     )
9   INC., and TICKETMASTER LLC, )
                                )
10                  Defendants.)
_____)
11

12

13      *** HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY ***

14          VIDEOTAPED DEPOSITION OF PARAG PATHAK, PH.D.,

15   taken via Zoom Videoconference, on Tuesday,

16   October 14, 2025, at 9:35 a.m. ET, before Cheryl Haab

17   Scott, RDR, CRR, CCRR, Certified Shorthand Reporter No.

18   13600 in and for the State of California, Certified

19   Court Reporter No. 3499 in and for the State of

20   Washington, and Certified Court Reporter No. 1003 in and

21   for the State of Nevada.

22

23

24

25

3

```
 1                    A P P E A R A N C E S
                           --oOo--
 2

 3     For Plaintiffs:

 4         QUINN EMANUEL URQUHART & SULLIVAN, LLP
           BY:  BRANTLEY I. PEPPERMAN, ESQ.
 5              EMMA BARTON, ESQ.
                WILLIAM R. SEARS, ESQ.
 6         865 South Figueroa Street, Tenth Floor
           Los Angeles, California 90017
 7         213.443.3000
           brantleypepperman@quinnemanuel.com
 8         emmabarton@quinnemanuel.com
           willsears@quinnemanuel.com
 9

10     For Defendants:

11         LATHAM & WATKINS LLP
           BY:  TIM O'MARA, ESQ.
12              ALICIA JOVAIS, ESQ.
                SAMUEL JEFFREY, ESQ.
13         505 Montgomery Street, Suite 2000
           San Francisco, California 94111
14         415.391.0600
           tim.o'mara@lw.com
15         alicia.jovais@lw.com
           sam.jeffrey@lw.com
16
           THE CAMPBELL FIRM
17         BY:  CHRISTOPHER B. CAMPBELL, ESQ.
           455 Market Street, Suite 1950
18         San Francisco, California 94105
           chris@thecampbellfirm.com
19

20     Also Present:

21         BRADEN TOHILL, VIDEOGRAPHER
22         KETAN PATEL
           GEORGE LYNCH
23

24

25
```

4

1                          I N D E X
                             --oOo--
2

3   WITNESS: Parag Pathak, Ph.D.

4                                                            PAGE

5   Examination By Mr. O'Mara                                  6

6

7

8
                        INDEX TO EXHIBITS
9                            --oOo--

10  EXHIBIT NO.                                             PAGE

11  Exhibit 100    "Expert Declaration of Parag              8
                   Pathak, Ph.D. in Support of
12                 Plaintiffs' Motion for Class
                   Certification"
13
    Exhibit 101    "Appendix C"                             12
14
    Exhibit 102    Spreadsheet, two pages; first           175
15                 page, "CPI and BFW"

16

17

18

19

20

21

22

23

24

25

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 7 of 41    Page
ID #:11620
HECKMAN v                                                        Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only              October 14, 2025

46

```
 1            THE WITNESS:  The way I think about my

 2    overcharge calculation is I'm trying to model a

 3    scenario where there is competition between ticket

 4    service providers where there's no anticompetitive

 5    conduct, and the usual starting point in economics

 6    when we have competition is that prices should

 7    approach costs.  So the approach that we take in the

 8    damage calculation is to try to get to a benchmark

 9    of costs.

10            So I hope I've answered your question; but

11    if I haven't, please ask it again.

12    BY MR. O'MARA:

13       Q    Yeah, I think you did.

14            So when you say "overcharges," you're

15    referring to the difference between the actual fees

16    paid in the real world and your but-for benchmark

17    based on this cost benchmark, which we'll talk about

18    later.

19            MR. PEPPERMAN:  Objection.  Form.

20            THE WITNESS:  I think that's accurate.  So

21    the overcharge is real-world fee paid for

22    fee-bearing tickets by class members relative to my

23    best attempt to estimate what the price for the

24    service provision would have been in a world without

25    anticompetitive conduct.  That delta, that
```

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 8 of 41   Page
ID #:11621
HECKMAN v                                                    Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only          October 14, 2025

47

 1    difference.

 2    BY MR. O'MARA:

 3       Q    And again, we'll talk quite a bit more about

 4    it.  But that benchmark is -- is it fair to say

 5    that's a cost benchmark?

 6            MR. PEPPERMAN:  Objection.  Form.

 7            THE WITNESS:  The benchmark is built up by

 8    trying to estimate what the costs of ticket services

 9    provision is.  So the inputs into that are aspiring

10    to get to a measure of what the cost of ticket

11    provision is.

12    BY MR. O'MARA:

13       Q    Okay.  Dr. Pathak, are you opining that the

14    alleged anticompetitive conduct in this case began

15    in 2010, when Live Nation merged with Ticketmaster?

16       A    I don't think my report has that statement

17    about the start date.  As I understand your

18    question, when did things begin?

19       Q    Yes.

20       A    My assignment was to look from 2010 to

21    present and examine the anticompetitive effects of

22    Ticketmaster from 2010 to present.

23       Q    So to be clear, then:  Are you saying that

24    the anticompetitive conduct started in 2010?

