UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
## [FOR PUBLIC VIEW]
### CIVIL MINUTES - GENERAL

| Case No. | CV 22-0047-GW-DSRx | | Date | December 3, 2025 |
|---|---|---|---|---|
| Title | *Skot Heckman, et al. v. Live Nation Entertainment, Inc., et al.* | | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**      **IN CHAMBERS - TENTATIVE RULING ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CO-LEAD CLASS COUNSEL [472]**

Attached hereto is the Court's *redacted* Tentative Ruling on Plaintiffs' Motion [472] set for hearing on December 4, 2025 at 8:30 a.m.

:

Initials of Preparer      JG

---

CV-90 (06/04)                      **CIVIL MINUTES - GENERAL**                      Page 1 of 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
**[UNDER SEAL]**
**CIVIL MINUTES - GENERAL**

| Case No. | CV 22-0047-GW-DSRx | Date | December 3, 2025 |
|---|---|---|---|
| Title | *Skot Heckman, et al. v. Live Nation Entertainment, Inc., et al.* | | |

Present: The Honorable     GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:                 Attorneys Present for Defendants:

None Present                                   None Present

**PROCEEDINGS:**     **IN CHAMBERS - TENTATIVE RULING ON PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION AND APPOINTMENT OF CO-LEAD
CLASS COUNSEL [472]**

Attached hereto is the Court's under seal Tentative Ruling on Plaintiffs' Motion [472] set for hearing on December 4, 2025 at 8:30 a.m.

****This Tentative Ruling is initially filed under seal as it references materials previously filed under seal. The parties shall advise the Court whether they request that any portion of this Tentative Ruling remain sealed in the final version of the order. If so, the parties shall submit proposed redactions via email to the Courtroom Deputy Clerk.****

                                                                                     :

Initials of Preparer     JG

<u>***Skot Heckman et al v. Live Nation Entertainment, Inc. et al***</u>; Case No. 2:22-cv-00047-GW-
(DSRx); Tentative Ruling on Motion for Class Certification and Appointment of Co-Lead Class
Counsel
***This Tentative Ruling is initially filed under seal as it references materials previously filed under seal. The
parties shall advise the Court whether they request that any portion of this Tentative Ruling remain sealed in the
final version of the order. If so, the parties shall submit proposed redactions via email to the Courtroom Deputy
Clerk.***

Before the Court is Plaintiffs' Motion for Class Certification and Appointment of Co-Lead
Class Counsel (the "Motion"). *See* Motion, Docket No. 471-1. The Court has considered the
Motion, Defendants' opposition ("Opp.," Docket No. 502), and Plaintiffs' reply ("Reply," Docket
No. 511-1). For the reasons stated herein, the Court would **GRANT** the Motion.

I.      **Background**

On January 4, 2022, Plaintiffs Skot Heckman,[1] Luis Ponce, Jeanene Popp, and Jacob
Roberts (collectively, "Plaintiffs") brought this putative antitrust class action against Defendants
Live Nation Entertainment, Inc. ("Live Nation") and Ticketmaster LLC ("Ticketmaster")
(collectively, "Defendants"), alleging various anticompetitive practices in violation of Sections 1
and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. *See generally* Complaint, Docket No. 1.

On March 8, 2022, Defendants moved to compel arbitration based upon an arbitration
agreement contained in their terms of use as set forth in their websites. *See* Motion to Compel
Arbitration, Docket No. 30. The Court granted Plaintiffs' request to conduct limited discovery
related to the validity, unconscionability, and severability of the dispute-resolution provisions in
the terms of use. *See* Docket No. 50. On August 10, 2023, the Court denied Defendants' motion
to compel arbitration, finding the arbitration agreement both procedurally and substantively
unconscionable which thereby made it unenforceable. *See Heckman v. Live Nation Ent., Inc.*, 686
F. Supp. 3d 939, 969 (C.D. Cal. 2023). On September 8, 2023, Defendants appealed that order to
the Ninth Circuit. *See* Docket No. 212. The same day, Defendants moved to stay the case pending
resolution of the appeal on arbitrability as mandated by *Coinbase, Inc. v. Bielski*, 599 U.S. 736,
738 (2023), *see* Docket No. 213, which the Court granted, *see* Docket No. 229. On October 28,
2024, the Ninth Circuit issued a published opinion affirming this Court's ruling. *See Heckman v.
Live Nation Ent., Inc.*, 120 F.4th 670, 690 (9th Cir. 2024). Defendants then petitioned for a
rehearing and for a rehearing en banc, which the Ninth Circuit denied and then issued a final

---

[1] Plaintiff Skot Heckman has voluntarily withdrawn as a named representative in this action, though Plaintiffs
indicate that he remains within the proposed class definition. *See* Motion at 2 of 32 n.1.

mandate.

With a decision on Defendants' interlocutory appeal rendered, this Court lifted the stay on December 9, 2024 and ordered the parties to file a joint report addressing future proceedings in this litigation. *See* Docket No. 262. In the status report, Defendants argued that the Court should stay the case due to a similar antitrust action brought by the United States Department of Justice ("DOJ") and Attorneys General from thirty-nine states and the District of Columbia against Defendants in the United States District Court for the Southern District of New York (the "Public Enforcer Action"). *See* Docket No. 269; *United States et al v. Live Nation Ent., Inc. et al*, Case No. 1:24-cv-03973-AS (S.D.N.Y.). The Court denied the motion to stay without prejudice. *See* Docket Nos. 283-84. On January 27, 2025, Defendants filed their Motion to Dismiss. *See* Docket No. 293. Following full briefing and oral argument, the Court granted the motion in part and denied it in part. *See* Docket No. 314. The allegations are summarized in this Court's final ruling on Defendants' Motion to Dismiss. *See id.* at 1-3.

On August 18, 2025, Plaintiffs filed the instant Motion, seeking to certify the following Class:

> All purchasers in the United States who directly purchased a primary ticket and paid associated fees for primary ticketing services for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation Entertainment, Inc. at any point since 2010.

Motion at 1. While the Court finds it unnecessary to revisit the factual background in this case, the Court acknowledges that the parties filed an extensive collection of evidence and supporting declarations with their respective briefing on the instant Motion. The Court has reviewed these additional submissions and will detail in the discussion section any evidence germane to deciding the class certification question now before the Court.

## II.    <u>Legal Standard</u>

"A representative plaintiff may sue on behalf of a class when the plaintiff affirmatively demonstrates the proposed class meets the four threshold requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018). The proponent of class treatment bears the burden of demonstrating that class certification is appropriate. *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012).

Federal Rule of Civil Procedure 23 requires the party seeking certification to satisfy all four requirements of Fed. R. Civ. P. 23(a) and at least one of the subparagraphs of Fed. R. Civ. P. 23(b). Fed. R. Civ. P. 23(b). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original).

Before certifying a class, the district court must conduct a "rigorous analysis" to determine whether the party seeking certification has met the prerequisites of Rule 23, which may require some overlap with the merits of the case. *Id*. at 350-51. The court must consider any material necessary to its determination, but "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). "To hold otherwise would turn class certification into a mini-trial." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011); *see also Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) ("It is critical to keep in mind that class certification is different from summary judgment.").

## III.  Discussion

Plaintiffs seek certification under Rule 23(b)(3). *See* Motion at 1. As such, the Court will analyze whether Plaintiffs have satisfied all four requirements of Fed. R. Civ. P. 23(a) and then those of Fed. R. Civ. P. 23(b)(3).

### A.  Rule 23(a)

#### 1.  Rule 23(a)(1): Numerosity

Rule 23(a)(1) requires a demonstration that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[C]ourts within the Ninth Circuit generally agree that numerosity is satisfied if the class includes forty or more members." *Weston v. DocuSign, Inc.*, 348 F.R.D. 354, 362 (N.D. Cal. 2024). Here, Plaintiffs assert that the Class encompasses millions of purchasers. *See* Motion at 9 (citing Declaration of Parag Pathak, Ph.D. ("Pathak Decl."), Docket No. 471-33, ¶ 10, Table 9). Defendants do not contest that the numerosity requirement is satisfied. The joinder of these purchasers as plaintiffs would undoubtedly be impracticable.

3

The Court would find, therefore, that Plaintiffs have satisfied the numerosity requirement of Fed. R. Civ. P. 23(a)(1).

2.   Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Rule 23(a)(2) has been construed permissively" and its requirements "are less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)*, overruled on other grounds by Wal-Mart Stores*, 564. U.S. 338. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores*, 564 U.S. at 359 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). But "[a]ll questions of fact and law need not be common to satisfy the rule." *Hanlon*, 150 F.3d at 1019. To satisfy Rule 23(a)(2), "even a single common question will do." *Wal-Mart Stores*, 564 U.S. at 359 (quotations and brackets omitted). The class claims, however, "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Id*. at 350.

"Where an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (citation omitted) (internal quotation marks omitted). "Antitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each class member's claim 'in one stroke,' [*Wal-Mart Stores*, 564 U.S. at 350], 'because proof of an alleged conspiracy will focus on defendants' conduct and not on the conduct of individual class members.'" *Id*. (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal. 2010)).

Here, under the proposed class definition, all putative class members purchased a primary ticket and paid associated fees for primary ticketing services for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned by Live Nation at some point since 2010. Plaintiffs identify at least one common question capable of generating a common answer (antitrust liability). Specifically, Plaintiffs assert that their claims "raise many common issues, including market definition, monopoly and market power, and Defendants' anticompetitive conduct and its effects." Motion at 10. Defendants do not challenge the commonality requirement.

4

The Court would find, therefore, that Plaintiffs have satisfied the commonality requirement of Fed. R. Civ. P. 23(a)(2).

### 3. Rule 23(a)(3): Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."  *Id.* (quotations and citation omitted).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Id.* (quotations and citation omitted); *see also Falcon*, 457 U.S. at 156 (indicating that class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members").  The representative plaintiff's claims need not be identical to those of the class, but rather need only be "reasonably co-extensive with those of absent class members . . . ."  *Hanlon*, 150 F.3d at 1020.

However, "a named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."  *Hanon*, 976 F.2d at 508 (quotations omitted).  Such a danger might arise if the named plaintiff has a "unique background and factual situation" relative to members of the proposed class that would implicate defenses specific to them and that are likely to become "a major focus of the litigation."  *Id*. at 508-509.

Plaintiffs assert that typicality is met because Plaintiffs, along with the proposed class, are direct purchasers that used Defendants' primary ticketing services and paid fees to Defendants.  *See* Motion at 10.  As such, they "bring the same antitrust claims, against the same Defendants, based on the same conduct and legal theories, resulting in the same type of injury."  *Id.* (footnote omitted).  Plaintiffs' allegations are sufficient to satisfy the typicality requirement.  *See High-Tech*, 985 F. Supp. 2d at 1181.