25            MR. PEPPERMAN:  Objection.

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 9 of 41   Page
ID #:11622
HECKMAN v                                                                    Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only                          October 14, 2025

48

```
 1   BY MR. O'MARA:

 2      Q    I mean, the tie obviously can't exist before

 3   that; right?

 4           MR. PEPPERMAN:  Objection.  Form.

 5           THE WITNESS:  The exclusive dealing predates

 6   2010.  So anticompetitive conduct existed before

 7   2010.  So not saying anything starts in 2010 other

 8   than the assignment that I was given, which is the

 9   class period starts in 2010.

10   BY MR. O'MARA:

11      Q    So did you examine whether the period prior

12   to 2010 was competitive or subject to

13   anticompetitive harm?

14           MR. PEPPERMAN:  Objection.  Form.

15           THE WITNESS:  That's something I considered,

16   yes.

17   BY MR. O'MARA:

18      Q    And what did you conclude?

19      A    That wasn't my assignment.  The way this

20   factored into my analysis is when I think about the

21   but-for world, would there have been enough time for

22   my but-for world to have existed by the beginning of

23   the class period.

24           So said another way, if Ticketmaster's

25   anticompetitive conduct had been prohibited, if
```

49

```
 1   their exclusive dealing, in particular, was not

 2   present, would there have been sufficient

 3   competition such that by the beginning of the class

 4   period, I think my calculation is a reasonable

 5   calculation.  And I came to the conclusion that it

 6   is.

 7        MR. PEPPERMAN:  We've been going for about

 8   an hour, an hour shortly thereafter.  Is it a good

 9   time for a break?

10        MR. O'MARA:  Sure.

11        THE WITNESS:  I could go to the restroom;

12   but if you're in the middle of something, I don't

13   want to interrupt you.  So...

14        MR. O'MARA:  No, that's fine.  We can take a

15   quick break.

16        Ten minutes?

17        MR. PEPPERMAN:  Sure.

18        MR. O'MARA:  Thanks.

19        THE VIDEOGRAPHER:  The time is 10:36 a.m.,

20   and we're going off the record.

21        (Recess.)

22        THE VIDEOGRAPHER:  The time is now

23   10:49 a.m. Eastern, and we're back on the record.

24   BY MR. O'MARA:

25      Q    Dr. Pathak, can I direct your attention to
```

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 11 of 41    Page
ID #:11624
HECKMAN v                                                                    Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only                          October 14, 2025

63

 1    conduct:  Exclusive dealing contracts, tying, and

 2    coercion; is that right?

 3            MR. PEPPERMAN:  Objection.

 4            THE WITNESS:  The real-world price is

 5    influenced by the conduct.  Correct.

 6    BY MR. O'MARA:

 7      Q    And so my question is, is for your damage

 8    method -- your impact and damage methodology, if it

 9    turns out that plaintiffs are incorrect and cannot

10    prove one of those theories of alleged

11    anticompetitive conduct, how does your impact and

12    damages methodology account for that?

13            MR. PEPPERMAN:  Objection.

14    BY MR. O'MARA:

15      Q    Can you separate the damages according to

16    the individual theories of alleged anticompetitive

17    conduct?

18            MR. PEPPERMAN:  Same objection.

19            THE WITNESS:  Well, my approach is to anchor

20    my analysis in exclusive -- exclusive dealing, and

21    as my report describes, these other conducts amplify

22    the anticompetitive effects of exclusive dealing.

23    And that's, you know, manifest in the real-world

24    prices that we observe.

25    ///

64

```
 1   BY MR. O'MARA:

 2       Q    So let's say that the court concludes that

 3   exclusive dealing is not anticompetitive.

 4            Can your damage and impact methodology still

 5   identify the damages that are specific only to the

 6   tying and coercion claims?

 7            MR. PEPPERMAN:  Objection.  Form.

 8            THE WITNESS:  Well, if exclusive dealing is

 9   not anticompetitive, then raises the question of why

10   have other ticket service providers, you know, not

11   successfully attracted business from other venues.

12   And in the way I think about this is, exclusive

13   dealing is the anchor.  So tying is kind of additive

14   on exclusive dealing in a way that's reflected in

15   real-world prices.

16            But your specific exercise is not one I

17   undertook, because I believe all of these things are

18   happening at the same time.  So it's a hypothetical

19   that I didn't, you know, need to consider because

20   that's not the record of the case.

21   BY MR. O'MARA:

22       Q    Okay.  Just to finish that thought.  The

23   flip side of it:  If the court concluded there's no

24   tie, your damage methodology cannot distinguish

25   between the current proposed damages for all three
```

1    theories and a world in which only the exclusivity

2    is the anticompetitive conduct.

3          MR. PEPPERMAN:  Objection.

4          THE WITNESS:  I don't agree with that.  I'm

5    just kind of going back to what I'm saying; right?

6    We're comparing the real world to a world where

7    there's competition.  So competition is what would

8    happen if there's no anticompetitive conduct.  So

9    whatever the court decides about which claims

10   hold -- you know, the current world has

11   anticompetitive conduct, and my methodology tells me

12   what would happen if there was no anticompetitive

13   conduct.

14   BY MR. O'MARA:

15     Q    Can your methodology identify the amount of

16   the damage which is specific to the alleged unlawful

17   tie?