Nonetheless, Defendants contend that Plaintiffs are not typical (or adequate) because at least thirty percent of absent class members are subject to an arbitration agreement and class action waiver.  *See* Opp. at 33.  Defendants indicate that "between June 14, 2011 and July 2, 2021,

5

Ticketmaster's Terms of Use – to which every ticket purchaser must agree – included an arbitration agreement and class action waiver consistently held to be enforceable." *Id.* (citing Docket No. 31, ¶¶ 7-27 and *Oberstein v. Live Nation Ent., Inc.*, No. 2:20-cv-03888-GW-(GJSx), 2021 WL 4772885, at *3-9 (C.D. Cal. Sept. 20, 2021), *aff'd*, 60 F.4th 505 (9th Cir. 2023)). Defendants had updated their terms of use ("TOU") in July 2021 to select a new arbitration provider with new arbitration procedures (the "New Era Terms"), to which Plaintiffs agreed. *See* Docket No. 202, at 1. As already indicated, this Court held that such terms were unconscionable and thus unenforceable under California law. *See id.* at 27-28; *Heckman*, 120 F.4th at 676. Defendants claim that "for *at least 30%* – ▮▮▮▮▮▮▮ – of the accounts used to buy tickets since 2014, there is no evidence that the purchaser *ever* agreed to the New Era Terms." Opp. at 33 (emphasis in original) (citing Declaration of Bob Ritter ("Ritter Decl."), Docket No. 502-18, at 1). As such, Defendants aver that "[t]he inclusion of ▮▮▮▮▮▮▮ of ineligible class members . . . makes Plaintiffs atypical and inadequate class representatives." *Id.*

In support, Defendants rely on the Ninth Circuit's decision in *Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579 (9th Cir. 2015). *See id.* In *Avilez*, the district court had certified classes and subclasses that included employees who signed class action waivers even though the named plaintiff's arbitration agreement did not contain such a waiver. 596 F. App'x at 579. The Ninth Circuit held that this was an abuse of discretion because class members who signed a waiver would "have potential defenses that Avilez would be unable to argue on their behalf." *Id.* Some district courts have relied on *Avilez* in deciding that class certification is properly denied based upon the existence of an arbitration agreement and class action waiver applicable to unnamed class members but not the proposed class representative. *See, e.g.*, *Heredia v. Sunrise Senior Living LLC*, No. 8:18-cv-01974-JLS-(JDEx), 2021 WL 811856, at *4 (C.D. Cal. Feb. 9, 2021); *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 986-87 (N.D. Cal. 2019); *Campanelli v. Image First Healthcare Laundry Specialists, Inc.*, No. 4:15-cv-04456-PJH, 2018 WL 6727825, at *7 (N.D. Cal. Dec. 21, 2018); *Tan v. Grubhub, Inc.*, No. 3:15-cv-05128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016); *Tschudy v. J.C. Penney Corp., Inc.*, No. 3:11-cv-01011-JM-(KSC), 2015 WL 8484530, at *3 (S.D. Cal. Dec. 9, 2015). Other district courts have suggested that class certification is not precluded by the existence of an arbitration defense as to some putative class members. *See, e.g.*, *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 284-85 (N.D. Cal. 2016); *Ehret v. Uber Techs., Inc.*, *Mora v. Harley-Davidson Credit Corp.*, No. 1:08-cv-01453-

6

AWI-(BAM), 2012 WL 1189769, at *12 (E.D. Cal. Apr. 9, 2012); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 681 (N.D. Cal. 2011).

The Ninth Circuit's most recent decisions on this issue in *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087 (9th Cir. 2018), and *Lawson v. Grubhub, Inc.*, 13 F.4th 908 (9th Cir. 2021), suggest that Plaintiffs would lack typicality with respect to the class members who remain subject to an enforceable arbitration agreement and class action waiver. In *O'Connor*, the Ninth Circuit decertified a class because it "include[d] drivers who entered into agreements to arbitrate their claims and to waive their right to participate in a class action with regard to those claims." 904 F.3d at 1094. Subsequently, in *Lawson*, the Ninth Circuit affirmed the district court's denial of class certification where the named plaintiff was one of two individuals to opt out of an arbitration agreement that was entered into by every other putative class member. 13 F.4th at 913. The Ninth Circuit indicated that the named plaintiff "could not satisfy the requirements in Rule 23(a) because he is neither typical of the class nor an adequate representative . . . ." *Id.*

Plaintiffs argue in response that "[f]or as long as the Ticketmaster Terms have contained an arbitration clause, those same Terms have expressly stated that, when a user creates an account, they agree to be bound by future updates to the Terms as soon as the updates are posted on the Ticketmaster website." Reply at 29 (citations omitted). Indeed, in denying Defendants' motion to compel arbitration, this Court observed that "Defendants in their TOU reserve the right to 'make changes to the Terms at any time,' which will become 'effective immediately' and will apply to any dispute irrespective of when it arose." Docket No. 202, at 13 (citations omitted). Plaintiffs argue that "Defendants cannot now pretend those prior versions of the Terms spring back to life just because Defendants believe they are an obstacle to class certification." *See* Reply at 29. The Court is not persuaded that any portion of the proposed class remains subject to any arbitration agreement or class action waiver such that Plaintiffs would lack typicality.

To the extent any putative class members remain subject to arbitration, however, the Court does not find that this would necessarily preclude class certification. Plaintiffs have indicated that such members may be excluded from the class definition.[2] *See id.* at 30. The Court will allow further argument from the parties on this issue before deciding whether the class definition should be amended.

---

[2] Alternatively, class members subject to an enforceable arbitration agreement and class action waiver could be placed into a sub-class pending a determination as to whether their claims can proceed in this action.

4. Rule 23(a)(4): Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Generally, whether or not the class representative satisfies Rule 23's adequacy requirement "depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010) (quotations omitted) (quoting *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) and *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir. 1994)); *see also Ellis*, 657 F.3d at 985 ("To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'"); *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) ("The record indicates clearly that [the class representative] understands his duties and is currently willing and able to perform them. The Rule does not require more.").

Here, Plaintiffs assert in the Motion that there are no conflicts of interest with the proposed class. Motion at 11 (citing Declaration of Luis Ponce ("Ponce Decl."), Docket No. 472-45, ¶ 5; Declaration of Jeanene Popp ("Popp Decl."), Docket No. 472-46, ¶ 5; and Declaration of Jacob Roberts ("Roberts Decl."), Docket No. 472-47, ¶ 7). The Court agrees with Plaintiffs that their interest in this litigation is aligned with that of the absent class members. In addition, the Court is fully satisfied with their participation in this action, as "[t]hey retained experienced counsel and have litigated this case for years, successfully opposing Defendants' motions to compel arbitration and to dismiss." *Id.* (citing *Baten v. Mich. Logistics, Inc.*, 2:18-cv-10229-GW-(MRWx), 2022 WL 17481068, at *5 (C.D. Cal. Dec. 6, 2022)). Plaintiffs have also indicated their willingness and ability to fulfill their duties as class representatives, including by assisting with further discovery and testifying at trial. *See* Ponce Decl. ¶ 6; Popp Decl. ¶ 6; Roberts Decl.¶ 8. The Court finds that there is no obvious conflict of interest or sign of collusion that would cause this Court to question Plaintiffs' attestation that none exist.[3]

---

[3] However, should there be any amendment of the class definition in this matter to create a subclass of persons who are deemed to be subject to an enforceable arbitration agreement and/or class action waiver, the question arises as to whether any current named plaintiff could be identified as also being subject to those provisions and thus be considered as a named plaintiff for said subclass.

With respect to Plaintiffs' counsel, the Court is more than satisfied that Quinn Emanuel Urquhart & Sullivan, LLP and Keller Postman LLC would serve as adequate Co-Lead Class Counsel. Both firms are highly experienced in complex class action and antitrust litigation. *See* Motion at 21 (citing Declaration of Kevin Y. Teruya ("Teruya Decl.), Docket No. 472-48, ¶¶ 3-17 and Declaration of Warren D. Postman ("Postman Decl."), Docket No. 472-49, ¶¶ 3-11). They have, *inter alia*, "defeated Defendants' motion to compel arbitration (before both this Court and the Ninth Circuit), overc[o]me a motion to dismiss, and pushed discovery forward with both Defendants and non-parties." *Id.* (citing Teruya Decl. ¶¶ 18-22; Postman Decl. ¶¶ 12-16). Indeed, the Court is intimately aware of the extensive work that has been performed so far in this action. The Court will take this opportunity to observe that the lawyers on *both* sides of this case have proven themselves thorough, professional, and to be vigorously litigating this case. Upon reviewing the declarations submitted at Docket Nos. 472-48 and 472-49, the Court finds that all of the factors in Fed. R. Civ. P. 23(g)(1)(A) weigh in favor of appointing these two firms as Co-Lead Class Counsel.

The Court would find, therefore, that Plaintiffs and Class Counsel satisfy the adequacy requirement of Fed. R. Civ. P. 23(a)(2).

For all of the foregoing reasons, the Court would find that the requirements delineated in Rule 23(a) are satisfied. The Court would, therefore, **APPOINT** Quinn Emanuel Urquhart & Sullivan, LLP and Keller Postman LLC as Co-Lead Class Counsel and continue to analyze the propriety of class certification under Rule 23(b)(3).

### B. Rule 23(b)(3)

Because Plaintiffs seek to certify a class under Rule 23(b)(3), the Court must analyze whether the proposed class satisfies the predominance and superiority inquiries. *See* Fed. R. Civ. P. 23(b). Rule 23(b)(3) provides:

> (b) TYPES OF CLASS ACTIONS. A class action may be maintained if Rule 23(a) is satisfied and if: . . .
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

1. Predominance

"The Rule 23(b)(3) predominance inquiry asks the court to make a global determination of whether common questions prevail over individualized ones." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). "For purposes of this analysis, an individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Id*. (quotations and brackets omitted) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

"Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (internal quotation marks omitted). A court must analyze these elements to "determine which are subject to common proof and which are subject to individualized proof." *TFT-LCD*, 267 F.R.D. at 310-11.

The claims at issue here are violations of §§ 1 and 2 of the Sherman Act. *See* Complaint ¶¶ 143-207; Motion at 11-12. All three claims are based upon the same alleged antitrust behavior. *See generally* Complaint. To establish such claims, Plaintiffs must prove: (1) "the existence of an antitrust violation;" (2) an "'antitrust injury' or 'impact' flowing from that violation (i.e., the conspiracy); and (3) "measurable damages." *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665-66 (9th Cir. 2022). "Therefore, to prove there is a common question of law or fact that relates to a central issue in an antitrust class action, plaintiffs must establish that 'essential elements of the cause of action,' such as the existence of an antitrust violation or antitrust impact, are capable of being established through a common body of evidence, applicable to the whole class." *Id.* at 666 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)).

The court in *High-Tech* identified five principles that this Court considers helpful in

guiding the predominance inquiry:

> First, and most importantly, the critical question that this Court must answer is whether common questions predominate over individual questions. *Amgen*, [568 U.S. at 459]. In essence, this Court must determine whether common evidence and common methodology could be used to prove the elements of the underlying cause of action. *Id.* Second, in answering this question, this Court must conduct a "rigorous" analysis. *Comcast Corp.*[ *v. Behrend*, 569 U.S. 27, 33 (2013)]. This analysis may overlap with the merits, but the inquiry cannot require Plaintiffs to prove elements of their substantive case at the class certification stage. *Amgen*, [568 U.S. at 465-66]. Third, this Court must determine not only the admissibility of expert evidence that forms the basis of the methodology that demonstrates whether common questions predominate. *Ellis*, 657 F.3d at 982. Rather, this Court must also determine whether that expert evidence is persuasive, which may require the Court to resolve methodological disputes. *Id.*; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d [244, 255 (D.C. Cir. 2013)]. Fourth, the predominance inquiry is not a mechanical inquiry of "bean counting" to determine whether there are more individual questions than common questions. *Butler* [*v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013)]. Instead, the inquiry contemplates a qualitative assessment, which includes a hard look at the soundness of statistical models. *Id.*; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d at 255. Fifth, Plaintiffs are not required to show that each element of the underlying cause of action is susceptible to classwide proof. *Amgen*, [568 U.S. at 469]. Rather, they need only show that common questions will predominate with respect to their case as a whole. *Id.*

985 F. Supp. 2d at 1186-87.

Plaintiffs assert that the following common issues predominate: (1) market definition and power; (2) Defendants' anticompetitive conduct; (3) antitrust impact; and (4) damages. *See* Motion at 12-19. The primary focus of Defendants' opposition is to challenge this assertion by contending that individual questions will predominate as to each element Plaintiffs must establish to prove their claims. *See* Opp. at 8. Defendants also contend that individual inquiries as to fraudulent concealment will be required because Plaintiffs' claims as to some putative class members might be barred by the statute of limitations. *See id.* at 32. With the aforementioned guidance in mind, the Court addresses each of the three antitrust elements, including any specific arguments raised by Defendants, before turning to the statute of limitations.