18         MR. PEPPERMAN:  Objection.  Form.

19         THE WITNESS:  The tie amplifies the effects

20   of exclusive dealing.  For instance, if I looked at

21   the increase in ticket service fees and the increase

22   in market shares over time that is due to exclusive

23   dealing which has been amplified by the tie in more

24   recent periods.  But my methodology accounts for

25   that because it's taking, as input, the real-world

 1    A    I'd say that's to a much lesser extent, you

 2  know, think about a fan traveling from New York to

 3  Paris to go watch a concert.  That's, I think, much

 4  more costly than a fan traveling from New York to

 5  Philadelphia to watch a concert.  That's a matter of

 6  degree.

 7    Q    But you would agree that travel costs place

 8  some limits on a fan's ability to switch between

 9  major concert venues in the U.S. from one city to

10  the next?

11         MR. PEPPERMAN:  Objection.  Form.

12         THE WITNESS:  I think that's what I said.

13  It's differing degrees.  An international flight

14  is -- if you're asking me to say is an international

15  flight more expensive on average, say, than domestic

16  flights, I'd say that's a fair proposition.

17  BY MR. O'MARA:

18    Q    My point isn't the comparison with U.S.

19  versus non-U.S.  My focus is within the U.S., and

20  I'm just trying to confirm that we agree that travel

21  costs place limits on a fan's ability to switch

22  between major concert venues in one U.S. city versus

23  another.

24         Do you agree with that?

25         MR. PEPPERMAN:  Objection.  Form.

96

```
 1            THE WITNESS:  I think the quantitative

 2   dimension of that is where maybe we are talking past

 3   each other here.  So yes, if there is a concert down

 4   the street from me versus one that's a subway ride

 5   away, of course the subway ride is going to cost

 6   more than one I can walk to.  So just kind of as a

 7   common sense point, travel costs affect

 8   substitution.

 9            But for the purposes of market definition,

10   we need to think about whether that's a substantial

11   difference or not.

12   BY MR. O'MARA:

13     Q    And travel between, say, New York and LA, is

14   substantial.  Is it not?

15            MR. PEPPERMAN:  Objection.  Form.

16            THE WITNESS:  It depends.  I mean, not to

17   make it personal, but my sister has traveled across

18   the country to go watch artists because she cares

19   about certain artists.

20   BY MR. O'MARA:

21     Q    Sure.  But --

22     A    Yeah.

23     Q    -- no doubt that happens.

24     A    Yeah.

25     Q    But is it your opinion that consumers
```

97

1    consider a show in one city a substitute for the

2    same show in a different city that's greater than a

3    hundred miles away?

4          MR. PEPPERMAN:  Objection.  Form.

5          THE WITNESS:  Do they think of it as a

6    substitute?  Yes.  So, like, imagine you're a

7    consumer -- I'll give you, like, an example right

8    now.  Herbie Hancock, the famous jazz pianist --

9    he's more than 80 years old -- is performing right

10   now on a tour.  And I know many folks who are very

11   excited about that and are willing to travel a

12   hundred miles to go see Herbie Hancock, as he's

13   famous and this may be his last tour.  So there's

14   substitution, even though it's more than a hundred

15   miles apart.

16   BY MR. O'MARA:

17     Q    Have you studied the degree to which that

18   happens?  Coming back to the SSNIP on -- have you

19   conducted a SSNIP on whether or not the geographic

20   market for fans purchasing tickets to concerts is

21   smaller than the U.S.?

22         MR. PEPPERMAN:  Objection.  Form.

23         THE WITNESS:  I mean, there's no explicit

24   SSNIP on the sub-national potential market

25   definition; but I didn't feel the need to do that,

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 17 of 41    Page
ID #:11630
HECKMAN v                                                    Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only              October 14, 2025

98

```
 1   given ticket service provision is -- you know, is

 2   provided to venues regardless of the location of the

 3   venues.

 4   BY MR. O'MARA:

 5       Q    But fans are paying for the ticket; right?

 6   So my question is, the relevant question is, for the

 7   fan, would a SSNIP on ticketing fees lead them to

 8   purchase and travel to a concert outside of their

 9   local region?

10           Did you study that?

11           MR. PEPPERMAN:  Objection.  Form.

12           THE WITNESS:  Let me just think about your

13   question for a second here.  We're talking about a

14   comparison between U.S. and non-U.S.  And now you're

15   asking me about U.S. versus within U.S.?

16   BY MR. O'MARA:

17       Q    Correct.

18       A    Right.  Okay.  And if we were to increase

19   prices in one area of the U.S., would that be

20   profitable.  If a hypothetical monopolist came in,

21   we would be trading off that increase in price

22   versus the incidence of travel costs by the fan, and

23   it's not clear to me that would be profitable.

24       Q    But you haven't done that analysis?

25       A    As I said, I don't think there was a need to
```

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 18 of 41    Page
ID #:11631
HECKMAN v                                                              Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only                    October 14, 2025

99

1    do that analysis because ticket service provision is

2    a national product.  Right?  Ticketmaster provides

3    all venues, regardless if you're in Omaha or in

4    New York with ticket service provision.

5         Q    But the ticketing fees aren't the same venue

6    to venue; right?

7              MR. PEPPERMAN:  Objection.

8              THE WITNESS:  The ticketing fees are

9    negotiated at the venue level, so they're not the

10   same.  But the product has no real geographic

11   component.  It's, you know, managing the logistics

12   and issuing of tickets.  So whether that's done in

13   Madison Square Garden; right -- like, in New York

14   City, say, versus a very big venue in Omaha, the

15   product itself really has no big geographic

16   component.