> ### a. Antitrust Violation
>
> #### i. Market Definition

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)) (citing *Image Tech. Servs.,*

*Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997)).  "The relevant market for antitrust purposes is determined by (1) the relevant product market and (2) the relevant geographic market."  *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 911 (N.D. Cal. 2023) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962)).

Plaintiffs allege that "Defendants have monopoly power in the relevant market for primary ticketing services for major concert venues and in the relevant market for concert promotion services for major concert venues."  Complaint ¶ 155.  Plaintiffs indicate that they "will rely on expert analysis from [Dr.] Pathak as well as documentary evidence" to establish these relevant markets.  *See* Motion at 12.  Plaintiffs further indicate that Defendants' power in these markets can be shown through common evidence – that is, Dr. Pathak's "assess[ment of] market shares . . . , substantial barriers to entry, increased prices, decreased quality, and excluded competitors."  *Id.*

To define the relevant product markets, Dr. Pathak applies the hypothetical monopolist test ("HMT").  Declaration of Parag Pathak, Ph.D. ("Pathak Decl."), Docket No. 471-33, ¶ 83.

> The HMT asks if a hypothetical monopolist over a set of products in a proposed market could profitably impose a small but significant and non-transitory increase in price ("SSNIP") or a worsening of terms.  If enough customers respond to the SSNIP by switching to products outside the proposed market, the hypothetical monopolist of the proposed market would find such a SSNIP unprofitable.  In this situation, the HMT indicates the proposed market is too narrow and additional closely related products should be added until the hypothetical monopolist finds a SSNIP to be profitable.  If enough consumers do not respond to the SSNIP by switching to products outside the proposed market, the SSNIP will be profitable and the proposed market is a relevant market.

*Id.* (internal footnotes omitted).  "The HMT is a quantitative tool used by courts to help define a relevant market by determining reasonably interchangeable products."  *Meta Platforms*, 654 F. Supp. 3d at 919 (citing *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 n.1 (9th Cir. 2021)).

Dr. Pathak indicates that primary ticketing services for major concert venues is a relevant market because "none of the participants [(*i.e.*, artists, promoters, venues, and consumers)] in the primary ticketing market would switch to alternatives in sufficient numbers in response to a SSNIP by a hypothetical monopolist of primary ticketing services at major concert venues to render the SSNIP unprofitable."  Pathak Decl. ¶ 85.  For artists and their managers, Dr. Pathak claims that "the relevant consideration . . . is whether they would be able to switch to venues other than major concert venues in response to an increase in primary ticketing fees."  *See id.* ¶ 86.  Dr. Pathak

12

contends that artists are unlikely to relocate to smaller venues where they would attract smaller audiences, sell fewer tickets and incur additional costs from having to modify their tour productions and because "[m]ajor concert venues also provide infrastructure, amenities, and an audience experience different from smaller venues." *See id.* ¶¶ 86-87.  Dr. Pathak contends that "[m]ajor concert venues have complex primary ticketing needs and would not be able to switch to alternative services in response to an increase in primary ticketing fees." *See id.* ¶ 89.  Such venues also would not be able to switch to secondary ticketing services or to handling ticketing themselves. *See id.* ¶¶ 90-91.  Dr. Pathak contends that consumers are also unlikely to switch to alternatives in sufficient numbers in the face of an increase in primary ticketing fees in part because "[t]he ticketing service is simply the necessary intermediary that enables consumers to access what they actually want: the live concert experience." *See id.* ¶ 92.  Additionally, "primary ticketing has features that make it relatively more attractive to consumers than purchasing on the secondary market, including, for example, lower prices in the case of high demand shows." *Id.* ¶ 93 (footnote omitted).

Dr. Pathak indicates that concert promotion services for major concert venues is also a relevant market. *See id.* ¶ 95.  Concert promoters provide services to venues by assisting them with booking and marketing shows and to artists by advising them on which venues they should play, arranging the logistics of the concert or tour, marketing the concert or tour once either is booked, and guaranteeing the finances of the concert. *See id.*  Dr. Pathak indicates that there are no substitutes for the services provided by concert promoters, major concert venues rely on third-party promoters, and artists are unlikely to switch from promotion at a major concert venue to promotion at a different type of venue. *See id.* ¶¶ 96-97.  As such, it is unlikely that a sufficient number of major concert venues or artists would switch to other services when faced with a SSNIP by a hypothetical monopolist of concert promotion services at major concert venues to render the SSNIP unprofitable. *See id.*

Plaintiffs allege that the relevant geographic scope of both markets is the United States. *See* Complaint ¶¶ 83-84.  Relying on guidance from the DOJ and the Federal Trade Commission regarding the factors that may limit the geographic scope of a market, Dr. Pathak confirms that the United States is the relevant geographic market in this case.  Pathak Decl. ¶ 98.  Venues, ticketers, and other market participants behave in such a manner that suggests the United States is a distinct market. *See id.* ¶¶ 99, 102.  Similarly, with respect to artists and customers, Dr. Pathak indicates

that "[g]eographic barriers and travel costs place limits on artists' and customers' ability to switch between US and non-US markets for major concert venue ticketing." *Id.* ¶ 100. He reasons that "[a]rtists would not be able to switch from venues in the US to venues outside the US because most of the fans they hope to attract to concerts at US venues live in the US" and "[w]hile some fans might travel to another country to see an artist perform, most fans would not." *Id.* Moreover, concert promotion services outside the United States do not serve as a reasonable substitute for such services in the United States. *See id.* ¶ 101.

Defendants challenge only the scope of the relevant geographic market. *See* Opp. at 21-23. Specifically, Defendants contend that Dr. Pathak neither considers any narrower definition of the geographic market nor whether narrower geographic markets would raise individualized inquires across the proposed class. *See id.* at 21-22. Defendants claim that the relevant market is regional, not national, because "[c]oncertgoers will typically not travel out of their region to attend a concert in response to higher ticket prices in their area." *See id.* at 22 (quoting *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 682 (4th Cir. 2016)).

The Court would decline to adopt Defendants' position that Plaintiffs cannot establish predominance because there might be local markets for ticket sales. As Plaintiffs assert, their alleged relevant market is for primary ticketing *services*, not *tickets*, which "is a national product" with "no big geographic component." *See* Reply at 20 (quoting Ex. 45, Docket No. 511-3, at 99:1-16). Plaintiffs further assert that the cases Defendants' rely on in support of their position are inapposite because none address ticketing services or involve a motion for class certification, *see id.*, and the Court would agree. Moreover, Defendants do not explain precisely how the geographic scope of the relevant market would be an issue that would affect different class members differently. At this point, Plaintiffs have satisfied their burden to show that evidence common to the class is capable of answering the question of whether the relevant geographic market is the United States. Dr. Pathak's application of economic principles and consideration of available evidence in defining the relevant geographic market suffices at the class certification stage. The Ninth Circuit has indicated that "there is no requirement to use any specific methodology in defining the relevant market." *Optronic Techs.*, 20 F.4th at 482. Furthermore, "[c]ourts regularly find that reasonable estimates concerning market definition and market share performed using all the available data are sufficient." *In re Telescopes Antitrust Litig.*, 348 F.R.D. 455, 472 (N.D. Cal. 2025) (collecting cases). While Defendants may ultimately prevail in proving that the United

14

States is not an appropriate market definition for determining impact, that is not for the Court to decide at this stage and for purposes of this predominance inquiry.

ii. Monopoly Power in the Relevant Markets

"Market power is the power 'to force a purchaser to do something that he would not do in a competitive market.' It has been defined as 'the ability of a single seller to raise price and restrict output.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992); *see also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021) (stating that "'[m]arket power is the ability to raise prices above those that would be charged in a competitive market'"); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1111 (N.D. Cal. 2004) (noting that the Federal Trade Commission Horizontal Merger Guidelines "define market power as 'the ability profitably to maintain prices above competitive levels for a significant period of time'").

"Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power. If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)). "The more common type of proof is circumstantial evidence pertaining to the structure of the market. To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* (citing *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1232 (8th Cir. 1987), *cert. denied*, 484 U.S. 1026 (1988), and *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986)). "Market power is generally inferred from the defendant's possession of a high market share and the existence of 'significant barriers to entry.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023).

To determine Defendants' economic power in the relevant markets, Dr. Pathak uses both direct and indirect methods. *See* Pathak Decl. ¶ 103. Under the direct method, Dr. Pathak uses "evidence that a firm has been able to raise prices, lower quantities (output), decrease quality, or exclude competitors" to evaluate market power. *See id.* ¶ 104. He observes that (1) Ticketmaster's gross base service fees for events at major concert venues increased from ▮▮▮▮ of ticket face

15

value in 2015 to ███ in 2024, even as it gained market share; (2) Ticketmaster's use of exclusive contracts results in lower output (*i.e.*, fewer ticket sales) than what would have existed in a more competitive market; and (3) Ticketmaster has less incentive to innovate with its market power and thus offers primary ticketing services of lesser quality than its competitors. *See id.* ¶¶ 106-16. Defendants' internal documents suggest that ███████████████████████ ████████. *See, e.g.*, Ex. 3, Docket No. 471-3, at 4-5 (noting a ███████████████ ██████████████████████████████████████████ ████████████████████).

Under the indirect method, Dr. Pathak analyzes "a firm's share of a relevant market and barriers to entry" to evaluate market power. *See* Pathak Decl. ¶ 117. Using data from Pollstar and data produced by Defendants for purposes of this litigation, Dr. Pathak estimates that Ticketmaster held an 80% share of the primary ticketing services market for major concert venues in 2024. *See id.* ¶¶ 118-20. Dr. Pathak further observes other evidence of Ticketmaster's market power, including the lack of successful entry of would-be competitors and the multiple barriers to entry (*e.g.*, concern that Live Nation concerts will not be retained). *See id.* ¶¶ 121-31; *see also* Ex. 8, Docket No. 471-7, at -967 (listing ████████████████████████ ████████████████████); Ex. 9, Docket No. 472-10, at -273 ("Live Nation is well insulated from competition due to a number of barriers to entry and its leading position."); Ex. 10, Docket No. 472-11, at -180 ("[Live Nation's] scale provides it with excellent barriers to entry").

Using the same methods, Dr. Pathak indicates that Live Nation holds market power in the market for promotion services at major concert venues. *See* Pathak Decl. ¶ 132. He first observes that Defendants' conditioning of the availability of Live-Nation promoted concerts at major concert venues on the use by those venues of Ticketmaster's primary ticketing services would be evidence of Live Nation's market power in concert promotion services at major concert venues. *See id.* He then observes indirect evidence in the form of the Live Nation's market shares in the market for promotion services at major concert venues and promotion shares with top artists. *See id.* ¶¶ 133-36. Live Nation's market shares in the market for promotion services at major concert venues was approximately 59% in 2024. *See id.* ¶ 133. Live Nation has promoted between 60% and 87% of the top thirty artists over the 2010 to 2024 period, and those artists represent between 59% and 83% of ticket sales for the top thirty artists. *See id.* ¶ 135. The statements of Live Nation's CEO appear to confirm the extent of Live Nation's power in this market. *See* Ex. 1,

16

Docket No. 472-2, at -956 ("[A]lthough we didn't brag about this during the DOJ years, we're larger than every other promoter in the world combined.  So we have incredible market power around the world . . . .").