17   BY MR. O'MARA:

18        Q    But you're not saying that the fans are

19   buying the inventory management system?

20             MR. PEPPERMAN:  Objection.

21   BY MR. O'MARA:

22        Q    Fans are buying tickets?

23        A    Fans are buying tickets, yeah.

24        Q    Right.  And so it would be possible to study

25   whether fans would travel between cities in response

```
 1   to an increase in the price of a ticket.  The

 2   demands for concerts, from a fan's perspective, is

 3   regional or local.  Is it not?

 4          MR. PEPPERMAN:  Objection.  Form.

 5          THE WITNESS:  I think it depends, you know,

 6   on who the artist is.  I mean, back to kind of

 7   Herbie Hancock; right?  Depends on whether the

 8   artist is coming to your geographic area or not,

 9   what the alternatives are.

10   BY MR. O'MARA:

11     Q    So it would vary by artist, geography.  What

12   else?

13     A    I mean, we're thinking about all -- as I

14   understand your question, you're saying what is the

15   underlying source of demand for watching live music

16   concerts by fans?

17     Q    Yes.

18     A    So that depends on the attributes of fans,

19   like their income levels, their -- so things

20   specific to the fans and their interest in watching

21   a given artist.

22     Q    And also things specific to the venue, the

23   artist, the geography?

24          MR. PEPPERMAN:  Objection.  Form.

25          THE WITNESS:  Those could play a role.
```

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 20 of 41    Page
ID #:11633
HECKMAN v                                                          Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only              October 14, 2025

101

```
 1           MR. O'MARA:  Okay.  Is now a good time for

 2    another five-minute break?

 3           MR. PEPPERMAN:  Sure.  Getting toward

 4    lunchtime on the East Coast.

 5           MR. O'MARA:  Oh, yeah.  I meant to ask you

 6    guys about that.  Obviously we're on the West Coast,

 7    but we will schedule lunch around you.  Did you have

 8    a time you wanted to shoot for?

 9           THE COURT REPORTER:  Could we talk about

10    logistics off the record, though?

11           MR. O'MARA:  Oh, yeah.  Sorry.

12           THE VIDEOGRAPHER:  The time is 12:09 p.m.,

13    and we're going off the record.

14           (Recess.)

15           THE VIDEOGRAPHER:  The time is 12:26 p.m.,

16    and we are back on the record.

17    BY MR. O'MARA:

18       Q    Welcome back, Dr. Pathak.

19           So I'd like to talk a little bit about the

20    ticketing contracts.  And I know we've covered a

21    little bit of this, so I'll try not to belabor it

22    and repeat myself too much.

23           But I believe, just to cover some stuff I

24    think we've already covered -- correct me if any of

25    this is wrong, but you said that you did look at
```

```
 1   the average, right, the aggregate.  You know,

 2   table 2, for instance, is showing you the average

 3   price over time.  Right?  That is, you know, not

 4   possible for me to show that series for every single

 5   venue given the number of venues here.

 6           So likewise, table 9 is the total damage for

 7   all members of the class.  But there's nothing

 8   that's preventing me from tabulating this at an

 9   individual level.

10   BY MR. O'MARA:

11     Q    Okay.  So let me ask another question about

12   contract variation.

13           Did you look at whether or not the contracts

14   vary from venue to venue along various customer

15   support lines, like the provision of a call support

16   center for one venue versus another?

17     A    Yes, that's something I observed, the

18   provisions of screening that there's lines on that

19   in different contracts and the exact terms of that

20   may differ from one contract to the other.

21     Q    So if the customer service commitments vary

22   from contract to contract, does that mean that

23   Ticketmaster's costs vary from contract to contract,

24   venue to venue?

25           MR. PEPPERMAN:  Objection.  Form.
```

111

```
 1          THE WITNESS:  Well, Ticketmaster has an

 2   average cost associated with the contract.  That's

 3   how they think about it in accounting statements

 4   that I've looked at.  They have a, you know,

 5   variable expense.  There's a line there about phone

 6   center, which I think is defined to be costs

 7   associated with customer service, so that's kind of

 8   the aggregate line item and that represents what's

 9   happening across their venues.

10   BY MR. O'MARA:

11      Q    But on an individual basis, whether the

12   venue -- whether Ticketmaster provides a call center

13   or not, changes Ticketmaster's cost; correct?

14          MR. PEPPERMAN:  Objection to form.

15          THE WITNESS:  So, yes, I would agree with

16   that.  So it's -- that's right.

17   BY MR. O'MARA:

18      Q    So it's fair to say that Ticketmaster's

19   costs in providing ticketing services vary from

20   venue to venue?

21          MR. PEPPERMAN:  Objection.

22          THE WITNESS:  Well, there's the fixed costs,

23   I think, are fairly similar and the labor support

24   costs are this aggregate line item that -- if --

25   maybe one way to think about your question, I guess,
```

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 23 of 41   Page
ID #:11636
HECKMAN v
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only

Parag Pathak, Ph.D.
October 14, 2025

112

1    is there's a venue that has lots of customer service

2    versus one that has no customer service.  The costs

3    of providing those two contracts would differ, yes.