### iii. Alleged Anticompetitive Conduct

Armed with this significant market power, Plaintiffs allege that Defendants' engaged in anticompetitive conduct through (1) exclusive dealing; (2) coercive tying arrangements; and (3) the use of economic threats and coercion.  *See* Motion at 5, 13-14.  Plaintiffs claim that this anticompetitive conduct is shown through common evidence.  *See id.*  Specifically, "[t]his evidence includes documents and testimony from Defendants and third parties, as well as economic analysis and opinions from MIT Professor of Economics Parag Pathak and industry analysis from insider Dean Budnick." *Id.* at 1-2.

As to exclusive dealing, Plaintiffs allege that "Defendants have entered into long-term exclusive dealing arrangements with venues with respect to the provision of primary and secondary ticketing services" and that such "arrangements have had the effect of foreclosing competition in a substantial share of the line of commerce affected and the relevant market for primary and secondary ticketing services for major concert venues."  Complaint ¶¶ 148-49.  Plaintiffs indicate that to establish these arrangements and their anticompetitive effects, they "will rely on class-wide evidence, including the agreements themselves and documents and testimony from Defendants and other market participants."  Motion at 13 (citing Ex. 39, Docket No. 472-40, at 18).

Dr. Pathak indicates that "Ticketmaster places constraints on venues' ability to deal with rival ticketers in exchange for Ticketmaster's agreement to supply primary ticketing services." Pathak Decl. ¶ 56.  Plaintiffs indicate that these constraints are long-term, with some lasting between ▮▮▮▮▮▮ and others lasting ▮▮▮▮ or more.  *See id.* at 5 (citing Ex. 13, Docket No. 471-9, at -711 and Ex. 14, Docket No. 471-10, at -049, -052).  Plaintiffs further indicate that Ticketmaster ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  *See id.* (quoting Ex. 15, Docket No. 471-11, at -023).  Plaintiffs also point to other evidence of Defendants' alleged use of exclusivity to block competition.  In response to the merger between Songkick and Crowdsurge, Ticketmaster's then-Chairman indicated, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮"  Ex. 16, Docket No. 471-12, at -224.  Ticketmaster's ▮▮▮ ▮▮▮▮▮▮▮▮ similarly emphasized ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ Ex. 17, Docket No. 471-13, at -273.  In preparing for

negotiations to renew a venue's contract with Ticketmaster, Ticketmaster's Executive Vice President and Co-Head of Sports ███████████████████████████████ ██████████████████████ Ex. 18, Docket No. 471-14, at -831. Dr. Pathak explains that "Ticketmaster can profitably prevent new competitors from entering the market . . . by denying entrants access to enough customers to operate at an efficient scale." Pathak Decl. ¶ 149 (footnote omitted). For example, Ticketmaster's net renewal rates for exclusive deals appear to consistently exceed one hundred percent. *See* Ex. 19, Docket No. 472-20, at -993 ("[F]or the seventh consecutive year, we'll have a net renewal rate of over 100%."). Based on such a successful renewal rate, Dr. Pathak observes that "[i]n aggregate, fewer tickets [a]re available for other ticketers to compete for because Ticketmaster contract[s] more new tickets than they los[e]." Pathak Decl. ¶ 156.

Defendants contend that the inquiry into whether Plaintiffs can show that Defendants' alleged exclusive dealing actually foreclosed a "substantial share" of competition will turn on the specific terms of individual venue contracts, such as duration, terminability, and scope of exclusivity. *See* Opp. at 25 (citations omitted). Defendants contend that even if Plaintiffs could make such a showing, Defendants are entitled to show a procompetitive justification that will require individualized evidence and arguments, varying across venues, geography, and time. *See id.* While there might very well be variation in the competitive conditions during the proposed fifteen-year class period, it is the combined effect of Defendants' various exclusive contracts that form the basis of Plaintiffs' exclusive dealing theory. *See* Reply at 23 ("[W]hether Defendants engaged in widespread exclusive dealing does not differ by Class member."). As Dr. Pathak indicates, "exclusive dealing, particularly when combined with tying, . . . operate through systematic market-wide mechanisms that affect all consumers, rather than through individualized negotiations or venue-specific arrangements." Pathak Decl. ¶ 142. As such, the Court is not persuaded that questions of fact regarding individual venue contracts would prevail over common questions applicable to the whole class, such as whether Ticketmaster's primary ticketing contracts constitute exclusive dealing arrangements.

As to tying, Plaintiffs allege that "[t]he provision of concert promotion services and primary ticketing services are two separate services or products." Complaint ¶ 164. Plaintiffs allege that "Defendants have conditioned the provision of concert promotion services on the use of primary ticketing services from Ticketmaster" and that such "conduct has affected a not

insubstantial amount of interstate commerce in the provision of primary ticketing services for major concert venues" and "had an anticompetitive effect in the relevant market for primary ticketing services for major concert venues." *Id.* ¶¶ 165, 167-68. Plaintiffs indicate that they "will prove these tying arrangements through common evidence, including internal emails, contracts, and testimony from Defendants, competitors, and other market participants." Motion at 13.

Dr. Pathak indicates that "[m]ajor concert venues are typically not able to source a sufficient number of events on their own and must rely on third-party promoters." Pathak Decl. ¶ 96 (footnote omitted). Plaintiffs indicate that Defendants exploit this reliance by tying Ticketmaster's services to concerts promoted by Live Nation. *See* Motion at 6 (citation omitted). For example, one venue suggested approaching Defendants as a "███████████████" because ████████████████████████████████████████████████████████████████████████████████████████████████████████." Ex. 20, Docket No. 471-15, at -188. Plaintiffs produce evidence that appears to show Defendants would ████████████████████████████████████████████████████████████████████████████████████████ *See, e.g.*, Ex. 21, Docket No. 471-16, at -423 ("████████████████"); Ex. 22, Docket No. 471-17, at -459 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); Ex. 23, Docket No. 471-18, at -237 ("████████████████"); Ex. 24, Docket No. 471-19, at -446 ("█████████████████████████████████"). Plaintiffs also produce evidence that some ticketing deal agreements were ██████████████████████████████████████. *See, e.g.*, Ex. 25, Docket No. 471-20, at -417 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."). Plaintiffs further indicate that "some deals █████████████████████████████████████████████████████████████████████████████████████████." Motion at 6 (citing Ex. 26, Docket No. 471-21, at 113:18-114:12). While benefitting Defendants by helping them "win the business," *see* Ex. 27, Docket No. 472-28, at -258, these tying arrangements appear to harm competition by ensuring that ████████████████████████████████████████████ *see* Ex. 28, Docket No. 471-22, at -007.

As to the use of economic threats and coercion, Plaintiffs allege that "Defendants have also coerced major concert venue operators to enter into long-term exclusive deals with Ticketmaster"

19

and "not to work with other primary and secondary ticketing service providers."  Complaint ¶¶ 158-59.  Plaintiffs allege that "Defendants' threats and coercion have impeded competitors' ability to secure contracts for primary and secondary ticketing services with the majority of major concert venues in the United States" and "impeded competitors' ability to attract resellers to their secondary ticket platform for secondary ticket sales."  *Id.* ¶¶ 160, 163.  Plaintiffs indicate that they "will rely on common evidence . . . to prove Defendants reinforced their exclusive ticketing deals through a pattern of coercion and threats."  Motion at 14.

Specifically, Plaintiffs produce evidence that "Ticketmaster routinely threatened venues with the loss of Live Nation concerts if they chose a rival ticketing provider."  *Id.* at 7.  On January 24, 2023, the Co-Founder and CEO of SeatGeek testified before the Senate Judiciary Committee that the entertainment industry "recognize[s] that Ticketmaster's dominance in primary ticketing arises in part from Live Nation's control of concert revenue."  Ex. 30, Docket No. 472-31, at -426 ("Ticketmaster typically has an upper hand in negotiating with venues, as it also controls access to the talent.  *If the firm declines to use Ticketmaster, then* [*Live Nation*] *can elect to take its talent to an alternative venue.*" (emphasis in original)).  If venues do not accept Ticketmaster as their ticketing provider, then they risk losing concerts that they need in order to stay in business.  *See, e.g.*, Ex. 31, Docket No. 471-24, at 20:9-12 (█████████████████████████████████████████████████████████████████████████████████████████████████████████); Declaration of Dean Budnick ("Budnick Decl."), Docket No. 472-44, ¶¶ 53-61.  One Ticketmaster employee explained that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Ex. 32, Docket No. 471-25, at -151.  Plaintiffs' evidence shows ████████ were made to other venues.  *See, e.g.*, Ex. 33, Docket No. 471-26, at -362 ("████████████████████████████████████████████████████████████████████████████████████); Ex. 34, Docket No. 471-27, at -440 ("████████████████████████████████████████████████████████████"); Ex. 35, Docket No. 471-28, at -524 ("████████████████████████████████████████████████████████████"); Ex. 36, Docket No. 471-29, at -962 ("████████████████████████████

”).  An internal slide deck titled, “█████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████” *See* Ex. 38, Docket No. 471-30, at -755 (███████████████████████ █████████████████████████████████████).

Defendants contend that the question of whether they coerced venues into using Ticketmaster is not a single question of fact, but rather encompasses separate questions of fact for each venue and, in the absence of an express tying agreement, requires individualized inquiries into each of the ticketing agreements Plaintiffs challenge.  *See* Opp. at 23 (citations omitted). Defendants contend that even if Plaintiffs could show evidence of coercion, Defendants are entitled to introduce individualized evidence that “a particular venue *chose* Ticketmaster . . . because Ticketmaster provides superior service” and “Live Nation does not threaten to or actually withhold content from any venue that uses other ticketers.”  *Id.* (emphasis in original).

To show coercion for purposes of a tying claim, courts have required plaintiffs satisfy two elements:  First, plaintiffs must show that the seller has market power in the tying product.  *See Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1084 (C.D. Cal. 2017). “Without [market] power [in the tying product], the seller has no leverage to force buyers to purchase the tied product from it at a (potentially) supracompetitive price; the buyer will simply purchase the tying product from another seller, leaving him or her free to shop around for a competitive price for the tied product.”  *Id.* at 1085 (citing *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 620 (1977), and *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 17 (1984)). “But when ‘the seller's share of the market is high, or when the seller offers a unique product that competitors are not able to offer, . . . the likelihood that market power exists and is being used to restrain competition in [the tied product] market is sufficient to make per se condemnation [of the tie] appropriate.”  *Id.* (alterations in original) (quoting *Jefferson Par.*, 466 U.S. at 17).

Second, plaintiffs must demonstrate that “the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product.”  *See id.* (quoting *Paladin Assocs., Inc. v. Mont. Power Co.*, 329 F.3d 1145, 1159 (9th Cir. 2003)). “Although some cases in other circuits have required a showing of actual coercion,” the Ninth Circuit has indicated that “coercion may be implied from a showing that an appreciable number of buyers have accepted burdensome terms, such as a tie-in, and there exists sufficient economic

21

power in the tying product market." *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1216-17 (9th Cir. 1977).  The Ninth Circuit rejected an "individual coercion theory," finding instead that "[a] showing of an onerous effect on an appreciable number of buyers coupled with a demonstration of sufficient economic power in the tying market is sufficient to demonstrate coercion." *Id.* at 1217.