4    BY MR. O'MARA:

5        Q    All right.  Did you study whether

6    Ticketmaster's share of the ticketing fees changed

7    depending on whether a contract included some of

8    these incentives and variations that we've been

9    discussing, like a call center?

10            MR. PEPPERMAN:  Objection.  Form.

11            THE WITNESS:  That wasn't important for my

12   analysis because we've said that in the but-for

13   world, the venue is receiving the same share of the

14   ticket service fees.  So whatever is their share in

15   the current world is informing the but-for world

16   share that they get and we're focused on the

17   ticketing side, the net fee that Ticketmaster

18   claims.

19   BY MR. O'MARA:

20       Q    So does your impact and damages model of the

21   but-for world, does it vary Ticketmaster's but-for

22   ticketing fee along any of the dimensions of the

23   variations from contract to contract, such as call

24   centers?

25            MR. PEPPERMAN:  Objection.  Form.

```
 1              THE WITNESS:  Yes, it does.  Right?  It's
 2    taking, as input, the ticket service fee; it's
 3    ensuring that the venue's economics are not changed;
 4    and it's then reducing Ticketmaster's component to
 5    this cost-based benchmark.  So the extent to which
 6    that changes depends on the extent of which the
 7    venue gets a share of the ticket service fees in one
 8    place versus another, so it's accounted for.
 9    BY MR. O'MARA:
10         Q    So the cost benchmark doesn't change venue
11    to venue?
12         A    The cost benchmark is the cost of an
13    incremental ticket.  Yup.  That's correct.  What
14    does change venue to venue is how that's applied.
15    Right?  So the cost is my attempt to estimate the
16    cost of providing an incremental ticket.  Okay?
17              But then the way I apply that is I have the
18    real-life share that the venue gets, and we're
19    taking the component that Ticketmaster gets; and
20    that is reduced to the cost-based benchmark so that
21    there's, venue by venue, adjustments that are
22    happening because of that.
23         Q    So what you're saying is that in the real
24    world, the net service fees in your table 9, they
25    vary venue to venue?
```

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 25 of 41    Page
ID #:11638
HECKMAN v                                                                Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only              October 14, 2025

148

1    section, I think we call it, and then I go on to

2    say:

3            "While this analysis does not eliminate the

4    possibility that venues are solving a different

5    pricing problem for sports events and that either

6    contributes to or leads to lower sports fees and

7    concerts fees, both sports teams and artists have

8    similar incentives.  They want to attract fans,

9    repeat fans, and want to price their tickets

10   accordingly."

11       Q    So this regression doesn't eliminate the

12   possibility that with respect to ticketing fees,

13   sports pricing and concert pricing are just

14   different?

15           MR. PEPPERMAN:  Objection.  Form.

16   BY MR. O'MARA:

17       Q    For reasons that have nothing to do with the

18   anticompetitive conduct?

19           MR. PEPPERMAN:  Same objection.

20           THE WITNESS:  I think, I mean, I can read

21   the sentence to you again.  Right?  The sentence

22   there says:

23           "This analysis does not eliminate the

24   possibility that venues are solving a different

25   pricing problem."

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 26 of 41    Page
ID #:11639
HECKMAN v                                                                    Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only                          October 14, 2025

149

1          But if we think about the incentives of

2     sports teams and the incentives of artists, they're

3     similar in many respects.  They want to attract

4     fans.  And having lower fees is going to attract

5     fans because the price that they pay would be lower

6     and demand curve slope downwards.

7     BY MR. O'MARA:

8         Q    So that's a "yes" to my question?

9              MR. PEPPERMAN:  Objection.  Form.

10             THE WITNESS:  Maybe you could ask your

11    question again.

12    BY MR. O'MARA:

13        Q    Yeah, so my question is, so that -- the

14    regression doesn't eliminate the possibility with

15    respect to ticketing fees, sports pricing and

16    concert pricing are just different for reasons that

17    have nothing to do with the anticompetitive conduct?

18             MR. PEPPERMAN:  Same objection.

19             THE WITNESS:  What I write is, I think that

20    the answer to your question is not just a simple yes

21    and no.  Because I do concede that this analysis

22    does not eliminate the possibility that venues are

23    solving a different pricing problem for sports

24    events.  But my belief is both sports teams and

25    artists have similar incentives.  They want to

150

1    attract fans, and a way to do that is to have lower

2    fees; and because of the motivation for this

3    exercise, that there's more competitive restraints

4    on sporting events due to the structure, that

5    there's more non fee-bearing tickets and there is,

6    you know, season tickets, et cetera, things that

7    we've already discussed.  I think it's consistent

8    with the effect of Ticketmaster's exclusive

9    contracts leading to elevated service fees for

10   concerts.

11   BY MR. O'MARA:

12       Q    Okay.  Can I direct you, please, to page 75

13   and paragraphs 158, 159.

14       A    Page 75, 158.  Okay.  I'm there.

15       Q    So these two paragraphs, you talk about

16   basically analysis of competition and you're talking

17   about credible threats.  Sorry.  I'm on the wrong

18   page.

19            And what I -- what I wanted to ask you is

20   whether it's your opinion that there's no

21   competitive credible threats to Ticketmaster during

22   the class period.

23            MR. PEPPERMAN:  Objection.  Form.

24            THE WITNESS:  So let me just track where you

25   are, Mr. O'Mara.  Are you referring to a specific

 1    Thank you.

 2           MR. O'MARA:  Ten minutes, yeah.  Thanks.

 3           THE VIDEOGRAPHER:  The time is 3:10, and

 4    we're going off the record.