While Defendants produce evidence that suggests some venues were not subject to any coercion in selecting Ticketmaster over other ticketers, *see* Opp. at 24 n.11, Plaintiffs' evidence – as described above – suggests that Defendants possess substantial market power in concert promotion services (the tying product) and leverages that power to establish its dominance in the primary ticketing services market (the tied product), *see, e.g.*, Pathak Decl. ¶¶ 60-78, 162. Importantly, "Plaintiffs (*e.g.*, fans) do not claim **they** were subject to tying or coercion; they contend tying of venues was one strategy Defendants use to facilitate market-wide exclusive dealing.  Whether Defendants tied or coerced specific venues does not differ by Class member, nor does that affect whether fans suffered overcharges due to Defendants' market-wide web of exclusive deals (some, but not all, of which were obtained by tying/coercion)."  Reply at 22 (emphasis in original).  That Defendants intend to rebut Plaintiffs' evidence of coercion with evidence relating to specific venue contracts does not suggest, therefore, that such individualized inquiries will predominate over common questions, such as whether Defendants have sufficient economic power in the tying product market and whether venues "must accept the tied item and forego possibly desirable substitutes."  *See Moore*, 550 F.2d at 1217.  Regardless of the evidence Defendants intend to invoke to defend against Plaintiffs' allegations of coercion, this dispute boils down to a merits question, and Plaintiffs need not prevail on their claims as a matter of law at this stage.  *See Amgen*, 568 U.S. at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.").

The Court would find, therefore, that Plaintiffs' evidence supports their assertion that common legal and factual issues will predominate as to the existence of an antitrust violation. Defendants' arguments do not convince this Court otherwise.

### b.  Antitrust Impact

"Antitrust 'impact' – also referred to as antitrust injury – is the 'fact of damage' that results from a violation of the antitrust laws."  *High-Tech*, 985 F. Supp. 2d at 1192 (quoting *In re DRAM Antitrust Litig.*, No. 4:02-md-01486-PJH, 2006 WL 1530166, at *7 (N.D. Cal. June 5, 2006)).  "It

is the causal link between the antitrust violation and the damages sought by plaintiffs." *Id.* (quoting *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 19 n. 18 (1st Cir. 2008). The question at this stage is "whether Plaintiffs have presented a sufficiently reliable theory to demonstrate that common evidence can be used to demonstrate impact." *Id.*

Plaintiffs assert that "each member of the Class can rely on common proof to show antitrust impact of any amount." Motion at 14 (citing *Olean*, 31 F.4th at 679). The proposed class includes "direct purchasers who bought a primary ticket from Defendants and paid associated primary ticketing fees for an event at a major concert venue." *Id.* (citing Docket No. 461). As such, all putative class members paid fees to Ticketmaster "in the actual world." *Id.* To analyze the effects of Defendants' alleged anticompetitive conduct, Dr. Pathak constructs "a more competitive but-for world." *See* Pathak Decl. ¶¶ 137-39. Plaintiffs claim that "[b]ecause that competitive world was foreclosed by Defendants' anticompetitive conduct, all Class members were overcharged by the difference between supracompetitive fees actually paid and the fees Class members would have paid in a competitive market." Motion at 14; *see also* Reply at 5 ("Pathak's model compares the service fees Class members paid to the fees they would have paid in a more competitive but-for world – the difference is the 'overcharge' (*i.e.*, damages)." (citing Pathak Decl. ¶¶ 137-41, 171-86)).

Plaintiffs first advance documentary evidence of common impact. *See* Motion at 14-15. Specifically, Plaintiffs point to Defendants' admission that ███████████████████ *id.* at 14-15 (quoting Ex. 40, Docket No. 471-31, at -270), which Plaintiffs claim, "stems in part from the 'incredible moat' of barriers to entry Defendants built to entrench their monopoly," *id.* at 15 (quoting Ex. 1, Docket No. 472-2, at -964). Plaintiffs also point to evidence of "Defendants' coercive tying arrangements [that] affected a wide range of tickets," *see* Ex. 41, Docket No. 471-32, at 127:22-128:1 ("████████████████████████████████████████ ████████████████████████████"), and suggest that Defendants use their market power to ████████████████████████████████████," *see, e.g.*, Ex. 4, Docket No. 471-4, at -154 ("████████████████████████████████████ ███████████"); Ex. 6, Docket No. 471-6, at -535 (████████████████████████████ ████████████████████████████████). *See* Motion at 15.

Plaintiffs then reference Dr. Pathak's methods of demonstrating common impact. *See id.* Dr. Pathak examines the economic literature on exclusive dealing, especially when coupled with

23

tying, and concludes that these practices "result in anticompetitive outcomes when used by firms like Ticketmaster in fragmented buyer markets such as the market for primary ticketing services at major concert venues." *See* Pathak Decl. ¶¶ 142-70. Dr. Pathak also uses competitive benchmarks to demonstrate classwide impact. *See id.* ¶¶ 171-86. Plaintiffs claim that his "quantitative analyses confirm[ ] that all members of the class were impacted by Defendants' anticompetitive conduct." Motion at 15.

To begin, Dr. Pathak uses the period between 2008 and 2009 as a proxy for competitive conditions in the primary ticketing market. *See* Pathak Decl. ¶ 171. During this period, Live Nation entered the primary ticketing market and competed with Ticketmaster. *See id.* ¶¶ 172-74. Instead of renewing its long-standing contract with Ticketmaster in 2008, Live Nation obtained an exclusive license for ticketing software from CTS Eventim – the leading provider of primary ticketing services in Europe – in exchange for ███████████████████████████. *See id.* ¶¶ 173-75. As part of its entry into the primary ticketing market, Live Nation negotiated and contracted with SMG – a large, sophisticated venue operator – to provide SMG with primary ticketing services. *See id.* ¶ 176. Live Nation's agreement with SMG split ticketing service fee revenues between the two parties and required a true-up payment of ████ for each ticket below the forecasted amount of tickets sold at SMG venues. *See id.* Using actual-world cost data to estimate Ticketmaster's variable costs in the but-for world, Dr. Pathak concludes that "the fee agreed to by Live Nation and SMG exceeds Ticketmaster's variable costs and the licensing fee they paid to CTS Eventim." *See id.* ¶ 177. Dr. Pathak indicates that "[w]hile Live Nation's entry into primary ticketing and its contract with SMG occurred under the backdrop of Ticketmaster's existing substantial market power, this situation represents the closest approximation to competitive conditions observed in the US market and provides directional evidence of the type of outcomes achievable by competition." *Id.* ¶ 178 (footnote omitted).

Alternatively, Dr. Pathak considers the costs directly related to providing ticketing services, which include the fixed costs of creating a ticketing system and variable costs. *See id.* ¶ 179. Dr. Pathak indicates that "[c]ompetition drives prices towards costs, so a competitive market has prices near cost." *Id.* Based on the licensing contract between Live Nation and CTS Eventim, Dr. Pathak concludes that "a conservative estimate of the fixed costs associated with ticketing is ████ per ticket adjusted for inflation." *Id.* ¶ 180. Based on Live Nation's documents, variable costs were ████ per ticket over the 2017 to 2022 period. *Id.* (footnote omitted). Dr.

24

Pathak combines the conservative estimate of fixed costs and Live Nation's estimate of variable costs to reach another estimate of a potential outcome in a more competitive market – that is, approximately ███ in 2010 to ███ in 2024.  *See id.* ¶ 181.

Dr. Pathak then "model[s] the reduction in but-for ticketing fees each year as the percentage reduction required to reach the relevant inflation adjusted aggregate fee, which was approximately ███ in 2024."  *Id.* ¶ 182 (footnote omitted).  He concludes that "consumers paying a positive fee to Ticketmaster in the real world were harmed through a common mechanism."  *Id.*  Dr. Pathak indicates that "[t]his competitive benchmark provides evidence of systematic impact because it shows that competitive pressure would result in lower pricing that would affect all market participants."  *Id.* ¶ 183.  He also indicates that his model preserves "[f]ee variations . . . across venues and time periods in the current market" without "require[ing] venue or customer specific inquiry."  *Id.*

As further evidence of classwide impact, Dr. Pathak observes that Ticketmaster's net service fees have increased over time across all major concert venues, which he claims "is consistent with exclusive contracts and tying having anticompetitive effects."  *Id.* ¶ 184. Specifically, the net service fees have increased from ███ of face value in 2015 to ███ in 2024. *Id.* ¶ 185 & Table 3.  Live Nation's ticketing profits rose in parallel, with margins increasing from 15.3% when Live Nation competed with Ticketmaster to 37.6% in 2024.  *See id.* ¶ 186.

To "test[ ] these conclusions," Plaintiffs point to Dr. Pathak's "regression analysis that shows sports events (often exempt from exclusivity) carry lower service fees than concerts at the same venue and time."  Motion at 16 (citing *id.* ¶¶ 189-94).  Dr. Pathak explains that "if Ticketmaster's exclusive dealing arrangements systematically increase fees for all consumers, then events subject to reduced exclusivity, such as sports events, should show systematically lower fees than events subject to greater or full exclusivity, such as concerts, at the same venues."  Pathak Decl. ¶ 188.

Defendants offer a litany of critiques of Dr. Pathak's method of demonstrating classwide impact.  *See* Opp. at 9-20.  The Court addresses each in turn.

       i.   General Challenges

At the outset, Defendants appear to challenge the validity of Dr. Pathak's approach.  First, Defendants take issue with Dr. Pathak's "but-for benchmark," pointing to Dr. Pathak's admission that "he does not derive his benchmark from 'another market with the same features . . . but without

the alleged anticompetitive conduct.'" *Id.* at 9-10 (ellipsis in original) (quoting Pathak Decl. ¶ 171). Defendants acknowledge the need for a benchmark, yet they do not specify what they believe would be "a suitable one." *See id.* Plaintiffs suggest that "choosing the best of imperfect benchmarks" is not a question for this Court to resolve at this stage, *see* Reply at 6, and the Court would agree. While Defendants challenge the actual benchmark, they do not dispute that Dr. Pathak's method of using a benchmark to model a but-for world is capable of modeling classwide impact. *See id.* The Court finds it sufficient for purposes of class certification that Dr. Pathak uses "the best available evidence of competitive outcomes" and that "his approach represents the most accurate analysis possible given the limitations in markets subject to long-term anticompetitive conduct." Pathak Decl. ¶ 171.

Second, Defendants take issue with Dr. Pathak's assumption that "in a but-for, competitive world, Ticketmaster's price to venues (*i.e.*, its 'net service fees') would equal its costs." Opp. at 10 (footnote omitted). Although Defendants acknowledge Dr. Pathak's correction in his deposition testimony that "price *approaches* costs," *see* Ex. 45, Docket No. 511-3, at 168:13-169:2 (emphasis added), Defendants contend without any explanation that "his methodology actually sets price *equal* to his assessment of costs, *see* Opp. at 10 n.2 (emphasis in original). Dr. Pathak expressly indicates that "[c]ompetition drives prices *towards* costs, so a competitive market has prices *near* cost." Pathak Decl. ¶ 179 (emphasis added). Defendants do not appear to challenge this notion of competition-driven pricing, which the Court agrees with Plaintiffs is a principle that "accords with well-accepted economics." *See* Reply at 7 (citing *Ind. Lumbermens Mut. Ins. Co. v. Reinsurance Results, Inc.*, 513 F.3d 652, 658 (7th Cir. 2008)).

Third, Defendants take issue with Dr. Pathak's "appl[ication] of the same 'percentage reduction' to service fees for every ticket from every venue across the country." Opp. at 11. Defendants claim that Dr. Pathak's method "ignores the huge economic variations across different venues, in different locations, hosting distinct concerts – all of which can affect the prices paid by consumers." *Id.* Nonetheless, Dr. Pathak notes that "Ticketmaster's ticketing fees in the real-world exhibit variation and . . . expect[s] variation in the ticketing fees in the but-for-world." Pathak Decl. ¶ 182. He acknowledges that "[f]ee variations exist across venues and time periods in the current market" and claims that "the benchmark preserves such variation in a method that does not require venue or customer specific inquiry." *See id.* ¶ 183. Specifically, as Plaintiffs explain, Dr. Pathak's method addresses variation across venues by "(1) consider[ing] for each at-

26

issue event during the Class period data from all the at-issue major concert venues; (2) account[ing] for particular up-front payments, rebates, and other monies each venue receives; and (3) us[ing] a percentage (not absolute dollar-value) reduction." Reply at 8 (citing *id.* ¶¶ 182-83, 212-13 and Reply Expert Declaration of Parag Pathak, Ph.D. ("Pathak Reply Decl."), Docket No. 511-12, ¶¶ 12-18, 25-34).