 5           (Recess.)

 6           THE VIDEOGRAPHER:  The time is now

 7    3:27 p.m., and we're back on the record.

 8    BY MR. O'MARA:

 9      Q    So, Dr. Pathak, I want to talk about how

10    your competitive benchmark works, starting on

11    page 81, the historical competitive benchmark.

12      A    Okay.

13      Q    Okay.  So I think you said this earlier, but

14    just to make sure we're all on the same page.

15           So what you are doing here is you're

16    taking -- at a high level, you're taking net service

17    fees in the real world; you theorize that in the

18    but-for world, price would equal cost, and you're

19    offering a benchmark of what that cost would be; and

20    the difference between the real world and your

21    benchmark is damages.

22           Is that fair, at a high level?

23           MR. PEPPERMAN:  Objection.  Form.

24           THE WITNESS:  I'm going to take that step by

25    step, given all the components of what you said.

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 29 of 41    Page
ID #:11642
HECKMAN v                                                                    Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only                          October 14, 2025

169

1          So price approaches costs, one correction, I

2    would say.

3          The way, I mean, I think about this is we

4    have our estimate of fixed costs and variable costs.

5    And I think both of those estimates have baked in a

6    great deal of conservatism, and then we have an

7    estimate of bonus payments.  We compare that to the

8    real-world net service fees.  We say what's the

9    ratio of the two, what's then 1 minus that ratio,

10   and then we would take the service fees

11   and multiply -- the net service fees and multiply by

12   that ratio to get to the overcharge for the

13   Ticketmaster component of the ticket service fees --

14   when we would have the property that venues would,

15   under this algorithm, be able to obtain the same

16   economics in the but-for world as in the current

17   world.

18   BY MR. O'MARA:

19      Q    So just to circle back, Dr. Pathak, to a

20   question I asked you earlier.

21         This section that I'm asking about, 6B, this

22   competitive benchmark section, you don't have a

23   table for this section like table 8, do you?

24      A    You were just asking me, is there a table in

25   Section 6B, B1, I guess.  There is no table in

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 30 of 41   Page
ID #:11643
HECKMAN v                                                      Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only                 October 14, 2025

170

1    Section B1.

2        Q    And what I was asking earlier is whether

3    this historical competitive benchmark is a

4    regression analysis, and you rightly pointed out

5    that you do have three other regressions and that

6    you provided for each of them a table like table 8

7    with the regression results.  And so my point was

8    simply, you know, do you consider -- you don't have

9    a table like that for this historical benchmark, do

10   you?

11           MR. PEPPERMAN:  Objection.  Form.

12           And for the reporter, I did object to the

13   prior question as well.

14           THE WITNESS:  Just as a simple matter of, is

15   there -- are there numbers in that section, specific

16   numbers.  There's many, many paragraphs that

17   describe specific numbers.  Are they formatted in a

18   table exhibit in this section, you can see as well

19   as I that there's no table in this 6B1 part of my

20   report.

21   BY MR. O'MARA:

22       Q    Could you create a table of regression

23   results like table 8 or Section 61, report in R , a

24   constant variable, an indicator variable?  It

25   just -- that's not what it is; right?

Case 2:22-cv-00047-GW-KES     Document 490-3     Filed 10/20/25     Page 31 of 41     Page
ID #:11644
HECKMAN v                                                           Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only                 October 14, 2025

206

1   because of competition, right, because of

2   competition between ticket service providers.  So

3   the tax they're imposing on fans is going to be

4   lower.

5   BY MR. O'MARA:

6       Q    So what I want to ask you is, is so did

7   you -- did you do any modeling to analyze whether

8   the venue would pass on that reduction in service

9   fees to the fan on a one to one basis as opposed to

10  keeping some of that reduction themselves?

11      A    Yes, I did.

12           MR. PEPPERMAN:  Objection.  Form.

13           THE WITNESS:  I'm sorry, Brandt.

14           Yes, I did consider that.

15  BY MR. O'MARA:

16      Q    Can you point me to where that is in your

17  report?

18      A    What I considered was the economic

19  incentives of the venue in the worst case.  So

20  imagine we have a supply chain where there is a

21  monopolist vendor venue and a monopolist ticket

22  service provider and they're selling to an

23  underlying demand for tickets from fans.  And let's

24  consider the world where the ticket service provider

25  becomes not a monopolist, but becomes competitive.

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 32 of 41    Page
ID #:11645
HECKMAN v                                                                      Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only                            October 14, 2025

207

1          The venue is going to be taking the cost

2     imposed by the ticket service provider in the

3     vertical chain as a cost that now has gone down.

4     And so even in the worst case, if you had an

5     economic model where the venue is a, say,

6     monopolist, the underlying prices will be lower

7     because they're selling to the same underlying

8     demand curve that is driven by consumers wanting to

9     go see shows, and now they face a lower cost because

10    the ticket server provider's costs have moved to

11    competitive levels.

12         So that's kind of an elementary result from

13    competition economics when we think about supply

14    chain with different levels of competition at

15    different levels.  So that's analysis that I

16    considered and undertook. I don't know if that -- I

17    don't think that's in the final part of the report,

18    but that's the reason why I'm taking this pretty

19    conservative position that venues are going to still

20    get the same payments.