Defendants fault Dr. Pathak's "reli[ance] on aggregate 'proof,'" contending that Plaintiffs have used an "oversimplified approach" that "simply plot[s] the same assumed, artificially low but-for per-ticket cost against a multitude of distinct venue negotiations and decisions" and thus does not account for "any (much less all) of the relevant variables that lawfully impact real-world prices." Opp. at 11-12. Relying largely on the Ninth Circuit's decision in *Olean*, Plaintiffs claim that this "is a repackaged argument antitrust defendants raise in virtually every class action." *See* Reply at 8. In *Olean*, the Ninth Circuit indicated that a regression model's use of "averaging assumptions" (*i.e.*, a model that assumes all direct purchasers were "overcharged by the same uniform percentage") is not "inherently unreliable." 31 F.4th at 677. Furthermore, "[i]t is not implausible to conclude that a conspiracy could have a class-wide impact, 'even when the market involves diversity in products, marketing, and prices,' especially 'where, as here, there is evidence that the conspiracy artificially inflated the baseline for price negotiations.'" *Id.* at 677-78 (quoting *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254-55 (10th Cir. 2014)). The Court would find that Dr. Pathak's model is capable of establishing antitrust impact on a classwide basis. "[I]t is for the jury, not the court, to decide the persuasiveness of [Dr. Pathak's] evidence in light of 'common sense and empirical evidence.'" *Id.* at 678.

### ii. Approximation of Fixed Costs

Defendants next challenge Dr. Pathak's estimate of fixed costs. *See* Opp. at 12. Specifically, Defendants argue that Dr. Pathak's "cost benchmark is fatally flawed" in part because "the 2008 Eventim contract he relies on does not represent the 'fixed cost of developing or purchasing' a platform competitive with Ticketmaster's." *Id.* (quoting Pathak Decl. ¶ 180). Relying on a partial arbitral award in a proceeding between CTS Eventim and Live Nation involving ███████████████████████, Defendants claim that this "███████████████ ██████████████" *Id.* (emphasis in original). Defendants contend, therefore, that "[i]f the Eventim contract is proof of anything, then, it is that ██████-a-ticket was nowhere near the requisite '████████████████' to support a competitive ticketing service in 2008." *Id.* at 13

(footnote omitted).

Plaintiffs argue in response that the arbitrator's findings do not undermine Dr. Pathak's reliance on the ███ cost figure. *See* Reply at 9-10. Plaintiffs claim that the order ███



*Id.* (citing Ex. 47, Docket No. 511-5, ¶¶ 90, 95, 107, 343). Plaintiffs further argue in response that Defendants "ignore that the ███ ***fixed cost*** benchmark conservatively overstates Defendants' actual costs, thereby understating impact and damages." *Id.* at 10 (emphasis in original) (citing Pathak Decl. ¶¶ 180-81; Pathak Reply Decl., ¶ 77).

Even if Dr. Pathak could rely on this benchmark from 2008, Defendants contend that Dr. Pathak fails to address "costs through 2025, which have changed over time." *See* Opp. at 13-14. Defendants claim that "by comparing prices in the real world (where ticketing companies must account for their actual costs when negotiating, and where Ticketmaster's financial reporting ██████████████████████████████, [Expert Report of Dr. John H. Johnson, IV ("Johnson Report"), Ex. 1, Docket No. 502-1], ¶ 139) to prices in a hypothetical world where costs are pegged to an artificially low fixed cost from years earlier, Plaintiffs guarantee that their model will yield an 'overcharge.'" *Id.* (emphasis in original). Plaintiffs point in response to Dr. Pathak's use of the "same inflation adjustments as the ██████████." *See* Reply at 10 (citing Pathak Decl. ¶ 175 and Ex. 45, Docket No. 511-3, 177:3-177:14). Plaintiffs also identify additional evidence in support of Dr. Pathak's estimated fixed costs figure that appears to refute Defendants' assumption that their fixed costs were higher than Dr. Pathak's estimate. *See id.* at 10-11.

The Court declines to resolve the parties' dispute over Dr. Pathak's estimate of fixed costs. Defendants' criticisms of Dr. Pathak's cost benchmark, whether they will eventually prevail before a factfinder, do not suggest that the challenged anticompetitive conduct is not capable of being measured on a classwide basis. The Court agrees with Plaintiffs that Defendants' challenge "highlights yet another classwide dispute" and thus does not defeat predominance. *See* Reply at 9 (collecting cases).

### iii. Setting of Fan-Facing Fees

Defendants next challenge Dr. Pathak's model for its purported failure to "account for venues' real-world role in setting fan-facing fees." Opp. at 16. Defendants claim that (1) "Ticketmaster does not set ticket prices paid by fans;" and (2) "the split of the ticketing fees between a given venue and Ticketmaster is the result of complex, bilateral negotiations, and turns on many individualized factors, ███████████████████████████████████████ ███████████████████████." *Id.* at 14 (citations omitted). As such, Defendants indicate that "if increased competition reduced Ticketmaster's fee, that benefit would flow first to the *venue*" and "[i]n turn, the *venue* would decide whether to pass any savings on to fans." *Id.* at 14-15 (emphasis in original). Defendants contend that "Plaintiffs have not shown – and cannot show – that all differently-situated venues would have responded to this theoretical reduction in Ticketmaster's fees in the same way." *Id.* at 15. Defendants present two "case studies" to demonstrate that ████████████████████████████████████████████████ ███████████████████████████, which would result in no antitrust impact for tickets purchased at those venues." *See id.* at 15-16.

Plaintiffs raise four arguments in response. First, Plaintiffs clarify that their claim is for overcharges on service fees, not ticket prices. *See* Reply at 11-12 (citing Complaint ¶ 121; Pathak Decl. ¶ 208). Second, relying on Dr. Pathak's report and Defendants' internal documents, Plaintiffs argue that "while venues may 'set' the fee in that they agree to it in a contract, Defendants significantly influence fee-setting (██████████████████████████████████ ████████)." *Id.* at 12 (citations omitted). Plaintiffs argue that this influence "inflates the baseline for service fees across the board, regardless of any supposed 'variations' from any individual venue's negotiations or goals." *Id.* (citing Pathak Reply Decl. ¶¶ 10-15). Plaintiffs claim that evidence of such conduct is sufficient for certification. *See id.* (citing *Olean*, 31 F.4th at 677-78). Plaintiffs further claim that Dr. Pathak already "accounts for Defendants' up-front payments to venues and Defendants' various ticket fee models."[4] *Id.* Third, Plaintiffs point out that, regardless

---

[4] As to up-front payments, Dr. Pathak explains that he "conservatively assum[es] that each venue obtains ticketing related venue in the but-for world that is no less than what it currently receives." Pathak Reply Decl. ¶ 18. He "uses real-world data that incorporates up-front payments, rebates, and other financial terms that major concert venues across the country in the real world receive." *Id.* He explains that his "assumption is conservative because it is unlikely a venue would be able to extract a greater amount of service fees in the but-for world with competition than in the current monopolistic market" because "venues and artists have an economic incentive to lower fees to increase demand for their concerts." *Id.* Defendants also claim that "[v]enues choose between multiple strategies to set fees (███

29

of pass-through rate, any reduction in fees shows impact. *See id.* at 13 (citing Pathak Reply Decl. ¶ 50 and *Olean*, 31 F.4th at 679). Plaintiffs also argue that this challenge is yet another "classwide merits dispute." *See id.* Fourth, Plaintiffs challenge Defendants' case studies, claiming that they "are tainted by the conduct at issue here because they come from the real world where Defendants dominate and acted anticompetitively." *See id.* at 14 (citing Pathak Reply Decl. ¶¶ 40-41). Dr. Pathak claims that "[e]ven if looking to real-world outcomes could reliably predict how venues would respond to fee changes," such case studies are "unreliable" because they were "not select[ed] randomly." Pathak Reply Decl. ¶ 42. Moreover, Dr. Pathak indicates that Defendants' use of such case studies does not control for certain factors that affect the level of fees, such as the effect of entering new contracts and increased ticket face values. *See id.* ¶ 43. Dr. Pathak's event study regression, which controls for time-varying effects such as changes in ticket prices over time, demonstrates that service fees to consumers generally decrease after a new contract. *See id.* ¶ 44.

Once again, the Court "is confronted with two opposing expert analyses or econometric models of what the 'but for' world would look like." *See In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 373 (C.D. Cal. 2011). At the certification stage, the Court declines to choose between the expert opinions as to what precisely venues do in response to reduced Ticketmaster fees. While technical flaws in Dr. Pathak's methodology may later prove fatal to Plaintiffs' ability to prove antitrust impact at trial, the Court tentatively finds it sufficient that the evidence Plaintiffs intend to present is at least capable of demonstrating such impact.

iv. Controlling for Non-Violation Variables and Generating False Positives

Defendants next challenge Dr. Pathak's model for its purported failure to control for certain variables that render it vulnerable to "false positives." *See* Opp. at 17-18. Defendants claim that Dr. Pathak's model shows injuries derived from "legacy contracts" that predate the alleged anticompetitive conduct that began in 2010 following the merger of Live Nation and Ticketmaster. *See id.* Defendants also claim that, while this case concerns exclusive ticketing contracts for concerts at major concert venues, Dr. Pathak's model shows injuries derived from "fees paid at venues with *non-exclusive* contracts, fees paid at venues *outside* Plaintiffs' alleged market

---

[BLACK REDACTION BAR]" Opp. at 14 n.4 (citing Ex. 6, Docket No. 502-4, at 36-38). Dr. Pathak clarifies that "[u]nder all three models, service fees are direct taxes on the artist's sale of tickets." Pathak Decl. ¶ 41. Accordingly, Dr. Pathak's analysis "does not differ" by those models because a "higher service fee raises the full price consumers pay when purchasing a ticket no matter how the service fee is structured." *Id.* (footnote omitted).

(including the smallest clubs), and fees paid on *sporting* tickets." *Id.* at 18 (emphasis in original). This is so, as Defendants argue, "because his methodology applies the exact same 'reduction in service fees' across the board in any given year." *Id.*

With respect to the legacy contracts, Plaintiffs argue in response that their claim for damages is limited to the years since 2010 "because that is the earliest they can do so under the statute of limitations." Reply at 15. Nonetheless, Plaintiffs' aver that the same alleged anticompetitive conduct occurred before 2010 and that the merger "amplified [Ticketmaster's] preexisting market power" such that "the effects of [Ticketmaster's] pre-Class period conduct lingered and then grew, post-2010." *Id.* Therefore, Plaintiffs claim that "even the pre-2010 contracts are affected by the anticompetitive conduct." *Id.* at 16.