21         And we could also imagine artists at higher

22    level -- here in the worst case, imagine an artist

23    is a single monopolist interacting with a venue who

24    in turn is interacting with the ticket service

25    provider, who in turn -- all of these guys are

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 33 of 41    Page
ID #:11646
HECKMAN v                                                           Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only              October 14, 2025

208

1    selling to the same demand -- and we take out the

2    monopoly provision at the bottom rung here.  And

3    what you see is that prices go down because each of

4    the prices set at the different levels affects costs

5    at the higher level.

6             So that's the analysis that I've undertaken

7    and explored and thought about.

8    BY MR. O'MARA:

9      Q    So what I understood you to say, Dr. Pathak,

10   is you told me the theory behind why any reduction

11   in fees -- ticketing fees would translate into lower

12   fees for consumers.  But have you -- have you

13   modeled that in any way, did you do any data

14   analysis that shows the effect on pass through?

15            MR. PEPPERMAN:  Objection.  Form.

16            THE WITNESS:  There's no reason for me to do

17   that given the theoretical discussion I just

18   described for you is the worst case, and that's why

19   we've taken this, you know, very conservative

20   position that venues receive the same amounts in the

21   but-for world as they do in the current world.

22   BY MR. O'MARA:

23     Q    So when you say the worst case, your

24   testimony is that if ticketing -- if the ticketer's

25   share of ticketing fees goes down, there is no

211

```
 1   even fill up that third day.
 2   BY MR. O'MARA:
 3       Q    So in other words, for your analysis to
 4   hold, you have to change the supply.  You're not
 5   holding the supply constant?
 6            MR. PEPPERMAN:  Objection.  Form.
 7            THE WITNESS:  That was one way we could get
 8   this behavioral response that I'm talking about.
 9   That the venue would be able to accommodate more
10   quantity.  We could have differentiation in other
11   ways in terms of the quantity.  So it doesn't
12   necessarily have to be a show on the next day.
13   There could be some other thing that is sold to fans
14   that would be in the venue's interest and would be
15   able to reach more fans because the costs are lower.
16   BY MR. O'MARA:
17       Q    So wouldn't that analysis depend on the
18   artist and the venue and the city?
19            MR. PEPPERMAN:  Same objection.
20            THE WITNESS:  I mean, the -- the demand
21   curve is downward sloping.  That's kind of the key
22   ingredient into this economic discussion.  If prices
23   are lower, we can sell more things.  And that's a
24   very, I think, reasonable starting point.  That's
25   what I teach my students at MIT every year in my
```

212

```
 1    economics classes.  That's how economists think

 2    about markets.

 3    BY MR. O'MARA:

 4       Q    Right.  And so but -- I think we just

 5    covered that.  So sell more things means you have to

 6    change the supply curve so the artists have to

 7    perform more shows --

 8       A    I'm sorry.  Sorry to interrupt.  I have not

 9    said that.  This has nothing to do with changing

10    supply curves.  This is about the demand curve being

11    downward sloping.

12       Q    So I'm not following your answer in my

13    hypothetical.  So my hypothetical is you have a

14    sold-out show.  And your model is presuming that

15    there is a reduction in the ticketing service

16    provider's ticketing fees, and that that reduction

17    in ticketing fees is passed on to consumers.  And

18    I'm trying to understand why you think that is the

19    case, as opposed to the venue or the artist taking

20    more of the -- taking more and the total ticketing

21    fee -- the total ticketing all-in pricing staying

22    the same.

23       A    Even in the monopoly case, if you open an

24    introductory economics textbook, the pass-through of

25    changes to cost is not zero because there's
```

213

1    potential consumers who can opt not to buy.  Right?

2    That's the force that we're talking about here.

3        Q    Well --

4            MR. PEPPERMAN:  Excuse me, Counsel.

5            For the reporter, I did object to the last

6    question.  Thanks.

7    BY MR. O'MARA:

8        Q    So are you -- are you saying or are you not

9    saying that the pass-through, whatever the reduction

10   in ticketing fees is, that the amount that the

11   artist and the venue decide to pass through the

12   consumer, is that going to vary?

13           MR. PEPPERMAN:  Objection.

14           THE WITNESS:  Is that going to vary?  In

15   what respect?  Across artists?

16   BY MR. O'MARA:

17       Q    Venue by venue.

18       A    Well, the approach that we've taken here is

19   assuming the venue is still capturing enough to get

20   their prior economics.  But what we're talking about

21   is reasons why the venue might actually decrease

22   prices because the costs that they face when they

23   solve their profit maximization problem is lower and

24   prices reflect costs even for monopolists.