Plaintiffs further argue that Defendants' reliance on *Rail Freight* is unavailing. *See* Reply at 15-16. In *Rail Freight*, railway freight customers brought an antitrust class action against four major rail freight shippers who were allegedly involved in a price-fixing conspiracy. 725 F.3d at 247. The plaintiffs sought to demonstrate that the class could prove common injury through common proof using a regression model that turned out to be flawed because it ascribed an injury to "shippers who were subject to legacy contracts – *i.e.*, those shippers who, during the Class Period, were bound by rates negotiated before any conspiratorial behavior was alleged to have occurred." *Id.* at 252. While the plaintiffs' expert in *Rail Freight* "conceded [his damages model] measured overcharges to legacy shippers and class members alike," *id.* at 253, Dr. Pathak claims that his "model does not find 'false positives,'" Pathak Reply Decl. ¶ 24. Dr. Pathak also provides a persuasive explanation beyond his own opinion as to how pre-2010 contracts were affected by the alleged anticompetitive conduct and identifies the evidence he relied on in reaching that conclusion. *See id.* ¶¶ 51-58. Based on what has been presented to the Court, there does not appear to be any "glaringly erroneous results that would render the model unreliable." *See In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 326 (S.D. Cal. 2019). "While Defendants point to possible false positives, Dr. [Pathak] explains [his] results using sound econometric principles that are not obviously contrary to the theory of the case." *See id.*

As to the claim that Dr. Pathak's model results in injuries from non-exclusive ticketing contracts, Plaintiffs question the grounds for Defendants' arguments and suggest that such arguments "misconstrue [Dr.] Pathak's opinions." *See id.* As Plaintiffs explain, "Defendants' widespread use of exclusive contracts has 'market-wide impacts' by den[ying] rival' primary

ticketers scale, which allows Defendants to impose supracompetitive fees even at (the few) venues that are non-exclusive." *Id.* (citing Ex. 45, Docket No. 511-3, at 32:11-34:1; Pathak Decl. ¶¶ 143-45, 151; Pathak Reply Decl. ¶ 24). This same explanation applies to smaller venues. *Id.* (citing Pathak Reply Decl. ¶ 24). With respect to sporting tickets, Plaintiffs explain that "Defendants' fees on concert tickets (*i.e.*, what Class members paid) are actually higher than on sporting tickets, underscoring Defendants' concert venue power." *Id.* at 17 (citing Pathak Decl. ¶¶ 187-94). The Court would agree with Plaintiffs and find that Defendants have not shown these purported false positives undermine Dr. Pathak's finding of classwide impact.

### v.   Alternative Approaches

Defendants lastly challenge Professor Pathak's alternative approaches to demonstrating common impact. *See* Opp. at 19-20. First, Defendants begin by denouncing Dr. Pathak's reliance on economic literature that is "decades old" or not "specific to Defendants or this case." *Id.* at 19. Plaintiffs argue that Defendants are wrong for various reasons: Plaintiffs claim that "[Dr. ]Pathak cites recent economic and competition authorities, as well as literature ***directly addressing exclusive dealing by Ticketmaster***." Reply at 17 (emphasis in original) (citing Pathak Decl. ¶¶ 145 n.237, 153 n.248, 157 n.257 and Pathak Reply Decl. ¶¶ 71-72). Plaintiffs point to the fact that "Defendants offer no competing literature review" and claim that Defendants' expert himself has suggested that using such materials is acceptable. *Id.* (citing Ex. 43, Docket No. 512-2, at 4). Plaintiffs claim that "[c]ourts regularly find predominance regarding impact where, as here, economic literature corroborates the expert's analyses." *Id.* (citing *Nat'l ATM Council v. Visa Inc.*, No. 1:11-cv-01803-RJL-(MAU), 2021 WL 4099451, at *6 (D.D.C. Aug. 4, 2021) and *In re Lidoderm Antitrust Litig.*, No. 3:14-md-02521-WHO, 2017 WL 679367, at *10 (N.D. Cal. Feb. 21, 2017)). The Court does not see any material issue with Dr. Pathak's survey of the relevant economic literature, which appears to reinforce his finding of classwide impact, that would defeat predominance.

Second, Defendants attack Dr. Pathak's regression analysis showing that sporting events have lower fees than concerts. *See* Opp. at 19. Defendants contend that his analysis is "completely undercut by his candid admission that it '*does not eliminate the possibility that venues are solving a different pricing problem for sports events*' which 'contributes to or leads to lower sports fees than concert fees.'" *Id.* (emphasis in original) (quoting Pathak Decl. ¶ 192) (citing Ex. 2, Docket No. 490-3, at 149:21-24). Plaintiffs argue in response that Defendants attack "overlooks that the

32

regression simply acts as a robustness check on [Dr. ]Pathak's cost-based methodology, which corroborates his other analyses." Reply at 18 (citing Ex. 45, Docket No. 511-3, at 148:11-150:10 and Pathak Reply Decl. ¶¶ 67-70). The Court agrees. Furthermore, while Dr. Pathak acknowledges the difference between sporting events and concerts, he explains the utility of his regression analysis based on the similar incentives held by both sports teams and artists. *See* Pathak Decl. ¶ 192. Dr Pathak observes that the results of this analysis are "consistent with the effect of Ticketmaster's exclusive contracts leading to elevated service fees for concerts." Ex. 45, Docket No. 511-3, at 150:7-10.

Third, Defendants take issue with Dr. Pathak's claim that the increase in Ticketmaster's net service fees and aggregate profit margins over time is "consistent with exclusive contracts and tying having anticompetitive effects." *See* Opp. at 20 (quoting Pathak Decl. ¶¶ 184-86). Defendants contend that Dr. Pathak's observation is "meaningless" without any analysis of why such fees and margins have increased. *See id.* Defendants further contend that Dr. Pathak's use of "aggregates and averages . . . obscure[s] the fact that whether Ticketmaster's fees and margins went up or down over time varies dramatically by venue and for different time periods." *Id.* Plaintiffs argue in response that Dr. Pathak's observation "reinforces his other analyses explaining that Defendants' ***conduct*** allowed them to increase fees and profits." *See* Reply at 18 (emphasis in original) (citing Pathak Decl. ¶¶ 142-70). Plaintiffs also point to Dr. Pathak's consideration and rejection of Defendants' criticisms of his analysis of net service fees and profits. *See id.* at 18-19 (citing Pathak Reply Decl. ¶¶ 59-66). Dr. Pathak indicates, for example, that the increase in fees and margins over time is consistent with the anticompetitive effects of exclusive dealing and tying that economic literature suggests will result in a market with the features of primary ticketing. *See* Pathak Reply Decl. ¶ 59. Plaintiffs further argue that Defendants' challenge here is to the persuasive value of Dr. Pathak's analysis and thus presents a classwide merits dispute. *See* Reply at 19 (citing *Olean*, 31 F.4th at 672 n.16 and *De Coster v. Amazon.com, Inc.*, No. 2:21-cv-00693-JHC, 2025 WL 2836824, at *16-17 (W.D. Wash. Aug. 6, 2025)).

Finally, Defendants accuse Dr. Pathak of "cherry-pick[ing]" and "badly misinterpret[ing] documents to show classwide impact. *See* Opp. at 20 (footnote omitted) (citing Pathak Decl. ¶¶ 56-78, 195-206). Plaintiffs not only dispute Defendants' accusation but also claim that "even if it were true, it provides no basis to deny certification." *See* Reply at 19 (citing *In re Capacitors Antitrust Litig.*, No. 3:17-md-02801-JD, 2020 WL 870927, at *2 (N.D. Cal. Feb. 21, 2020); *De*

33

*Coster*, 2025 WL 2836284, at *18; and *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143-RS, 2016 WL 467444, at *11 (N.D. Cal. Feb. 8, 2016)).  Defendants identify one example of Dr. Pathak's purported "misread[ing] of a text exchange," yet they do not sufficiently explain the misinterpretation.  *See id.* at 20 n. 9 (citing Ex. 9, Docket No. 502-7).  Even if they did, one example would not persuade this Court to find Dr. Pathak's entire model unreliable.  The same goes for Defendants' claim that Dr. Pathak "ignores contrary documents."  *See id.* at 20 (citing Johnson Report ¶¶ 108-13 and *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 173 (C.D. Cal. 2007)).  At best, Defendants presentation of "contrary evidence" raises yet another classwide merits dispute that the Court finds unnecessary to resolve at this stage.

Ultimately, Defendants' various criticisms do not persuade this Court that Dr. Pathak's model is unreliable or incapable of showing impact on a classwide basis.  The Court would find, therefore, that Plaintiffs' evidence supports their assertion that common legal and factual issues will predominate as to antitrust impact.

### c.  Damages

In addition to disputing whether Plaintiffs can show antitrust impact on a classwide basis, Defendants dispute whether Plaintiffs can show damages on a classwide basis.  "To show that common questions regarding damages predominate, Plaintiffs must demonstrate the calculations proposed to determine damages use common evidence."  *Packaged Seafood*, 332 F.R.D. at 328 (citing *Meijer, Inc. v. Abbot Labs.*, No. 4:07-cv-05985-CW, 2008 WL 4065839, at *7 (N.D. Cal. Aug. 27, 2008)).  The Ninth Circuit has "repeatedly confirmed" that "the need for individual damages calculations does not, alone, defeat class certification."  *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

"[A] plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation."  *Comcast*, 569 U.S. at 35.  Although, the "[c]alculations need not be exact."  *Id.*  "The Supreme Court has repeatedly explained that courts should afford plaintiffs relatively broad leeway in constructing a damages model – at least within the 'just and reasonable inference[s] from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business.'"  *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 479 (N.D. Cal. 2020) (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946)).  "The Supreme Court has more recently affirmed this understanding, explaining that '[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in

34

the absence of the defendant's antitrust violation.'" *Id.* (quoting *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981)).

Plaintiffs assert that Dr. Pathak's analysis offers "a reliable and common methodology to calculate both class-wide and individual damages attributable to Defendants' anticompetitive conduct." Motion at 17. Plaintiffs suggest that Dr. Pathak uses "[a] standard method for calculating damages in antitrust cases" – that is, the "before-and-after" method. *Id.* This method "compares prices during the period affected by anticompetitive conduct with those from a more competitive period to estimate overcharges." *Id.* Using the same benchmark for competitive pricing as described in Section III.B.1.b, *supra*, Dr. Pathak's "model estimates class-wide damages of ▮▮▮▮▮." *Id.* at 18. Plaintiffs indicate that Dr. Pathak's model can also be used to calculate individual Class members' damages. *See id.* (citing Pathak Decl. ¶¶ 216-22). Dr. Pathak provides the following formula to calculate damages for individual Class members: "Individual Damages = Actual Net Service Fee Paid Per Ticket × Number of Tickets Purchased × The Percentage Reduction for the Relevant Year." Pathak Decl. ¶ 217.

First, Defendants contend that this formula is inadequate because "the 'Percentage Reduction' is calculated using the same flawed, aggregate cost/price guesstimate as Plaintiffs' impact model." Opp. at 26-27 (citing Pathak Decl. ¶¶ 215-22). Specifically, Defendants claim that the Percentage Reduction improperly assumes the following: (1) Ticketmaster would charge only its costs and no more; (2) Ticketmaster's fixed costs would be pegged to the artificially low Eventim licensing fee; (3) Ticketmaster's variable costs would be held constant at ▮▮▮ for every venue; (4) every venue would pass on every cent of Ticketmaster's reduced but-for fee to fans for every show; and (5) Ticketmaster would still make the same ▮▮▮▮▮▮▮▮ upfront payments to venues despite receiving up to ▮▮ less in ticketing fees. *See id.* at 27. As such, Defendants claim that Dr. Pathak's model "piles speculation atop speculation." *Id.* (quoting *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1364 (D.C. Cir. 2012)).

Plaintiffs argue in response that this argument largely mirrors Defendants' impact arguments and does not defeat certification for the same reasons. *See* Reply at 24. The Court would agree. Furthermore, to the extent that Defendants contest certain inputs into Dr. Pathak's formula for calculating individual damages, the Court finds those issues to be more appropriate for a jury. "[T]hat the experts dispute what the appropriate inputs should be does not undermine the approach or the reliability of [Dr. Pathak's] model." *See Lidoderm*, 2017 WL 679367, at *12.