25       Q    So it's your testimony that the pass-through

214

```
 1   of any ticketing savings, the results from a

 2   ticketer's ticketing fees being reduced is going to

 3   be the same for all venues?

 4            MR. PEPPERMAN:  Objection.  Form.

 5            THE WITNESS:  I'm just trying to understand

 6   how you summarized what I said.

 7            Can you please repeat the question?

 8   BY MR. O'MARA:

 9       Q    Yeah.  I'm just trying to understand, if

10   you're saying that this -- is it -- correct me if

11   you don't like this -- the terminology.  Like,

12   it's -- the reduction in ticketing fees, I'm calling

13   that a "pass-through" because you're saying that in

14   the but-for world, fans ultimately end up paying

15   less, so there's a reduction.  I think even

16   called -- you call it a "percentage reduction in

17   service fees"; right?

18       A    The but-for world has lower ticket service

19   fees paid by fans.  Correct.

20       Q    Right.  And so what I'm trying to understand

21   is the relative benefit or exactly where the money

22   goes between the venues, the artists, and the fans.

23            And I'm trying to -- and so my question to

24   you is:  Is it your testimony that a hundred percent

25   of the reduction in fees always goes to fans?
```

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 38 of 41   Page
ID #:11651
HECKMAN v                                                                 Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only        October 14, 2025

215

1          MR. PEPPERMAN:  Objection.  Form.

2          THE WITNESS:  In the case where we even have

3    a monopolist vendor, they would pass on cost

4    reductions to fans.  That is my testimony.  And

5    there are situations where we don't have monopolist

6    vendors -- I should say venues.  Because venues in

7    certain geographic areas compete against one

8    another; and what we've assumed here is that

9    entire -- in your example, the hundred dollars,

10   right, that $50 is still going to stay with a venue

11   when it's very possible in certain localities where

12   venues are competing against one another, that the

13   total 100 goes down even more -- than the monopoly

14   case.

15   BY MR. O'MARA:

16        Q    So in all cases, a hundred percent of any

17   reduction in any ticketing fees goes to the fans?

18        MR. PEPPERMAN:  Same objection.  Form.

19        THE WITNESS:  That's a consequence of the

20   demand curves being downward sloping; and if that's

21   true when a monopolist is -- sorry, when a vendor is

22   a monopolist and an artist is a monopolist, that

23   would be true when they face other, you know,

24   additional competitive forces as well.

25   ///

Case 2:22-cv-00047-GW-KES    Document 490-3    Filed 10/20/25    Page 39 of 41    Page
ID #:11652
HECKMAN v                                                                    Parag Pathak, Ph.D.
LIVE NATION ENTERTAINMENT, INC. Attorneys Eyes Only                          October 14, 2025

216

```
 1   BY MR. O'MARA:

 2       Q    So and to circle back to a question I think

 3   I asked you before.  But have you done any empirical

 4   analysis to validate that the venues will pass on

 5   the savings from the primary ticketer to the

 6   consumer?

 7             MR. PEPPERMAN:  Objection.  Form.

 8             THE WITNESS:  This is a consequence of

 9   simple economic logic, so I've written down a model

10   to flesh out what we're talking about here to verify

11   what we've been discussing.  That is analysis that I

12   have done that is, you know, not in the report but

13   that is something I've also looked in textbooks

14   about.

15             And the approach that we've taken where

16   venues get the same payments and is, you know, the

17   conservative approach here.  So the answer to your

18   question -- sorry, let me not lose the thread -- the

19   answer to your question is there was no need for me

20   to do that empirical analysis, given what the

21   theoretical predictions are.

22             MR. O'MARA:  Okay.  I know we just took a

23   break; but if we can take a short break here, I

24   think I'm getting close to actually wrapping up.

25             Can we do another ten minutes.
```

217

```
 1          MR. PEPPERMAN:  Sure.

 2          THE VIDEOGRAPHER:  The time is 5:07 p.m.,

 3     and we're going off the record.

 4          (Recess.)

 5          THE VIDEOGRAPHER:  The time is 5:25 p.m.,

 6     and we're back on the record.

 7          MR. O'MARA:  Dr. Pathak, I want to thank you

 8     for your time today.  I have no further questions at

 9     this time.

10          I would like to ask the court reporter to

11     designate this transcript highly confidential.

12          MR. PEPPERMAN:  I have no further questions

13     at this time.  Thanks for your time.

14          THE VIDEOGRAPHER:  All right.  Before we go

15     off the record, Mr. O'Mara, how would you like your

16     video order?

17          MR. O'MARA:  Whatever the standard Latham

18     order is.

19          THE VIDEOGRAPHER:  All right.  And would you

20     like that synced with the transcript?

21          MR. O'MARA:  I'm sorry?  Yes, please sync it

22     with the transcript.

23          THE VIDEOGRAPHER:  Yeah.

24          Pepperman, would you like a copy of the

25     video?
```

221

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

1

2          The undersigned Certified Shorthand Reporter and

3    Deposition Notary Public of the States of California,

4    Washington and Nevada does hereby certify:

5          That the foregoing deposition was taken before me

6    remotely at the time therein set forth, at which time the

7    witness was duly sworn by me;

8          That the testimony of the witness and all

9    objections made at the time of the deposition were

10   recorded stenographically by me and were thereafter

11   transcribed, said transcript being a true and correct copy

12   of the proceedings thereof.

13         I further certify that I am neither counsel for

14   nor related to any party to said action, nor in any way

15   interested in the outcome thereof.

16         Further, that if the foregoing pertains to the

17   original transcript of a deposition in a federal case,

18   before completion of the proceedings, review of the

19   transcript was not requested/offered on the record.

20

21         In witness whereof, I have subscribed my name,

22   this date:  October 15, 2025

23

24   _____

25        Cheryl Haab Scott, RDR, CRR, CCRR
          CSR No. 13600/WA CSR No. 3499/NV CCR No. 1003