Plaintiffs also argue that the Court need not resolve these assumptions because "'we can't know exactly what could have happened in th[e] but-for world,' since Defendants' conduct prevented it from existing." *Id.* (quoting *Glumetza*, 336 F.R.D. at 479-80).

Second, Defendants contend that, even if the aforementioned assumptions were true, Dr. Pathak's formula for calculating individual damages is flawed because "it applies the same 'percentage reduction' to net service fees for every venue each year, 'regardless of venue, artist, or individual consumer characteristics.'" Opp. at 27 (quoting Pathak Decl. ¶ 222). Defendants claim that Dr. Pathak's model is not reliable because it results in but-for net service fees that are below Defendants' costs for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id.* at 27-31. The formula, therefore, improperly "assum[es] Ticketmaster would enter into ticketing deals year after year that lose money on ▮▮▮▮▮▮▮▮▮ of ticket sales." *Id.* at 31. In support of their claim, they present calculations comparing the aggregate net service fees in a given year for two venues against Ticketmaster's costs. *See id.* at 29-30.

Plaintiffs argue in response that "Defendants (like many companies) lose money on some sales, which is economically rational when the business is profitable overall; *e.g.*, **over the life of a venue contract**" and that such is "the case for Defendants' primary ticketing business." Reply at 25 (emphasis in original) (citing Pathak Reply Decl. ¶¶ 86-88, 93). Plaintiffs explain that "[b]ecause Defendants' conduct inflated service fees on **all** Class members' tickets in the actual world, this just means that fees on 'below cost' tickets would be even **lower** in the but-for world." *Id.* (emphasis in original) (citing same). Accordingly, "even 'below cost' purchasers were overcharged." *Id.* (citing same). Plaintiffs further argue that Defendants' ▮▮ figure is inflated because Defendants use Dr. Pathak's benchmark, which errs on the side of underestimating damages and thus overestimates costs. *See id.* (citing Pathak Reply Decl. ¶ 89). Plaintiffs also identify "two egregious errors" in Defendants' analysis: (1) by focusing on single years of multi-year contracts, Defendants ignore that Ticketmaster often loses money in the first year but makes it back in subsequent years; and (2) by examining only base service fees for concerts and ignoring Ticketmaster's collection of other fees, Defendants incorrectly interpret the profitability of certain contracts. *See id.* (citing Pathak Reply Decl. ¶¶ 90-91). Plaintiffs claim that "[f]ixing [these] errors shows Ticketmaster lost money on only ▮▮▮ of concert tickets in the actual world, which would increase just ▮▮▮ in the but-for world." *Id.* at 26 (citing Pathak Reply Decl. ¶ 92). As such, Plaintiffs argue that "any increase in below-cost-tickets in the but-for world is *de minimis*, not an

impediment to certification." *Id.* (citing Pathak Reply Decl. ¶¶ 92-93 and *Olean*, 31 F.4th at 669).

For the reasons Plaintiffs articulated, the Court is not persuaded by Defendants' attempt to challenge the reliability of Dr. Pathak's formula for calculating individual damages based on the fact that it results in service fees below Defendants' costs at certain venues during certain years. Dr. Pathak's formula is premised upon the notion that the market-wide effects of the alleged anticompetitive conduct inflated fees on all ticket purchases at major concert venues during the Class period. That some percentage of tickets sold were below costs does not render the entire formula unreliable. As Dr. Pathak states, "[c]ompanies often incur losses on certain products, particularly where, as here, they profit on others and maintain profitability in aggregate: this is rational portfolio pricing." Pathak Reply Decl. ¶ 87. To the extent there is an increase in below-cost tickets in Dr. Pathak's but-for world, the Court does not find that this would bar certification.[5]

Lastly, Defendants contend that the Supreme Court's decision in *Comcast* bars certification because Dr. Pathak's model "does not disaggregate the effects of Plaintiffs' three conduct theories." Opp. at 31. Therefore, if the Court were to reject any of Plaintiffs' conduct theories, then it cannot certify the class as to the remainder because Plaintiffs propose no viable method of ascribing damages to each theory. *Id.* at 32. In *Comcast*, the Supreme Court was confronted with a situation where the plaintiffs had proposed four theories of antitrust impact but the district court accepted only one of those theories and rejected the rest. 569 U.S. at 31. Nonetheless, the district court held that damages could be established using an expert's model that "did not isolate damages resulting from any one theory of antitrust impact" but instead "assumed the validity of all four theories of antitrust impact initially advanced" by the plaintiffs. *Id.* at 32, 36. The Supreme Court disagreed, finding that the expert's "model failed to measure damages resulting from the particular antitrust injury" on which liability was premised. *Id.* at 36.

Plaintiffs argue in response that *Comcast* does not apply here because they have only a single theory of impact. Specifically, Plaintiffs indicate that the exclusive dealing, tying, and coercion are not distinct theories that produce separate damages; "[r]ather, exclusive dealing is the 'anchor,' and tying and coercion reinforce the exclusive dealing." Reply at 26-27 (citing Ex. 45, Docket No. 511-3, at 34:3-35:11, 61:13-66:3). Plaintiffs explain that "while Defendants' tying

---

[5] Defendants also contend that Dr. Pathak's model does not control for "multiple, real-world, non-liability variables that affect Ticketmaster's fixed costs, variable costs, and fee shares" as well as "each venue's price-setting behavior." Opp. at 31. The Court has already effectively considered and declined to find Dr. Pathak's model unreliable on these grounds. *See* Section III.B.1.b, *supra*.

and coercion facilitate exclusive deals (by forcing some venues into the deals), the exclusive dealing is the end result and the basis for [Dr. ]Pathak's impact and damages opinions." *Id.* at 27 (citing Pathak Reply Decl. ¶ 8; *Moehrl v. Nat'l Ass'n of Realtors*, No. 1:19-cv-01610, 2023 WL 2683199, at *20 (N.D. Ill. Mar. 29, 2023) and *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 35-39, n.5 (E.D. Pa. 2019)). The Court agrees and, thus, does not find any *Comcast* problem.

The Court would find, therefore, that Plaintiffs' evidence supports their assertion that common legal and factual issues will predominate as to damages.

### d. Fraudulent Concealment and the Statute of Limitations

Finally, Defendants contend that individualized issues regarding the statute of limitations defeat predominance. *See* Opp. at 32. The four-year statute of limitations for Plaintiffs' claims runs from the date of the allegedly anticompetitive conduct. 15 U.S.C. § 15b; *see also Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 693-94 (9th Cir. 1982). Plaintiffs maintain that they "may recover damages since 2010 because Defendants fraudulently concealed their conspiracy" and "the statute of limitations is at most a merits issue that turns on common evidence and thus poses no impediment to certification." Motion at 18 n.4 (citations omitted). Defendants contend, however, that "this is not accurate where, as here, the question is not whether Defendants successfully concealed *one* anticompetitive act from all class members (*e.g.*, a price-fixing conspiracy, as in . . . *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010)), but rather whether and how Defendants concealed *numerous, distinct* alleged acts affecting each of their individual ticketing contracts." Opp. at 32 (emphasis in original) (citing *Lucas v. Breg*, 212 F. Supp. 3d 950, 971-72 (S.D. Cal. 2016)). Plaintiffs argue in response that Defendants' attempt to distinguish *TFT-LCD* "fails under its own logic" because "price-fixing, by its very nature (and just like here), involves fraudulent concealment of multiple acts over a period of time." Reply at 28. Plaintiffs further argue that *Lucas* is inapposite because it is not "an antitrust case alleging market-wide, common concealment of conduct with widespread anticompetitive effects." *Id.*

The Court fails to understand Defendants' distinction between price-fixing and monopolization for purposes of its statute-of-limitations argument and is otherwise unconvinced that any individual limitations issues Defendants believe will result would predominate over the various other common issues already observed. The Ninth Circuit has repeatedly held that "[t]he

38

existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones." *Williams v. Sinclair*, 529 F.2d 1383, 1388 (9th Cir. 1975); *see also Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976) ("We hold that the presence of individual issues of compliance with the statute of limitations here does not defeat the predominance of the common questions."). "This is particularly so when the issues surrounding the statute of limitations defense are susceptible to common proof." *Pace v. Quintanilla*, 308 F.R.D. 644, 648 (C.D. Cal. 2015) (citing *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) and *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 486 (C.D. Cal. 2012)).

In sum, "the adjudication of Defendants' alleged antitrust violation will turn on overwhelmingly common legal and factual issues." *See High-Tech.*, 985 F. Supp. 2d at 1180. The Court would find that an antitrust violation, antitrust impact, and damages – the critical elements of Plaintiffs' claims – are common questions capable of classwide proof. To the extent there are any remaining individual questions, this Court does not find them to be so significant or pervasive as to predominate over those common questions. As such, the Court would find that Plaintiffs have sufficiently shown predominance.

2. <u>Superiority</u>

Rule 23(b)(3) also tests whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Under Rule 23(b)(3), the Court must consider four non-exclusive factors in evaluating whether a class action is a superior method of adjudicating plaintiffs' claims: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *See id.*; *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190-92 (9th Cir. 2001). This analysis must "focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser*, 253 F.3d at 1190 (quoting 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1780 at 562 (2d ed. 1986)).

Plaintiffs assert that all four factors weigh in favor of certification of the proposed class. *See* Motion at 19. First, Plaintiffs claim that "the damages of individual direct purchasers are likely

to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress." *Id.* (quoting *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 375 (C.D. Cal. 2011)).  Second, Plaintiffs claim that the Public Enforcer Action, including the *parens patriae* damages claims for residents of certain states, "should have no material bearing on whether this case should proceed as a class action or instead as millions of individual suits." *Id.* at 20.  Third, Plaintiffs claim that concentrating the litigation of the claims before this Court – which has presided over this case for years – "is the fairest, most efficient, and superior method for these proceedings" because Defendants maintain their principal place of business in this District, Defendants' TOU contains a forum selection clause that requires any lawsuit against Defendants by their customers be brought in this District, and much of the relevant evidence is in this District.  *Id.*  Lastly, Plaintiffs claim that "there are no unique difficulties" and that "requiring each Class member to proceed individually would compound manageability difficulties for the parties and the Court by creating millions of duplicative lawsuits."  *Id.* Defendants do not challenge Plaintiffs' assertion that the superiority requirement is satisfied.

The Court agrees with Plaintiffs that the interests of the proposed class weigh in favor of resolving the claims presented in this case through a class action.  "The nature of Defendants' alleged overarching conspiracy and the desirability of concentrating the litigation in one proceeding weigh heavily in favor of finding that class treatment is superior to other methods of adjudication." *High-Tech*, 985 F. Supp. 2d at 1228-29.  The Court would find, therefore, that the superiority requirement of Fed. R. Civ. P. 23(b)(3) is satisfied.

Having found the requirements of predominance and superiority satisfied, the Court would find that Plaintiffs have met their burden to preliminarily certify the proposed class under Rule 23(b)(3).

## IV.     <u>Conclusion</u>

Having considered the foregoing, because all requirements of Rule 23(a) and Rule 23(b)(3) are generally satisfied (but see footnote 2 and accompanying text), the Court would tentatively conclude that preliminary certification of the proposed class (at least in part) is appropriate here. Accordingly, the Court would **PRELIMINARILY CERTIFY** the proposed class, **APPOINT** Luis Ponce, Jeanene Popp, and Jacob Roberts as Class Representatives, and **APPOINT** Quinn Emanuel Urquhart & Sullivan, LLP and Keller Postman LLC as Co-Lead Class Counsel.